# EXHIBIT 1

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Monday, September 14, 2009 23:28 Central |
| Client Identifier: | BARNETT |
| Database: | FSFIND |
| Citation Text: | 566 F.Supp.2d 63 |
| Lines: | 496 |
| Documents: | 1 |
| Images: | 0 |

 The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.


566 F.Supp.2d 63, 2008 DNH 129
**(Cite as: 566 F.Supp.2d 63)**

United States District Court,
D. New Hampshire.
Fred HOLLANDER
v.
Senator John McCAIN and the Republican National
Committee.
**Civil No. 08-cv-99-JL.**

July 24, 2008.

**Background:** Voter brought action against the Republican National Committee (RNC) and its presumed presidential nominee, alleging that candidate was not eligible for the presidency due to fact that he was born in the Panama Canal Zone. The RNC moved to dismiss.

**Holding:** The District Court, Joseph N. Laplante, J., held that voter did not have standing to bring suit.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A 1829**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1827 Determination
               170Ak1829 k. Construction of Pleadings. Most Cited Cases

**Federal Civil Procedure 170A 1835**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
             170Ak1827 Determination
               170Ak1835 k. Matters Deemed Admitted; Acceptance as True of Allegations in Complaint. Most Cited Cases

A court faced with a challenge to standing at the pleading stage must accept as true all material allegations of the complaint, and construe the complaint in favor of the complaining party.

**[2] Federal Civil Procedure 170A 657.5(1)**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
            170Ak657.5 Pro Se or Lay Pleadings
               170Ak657.5(1) k. In General. Most Cited Cases

A pro se complaint must be construed liberally, held to less stringent standards than formal pleadings drafted by lawyers.

**[3] Federal Civil Procedure 170A 103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

**Federal Civil Procedure 170A 103.3**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.3 k. Causation; Redressability. Most Cited Cases

Article III standing has three requirements: (1) the plaintiff has suffered an injury in fact; (2) that injury bears a causal connection to the defendant's challenged conduct; and (3) a favorable judicial decision will likely provide the plaintiff with redress from that injury. U.S.C.A. Const. Art. 3, § 1 et seq.

**[4] United States 393 26**

393 United States

566 F.Supp.2d 63, 2008 DNH 129
**(Cite as: 566 F.Supp.2d 63)**

393I Government in General
    393k26 k. President. Most Cited Cases
New Hampshire voter did not have standing to challenge Republican party's presumed presidential nominee, based on allegation that by virtue of candidate's birth in the Panama Canal Zone, he was not a "natural born citizen" eligible to hold office of President under the Constitution; voter did not suffer a cognizable injury, as inclusion of an alleged constitutionally ineligible candidate on the ballot did not prevent voter from voting for someone else. U.S.C.A. Const. Art. 2, § 1, cl. 1 et seq.; U.S.C.A. Const. Art. 3, § 1 et seq.

**[5] Elections 144 ☞273**

144 Elections
    144X Contests
        144k273 k. Persons Entitled to Bring Proceedings. Most Cited Cases
Voters have no standing to complain about the participation of an ineligible candidate in an election, even if it results in the siphoning of votes away from an eligible candidate they prefer.
**\*64** Fred Hollander, Nashua, NH, pro se.

Amir C. Tayrani, Matthew D. McGill, Gibson Dunn & Crutcher LLP, Washington, DC, Charles G. Douglas, III, Douglas Leonard & Garvey, Concord, NH, for Defendants.

### ORDER

JOSEPH N. LAPLANTE, District Judge.

Fred Hollander, proceeding pro se, brings this action challenging Senator John McCain's eligibility to serve as President of the United States. Hollander claims that McCain, by virtue of his birth in the Panama Canal Zone-albeit to American parents-is not a "natural born Citizen" eligible to hold the office of President under Article II, § 1 of the Constitution.

Though McCain and his co-defendant, the Republican National Committee ("RNC"), vigorously dispute this claim, they argue that this court cannot decide it in any event due to a number of jurisdictional defects: lack of standing and ripeness, mootness, and nonjusticiability. The defendants also argue that Hollander has failed to state a claim for relief because (1) they are not state actors, so Hollander cannot maintain any constitu-

tional claim against them and (2) in any event, any remedy for it would necessarily violate their own First Amendment rights.

**\*65** This court held a hearing on the defendants' motion to dismiss this action on those grounds on July 24, 2008. Based on the arguments presented there, as well as in the parties' briefing, the court rules that Hollander lacks standing to bring this action. The court does not reach the rest of the parties' arguments, including, most notably, the question of McCain's constitutional eligibility to be President.

### I. *Applicable Legal Standard*

[1][2] A court faced with a challenge to standing at the pleading stage, as here, must "accept as true all material allegations of the complaint, and ... construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Hollander's pro se complaint, furthermore, must be construed liberally, "held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (internal quotation marks omitted). Yet even these standards do not require the court to credit "[e]mpirically unverifiable conclusions, not logically compelled, or at least supported, by the stated facts" in the complaint. *Sea Shore Corp. v. Sullivan,* 158 F.3d 51, 54 (1st Cir.1998) (internal quotation marks omitted); *Ahmed v. Rosenblatt,* 118 F.3d 886, 890 (1st Cir.1997).

### II. *Background*

McCain was born, in 1936, at the Coco Solo Naval Air Station, a United States military installation in the Panama Canal Zone.[FN1] At the time, McCain's father-who, like McCain's mother, was an American citizen-was stationed there on active duty with the United States Navy. McCain, by virtue of his American parentage, is unquestionably an American citizen. *See* Act of May 24, 1934, Pub.L. No. 73-250, § 1, 48 Stat. 797 (amended 1952) ("Any child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States, is declared to be a citizen of the United States")[FN2]; *see also* Act of Aug. 4, 1937, Pub.L. No. 75-243, 50 Stat. 558 (codified as amended at 8 U.S.C. § 1403(b))

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

566 F.Supp.2d 63, 2008 DNH 129
**(Cite as: 566 F.Supp.2d 63)**

(conferring citizenship on children born in the Canal Zone to one American parent on or after February 26, 1904, and born to one American parent anywhere in Panama after that date so long as the parent was employed there by the United States at the child's birth).

FN1. Though Hollander makes this allegation in his complaint, in his objection he states, "[s]ince the hospital at the Coco Solo Naval Air Station did not even exist until 1941 ..., it is reasonable to assume that [McCain] was born in the city of Colón in the Republic of Panama." Hollander has also provided a copy of McCain's birth certificate, which lists his place of birth as Colón. The defendants dispute this theory, but it is irrelevant to the present motion in any event.

FN2. The law is the same today. *See* 8 U.S.C. § 1401(c) (2005).

Yet the Constitution provides that "No person except a *natural born* Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President." U.S. Const., art. II, § 1, cl. 4 (emphasis added). The phrase "natural born Citizen" is not defined in the Constitution, *see* Minor v. Happersett, 88 U.S. 162, 167, 21 Wall. 162, 22 L.Ed. 627 (1875), nor does it appear anywhere else in the document, *see* Charles Gordon, *Who Can Be President of the United States: An Unresolved Enigma,* 28 Md. L. Rev. 1, 5 (1968). The phrase has thus spawned a largely academic controversy over whether it excludes those citizens who acquired that **66 status via birth to American parents abroad. *Compare, e.g.,* Jill A. Pryor, The Natural-Born Citizen Clause and Presidential Eligibility: An Approach for Resolving Two Hundred Years of Uncertainty, 97 Yale L.J. 881, 899 (1988) (concluding that those citizens are eligible) *with, e.g.,* Gabriel J. Chin, *Why Senator John McCain Cannot Be President* 17-18 (July 2008) (unpublished manuscript), *available at* http:// www. law. arizona. edu/ Faculty Pubs/ Documents/ Chin/ ALS 08- 14. pdf (concluding they are not).[FN3]

FN3. Though the weight of the commentary falls heavily on the side of eligibility, *see, e.g.,* Sarah Helene Duggin & Mary Beth Collins, "Natural Born" in the USA: The Striking Unfairness and Dangerous Ambi-

guity of the Constitution's Presidential Qualifications Clause and Why We Need to Fix It, 85 B.U. L. Rev. 53, 82-83 (2005) (surveying authority), many of these commentators acknowledge that the question is not completely free from doubt, *see, e.g.,* Lawrence Friedman, *An* Idea Whose Time Has Come-The Curious History, Uncertain Effect, and Need for Amendment of the "Natural Born Citizen" Requirement for the Presidency, 52 St. Louis U. L.J. 137, 143 (2007).

The question has taken on a real-world dimension, however, during the occasional presidential candidacies of politicians born abroad: Franklin D. Roosevelt, Jr., who was born to American parents in Canada, *see* Warren Freedman, *Presidential Timber: Foreign Born Children of American Parents,* 35 Cornell L.Q. 357 n. 2 (1950); George Romney (father to McCain's one-time opponent in the recent Republican presidential primary, Mitt Romney), who was born to American parents in Mexico, *see* Gordon, *supra,* at 1; and, now, McCain, *see, e.g.,* Chin, *supra,* at 3-4. In McCain's case, the question also takes on an additional layer of complication due to his birth in the Panama Canal Zone.

Those born "in the United States, and subject to the jurisdiction thereof," U.S. Const., amend. XIV, have been considered American citizens under American law in effect since the time of the founding, United States v. Wong Kim Ark, 169 U.S. 649, 674-75, 18 S.Ct. 456, 42 L.Ed. 890 (1898), and thus eligible for the presidency, *see, e.g.,* Schneider v. Rusk, 377 U.S. 163, 165, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964) (dicta). So the defendants say that, apart from McCain's citizenship by parentage, he can be President because "he was born within the sovereign territory of the United States," namely, the Canal Zone, over which they argue the United States was exercising the powers of a sovereign at the time of McCain's birth, under the Hay-Bunau-Varilla Convention. *See* Convention between the United States and the Republic of Panama for the Construction of a Ship Canal to Connect the Waters of the Atlantic and Pacific Oceans, U.S.-Pan., art. III, Nov. 18, 1903, 33 Stat. 2234, 2235. The Supreme Court, however, has made contradictory comments in dicta on the status of the Canal Zone. *Compare* O'Connor v. United States, 479 U.S. 27, 28, 107 S.Ct. 347, 93 L.Ed.2d 206 (1986) (observing that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the United States exercised sovereignty over the Canal Zone under the Convention) *with Vermilya-Brown Co. v. Connell, 335 U.S. 377, 381, 69 S.Ct. 140, 93 L.Ed. 76 (1948)* (observing that the United States has no sovereignty there).

Hollander claims, due to what he calls McCain's "unequivocal ineligibil [ity]" for the Presidency, that the RNC "should not be permitted to nominate him.... This would lead to the disenfranchisement of [Hollander] and 100 million additional voters" in the general presidential election. Hollander, in fact, claims that he has already suffered disenfranchisement in the 2008 New Hampshire Republican primary, because it resulted in the allocation of delegates to the Republican National Convention**67** on McCain's behalf, despite his alleged ineligibility.[FN4]

> **FN4.** McCain received about 37 percent of the vote in the primary, resulting in the allocation of seven delegates to him and five to other candidates.

As a result, Hollander says, his vote in the New Hampshire primary, and those of others participating in primary elections in which McCain appeared on the ballot, "will count less than [the votes of] those who voted in other parties' primary elections," which led to the allocation of votes to a constitutionally eligible Presidential candidate. Hollander adds that the defendants are responsible for this disenfranchisement because McCain ran in the New Hampshire primary "under false pretenses" to his eligibility for the Presidency, while the RNC "authorized" him to do so. To remedy his claimed disenfranchisement in the New Hampshire Republican primary, and to prevent his further claimed disenfranchisement in the general election, Hollander requests: (1) a declaratory judgment that McCain is ineligible for the Presidency, (2) an injunction requiring McCain to withdraw his candidacy, and (3) an injunction requiring the RNC to reallocate the delegates awarded to McCain as the result of the New Hampshire primary and others, and to nominate another candidate.

### III. *Analysis*

[3] As previously mentioned, the defendants argue that Hollander lacks standing to maintain this lawsuit. "Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies'.... As an incident to the elaboration of this bedrock requirement, [the Supreme] Court has always required that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).* So-called "Article III standing" has three requirements: (1) the plaintiff has suffered "an injury in fact," (2) that injury bears a causal connection to the defendant's challenged conduct, and (3) a favorable judicial decision will likely provide the plaintiff with redress from that injury. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).* The party bringing the claim-Hollander here-bears the burden to show his or her standing to bring it. *Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004).*

Based on these principles, the Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large-does not state an Article III case or controversy." *Lujan, 504 U.S. at 573-74, 112 S.Ct. 2130.* These holdings include *Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974),* where the Court ruled that a group of citizens lacked standing to litigate the eligibility, under the Incompatibility Clause,[FN5] of members of Congress to serve simultaneously in the military reserves.

> **FN5.** Together with the Ineligibility Clause, this provision states, "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." *U.S. Const., art. I, § 6, cl. 2.*

**68** Alleging injury "because Members of Congress

holding a Reserve position in the Executive Branch were said to be subject to the possibility of undue influence by the Executive Branch, in violation of the concept of the independence of Congress" embodied in the Clause, the plaintiffs sought an injunction against the service of congressmen in the reserves as well as "a declaration that membership in the Reserves is an office under the United States prohibited to Members of Congress by Art. I, § 6, cl. 2." *Schlesinger,* 418 U.S. at 211-12, 94 S.Ct. 2925 (footnote omitted). But the Court called it

> nothing more than a matter of speculation whether the claimed nonobservance of that Clause deprives citizens of the faithful discharge of the legislative duties of reservist members of Congress. And that claimed nonobservance, standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury.

*Id.* at 217, 94 S.Ct. 2925 (footnote omitted). The Court went on to hold "that standing to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share." *Id.* at 229, 94 S.Ct. 2925.

*Schlesinger* makes clear, then, that Hollander does not have standing from the harm he would suffer should McCain be elected President despite his alleged lack of eligibility under Art. II, § 1, cl. 4. That harm, "standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance." 418 U.S. at 217, 94 S.Ct. 2925; *see also Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937) (ruling that citizen lacked standing to challenge appointment of Hugo Black to the Court under the Ineligibility Clause based on his membership in Congress when it enacted a new judicial pension plan).

[4] Hollander, however, argues that the harm to him from McCain's candidacy transcends simply the right to be governed by a constitutionally qualified President; Hollander claims it also impacts his right to vote, both in the New Hampshire Republican Primary and the general election. This is a difficult theory to understand, but it appears to rest on the premise that McCain's mere status as a presidential candidate or

party nominee somehow interferes with the electoral franchise of voters like Hollander who consider McCain ineligible for the office. Presumably, those voters are empowered to address that concern on their own by voting for a different presidential candidate, whose eligibility is unimpeachable. The presence of some allegedly ineligible candidate on the ballot would not seem to impair that right in the least, no matter how that candidate performs in the election.

To be sure, courts have held that a candidate or his political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election. *See, e.g., Tex. Dem. Party v. Benkiser,* 459 F.3d 582, 586-87 & n. 4 (5th Cir.2006); *Schulz v. Williams,* 44 F.3d 48, 53 (2d Cir.1994); *Fulani v. Hogsett,* 917 F.2d 1028, 1030 (7th Cir.1990). But that notion of "competitive standing" has never been extended to *voters* challenging the eligibility of a particular candidate. *See Gottlieb v. Fed. Elec. Comm'n,* 143 F.3d 618, 622 (D.C.Cir.1998).

[5] In *Gottlieb,* the court drew a distinction between voters' claims over the allegedly illegal *exclusion* of their preferred candidate and the allegedly illegal *inclusion* of a rival candidate. *Id.* While **\*69** the exclusion "directly imping[es] on the voters' ability to support" their chosen candidate-after all, they cannot vote for somebody who is not on the ballot-the mere inclusion of a rival does "not impede the voters from supporting the candidate of their choice" and thus does not cause the legally cognizable harm necessary for standing. *Id.* (citing *Buckley v. Valeo,* 424 U.S. 1, 94, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). So voters have no standing to complain about the participation of an ineligible candidate in an election, even if it results in the siphoning of votes away from an eligible candidate they prefer. *See id.* As *Gottlieb* reasons, only the eligible candidate, or his or her political party, can claim standing based on that injury.

In addition to *Gottlieb,* "[s]everal other Circuit Courts have also concluded that a voter fails to present an injury-in-fact when the alleged harm ... is only derivative of a harm experienced by a candidate." *Crist v. Comm'n on Pres. Debates,* 262 F.3d 193, 195 (2d Cir.2001) (per curiam). One of those courts was the First Circuit in *Becker v. Federal Election Commis-*

566 F.Supp.2d 63, 2008 DNH 129
 **(Cite as: 566 F.Supp.2d 63)**

sion, 230 F.3d 381 (1st Cir.2000). There, both presi-
dential candidate Ralph Nader and a group of voters
challenged the corporate sponsorship of presidential
debates. Id. at 383-84. Nader alleged that, in light of
"his principled stand against accepting corporate
contributions," he could not participate in these de-
bates, placing him at a competitive disadvantage to his
campaign rivals, who harbored no such qualms. Id. at
386. The court of appeals ruled that this conferred
standing on Nader, but not on the voters. Id. at 389-90.

In rejecting the voters' standing, the court reasoned:

Regardless of Nader's injury, his supporters remain
 fully able to advocate for his candidacy and to cast
 their votes in his favor. The only derivative harm
 Nader's supporters can possibly assert is that their
 preferred candidate now has less chance of being
 elected. Such 'harm,' however, is hardly a restric-
 tion on voters' rights and by itself is not a legally
 cognizable injury sufficient for standing.

Id. at 390 (citations omitted). That reasoning applies
with equal force here. McCain's candidacy for the
presidency, whatever his eligibility, is "hardly a re-
striction on voters' rights" because it in no way pre-
vents them from voting for somebody else. In fact,
Hollander alleges that he did just that in the New
Hampshire Republican primary.

That Hollander's chosen candidate lost despite
McCain's alleged ineligibility does not, as Hollander
asserts, mean that his vote "count[ed] less" than, say,
those cast in the New Hampshire Democratic primary,
which presumably gave voters a choice among con-
stitutionally qualified candidates only.[FN6] So far as the
complaint discloses, the New Hampshire Secretary of
State duly counted the votes in each party's primary
and apportioned the delegates to the candidates ac-
cordingly under New Hampshire law. See
N.H.Rev.Stat. Ann. § 659:94. The apportionment of a
majority**70 of the Republican delegates to McCain,
who won his party's primary here, did not injure Hol-
lander any more than the constructive exclusion of
Nader from the presidential debates injured his sup-
porters; in each case, the practice simply made it less
likely that the plaintiff's preferred candidate would
ultimately be elected, which, as the First Circuit held
in Becker, does not amount to a judicially cognizable
injury.

[FN6.] It is hard to say for sure, since there
were some twenty-one presidential candi-
dates in the New Hampshire Democratic
primary, many of whom are hardly house-
hold names. N.H. Sec'y of State, *Candidates
for Upcoming Presidential Primary Election,*
http:// www. sos. nh. gov/ presprim 2008/
candidates filed. htm (last visited July 24,
2008). There were the same number of
presidential candidates on the Republican
side. *Id.* This underscores the difficulty with
Hollander's theory that the simple presence
of an ineligible candidate on a ballot neces-
sarily disenfranchises all voters who support
eligible candidates in that election.

Hollander also argues that he "would again be disen-
franchised should he vote for McCain in the general
election and then McCain should be subsequently
removed due to his lack of eligibility." Unlike Hol-
lander's other "disenfranchisement" theory, this one
does not depend on the failure of his chosen candidate
*because of* McCain's alleged ineligibility, but on the
success of Hollander's chosen candidate-who is
McCain in this scenario-*despite* his alleged ineligibil-
ity. On this theory, however, Hollander's alleged
"disenfranchisement" flows not from the actions he
has challenged here, *i.e.,* McCain's presidential cam-
paign or the RNC's likely selection of him as its no-
minee, but from his subsequent removal from office at
the hands of someone else (presumably one of the
co-equal branches of government), resulting (pre-
sumably, yet again) in a President different from the
one Hollander helped to elect.

This theory presents a number of serious problems,
not the least of which are whether the removal of an
elected official by non-electoral means amounts to
"disenfranchisement" of the voters who put him there,
*cf. Powell v. McCormack,* 395 U.S. 486, 547, 89 S.Ct.
1944, 23 L.Ed.2d 491 (1969), and whether the claim is
"contingent on events that may not occur as antic-
ipated or may not occur at all," *Lincoln House, Inc. v.
Dupre,* 903 F.2d 845, 847 (1st Cir.1990), namely,
McCain's election to, then removal from, the office of
President.[FN7] Putting those considerations aside,
however, the theory does not establish Hollander's
standing because it does not "allege personal injury
fairly traceable to the defendant's allegedly unlawful

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

566 F.Supp.2d 63, 2008 DNH 129
 (Cite as: 566 F.Supp.2d 63)

conduct," *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), but to the conduct of those-whoever they might turn out to be-responsible for ultimately ousting McCain from office. Indeed, McCain and the RNC are trying to achieve the opposite.

> FN7. There is also the question of whether "disenfranchisement" resulting from a vote for an ineligible candidate is the sort of "self-inflicted" harm caused by the voter, rather than any state actor, which therefore does not amount to an infringement of the franchise right. *See* 1 Lawrence H. Tribe, *American Constitutional Law* § 13-24, at 1122-23 (2d ed. 1988) (reasoning that, where voters disqualify themselves from voting in one party's primary under state law by voting in another's, it is the voters' own behavior, "rather than the operation of state law, that should be blamed for their inability to cast a ballot," discussing *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973)).

Hollander's real complaint seems to be that, in the general election, he will face the Hobson's choice of having to vote for his party's nominee, who is allegedly ineligible, or against his party's nominee, though he is a registered Republican. But a political party retains considerable, if not unlimited, discretion over the selection of its nominees, *see* 1 Tribe, *supra,* §§ 13-23-13-25, at 1118-1129, and these limitations have never been understood to incorporate the "right" of registered party members to a constitutionally eligible nominee.[FN8] Moreover, Hollander remains free **71 to cast his vote for any candidate he considers eligible, including by writing in whichever Republican candidate he believes should be nominated instead of McCain, and to have that vote counted just as much as those cast for the party's official nominee, so his right to the franchise remains intact. *See Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (defining right as "to vote freely for the candidate of one's choice" without "debasement or dilution of the weight of a citizen's vote"). Difficult choices on Election Day do not translate into judicially cognizable injuries.

> FN8. The Supreme Court has upheld state

laws prohibiting certain candidates from appearing on the ballot-including those "ineligible for office, unwilling to serve, or [running as] another party's candidate"-against challenges founded on the associational rights of the party who wishes to nominate such a candidate. *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 359, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (footnote omitted); *see also Socialist Workers Party of Ill. v. Ogilvie,* 357 F.Supp. 109, 113 (N.D.Ill.1972) (rejecting party's First Amendment challenge to exclusion from ballot of presidential candidate who did not meet constitutional age requirement). But again, Hollander's claim is not a political party's challenge to the exclusion of its candidate from, or the inclusion of a rival candidate on, the ballot; it is a voter's challenge to the inclusion of an allegedly ineligible candidate on the ballot. So this case raises no question as to the constitutionality of a state-law prohibition on ineligible candidates; Hollander's claim is not that McCain was or will be kept from the ballot, but that he should have been or should be.

This is not to demean the sincerity of Hollander's challenge to McCain's eligibility for the presidency; as discussed *supra* Part II, that challenge has yet to be definitively settled, and, as a number of commentators have concluded, arguably cannot be without a constitutional amendment. What is settled, however, is that an individual voter like Hollander lacks standing to raise that challenge in the federal courts. *See* Dugan & Collins, *supra,* at 115 (recognizing debates over meaning of Art. II, § 1, cl. 4, but concluding that voters lack standing to raise that issue judicially). Indeed, "[t]he purest reason to deny standing is that the plaintiff is not able to show an injury to the voter interest, however much the plaintiff may feel offended by the challenged practice." 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3531.4 (2d ed. 1984 & 2007 supp.) (footnote omitted). Because Hollander can show no such injury, this court lacks jurisdiction over his attempt to resolve the question of McCain's eligibility under Art. II, § 1, cl. 4. Whatever the contours of that constitutional provision, Article III has been definitively read by the courts to confer no jurisdiction over this kind of action.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

566 F.Supp.2d 63, 2008 DNH 129
 **(Cite as: 566 F.Supp.2d 63)**

**IV.** *Conclusion*

For the foregoing reasons, the defendants' motion to dismiss is granted on the ground that Hollander lacks standing. All other pending motions are denied as moot. The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

D.N.H.,2008.
Hollander v. McCain
566 F.Supp.2d 63, 2008 DNH 129

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 2

**Westlaw Delivery Summary Report for KREEP,GARY G**

Date/Time of Request:           Monday, September 14, 2009 23:28 Central
Client Identifier:              BARNETT
Database:                       DCT
Citation Text:                  Not Reported in F.Supp.2d
Lines:                          162
Documents:                      1
Images:                         0

 The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West
and their affiliates.

Not Reported in F.Supp.2d, 2003 WL 22462393 (C.D.Cal.), Fed. Sec. L. Rep. P 92,519
**(Cite as: 2003 WL 22462393 (C.D.Cal.))**



United States District Court,
C.D. California.
In re LANTRONIX, INC. SECURITIES LITIGATION
**No. CV 02-03899 PA.**

Filed May 15, 2002.
Sept. 26, 2003.

Shareholders brought action against corporation and its officers alleging fraud under federal securities laws. On shareholder's motion to lift automatic stay on discovery, the District Court, Anderson, J., held that: (1) lifting of discovery stay under Private Securities Litigation Reform Act (PSLRA) was not justified, and (2) shareholder failed to establish need to preserve evidence or undue prejudice required to justify lifting of discovery stay.

Motion denied.

West Headnotes

**[1] Federal Civil Procedure 170A ⚖1264**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1264 k. Actions in Which Remedy Is Available. Most Cited Cases
Lifting of discovery stay under Private Securities Litigation Reform Act (PSLRA) was not justified, for documents corporation made available to governmental entities and other parties in state court actions related to alleged accounting and securities law irregularities, although corporation conceded that portion of shareholder's fraud claim was viable; pendency of motions to dismiss filed by remaining defendants and corporation's motion to dismiss plaintiff's other claims still triggered PSLRA's discovery stay provisions. Securities Act of 1933, § 27(b)(1), as amended, 15 U.S.C.A. § 77z-1(b)(1); Securities Exchange Act of 1934, § 21D(b)(3)(B), as amended, 15 U.S.C.A. § 78u-4(b)(3)(B).

**[2] Federal Civil Procedure 170A ⚖1264**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1264 k. Actions in Which Remedy Is Available. Most Cited Cases
Shareholder failed to establish need to preserve evidence or undue prejudice required to justify lifting of discovery stay under Private Securities Litigation Reform Act (PSLRA) on allegations that further delay in discovery would have caused undue prejudice to its settlement prospects; although corporation settled with plaintiffs in another action, delay was routine under PSLRA, and risk that evidence would be lost was negligible because shareholder sought documents which had been produced and were in custody of third parties. Securities Act of 1933, § 27(b)(1), as amended, 15 U.S.C.A. § 77z-1(b)(1); Securities Exchange Act of 1934, § 21D(b)(3)(B), as amended, 15 U.S.C.A. § 78u-4(b)(3)(B).

Michael D Braun, Stull Stull & Brody, Los Angeles, CA, Kevin J Yourman, Elizabeth P Lin, Weiss & Yourman, Los Angeles, CA, for Stephen Bachman, on behalf of himself and all others similarly situated, plaintiff.

Keith E Eggleton, Daniel W Turbow, Boris Feldman, Cheryl Weisbard Foung, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Lantronix Inc, defendant.

Peter M Stone, Jay C Gandhi, Michael J Rozak, Paul Hastings Janofsky & Walker, Costa Mesa, CA, for Frederick G Thiel, defendant.

Michael D Dempsey, Robert D Donaldson, Dempsey & Johnson, Los Angeles, CA, for Steven V Cotton, defendant.

Kevin W Kirsch, Stradling Yocca Carlson & Rauth, Newport Beach, CA, Koji F Fukumura, Cooley Godward, San Diego, CA, Michael J Bleck, Oppenheimer Wolff & Donnelly, Minneapolis, MN, Paul C Nyquist, Voss Cook & Thel, Newport Beach, CA, for Bernhard Bruscha, defendant.

Miles N Ruthberg, Robert W Perrin, Lisa Sheaufeng Tsai, Latham & Watkins, Los Angeles, CA, for Ernst & Young LLP, defendant.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22462393 (C.D.Cal.), Fed. Sec. L. Rep. P 92,519
 **(Cite as: 2003 WL 22462393 (C.D.Cal.))**

Kevin J Yourman, Elizabeth P Lin, Weiss & Yourman, Los Angeles, CA, for John B Lindsay, plaintiff.

Kevin J Yourman, Elizabeth P Lin, (See above), for Linda-Pauwels, plaintiff.

Keith E Eggleton, Daniel W Turbow, Boris Feldman, Cheryl Weisbard Foung, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Thomas W Burton, defendant.

Keith E Eggleton, Daniel W Turbow, Boris Feldman, Cheryl Weisbard Foung, (See above), for W Brad Freeburg, defendant.

Jerry L Marks, Deborah Rosenthal, Kathleen Balderrama, Heller Ehrman White & McAuliffe, Los Angeles, CA, for Credit Suisse First Boston Corporation, defendant.

ANDERSON, J.

PROCEEDINGS:

IN CHAMBERS-COURT ORDER

*1 Plaintiff's Motion for Order Partially Lifting Discovery Stay (Docket No. 94) is currently on calendar for September 29, 2003 at 1:30 p.m. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for September 29, 2003 is vacated, and the matter taken off calendar.

Plaintiff's Motion seeks to lift the automatic stay on discovery imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B) for all documents Lantronix produced to governmental entities, including transcripts of witness interviews and depositions, and all documents produced by Lantronix in connection with lawsuits filed against it in state court actions involving allegations of accounting and securities law irregularities. Under the PSLRA, an automatic stay of discovery is in effect during the pendency of any motion to dismiss, "unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. §§ 77z1(b)(1) & 78u-4(b)(3)(B). Recognizing that the "cost of discovery often forces innocent parties to settle frivolous securities class actions," H.R. Conf. Rep. No. 104-369, at 37 (1995), Congress enacted the mandatory stay of discovery, in part, to prevent plaintiffs from filing frivolous lawsuits and using it as a vehicle "in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint." S.Rep. No. 104-98, at 14 (1998). As the Ninth Circuit has explained:

"The purpose of the [PSLRA] was to restrict abuses in securities class-action litigation, including: (1) the practice

of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys."

 *SG Cowen Securities Corp. v. U.S. Dist. Court,* 189 F.3d 909, 911 (9th Cir.1999) (quoting *In re Advanta Corp. Secs. Litig.,* 180 F.3d 525, 530-31 (3d Cir.1999)).

[1] Defendants' Motions to Dismiss the First Consolidated Complaint are currently under submission. As a result, absent a need to preserve evidence or to prevent "undue prejudice," the PSLRA's discovery stay prevents Plaintiff from engaging in any discovery. *SG Cowen Securities Corp.,* 189 F.3d at 912-13 (9th Cir.1999) (The "Stay of Discovery" provision of the Act clearly contemplates that "discovery should be permitted in securities class actions *only after the court has sustained the legal sufficiency of the complaint."* ) (quoting S.Rep. No. 104-98, at 14 (1995) reprinted in U.S.C.C.A.N. 693)). Plaintiff argues that the discovery stay should be lifted because Lantronix's concession that the First Consolidated Complaint states a viable claim under section 10(b) of the Securities Exchange Act of 1934 means that at least a portion of the First Consolidated Complaint will survive the motion to dismiss stage. Plaintiff also contends that any further delay in discovery will cause undue prejudice to Plaintiff's settlement prospects.

*2 Although Lantronix does not challenge the sufficiency of a portion of the section 10(b) claim, that fact alone does not justify lifting the discovery stay for documents Lantronix has made available to governmental entities and other parties in state court actions related to the alleged

Not Reported in F.Supp.2d, 2003 WL 22462393 (C.D.Cal.), Fed. Sec. L. Rep. P 92,519
 **(Cite as: 2003 WL 22462393 (C.D.Cal.))**

accounting and securities law irregularities at issue here. *See In re AOL Time Warner, Inc. Securities & ERISA Litig.,* No. 02 Civ. 5575(SWK), 2003 WL 21729842, *1 (S.D.N.Y. July 25, 2003) ("It cannot be concluded that 'evidence from discovery might not be the subject of controversy as to a claim in the complaint if leave to replead were granted.' Nor can it be assured that plaintiffs will not attempt to use the discovery materials in opposition to the recently filed motion.") (quoting *In re Vivendi Universal. S.A., Sec. Litig.,* No. 02 Civ. 5571(HB), 2003 WL 21035383, at *1 (S.D.N.Y. May 6, 2003)). Even with Lantronix's concession on a portion of Plaintiff's section 10(b) claim, the pendency of the Motions to Dismiss filed by the remaining defendants and Lantronix's Motion to Dismiss Plaintiff's other claims still trigger the PSLRA's discovery stay provisions.

[2] Plaintiff has also failed to adequately support his contention that the discovery stay unduly prejudices the putative class's settlement prospects. *In re AOL Time Warner, 2003 WL 21729842, at *1* ("Lead Plaintiff's assertions of an impending settlement that could prejudice plaintiffs' possible recovery are premature."). Although Lantronix has apparently settled with plaintiffs in another action, Plaintiff here makes no showing of how the discovery materials sought are necessary at this moment to effectuate a settlement in this case or how one settlement in another case creates anything more than the routine delay contemplated by the PSLRA. Moreover, because Plaintiff only seeks documents which have already been produced and are in the custody of third parties, the risk that evidence will be lost is negligible. *See id.* at *2.

Plaintiff has failed to establish the need to preserve evidence or undue prejudice required to justify the lifting of the PSLRA's discovery stay. The Court therefore denies Plaintiff's Motion for an Order Lifting Discovery without prejudice.

IT IS SO ORDERED.

C.D.Cal.,2003.
In re Lantronix, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2003 WL 22462393 (C.D.Cal.), Fed. Sec. L. Rep. P 92,519

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 3

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Monday, September 14, 2009 23:45 Central |
| Client Identifier: | BARNETT |
| Database: | SCTFIND |
| Citation Text: | 65 S.Ct. 1307 |
| Lines: | 676 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



☛

Supreme Court of the United States
In re SUMMERS.
**No. 205.**

Argued April 27-30, 1945.
Decided June 11, 1945.
Rehearing Denied Oct. 22, 1945.

See 66 S.Ct. 94.

Proceedings in the matter of the application of Clyde Wilson Summers for admission to the practice of law in Illinois. To review the action the Supreme Court of Illinois in denying petitioner's prayer, petitioner brings certiorari.

Affirmed.

Mr. Justice BLACK, Mr. Justice DOUGLAS, Mr. Justice MURPHY, and Mr. Justice RUTLEDGE, dissenting.

On Writ of Certiorari to the Supreme Court of the State of Illinois.

West Headnotes

**[1] Attorney and Client 45 ☞7**

45 Attorney and Client
   45I The Office of Attorney
     45I(A) Admission to Practice
      45k7 k. Determination of Right to Admission. Most Cited Cases
Under Illinois law, an application for admission to the bar is an application for appointment as an officer of the court, and action of Illinois Supreme Court on application is a ministerial act performed by virtue of the judicial power, rather than a judicial proceeding. Smith-Hurd Stats. c. 110, § 259.58; Smith-Hurd Stats. Const. Art. 3.

**[2] Federal Courts 170B ☞501**

170B Federal Courts
   170BVII Supreme Court
     170BVII(E) Review of Decisions of State Courts
      170Bk501 k. In General. Most Cited Cases
      (Formerly 106k391(1))
A "case" arises within meaning of constitutional provision pertaining to the judicial power of the United States when any question respecting the Constitution, treaties or laws of the United States has assumed such a form that the judicial power is capable of acting on it, and there must be an actual controversy over an issue, and the mere form of proceeding is not significant. U.S.C.A. Const. Art. 3, s 2, cl. 1.

**[3] Federal Courts 170B ☞501**

170B Federal Courts
   170BVII Supreme Court
     170BVII(E) Review of Decisions of State Courts
      170Bk501 k. In General. Most Cited Cases
      (Formerly 106k391(1))
Where petitioner for admission to the Illinois bar sought relief in Illinois Supreme Court against action of bar committee on character and fitness in refusing to grant petitioner a certificate, and the Illinois Supreme Court took cognizance of complaint, even though without requiring appearance of committee or its members, and denied petitioner's assertion of a present right to admission, there was a "case or controversy" between adversaries presenting a case which could be reviewed by United States Supreme Court, provided federal questions were raised. Smith-Hurd Stats. c. 110, s 259.58; Smith-Hurd Stats. Const. art. 3; U.S.C.A. Const. Art. 3, s 2, cl. 1.

**[4] Attorney and Client 45 ☞1**

45 Attorney and Client
   45I The Office of Attorney
     45I(A) Admission to Practice
      45k1 k. Constitutional and Statutory Provisions. Most Cited Cases
The responsibility for choice as to personnel of the Illinois bar rests with Illinois so long as method of selection does not violate a federal right secured by the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Fourteenth Amendment. Smith-Hurd Stats. c. 110, § 259.58; Smith-Hurd Stats. Const. Art. 3; U.S.C.A.Const. Amend. 14.

**[5] Attorney and Client 45 🔑4**

45 Attorney and Client
    45I The Office of Attorney
        45I(A) Admission to Practice
            45k4 k. Capacity and Qualifications. Most Cited Cases

**Constitutional Law 92 🔑1391**

92 Constitutional Law
    92XIII Freedom of Religion and Conscience
        92XIII(B) Particular Issues and Applications
            92k1390 Licenses
                92k1391 k. In General. Most Cited Cases
    (Formerly 92k84.5(16), 92k84)

**Constitutional Law 92 🔑4273(2)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)12 Trade or Business
                92k4266 Particular Subjects and Regulations
                92k4273 Attorneys
                    92k4273(2) k. Admission and Examination. Most Cited Cases
    (Formerly 92k275(1))
One cannot be excluded from the practice of law simply because he belongs to a particular religious group. U.S.C.A.Const. Amends. 1, 14.

**[6] Constitutional Law 92 🔑4273(2)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)12 Trade or Business
                92k4266 Particular Subjects and Regulations
                92k4273 Attorneys
                  92k4273(2) k. Admission and

Examination. Most Cited Cases
    (Formerly 92k275(1))
Petitioner for admission to the Illinois bar, who had a conscientious belief in nonviolence to extent that he would not use force to prevent wrong no matter how aggravating, who would not act even in a police force to coerce threatened violations of the law, and who was classified as a conscientious objector under Selective Service Act, was not denied due process with respect to religious freedom under Federal Constitution by refusal of Illinois Supreme Court to admit him to practice on the ground that he could not in good faith swear to support the Illinois Constitution which provides for service in the Illinois militia of persons in petitioner's age group. S.H.A. ch. 110, § 101.58; S.H.A.Const. Art. 3; art. 12, §§ 1, 6; Selective Training and Service act of 1940, § 5(g), 50 U.S.C.A.Appendix § 305(g); U.S.C.A.Const. Amends. 1, 14.

**\*\*1308 \*561** Mr. Julien Cornell, of New York City, for petitioner.

**\*562** Mr. William C. Wines, of Chicago, Ill., for respondents.

Mr. Justice REED delivered the opinion of the Court.

Petitioner sought a writ of certiorari from this Court under Section 237(b) of the Judicial Code, 28 U.S.C.A. s 344(b), to review the action of the Supreme Court of Illinois in denying petitioner's prayer for admission to the practice of law in that state. It was alleged that the denial was 'on the sole ground that he is a conscientious objector to war' or to phrase petitioner's contention slightly differently 'because of his conscientious scruples against participation in war.' Petitioner challenges here the right of the Supreme Court to exclude him from the bar under the due process clause of the Fourteenth Amendment to the Constitution of the United States which secured to him protection against state action in violation of the principles of the First Amendment.[FN1] Because of the **\*\*1309** importance of the tendered issue in the domain of civil rights, we granted certiorari.[FN2] 323 U.S. 705, 65 S.Ct. 274.

    FN1 Fourteenth Amendment: '* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *.'

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

First Amendment: 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *.'

Cf. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628, 147 A.L.R. 674.

FN2 The petition for certiorari was not accompanied by a certified record. Rule 38(1), 28 U.S.C.A. following section 354. It alleged an inability to obtain a record from the Clerk of the Supreme Court of Illinois because the documents were not in that official's custody. See note 8, infra. No opposing brief was filed. After the expiration of the time for opposing briefs, rule 38(3), a rule issued 'returnable within 30 days, requiring the Supreme Court of Illinois to show cause why the record in this proceeding should not be certified to this Court and also why the petition for writ of certiorari herein should not be granted.' Journal, Supreme Court of the United States, October Term, 1944, p. 6. A return was duly made by the Chief Justice and the Associate Justices of the Supreme Court of Illinois which stated the position of the justices on the certification of the supposed and alleged record and their opposition to the granting of the certiorari. On consideration our writ of certiorari issued, directed to the Honorable, the Judges of the Supreme Court of Illinois, commanding that 'the record and/or papers and proceedings' be sent to this Court for review. Journal, Supreme Court of the United States, October Term, 1944, p. 93. The papers comprising the proceedings before the Supreme Court of Illinois were certified to us by the Clerk of that court.

**\*563** Since the proceedings were not treated as judicial by the Supreme Court of Illinois, the record is not in the customary form. It shows accurately, however, the steps by which the issue was developed and the action of the Supreme Court on the prayer for admission to the practice of law in the State of Illinois. From the record it appears that Clyde Wilson Summers has complied with all prerequisites for admission to the bar of Illinois except that he has not obtained the certificate of the Committee on Character and Fitness. Cf.

Illinois Revised Statutes 1943, c. 110, s 259.58. No report appears in the record from the Committee. An unofficial letter from the Secretary gives his personal views.FN3 A petition was filed in the **\*564** Supreme Court on August 2, 1943, which alleged that petitioner was informed in January, 1943, that the Committee declined to sign a favorable certificate. The petition set out that the sole reason for the Committee's refusal was that petitioner was a conscientious objector to war, and averred that such reason did not justify his exclusion because of the due process clause of the Fourteenth Amendment. The denial of the petition for admission is informal. It consists of a letter of September 20, 1943, to the Secretary of the Committee which is set out Below, FN4 a letter of the same date toMr. Summers and a third letter of March 22, 1944, to **\*\*1310** Mr. Summers' attorney on petition for rehearing. These latter two letters are set out in note 8.

FN3 In part it reads:

'I think the record establishes that you are a conscientious objector,-also that your philosophical beliefs go further. You eschew the use of force regardless of circumstances but the law which you profess to embrace and which you teach and would practice is not an abstraction observed through mutual respect. It is real. It is the result of experience of man in an imperfect world, necessary we believe to restrain the strong and protect the weak. It recognizes the right even of the individual to use force under certain circumstances and commands the use of force to obtain its observance.

'I do not argue against your religious beliefs or your philosophy of nonviolence. My point is merely that your position seems inconsistent with the obligation of an attorney at law.'

FN4 'This Court has an elaborate petition filed by Francis Heisler, an attorney of 77 West Washington Street, Chicago, Illinois, on behalf of Clyde Wilson Summers.

'The substance of the petition is that the Board should overrule the action of the Committee on Character and Fitness, in which the Committee refused to give him a certificate because he is a conscientious ob-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

jector, and for that reason refused to register or participate in the present national emergency.

'I am directed to advise you that the Court is of the opinion that the report of the Committee on Character and Fitness should be sustained.

'Yours very truly, (Signed)

June C. Smith, Chief Justice.'

The answer of the Justices to these allegations does not appear in the record which was transmitted from the Supreme Court of Illinois to this Court but in their return to the rule to show cause why certiorari should not be granted. The answer is two-fold: First, that the proceedings were not a matter of judicial cognizance in Illinois and that no case or controversy exists in this Court *565 under Article III of the Federal Constitution; second, that assuming the sole ground for refusing to petitioner admission to practice was his profession of conscientious objection to military service, such refusal did not violate the Fourteenth Amendment because the requirement for applicants for admission to the bar to take an oath to support the Constitution of Illinois could not be met. In view of his religious affirmations, petitioner could not agree, freely, to serve in the Illinois militia. Therefore petitioner was not barred because of his religion but because he could not in good faith take the prescribed oath, even though he might be willing to do so. We turn to consideration of the Justices' contentions.

[1] Case or Controversy. The return of the Chief Justice and the Associate Justices states that the correspondence and communications of petitioner with the Justices were not spread upon the records of the Supreme Court of Illinois and that under the law of Illinois this petition for admission to the bar does not constitute a case or controversy or a judicial proceeding but is a mere application for appointment as an officer of the court.FN5 We of course accept this authoritative commentary upon the law of Illinois as establishing for that state the non-judicial character of an application for admission to the bar.FN6 We take it that the law of Illinois treats the action of the Supreme*566 Court on this petition as a ministerial act which is performed by virtue of the judicial power, such as the appointment of a clerk or bailiff or the

specification of the requirements of eligibility or the course of study for applicants for admission to the bar, rather than a judicial proceeding.

FN5 Other courts reason to the contrary result. Ex parte Secombe, 19 How. 9, 15, 15 L.Ed. 565; Ex parte Garland, 4 Wall. 333, 18 L.Ed. 366; Randall v. Brigham, 7 Wall. 523, 535, 19 L.Ed. 285; In the Matter of the Application of Henry W. Cooper, 22 N.Y. 67; Ex parte Cashin, 128 Miss. 224, 232, 90 So. 850.

FN6 Illinois considers that the power and jurisdiction of its Supreme Court with respect to the admission of attorneys are inherent in the judiciary under the constitution of the state, which provides, Article III, for the traditional distribution of the powers of government. Smith Hurd Illinois Anno. Statutes, Constitution, p. 394; In re Day, 181 Ill. 73, 82, 54 N.E. 646, 50 L.R.A. 519. Attorneys are officers of the court, answerable to it for their conduct. People v. Peoples Stock Yards State Bank, 344 Ill. 462, 470, 176 N.E. 901. The act of admission is an exercise of judicial power, 344 Ill. 470, 176 N.E. 901, a judgment, In re Day, 181 Ill. at page 97, 54 N.E. 646, 50 L.R.A. 519, even though it is not considered a judicial proceeding. In the exercise of its judicial power over the bar, the Supreme Court of Illinois has adopted rules for admission to practice before the courts of that state which permit the admission by the Supreme Court after satisfactory examination by the Board of Law Examiners which includes a certification by a Committee on Character and Fitness as to the applicant's character and moral fitness. Illinois Revised Statutes 1943, c. 110, s 259.58.

For the purpose of determining whether the action of the Supreme Court of Illinois in denying Summers' petition for an order for admission to practice law in Illinois is a judgment in a judicial proceeding which involves a case or controversy reviewable in this Court under Article III, Sec. 2, Cl. 1, of the Constitution of the United States,FN7 we must for ourselves appraise**1311 the circumstances of the refusal. Nashville, C. & St. L. Ry. v. Wallace, 288 U.S. 249, 259, 53 S.Ct. 345, 346, 77 L.Ed. 730, 87 A.L.R. 1191. Cf.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Bridges v. California, 314 U.S. 252, 259, 260, 62 S.Ct. 190, 192, 86 L.Ed. 192; Nixon v. Condon, 286 U.S. 73, 88, 52 S.Ct. 484, 487, 76 L.Ed. 984, 88 A.L.R. 458; First National Bank of Hartford, Wis. v. Hartford, 273 U.S. 548, 552, 47 S.Ct. 462, 463, 71 L.Ed. 767, 59 A.L.R. 1; Truax v. Corrigan, 257 U.S. 312, 324, 42 S.Ct. 124, 126, 66 L.Ed. 254, 27 A.L.R. 375.

> FN7 Constitution, Art. III, Sec. 2, cl. 1: 'The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;-to all Cases affecting Ambassadors, other public Ministers and Consuls;-to all Cases of admiralty and maritime Jurisdiction;-to Controversies to which the United States shall be a Party;-to Controversies between two or more States;-between a State and Citizens of another State;-between Citizens of different States;-between citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.'

[2] A case arises, within the meaning of the Constitution, when any question respecting the Constitution, treatise **567 or laws of the United States has assumed 'such a form that the judicial power is capable of acting on it.' Osborn v. Bank, 9 Wheat. 738, 819, 6 L.Ed. 204. The Court was then considering the power of the bank to sue in the federal courts. A declaration on rights as they stand must be sought, not on rights which may arise in the future, Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150, and there must be an actual controversy over an issue, not a desire for an abstract declaration of the law. Muskrat v. United States, 219 U.S. 346, 361, 31 S.Ct. 250, 255, 55 L.Ed. 246; Fairchild v. Hughes, 258 U.S. 126, 129, 42 S.Ct. 274, 275, 66 L.Ed. 499. The form of the proceeding is not significant. It is the nature and effect which is controlling. Nashville, C. & St. L. Ry. v. Wallace, 288 U.S. 249, 259, 53 S.Ct. 345, 346, 77 L.Ed. 730, 87 A.L.R. 1191.

[3] The brief for the Justices raises the question as to who are the adversary parties. The petition in the state court was entitled, 'Clyde Wilson, Summers, Petitioner, v. Committee on Character and Fitness for Third Appellate District, Respondent.' The prayer

sought relief against those named as respondents. The record does not show that any process issued or that any appearance was made. Our rule on the petition for certiorari required the Supreme Court of Illinois to show cause why a record should not be certified and the writ of certiorari granted. The return was by the Justices, not by the Court. The Supreme Court of Illinois, however, concluded that the 'report of the Committee on Character and Fitness should be sustained.' Thus it considered the petition on its merits. While no entry was placed by the Clerk in the file, on a docket, or on a judgment roll, the Court took cognizance of the petition and passed an order which is validated by the signature of the presiding officer.FN8 Where relief is thus sought in a state court against the action of a committee,**568 appointed to advise the court, and the court takes **1312 cognizance of the complaint without requiring the appearance of the committee or its members, we think the consideration of the petition by the Supreme Court, the body which has authority itself by its own act to give the relief sought, makes the proceeding adversary in the sense of a true case or controversy.

> FN8 The act of adjudging to which we have referred is contained in a letter addressed to petitioner, which reads as follows:
>
> 'Your petition to be admitted to the bar, notwithstanding the unfavorable report of the Committee on Character and Fitness for the Third Appellate Court District, has received the consideration of the Court.
>
> 'I am directed to advise you that the Court is of the opinion that the report of the Committee on Character and Fitness should be sustained.
>
> 'Yours very truly (Signed) June C.
>
> Smith, Chief Justice.'
>
> The letter was certified by the Clerk of the Supreme Court of Illinois under its seal as 'filed in this office _____ in a certain cause entitled in this Court. Non Record No. 462. In Re Clyde Wilson Summers.'
>
> Later another letter was written in regard to

the admission which reads as follows:

'March 22, 1944.

'Mr. Francis Heisler, Attorney at Law, 77 West Washington Street,

'Suite 1324, Chicago, 2, Illinois.

'In re: Clyde Wilson Summers.

'Dear Sir:

'Your petition on behalf of Clyde Wilson Summers to reconsider the prior action of the Court sustaining the report of the Committee on Character and Fitness for the Third Appellate Court District, has had the consideration of the Court.

'I am directed to advise you that the Court declines to further consider its former action in this matter.

'Yours very truly,

June C. Smith, Chief Justice.'

By stipulation of petitioner and the Justices, the Clerk prepared a supplemental record in this cause which includes the following: (1) a transcript of the proceedings before the Character Committee; (2) the letter of March 22, 1944; (3) a certificate that the transcript is the original and the letter a document of the Supreme Court of Illinois.

A claim of a present right to admission to the bar of a state and a denial of that right is a controversy. When the claim is made in a state court and a denial of the right is **\*569** made by judicial order, it is a case which may be reviewed under Article III of the Constitution when federal questions are raised and proper steps taken to that end, in this Court.[FN9]

> [FN9] In Bradwell v. State of Illinois, 16 Wall. 130, 21 L.Ed. 442, this Court took cognizance of a writ of error to an order of the Supreme Court of Illinois which denied a mo-

tion of Mrs. Bradwell for admission to the bar of Illinois. The proceeding was entitled by the Supreme Court of Illinois, 'In the matter of the application of Mrs. Myra Bradwell for a license to practice as an attorney-at-law.' There was an opinion. A writ of error under the Illinois title was issued to bring up the case. The objection to Mrs. Bradwell's admission was on the ground of her sex. As no question was raised as to the jurisdiction of this Court under Article III of the Constitution, the case is of little, if any, value as a precedent on that point. United States ex rel. Arant v. Lane, 245 U.S. 166, 170, 38 S.Ct. 94, 96, 62 L.Ed. 223; United States v. More, 3 Cranch 159, 172, 2 L.Ed. 397.

Disqualification Under Illinois Constitution. The Justices justify their refusal to admit petitioner to practice before the courts of Illinois on the ground of petitioner's inability to take in good faith the required oath to support the Constitution of Illinois. His inability to take such an oath, the justices submit, shows that the Committee on Character and Fitness properly refused to certify to his moral character and moral fitness to be an officer of the Court, charged with the administration of justice under the Illinois law. His good citizenship, they think, judged by the standards required for practicing law in Illinois, is not satisfactorily shown.[FN10] A conscientious belief in non-**\*570** violence to the extent that the believer will not use force to prevent wrong, no matter how aggravated, and so cannot swear in good faith to support the Illinois Constitution, the Justices contend, must disqualify such a believer for admission.

> [FN10] Section IX(2) of the Rules for Admission to the Bar reads as follows: 'Before admission to the Bar, each applicant shall be passed upon by the Committee in his district as to his character and moral fitness. He shall furnish the Committee with an affidavit in such form as the Board of Law Examiners shall prescribe concerning his history and environments, together with the affidavits of at least three reputable persons personally acquainted with him residing in the county in which the applicant resides, each testifying that the applicant is known to the affiant to be of good moral character and general fitness

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to practice law, setting forth in detail the facts upon which such knowledge is based. Each applicant shall appear before the Committee of his district or some member thereof and shall furnish the Committee such evidence of his moral character and good citizenship as in the opinion of the Committee would justify his admission to the Bar.' Ill.Rev.Stat. 1943, c. 110, s 259.58.

Petitioner appraises the denial of admission from the viewpoint of a religionist. He said in his petition:

'The so-called 'misconduct' for which petitioner could be reproached for is his taking the New Testament too seriously. Instead of merely reading or preaching the Sermon on the Mount, he tries to practice it. The only fault of the petitioner consists in his attempt to act as a good Christian in accordance with his interpretation of the Bible, and according to the dictates of his conscience. We respectfully submit that the profession of law does not shut its gates to persons who have qualified in all other respects, even when they follow in the footsteps of that Great Teacher of mankind who delivered the Sermon on the Mount. We respectfully submit that under our Constitutional guarantees even good Christians who have met all the requirements for the admission to the bar may be admitted to practice law.'

[4][5] Thus a court created to administer the laws of Illinois, as it understands them and charged particularly with the protection of justice in the courts of Illinois**1313 through supervision of admissions to the bar found itself faced with the dilemma of excluding an applicant whom it deemed disqualified for the responsibilities of the profession of law or of admitting the applicant because of its deeply rooted tradition in freedom of belief. The responsibility for choice as to the personnel of its bar rests *571 with Illinois. Only a decision which violated a federal right secured by the Fourteenth Amendment would authorize our intervention. It is said that the action of the Supreme Court of Illinois is contrary to the principles of that portion of the First Amendment which guarantees the free exercise of religion. Of course, under our Constitutional system, men could not be excluded from the practice of law, or indeed from following any other calling, simply because they belong to any of our religious groups, whether Protestant, Catholic, Quaker or Jewish, assuming it conceivable that any state of the

Union would draw such a religious line. We cannot say that any such purpose to discriminate motivated the action of the Illinois Supreme Court.

The sincerity of petitioner's beliefs are not questioned. He has been classified as a conscientious objector under the Selective Training and Service Act of 1940, 54 Stat. 885, as amended, 50 U.S.C.A.Appendix s 301 et seq. Without detailing petitioner's testimony before the Committee or his subsequent statements in the record, his position may be compendiously stated as one of non-violence. Petitioner will not serve in the armed forces. While he recognizes a difference between the military and police forces, he would not act in the latter to coerce threatened violations. Petitioner would not use force to meet aggressions against himself or his family, no matter how aggravated or whether or not carrying a danger of bodily harm to himself or others. He is a believer in passive resistance. We need to consider only his attitude toward service in the armed forces.

[6] Illinois has constitutional provisions which require service in the militia in time of war of men of petitioner's age group.[FN11] The return of the Justices alleges that petitioner has not made any showing that he would serve notwithstanding*572 his conscientious objections. This allegation is undenied in the record and unchallenged by brief. We accept the allegation as to unwillingness to serve in the militia as established. While under Section 5(g) of the Selective Training and Service Act, supra, conscientious objectors to participation in war in any form now are permitted to do non-war work of national importance, this is by grace of Congressional recognition of their beliefs. Hamilton v. Regents, 293 U.S. 245, 261-265, 55 S.Ct. 197, 203-205, 79 L.Ed. 343, and cases cited. The Act may be repealed. No similar exemption during war exists under Illinois law. The Hamilton decision was made in 1934, in time of peace.[FN12] This decision as to the powers of the state government over military training is applicable to the power of Illinois to require military service from her citizens.

> FN11 'The militia of the state of Illinois shall consist of all able-bodied made persons resident in the state, between the ages of eighteen and forty-five, except such persons as now are, or hereafter may be, exempted by the laws of the United States, or of this state.' (Constitution of Illinois, Art. XII, Sec. 1, Ill.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Rev. Stat. 1943.)

'No person having conscientious scruples against bearing arms shall be compelled to do militia duty in time of peace: Provided, such person shall pay an equivalent for such exemption.' (Constitution of Illinois, Art. XII, Sec. 6, Ill. Rev. Stat. 1943.)

FN12 California imposed instruction in military tactics on male students in the University of California. Some students sought exemption from this training on the ground that such training was inconsistent with their religious beliefs. This Court denied them any such exemption based on the due process clause of the federal Constitution. The opinion states, at pages 262, 263 of 293 U.S., at page 204 of 55 S.Ct., 79 L.Ed. 343:

'Government, federal and state, each in its own sphere owes a duty to the people within its jurisdiction to preserve itself in adequate strength to maintain peace and order and to assure the just enforcement of law. And every citizen owes the reciprocal duty, according to his capacity to support and defend government against all enemies. Selective Draft Law Cases ( Arver v. United States), supra, page 378 of 245 U.S., 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas.1918B, 856; Minor v. Happersett, 21 Wall. 162, 166, 22 L.Ed. 627.'

The United States does not admit to citizenship**1314 the alien who refuses to pledge military service. United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889; United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302. Even the powerful dissents which emphasized the deep cleavage in this Court on the issue of admission*573 to citizenship did not challenge the right of Congress to require military service from every able-bodied man. 279 U.S. at page 653, 49 S.Ct. at page 451, 73 L.Ed. 889; 283 U.S. at page 632, 51 S.Ct. at page 577, 75 L.Ed. 1302. It is impossible for us to conclude that the insistence of Illinois that an officer who is charged with the administration of justice must take an oath to support the Constitution of Illinois and Illinois' interpretation of that oath to require a willingness to perform military service violates the principles of reli-

gious freedom which the Fourteenth Amendment secures against state action, when a like interpretation of a similar oath as to the Federal Constitution bars an alien from national citizenship.[FN13]

FN13 United States v. Macintosh, 283 U.S. 605, 625, 626, 51 S.Ct. 570, 575, 75 L.Ed. 1302.

'If the attitude of this claimant, as shown by his statements and the inferences properly to be deduced from them, be held immaterial to the question of his fitness for admission to citizenship, where shall the line be drawn? Upon what ground of distinction may we hereafter reject another applicant who shall express his willingness to respect any particular principle of the Constitution or obey any future statute only upon the condition that he shall entertain the opinion that it is morally justified? The applicant's attitude, in effect, is a refusal to take the oath of allegiance except in an altered form. The qualifications upon which he insists, it is true, are made by parol and not by way of written amendment to the oath; but the substance is the same.'

Affirmed.

Mr. Justice BLACK, dissenting.

The State of Illinois has denied the petitioner the right to practice his profession and to earn his living as a lawyer. It has denied him a license on the ground that his present religious beliefs disqualify him for membership in the legal profession. The question is, therefore, whether a state which requires a license as a prerequisite to practicing law can deny an applicant a license solely because of his deeply-rooted religious convictions. The fact that petitioner measures up to every other requirement for admission to *574 the Bar set by the State demonstrates beyond doubt that the only reason for his rejection was his religious beliefs.

The state does not deny that petitioner possesses the following qualifications:

He is honest, moral, and intelligent, has had a college and a law school education. He has been a law professor and fully measures up to the high standards of legal knowledge Illinois has set as a prerequisite to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

admission to practice law in that State. He has never been convicted for, or charged with, a violation of law. That he would serve his clients faithfully and efficiently if admitted to practice is not denied. His ideals of what a lawyer should be indicate that his activities would not reflect discredit upon the bar, that he would strive to make the legal system a more effective instrument of justice. Because he thinks that 'Lawsuits do not bring love and brotherliness, they just create antagonisms,' he would, as a lawyer, exert himself to adjust controversies out of court, but would vigorously press his client's cause in court if efforts to adjust failed. Explaining to his examiners some of the reasons why he wanted to be a lawyer, he told them: 'I think there is a lot of work to be done in the law. * * * I think the law has a place to see to it that every man has a chance to eat and a chance to live equally. I think the law has a place where people can go and get justice done for themselves without paying too much, for the bulk of people that are too poor.' No one contends that such a vision of the law in action is either illegal or reprehensible.

The petitioner's disqualifying religious beliefs stem chiefly from a study of the New Testament and a literal acceptance of the teachings of Christ as he understands them. Those beliefs are these:

He is opposed to the use of force for either offensive or defensive purposes. The taking of human life under any circumstances he believes to be against the Law **1315 of God and contrary to the best interests of man. He would if he could, he told his examiners, obey to the letter *575 these precepts of Christ: 'Love your Enemies; Do good to those that hate you; Even though your enemy strike you on your right cheek, turn to him your left cheek also.' [FN1] The record of his evidence before us bears convincing marks of the deep sincerity of his convictions, and counsel for Illinois with commendable candor does not question the genuineness of his professions.

> FN1 The quotations are the petitioner's paraphrase of the King James translation of Verses 38, 39 and 44 of St. Matthew, Chapter 5, which read as follows:
>
> 'Ye have heard that it hath been said, An eye for an eye, and a tooth for a tooth:
>
> 'But I say unto you, That ye resist not evil:

but whosoever shall smite thee on thy right cheek, turn to him the other also. * * *

'But I say unto you, Love your enemies, bless them that curse you, do good to them that hate you, and pray for them which despitefully use you, and persecute you; * * *.'

I cannot believe that a state statute would be consistent with our constitutional guarantee of freedom of religion if it specifically denied the right to practice law to all members of one of our great religious groups, Protestant, Catholic, or Jewish. Yet the Quakers have had a long and honorable part in the growth of our nation, and an amicus curiae brief filed in their behalf informs us that under the test applied to this petitioner, not one of them if true to the tenets of their faith could qualify for the bar in Illinois. And it is obvious that the same disqualification would exist as to every conscientious objector to the use of force, even though the Congress of the United States should continue its practice of absolving them from military service. The conclusion seems to me inescapable that if Illinois can bar this petitioner from the practice of law it can bar every person from every public occupation solely because he believes in non-resistance rather than in force. For a lawyer is no more subject to call for military duty than a plumber, a highway worker, a Secretary of State, or a prison chaplain. *576 It may be, as many people think, that Christ's Gospel of love and submission is not suited to a world in which men still fight and kill one another. But I am not ready to say that a mere profession of belief in that Gospel is a sufficient reason to keep otherwise well qualified men out of the legal profession, or to drive law-abiding lawyers of that belief out of the profession, which would be the next logical development.

Nor am I willing to say that such a belief can be penalized through the circuitous method of prescribing an oath, and then barring an applicant on the ground that his present belief might later prompt him to do or refrain from doing something that might violate that oath. Test oaths, designed to impose civil disabilities upon men for their beliefs rather than for unlawful conduct, were an abomination to the founders of this nation. This feeling was made manifest in Article VI of the Constitution which provides that 'no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.' Cummings v. State of Missouri, 4 Wall. 277, 18 L.Ed.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

356; Ex parte Garland, 4 Wall. 333, 18 L.Ed. 366.

The state's denial of petitioner's application to practice law resolves itself into a holding that it is lawfully required that all lawyers take an oath to support the state constitution and that petitioner's religious convictions against the use of force make it impossible for him to observe that oath. The petitioner denies this and is willing to take the oath. The particular constitutional provision involved authorizes the legislature to draft Illinois citizens from 18 to 45 years of age for militia service. It can be assumed that the State of Illinois has the constitutional power to draft conscientious objectors for war duty and to punish them for a refusal to serve as soldiers,-powers which this Court held the United States possesses in United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889, and United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302. But that is not to say **577** that Illinois could constitutionally use the test oath it did in this case. In the Schwimmer and Macintosh cases aliens were barred from natuaralization because their then religious beliefs would bar them from bearing arms to defend the country. Dissents in both **1316** cases rested in part on the permise that religious tests are incompatible with our constitutional guarantee of freedom of thought and religion. In the Schwimmer case dissent, Mr. Justice Holmes said that 'if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought-not free thought for those who agree with us but freedom for the thought that we hate. I think that we should adhere to that principle with regard to admission into, as well as to life within his country.' Pages 654, 655, of 279 U.S., page 451 of 49 S.Ct., 73 L.Ed. 889. In the Macintosh case dissent, Mr. Chief Justice Hughes said, 'To conclude that the general oath of office is to be interpreted as disregarding the religious scruples of these citizens and as disqualifying them for office because they could not take the oath with such an interpretation would, I believe, be generally regarded as contrary not only to the specific intent of the Congress but as repugnant to the fundamental principle of representative government.' Page 632, of 283 U.S., page 577 of 51 S.Ct., 75 L.Ed. 1302. I agree with the constitutional philosophy underlying the dissents of Mr. Justice Holmes and Mr. Chief Justice Hughes.

The Illinois Constitution itself prohibits the draft of conscientious objectors except in time of war and also

excepts from militia duty persons who are 'exempted by the laws of the United States.' It has not drafted men into the militia since 1864, and if it ever should again, no one can say that it will not, as has the Congress of the United States, exempt men who honestly entertain the views that this petitioner does. Thus the probability that Illinois would ever call the petitioner to serve in a war has little more reality than an imaginary quantity in mathematics.

**578** I cannot agree that a state can lawfully bar from a semi-public position, a well-qualified man of good character solely because he entertains a religious belief which might prompt him at some time in the future to violate a law which has not yet been and may never be enacted. Under our Constitution men are punished for what they do or fail to do and not for what they think and believe. Freedom to think, to believe, and to worship, has too exalted a position in our country to be penalized on such an illusory basis. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 643-646, 63 S.Ct. 1178, 1187-1189, 87 L.Ed. 1628, 147 A.L.R. 674.

I would reverse the decision of the State Supreme Court.

Mr. Justice DOUGLAS, Mr. Justice MURPHY, and Mr. Justice RUTLEDGE concur in this opinion.
U.S. 1945.
In re Summers
325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 4

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Monday, September 14, 2009 23:24 Central |
| Client Identifier: | BARNETT |
| Database: | AR-CS |
| Citation Text: | 163 S.W.2d 512 |
| Lines: | 383 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.




Supreme Court of Arkansas.
IRBY
v.
BARRETT.
**No. 4-6886.**

July 6, 1942.

Appeal from Pulaski Chancery Court; Frank H. Dodge, Chancellor.

Mandamus proceedings by W. O. Irby against Joe C. Barrett and another, to compel defendants to certify petitioner as a candidate for the office of state senator. From a decree of dismissal, petitioner appeals.

Reversed and remanded with directions.

GRIFFIN SMITH, C. J., dissenting.

### West Headnotes

**States 360 30**

360 States
    360II Government and Officers
        360k24 Legislature
            360k30 k. Determination as to Election and Qualification of Members. Most Cited Cases
In passing upon qualifications of a member of the State Senate, that body may accept either the majority or minority view of Supreme Court with respect to whether member is eligible to hold office, and the Senate's action on such question cannot be reviewed by Supreme Court, since the Senate is sole judge of qualifications of its members. Const. art. 5, § 11.

**Elections 144 121(1)**

144 Elections
    144VI Nominations and Primary Elections
        144k121 Party Organizations and Regulations
            144k121(1) k. In General. Most Cited Cases
The duties of the chairman and secretary of the Democratic State Committee are purely "ministerial duties" and they have no judicial power.

**Elections 144 152**

144 Elections
    144VI Nominations and Primary Elections
        144k148 Objections and Contests
            144k152 k. Determination by Party Tribunals. Most Cited Cases
Where petitioner had sufficiently complied with Democratic Party rules and state laws to become a Democratic candidate for office of state senator, the chairman and secretary of the Democratic State Committee could not exclude petitioner's name as a candidate because, in their opinion, petitioner was ineligible for office of senator, whether that ineligibility arose out of a conviction for a felony or any other cause which would render petitioner ineligible. Const. art. 5, §§ 9, 11.

**\*512** Arthur Sneed, of Piggott, for appellant.

Buzbee, Harrison & Wright, of Little Rock, for appellee.

FRANK G. SMITH, Justice.

Appellant filed in the court below a petition for a writ of mandamus requiring Joe C. Barrett and Harvey G. Combs, chairman and secretary of the Democratic State Committee, respectively, to certify him as a candidate for the office of state senator from the 28th Senatorial District, of which district Clay county is a part. He alleged that he had been a resident of Clay county for many years; that he is 64 years of age and a qualified elector of that county, and had been all his life a Democrat, and that he is a member of the Democratic Party in Clay county, and that he had complied with all the laws of the state and all the rules of the Democratic Party to become a candidate for the nomination of his party as its candidate for the Senate in the district of which Clay county is a part; but notwithstanding these facts the defendants had refused to certify his name as required by the rules of the Democratic Party.

An answer was filed, which did not deny any of these

allegations, and averred that defendants had refused to certify petitioner's name because petitioner is legally ineligible to hold the office of State Senator by virtue of Art. 5, § 9, of the Constitution of 1874, which prohibits any person convicted of the embezzlement of public money or other infamous crime from serving as a member of the General Assembly or from holding any office of trust or profit in this State.

A demurrer was filed to this answer, which was overruled, and petitioner's cause of action was dismissed when he stood on his demurrer, and from that decree is this appeal.

Appellees justify their action by citing the cases of State ex rel. Attorney General v. Irby, 190 Ark. 786, 81 S.W.2d 419; Winton v. Irby, 189 Ark. 906, 75 S.W.2d 656, and Irby v. Day, 182 Ark. 595, 32 S.W.2d 157.

The case first above cited was a quo warranto proceeding to oust petitioner from the office of county judge of Clay county to which he had been elected, and it was there held that petitioner was ineligible to hold that office because of his conviction in the Federal District Court of the crime of embezzling post office funds, notwithstanding his unconditional and full pardon for that offense by the President of the United States.

It is urged that it would be a vain and useless proceeding to permit petitioner to be a candidate for an office which he could not fill, if he were elected to it.

**\*513** We cannot anticipate what action the Senate might take in the event petitioner were nominated and then elected Senator from the District in which he resides. Section 11 of Art. 5 of the Constitution provides that "Each house [of the General Assembly] shall appoint its own officers, and shall be sole judge of the qualifications returns and elections of its own members".

The last of these Irby cases, 190 Ark. 786, 81 S.W.2d 419, 425, was decided by a divided vote of 4 to 3. It is possible, and within the power of the Senate, to adopt the view of the dissenting judges, rather than the opinion of the majority, in that case, in which event petitioner would be eligible to serve as a member of the Senate.

It was the opinion of the majority in that case that one convicted, in a Federal Court, of embezzlement of money belonging to the United States, is ineligible to hold any office of trust or profit within this State notwithstanding the Presidential pardon, since the pardon restored merely his civil rights, as distinguished from his political privileges.

It was the opinion of the majority in that case that the disqualification of petitioner to hold office was no part of the punishment for the crime for which petitioner had been convicted and that, therefore, the pardon could not remove his disqualification for holding office.

It was also the opinion of the majority that it was immaterial that petitioner had not been convicted for a violation of a law of this State, and that a conviction in any jurisdiction barred petitioner from holding office as effectively as a conviction for a violation of the laws of this State would have done.

It was the opinion of the minority that all these holdings were contrary to the great weight of authority. It was said in the minority opinion that "It has held, upon great consideration, that a conviction and sentence for felony in one of the states and the disabilities arising from the same would not come within the inhibition of statutory and constitutional provisions of another state and the disqualifications therein denounced. Greenleaf on Evidence, [15th] Ed. [§ 376]".

It was the opinion also of the minority that the pardon removed, not only the guilt of the one pardoned, but likewise the legal infamy and all other consequences arising out of the conviction, and that it was futile to say that ineligibility to hold office was not a part of the punishment for crimes denounced by § 9 of Art. 5 of the Constitution. The concession appears to have been made in the majority opinion that if ineligibility to hold office was a part of the punishment, that this ineligibility was removed by the pardon.

 The Senate has the power to accept either the majority or the minority view, and its action is beyond the power of review by this court, as the Senate is the sole judge of the qualification of its members.

 But aside from these considerations, we are of the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

opinion that the Chairman and Secretary of the State Committee acted without authority in refusing to certify petitioner as a candidate. Certainly no law of this State confers that power, and we are cited to no rule of the Party conferring it. Certain it is that the Chairman and Secretary of the State Committee are clothed with no judicial power. Their duties are purely ministerial, and in the matter under consideration are defined by § 58 of the Rules of the Party, which reads as follows: "Sec. 58. All candidates for United States Senator, Representative in Congress and all state and district offices shall file the prescribed pledge with the Secretary of the State Committee and all candidates for county and township offices shall file the prescribed pledge with the Secretary of the County Committee, not later than 12 o'clock noon on the 90th day before the preferential primary election, and all candidates for municipal offices (including candidates for county and city committeemen) shall file their pledges with the Secretary of the County Committee and the City Committee not later than 12 o'clock noon on the 30th day before the preferential primary election.

"The name of any candidate, who shall fail to sign and file said pledge within the time fixed shall not appear on the official ballot in said primary election.

"The Chairman and Secretary of the State Committee shall certify to the various county committees not later than 30 days before the day of the election the names of all candidates who have complied with the rules herein prescribed, and the name of no other candidate for such office shall be printed on the ballots by the county committee."

**\*514** It was held in the case of Williamson v. Montgomery, 185 Ark. 1129, 51 S.W.2d 987, that no one could become a candidate for a party nomination for an office without complying with the rules of the party; but it was also held in that case where the committee or officer conducting a primary election acted fraudulently or in such an arbitrary manner as to prevent a person who, in good faith, sought to comply with the rules, the courts would require the party officers to comply with the party rules. There is no intimation here that the Chairman and Secretary of the Committee have acted fraudulently, but we think they have acted without authority conferred either by the laws of this State or the rules of the Party.

Rule 58, above quoted, requires the Chairman and Secretary to certify the names of all candidates "who have complied with the rules herein prescribed". The fact stands undisputed that the petitioner has complied with these rules and, having done so, no duty rests upon, nor is there any power vested in, the Chairman and Secretary of the Committee except to perform the ministerial duty of certifying the names of petitioner and all others who have complied with the party rules.

If it be said-and it is said-that the Supreme Court has decided that petitioner is ineligible to hold a public office, it may be answered that this proceeding is not a contest for an office nor a proceeding to oust one from office. The only question here is whether petitioner has complied with the laws of the State and the party rules sufficiently to become a candidate for office; and the fact is undisputed that he has done so.

If the Chairman and Secretary of the Committee have the right to say that because of the decision of this court petitioner is ineligible to be a candidate for office, they may also say, in any case, that for some other reason a candidate is ineligible. For instance, it has been held by this court in many election contests that one must pay his poll tax; that he must do so after proper assessment in the time and manner required by law, and that otherwise he is not eligible even to vote, and unless he were a voter he could not hold office. So with other qualifications, such as residence. May this question be considered or decided by the Chairman and Secretary of the Committee? It may be that such power can be conferred upon them by laws of this State or the rules of the party; but it is certain that this has not yet been done. If this can be done, and should be done, the door would be opened wide for corrupt and partisan action. It might be certified that a prospective candidate has sufficiently complied with the laws of the State and the rules of a political party to become a candidate, and, upon further consideration, that holding might be recalled; and this might be done before that action could be reviewed in a court of competent jurisdiction and reversed in time for the candidate to have his name placed on the ticket. It would afford small satisfaction if, after the ticket had been printed with the name of the candidate omitted, to have a holding by the court that the name should not have been omitted.

We are cited to only two cases in point, and in view of the fact that this opinion must be rendered within a

week after the submission of the cause, if the petitioner is to have redress which will require that he be certified as a candidate, the time has not been afforded for the investigation which otherwise would have been made.

 But these two cases are exactly in point and are consonant with our view that the Chairman and Secretary of the State Committee have only a ministerial duty to perform, and have no right to exclude the name of a candidate because, in their opinion, he is ineligible and could not hold the office, whether that ineligibility arose out of a conviction for a felony or any other cause which would render him ineligible.

The two cases to which we have referred are Young v. Beckham, 115 Ky. 246, 72 S.W. 1092, decided by the Court of Appeals of Kentucky, and the case of Roussel v. Dornier, 130 La. 367, 57 So. 1007, 39 L.R.A.,N.S., 826.

In the first of these cases the facts are so similar and the reasoning so convincing that we quote somewhat extensively from it. The first sentence in the opinion in that case reads as follows: "Paynter, J. The purpose of this proceeding is to compel the Democratic committee to place the name of the appellee, J. C. W. Beckham, on the ballot as a candidate for the office of governor before the Democratic primary election called for May 9, 1903. The question of his eligibility has been raised, and the committee refuses to place his name upon the ballot. The question to be **515 determined from the pleading is whether the governing authority of the party has called a primary election, and, if so, (a) whether the statute authorizes the holding of primary elections to nominate candidates for state offices; (b) whether the committee can refuse to place his name upon the ballot because they think he is ineligible to re-election; (c) whether, by proceeding in mandamus, the committee may be compelled to place his name upon the ballot used at the primary as a candidate for governor."

The opinion does not state upon what ground the committee found Beckham to be ineligible. The facts upon which the committee found Beckham to be ineligible were not in dispute, as the opinion does not state them. Probably the Democratic State Committee had concluded that a man had aspired to the nomination of their party for the highest office in the State who could not serve if he were nominated and elected.

The ground of a candidate's ineligibility would be immaterial. It would be unimportant whether he had been convicted of a felony or was ineligible for some other reason. If he were ineligible, he was ineligible regardless of the cause of the ineligibility.

The Kentucky court did not consider the correctness of the committee's finding that Beckham was ineligible to be a candidate. That question was predetermined and not even referred to, the opinion being based solely upon the question of the power of the committee to exclude the name of a candidate. In holding that the committee did not have this power it was there said: "We are of the opinion that the committee had no right to raise the question of the appellee's eligibility to re-election to the office of governor. The governing authority of the party has no right to determine who is eligible under the laws of the land to hold offices. It can call primary elections and make proper rules for their government, but has no right to say who is eligible to be a candidate before the primary. The persons who are entitled to vote at the primary are the ones to determine who shall be selected as their candidates for a particular office. If the committee can say who is and who is not eligible to be nominated as party's candidate for office, they can, on the very last day before the ballots are printed, refuse to allow a person's name to go on the ballot upon the pretext that he is ineligible, and thus prevent his name from appearing upon the official ballot. They could thus destroy one's prospect to be nominated, for the rules of procedure in courts are necessarily such that no adequate relief could be afforded the party complaining, if at all, until after the primary election had been held. If the committee or governing authority has the authority to decide the question as to who is eligible to hold an office or be a candidate before a primary election, then they would have a discretion and judgment to exercise that could not be exercised by a mandamus. The most that could be done by such a writ would be to compel them to act upon the question."

In the second case above cited the Supreme Court of Louisiana, with equal emphasis, denied the right of a party committee to pass upon the eligibility of a candidate for the nomination of that party as its candidate for office. A headnote in that case reads as follows: "1. A Democratic parish committee has no power to pass upon the eligibility of candidates for public office as they are not charged with judicial functions nor clothed with juridical power." Parish committees in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Louisiana correspond with county committees in this State.

We conclude, therefore, that the Chairman and Secretary of the State Committee exceeded their power in refusing to perform the ministerial duty of certifying petitioner as one who had complied with the laws of the State and the rules of the party, as he admittedly has done.

The decree of the court below will, therefore, be reversed and the cause will be remanded with directions to award the writ of mandamus.

GRIFFIN SMITH, C. J., dissents.
GRIFFIN SMITH, Chief Justice (dissenting).
One of two things is certain: This court either inexcusably wronged W. O. Irby in two of the three cases cited in the majority opinion, or, figuratively speaking, it is playing checkers with decisions.

"In Irby v. Day, 182 Ark. 595, 32 S.W.2d 157, we expressly held that Irby was disqualified to receive the democratic nomination to public office in this state because of his previous conviction for embezzlement of public funds, therefore, any question as to his conviction resting in a foreign jurisdiction is laid at rest and we *516 shall not again consider it. The sole question here presented for consideration is, Does a pardon by the Chief Executive restore to Irby all civil rights and political privileges enjoyed by him prior to his conviction?"[FN1]

FN1. Irby was sentenced February 17, 1922 on a charge of embezzling post office funds. He entered a plea of guilty. February 19, 1931, President Hoover issued a pardon, "the purpose being to restore Irby's civil rights".

The author of the opinion in Irby v. Day, (the preceding quotation having been taken from State ex rel. Attorney General v. Irby, 190 Ark. 786, 81 S.W.2d 419, 420) said: "Appellant's second and last contention for a reversal of the judgment is that the plea did not constitute a defense to the cause of action. The plea was sufficient to show that the appellant was ineligible to hold the office of representative from Clay county, and for that reason had no right to contest appellee's certificate of nomination. Section 9 of article 5 of the Constitution of 1874 provides that no person convicted of embezzlement of public money

shall be eligible to hold an office of representative in the General Assembly". [ 32 S.W.2d 158]

From what I have been able to ascertain by reading the majority opinion of today, and from discussions in conference, it is not intended that State ex rel. Attorney General v. Irby be overruled. On the contrary, my understanding is that if the result brings about an impairment of the opinion written by Chief Justice Johnson, a majority of the justices did not so intend. In other words, there were not four votes to overrule the former holding. We have, then, reaffirmation of the rule that one convicted of embezzling public money may not hold office, and this status is not altered by pardon.

By circuitous construction the opinion in State ex rel. Attorney General v. Irby is bypassed. It is now held that the state committee could not exercise a judicial function by deciding that Irby was not eligible; that the committee's functions were ministerial; that its members must close their vision and their minds to what this court has said on previous occasions-all this because, as it is argued, Irby might be nominated and elected, and under Art. 5, § 11, of the constitution, he could be seated.

But where, may it be asked, was the constitution when on November 3, 1930, it was held that appellant was ineligible to hold the office of representative? Art. 5, § 11, gives the house of representatives the same power that it accords the senate in respect of member qualifications. It would seem that the only thing to consider is whether appellant is the same Irby whose status was determined by this court in 1930, and again on April 8, 1935. Since this is admitted, the issue has heretofore been disposed of.

Unless it should be held that the presidential pardon restored appellant's political rights, as well as his civil rights, I do not agree that if elected he can be seated by the senate. Section 11 of Art. 5 of the constitution authorizes each house of the general assembly to appoint its own officers; and it shall be the sole judge of the qualifications, returns and election of its own members when there has been an election. But this right must be read in connection with Art. 5, § 9, and with § 8 of Art. 5 when it is applicable. Section 8 provides: "No person who now is or shall be hereafter a collector or holder of public money, nor any assistant or deputy of such holder or collector of public

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

money, shall be eligible to a seat in either house of the General Assembly, nor to any office of trust or profit, until he shall have accounted for and paid over all sums for which he may have been liable".

Section 9 is: "No person hereafter convicted of embezzlement of public money *** shall be eligible to the General Assembly or capable of holding any office of trust or profit in this State".

Effect of the majority opinion is to hold that the chairman and secretary of the state committee are guilty of tyrannical conduct, or at least grave indiscretion, in following the law as laid down in the decisions of 1930 and 1935.

It is my view that they were justified in believing the court meant what it said. They would have been insensible to a public trust had they ignored State ex rel. Attorney General v. Irby, and Irby v. Day. No discretion was exercised; no judicial function was usurped. This court had already made the law. There was more understanding in what they did than would have been the case had they simulated estrangement to the law as it had been written.

Ark. 1942.
Irby v. Barrett
204 Ark. 682, 163 S.W.2d 512

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 5

**Westlaw Delivery Summary Report for KREEP,GARY G**

Date/Time of Request:          Monday, September 14, 2009 23:24 Central
Client Identifier:             BARNETT
Database:                      SCTFIND
Citation Text:                 57 S.Ct. 163
Lines:                         411
Documents:                     1
Images:                        0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.


Supreme Court of the United States.
LANDIS et al.
v.
NORTH AMERICAN CO.
SAME
v.
AMERICAN WATER WORKS & ELECTRIC CO.,
Inc.
**Nos. 221 and 222.**

Argued Nov. 9, 1936.
Decided Dec. 7, 1936.

On Writs of Certiorari to the United States Court of Appeals for the District of Columbia.

Two suits by the North American Company, and by the American Water Works & Electric Company, Incorporated, against James M. Landis and others. To review a judgment of the United States Court of Appeals for the District of Columbia ( 85 F.(2d) 398), reversing an order of the District Court for the District of Columbia, staying proceedings, James M. Landis and others bring certiorari.

In each suit, decree of the Court of Appeals reversed, and order of the District Court vacated and cause remanded to the District Court, with directions.

West Headnotes

**[1] Action 13 ⚷69(1)**

13 Action
 13IV Commencement, Prosecution, and Termination
  13k67 Stay of Proceedings
   13k69 Another Action Pending
    13k69(1) k. In General. Most Cited Cases
  (Formerly 13k69(4), 13k69)
Parties to two causes need not be same and issues need not be identical to empower court to stay proceedings in one suit to abide proceedings in the other.

**[2] Action 13 ⚷68**

13 Action
 13IV Commencement, Prosecution, and Termination
  13k67 Stay of Proceedings
   13k68 k. In General. Most Cited Cases
Power to stay proceedings is incidental to power inherent in every court to control disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants.

**[3] Action 13 ⚷69(1)**

13 Action
 13IV Commencement, Prosecution, and Termination
  13k67 Stay of Proceedings
   13k69 Another Action Pending
    13k69(1) k. In General. Most Cited Cases
  (Formerly 13k69)
Litigant seeking stay of proceedings in one suit to abide proceedings in another must make out clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else, and only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.

**[4] Action 13 ⚷69(5)**

13 Action
 13IV Commencement, Prosecution, and Termination
  13k67 Stay of Proceedings
   13k69 Another Action Pending
    13k69(5) k. Nature and Subject Matter of Actions in General. Most Cited Cases
  (Formerly 13k69(6), 13k69)
In suits to enjoin enforcement of Public Utility Holding Company Act of 1935, court had power to grant stay to abide proceedings instituted in another district to test constitutionality of such act. Public Utility

Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq.

**[5] Action 13 ☞69(5)**

13 Action
    13IV Commencement, Prosecution, and Termination
        13k67 Stay of Proceedings
          13k69 Another Action Pending
            13k69(5) k. Nature and Subject Matter of Actions in General. Most Cited Cases
    (Formerly 13k69(6), 13k69)
Staying suits to enjoin enforcement of alleged unconstitutional Public Utility Holding Company Act of 1935 until after decision by District Court in suit in another district to test constitutionality of act, and until determination by United States Supreme Court of any appeal therefrom, constituted abuse of discretion. Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79, et seq.

**[6] Federal Courts 170B ☞452**

170B Federal Courts
    170BVII Supreme Court
        170BVII(B) Review of Decisions of Courts of Appeals
          170Bk452 k. Certiorari in General. Most Cited Cases
    (Formerly 106k383(1))
Supreme Court, determining that District Court abused its discretion in staying suits to enjoin enforcement of alleged unconstitutional Public Utility Holding Company Act of 1935 until determination of suit instituted in another district to test constitutionality of act and until Supreme Court's determination of any appeal therefrom, would not determine whether a stay to continue until decision by District Court and then ending automatically would be moderate, in view of fact that following stay order, facts in test case had been settled by stipulation, briefs had been prepared, and case had been argued on merits justifying expectation of decision within reasonable time, but would remand case to District Court for reappraisal of facts and new exercise of discretion. Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq.

**[7] Federal Courts 170B ☞445**

170B Federal Courts
    170BVII Supreme Court
        170BVII(A) In General
          170Bk445 k. Appellate Jurisdiction and Procedure in General. Most Cited Cases
    (Formerly 106k379)
United States Supreme Court is a court of review and limits exercise of its jurisdiction in accordance with its function.
**\*\*163** Messrs. Homer S. **\*249** Cummings, Atty. Gen., Stanley F. Reed, Sol. Gen., of Washington, D.C., and Robert H. Jackson, Asst. Atty. Gen., for petitioners.

Mr. John C. Higgins, of New York City, for respondent.

Mr. Justice CARDOZO delivered the opinion of the Court.

The controversy hinges upon the power of a court to stay proceedings in one suit until the decision of another, and upon the propriety of using such a power in a given situation.

Respondents, nonregistered holding companies, brought suit in the District Court **\*\*164** for the District of Columbia to enjoin enforcement of the Public Utility Holding Company Act of 1935 (chapter 687, 49 Stat. 803 (15 U.S.C.A. s 79 et seq.)) on the ground that the Act in its entirety is unconstitutional and void. The complaint in No. 221 (the suit by the North American Company) was filed November 26, 1935; the complaint in No. 222 (the suit by the American Water Works & Electric Company) was filed the next day. By concession the two plaintiffs are holding companies within the meaning of the Act, and must register thereunder if the Act is valid as to them. One plaintiff, the North American Company, is at the apex of a pyramid which includes subsidiary holding companies as well as **\*250** subsidiary operating companies, these last being engaged as public utilities in supplying gas and electricity to consumers in different states. The other plaintiff, American Water Works & Electric Company, is at the apex of another pyramid including like subsidiaries. The defendants in both suits (petitioners in this court) are the members of the Securities and Exchange Commission, the Attorney General of the United States, and the Postmaster General.

On November 26, 1935, the Commission filed a bill of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

complaint in the District Court of the United States for the Southern District of New York to compel other holding companies, members of a different public utility system, to register with the Commission in accordance with the statute. At the beginning, the defendants were the Electric Bond & Share Company, the parent holding company, and five intermediate holding company subsidiaries. Sixteen other holding company subsidiaries were later added as defendants with the Government's consent. All the twenty-two defendants, parties to that suit, appeared and answered the complaint. All joined in a cross-bill contesting the validity of the Act and praying a decree restraining its enforcement. To give opportunity for full relief, the present petitioners appeared as cross-defendants, answering the cross-bill and opposing an injunction.

On December 7, 1935, the Attorney General filed a notice of motion in behalf of the petitioners for a stay of proceedings in Nos. 221 and 222, pending at that time in the District of Columbia. The petitioners had not yet submitted their answer to the bills, but their position as supporters of the statute in its application to respondents was made abundantly apparent. By the notice of motion it was shown that other suits to restrain the enforcement of the Act had been filed by other plaintiffs in the District of Columbia, and many more in other districts. The Government professed its anxiety to secure an early *251 determination of its rights, and to that end pledged itself to proceed with all due diligence to prosecute the suit which it had chosen as a test. There were representations that the trial of a multitude of suits would have a tendency 'to clog the courts, overtax the facilities of the Government, and make against that orderly and economical disposition of the controversy that is the Government's aim.' Accordingly the court was asked to stay proceedings in the suits at bar 'until the validity of said Act has been determined by the Supreme Court of the United States' in the Electric Bond & Share case, 'or until that case is otherwise terminated.' To that motion the plaintiffs filed an answer on December 12, 1935, contesting the power of the court to grant the requested stay, asserting that the questions to be passed upon in their suits were not identical with the questions presented in the test one, pointing out that the Act even if valid as applied to some companies, might be invalid as applied to others, and dwelling upon the loss that they were suffering day by day while the menace of the Act obstructed their business and cast a cloud on its legality.

Upon the argument of the motion the Attorney General and the Securities and Exchange Commission announced that until the validity of the Act had been determined by this court in a civil suit which would be diligently prosecuted, neither the Attorney General nor the Commission would seek to enforce the criminal penalties of the Act, and that even after such determination they would not seek to exact penalties for earlier offenses. Written notice to that effect was given to all prosecuting officers. At the same time the Postmaster General announced that even if he had authority, he would not exclude any company from using the mails because of any violation of the Act pending the judicial determination of its validity by this court. Also, the Commission issued **165 a regulation permitting a holding company, when registering,*252 to reserve any legal or constitutional right and to stipulate that its registration should be void and of no effect in the event that such a reservation should be adjudged invalid or ineffective. Finally, the Attorney General offered to submit to a temporary injunction restraining the enforcement of the Act until the Electric Bond & Share case should be determined by this court. On the other side, the plaintiffs offered to consolidate their cases and thus dispose of them as one. They also offered, as we were informed upon the argument, to select a group of suits, not more than three or four, to be tried at the same time, with the understanding that any others would then be held in abeyance. These offers were rejected, and the Government stood upon its motion.

How many suits for like relief were pending in the same and other districts was the subject of oral representations when the motion was submitted. By consent, however, an affidavit by the Attorney General was afterwards supplied with a stipulation of counsel supplementary thereto. The affidavit and stipulation were accepted by the Court, and give precision to representations that would otherwise be vague. From the affidavit it appeared that, in addition to the suits at bar, forty-seven suits had been brought in thirteen districts, five of them, afterwards reduced to four, in the District of Columbia, the others elsewhere. From the stipulation it appeared, however, that none of the cases in other districts would be heard or determined on the merits. The bills were to be dismissed or process was to be quashed in so far as relief was demanded against any officials who are parties to the present suits, and this for the reason that as to all

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

such defendants the venue was improper. In a few suits there were to be decrees pro confesso against local officials who had been instructed by the Attorney General not to offer a defense. The number of pending suits was thus reduced to those in the District of Columbia, though there *253 was a possibility, more or less uncertain, that there would be a renewal in that district of the suits begun elsewhere and discontinued or dismissed. Along with the affidavit and stipulation the Government submitted a copy of the complaint and the cross-bill in the suit against the Bond & Share Company.

Upon this showing the District Judge reached the conclusion that the motion should be granted, stating his reasons in an opinion. 'A decision,' he said, 'by the Supreme Court in the Electric Bond and Share case, even if it should not dispose of all the questions involved, would certainly narrow the issues in the pending cases and assist in the determination of the questions of law involved.' However, the granting of the motion would be conditioned upon diligent and active prosecution of the Government's suit. An order was made on January 9, 1936, staying all proceedings upon the terms and conditions stated in the opinion. From that order the Court of Appeals for the District of Columbia allowed a special appeal, which was heard in April, 1936 (four judges sitting), and decided in June. There were three opinions: An opinion by Mr. Justice Van Orsdel, concurred in by the Chief Justice; a separate opinion by Mr. Justice Groner; and a dissenting opinion by Mr. Justice Stephens. 85 F. (2d) 398, 400. The first opinion states the question before the court to be whether or not the District Court had 'abused its discretionary power in the control of its docket.' Standing alone, this statement would seem to concede that there was power, the inquiry being merely whether the power had been discreetly exercised. The concession, if made, was speedily withdrawn. A few sentences later we are told that the power is confined to cases where the issues and the parties are the same. The separate opinion of Groner, J., treats the subject with greater flexibility. He suggests that after joinder of issue there may be a postponement of the trial if the court *254 in the control of its own docket shall find that course expedient. He couples this with a statement that a stay so indefinite as the one before him would be too broad in any case. None the less, much latitude of judgment would have been left to the trial judge if the standards of that opinion had been adopted as a guide. But plainly they were not. The order of the Court of Appeals in each of

the two suits reverses the stay order and remands the cause 'for further proceedings not inconsistent with the opinion of this court.' Evidently the trial judge was expected to **166 conform to doctrine expounded for his instruction in the course of an opinion, yet he would have difficulty in knowing which opinion to select. He might believe that comity or deference constrained him to submit to the opinion approved by two members of the reviewing court, since none had been accepted by the vote of a majority. At the very least there was a likelihood, and indeed almost a certainty, of confusion and embarrassment. In such circumstances the call is plain for a decision that will mark with greater clearness the bounds of power and discretion. We granted certiorari that this result might be attained.

[1][2][3] Viewing the problem as one of power, and of power only, we find ourselves unable to assent to the suggestion that before proceedings in one suit may be stayed to abide the proceedings in another, the parties to the two causes must be shown to be the same and the issues identical. Indeed, counsel for the respondents, if we understand his argument aright, is at one with us in that regard, whatever may have been his attitude at the hearing in the courts below. Apart, however, from any concession, the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must *255 weigh competing interests and maintain an even balance. Kansas City Southern R. Co. v. United States, 282 U.S. 760, 763, 51 S.Ct. 304, 305, 306, 75 L.Ed. 684; Enelow v. New York Life Ins. Co., 293 U.S. 379, 382, 55 S.Ct. 310, 311, 79 L.Ed. 440. True, the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else. Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both. Considerations such as these, however, are counsels of moderation rather than limitations upon power. There are indeed opinions, though none of them in this court, that give color to a stricter rule. Impressed with the likelihood or danger of abuse, some courts have stated broadly that, irrespective of particular conditions, there is no power by a stay to compel an unwilling litigant to wait upon the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

outcome of a controversy to which he is a stranger. Dolbeer v. Stout, 139 N.Y. 486, 489, 34 N.E. 1102; Rosenberg v. Slotchin, 181 App.Div. 137, 138, 168 N.Y.S. 101; cf. Wadleigh v. Veazie, Fed.Cas.No.17,031; Checker Cab Mfg. Co. v. Checker Taxi Co. (D.C.) 26 F.(2d) 752; Jefferson Standard Life Ins. Co. v. Keeton (C.C.A.) 292 F. 53. Such a formula, as we view it, is too mechanical and narrow. Kansas City Southern R. Co. v. United States, supra; Friedman v. Harrington (C.C.) 56 F. 860; Amos v. Chadwick, L.R. 9 Ch.Div. 459; L.R. 4 Ch.Div. 869, 872. All the cases advancing it could have been adequately disposed of on the ground that discretion was abused by a stay of indefinite duration in the absence of a pressing need. If they stand for more than this, we are unwilling to accept them. Occasions may arise when it would be 'a scandal to the administration of justice' in the phrase of Jessel, M.R. (Amos v. Chadwick, L.R. 9 Ch.Div. 459, 462), if power to coordinate the business of the court efficiently and sensibly were lacking altogether.

*256 [4] We must be on our guard against depriving the processes of justice of their suppleness of adaptation to varying conditions. Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted. In these Holding Company Act cases great issues are involved, great in their complexity, great in their significance. On the facts there will be need for the minute investigation of intercorporate relations, linked in a web of baffling intricacy. On the law there will be novel problems of far-reaching importance to the parties and the public. An application for a stay in suits so weighty and unusual will not always fit within the mould appropriate to an application for such relief in a suit upon a bill of goods. True, a decision in the cause then pending in New York may not settle every question of fact and law in suits by other companies, but in all likelihood it will settle many and simplify them all. Even so, the burden of making out the **167 justice and wisdom of a departure from the beaten track lay heavily on the petitioners, suppliants for relief, and discretion was abused if the stay was not kept within the bounds of moderation.

[5] We are satisfied that the limits of a fair discretion are exceeded in so far as the stay is to continue in effect after the decision by the District Court in the

suit against the Bond & Share Company, and until the determination by this court of any appeal therefrom. Already the proceedings in the District Court have continued more than a year. With the possibility of an intermediate appeal to the Circuit Court of Appeals, a second year or even more may go by before this court will be able to pass upon the Act. Whether the stay would have been proper if more narrowly confined will be considered later on. For the moment we fix the uttermost limit as the date of the first *257 decision in the suit selected as a test, laying to one side the question whether it should even go so far. How the District Court in New York will decide the issues in that case is not to be predicted now. The Act may be held valid altogether, or valid in parts and invalid in others, or void in its entirety. Whatever the decision, the respondents are to be stayed by the terms of the challenged order until this court has had its say. They are not even at liberty, in case of an adjudication of partial invalidity, to bring themselves within the class adjudged to be exempt, though their membership in such a class may be uncertain or contested. Relief so drastic and unusual overpasses the limits of any reasonable need, at least upon the showing made when the motion was submitted.

We think the answer is inadequate that in the contingencies suggested the respondents will be at liberty to move to vacate the stay, and will prevail upon that motion if they can satisfy the court that its restraints are then oppressive. To drive them to that course is to make them shoulder a burden that should be carried by the Government. The stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description. When once those limits have been reached, the fetters should fall off. To put the thought in other words, an order which is to continue by its terms for an immoderate stretch of time is not to be upheld as moderate because conceivably the court that made it may be persuaded at a later time to undo what it has done. Disapproval of the very terms that have already been approved as reasonable is at best a doubtful outcome of an application for revision. If a second stay is necessary during the course of an appeal, the petitioners must bear the burden, when that stage shall have arrived, of making obvious the need. Enough for present purposes that they have not done so yet.

*258 [6][7] From the stay in its operation during the

course of an appeal, we pass to the stay in its operation while the test suit is undetermined. That aspect of the order is subject to separate considerations and calls for separate treatment. The Government contends that a stay thus limited in duration is not unreasonably long, and that the respondents have been sufficiently protected against substantial loss or prejudice. The respondents deny that this is so, and insist that loss or prejudice, substantial in degree, is possible and even probable. We do not find it necessary to determine whether a stay to continue until the decision by the District Judge, and then ending automatically, would be moderate or excessive if viewed as of the time when the order differently conditioned was placed upon the files. Almost a year has gone by since the entry of that order, and in the intervening months many things have happened. All the parties have united in bringing these happenings to our notice and in inviting us to consider them. In the suit against the Bond & Share Company the facts have now been settled by stipulation; the briefs have been prepared; the case has been argued on the merits; and a decision may be expected within a reasonable time. With these happenings disclosed a decision by this court, if directed to the fairness of the stay order as of the date of its entry and if based upon a record made up substantially a year ago, would have little relation to present day realities. 'This court is a court of review and limits the exercise of its jurisdiction in accordance with its function.' AEro Mayflower Transit Co. v. Georgia Public Service Commission, 295 U.S. 285, 294, 55 S.Ct. 709, 713, 79 L.Ed. 1439. To bring about a fitting correspondence**168** between rulings and realities, there must be a new appraisal of the facts by the court whose function it is to exercise discretion, and an appraisal in the light of the situation existing and developed at the time of the rehearing. Patterson v. Alabama, 294 U.S. 600, 607, 55 S.Ct. 575, 578, 79 L.Ed. 1082; **\*259**Watts, Watts & Co. v. Unione Austriaca, 248 U.S. 9, 21, 39 S.Ct. 1, 63 L.Ed. 100, 3 A.L.R. 323. Benefit and hardship will be set off, the one against the other, and upon an ascertainment of the balance discretionary judgment will be exercised anew.

In each suit, the decree of the Court of Appeals is reversed, the order of the District Court vacated, and the cause remanded to the District Court to determine the motion for a stay in accordance with the principles laid down in this opinion.

Reversed.

Mr. Justice McREYNOLDS concurs in the result.
Mr. Justice STONE took no part in the consideration or decision of this case.
U.S. 1936.
Landis v. North American Co.
299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 6

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Monday, September 14, 2009 23:23 Central |
| Client Identifier: | BARNETT |
| Database: | FEDFIND |
| Citation Text: | 99 F.3d 325 |
| Lines: | 283 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



99 F.3d 325, 65 USLW 2316, Fed. Sec. L. Rep. P 99,337, 36 Fed.R.Serv.3d 321, 96 Cal. Daily Op. Serv. 7966, 96 Daily Journal D.A.R. 13,219
 **(Cite as: 99 F.3d 325)**

United States Court of Appeals,
Ninth Circuit.
Ajit K. MEDHEKAR; Sid Agrawal; C.N. Reddy; C.N. Reddy Investments, Inc.; N. Damodar Reddy; N.D.R. Investments, Inc.; Ronald K. Shelton; Alliance Sem-iconductor Corp., Petitioners,
v.
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, Respondent,
and
Robert Hockey, on behalf of himself and all others similarly situated, Real Party in Interest.
**No. 96-70437.**

Argued and Submitted by Telephone to Motions Panel Oct. 1, 1996.
Decided Oct. 31, 1996.

Defendants in securities fraud action petitioned for writ of mandamus directing the district court to stay the initial disclosure requirements of Federal Rules of Civil Procedure and local rule, pending disposition by district court of defendants' motion to dismiss the action. After the District Court for the Northern District of California, Marilyn H. Patel, J., 932 F.Supp. 249, declined to stay disclosure requirements, the Court of Appeals held that initial disclosures constitute "discovery or other proceedings" under Private Securities Litigation Reform Act.

Petition granted.

West Headnotes

**[1] Mandamus 250 1**

250 Mandamus
    250I Nature and Grounds in General
        250k1 k. Nature and Scope of Remedy in General. Most Cited Cases
Review by way of petition for writ of mandamus is extraordinary and will only be granted if certain ex-

acting standards are met.

**[2] Mandamus 250 1**

250 Mandamus
    250I Nature and Grounds in General
        250k1 k. Nature and Scope of Remedy in General. Most Cited Cases
Factors to be considered in deciding whether to grant mandamus are whether petitioner has no other adequate means, such as direct appeal, to attain desired relief; whether petitioner will be damaged or prejudiced in way not correctable on appeal; whether district court's order is clearly erroneous as matter of law; whether district court's order is an oft-repeated error, or manifests persistent disregard of federal rules; and whether district court's order raises new and important problems, or issues of law of first impression.

**[3] Mandamus 250 4(4)**

250 Mandamus
    250I Nature and Grounds in General
        250k4 Remedy by Appeal or Writ of Error
            250k4(4) k. Modification or Vacation of Judgment or Order. Most Cited Cases

**Mandamus 250 32**

250 Mandamus
    250II Subjects and Purposes of Relief
        250II(A) Acts and Proceedings of Courts, Judges, and Judicial Officers
            250k32 k. Proceedings in Civil Actions in General. Most Cited Cases
Mandamus was appropriate vehicle for review of issue whether initial disclosure requirements of Federal Rules of Civil Procedure and accompanying local rules constituted "discovery" or "other proceedings" for purposes of Private Securities Litigation Reform Act's stay provision; district court's order denying petitioners' motion to stay disclosure requirements of Act was not immediately appealable, harm sought to be avoided, the burden and cost of providing initial disclosures, could not be corrected in subsequent

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

99 F.3d 325, 65 USLW 2316, Fed. Sec. L. Rep. P 99,337, 36 Fed.R.Serv.3d 321, 96 Cal. Daily Op. Serv. 7966, 96 Daily Journal D.A.R. 13,219
 **(Cite as: 99 F.3d 325)**

appeal from final judgment, and order raised important question of first impression. Securities Exchange Act of 1934, § 21D(b)(3)(B), as amended, 15 U.S.C.A. § 78u-4(b)(3)(B); Fed.Rules Civ.Proc.Rule 26(a)(1), 28 U.S.C.A.; U.S.Dist.Ct.Rules N.D.Cal., Civil Rule 16-5.

**[4]** Federal Civil Procedure 170A ⛏1264

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1264 k. Actions In Which Remedy Is Available. Most Cited Cases
Initial disclosure requirements of Federal Rules of Civil Procedure and accompanying local rules constitute "discovery" or "other proceedings" which, under Private Securities Litigation Reform Act, must be stayed pending disposition of motion to dismiss. Securities Exchange Act of 1934, § 21D(b)(3)(B), as amended, 15 U.S.C.A. § 78u-4(b)(3)(B); Fed.Rules Civ.Proc.Rule 26(a)(1), 28 U.S.C.A.; U.S.Dist.Ct.Rules N.D.Cal., Civil Rule 16-5.
**\*325** Joyce M. Cartun and Norman J. Blears, Heller, Ehrman, White & McAuliffe, Palo Alto, CA, for petitioners.

William S. Dato, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, for real party in interest.

**\*326** Jeffrey S. Facter, Steven A. Maddox and Michele F. Kyrouz (briefed), Shearman & Sterling, San Francisco, CA, for amici curiae The National Venture Capital Association and The Information Technology Association of America.

Appeal from the United States District Court for the Northern District of California, Marilyn H. Patel, District Judge, Presiding. D.C. No. CV-96-815-MHP.

Before: BROWNING, SCHROEDER and RYMER, Circuit Judges.

PER CURIAM:

Petitioners are defendants in a securities fraud action filed by real party in interest in connection with the purchase and sale of stock in one of the defendant companies. Petitioners seek a writ of mandamus directing the district court to stay the initial disclosure requirements of Fed.R.Civ.P. 26(a)(1) and Northern California Civil Local Rule 16-5 pending the disposition by the district court of defendants' motion to dismiss the action. The district court in a published opinion ordered the disclosures to go forward. *Hockey v. Medhekar, 932 F.Supp. 249 (N.D.Cal.1996)*. We accept mandamus review and grant the petition.

This petition raises a question of first impression relating to interpretation of the Private Securities Litigation Reform Act of 1995 (the "Act"), P.L. 104-67, codified at 15 U.S.C. §§ 77a et seq. Pursuant to section 21D(b)(3)(B) of the Act, "all discovery and other proceedings" must be stayed pending the disposition of a motion to dismiss a securities action covered by the Act. 15 U.S.C. § 78u-4(b)(3)(B). It is undisputed that the Act applies to this action, and that the limited statutory exception to the stay of discovery is not applicable here. The only question presented in this petition is whether the initial disclosure requirements of Fed.R.Civ.P. 26(a)(1) and accompanying local rules constitute "discovery" or "other proceedings" for purposes of the stay provision. We hold that such disclosures are discovery for purposes of the Act.

(1) Jurisdiction

**[1]** Before addressing the merits of the petition, we must determine whether mandamus review is appropriate. Review by way of a petition for writ of mandamus is extraordinary and will only be granted if certain exacting standards are met. *See Bauman v. United States District Court, 557 F.2d 650 (9th Cir.1977)*.

**[2]** Under *Bauman*, five factors are to be considered in deciding whether to grant mandamus: (1) whether the petitioner has no other adequate means, such as a direct appeal, to attain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems, or issues of law of first impression. *Id.* at 654-55.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

99 F.3d 325, 65 USLW 2316, Fed. Sec. L. Rep. P 99,337, 36 Fed.R.Serv.3d 321, 96 Cal. Daily Op. Serv. 7966, 96 Daily Journal D.A.R. 13,219
 **(Cite as: 99 F.3d 325)**

[3] Petitioners have satisfied the first *Bauman* factor, in that the district court's published opinion denying their motion to stay the disclosure requirements under the Act is not immediately appealable. *See Admiral Insurance Co. v. United States District Court, 881 F.2d 1486, 1491 (9th Cir.1989)* (discovery orders not immediately appealable). Neither is it appropriate for certification pursuant to Fed.R.Civ.P. 54(b) (relating to the dismissal of some claims or parties) or 28 U.S.C. § 1292(b) (requiring a controlling question of law whose determination would materially advance the termination of the litigation). Consequently, there is no avenue for immediate review of the district court's opinion except by mandamus.

Petitioners have also satisfied the second *Bauman* factor, in that the harm sought to be avoided, the burden and cost of providing the initial disclosures, cannot be corrected in a subsequent appeal from a final judgment in the absence of mandamus relief. *See Admiral Insurance Co., 881 F.2d at 1491.* To the extent that potential harm exists in this case, it is irreparable and probably cannot even be **\*327** addressed in a subsequent appeal from entry of a final judgment because it will be moot. It is the precise harm intended to be avoided by the stay provision of the Act. *See* 141 Cong.Rec. H13691, H13700 (daily ed. Nov. 28, 1995) (purpose of stay provision to minimize costs for defendants during pendency of motion to dismiss).

Because this is a question of first impression not yet addressed by any circuit court in a published opinion, petitioners cannot satisfy the third and fourth *Bauman* factors, requiring a showing of a clear or oft-repeated error by the district court. It is not necessary to satisfy all five of the *Bauman* factors, however, and would in fact be impossible to do so in light of the fifth factor, which is the existence of a new and important question of first impression. *See Admiral Insurance Co., 881 F.2d at 1491* (not necessary to satisfy all five factors; fourth and fifth factors rarely if ever present together). This last factor is clearly satisfied here.

Given the fact that this is an important question of first impression, and the likelihood that this court will not have the opportunity to address the issue in the context of a later appeal from the judgment, mandamus is an appropriate vehicle for review in this situation.

(2) Discussion

The Act provides that, upon the filing of a motion to dismiss by the defendants in a private securities fraud action, "all discovery and other proceedings shall be stayed during the pendency" of such motion. 15 U.S.C. § 78u-4(b)(3)(B). Fed.R.Civ.P. 26(a)(1) requires that parties to any civil action must, without waiting for discovery requests, provide to the other parties: (a) the name and address of individuals likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings; (b) a copy or description of all documents and things in the party's custody that are relevant to disputed facts alleged with particularity in the pleadings; (c) a computation of damages claimed by the disclosing party; and (d) copies of relevant insurance agreements.

The single issue presented by this petition is whether the terms "discovery" or "other proceedings" as used in the Act include the initial disclosures required by Rule 26(a) and related local rules.

(a) *Discovery*

[4] The district court held that "initial disclosures" is a term of art created by Congress and the Judicial Conference in 1993 as a supplement to discovery, and that, throughout the discovery rules, it is used separately from the term discovery. *Hockey v. Medhekar, 932 F.Supp. 249, 251-52 (N.D.Cal.1996).* The court determined that Congress had chosen in amending the discovery rules to make a distinction between discovery and disclosures, and that Congress neglected to acknowledge the existence of or include disclosure requirements in enacting the stay of discovery provision of the 1995 Act. *Id.* The court held that this omission is significant, and that, even if an intent to omit disclosures in the Act can not be affirmatively presumed, Congress should have been more precise in using language it knew to be ambiguous. *Id.*

In addition, real party in interest argues that the omission of initial disclosures from the Act's stay of discovery is not inconsistent with the purpose of the Act. Real party in interest argues that the stay provisions of the Act were designed to alleviate the expense and burden of formal discovery prior to a ruling on a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

99 F.3d 325, 65 USLW 2316, Fed. Sec. L. Rep. P 99,337, 36 Fed.R.Serv.3d 321, 96 Cal. Daily Op. Serv. 7966, 96 Daily Journal D.A.R. 13,219
 **(Cite as: 99 F.3d 325)**

motion to dismiss, and that the initial disclosure requirements fulfill a similar purpose by eliminating the costs of formal discovery in the early stages of litigation and by preventing "fishing expeditions" prior to having to state a valid claim. Real party asserts that, because disclosures are limited to facts alleged with particularity in the pleadings, they are sufficiently narrow to avoid the evils addressed by Congress in the Act.

While this court is mindful of the concerns of real party in interest that including the initial disclosure requirements in the discovery stay might lead to unnecessary or unreasonable delays in the early stages of litigation, we must consider the usage of initial disclosures in the context of the federal discovery**328** rules to determine whether such disclosures are discovery for purposes of the Act. We conclude that initial disclosures are a subset of discovery, and that, as such, they are included in the Act's stay provision.

The initial disclosure requirements of Rule 26(a) are contained in a rule entitled "general provisions governing discovery; duty of disclosure," which is found in a section entitled "depositions and discovery." The drafters of Rule 26(a) intended these disclosures to serve as "the functional equivalent" to discovery, and to eliminate the need for formal discovery at the early stages of litigation. 1993 Advisory Committee Notes to Fed.R.Civ.P. 26(a)(1).

The federal discovery rules contain numerous examples in which disclosures are treated as a subset of discovery. See Fed.R.Civ.P. 26(a)(1)-(5) (identifying different forms of disclosures and methods to discover additional matters); Fed.R.Civ.P. 26(c) (availability of protective orders relating to discovery or disclosures); Fed.R.Civ.P. 26(f) (including disclosures in the discovery plan). The fact that the rules refer to disclosures and discovery as two distinct terms does not alter the usage of disclosures as a form of discovery any more than does the use of the distinct term alter the usage of depositions as a form of discovery.

In addition, although disclosures are intended to be less burdensome than formal discovery, the time and expense involved in the identification and production of documents and other items required by the disclosure rule is exactly the type of burden sought to be

eliminated by the Act. See 141 Cong.Rec. at H13700 (stay provision designed to minimize unnecessary imposition of costs on defendants); 141 Cong.Rec. S19146, S19151 (daily ed. Dec. 22, 1995) (judicial determination of merit should precede imposition of time and expense of turning over company's records to plaintiffs). Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed. See 141 Cong.Rec. at H13699 (Act to prevent practice of filing premature or baseless lawsuits in hopes of obtaining grounds through discovery process); 141 Cong.Rec. at S19151 (judges should determine merit of complaint before defendants are required to turn over company's records).

### (b) *Other Proceedings*

To the extent that it can be argued that initial disclosures are not the same as discovery, we hold that such disclosures are at a minimum included in the ban on "other proceedings" during the pendency of a motion to dismiss.

The district court held that the term "other proceedings" refers only to judicial proceedings relating to discovery, such as a motion to compel discovery or a request for a protective order. Medhekar, 932 F.Supp. at 253. The court held that the term "proceedings" implies a formal activity involving the court's participation, and does not include informal activity by the parties outside of the courtroom. Id. Real party in interest further argues that, to include disclosures in the term "other proceedings" would be to construe that term so broadly as to include every possible movement or activity relating to the litigation, and would be an absurd interpretation of the Act.

We disagree that the term "other proceedings" must be either very narrowly or very broadly interpreted. Disclosure requirements are as much a "supplement" to plaintiffs' narrowly defined "discovery" as anything could be. Given the context and legislative history of the Act, it appears that the term was intended to include litigation activity relating to discovery, which would certainly include disclosures and would not, as real party fears, include all litigation activity in general. See 141 Cong.Rec. at H13699 (intent of Act to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

99 F.3d 325, 65 USLW 2316, Fed. Sec. L. Rep. P 99,337, 36 Fed.R.Serv.3d 321, 96 Cal. Daily Op. Serv. 7966, 96 Daily Journal D.A.R. 13,219
 **(Cite as: 99 F.3d 325)**

minimize unnecessary costs of production of documents and to prevent abusive filings in which facts are sought after initiation of litigation).

(3) Conclusion

We hold that the initial disclosure requirements of Fed.R.Civ.P. 26(a) and related local rules are "discovery" or "other proceedings" for purposes of the Act's stay provision, and **\*329** that such disclosures must be stayed pending the disposition of a motion to dismiss in an action covered by the Act. Consequently, the petition for a writ of mandamus is granted and the district court's opinion is vacated.

**PETITION GRANTED**.

C.A.9 (Cal.),1996.
Medhekar v. U.S. Dist. Court for the Northern Dist. of California
99 F.3d 325, 65 USLW 2316, Fed. Sec. L. Rep. P 99,337, 36 Fed.R.Serv.3d 321, 96 Cal. Daily Op. Serv. 7966, 96 Daily Journal D.A.R. 13,219

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 7

**Westlaw Delivery Summary Report for KREEP,GARY G**

Date/Time of Request:                Monday, September 14, 2009 23:22 Central
Client Identifier:                       BARNETT
Database:                               FSFIND
Citation Text:                          917 F.Supp. 717
Lines:                                    439
Documents:                             1
Images:                                  0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.


917 F.Supp. 717, Fed. Sec. L. Rep. P 99,033
 **(Cite as: 917 F.Supp. 717)**

☞

United States District Court,
S.D. California.

MEDICAL IMAGING CENTERS OF AMERICA,
INC., Plaintiff/Appellant,
v.
Warren G. LICHTENSTEIN, et al., Defendants/Appellees.
**Civil No. 96-0039-B.**

Feb. 14, 1996.

Corporation brought suit against group seeking to elect alternative slate of board of directors, alleging proxy solicitation violations under Williams Act. Proxy solicitors moved to dismiss. Corporation moved for order to allow expedited discovery. The District Court, Brewster, J., affirming ruling of Battaglia, United States Magistrate Judge, held that: (1) "undue prejudice," required to be shown in order to obtain court order authorizing discovery during pendency of motion to dismiss securities suit, meant improper or unfair detriment amounting to less than irreparable harm, and (2) "undue prejudice" was not found based upon corporation's need to have discovery prior to date set for election of directors.

Motion to dismiss denied.

West Headnotes

**[1] Injunction 212 ☞138.42**

212 Injunction
 212IV Preliminary and Interlocutory Injunctions
 212IV(A) Grounds and Proceedings to Procure
 212IV(A)3 Subjects of Relief
 212k138.42 k. Corporate Management and Dealings. Most Cited Cases
In corporate control contests, stage of preliminary injunctive relief, rather than postcontest lawsuits, is time when relief can best be given.

**[2] Federal Civil Procedure 170A ☞1264**

170A Federal Civil Procedure
 170AX Depositions and Discovery
 170AX(A) In General
 170Ak1264 k. Actions in Which Remedy Is Available. Most Cited Cases
"Undue prejudice" sufficient under Securities Exchange Act to overcome statutory bar to discovery pending resolution of motion to dismiss, means improper or unfair detriment amounting to something less than irreparable harm. Securities Exchange Act of 1934, § 21D(b)(3)(B), as amended, 15 U.S.C.A. § 78u-4(b)(3)(B).

**[3] Federal Civil Procedure 170A ☞1264**

170A Federal Civil Procedure
 170AX Depositions and Discovery
 170AX(A) In General
 170Ak1264 k. Actions in Which Remedy Is Available. Most Cited Cases
Corporation did not show "undue prejudice," required to override statutory bar to discovery during pendency of motion to dismiss securities action, in connection with its request to discover further information regarding entity seeking to take over corporation through proxy solicitation process, even though corporation claimed it would be prejudiced if discovery could not be conducted prior to date for vote on directors; there were preliminary indications that discovery would not result in disclosure of proxy solicitation violations, claim that information regarding percentage of ownership of solicitors was necessary to determine whether "poison pill" should be activated was weakened by evidence that corporation had decided not to use "pill" for other business reasons, and there were procedures for undoing corporate takeover if post-contest discovery revealed proxy solicitation violations.

*717 Peter H. Benzian, Latham & Watkins, San Diego, CA, James W. Baker, Latham & Watkins, San Diego, CA, for plaintiff.

Donald G. Rez, Cynthia A. Fissel, Sullivan, Hill, Lewin, Rez, Engel & Labazzo, San Diego, CA, David E. Bamberger, Olshan, Grundman Frome & Rosenz-

917 F.Supp. 717, Fed. Sec. L. Rep. P 99,033
**(Cite as: 917 F.Supp. 717)**

weig, New York City, Paul Gonson, Securities &
Exchange Commission, Washington, DC, as Amicus
Curiae, for defendants.

### ORDER AFFIRMING THE MAGISTRATE JUDGE'S ORDER STAYING DISCOVERY BY PLAINTIFF/APPELLANT PENDING RESOLUTION OF DEFENDANTS'/APPELLEES' MOTION TO DISMISS

BREWSTER, District Judge.

On February 7, 1996, this Court held a hearing in the
above-captioned matter considering **\*718** Plaintiff's
Objection to Magistrate Judge Anthony J. Battaglia's
ruling of January 19, 1996, which denied Plaintiff's
Motion for Expedited Discovery and granted Defendants' Motion for a Stay of Discovery. Peter H. Benzian, Esq. and James W. Baker, Esq. appeared on
behalf of Plaintiff/Appellant, Medical Imaging Centers of America (MICA). Donald G. Rez, Esq., Cynthia A. Fissel, Esq. and David E. Bamberger, Esq.
appeared on behalf of the Defendants/Appellees,
Warren F. Lichtenstein, et. al. Paul Gonson, Esq.
appeared on behalf of the Securities and Exchange
Commission, which has entered in this case as Amicus
Curiae.

After due consideration of the parties' briefs and arguments in this matter, the Court AFFIRMS the Magistrate Judge's Order.

### I. INTRODUCTION

On December 22, 1995, Congress passed the Private
Securities Litigation Reform Act of 1995 (hereinafter
"Reform Act"). This appeal presents a case of first
impression interpreting a provision of these new
amendments to the federal securities laws which it is
suggested was designed to prevent discovery "fishing
expeditions" by plaintiffs.

The parties are before this Court pursuant to an action
filed by Appellant alleging various violations of federal and state law by Appellees, and requesting declaratory and injunctive relief. Appellant is seeking,
among other things, to enjoin Appellees' continuing
violations of disclosure requirements by acquiring
shareholders, particularly with respect to a special
shareholders meeting scheduled for February 26,

1996, which was called by Appellees pursuant to
California Corporations Code §§ 600-601. Appellees
have filed a proxy statement and indicated their intention to unseat the current Board of Directors of
MICA at this meeting.

On January 10, 1996, following Appellees' call for the
special meeting, Appellant filed a Complaint seeking
damages alleging (1) violations of Section 13(d) of the
Securities Exchange Act (hereinafter "1934 Act"), 15
U.S.C. § 78m(d)(1); FN1 and (2) tortious interference
with economic relations. In response to Appellant's
Complaint, Appellees filed a Motion to Dismiss the
Complaint, based on their contention that they have
not violated the law as described by Appellant. In
preparation for the preliminary injunction hearing,
Appellant made a Motion for Expedited Discovery, **\*719** requesting leave to depose witnesses and
gather documents. In response, Appellees filed a Motion to Stay Discovery pending a decision on Appellees' Motion to Dismiss.

> FN1. Section 13(d)(1) and Rule 13d-1, require that any "person" who acquires beneficial ownership of more than five percent of
> the equity securities of a publicly held company disclose their position in a Schedule
> 13D filing to the SEC within ten days after
> such acquisition. 15 U.S.C. § 78m(d)(1); 17
> C.F.R. § 240.13d-1. In addition, they must
> disclose, "the background, and identity, residence, and citizenship of, and the nature of
> such beneficial ownership by such persons
> and all other persons by whom or on whose
> behalf the purchases have been or are to be
> effected." Id. A "person" can be defined to
> include a group of owners who have agreed
> to act together in "acquiring, holding or
> disposing of securities." 15 U.S.C. §
> 78m(d)(3). Section 13(d)(2) and Rule 13d-2
> require that whenever any "material" change
> occurs in the facts set forth in a Schedule
> 13D, the person must promptly file an
> amendment disclosing the "material"
> changes. 15 U.S.C. § 78m(d)(2); 17 C.F.R. §
> 240.13d-2. Section 13(d) is "intended to
> protect investors by enabling them to receive
> facts that are material to an informed investment decision." Purolator, Inc. v. Tiger
> Int'l., Inc., 510 F.Supp. 554, 555-56
> (D.D.C.1981).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

917 F.Supp. 717, Fed. Sec. L. Rep. P 99,033
 **(Cite as: 917 F.Supp. 717)**

Appellant alleges, in brief, that Appellees violated the provisions of Section 13(d) by: (1) failing to properly identify, as required by Schedule 13D, Item 3 a "foreign investment company" which Appellant argues is a member of the ownership "group" as defined by the statute, (2) failing to truthfully and completely indicate the group's entire beneficial interest, which Appellant claims is in excess of 20%, (3) failing to completely disclose all "agreements and contracts" concerning MICA stock, and (4) failing to accurately describe their ownership intent as required by Schedule 13D, Item 4. Appellees, in their most recent amendment to their 13D filings indicate that their "group" controls 19.7% of MICA's outstanding shares. By contrast, Appellant alleges that the control group's ownership is in excess of 20% of the outstanding stock because an undisclosed and unnamed individual is purchasing shares of MICA, "on advice and counsel of Lichtenstein." (Plaintiff's Complaint ¶ 46). If Appellant's allegations were true, they could be the basis for claiming a violation of Section 13(d). In addition, MICA's by-laws contain a protective "poison pill" provision which could be activated if an "acquiring group" owned 20% or more of the outstanding stock and would allow the remaining 80% or less of the shareholders to purchase bargain priced shares, thereby diluting the voting power of the Appellees.

The Motion to Stay was based on Section 21D(b)(3)(B) of the newly enacted Reform Act, which provides, in relevant part, that:

In *any private action* arising under this title, all discovery and other proceedings *shall* be stayed during the pendency of any motion to dismiss, unless the court finds, upon the motion of any party, that particularized discovery is necessary to preserve evidence *or to prevent undue prejudice to that party.*

Section 21D(b)(3)(B) of the Reform Act, to be codified at 15 U.S.C. § 78u-4(b)(3)(B) (emphasis added).

At the hearing before the Magistrate Judge, Appellant alleged that without expedited discovery it would suffer several harms that amounted to "undue prejudice" and thus it should be exempted from the Section 21D(b)(3)(B) discovery stay. It repeats these arguments here. First, Appellant contends that without concrete evidence of stock ownership by the Appellees, it will be unable to consider the viability of instituting MICA's "poison pill" provisions, discussed *supra.* In response to questioning by the Court, however, it appears that Appellant is uncertain as to whether it wants to activate the "poison pill" even in the event it were available. [FN2] In addition, Appellant alleges that a finding of 13(d) violations on the part of the Appellees subsequent to the February 26th vote would require an "unscrambling of the eggs" in order to rescind the election and reinstate the original Board of Directors, causing harm to the corporation in the interim. Appellant also alleges that if the Appellees gain control of the corporation at the February 26th meeting, the current case maintained by the Appellant corporation will be dismissed and the alleged violations of the federal securities laws will never be adjudicated. Thus, Appellant argues that allowing it to pursue discovery prior to the February 26th vote is necessary to avoid "undue prejudice." After considering the arguments advanced by all parties, the Magistrate Judge denied Appellant's request to lift the statutory stay pursuant to Section 21D(b)(3)(B) of the Reform Act. Appellant now appeals that ruling.

FN2. Appellant indicated that the "poison pill" would have adverse effects for the Corporation and thus would not necessarily be used. In addition, the Court is unaware of any restriction in California law which would prevent Appellant from instituting the "poison pill" now if it believes in good faith, as it has contended for purposes of this action, that Appellees own more than 20% of MICA.

## II. STANDARD OF REVIEW

Reconsideration of a magistrate's order is governed by 28 U.S.C. § 636(b)(1)(A) and Fed.R.Civ.P. 72(a). Section 636(b)(1)(A) provides in part that "[a] judge of the court may reconsider any pretrial matter ... where it has been shown that the magistrate's order is clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a) echoes § 636. Rule 72(a) provides that, "[t]he

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Thus, for issues of fact determined by the Magistrate Judge, the District Court review must limit itself to conclusions that are "clearly erroneous." Section 636(b)(1), however, has been interpreted to provide for *de novo* review by the district court on issues of law. *Adolph Coors Co. v. Wallace,* 570 F.Supp. 202 (C.D.Cal.1983). Appellant contends that the case at bar presents a mixed question of fact and law. Because the Court agrees that the questions of fact and law in this case are at least closely intertwined and because no transcript of the proceeding below was prepared, the Court has undertaken a *de novo* review of both the legal and factual findings of the Magistrate Judge.

### III. MOTION FOR STAY OF DISCOVERY

[1] At the outset, the Court wishes to emphasize its predominating concerns in this case. First, the Court is concerned with upholding the underlying purpose of the federal securities laws: to ensure a healthy market environment by ensuring full and truthful disclosure of all material information. **\*720** Second, the Court believes that resolving disputed legal issues *ex ante,* prior to effected events such as the shareholders meeting that is precipitating the case at bar, is preferable to an *ex post* resolution of those issues, which may require an "unscrambling of the eggs." As the Supreme Court has noted, "in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, 'is the time when relief can best be given.' " *Piper v. Chris-Craft Indus.,* 430 U.S. 1, 41-42, 97 S.Ct. 926, 949-50, 51 L.Ed.2d 124 (1976) (citing *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (2d Cir.1969) (Friendly, J.)).

#### A. Standard of Law

At issue in this case is a new section of the 1934 Act, added by the Reform Act, which mandates a stay of discovery whenever a motion to dismiss is pending, unless either or both of two statutorily prescribed exceptions that mandate apply as follows: (1) "particularized discovery is necessary to preserve evidence" *or* (2) "to *prevent undue prejudice to that party.*" Section 21D(b)(3)(B) of the Reform Act

(emphasis added). No party contends the first exception applies; rather, the issue on this appeal is whether the facts of this case justify application of the second exception so as to permit immediate discovery for Appellant.

"The starting point for interpreting any statute is the plain meaning of the language used by Congress." *Lewis v. McAdam,* 762 F.2d 800, 804 (9th Cir.1985). *See also, Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). If questions remain after examining the plain language, the Court may attempt to infer Congressional intent. *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, ----, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994). Congress gave very little guidance as to the meaning of Section 21D(b)(3)(B). The legislative history concerning this provision of the new law provides that:

> Courts must stay all discovery pending a ruling on a motion to dismiss, unless exceptional circumstances exist where particularized discovery is necessary to preserve evidence or to prevent undue prejudice to a party. For example, the terminal illness of an important witness might require the deposition of the witness prior to the ruling on the motion to dismiss.

Statement of Managers-The "Private Securities Litigation Reform Act of 1995," 141 Cong.Rec. H13699, H13701 (daily ed. Nov. 28, 1995); H.Rep. 104-369, 104th Cong. 1st Sess. at 63 (hereinafter "Statement of Managers").

In considering Appellant's Motion for Expedited Discovery, and Appellees' Motion for a Stay, the Magistrate Judge was required to determine whether granting a stay would cause "undue prejudice" to Appellant. Both Appellant and the SEC have suggested that the Magistrate Judge, rather than applying an "undue prejudice" standard, instead "saddled" the Appellant with the burden of proving that the stay would cause "irreparable harm."

[2] This Court finds, in apparent agreement with all parties and the *Amicus* to this case, that the correct standard for granting an exception to the statutorily mandated stay of discovery is "undue prejudice" for the moving party. This "undue prejudice" standard is, as Appellant in this case has correctly stated, some-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

917 F.Supp. 717, Fed. Sec. L. Rep. P 99,033
**(Cite as: 917 F.Supp. 717)**

thing less than "irreparable harm." In contrast to "irreparable harm," "undue prejudice" means improper or unfair detriment.

The Court finds that such an interpretation is not only consistent with a plain reading of the statute, but is also consistent with both the underlying objectives of the securities law in general and with the stated purposes of the Reform Act. The introductory paragraphs of the Statement of Managers for the Reform Act noted that Congress, in passing this new legislation, was "prompted by significant evidence of abuse in private securities lawsuits," which Congress found to include, "the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle." *Statement of Managers, supra,* at 59. Congress also noted, however, the broader purpose of the federal securities laws, "to protect**721** investors and to maintain confidence in the securities markets, so that our national savings, capital formation and investment may grow for the benefit of all Americans." *Id.* Using an "undue prejudice" standard in applying the exception to the statutory discovery stay appropriately attempts to balance the competing concerns of maintaining truth and integrity in the marketplace while curbing meritless litigation.[FN3]

> [FN3.] The Court wishes to make clear that if the Appellees have in fact violated the disclosure provisions of the federal securities laws, the purpose of which is to preserve investor confidence in the integrity of the markets and protect investor access to important and material information by which they can make informed investment decisions, that such violations should ultimately be properly sanctioned. If, in fact, Appellant had shown that the discovery stay would prejudice it because the Appellees would be shielded from eventual liability for any material violations of the securities laws, the Court would find that an "undue prejudice" exception to the statutory stay had been shown. In the case at bar, however, the Court finds that the Appellant would have an adequate opportunity, following a favorable resolution of the Motion to Dismiss, to undertake adequate discovery if it were warranted, prior to the preliminary injunction hearing or the special shareholders meeting.

Appellant also argues that Section 21D(b)(3)(B) is simply not applicable, even under an "undue prejudice" standard, to a case such as this one which falls outside the category of lawsuits Congress was targeting with its Reform Act. Appellant argues that Congress was attempting to stem the tide of abusive litigation in the form of large class action "strike" lawsuits, rather than injunctive actions by a corporation. Appellant contends that such stays are more appropriate in the class action damages context, where time is not of the essence, than in "fast-paced" proxy contests. The SEC has echoed this sentiment, suggesting that the Reform Act was aimed more at suits claiming damages for *past harms* than at suits aimed at continuing or future violations, such as this one. While this may be true, it is but one factor which the Court should consider in interpreting the legislation as enacted, which the Court reads to *mandate* a discovery stay in "any private action" where a motion to dismiss is pending, unless one of the two exceptions is applicable. The legislation by its terms does not carve out specific types of actions which will be exempt from the stay. The Court notes, however, that the "undue prejudice" exception contemplates an analysis of the facts and circumstances surrounding a request for an exception to the mandated discovery stay, and the fact that such a request comes in the middle of a proxy contest may be appropriately considered by the Court as part of the totality of the circumstances.

**B. Appellant's Case: Application of the "Undue Prejudice" Standard**

Thus, in the case at bar, the Court must decide if Appellant will suffer "undue prejudice" as the result of being barred from pursuing discovery until after a favorable resolution on the Motion to Dismiss. In reaching these conclusions, the Court finds that the Magistrate Judge purported to apply the "undue prejudice" standard and did not overtly base his decision on an "irreparable harm" standard. The Magistrate Judge's opinion refers to "undue prejudice" several times while never mentioning "irreparable harm" as the correct standard. The real issue is whether, based on the facts presented, Appellant established a case of "undue prejudice."

Appellant argues that the Magistrate Judge's reference to the one example provided in the *Statement of*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

917 F.Supp. 717, Fed. Sec. L. Rep. P 99,033
 **(Cite as: 917 F.Supp. 717)**

*Managers, supra,* the "terminal illness of an important witness," indicates that the Magistrate Judge, despite using "undue prejudice" language, was applying what amounted to an "irreparable harm" standard. This Court agrees with the SEC that the "terminal illness of a witness" is an example pertaining to the first exception, "the need to preserve evidence," a provision which is not at issue here. The "terminal illness of a witness" is not applicable to consideration of the "undue prejudice" exception.

In reality, Appellant appears to be so persuaded by the weight of its own evidence of "undue prejudice" that the discovery denial by the Magistrate Judge must have appeared to Appellant to have been the result of application of an "irreparable harm" standard. **\*722** This Court does not agree. In undertaking its *de novo* review of the facts, the Court is not convinced that Appellant demonstrated *any* prejudice, let alone *undue* prejudice.

[3] Appellant has failed to show that it would be prejudiced by waiting until a favorable resolution of the Motion to Dismiss before proceeding with its discovery.

At the present time, the Appellant has not shown that Section 13(d) establishes a legal right to all the information Appellant seeks in discovery. The Court questioned the parties extensively regarding the specific facts of the Section 13(d) violations. Appellees indicated that (1) Appellant was aware of the potentially material information regarding the identity of the "foreign investment company" and, (2) that Appellees' relationship with the "foreign investment company" is in the nature of a blind trust which would not be subject to the Section 13(d) disclosure requirements. These factual and legal contentions were unanswered by Appellant, thus the Court concludes that, based on the briefing submitted at this time, Appellant has not demonstrated a legal right to some of the information sought in discovery.

Similarly, the Court notes that the initial Schedule 13D and subsequent amendments filed by Appellees do indicate their potential future intention to seek control of MICA. Appellant has not yet presented any evidence to the Court which indicates that this disclosure is not sufficient to inform Appellant of Appellees' ultimate intention to seek control of MICA.

Such issues will be briefed and decided at the hearing on the Motion to Dismiss, after which, if Appellant is successful in defeating the Motion, the statutory requirements for continuation of the stay will be lifted and Appellant will be free to pursue discovery prior to a hearing on the preliminary injunction, including expedited discovery, if appropriate.

Appellant urges that it will be unduly prejudiced if not permitted to discover whether Appellees control 20% or more of the MICA stock, so that Appellant may activate its "poison pill" defense to a proxy fight. Ironically, Appellant concedes that nothing is preventing it from so doing immediately, since it claims in good faith that Appellees in fact do control more than 20% of the stock. Appellant is unwilling to activate that defensive procedure for other business reasons. If so, the Court has difficulty seeing this contention as showing undue prejudice.

Finally, Appellant has repeatedly noted the short time frame surrounding this contest for corporate control, and has argued that it will be unduly prejudiced because it will be unable to complete discovery prior to the February 26th vote. While there is certainly time pressure, this is true in a majority of cases involving contests for corporate control, and thus does not constitute an "undue" burden which is unique. The Court can expedite discovery if it appears appropriate. In addition, the Court notes that Appellant would also be able to seek post-election remedies which, although potentially cumbersome and not as effective as pre-election remedies, would ferret out violations of the securities laws on the part of the Appellees. *See, e.g., Western Dist. Council v. Louisiana Pacific Corp., 892 F.2d 1412, 1416 (9th Cir.1989)* (awarding injunctive relief after a proxy contest was over). Thus, this Court concludes that the Magistrate Judge, considering the facts presented here, correctly applied the "undue prejudice" standard and found that Appellant had failed to meet that standard.

## IV. CONCLUSION

After consideration of all of the facts presented, the arguments and cases marshalled by all parties, and the oral presentations made at the hearing on this issue, the Court concludes that the Magistrate Judge correctly applied the discovery stay provision of the new Reform Act, Section 21D(b)(3)(B), to this case by

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

917 F.Supp. 717, Fed. Sec. L. Rep. P 99,033
 **(Cite as: 917 F.Supp. 717)**

holding Appellant to an "undue prejudice" standard, a standard it has failed to meet.

THEREFORE, the Court, after a de-novo hearing on Appellant's appeal from the Magistrate Judge's imposition of a discovery stay AFFIRMS the ruling of the Magistrate Judge and ORDERS the parties to appear before it on February 14, 1996, at 9:00 a.m. for a hearing on the Defendants' Motion to Dismiss. The Court also ORDERS the parties**\*723** to appear before it on February 21, 1996 at 1:30 p.m. for a hearing on the Plaintiff's Motion for a Preliminary Injunction, if appropriate. If needed, the Court will consider a request for expedited discovery if Plaintiff prevails on the Motion to Dismiss.

IT IS SO ORDERED.

S.D.Cal.,1996.
Medical Imaging Centers of America, Inc. v. Lichtenstein
917 F.Supp. 717, Fed. Sec. L. Rep. P 99,033

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 8

**Westlaw Delivery Summary Report for KREEP,GARY G**

Date/Time of Request:          Monday, September 14, 2009 23:22 Central
Client Identifier:             BARNETT
Database:                      FSFIND
Citation Text:                 961 F.Supp. 233
Lines:                         221
Documents:                     1
Images:                        0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

961 F.Supp. 233, Fed. Sec. L. Rep. P 99,552
 **(Cite as: 961 F.Supp. 233)**



United States District Court,
S.D. California.

Robert POWERS; Peter Franklin; Sea Breeze Print-
ing, Inc.; Garvin D Stanislawski; Starlog Group, Inc.
Defined Pension Plan, on behalf of themselves and all
others similarly situated, Plaintiff,
v.
Paul EICHEN; Robert Johnson; Kenneth E. Olson;
Frederick Parker; Michael Tamkin; Michael Vogt;
Dennis A. Whittler; Mary Zoeller; Arthur Minich;
John M. Siber; John Thomas; Jeffrey Nash; and,
Proxima Corporation, Defendants.
**Civil No. 96-1431 B AJB.**

April 15, 1997.

Securities fraud suit was brought. The District Court,
Brewster, J., granted in part and denied in part motion
to dismiss. Motion for reconsideration was filed. De-
fendants moved for protective order and to quash
subpenas. The District Court, Battaglia, United States
Magistrate Judge, held that automatic stay of discov-
ery during pendency of motion to dismiss, provided
for in Private Securities Litigation Reform Act
(PSLRA) applied also to period during which motion
for reconsideration of dismissal decision was under
review.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑**1264**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1264 k. Actions in Which Remedy Is
Available. Most Cited Cases

**Witnesses 410** 🔑**16**

**410** Witnesses
    **410I** In General
        **410k16** k. Subpoena Duces Tecum. Most Cited
Cases
Defendants in suit brought under Private Securities
Litigation Reform Act (PSLRA) had standing to seek
stay of subpoenas duces tecum issued to nonparties,
during pendency of motion to dismiss; PSLRA pro-
vided that "all" discovery was to be stayed while mo-
tion was decided. Securities Exchange Act of 1934, §
21D(b)(3)(B), as amended, 15 U.S.C.A. §
78u-4(b)(3)(B).

**[2] Federal Civil Procedure 170A** 🔑**1264**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1264 k. Actions in Which Remedy Is
Available. Most Cited Cases
Phrase "during the pendency of any motion to dis-
miss," contained in Private Securities Litigation
Reform Act (PSLRA) provision staying discovery for
that period, applies to time during which court is
considering motion for reconsideration of dismissal
decision. Securities Exchange Act of 1934, §
21D(b)(3)(B), as amended, 15 U.S.C.A. §
78u-4(b)(3)(B).
**\*234** Bill Grauer, San Diego, CA, for defendants.

Jan Adler, Sallie Blackman, San Diego, CA, Jennifers
Wells, Santa Barbara, CA, for plaintiff.

Order Granting Defendants' Motion for Protective
Order and Motion to Quash

BATTAGLIA, United States Magistrate Judge.

Defendants' Motion for Protective Order and Motion
to Quash came on regularly for hearing on April 14,
1997 at 9:00 a.m. before Magistrate Judge Anthony J.
Battaglia. Bill Grauer appeared on behalf of all de-
fendants; Jan Adler, Sallie Blackman, and Jennifers
Wells appeared on behalf of plaintiff. On behalf of all
purchasers of the common stock of Proxima Corpo-
ration ("Proxima"), plaintiffs' allege that defendants

961 F.Supp. 233, Fed. Sec. L. Rep. P 99,552
 **(Cite as: 961 F.Supp. 233)**

violated federal securities laws by making false and misleading statements to investors about the development of a new product by Proxima. Defendants' Motion for Protective Order and Motion to Quash is based on the Private Securities Litigation Reform Act of 1995 ("the Reform Act"), which provides for an automatic stay of discovery in private securities lawsuits during the pendency of a motion to dismiss.

In an order filed March 14, 1997, Judge Rudi M. Brewster granted in part and denied in part defendants' Motion to Dismiss and allowed plaintiffs sixty days to amend their complaint. Shortly thereafter, on March 26, 1997, defendants filed a Motion for Reconsideration, a Motion for Certification of Issue for Appeal,[FN1] and a Motion to Strike (collectively, "Motion for Reconsideration"). The Motion for Reconsideration is set for hearing on May 27, 1997. Defendants' contend that, in order to effectuate the purposes of the Reform Act, discovery in this action should be stayed while their Motion for Reconsideration of Judge Brewster's March 14, 1997 order is pending. By written opposition, plaintiffs oppose any further stay of discovery. Plaintiff further asserts that defendants lack standing to seek a stay of the subpenas that were issued to third parties.[FN2] Defendants also seek to quash document requests insofar as they relate to parties or portions of the complaint that were dismissed in Judge Brewster's order of March 14, 1997. Plaintiffs have not specifically addressed this issue in their written opposition but have indicated that they do not intend to amend the complaint as allowed by Judge Brewster's March 14, 1997 order.

>FN1. In their Motion for Reconsideration, defendants have alternatively requested that Judge Brewster certify the March 14, 1997 order for an interlocutory appeal and that Judge Brewster stay discovery pending the outcome of an interlocutory appeal.

>FN2. To support this argument, plaintiff cites In re Seagate Technology II Securities Litigation, 1993 WL 293008, 1993 U.S. Dist. LEXIS 18065 (N.D. Cal., June 15, 1993), which was not a Reform Act case.

*Discussion*

On March 4, 1997 through March 6, 1997, plaintiffs

served a total of eight subpenas duces tecum on nonparties, as well as a request for production of documents to ALL defendants, some of whom are no longer defendants pursuant to Judge Brewster's March 14, 1997 order. These document productions were scheduled to take place between March 24, 1997 and April 21, 1997. **\*235** On March 21, 1997, this Court granted defendants' ex parte application for a temporary stay of discovery pending the outcome of their Motion for Protective Order and Motion to Quash.

Defendants contend that the purposes of the Reform Act would be rendered meaningless if they are not entitled to a stay of discovery until all legal challenges to the complaint at the district and appellate courts have been resolved. Plaintiffs argue that this interpretation would extend the Reform Act beyond the plain language of the statute. It is plaintiffs' position that under the Reform Act defendants were only entitled to the automatic stay until March 3, 1997, when Judge Brewster indicated from the bench after oral argument that he intended to partially deny defendants' Motion to Dismiss. Plaintiffs also generally claim that they will be prejudiced by any further stay of discovery because it would cause an unnecessary delay in the resolution of this litigation and because documents maintained by unidentified third party witnesses may be destroyed absent a subpoena. However, plaintiffs have not cited any particular circumstances or evidence that indicates they will suffer actual prejudice if the Court orders a further stay of discovery.

Title 15, United States Code, section 78u-4(b)(3)(B), provides as follows:

In any private action arising under this title, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds, upon the motion of any party, that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

[1] By its language, the Reform Act addresses "all discovery" with no distinction between that sought from nonparties as opposed to parties. 15 U.S.C. 78u-4(b)(3)(B). As a result, defendants have standing to seek a stay of the subpenas duces tecum that were issued in this case to nonparties.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

961 F.Supp. 233, Fed. Sec. L. Rep. P 99,552
 **(Cite as: 961 F.Supp. 233)**

[2] The Reform Act does not specifically state whether a stay is proper while the district court is reconsidering its ruling on a motion to dismiss. Thus, in order to determine whether a stay is proper under these circumstances, this Court must decide whether the term "pendency" in section 21D(b)(3)(B) should be read narrowly to mean that discovery may commence as soon as the district court rules on a motion to dismiss or more broadly to include the district court's reconsideration of a ruling on a motion to dismiss.

"The starting point for interpreting any statute is the plain meaning of the language used by Congress." *Lewis v. McAdam,* 762 F.2d 800, 804 (9th Cir.1985). The court may look to legislative intent for guidance if questions remain after examining the plain language. *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 176-78, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994). In this case, the legislative history indicates that the Reform Act was passed to address widespread abuse of the securities laws by overzealous attorneys and investors. Congress found that the federal securities laws are frequently misused by the filing of frivolous suits "alleging violations of the federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation. These suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on nothing more than a company's announcement of bad news, not evidence of fraud." S. Rep. 104-98, 1995 WL 372783 (Leg.Hist.), at 4, U.S.Code Cong. & Admin.News 679, 683. Smaller start-up companies with unpredictable prospects, especially those involved in high technology, are particularly vulnerable. When a number of venture-backed companies less than ten years old was surveyed, it was learned that one in six had been sued at least once and that lawsuits had consumed an average of 1,055 hours of management time and $692,000 in legal fees. *Id.* at 8. Congress also found that 93 percent of these suits are settled and that many are "settled based not on the merits but on the size of the defendant's pocketbook." *Id.*

Congress was particularly concerned with the high costs associated with discovery, which accounts for approximately 80 percent of total litigation costs in securities fraud actions. *Id.* at 14. Testimony before the Securities Subcommittee indicated that discovery in securities actions often "resembles a fishing expedition." *Id.* It was learned that "plaintiffs sometimes file frivolous lawsuits**236** in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint." *Id.* As a result, the Securities Subcommittee recommended heightened pleading requirements and a stay of discovery pending the outcome of a motion to dismiss. The Subcommittee determined that "discovery should be permitted in securities class actions only after the court has sustained the legal sufficiency of the complaint." *Id.* Additionally, the Subcommittee recognized that "a motion to dismiss may remain pending for a period of time." To avoid the loss of relevant evidence that might occur while a motion to dismiss is pending, provisions were added to the Reform Act which make it illegal for any party who receives actual notice of the litigation to destroy or alter evidence. *Id.;* 15 U.S.C. § 78u-4(b)(3)(C). Plaintiffs may also obtain relief from a stay upon a showing of an "exceptional circumstance where particularized discovery is necessary to preserve evidence or to prevent undue prejudice to a party." S. Rep. 104-98, 1995 WL 37283 (Leg.Hist.), at 14, U.S.Code Cong. & Admin.News 679 693; 15 U.S.C. § 78u-4(b)(3)(B). It was recognized, for example, that "the terminal illness of an important witness may necessitate the deposition of the witness prior to ruling on the motion to dismiss." S. Rep. 104-98, 1995 WL 37283 (Leg.Hist.), at 14, U.S.Code Cong. & Admin.News p. 693. From these statements in the legislative history, it is clear that Congress did not contemplate a restrictive reading of the term "pendency" in section 78u-4(b)(3)(B). Rather, Congress balanced the possibility that "a motion to dismiss may remain pending for a period of time" by providing safeguards designed to protect plaintiffs against the loss of evidence that could occur while the sufficiency of the pleading is being tested. S. Rep. 104-98, 1995 WL 37283 (Leg.Hist.), at 14; 15 U.S.C. § 78u4(b)(3)(C). If the Reform Act was read more narrowly, defendants would be afforded very little of the protection that Congress intended in passing the Reform Act.

*Conclusion*

In the March 14, 1997 order, Judge Brewster dismissed the following defendants from the action: (1) Robert Johnson; (2) Frederick Parker; (3) John Seiber; (4) John Thomas; and (5) Jeffrey Nash. Plaintiffs have indicated that they do not intend to amend the complaint as allowed by Judge Brewster's March 14, 1997 order. Therefore, the Court finds it appropriate to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

961 F.Supp. 233, Fed. Sec. L. Rep. P 99,552
 **(Cite as: 961 F.Supp. 233)**

quash plaintiffs' First Request for Production of Document as to these defendants. In addition, because plaintiffs have made no showing that they will suffer actual prejudice from another brief stay of discovery, the Court finds it appropriate to stay all other discovery in this case until a formal ruling is issued on defendants' Motion for Reconsideration.[FN3] This order is without prejudice to any party seeking relief from the stay upon a showing that "particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B).

> FN3. The Court declines at this time to address the defendants' request for relief based upon the pending Motion for Certification of Issue for Appeal.

IT IS SO ORDERED.

S.D.Cal.,1997.
Powers v. Eichen
961 F.Supp. 233, Fed. Sec. L. Rep. P 99,552

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 9

**Westlaw Delivery Summary Report for KREEP,GARY G**

Date/Time of Request:              Monday, September 14, 2009 23:21 Central
Client Identifier:                 BARNETT
Database:                          AR-CS
Citation Text:                     779 S.W.2d 169
Lines:                             290
Documents:                         1
Images:                            0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



Supreme Court of Arkansas.
STATE of Arkansas ex rel. Blanche ROBINSON,
Appellant,
v.
CRAIGHEAD COUNTY BOARD OF ELECTION
COMMISSIONERS et al., Appellees.
**No. 89-68.**

Nov. 13, 1989.

Citizen petitioned for writ of mandamus ordering Board of Election Commissioners to remove names of three candidates from general election ballot. The Circuit Court, Craighead County, Gerald Pearson, J., declared that mandamus would not lie to compel Board of Election Commissioners to remove names from ballot once certified and imposed sanctions against the plaintiff and her attorney. Plaintiff appealed. The Supreme Court, Hickman, J., held that: (1) Board of Election Commissioners did not have authority to declare candidate ineligible and remove his name from ballot where there was dispute concerning the facts or the law; and (2) mandamus coupled with declaratory judgment action was proper legal proceeding to challenge eligibility of candidate and seek removal of candidate's name from general election ballot.

Affirmed in part, reversed in part.

West Headnotes

**[1] Mandamus 250 🔑74(1)**

250 Mandamus
    250II Subjects and Purposes of Relief
       250II(B) Acts and Proceedings of Public Officers and Boards and Municipalities
          250k74 Elections and Proceedings Relating Thereto
             250k74(1) k. In General. Most Cited Cases
Controversy regarding eligibility of candidate could be determined by Supreme Court even though controversy as to particular candidate's eligibility was

moot, due to public interest involved and possibility that similar controversies could become moot before they could be fully litigated.

**[2] Elections 144 🔑153**

144 Elections
    144VI Nominations and Primary Elections
       144k148 Objections and Contests
          144k153 k. Determination by Public Officers. Most Cited Cases
The Board of Election Commissioners does not have the authority to declare a candidate ineligible and remove his name from the ballot when there is a dispute concerning the facts or the law.

**[3] Declaratory Judgment 118A 🔑212**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
       118AII(K) Public Officers and Agencies
          118Ak212 k. Elections. Most Cited Cases

**Mandamus 250 🔑74(1)**

250 Mandamus
    250II Subjects and Purposes of Relief
       250II(B) Acts and Proceedings of Public Officers and Boards and Municipalities
          250k74 Elections and Proceedings Relating Thereto
             250k74(1) k. In General. Most Cited Cases
Mandamus, together with a request for declaratory relief, was the proper legal proceeding to challenge the eligibility of the candidate and seek removal of the candidate's name from a general election ballot. A.C.A. §§ 7-5-207(b), 16-115-103, 16-115-104(b); Rules Civ.Proc., Rules 11, 19.

**[4] Costs 102 🔑2**

102 Costs
    102I Nature, Grounds, and Extent of Right in General
       102k1 Nature and Grounds of Right
          102k2 k. In General. Most Cited Cases

Sanctions for filing frivolous pleadings were impro-
perly imposed on litigant who petitioned for writ of
mandamus ordering Board of Election Commissioners
to remove names of three candidates from general
election ballot; although litigant's action was not en-
tirely correct, it was warranted by existing law and
there was no evidence of bad faith or harassment.
Rules Civ.Proc., Rule 11.

**170 *407 Paul E. Hopper, Jonesboro, for appellant.

Mike Walden, Jonesboro, for appellees.

HICKMAN, Justice.

The question we must answer in this case is, what is
the proper legal proceeding to challenge the eligibility
of a candidate and seek removal of the candidate's
name from a general election ballot? The answer is
mandamus, coupled with a declaratory judgment ac-
tion.

[1] While the election has been held in this case, with
the candidates' names remaining on the ballot, we
choose to decide the central legal issue presented,
even though the controversy regarding the candidates'
eligibility is moot. This is not uncommon in matters
pertaining to elections where there is a public interest
involved and where the issue is such that it tends to
become moot before it can be fully litigated. See
Cummings v. Washington County Election Comm'n.,
291 Ark. 354, 724 S.W.2d 486 (1987); Carroll v.
Schneider, 211 Ark. 538, 201 S.W.2d 221 (1947).

The appellant, a citizen of Craighead County, peti-
tioned the circuit court for a writ of mandamus order-
ing the Board of Election Commissioners to re-
move the names of three candidates from the No-
vember 8, 1988, general election ballot. The candi-
dates had won in the Democratic primary the preced-
ing March, and their names had been certified to the
Board by the Craighead County Democratic Party
Committee. The appellant alleged that two justices of
the peace candidates, Hugh Atwood and Tom Cure-
ton, did not reside in the districts for which they were
seeking election, as required by Ark.Code Ann. §
14-14-1306(a) (1987). She claimed that candidate Bill
Webster was not eligible to run for municipal judge
because he was not "of good moral character" as re-
quired by Ark.Code Ann. § 16-17-209(a) (1987). The
*408 candidates were not named as defendants in the
action.[FN1]

FN1. The appellant also contended that the
act creating the Craighead County Municipal
Court is special and local legislation in vi-
olation of Ark. Const. amend. 14. For a
number of reasons, we will not address that
issue.

The judge held a hearing ten days before the election
and heard the testimony of Bill Penix and Charles
Frierson, two of the three members of the Board of
Election Commissioners. The two were also the sec-
retary and chairman, respectively, of the county
Democratic Party Committee. In his capacity as party
secretary, Penix had investigated Cureton's and At-
wood's eligibility. He disputed the appellant's claim
that the candidates were not residents of the districts
for which they sought election. He testified that, al-
though Cureton had been living in an apartment
complex in another district, it was because he had
been divorced from his wife and had deeded the house
to her. Penix was assured by Cureton that he intended
to return to the proper district.

Hugh Atwood originally lived within the district
which he sought to serve, but shortly after the primary,
he moved to another district. When questioned by
Penix, he explained that he was living in the other
district only temporarily and had bought a lot in his
original district, planning to return there.

The claims regarding municipal judge candidate Bill
Webster (an incumbent) concerned allegations of use
of public property and services to conduct private
business, solicitation of charitable donations on court
stationery, violations of campaign laws and lack of
proper decorum and demeanor on the bench.

None of the candidates testified at the hearing. Before
the appellant could present her case, the judge de-
clared that mandamus would not lie to compel the
Board of Election Commissioners to remove names
from the general election ballot once those names
were certified to the board by the county political
party committee. The judge also found that the peti-
tion had been filed without legal basis and for the
purpose of harassment. He imposed **171 ARCP
Rule 11 sanctions of $1,000 in attorney fees against
the appellant and her attorney.

[2] The judge's refusal to issue the writ was based on

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

his reluctance to violate a well known legal maxim: mandamus may **409** not be used for the purpose of controlling discretion, reviewing findings of fact or correcting erroneous action. *See Municipal Court of Huntsville v. Casoli, 294 Ark. 37, 740 S.W.2d 614 (1987); McKenzie v. Burris, 255 Ark. 330, 500 S.W.2d 357 (1973).* The judge concluded that the Board of Election Commissioners had the power to make factual determinations concerning a candidate's eligibility and that, once that determination was made, mandamus could not compel an opposite result. In fact, the board does not have the authority to declare a candidate ineligible and remove his name from the ballot when there is a dispute concerning the facts or the law.

We have been reluctant over the years to allow either a party committee or a board of election commissioners to remove a candidate's name from a ballot. *See Ridgeway v. Catlett, 238 Ark. 323, 379 S.W.2d 277 (1964); Carroll v. Schneider, supra, Irby v. Barrett, 204 Ark. 682, 163 S.W.2d 512 (1942).* In *Irby,* the state Democratic party refused to certify Irby's name as a candidate for state senator because of this court's ruling that Irby's felony conviction in federal court rendered him ineligible for political office. We stated that the chairman and secretary of the state committee acted outside their authority in refusing to certify Irby as a candidate. Our reasons were compelling:

> If the chairman and secretary of the committee have the right to say that because of the decision of this court petitioner is ineligible to be a candidate for office, they may also say, in any case, that for some other reason a candidate is ineligible. For instance, it has been held by this court in many election contests that one must pay his poll tax; that he must do so after proper assessment in the time and manner required by law, and that otherwise he is not eligible even to vote, and unless he were a voter he could not hold office. So with other qualifications, such as residence. May this question be considered or decided by the chairman and secretary of the committee? It may be that such power can be conferred upon them by laws of this state or the rules of the party; but it is certain that this has not yet been done. If this can be done, and should be done, the door would be opened wide for corrupt and partisan action.

We also quoted from the Kentucky case of **410***Young v. Beckham, 115 Ky. 246, 72 S.W. 1092 (1903):*

> If the committee or governing authority has the authority to decide the question as to who is eligible to hold an office or be a candidate before a primary election, then they would have a discretion and judgment to exercise that could not be exercised by a mandamus. The most that could be done by such a writ would be to compel them to act upon the question.

Since *Irby, Carroll v. Schneider, supra,* and *Ridgeway v. Catlett, supra,* were decided, the general assembly has passed a number of new election laws. One of those laws gives county political party committees the duty to investigate and make an affirmative determination of a candidate's eligibility before placing the candidate's name on the party's primary election ballot. Ark.Code Ann. § 7-7-301(b) (1987).[FN2] No such power has been conferred on boards of election commissioners.

> FN2. We do not decide whether this statute would allow a *party committee* to declare a candidate ineligible. Our focus is the power of the Board of Election Commissioners.

The reasoning of those early cases still applies where boards of election commissioners are concerned. This case well illustrates that the determination of eligibility may often require more than mere ministerial action. Here, the determination of residence requires an exploration of the candidates' intentions and conduct. Ark.Code Ann. § 14-14-1306(c) (1987). The question of whether a candidate is of good moral character likewise cannot be answered **172** without delving into the facts. To allow the board to consider disputed facts, make findings, and act thereon, is to put it in the same posture as a judicial tribunal. The board, being a ministerial entity, simply does not have that power.

So, the legal maxim that mandamus cannot control discretion or review findings of fact is no impediment. The board may not exercise discretion or make findings of fact concerning the eligibility of a candidate. That determination may only be made by a court, and the court may then direct the board to either place the candidate's name on the ballot or remove it, as the case may be. The next question to be answered is, by what means may the court direct the board to so act?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*411** Mandamus is traditionally regarded as a remedy to be used on all occasions where the law has established no specific remedy, and justice and good government require it. *Ex parte Trapnall,* 6 Ark. 9 (1845). It is a writ which is used to enforce an established right. *Gregg v. Hartwick,* 292 Ark. 528, 731 S.W.2d 766 (1987). The right the appellant seeks to enforce is contained in Ark.Code Ann. § 7-5-207(b) (1987). That statute created a right in the people to the proper administration of election laws by prohibiting the inclusion of ineligible candidates on the ballot:

No person's name shall be printed upon the ballot as a candidate for any public office in this state at any election unless the person is qualified and eligible at the time of filing as a candidate for the office, to hold the public office for which he is a candidate....

[3] The only practical method of enforcing this right is the remedy of mandamus. An action in chancery cannot lie because the chancery court has no jurisdiction in matters pertaining to elections. *Curry v. Dawson,* 238 Ark. 310, 379 S.W.2d 287 (1964). A writ of prohibition may only be directed to a court or adjudicative committee that is proceeding wholly without jurisdiction; it cannot be directed, as a writ of mandamus can, to a ministerial officer. Ark.Code Ann. § 16-115-101 (1987); *see also Sexton v. Supreme Court Comm. on Professional Conduct,* 297 Ark. 154-A, 761 S.W.2d 602 (1988). *Quo warranto* is not appropriate because it is the state that initiates that proceeding, not an individual. Ark.Code Ann. § 25-16-704 (1987); *Cummings v. Washington County Election Comm'n., supra*; *McKenzie v. Burris, supra.*

We have implicitly sanctioned the use of mandamus when seeking removal of a candidate's name from the ballot or when requiring a board to place a candidate's name on the ballot. *Cummings v. Washington County Election Comm'n., supra*; *Garner v. Holland,* 264 Ark. 536, 572 S.W.2d 589 (1978). *See also Ridgeway v. Ray,* 297 Ark. 195, 760 S.W.2d 848 (1988) (Glaze, J., concurring). In *Cummings,* the board placed the name of a Mrs. Linda Oxford on the ballot as a candidate for the county school board, even though she was admittedly not a resident of the school district. Citizens of the district filed a petition for a writ of mandamus commanding the board to remove the candidate's **\*412** name from the ballot. Mrs. Oxford intervened in the action. We held that mandamus was appropriate.

While it has its favorable features, mandamus is not a perfect remedy for this type of action. But more than any other remedy, it provides for prompt consideration of the matter, which is often important in election cases. Petitions for writs of mandamus and prohibition have precedence over other actions and, upon written application, must be heard within seven days. *See* Ark.Code §§ 16-115-103 and 16-115-104(b) (1987). Yet mandamus does not, as this case demonstrates, provide for the joinder of all affected parties. The trial judge was concerned, as are we, that the candidates in this case were not parties to the action. When a mandamus action is brought in a case such as this, courts will have to see that all necessary parties are joined under ARCP Rule 19. Of course, joinder will not be necessary if the candidates themselves bring the action, or if the candidates intervene, as in *Cummings.*

Additionally, mandamus does not provide the means for the court to make a declaration concerning the candidates' eligibility. So a request must be made for declaratory **\*\*173** relief in addition to mandamus. Even though the mandamus remedy is combined with a request for declaratory relief, that action will still be considered essentially one of mandamus and must be heard within seven days.

We declare that an action for mandamus and declaratory relief is the proper method of enforcing the right set out in Ark.Code Ann. § 7-5-207(b) which prohibits the inclusion of an ineligible candidate on an election ballot.

[4] Finally, we address the trial court's imposition of ARCP Rule 11 sanctions. Sanctions should not have been imposed in this case. By signing a pleading, motion or other paper, a party or attorney warrants that to the best of his knowledge, information and belief, formed after a reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as harassment or unnecessary delay. The party asking for Rule 11 sanctions has the burden of proving a violation of the rule. **\*413***Miles v. Southern,* 297 Ark. 274, 760 S.W.2d 868 (1988).

The appellant essentially brought the proper action and did not abuse the mandamus remedy as contended by the appellee. Her action, while not entirely correct,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

was warranted by existing law. We find no evidence of bad faith or harassment. Therefore, the order imposing sanctions is reversed.

Because the controversy is moot in this case, we make no ruling on the candidates' eligibility. We do find the trial court erred in deciding that mandamus was an improper remedy. However, since the candidates were not made parties to the appellant's action, and since she failed to ask for declaratory relief, her action was not entirely proper. For that reason, we affirm in part and reverse in part.

Affirmed in part, reversed in part.

Ark.,1989.
State ex rel. Robinson v. Craighead County Bd. of Election Com'rs
300 Ark. 405, 779 S.W.2d 169

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 10

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Monday, September 14, 2009 23:18 Central |
| Client Identifier: | BARNETT |
| Database: | AR-AG |
| Citation Text: | Ark. Op. Atty. Gen. No. 2006-153 |
| Lines: | 363 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



Ark. Op. Atty. Gen. No. 2006-153, 2006 WL 2474743 (Ark.A.G.)                                Page 1

Ark. Op. Atty. Gen. No. 2006-153, 2006 WL 2474743 (Ark.A.G.)

Office of the Attorney General
State of Arkansas

Opinion No. 2006-153

August 23, 2006

Mr. Bob Bodenhamer
Chairman

Dear Chairman Bodenhamer:

I am writing in response to your request for an opinion on the eligibility of school "resource officers" to hold the office of school board member in the school district in which they work. Specifically, you describe the school resource officers in question as being "actual employees of the Mountain Home City Police Department...." You also note, however, that the "school system contributes $5,833 to each officer's salary" and that the schools "also pay for travel and workshops the officers attend." You state that "[t]hese funds come out of federal money that the school receives." Finally, you note that the "officers also work under the supervision of the Principal of the school they are assigned to." Your question is "whether "they are indeed eligible to serve on the Mountain Home School Board."

**RESPONSE**
As a preliminary matter, I should note that the Baxter County Board of Election Commissioners is not empowered to omit from the ballot the names of any candidates who have complied with the filing requirements for the office. When questions arise as to a candidate's eligibility prior to an election, the proper remedy is resort to the courts, by virtue of an action for a declaratory judgment and mandamus.

In my opinion, if such an action was instituted, the question of whether the school resource officers are eligible to serve as school board members will depend, under A.C.A. § 6-13-616(b), on whether they are "employed" by the school district. This is a question of fact, dependent not only on which entity issues the officers' paychecks, but more importantly, on which entity has the authority to direct and control the work of the officers. There appear to be some potentially conflicting statements of fact in this regard. I am not empowered as a factfinder in the issuance of Attorney General opinions, and as such, cannot definitively resolve the issue under A.C.A. § 6-13-616(b). A court of competent jurisdiction properly presented with the question would be invested with power to determine the applicable facts and issue a ruling.

In addition to the possible prohibition found at A.C.A. § 6-13-616(b), the ethical guidelines and prohibitions found at A.C.A. §§ 6-24-101 to -120 (Supp. 2005) may stand as an obstacle to a school board member, once elected, continuing to work as a school resource officer. That subchapter is enforced by the local prosecuting attorneys and is administered by the Arkansas Department of Education. As I stated in Op. Att'y Gen. 2005-254 "I am not invested with any authority to determine compliance with [this] subchapter."

Finally, the common law "incompatibility" doctrine may prohibit the dual service. Although the question of whether

the duties of these two positions are incompatible is to some extent one of fact, in my opinion a substantial question is raised under the incompatibility doctrine in this instance because school board members are in a position to make decisions regarding the contract under which the resource officers are employed.

**\*2** Discussion of two preliminary points is necessary prior to discussion of the substantive law regarding eligibility.

First, I will note county boards of election commissioners "do[] not have the authority to declare a candidate ineligible and remove his name from the ballot when there is a dispute concerning the facts or the law." *State v. Craighead County Bd. of Election Comm'rs*, 300 Ark. 405, 409, 779 S.W.2d 169 (1989). The proper remedy in such case is a court action for mandamus coupled with a declaratory judgment. *Id. See also, Hill v. Carter*, 357 Ark. 597, 184 S.W.3d 431 (2004). As I stated in Op. Att'y Gen. 2005-204: "This conclusion follows… from the well-established principle that that the election commission generally performs a ministerial function in preparing and furnishing the ballots. *See State v. Craighead County Board of Election Commissioners, supra* (stating that such commissions' actions are ministerial only). The court in *Craighead County, supra*, reasoned that:

> …the determination of eligibility may often require more than mere ministerial action…. To allow the board to consider disputed facts, make findings, and act thereon, is to put it in the same posture as a judicial tribunal. The board, being a ministerial entity, simply does not have that power…. The board may not exercise discretion or make findings of fact concerning the eligibility of a candidate. That determination may only be made by a court, and the court may then direct the board to either place the candidate's name on the ballot or remove it, as the case may be.

*Id.* at 410.

Second, the applicable statute in such judicial actions, A.C.A. § 7-5-207(b), requires a candidate for office, with certain exceptions not applicable here, to be "qualified and eligible at the time of filing as a candidate for the office to hold the public office for which he is a candidate…." Thus, as a general matter, candidates for office must possess the required eligibility at the time of filing for the office. It has been stated that this "statute created a right in the people to the proper administration of election laws by prohibiting the inclusion of ineligible candidates on the ballot…." *State v. Craighead County Board of Election Commissioners, supra* at 411. *See also, Clement v. Daniels* (Ark. Sup. Ct. No. 06-519, May 17, 2006) ("Section 7-5-207(b) provides a means for a *voter* to raise a *pre-election* attack on a candidate's eligibility to stand for election and for removal of that ineligible candidate's name from the ballot.") County boards of election commissioners have standing to institute such proceedings. *See Jacobs v. Yates*, 342 Ark. 243, 27 S.W.3d 734 (2000). Section 7-5-207(b) apparently applies in the context of school elections, but any such action must be brought in an expeditious manner. *See Ball v. Phillips County Election Commission*, (Ark. Sup. Ct. No. 05-105 January 12, 2006).

**\*3** After election, the proper remedy for ineligibility of an office-holder is provided by A.C.A. § 16-118-105, or by an action in the nature of *quo warranto*, brought by the prosecuting attorney. *Pederson v. Stracener*, 354 Ark. 716, 128 S.W.3d 818 (2003). *See also, State ex rel. Robinson v. Jones*, 194 Ark. 445, 108 S.W.2d 901 (1937) (prosecuting attorney had authority to institute *quo warranto* to oust school board member who acted as judge of his own election in violation of constitutional provision).

Turning now to the substantive law, a court faced with the eligibility of a school resource officer to be a candidate for, or hold the office of, school board member, would have to consider the applicability of A.C.A. § 6-13-616(b), which provides as follows:

6-13-616. Qualifications of directors.

* * *

(b) No person who is elected to a school district board of directors shall be eligible for employment in that same school district.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The pertinent inquiry under this statute therefore focuses on whether the school resource officers in question are engaged in "employment" in the school district.

I recently outlined the nature of the employment of school resource officers in Op. Att'y Gen. No. 2006-010:

> In the attached Ark. Op. Att'y Gen. No. 2003-001, one of my predecessors discussed in some detail the actual practice of various districts in providing security on school district campuses, concluding that certain districts avail themselves of local police resources through what appears to be an independent-contractor arrangement, possibly buffering this service with security forces that comprise true employees. Specifically, my predecessor reported:

> > Based upon my inquiries, police officers apparently serve with some regularity as school resource officers, although districts vary in their policies regarding remuneration. In the Little Rock School District, police officers are reportedly assigned as school resource officers pursuant to a purchased-services contract pro-viding that the district will pay one half of the officers' salaries. In the North Little Rock School District, police officers are reportedly assigned as school resource officers pursuant to an agreement providing that the city will continue to pay the officers' salaries. The district pays for some training and travel required to perform these services. In the Pulaski County School District, police officers within cities and deputy sheriffs serve in that capacity in the county without any payment by the district, although the district does provide some office space. *See also* Garcia v. State, 333 Ark. 26, 29, 969 S.W.2d 591 (1998) (without addressing the issue of remuneration, noting that a witness in a criminal trial was both a school resource officer and a Russellville police officer). Each of these districts also reportedly maintains its own security staff, which serve as the principal agents to enforce school disciplinary policy. As I understand it, the school resource officers primarily serve to deter criminal activity, to effect any necessary arrests and to expedite good relations among the police, the students and the community. In sum, the school and its environs in all respects are seen as comprising the officer's "beat."

**\*4** *Id.* at 7.

You have noted that in the Mountain Home School District, the resource officers "are actual employees of the Mountain Home City Police Department," but that the "school system contributes $5,833 to each officer's salary." You also state that the school system pays for travel and workshops the officers attend. The question of whether the resource officers in question are "actual employees" of the Police Department is one of fact that can only be decided on a case-by-case basis. *See* Op. Att'y Gen. 98-095 ("Under Arkansas law, the question of employment is a question of fact"). As one of my predecessors noted in Op. Att'y Gen. 2001-202 "… payment of salary alone does not equate to a finding of "employment" by the entity paying the salary." In that opinion it was concluded that even if a city or county or some combination thereof paid the municipal court clerk's salary, that fact did not conclusively establish the clerk as an "employee" of that entity. My predecessor placed emphasis on the fact that the municipal judge appointed the clerk and relied upon Carter v. Cash, 312 Ark. 41, 847 S.W.2d 18 (1993) for the proposition that the "most important factor in determining an employment relationship is the right to control the activities of the employee, not necessarily the payment of salary." A similar statement was made in Op. Att'y. Gen. 99-346, regarding the employment status of volunteer firefighters:

> Ordinarily, in determining whether an "employment" relationship exists, the Arkansas Supreme Court has em-phasized the importance of an employer's control over the individual. *See, e.g.,* Cash v. Carter, 312 Ark. 41, 847 S.W.2d 18 (1993). *See also* BLACK'S LAW DICTIONARY 471 (5th ed. 1979) (defining "employee" as "[a] person in the service of another… where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.") Applying this definition clearly requires reference to the surrounding facts.

*Id.* at 3. *See also* Ops. Att'y Gen. 98-095; 98-288; 97-359; and 93-324.

With regard to the degree of control exercised by the school system, you have noted that the "officers work under the supervision of the Principal of the school they are assigned to." This indicates some element of control by the school system over the actions of the officers. On the other hand, statements have been made that "these gentlemen report to

their chief and that he could change their patrol at anytime." Armando Rios, "*MHSB legal issue drawing opinions; Board president says he doesn't see anything wrong with SRO running for vacant position*" The Baxter Bulletin, (August 14th, 2006), quoting the President of the Mountain Home School Board, in turn quoting an Arkansas School Boards Association Attorney. [FN1] Obviously, therefore, an issue of fact is presented as to whether the resource officers in question are engaged in "employment" with the school district as that term is usually interpreted by the judicial branch. In my opinion, therefore, the question of whether A.C.A. § 6-13-616(b)'s "employment" restriction prohibits the officers from serving as school board members is one of fact. I am not empowered as a factfinder in the issuance of Attorney General opinions, and as such, cannot definitively resolve this issue. A court of competent jurisdiction properly presented with the question would be invested with power to determine the applicable facts and issue a ruling.

**\*5** Two other potential obstacles to the resource officers' service as school board members should also be noted.

First, Sections 6-24-101 to -120 (Supp. 2005) of the Arkansas Code enumerate ethical guidelines for school district board members, administrators, and employees. Among other things, this subchapter declares that it is a "breach of the ethical standards of this chapter for a board member to contract with the public educational entity the member serves if the board member has knowledge that he or she is directly or indirectly interested in the contract." A.C.A. § 6-24-105(a). Contracts totaling five thousand dollars or more per fiscal year require the approval of the Arkansas Commissioner of Education. A.C.A. § 6-24-105(c)(2)(A). The subchapter defines the applicable terms and requires the State Board of Education to adopt rules and regulations to implement the subchapter. The Arkansas Department of Education has promulgated rules in compliance with this mandate. *See Arkansas Department of Education Rules and Regulations Governing Ethical Guidelines and Prohibitions for Educational Administrators, Employees, Board Members and other Parties* ("ADE Reg.") §§ 1.00 through 19.03.

I am not in a position to determine the applicability or effect of these provisions on the arrangement you describe. As I stated in Op. Att'y Gen. 2005-254, "I am not invested with any authority to determine compliance with [this] subchapter. That power has been granted to the appropriate prosecuting attorney. A.C.A. § 6-24-116." I noted therein that Section 6-24-116 (Supp. 2005) provides that "[a]t the request of a board of a public educational entity, the executive administrator at a public educational entity, the Commissioner of Education, or the Legislative Joint Auditing Committee, the appropriate prosecuting attorney shall review contracts or transactions for compliance with the provisions of this chapter." (Emphasis added). I also noted that A.C.A. § 6-24-114(a)(1) (Supp. 2005) states that the Department of Education "may review alleged violations of this chapter." I also stated that "I am not given any enforcement authority under the subchapter, except to pursue a mandamus proceeding, if necessary, to compel the prosecuting attorney to perform his or her duties thereunder." For questions regarding the legality, under A.C.A. §§ 6-24-101 to -120, of a particular school resource officer's service as a school board member, I suggest contact be made with the local prosecuting attorney or the Arkansas Department of Education.

Second, the common law "incompatibility" of offices doctrine should be considered. The Arkansas Supreme Court most recently discussed this doctrine in *Thompson v. Roberts*, 333 Ark. 544, 970 S.W.2d 239 (1998). The court cited previous case law in outlining the contours of the doctrine:

In *Tappan v. Helena Federal Savings & Loan Ass'n*, 193 Ark. 1023, 104 S.W.2d 458 (1937), we explained the rule that "[t]he inconsistency, which at common law makes offices incompatible… lies rather in the conflict of interest, as where one is subordinate to the other, and subject in some degree to the supervisory power of its incumbent, or where the incumbent of one office has the power to remove the incumbent of the other or to audit the accounts of the other." *Byrd v. State*, 240 Ark. 743, 402 S.W.2d 121 (1966), expounded on *Tappan*, stating that "incompatibility exists where there is a conflict of interests, which includes, *inter alia*, where one office is subordinate to the other."

\* \* \*

**\*6** At common law, and generally under statutory enactment, it is now established beyond question that a contract

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

made by an officer of a municipality with himself, or in which he is interested, is contrary to public policy, and tainted with illegality; and this rule applies whether such officer acts alone on behalf of the municipality, or as a member of a board or council. Neither the fact that a majority of the votes of a council, or board, in favor of the contract are cast by disinterested officers, nor the fact that the officer interested did not participate in the proceedings, necessarily relieves the contract from its vice. The facts [sic] that the interest of the offending officer in the invalid contract is indirect, and is very small, is immaterial. The statutory prohibition is frequently so wide in its terms as to prohibit any officer from contracting with the municipality, whether he takes part in the making of the contract or not.

*Id.* at 549 and 548, relying in part on *Rogers v. Sangster*, 180 Ark. 907, 23 S.W.2d 613 (1930), and *Davis v. Doyle*, 230 Ark. 421, 323 S.W.2d 202 (1959).

In *Thompson*, at issue was a mayor's simultaneous service as a part-time bookkeeper for the city she served. The court found such service incompatible, stating:

While the trial court found that appellants had proved no wrongdoing except "performing two jobs," it is that very inconsistency which is the basis of the incompatibility doctrine. One commentator has explained, "Incompatibility arises, therefore, from the nature of the duties of the offices, when there is an inconsistency in the functions of the two, where the functions of the two are inherently inconsistent or repugnant, as where the antagonism would result in the attempt by one person to discharge the duties of both offices, or where the nature and duties of the two offices are such as to render it improper from considerations of public policy for one person to retain both." Eugene McQuillin, *3 The Law of Municipal Corporations* § 12.67 (3d ed. 1990). In the present case, common sense dictates that the bookkeeper for the city would to some degree be subject to the supervisory power of the mayor.

*Id.* at 549.

The "incompatibility" doctrine has been applied in the case of school district board members. *See e.g, Byrd, supra,* and Ops. Att'y Gen. 2004-291; 99-249; 96-035; 92-003; 89-201 and 88-178. *See also,* Allan E. Korpela, LL.B. "*Right of Schoolteacher to Serve as Member of School Board in School District Where Employed,* 70 A.L.R.3d 1188 (1976). [FN2]

The pertinent question under the incompatibility doctrine is therefore whether the duties of a school board member are incompatible with the duties of a city police officer assigned as a school resource officer. Again, this will be a question of fact. The applicable inquiry is whether one of these positions "is subordinate to the other, and subject in some degree to the supervisory power of its incumbent," or whether "the incumbent of one office has the power to remove the incumbent of the other or to audit the accounts of the other." It seems apparent at a minimum, that the school district board of directors has authority to make decisions regarding the contract by which the resource officer is employed. In my opinion, a substantial question is therefore raised as to whether the concurrent holding of both positions would be unlawful under the "incompatibility" doctrine. Again, however, a definitive resolution of the issue will require findings of fact.

**\*7** Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.

Sincerely,
Mike Beebe
Attorney General

[FN1]. This same article also states that one of the officers in question has withdrawn his candidacy.

[FN2]. In my opinion, neither A.C.A. § 6-13-616(b), discussed above, nor Arkansas Constitution, art. 19, § 26 prevent application of the common law doctrine. In my opinion the common law doctrine is properly applied even if the conduct falls outside the applicable statute. *See generally, Price v. Edmonds,* 232 Ark. 381, 337 S.W.2d 658 (1960). In

addition, article 19, § 26, which states that "militia officers, and officers of the public schools, and Notaries may be elected to fill any executive or judicial office," appears to apply on to *elected* executive or judicial offices, and would therefore not prohibit statutory or common law proscriptions against employment or contracting with the school district.

 Ark. Op. Atty. Gen. No. 2006-153, 2006 WL 2474743 (Ark.A.G.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.