# EXHIBIT 1

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Monday, September 14, 2009 23:18 Central |
| Client Identifier: | BARNETT |
| Database: | AR-AG |
| Citation Text: | Ark. Op. Atty. Gen. No. 2006-153 |
| Lines: | 363 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Westlaw.

Ark. Op. Atty. Gen. No. 2006-153, 2006 WL 2474743 (Ark.A.G.)

Office of the Attorney General
State of Arkansas

Opinion No. 2006-153

August 23, 2006

Mr. Bob Bodenhamer
Chairman

Dear Chairman Bodenhamer:

I am writing in response to your request for an opinion on the eligibility of school "resource officers" to hold the office of school board member in the school district in which they work. Specifically, you describe the school resource officers in question as being "actual employees of the Mountain Home City Police Department…." You also note, however, that the "school system contributes $5,833 to each officer's salary" and that the schools "also pay for travel and workshops the officers attend." You state that "[t]hese funds come out of federal money that the school receives." Finally, you note that the "officers also work under the supervision of the Principal of the school they are assigned to." Your question is "whether "they are indeed eligible to serve on the Mountain Home School Board."

**RESPONSE**
As a preliminary matter, I should note that the Baxter County Board of Election Commissioners is not empowered to omit from the ballot the names of any candidates who have complied with the filing requirements for the office. When questions arise as to a candidate's eligibility prior to an election, the proper remedy is resort to the courts, by virtue of an action for a declaratory judgment and mandamus.

In my opinion, if such an action was instituted, the question of whether the school resource officers are eligible to serve as school board members will depend, under A.C.A. § 6-13-616(b), on whether they are "employed" by the school district. This is a question of fact, dependent not only on which entity issues the officers' paychecks, but more importantly, on which entity has the authority to direct and control the work of the officers. There appear to be some potentially conflicting statements of fact in this regard. I am not empowered as a factfinder in the issuance of Attorney General opinions, and as such, cannot definitively resolve the issue under A.C.A. § 6-13-616(b). A court of competent jurisdiction properly presented with the question would be invested with power to determine the applicable facts and issue a ruling.

In addition to the possible prohibition found at A.C.A. § 6-13-616(b), the ethical guidelines and prohibitions found at A.C.A. §§ 6-24-101 to -120 (Supp. 2005) may stand as an obstacle to a school board member, once elected, continuing to work as a school resource officer. That subchapter is enforced by the local prosecuting attorneys and is administered by the Arkansas Department of Education. As I stated in Op. Att'y Gen. 2005-254 "I am not invested with any authority to determine compliance with [this] subchapter."

Finally, the common law "incompatibility" doctrine may prohibit the dual service. Although the question of whether

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the duties of these two positions are incompatible is to some extent one of fact, in my opinion a substantial question is raised under the incompatibility doctrine in this instance because school board members are in a position to make decisions regarding the contract under which the resource officers are employed.

**\*2** Discussion of two preliminary points is necessary prior to discussion of the substantive law regarding eligibility.

First, I will note county boards of election commissioners "do[] not have the authority to declare a candidate ineligible and remove his name from the ballot when there is a dispute concerning the facts or the law." *State v. Craighead County Bd. of Election Comm'rs*, 300 Ark. 405, 409, 779 S.W.2d 169 (1989). The proper remedy in such case is a court action for mandamus coupled with a declaratory judgment. *Id. See also, Hill v. Carter*, 357 Ark. 597, 184 S.W.3d 431 (2004). As I stated in Op. Att'y Gen. 2005-204: "This conclusion follows... from the well-established principle that that the election commission generally performs a ministerial function in preparing and furnishing the ballots. *See State v. Craighead County Board of Election Commissioners, supra* (stating that such commissions' actions are ministerial only). The court in *Craighead County, supra*, reasoned that:

> ...the determination of eligibility may often require more than mere ministerial action.... To allow the board to consider disputed facts, make findings, and act thereon, is to put it in the same posture as a judicial tribunal. The board, being a ministerial entity, simply does not have that power.... The board may not exercise discretion or make findings of fact concerning the eligibility of a candidate. That determination may only be made by a court, and the court may then direct the board to either place the candidate's name on the ballot or remove it, as the case may be.

*Id*. at 410.

Second, the applicable statute in such judicial actions, A.C.A. § 7-5-207(b), requires a candidate for office, with certain exceptions not applicable here, to be "qualified and eligible at the time of filing as a candidate for the office to hold the public office for which he is a candidate...." Thus, as a general matter, candidates for office must possess the required eligibility at the time of filing for the office. It has been stated that this "statute created a right in the people to the proper administration of election laws by prohibiting the inclusion of ineligible candidates on the ballot...." *State v. Craighead County Board of Election Commissioners, supra* at 411. *See also, Clement v. Daniels* (Ark. Sup. Ct. No. 06-519, May 17, 2006) ("Section 7-5-207(b) provides a means for a *voter* to raise a *pre-election* attack on a candidate's eligibility to stand for election and for removal of that ineligible candidate's name from the ballot.") County boards of election commissioners have standing to institute such proceedings. *See Jacobs v. Yates*, 342 Ark. 243, 27 S.W.3d 734 (2000). Section 7-5-207(b) apparently applies in the context of school elections, but any such action must be brought in an expeditious manner. *See Ball v. Phillips County Election Commission*, (Ark. Sup. Ct. No. 05-105 January 12, 2006).

**\*3** After election, the proper remedy for ineligibility of an office-holder is provided by A.C.A. § 16-118-105, or by an action in the nature of *quo warranto*, brought by the prosecuting attorney. *Pederson v. Stracener*, 354 Ark. 716, 128 S.W.3d 818 (2003). *See also, State ex rel. Robinson v. Jones*, 194 Ark. 445, 108 S.W.2d 901 (1937) (prosecuting attorney had authority to institute *quo warranto* to oust school board member who acted as judge of his own election in violation of constitutional provision).

Turning now to the substantive law, a court faced with the eligibility of a school resource officer to be a candidate for, or hold the office of, school board member, would have to consider the applicability of A.C.A. § 6-13-616(b), which provides as follows:

6-13-616. Qualifications of directors.

* * *

(b) No person who is elected to a school district board of directors shall be eligible for employment in that same school district.

The pertinent inquiry under this statute therefore focuses on whether the school resource officers in question are engaged in "employment" in the school district.

I recently outlined the nature of the employment of school resource officers in Op. Att'y Gen. No. 2006-010:

> In the attached Ark. Op. Att'y Gen. No. 2003-001, one of my predecessors discussed in some detail the actual practice of various districts in providing security on school district campuses, concluding that certain districts avail themselves of local police resources through what appears to be an independent-contractor arrangement, possibly buffering this service with security forces that comprise true employees. Specifically, my predecessor reported:

>> Based upon my inquiries, police officers apparently serve with some regularity as school resource officers, although districts vary in their policies regarding remuneration. In the Little Rock School District, police officers are reportedly assigned as school resource officers pursuant to a purchased-services contract providing that the district will pay one half of the officers' salaries. In the North Little Rock School District, police officers are reportedly assigned as school resource officers pursuant to an agreement providing that the city will continue to pay the officers' salaries. The district pays for some training and travel required to perform these services. In the Pulaski County School District, police officers reportedly serve as school resource officers within cities and deputy sheriffs serve in that capacity in the county without any payment by the district, although the district does provide some office space. *See also* Garcia v. State, 333 Ark. 26, 29, 969 S.W.2d 591 (1998) (without addressing the issue of remuneration, noting that a witness in a criminal trial was both a school resource officer and a Russellville police officer). Each of these districts also reportedly maintains its own security staff, which serve as the principal agents to enforce school disciplinary policy. As I understand it, the school resource officers primarily serve to deter criminal activity, to effect any necessary arrests and to expedite good relations among the police, the students and the community. In sum, the school and its environs in all respects are seen as comprising the officer's "beat."

**\*4** *Id*. at 7.

You have noted that in the Mountain Home School District, the resource officers "are actual employees of the Mountain Home City Police Department," but that the "school system contributes $5,833 to each officer's salary." You also state that the school system pays for travel and workshops the officers attend. The question of whether the resource officers in question are "actual employees" of the Police Department is one of fact that can only be decided on a case-by-case basis. *See* Op. Att'y Gen. 98-095 ("Under Arkansas law, the question of employment is a question of fact"). As one of my predecessors noted in Op. Att'y Gen. 2001-202 "… payment of salary alone does not equate to a finding of "employment" by the entity paying the salary." In that opinion it was concluded that even if a city or county or some combination thereof paid the municipal court clerk's salary, that fact did not conclusively establish the clerk as an "employee" of that entity. My predecessor placed emphasis on the fact that the municipal judge appointed the clerk and relied upon Carter v. Cash, 312 Ark. 41, 847 S.W.2d 18 (1993) for the proposition that the "most important factor in determining an employment relationship is the right to control the activities of the employee, not necessarily the payment of salary." A similar statement was made in Op. Att'y. Gen. 99-346, regarding the employment status of volunteer firefighters:

> Ordinarily, in determining whether an "employment" relationship exists, the Arkansas Supreme Court has emphasized the importance of an employer's control over the individual. *See, e.g.*, Cash v. Carter, 312 Ark. 41, 847 S.W.2d 18 (1993). *See also* BLACK'S LAW DICTIONARY 471 (5th ed. 1979) (defining "employee" as "[a] person in the service of another… where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.") Applying this definition clearly requires reference to the surrounding facts.

*Id*. at 3. *See also* Ops. Att'y Gen. 98-095; 98-288; 97-359; and 93-324.

With regard to the degree of control exercised by the school system, you have noted that the "officers work under the supervision of the Principal of the school they are assigned to." This indicates some element of control by the school system over the actions of the officers. On the other hand, statements have been made that "these gentlemen report to

Case 8:09-cv-00082-DOC-AN   Document 67-2   Filed 09/18/09   Page 6 of 254

Ark. Op. Atty. Gen. No. 2006-153, 2006 WL 2474743 (Ark.A.G.)                                    Page 4

their chief and that he could change their patrol at anytime." Armando Rios, "*MHSB legal issue drawing opinions; Board president says he doesn't see anything wrong with SRO running for vacant position*" The Baxter Bulletin, (August 14th, 2006), quoting the President of the Mountain Home School Board, in turn quoting an Arkansas School Boards Association Attorney. [FN1] Obviously, therefore, an issue of fact is presented as to whether the resource officers in question are engaged in "employment" with the school district as that term is usually interpreted by the judicial branch. In my opinion, therefore, the question of whether A.C.A. § 6-13-616(b)'s "employment" restriction prohibits the officers from serving as school board members is one of fact. I am not empowered as a factfinder in the issuance of Attorney General opinions, and as such, cannot definitively resolve this issue. A court of competent jurisdiction properly presented with the question would be invested with power to determine the applicable facts and issue a ruling.

**\*5** Two other potential obstacles to the resource officers' service as school board members should also be noted.

First, Sections 6-24-101 to -120 (Supp. 2005) of the Arkansas Code enumerate ethical guidelines for school district board members, administrators, and employees. Among other things, this subchapter declares that it is a "breach of the ethical standards of this chapter for a board member to contract with the public educational entity the member serves if the board member has knowledge that he or she is directly or indirectly interested in the contract." A.C.A. § 6-24-105(a). Contracts totaling five thousand dollars or more per fiscal year require the approval of the Arkansas Commissioner of Education. A.C.A. § 6-24-105(c)(2)(A). The subchapter defines the applicable terms and requires the State Board of Education to adopt rules and regulations to implement the subchapter. The Arkansas Department of Education has promulgated rules in compliance with this mandate. *See Arkansas Department of Education Rules and Regulations Governing Ethical Guidelines and Prohibitions for Educational Administrators, Employees, Board Members and other Parties* ("ADE Reg.") §§ 1.00 through 19.03.

I am not in a position to determine the applicability or effect of these provisions on the arrangement you describe. As I stated in Op. Att'y Gen. 2005-254, "I am not invested with any authority to determine compliance with [this] subchapter. That power has been granted to the appropriate prosecuting attorney. A.C.A. § 6-24-116." I noted therein that Section 6-24-116 (Supp. 2005) provides that "[a]t the request of a board of a public educational entity, the executive administrator at a public educational entity, the Commissioner of Education, or the Legislative Joint Auditing Committee, the appropriate prosecuting attorney shall review contracts or transactions for compliance with the provisions of this chapter." (Emphasis added). I also noted that A.C.A. § 6-24-114(a)(1) (Supp. 2005) states that the Department of Education "may review alleged violations of this chapter." I also stated that "I am not given any enforcement authority under the subchapter, except to pursue a mandamus proceeding, if necessary, to compel the prosecuting attorney to perform his or her duties thereunder." For questions regarding the legality, under A.C.A. §§ 6-24-101 to -120, of a particular school resource officer's service as a school board member, I suggest contact be made with the local prosecuting attorney or the Arkansas Department of Education.

Second, the common law "incompatibility" of offices doctrine should be considered. The Arkansas Supreme Court most recently discussed this doctrine in *Thompson v. Roberts*, 333 Ark. 544, 970 S.W.2d 239 (1998). The court cited previous case law in outlining the contours of the doctrine:
    In *Tappan v. Helena Federal Savings & Loan Ass'n*, 193 Ark. 1023, 104 S.W.2d 458 (1937), we explained the rule that "[t]he inconsistency, which at common law makes offices incompatible… lies rather in the conflict of interest, as where one is subordinate to the other, and subject in some degree to the supervisory power of its incumbent, or where the incumbent of one office has the power to remove the incumbent of the other or to audit the accounts of the other." *Byrd v. State*, 240 Ark. 743, 402 S.W.2d 121 (1966), expounded on *Tappan*, stating that "incompatibility exists where there is a conflict of interests, which includes, *inter alia*, where one office is subordinate to the other."

                                              * * *

**\*6** At common law, and generally under statutory enactment, it is now established beyond question that a contract

made by an officer of a municipality with himself, or in which he is interested, is contrary to public policy, and tainted with illegality; and this rule applies whether such officer acts alone on behalf of the municipality, or as a member of a board or council. Neither the fact that a majority of the votes of a council, or board, in favor of the contract are cast by disinterested officers, nor the fact that the officer interested did not participate in the proceedings, necessarily relieves the contract from its vice. The facts [sic] that the interest of the offending officer in the invalid contract is indirect, and is very small, is immaterial. The statutory prohibition is frequently so wide in its terms as to prohibit any officer from contracting with the municipality, whether he takes part in the making of the contract or not.

*Id.* at 549 and 548, relying in part on *Rogers v. Sangster*, 180 Ark. 907, 23 S.W.2d 613 (1930), and *Davis v. Doyle*, 230 Ark. 421, 323 S.W.2d 202 (1959).

In *Thompson*, at issue was a mayor's simultaneous service as a part-time bookkeeper for the city she served. The court found such service incompatible, stating:

While many trial court found that appellants had proved no wrongdoing except "performing two jobs," it is that very inconsistency which is the basis of the incompatibility doctrine. One commentator has explained, "Incompatibility arises, therefore, from the nature of the duties of the offices, when there is an inconsistency in the functions of the two, where the functions of the two are inherently inconsistent or repugnant, as where the antagonism would result in the attempt by one person to discharge the duties of both offices, or where the nature and duties of the two offices are such as to render it improper from considerations of public policy for one person to retain both." Eugene McQuillin, *3 The Law of Municipal Corporations* § 12.67 (3d ed. 1990). In the present case, common sense dictates that the bookkeeper for the city would to some degree be subject to the supervisory power of the mayor.

*Id.* at 549.

The "incompatibility" doctrine has been applied in the case of school district board members. *See e.g., Byrd, supra*, and Ops. Att'y Gen. 2004-291; 99-249; 96-035; 92-003; 89-201 and 88-178. *See also*, Allan E. Korpela, LL.B. "*Right of Schoolteacher to Serve as Member of School Board in School District Where Employed*, 70 A.L.R.3d 1188 (1976). [FN2]

The pertinent question under the incompatibility doctrine is therefore whether the duties of a school board member are incompatible with the duties of a city police officer assigned as a school resource officer. Again, this will be a question of fact. The applicable inquiry is whether one of these positions "is subordinate to the other, and subject in some degree to the supervisory power of its incumbent," or whether "the incumbent of one office has the power to remove the incumbent of the other or to audit the accounts of the other." It seems apparent at a minimum, that the school district board of directors has authority to make decisions regarding the contract by which the resource officer is employed. In my opinion, a substantial question is therefore raised as to whether the concurrent holding of both positions would be unlawful under the "incompatibility" doctrine. Again, however, a definitive resolution of the issue will require findings of fact.

**7** Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.

Sincerely,
Mike Beebe
Attorney General

[FN1]. This same article also states that one of the officers in question has withdrawn his candidacy.

[FN2]. In my opinion, neither A.C.A. § 6-13-616(b), discussed above, nor Arkansas Constitution, art. 19, § 26 prevent application of the common law doctrine. In my opinion the common law doctrine is properly applied even if the conduct falls outside the applicable statute. *See generally, Price v. Edmonds*, 232 Ark. 381, 337 S.W.2d 658 (1960). In

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

addition, article 19, § 26, which states that "militia officers, and officers of the public schools, and Notaries may be elected to fill any executive or judicial office," appears to apply on to *elected* executive or judicial offices, and would therefore not prohibit statutory or common law proscriptions against employment or contracting with the school district.

Ark. Op. Atty. Gen. No. 2006-153, 2006 WL 2474743 (Ark.A.G.)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 2

**Westlaw Delivery Summary Report for KREEP,GARY G**

Date/Time of Request:                     Saturday, September 19, 2009 00:00 Central
Client Identifier:                        BARNETT
Database:                                 SCTFIND
Citation Text:                            82 S.Ct. 691
Lines:                                    5824
Documents:                                1
Images:                                   0

 The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West
and their affiliates.



Supreme Court of the United States
Charles W. BAKER et al., Appellants,
v.
Joe C. CARR et al.
**No. 6.**

Reargued Oct. 9, 1961.
Decided March 26, 1962.

Action under the civil rights statute, by qualified voters of certain counties of Tennessee for a declaration that a state apportionment statute was an unconstitutional deprivation of equal protection of the laws, for an injunction, and other relief. A three-judge District Court, for the Middle District of Tennessee, 179 F.Supp. 824, entered an order dismissing the complaint, and plaintiffs appealed. The Supreme Court, Mr. Justice Brennan, held that complaint containing allegations that a state statute effected an apportionment that deprived plaintiffs of equal protection of the laws in violation of the Fourteenth Amendment presented a justiciable constitutional cause of action, and the right asserted was within reach of judicial protection under the Fourteenth Amendment, and did not present a nonjusticiable political question.

Reversed and remanded.

Mr. Justice Frankfurter and Mr. Justice Harlan dissented.

West Headnotes

**[1] Federal Courts 170B** 753

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk753 k. Questions Considered in General. Most Cited Cases
        (Formerly 30k839(1))
It was improper on appeal from dismissal of an action seeking relief from a state statute which allegedly effected an apportionment that deprived plaintiffs of equal protection of the laws in violation of the Fourteenth Amendment, to consider what remedy would be most appropriate if

plaintiffs prevailed at trial. Acts Tenn.1901, c. 122; U.S.C.A.Const. Amend. 14.

**[2] Constitutional Law 92** 2450

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)1 In General
                92k2450 k. Nature and Scope in General. Most Cited Cases
        (Formerly 92k67)
"Nonjusticiability" means inappropriateness of subject for judicial consideration.

**[3] Federal Courts 170B** 12.1

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk12 Case or Controversy Requirement
                170Bk12.1 k. In General. Most Cited Cases
        (Formerly 92k67)
In instance of nonjusticiability, consideration of a cause is not wholly and immediately foreclosed, but rather inquiry proceeds to point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded.

**[4] Federal Courts 170B** 161

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(A) In General
            170Bk161 k. Federal Question Jurisdiction in General. Most Cited Cases
        (Formerly 106k282(1), 106k284, 106k298)

**Federal Courts 170B** 162

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(A) In General
            170Bk162 k. Cases Arising Under Treaties. Most Cited Cases

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

**Federal Courts 170B** 👉**171**

170B Federal Courts
   170BIII Federal Question Jurisdiction
      170BIII(B) Cases Arising Under the Constitution
         170Bk171 k. Constitutional Cases in General.
Most Cited Cases

**Federal Courts 170B** 👉**191**

170B Federal Courts
   170BIII Federal Question Jurisdiction
      170BIII(C) Cases Arising Under Laws of the United States
         170Bk191 k. In General; What Constitute "Laws of the United States". Most Cited Cases
In instance of lack of federal court jurisdiction, a cause either does not arise under the Federal Constitution, laws or treaties or fall within one or the other enumerated categories of article of the Constitution pertaining to judicial power, or is not a case or controversy within meaning of that section of the Constitution, or the cause is not one described by any jurisdictional statute. U.S.C.A.Const. art. 3, § 2.

**[5] Federal Courts 170B** 👉**244**

170B Federal Courts
   170BIII Federal Question Jurisdiction
      170BIII(D) Pleading
        170Bk242 Sufficiency of Allegations
         170Bk244 k. Civil Rights; Equal Protection.
Most Cited Cases
    (Formerly 106k299(3))
Dismissal by a federal court of a complaint alleging that a state statute effected an apportionment that deprived plaintiffs of equal protection of the laws in violation of the Fourteenth Amendment to the Federal Constitution, upon ground of lack of jurisdiction of the subject matter would be justified only if the claim were so attenuated and unsubstantial as to be absolutely devoid of merit, or frivolous. U.S.C.A.Const. art. 3, § 2; Amend. 14; Acts Tenn.1901, c. 122.

**[6] Federal Courts 170B** 👉**180**

170B Federal Courts
   170BIII Federal Question Jurisdiction
      170BIII(B) Cases Arising Under the Constitution

         170Bk178 Particular Cases and Questions, Due Process or Equal Protection
         170Bk180 k. Election and Right to Public Office; Apportionment Cases. Most Cited Cases
    (Formerly 106k282(3))
A claim that a state statute effected an apportionment that deprived plaintiffs of equal protection of the laws in violation of the Fourteenth Amendment to the Federal Constitution did not assert a federal constitutional claim unsubstantial and frivolous, for purposes of determining jurisdiction of the subject matter. U.S.C.A.Const. Amend. 14; Acts Tenn.1901, c. 122.

**[7] Federal Civil Procedure 170A** 👉**1742(1)**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
      170AXI(B)2 Grounds in General
         170Ak1742 Want of Jurisdiction
         170Ak1742(1) k. In General. Most Cited Cases
    (Formerly 170Ak1742)
Failure to state a cause of action calls for judgment on the merits and not for dismissal for want of jurisdiction.

**[8] Federal Courts 170B** 👉**171**

170B Federal Courts
   170BIII Federal Question Jurisdiction
      170BIII(B) Cases Arising Under the Constitution
         170Bk171 k. Constitutional Cases in General.
Most Cited Cases
No consideration of merits of a claim other than a determination of whether an asserted federal constitutional claim is unsubstantial and frivolous is relevant to a determination of a federal court's jurisdiction of subject matter of cause of action for redress of a federal constitutional right.

**[9] Federal Courts 170B** 👉**244**

170B Federal Courts
   170BIII Federal Question Jurisdiction
      170BIII(D) Pleading
        170Bk242 Sufficiency of Allegations
         170Bk244 k. Civil Rights; Equal Protection.
Most Cited Cases
    (Formerly 106k299(3))
Federal district court had jurisdiction of subject matter of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                    Page 3
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

complaint by certain Tennessee citizens alleging that a state statute effected an apportionment that deprived them of equal protection of the laws in violation of the Fourteenth Amendment, under the judicial-power article of the Federal Constitution, and under statute providing district courts shall have original jurisdiction of any civil action to redress deprivation of any right secured by the Federal Constitution. U.S.C.A.Const. art. 3, § 2; Amend. 14; 28 U.S.C.A. § 1343; Acts Tenn.1901, c. 122.

**[10] Constitutional Law 92 ⬤━2600**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)6 Advisory Opinions
                92k2600 k. In General. Most Cited Cases
        (Formerly 92k2601, 92k69)
A federal court cannot pronounce any statute, either of a state or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies.

**[11] Federal Courts 170B ⬤━243**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(D) Pleading
            170Bk242 Sufficiency of Allegations
                170Bk243 k. Particular Cases. Most Cited Cases
        (Formerly 106k299(3))
Gist of standing to challenge constitutionality of a state statute is whether plaintiffs have alleged such personal stake in outcome of the controversy as to assure concrete adverseness, and determination of such standing is a question of federal law.

**[12] Constitutional Law 92 ⬤━923**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
            92VI(A)11 Equal Protection
                92k923 k. Elections. Most Cited Cases
        (Formerly 92k42.1(1))
Residents of certain counties in the state, allegedly qualified to vote for members of the General Assembly representing counties in which they resided, suing on their own behalf and on behalf of all qualified voters of their respective counties and in behalf of all voters of the state similarly situated, had standing to maintain a suit in federal court for a declaration that a state statute effected an apportionment that deprived plaintiffs of equal protection. U.S.C.A.Const. Amends. 14; Acts Tenn.1901, c. 122.

**[13] Constitutional Law 92 ⬤━3657**

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(E) Particular Issues and Applications
            92XXVI(E)9 Elections, Voting, and Political Rights
                92k3656 Equality of Voting Power (One Person, One Vote)
                    92k3657 k. In General. Most Cited Cases
        (Formerly 92k225.3(1), 92k211)
A citizen's right to vote free of arbitrary impairment by state action is a right secured by the Federal Constitution if such impairment results from dilution by a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box. U.S.C.A.Const. Amend. 14.

**[14] Constitutional Law 92 ⬤━2586**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)5 Political Questions
                92k2584 Elections
                    92k2586 k. Apportionment, Election, and Discipline of Members of Legislature. Most Cited Cases
        (Formerly 92k68(3))
Allegations in complaint of certain Tennessee voters that a state statute effected an apportionment that deprived them of equal protection of the laws presented a justiciable constitutional cause of action, and the right asserted was within reach of judicial protection under the Fourteenth Amendment, and did not present a nonjusticiable political question. U.S.C.A.Const. Amend. 14; Acts Tenn.1901, c. 122.

**[15] Constitutional Law 92 ⬤━2586**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)5 Political Questions

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                                                Page 4
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

92k2584 Elections
  92k2586 k. Apportionment, Election, and
Discipline of Members of Legislature. Most Cited Cases
    (Formerly 92k68(3))
A claim of state voters that a state statute effected an ap-
portionment that deprived them of equal protection neither
rested upon nor implicated article of the Constitution pro-
viding that the United States shall guarantee to every state
a republican form of government, and justiciability of
equal-protection claim was not foreclosed by decisions of
cases involving the Guaranty Clause. U.S.C.A.Const. art.
4, § 4; U.S.C.A.Const. Amend. 14.

**[16] Constitutional Law 92 ⚬─2586**

92 Constitutional Law
  92XX Separation of Powers
    92XX(C) Judicial Powers and Functions
      92XX(C)5 Political Questions
        92k2584 Elections
          92k2586 k. Apportionment, Election, and
Discipline of Members of Legislature. Most Cited Cases
    (Formerly 92k68(3), 92k38(3))
Claim of certain state voters that they were being denied
equal protection was justiciable, and if discrimination was
sufficiently shown, right to relief under the
equal-protection clause was not diminished by fact that the
discrimination related to political rights. U.S.C.A.Const.
Amend. 14.

**[17] Constitutional Law 92 ⚬─2580**

92 Constitutional Law
  92XX Separation of Powers
    92XX(C) Judicial Powers and Functions
      92XX(C)5 Political Questions
        92k2580 k. In General. Most Cited Cases
    (Formerly 92k68(1))
In determining whether a question falls within the politi-
cal-question category for jurisdictional purposes, the ap-
propriateness of attributing finality to action of political
departments, and also lack of satisfactory criteria for a
judicial determination are dominant considerations.

**[18] Constitutional Law 92 ⚬─2580**

92 Constitutional Law
  92XX Separation of Powers
    92XX(C) Judicial Powers and Functions
      92XX(C)5 Political Questions

92k2580 k. In General. Most Cited Cases
    (Formerly 92k68(1))
Nonjusticiability of a political question is primarily a
function of separation of powers.

**[19] Constitutional Law 92 ⚬─2452**

92 Constitutional Law
  92XX Separation of Powers
    92XX(C) Judicial Powers and Functions
      92XX(C)1 In General
        92k2452 k. Determination of Powers of
Other Branches in General. Most Cited Cases
    (Formerly 92k67)
Deciding whether a matter has in any measure been
committed by the Constitution to another branch of gov-
ernment, or whether action of that branch exceeds what-
ever authority has been committed, is an exercise in con-
stitutional interpretation, and is the responsibility of the
Supreme Court as ultimate interpreter of the Constitution.
U.S.C.A.Const. art. 3.

**[20] Constitutional Law 92 ⚬─2500**

92 Constitutional Law
  92XX Separation of Powers
    92XX(C) Judicial Powers and Functions
      92XX(C)2 Encroachment on Legislature
        92k2499 Particular Issues and Applications
          92k2500 k. In General. Most Cited Cases
    (Formerly 92k70.1(12))
Although courts are reluctant to inquire into whether a
statute, as passed, complied with all requisite formalities,
courts will delve into a legislature's records upon such a
quest, and if an enrolled statute lacks an effective date, a
court will not hesitate to seek it in legislative journals in
order to preserve the enactment.

**[21] Constitutional Law 92 ⚬─2580**

92 Constitutional Law
  92XX Separation of Powers
    92XX(C) Judicial Powers and Functions
      92XX(C)5 Political Questions
        92k2580 k. In General. Most Cited Cases
    (Formerly 92k68(1))
Court cannot reject as "no law suit" a bona fide contro-
versy as to whether some action denominated "political"
exceeds constitutional authority.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[22] Constitutional Law 92 ⛭2583**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)5 Political Questions
                92k2583 k. Republican Form of Government. Most Cited Cases
    (Formerly 92k68(1))
Claims based on violation of clause of the Federal Constitution providing that United States shall guarantee to every state a republican form of government involve elements defining a political question, and for that reason they are nonjusticiable, but nonjusticiability of such claims has nothing to do with their touching upon matters of state governmental organization. U.S.C.A.Const. art. 4, § 4.

**[23] Constitutional Law 92 ⛭2583**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)5 Political Questions
                92k2583 k. Republican Form of Government. Most Cited Cases
    (Formerly 92k68(1))
A challenge to state action based on the Guaranty Clause of the Federal Constitution presents no justiciable question and similarly, challenges to congressional action on ground of inconsistency with that clause present no justiciable question. U.S.C.A.Const. art. 4, § 4.

**[24] Constitutional Law 92 ⛭2586**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)5 Political Questions
                92k2584 Elections
                    92k2586 k. Apportionment, Election, and Discipline of Members of Legislature. Most Cited Cases
    (Formerly 92k68(3))
Nonjusticiability of claims resting on Guaranty Clause which arises from their embodiment of political questions had no bearing upon justiciability of a claim that a state statute effected an apportionment which deprived plaintiffs of equal protection of the laws in violation of the Fourteenth Amendment. U.S.C.A.Const. art. 4, § 4; Amend. 14.

**[25] Federal Courts 170B ⛭171**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(B) Cases Arising Under the Constitution
            170Bk171 k. Constitutional Cases in General. Most Cited Cases
    (Formerly 106k262.4(1))

**Federal Courts 170B ⛭173**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(B) Cases Arising Under the Constitution
            170Bk173 k. Statutes and Administrative Proceedings in General. Most Cited Cases
    (Formerly 106k262.4(2))
When challenges to state action respecting matters of administration of affairs of a state and officers through whom they are conducted rest on claims of constitutional deprivation which are amenable to judicial correction, the Supreme Court will act upon its view of merits of the claim.

**[26] Courts 106 ⛭489(1)**

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
        106VII(B) State Courts and United States Courts
            106k489 Exclusive or Concurrent Jurisdiction
                106k489(1) k. In General. Most Cited Cases
State court's inability to grant relief does not bar a federal court from assuming jurisdiction to inquire into alleged deprivation of federal constitutional rights.

**[27] Courts 106 ⛭89**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k88 Previous Decisions as Controlling or as Precedents
                106k89 k. In General. Most Cited Cases
Discretionary exercise or nonexercise of equitable or declaratory judgment jurisdiction in one case is not precedent in another case where the facts differ.
**\*\*694 \*186** Charles S. Rhyne, Washington, D.C., and Z. T. Osborn, Jr., Nashville, Tenn., for appellants.

**\*187** Jack Wilson, Chattanooga, Tenn., for appellees.

Solicitor General Archibald Cox, Washington, D.C., for

82 S.Ct. 691                                                                                  Page 6
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
 (Cite as: 369 U.S. 186, 82 S.Ct. 691)

the United States, as amicus curiae, by special leave of Court.

Mr. Justice BRENNAN delivered the opinion of the Court.

This civil action was brought under 42 U.S.C. ss 1983 and 1988, 42 U.S.C.A. ss 1983, 1988 to redress the alleged deprivation of federal constitutional rights. The complaint, alleging that by means of a 1901 statute of Tennessee apportioning the members of the General Assembly among the State's 95 counties, FN1 'these plaintiffs and others similarly situated, *188 are denied the equal protection of the laws accorded them by the Fourteenth Amendment to the Constitution of the United States by virtue of the de-basement of their votes,' was dismissed by a three-judge court convened under 28 U.S.C. s 2281, 28 U.S.C.A. s 2281 in the Middle District of Tennessee.FN2 The court held that it lacked jurisdiction of the subject matter and also that no claim was stated upon which relief could be granted. 179 F.Supp. 824. We noted probable jurisdiction of the appeal. 364 U.S. 898, 81 S.Ct. 230, 5 L.Ed.2d 193.FN3 We hold that the dismissal was error, and remand the cause to the District Court for trial and further proceedings consistent with this opinion.

> FN1. Public Acts of Tennessee, c. 122 (1901), now Tenn.Code Ann. ss 3-101 to 3-107. The full text of the 1901 Act as amended appears in an Appendix to this opinion, 369 U.S., p. 237, 82 S.Ct., p. 720.

> FN2. The three-judge court was convened pursuant to the order of a single district judge, who, after he had reviewed certain decisions of this Court and found them distinguishable in features 'that may ultimately prove to be significant,' held that the complaint was not so obviously without merit that he would be justified in refusing to convene a three-judge court. 175 F.Supp. 649, 652.

> FN3. We heard argument first at the 1960 Term and again at this Term when the case was set over for reargument. 366 U.S. 907, 81 S.Ct. 1082.

The General Assembly of Tennessee consists of the Senate with 33 members and the House of Representatives with 99 members. The Tennessee Constitution provides in Art. II as follows:

'Sec. 3. Legislative authority-Term of office.-The Legislative authority of this State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives, both dependent on the people; who shall hold their offices for two years from the day of the general election.

'Sec. 4. Census.-An enumeration of the qualified voters, and an apportionment of the Representatives in the General Assembly, shall be made in the year one thousand eight hundred and seventy-one, and within every subsequent term of ten years.

'Sec. 5. Apportionment of representatives.-The number of Representatives shall, at the several *189 periods of making the enumeration, be apportioned among the several counties or districts, according to the number of qualified voters in each; and shall not exceed seventy-five, until the population of the State shall be one million and a half, and shall never exceed ninety-nine; Provided, that any county having two-thirds of the ratio shall be entitled to one member.

'Sec 6. Apportionment of senators.-The number of Senators shall, at the several periods of making the enumeration, be apportioned among the several counties or districts according to the number of qualified electors in each, and shall **695 not exceed one-third the number of representatives. In apportioning the Senators among the different counties, the fraction that may be lost by any county or counties, in the apportionment of members to the House of Representatives, shall be made up to such county or counties in the Senate, as near as may be practicable. When a district is composed of two or more counties, they shall be adjoining; and no county shall be divided in forming a district.'

Thus, Tennessee's standard for allocating legislative representation among her counties is the total number of qualified voters resident in the respective counties, subject only to minor qualifications.FN4 Decennial reapportionment *190 in compliance with the constitutional scheme was effected by the General Assembly each decade from 1871 to 1901. The 1871 apportionmentFN5 was preceded by an 1870 statute requiring an enumeration.FN6 The 1881 apportionment involved three statutes, the first authorizing an enumeration, the second enlarging the Senate from 25 to *191 33 members and the House from 75 to 99 members, and the third apportioning the membership of both Houses.FN7 In 1891 there **696 were both an enumeration and an apportionment.FN8 In 1901 the General Assembly

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

abandoned separate enumeration in favor of reliance upon the Federal Census and passed the Apportionment Act here in controversy.[FN9] In the more than 60 years since that action, all proposals in both Houses of the General Assembly for reapportionment have failed to pass.[FN10]

> **FN4.** A county having less than, but at least two-thirds of, the population required to choose a Representative is allocated one Representative. See also Tenn.Const. Art. II, s 6. A common and much more substantial departure from the number-of-voters or total-population standard is the guaranty of at least one seat to each county. See, e.g., Kansas Const. Art. 2, s 2; N.J.Const. Art. 4, s 3, 1, N.J.S.A.

While the Tennessee Constitution speaks of the number of 'qualified voters,' the exhibits attached to the complaint use figures based on the number of persons 21 years of age and over. This basis seems to have been employed by the General Assembly in apportioning legislative seats from the outset. The 1870 statute providing for the first enumeration, Acts of 1870 (1st Sess.), c. 107, directed the courts of the several counties to select a Commissioner to enumerate 'all the male inhabitants of their respective counties, who are twenty-one years of age and upward, who shall be resident citizens of their counties on the first day of January, 1871. * * *.' Reports compiled in the several counties on this basis were submitted to the General Assembly by the Secretary of State and were used in the first apportionment. Appendix to Tenn.S.J., 1871, 41-43. Yet such figures would not reflect the numbers of persons qualified to exercise the franchise under the then-governing qualifications: (a) citizenship; (b) residence in the State 12 months, and in the county 6 months; (c) payment of poll taxes for the preceding year unless entitled to exemption. Acts of 1870 (2d Sess.), c. 10. (These qualifications continued at least until after 1901. See Shan.Tenn.Code Ann. ss 1167, 1220 (1896; Supp. 1904).) Still, when the General Assembly directed the Secretary of State to do all he could to obtain complete reports from the counties, the Resolution spoke broadly of 'the impossibility of * * * (redistricting) without the census returns of the voting population from each county * * *.' Tenn.S.J., 1871, 46-47, 96. The figures also showed a correlation with Federal Census figures

for 1870. The Census reported 259,016 male citizens 21 and upward in Tennessee. Ninth Census of the United States, 1870, Statistics of the Population 635 (1872). The Tennessee Secretary of State's Report, with 15 counties not reported, gave a figure of 237,431. Using the numbers of actual votes in the last gubernatorial election for those 15 counties, the Secretary arrived at a total of 250,025. Appendix to Tenn.S.J., 1871, 41-43. This and subsequent history indicate continued reference to Census figures and finally in 1901, abandonment of a state enumeration in favor of the use of Census figures. See notes 7, 8, 9, infra. See also Williams, Legislative Apportionment in Tennessee, 20 Tenn.L.Rev. 235, 236, n. 6. It would therefore appear that unless there is a contrary showing at the trial, appellants' current figures, taken from the United States Census Reports, are apposite.

> **FN5.** Acts of 1871 (1st Sess.), c. 146.

> **FN6.** Acts of 1870 (1st Sess.), c. 107.

> **FN7.** The statute authorizing the enumeration was Acts of 1881 (1st Sess.), c. 124. The enumeration commissioners in the counties were allowed 'access to the U.S. Census Reports of the enumeration of 1880, on file in the offices of the County Court Clerks of the State, and a reference to said reports by said commissioners shall be legitimate as an auxiliary in the enumeration required. * * *' Ibid., s 4.

The United States Census reported 330,305 male citizens 21 and upward in Tennessee. The Tenth Census of the United States, 1880, Compendium 596 (1883). The Tennessee Secretary of State's Report gave a figure of 343,817, Tenn.H.J. (1st Extra.Sess.), 1881, 12-14 (1882).

The General Assembly was enlarged in accordance with the constitutional mandate since the State's population had passed 1,500,000. Acts of 1881 (1st Extra.Sess.), c. 5; and see, id., S.J.Res. No. III; see also Tenth Census of the United States, 1880, Statistics of the Population 77 (1881). The statute apportioning the General Assembly was Acts of 1881 (1st Extra.Sess.), c. 6.

> **FN8.** Acts of 1891, c. 22; Acts of 1891 (Ex-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

tra.Sess.), c. 10. Reference to United States Census figures was allowed just as in 1881, see supra, n. 7. The United States Census reported 402,476 males 21 and over in Tennessee. The Eleventh Census of the United States, 1890, Population (Part I) 781 (1895). The Tennessee Secretary of State's Report gave a figure of 399,575. ,1 Tenn.S.J., 1891, 473-474.

FN9. Acts of 1901, p. 1260, S.J.Res. No. 35; Acts of 1901, c. 122. The Joint Resolution said: 'The Federal census of 1900 has been very recently taken and by reference to said Federal census an accurate enumeration of the qualified voters of the respective counties of the State of Tennessee can be ascertained and thereby save the expense of an actual enumeration * * *.'

FN10. For the history of legislative apportionment in Tennessee, including attempts made since 1901, see Tenn.S.J., 1959, 909-930; and 'A Documented Survey of Legislative Apportionment in Tennessee, 1870-1957,' which is attached as exhibit 2 to the intervening complaint of Mayor West of Nashville, both prepared by the Tennessee State Historian, Dr. Robert H. White. Examples of preliminary steps are: In 1911, the Senate called upon the Redistricting Committee to make an enumeration of qualified voters and to use the Federal Census of 1910 as the basis. Acts of 1911, S.J.Res. No. 60, p. 315. Similarly, in 1961, the Senate called for appointment of a select committee to make an enumeration of qualified voters. Acts of 1961, S.J.Res. No. 47, p. 1219. In 1955, the Senate called for a study of reapportionment. Tenn.S.J., 1955, 224; but see id., at 1403. Similarly, in 1961, the House directed the State Legislative Council to study methods of reapportionment. Acts of 1961, H.J.Res. No. 65, p. 1114.

**\*192** Between 1901 and 1961, Tennessee has experienced substantial growth and redistribution of her population. In 1901 the population was 2,020,616, of whom 487,380 were eligible to vote.[FN11] The 1960 Federal Census reports the State's population at 3,567,089, of whom 2,092,891 are eligible to vote. [FN12] The relative standings of the counties in terms of qualified voters have changed significantly. It is primarily the continued application of the 1901 Apportionment Act to this shifted and enlarged voting population which gives rise to the present controversy.

FN11. Twelfth Census of the United States, 1900, Population (Part 1) 39 (1901); (Part 2) 202 (1902).

FN12. United States Census of Population: 1960, General Population Characteristics-Tennessee, Table 16 (1961).

Indeed, the complaint alleges that the 1901 statute, even as of the time of its passage, 'made no apportionment of Representatives and Senators in accordance with the constitutional formula * * *, but instead arbitrarily and capriciously apportioned representatives **\*\*697** in the Senate and House without reference * * * to any logical or reasonable formula whatever.' [FN13] It is further alleged **\*193** that 'because of the population changes since 1900, and the failure of the Legislature to reapportion itself since 1901,' the 1901 statute became 'unconstitutional and obsolete.' Appellants also argue that, because of the composition of the legislature effected by the 1901 Apportionment Act, redress in the form of a state constitutional amendment to change the entire mechanism for reapportioning, or any other change short of that, is difficult or impossible.[FN14] The complaint concludes that 'these plaintiffs**\*194** and others similarly situated, are denied the equal protection**\*\*698** of the laws accorded them by the Fourteenth Amendment to the Constitution of the United States by virtue of the debasement of their votes.'[FN15] They seek a **\*195** declaration that the 1901 statute is unconstitutional and an injunction restraining the appellees from acting to conduct any further elections under it. They also pray that unless and until the General Assembly enacts a valid reapportionment, the District Court should either decree a reapportionment by mathematical application of the Tennessee constitutional formulae to the most recent Federal Census figures, or direct the appellees to conduct legislative elections, primary and general, at large. They also pray for such other and further relief as may be appropriate.

FN13. In the words of one of the intervening complaints, the apportionment was 'wholly arbitrary, * * * and, indeed, based upon no lawfully pertinent factor whatever.'

FN14. The appellants claim that no General Assembly constituted according to the 1901 Act will submit reapportionment proposals either to the people or to a Constitutional Convention. There is no provision for popular initiative in Tennessee. Amendments proposed in the Senate or House

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

must first be approved by a majority of all members of each House and again by two-thirds of the members in the General Assembly next chosen. The proposals are then submitted to the people at the next general election in which a Governor is to be chosen. Alternatively, the legislature may submit to the people at any general election the question of calling a convention to consider specified proposals. Such as are adopted at a convention do not, however, become effective unless approved by a majority of the qualified voters voting separately on each proposed change or amendment at an election fixed by the convention. Conventions shall not be held oftener than once in six years. Tenn.Const. Art. XI, s 3. Acts of 1951, c. 130, s 3, and Acts of 1957, c. 340, s 3, provided that delegates to the 1953 and 1959 conventions were to be chosen from the counties and floterial districts just as are members of the State House of Representatives. The General Assembly's call for a 1953 Constitutional Convention originally contained a provision 'relating to the appointment (sic) of representatives and senators' but this was excised. Tenn.H.J., 1951, 784. A Resolution introduced at the 1959 Constitutional Convention and reported unfavorably by the Rules Committee of the Convention was as follows:

'By Mr. Chambliss (of Hamilton County), Resolution No. 12-Relative to Convention considering reapportionment, which is as follows:

'WHEREAS, there is a rumor that this Limited Convention has been called for the purpose of postponing for six years a Convention that would make a decision as to reapportionment; and

'WHEREAS, there is pending in the United States Courts in Tennessee a suit under which parties are seeking, through decree, to compel reapportionment; and

'WHEREAS, it is said that this Limited Convention, which was called for limited consideration, is yet a Constitutional Convention within the language of the Constitution as to Constitutional Conventions, forbidding frequent Conventions in the last sentence of Article Eleven, Section 3, second paragraph, more often than each six years, to-wit:

"No such Convention shall be held oftener than once in six years.'

'Now, THEREFORE, BE IT RESOLVED, That it is the consensus of opinion of the members of this Convention that since this is a Limited Convention as hereinbefore set forth another Convention could be had if it did not deal with the matters submitted to this Limited Convention.

'BE IT FURTHER RESOLVED, That it is the consensus of opinion of this Convention that a Convention should be called by the General Assembly for the purpose of considering reapportionment in order that a possibility of Court enforcement being forced on the Sovereign State of Tennessee by the Courts of the National Government may be avoided.

'BE IT FURTHER RESOLVED, That this Convention be adjourned for two years to meet again at the same time set forth in the statute providing for this Convention, and that it is the consensus of opinion of this body that it is within the power of the next General Assembly of Tennessee to broaden the powers of this Convention and to authorize and empower this Convention to consider a proper amendment to the Constitution that will provide, whe submitted to the electorate, a method of reapportionment.' Tenn.Constitutional Convention of 1959, The Journal and Debates, 35, 278.

FN15. It is clear that appellants' federal constitutional claims rest exclusively on alleged violation of the Fourteenth Amendment. Their primary claim is that the 1901 statute violates the Equal Protection Clause of that amendment. There are allegations invoking the Due Process Clause but from the argument and the exhibits it appears that the Due Process Clause argument is directed at certain tax statutes. Insofar as the claim involves the validity of those statutes under the Due Process Clause we find it unnecessary to decide its merits. And if the allegations regarding the tax statutes are designed as the framework for proofs as to the effects of the allegedly discriminatory apportionment, we need not rely upon them to support our holding that the complaint states a federal constitutional claim of violation of the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

Equal Protection Clause. Whether, when the issue to be decided is one of the constitutional adequacy of this particular apportionment, taxation arguments and exhibits as now presented add anything, or whether they could add anything however presented, is for the District Court in the first instance to decide.

The complaint, in addition to the claims under the Federal Constitution, also alleges rights, and the General Assembly's duties, under the Tennessee Constitution. Since we hold that appellants have-if it develops at trial that the facts support the allegations-a cognizable federal constitutional cause of action resting in no degree on rights guaranteed or putatively guaranteed by the Tennessee Constitution, we do not consider, let alone enforce, rights under a State Constitution which go further than the protections of the Fourteenth Amendment. Lastly, we need not assess the legal significance, in reaching our conclusion, of the statements of the complaint that the apportionment effected today under the 1901 Act is 'contrary to the philosophy of government in the United States and all Anglo-Saxon jurisprudence * * *.'

I.

THE DISTRICT COURT'S OPINION AND ORDER OF DISMISSAL.

Because we deal with this case on appeal from an order of dismissal granted on appellees' motions, precise identification**196** of the issues presently confronting us demands clear exposition of the grounds upon which the District Court rested in dismissing the case. The dismissal order recited that the court sustained the appellees' grounds '(1) that the Court lacks jurisdiction of the subject matter, and (2) that the complaint fails to state a claim upon which relief can be granted * * *.'

In the setting of a case such as this, the recited grounds embrace two possible reasons for dismissal:

First: That the facts and injury alleged, the legal bases invoked as creating the rights and duties relied upon, and the relief sought, fail to come within that language of Article III of the Constitution and of the jurisdictional statutes which define those matters concerning which United States District Courts are empowered to act;

Second: That, although the matter is cognizable and facts are alleged which establish infringement of appellants' rights as a result of state legislative action departing from a federal constitutional**\*699** standard, the court will not proceed because the matter is considered unsuited to judicial inquiry or adjustment.

We treat the first ground of dismissal as 'lack of jurisdiction of the subject matter.' The second we consider to result in a failure to state a justiciable cause of action.

The District Court's dismissal order recited that it was issued in conformity with the court's per curiam opinion. The opinion reveals that the court rested its dismissal upon lack of subject-matter jurisdiction and lack of a justiciable cause of action without attempting to distinguish between these grounds. After noting that the plaintiffs challenged the existing legislative apportionment in Tennessee under the Due Process and Equal Protection Clauses, and summarizing the supporting allegations and the relief requested, the court stated that

'The action is presently before the Court upon the defendants' motion to dismiss predicated upon three **\*197** grounds: first, that the Court lacks jurisdiction of the subject matter; second, that the complaints fail to state a claim upon which relief can be granted; and third, that indispensable party defendants are not before the Court.' 179 F.Supp., at 826.

The court proceeded to explain its action as turning on the case's presenting a 'question of the distribution of political strength for legislative purposes.' For,

'From a review of (numerous Supreme Court) * * * decisions there can be no doubt that the federal rule, as enunciated and applied by the Supreme Court, is that the federal courts, whether from a lack of jurisdiction or from the inappropriateness of the subject matter for judicial consideration, will not intervene in cases of this type to compel legislative reapportionment.' 179 F.Supp., at 826.

The court went on to express doubts as to the feasibility of the various possible remedies sought by the plaintiffs. 179 F.Supp., at 827-828. Then it made clear that its dismissal reflected a view not of doubt that violation of constitutional rights was alleged, but of a court's impotence to correct that violation:

'With the plaintiffs' argument that the legislature of Ten-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

nessee is guilty of a clear violation of the state constitution and of the rights of the plaintiffs the Court entirely agrees. It also agrees that the evil is a serious one which should be corrected without further delay. But even so the remedy in this situation clearly does not lie with the courts. It has long been recognized and is accepted doctrine that there are indeed some rights guaranteed by the Constitution for the violation of which the courts cannot give redress.' 179 F.Supp., at 828.

[1] In light of the District Court's treatment of the case, we hold today only that (a) that the court possessed jurisdiction of the subject matter; (b) that a justiciable cause of **198** action is stated upon which appellants would be entitled to appropriate relief; and (c) because appellees raise the issue before this Court, that the appellants have standing to challenge the Tennessee apportionment statutes.[FN16] Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at the trial.

> FN16. We need not reach the question of indispensable parties because the District Court has not yet decided it.

### **700** II.

### JURISDICTION OF THE SUBJECT MATTER.

[2][3][4] The District Court was uncertain whether our cases withholding federal judicial relief rested upon a lack of federal jurisdiction or upon the inappropriateness of the subject matter for judicial consideration-what we have designated 'nonjusticiability.' The distinction between the two grounds is significant. In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not 'arise under' the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, s 2), or is not a 'case or controversy' within the meaning of that section; or the cause is not one described by any jurisdictional statute. Our conclusion, see 369 U.S., pp. 208-237, 82 S.Ct., pp. 705-720, infra, that this cause presents no nonjusticiable 'political question' settles the only possible doubt that it is

a case or controversy. Under the present heading of 'Jurisdiction**199** of the Subject Matter' we hold only that the matter set forth in the complaint does arise under the Constitution and is within 28 U.S.C. s 1343, 28 U.S.C.A. s 1343.

[5][6][7][8][9] Article III, s 2, of the Federal Constitution provides that 'The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority * * *.' It is clear that the cause of action is one which 'arises under' the Federal Constitution. The complaint alleges that the 1901 statute effects an apportionment that deprives the appellants of the equal protection of the laws in violation of the Fourteenth Amendment. Dismissal of the complaint upon the ground of lack of jurisdiction of the subject matter would, therefore, be justified only if that claim were 'so attenuated and unsubstantial as to be absolutely devoid of merit,' Newburyport Water Co. v. Newburyport, 193 U.S. 561, 579, 24 S.Ct. 553, 557, 48 L.Ed. 795, or 'frivolous,' Bell v. Hood, 327 U.S. 678, 683, 66 S.Ct. 773, 776, 90 L.Ed. 939.[FN17] That the claim is unsubstantial must be 'very plain.' Hart v. B. F. Keith Vaudeville Exchange, 262 U.S. 271, 274, 43 S.Ct. 540, 541, 67 L.Ed. 977. Since the District Court obviously and correctly did not deem the asserted federal constitutional claim unsubstantial and frivolous, it should not have dismissed the complaint for want of jurisdiction of the subject matter. And of course no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter. We said in an earlier voting case from Tennessee: 'It is obvious * * * that the court, in dismissing for want of jurisdiction, was controlled by what it deemed to be the want of merit in the averments which were made in the complaint as to the violation of the Federal right. But as the very nature of the controversy was Federal, and, therefore, **200** jurisdiction existed, whilst the opinion of the court as to the want of merit in the cause of action might have furnished ground for dismissing for that reason, it afforded no sufficient ground for deciding that the action was not one arising under the Constitution and laws of the United States.' Swafford v. Templeton, 185 U.S. 487, 493, 22 S.Ct. 783, 785, 46 L.Ed. 1005. 'For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.' **701**Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776. See also Binderup v. Pathe Exchange, 263 U.S. 291, 305-308, 44 S.Ct. 96, 98-99, 68 L.Ed. 308.

> FN17. The accuracy of calling even such dis-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

missals 'jurisdictional' was questioned in Bell v. Hood. See 327 U.S. at 683, 66 S.Ct. at 776.

Since the complaint plainly sets forth a case arising under the Constitution, the subject matter is within the federal judicial power defined in Art. III, s 2, and so within the power of Congress to assign to the jurisdiction of the District Courts. Congress has exercised that power in 28 U.S.C. s 1343(3), 28 U.S.C.A. s 1343(3):

'The district courts shall have original jurisdiction of any civil action authorized by law[FN18] to be commenced by any person * * * (t)o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States * * *.'[FN19]

FN18. 42 U.S.C. s 1983, 42 U.S.C.A. s 1983 provides: 'Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.'

FN19. This Court has frequently sustained District Court jurisdiction under 28 U.S.C. s 1343(3), 28 U.S.C.A. s 1343(3) or its predecessors to entertain suits to redress deprivations of rights secured against state infringement by the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Douglas v. Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138; cf. Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984; Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; Egan v. Aurora, 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741.

**\*201** An unbroken line of our precedents sustains the federal courts' jurisdiction of the subject matter of federal constitutional claims of this nature. The first cases involved the redistricting of States for the purpose of electing Representatives to the Federal Congress. When the Ohio

Supreme Court sustained Ohio legislation against an attack for repugnancy to Art. I, s 4, of the Federal Constitution, we affirmed on the merits and expressly refused to dismiss for want of jurisdiction 'In view * * * of the subject-matter of the controversy and the Federal characteristics which inhere in it * * *.' Ohio ex rel. Davis v. Hildebrant, 241 U.S. 565, 570, 36 S.Ct. 708, 710, 60 L.Ed. 1172. When the Minnesota Supreme Court affirmed the dismissal of a suit to enjoin the Secretary of State of Minnesota from acting under Minnesota redistricting legislation, we reviewed the constitutional merits of the legislation and reversed the State Supreme Court. Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795. And see companion cases from the New York Court of Appeals and the Missouri Supreme Court, Koenig v. Flynn, 285 U.S. 375, 52 S.Ct. 403, 76 L.Ed. 805; Carroll v. Becker, 285 U.S. 380, 52 S.Ct. 402, 76 L.Ed. 807. When a three-judge District Court exercising jurisdiction under the predecessor of 28 U.S.C. s 1343(3), 28 U.S.C.A. s 1343(3), permanently enjoined officers of the State of Mississippi from conducting an election of Representatives under a Mississippi redistricting act, we reviewed the federal questions on the merits and reversed the District Court. Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131, reversing 1 F.Supp. 134. A similar decree of a District Court, exercising jurisdiction under the same statute, concerning a Kentucky redistricting act, was **\*202** reviewed and the decree reversed. Mahan v. Hume, 287 U.S. 575, 53 S.Ct. 223, 77 L.Ed. 505, reversing 1 F.Supp. 142.[FN20]

FN20. Since that case was not brought to the Court until after the election had been held, the Court cited not only Wood v. Broom, but also directed dismissal for mootness, citing Brownlow v. Schwartz, 261 U.S. 216, 43 S.Ct. 263, 67 L.Ed. 620.

**\*\*702** The appellees refer to Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, as authority that the District Court lacked jurisdiction of the subject matter. Appellees misconceive the holding of that case. The holding was precisely contrary to their reading of it. Seven members of the Court participated in the decision. Unlike many other cases in this field which have assumed without discussion that there was jurisdiction, all three opinions filed in Colegrove discussed the question. Two of the opinions expressing the views of four of the Justices, a majority, flatly held that there was jurisdiction of that subject matter. Mr. Justice Black joined by Mr. Justice Douglas and Mr. Justice Murphy stated: 'It is my judgment that the District Court had jurisdiction * * *,' citing the

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

predecessor of 28 U.S.C. s 1343(3), 28 U.S.C.A. s 1343(3), and Bell v. Hood, supra. 328 U.S. at 568, 66 S.Ct. at 1210. Mr. Justice Rutledge, writing separately, expressed agreement with this conclusion. 328 U.S. at 564, 565, note 2, 66 S.Ct. at 1208. Indeed, it is even questionable that the opinion of Mr. Justice Frankfurter, joined by Justices Reed and Burton, doubted jurisdiction of the subject matter. Such doubt would have been inconsistent with the professed willingness to turn the decision on either the majority or concurring views in Wood v. Broom, supra. 328 U.S. at 551, 66 S.Ct. at 1199.

Several subsequent cases similar to Colegrove have been decided by the Court in summary per curiam statements. None was dismissed for want of jurisdiction of the subject matter. Cook v. Fortson, 329 U.S. 675, 67 S.Ct. 21, 91 L.Ed. 596; Turman v. Duckworth, ibid.; Colegrove v. Barrett, 330 U.S. 804, 67 S.Ct. 973, 91 L.Ed. 1262;[FN21] Tedesco v. Board of Supervisors, 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357; Remmey v. Smith, 342 U.S. 916, 72 S.Ct. 368, 96 L.Ed. 685; Cox v. Peters, 342 U.S. 936, 72 S.Ct. 559, 96 L.Ed. 697; Anderson v. Jordan, 343 U.S. 912, 72 S.Ct. 648, 96 L.Ed. 1328; Kidd v. McCanless, 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157; Radford v. Gary, 352 U.S. 991, 77 S.Ct. 559, 1 L.Ed.2d 540; Hartsfield v. Sloan, 357 U.S. 916, 78 S.Ct. 1363, 2 L.Ed.2d 1363; Matthews v. Handley, 361 U.S. 127, 80 S.Ct. 256, 4 L.Ed.2d 180.[FN22]

   FN21. Compare Boeing Aircraft Co. v. King County, 330 U.S. 803, 67 S.Ct. 972, 91 L.Ed. 1262 ('the appeal is dismissed for want of jurisdiction'). See Coleman v. Miller, 307 U.S. 433, 440, 59 S.Ct. 972, 83 L.Ed. 1385.

   FN22. Matthews did affirm a judgment that may be read as a dismissal for want of jurisdiction, 179 F.Supp. 470. However, the motion to affirm also rested on the ground of failure to state a claim upon which relief could be granted. Cf. text following, on MacDougall v. Green. And see text, infra, 369 U.S., p. 236, 82 S.Ct., p. 720.

**\*203** Two cases decided with opinions after Colegrove likewise plainly imply that the subject matter of this suit is within District Court jurisdiction. In MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3, the District Court dismissed for want of jurisdiction, which had been invoked under 28 U.S.C. s 1343(3), 28 U.S.C.A. s 1343(3), a suit to enjoin enforcement of the requirement that nominees for state-wide elections be supported by a petition signed by a minimum of persons from at least 50

of the State's 102 counties. This Court's disagreement with that action is clear since the Court affirmed the judgment after a review of the merits and concluded that the particular claim there was without merit. In South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834, we affirmed the dismissal of an attack on the Georgia 'county unit' system but founded our action on a ground that plainly would not **\*\*703** have been reached if the lower court lacked jurisdiction of the subject matter, which allegedly existed under 28 U.S.C. s 1343(3), 28 U.S.C.A. s 1343(3). The express words of our holding were that 'Federal courts consistently refuse to exercise their equity powers in cases posing **\*204** political issues arising from a state's geographical distribution of electoral strength among its political subdivisions.' 339 U.S. at 277, 70 S.Ct. at p. 642.

We hold that the District Court has jurisdiction of the subject matter of the federal constitutional claim asserted in the complaint.

III.

STANDING.

[10][11] A federal court cannot 'pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies.' Liverpool, N.Y. & P. Steamship Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899. Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the question of standing. It is, of course, a question of federal law.

The complaint was filed by residents of Davidson, Hamilton, Knox, Montgomery, and Shelby Counties. Each is a person allegedly qualified to vote for members of the General Assembly representing his county.[FN23] These appellants sued 'on their own behalf and on behalf of all qualified voters of their respective counties, and further, on behalf of all voters of the State of Tennessee who **\*205** are similarly situated * * *.'[FN24] The appellees are the Tennessee Secretary of State, Attorney General, Coordinator of Elections, and members of the State Board of Elections; the members of the State Board sued in their own right and also as representatives of the County Election Commissioners whom they appoint.[FN25]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN23. The Mayor of Nashville suing 'on behalf of himself and all residents of the City of Nashville, Davidson County, . . .' and the Cities of Chattanooga (Hamilton County) and Knoxville (Knox County), each suing on behalf of its residents, were permitted to intervene as parties plaintiff. Since they press the same claims as do the initial plaintiffs, we find it unnecessary to decide whether the intervenors would have standing to maintain this action in their asserted representative capacities.

FN24. The complaint also contains an averment that the appellants sue 'on their own behalf and on behalf of all other voters in the State of Tennessee.' (Emphasis added.) This may be read to assert a claim that voters in counties allegedly over-represented in the General Assembly also have standing to complain. But it is not necessary to decide that question in this case.

FN25. The duties of the respective appellees are alleged to be as follows:

'Defendant, Joe C. Carr, is the duly elected, qualified and acting Secretary of State of the State of Tennessee, with his office in Nashville in said State, and as such he is charged with the duty of furnishing blanks, envelopes and information slips to the County Election Commissioners, certifying the results of elections and maintaining the records thereof; and he is further ex officio charged, together with the Governor and the Attorney General, with the duty of examining the election returns received from the County Election Commissioners and declaring the election results, by the applicable provisions of the Tennessee Code Annotated, and by Chapter 164 of the Acts of 1949, inter alia.

'Defendant, George F. McCanless, is the duly appointed and acting Attorney General of the State of Tennessee, with his office in Nashville in said State, and is charged with the duty of advising the officers of the State upon the law, and is made by Section 23-1107 of the Tennessee Code Annotated a necessary party defendant in any declaratory judgment action where the constitutionality of statutes of the State of Tennessee is attacked, and he is ex-officio charged, together

with the Governor and the Secretary of State, with the duty of declaring the election results, under Section 2-140 of the Tennessee Code Annotated.

'Defendant, Jerry McDonald, is the duly appointed Coordinator of Elections in the State of Tennessee, with his office in Nashville, Tennessee, and as such official, is charged with the duties set forth in the public law enacted by the 1959 General Assembly of Tennessee creating said office (chapter 148).

'Defendants, Dr. Sam Coward, James Alexander, and Hubert Brooks are the duly appointed and qualified members constituting the State Board of Elections, and as such they are charged with the duty of appointing the Flection Commissioners for all the counties of the State of Tennessee, the organization and supervision of the biennial elections as provided by the Statutes of Tennessee, Chapter 9 of Title 2 of the Tennessee Code Annotated, Sections 2-901, et seq.

'That this action is brought against the aforenamed defendants in their representative capacities, and that said Election Commissioners are sued also as representatives of all of the County Election Commissioners in the State of Tennessee, such persons being so numerous as to make it impracticable to bring them all before the court; that there is a common question of law involved, namely, the constitutionality of Tennessee laws set forth in the Tennessee Code Annotated, Section 3-101 through Section 3-109, inclusive; that common relief is sought against all members of said Election Commissions in their official capacities, it being the duties of the aforesaid County Election Commissioners, within their respective jurisdictions, to appoint the judges of elections, to maintain the registry of qualified voters of said County, certify the results of elections held in said County to the defendants State Board of Elections and Secretary of State, and of preparing ballots and taking other steps to prepare for and hold elections in said Counties by virtue of Sections 2-1201, et seq. of Tennessee Code Annotated, and Section 2-301, et seq. of Tennessee Code Annotated, and Chapter 164 of the Acts of 1949, inter alia.'

The question whether the named defendants are

sufficient parties remains open for consideration on remand.

**\*\*704** [12] **\*206** We hold that the appellants do have standing to maintain this suit. Our decisions plainly support this conclusion. Many of the cases have assumed rather than articulated the premise in deciding the merits of similar claims. [FN26] And Colegrove v. Green, supra, squarely held that voters who allege facts showing disadvantage to themselves as individuals have standing to sue. [FN27] A number **\*207** of cases decided after Colegrove recognized the standing of the voters there involved to bring those actions. [FN28]

> FN26. Smiley v. Holm, supra, 285 U.S., at 361, 52 S.Ct., at 397 ("citizen, elector and taxpayer' of the state'); Koenig v. Flynn, supra, 285 U.S., at 379, 52 S.Ct., at 403 ("citizens and voters' of the state'); Wood v. Broom, supra, 287 U.S. at 4, 53 S.Ct., at 1 ('citizen of Mississippi, a qualified elector under its laws, and also qualified to be a candidate for election as Representative in Congress'); cf. Carroll v. Becker, supra (candidate for office).

> FN27. Mr. Justice Rutledge was of the view that any question of standing was settled in Smiley v. Holm, supra; Mr. Justice Black stated 'that petitioner had standing to sue, since the facts alleged show that they have been injured as individuals.' He relied on Coleman v. Miller, 307 U.S. 433, 438, 467, 59 S.Ct. 972, 975, 988, 83 L.Ed. 1385. See 328 U.S. 564, 568, 66 S.Ct. 1208, 1209.

Commentators have suggested that the following statement in Mr. Justice Frankfurter's opinion might imply a view that appellants there had no standing: 'This is not an action to recover for damage because of the discriminatory exclusion of a plaintiff from rights enjoyed by other citizens. The basis for the suit is not a private wrong, but a wrong suffered by Illinois as a polity.' 328 U.S. at 552, 66 S.Ct. at 1199. See Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv.L.Rev. 1265, 1298 (1961); Lewis, Legislative Apportionment and the Federal Courts, 71 Harv.L.Rev. 1057, 1081-1083 (1958). But since the opinion goes on to consider the merits, it seems that this statement was not intended to intimate any view that the plaintiffs in that action lacked standing. Nor do the cases cited immediately after the above quotation deal with standing. See especially Lane v. Wilson, 307 U.S. 268, 272-273, 59 S.Ct. 872, 874-875, 83 L.Ed. 1291.

> FN28. MacDougall v. Green, supra, 335 U.S., at 282, 69 S.Ct., at 2 ('the 'Progressive Party,' its nominees for United States Senator, Presidential Electors, and State offices, and several Illinois voters'); South v. Peters, supra, 339 U.S., at 277, 70 S.Ct., at 642 ('residents of the most populous county in the state'); Radford v. Gary, supra, 145 F.Supp. 541, 542 ('citizen of Oklahoma and resident and voter in the most populous county'); Matthews v. Handley, supra ('citizen of the State'); see also Hawke v. Smith (No. 1), 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871; Leser v. Garnett, 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505; Coleman v. Miller, 307 U.S. 433, 437-446, 59 S.Ct. 972, 974-978, 83 L.Ed. 1385.

**\*\*705** [13] These appellants seek relief in order to protect or vindicate an interest of their own, and of those similarly situated. Their constitutional claim is, in substance, that the 1901 statute constitutes arbitrary and capricious state action, offensive to the Fourteenth Amendment in its irrational disregard of the standard of apportionment prescribed by the State's Constitution or of any standard, effecting a gross disproportion of representation to voting population. The injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a -vis voters **\*208** in irrationally favored counties. A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally, cf. United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; or by a refusal to count votes from arbitrarily selected precincts, cf. United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355, or by a stuffing of the ballot box, cf. Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717; United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341.

It would not be necessary to decide whether appellants' allegations of impairment of their votes by the 1901 apportionment will, ultimately, entitle them to any relief, in order to hold that they have standing to seek it. If such impairment does produce a legally cognizable injury, they are among those who have sustained it. They are asserting

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' Coleman v. Miller, 307 U.S. at 438, 59 S.Ct. at p. 975 not merely a claim of 'the right possessed by every citizen 'to require that the government be administered according to law * * *'.' Fairchild v. Hughes, 258 U.S. 126, 129, 42 S.Ct. 274, 275, 66 L.Ed. 499; compare Leser v. Garnett, 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505. They are entitled to a hearing and to the District Court's decision on their claims. 'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.' Marbury v. Madison, 1 Cranch 137, 163, 2 L.Ed. 60.

IV.

JUSTICIABILITY.

[14] In holding that the subject matter of this suit was not justiciable, the District Court relied on Colegrove v. Green, supra, and subsequent per curiam cases.[FN29] The **209 court stated: 'From a review of these decisions there can be no doubt that the federal rule * * * is that the federal courts * * * will not intervene in cases of this type to compel legislative reapportionment.' 179 F.Supp. at 826. We understand the District Court to have read the cited cases as **706 compelling the conclusion that since the appellants sought to have a legislative apportionment held unconstitutional, their suit presented a 'political question' and was therefore nonjusticiable. We hold that this challenge to an apportionment presents no nonjusticiable 'political question.' The cited cases do not hold the contrary.

FN29. Cook v. Fortson, 329 U.S. 675, 67 S.Ct. 21, 91 L.Ed. 596; Turman v. Duckworth, ibid.; Colegrove v. Barrett, 330 U.S. 804, 67 S.Ct. 973, 91 L.Ed. 1262; MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3; South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834; Remmey v. Smith, 342 U.S. 916, 72 S.Ct. 368, 96 L.Ed. 685; Anderson v. Jordan, 343 U.S. 912, 72 S.Ct. 648, 96 L.Ed. 1328; Kidd v. McCanless, 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157; Radford v. Gary, 352 U.S. 991, 77 S.Ct. 559, 1 L.Ed.2d 540.

Of course the mere fact that the suit seeks protection of a political right does not mean it presents a political question. Such an objection 'is little more than a play upon words.' Nixon v. Herndon, 273 U.S. 536, 540, 47 S.Ct. 446, 71 L.Ed. 759. Rather, it is argued that apportionment cases, whatever the actual wording of the complaint, can

involve no federal constitutional right except one resting on the guaranty of a republican form of government,[FN30] and that complaints based on that clause have been held to present political questions which are nonjusticiable.

FN30. 'The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic olence.' U.S.Const. Art. IV, s 4.

[15][16] We hold that the claim pleaded here neither rests upon nor implicates the Guaranty Clause and that its justiciability is therefore not foreclosed by our decisions of cases involving that clause. The District Court misinterpreted Colegrove v. Green and other decisions of this Court on which it relied. Appellants' claim that they are being denied equal protection is justiciable, and if *210 'discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights.' Snowden v. Hughes, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497. To show why we reject the argument based on the Guaranty Clause, we must examine the authorities under it. But because there appears to be some uncertainty as to why those cases did present political questions, and specifically as to whether this apportionment case is like those cases, we deem it necessary first to consider the contours of the 'political question' doctrine.

Our discussion, even at the price of extending this opinion, requires review of a number of political question cases, in order to expose the attributes of the doctrine-attributes which, in various settings, diverge, combine, appear, and disappear in seeming disorderliness. Since that review is undertaken solely to demonstrate that neither singly nor collectively do these cases support a conclusion that this apportionment case is nonjusticiable, we of course do not explore their implications in other contexts. That review reveals that in the Guaranty Clause cases and in the other 'political question' cases, it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'

[17][18][19] We have said that 'In determining whether a question falls within (the political question) category, the appropriateness under our system of government of attributing finality to the action of the political departments and

also the lack of satisfactory criteria for a judicial determination are dominant considerations.' Coleman v. Miller, 307 U.S. 433, 454-455, 59 S.Ct. 972, 982, 83 L.Ed. 1385. The nonjusticiability of a political question is primarily a function of the separation of powers. Much confusion results from the capacity of the 'political question' label to obscure the need for **\*211** case-by-case inquiry. Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution. To demonstrate this requires no less than to analyze representative**\*\*707** cases and to infer from them the analytical threads that make up the political question doctrine. We shall then show that none of those threads catches this case.

Foreign relations: There are sweeping statements to the effect that all questions touching foreign relations are political questions.[FN31] Not only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature;[FN32] but many such questions uniquely demand single-voiced statement of the Government's views.[FN33] Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences**\*212** of judicial action. For example, though a court will not ordinarily inquire whether a treaty has been terminated, since on that question 'governmental action * * * must be regarded as of controlling importance,' if there has been no conclusive 'governmental action' then a court can construe a treaty and may find it provides the answer. Compare Terlinden v. Ames, 184 U.S. 270, 285, 22 S.Ct. 484, 490, 46 L.Ed. 534, with Society for the Propagation of the Gospel in Foreign Parts v. New Haven, 8 Wheat. 464, 492-495, 5 L.Ed. 662. [FN34] Though a court will not undertake to construe a treaty in a manner inconsistent with a subsequent federal statute, no similar hesitancy obtains if the asserted clash is with state law. Compare Whitney v. Robertson, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386, with Kolovrat v. Oregon, 366 U.S. 187, 81 S.Ct. 922, 6 L.Ed.2d 218.

FN31. E.g., 'The conduct of the foreign relations

of our government is committed by the Constitution to the executive and legislative-'the political'-departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.' Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726.

FN32. See Doe ex dem. Clark v. Braden, 16 How. 635, 657, 14 L.Ed. 1090; Taylor v. Morton, 23 Fed.Cas. page 733, No. 13,799 (C.C.D.Mass.) (Mr. Justice Curtis), affirmed, 2 Black 481, 17 L.Ed. 277.

FN33. See Doe v. Braden, 16 How. 635, 657, 14 L.Ed. 1090.

FN34. And see Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633.

While recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing,'[FN35] and the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory,[FN36] once sovereignty over an area is politically determined and declared, courts may examine the resulting status and decide independently whether a statute applies to that area.[FN37] Similarly, recognition of belligerency abroad is an executive responsibility, but if the executive proclamations fall short of an explicit answer, a court may construe them seeking, for example, to determine whether the situation is such that statutes designed**\*\*708** to assure American neutrality have **\*213** become operative. The Three Friends, 166 U.S. 1, 63, 66, 17 S.Ct. 495, 502, 503, 41 L.Ed. 497. Still again, though it is the executive that determines a person's status as representative of a foreign government, Ex parte Hitz, 111 U.S. 766, 4 S.Ct. 698, 28 L.Ed. 592, the executive's statements will be construed where necessary to determine the court's jurisdiction, In re Baiz, 135 U.S. 403, 10 S.Ct. 854, 34 L.Ed. 222. Similar judicial action in the absence of a recognizedly authoritative executive declaration occurs in cases involving the immunity from seizure of vessels owned by friendly foreign governments. Compare Ex parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014, with Mexico v. Hoffman, 324 U.S. 30, 34-35, 65 S.Ct. 530, 532, 89 L.Ed. 729.

FN35. United States v. Klintock, 5 Wheat. 144,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

149, 5 L.Ed. 55; see also United States v. Palmer, 3 Wheat. 610, 634-635, 4 L.Ed. 471.

FN36. Foster & Elam v. Neilson, 2 Pet. 253, 307, 7 L.Ed. 415, and see Williams v. Suffolk Insurance Co., 13 Pet. 415, 420, 10 L.Ed. 226.

FN37. Vermilya-Brown Co. v. Connell, 335 U.S. 377, 380, 69 S.Ct. 140, 142, 93 L.Ed. 76; De Lima v. Bidwell, 182 U.S. 1, 180-200, 21 S.Ct. 743, 746-754, 45 L.Ed. 1041.

Dates of duration of hostilities: Though it has been stated broadly that 'the power which declared the necessity is the power to declare its cessation, and what the cessation requires,' Commercial Trust Co. v. Miller, 262 U.S. 51, 57, 43 S.Ct. 486, 488, 489, 67 L.Ed. 858, here too analysis reveals isolable reasons for the presence of political questions, underlying this Court's refusal to review the political departments' determination of when or whether a war has ended. Dominant is the need for finality in the political determination, for emergency's nature demands 'A prompt and unhesitating obedience,' Martin v. Mott, 12 Wheat. 19, 30, 6 L.Ed. 537 (calling up of militia). Moreover, 'the cessation of hostilities does not necessarily end the war power. It was stated in Hamilton v. Kentucky Distilleries & W. Co., 251 U.S. 146, 161, 40 S.Ct. 106, 110, 64 L.Ed. 194, that the war power includes the power 'to remedy the evils which have arisen from its rise and progress' and continues during that emergency. Stewart v. Kahn, 11 Wall. 493, 507, 20 L.Ed. 176.' Fleming v. Mohawk Wrecking Co., 331 U.S. 111, 116, 67 S.Ct. 1129, 1132, 91 L.Ed. 1375. But deference rests on reason, not habit. FN38 The question in a particular case may not seriously implicate considerations of finality-e.g., a public program of importance *214 (rent control) yet not central to the emergency effort. FN39 Further, clearly definable criteria for decision may be available. In such case the political question barrier falls away: '(A) Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared. * * * (It can) inquire whether the exigency still existed upon which the continued operation of the law depended.' Chastleton Corp. v. Sinclair, 264 U.S. 543, 547-548, 44 S.Ct. 405, 406, 68 L.Ed. 841. FN40 Compare Woods v. Cloyd W. Miller Co., 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596. On the other hand, even in private litigation which directly implicates no feature of separation of powers, lack of judicially discoverable standards and the drive for even-handed application may impel reference to the political departments' determination of dates of hostilities' beginning and ending.

The Protector, 12 Wall. 700, 20 L.Ed. 463.

FN38. See, e.g., Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 235, 78 L.Ed. 413.

FN39. Contrast Martin v. Mott, supra.

FN40. But cf. Dakota Central Tel. Co. v. South Dakota, 250 U.S. 163, 184, 187, 39 S.Ct. 507, 509, 510, 63 L.Ed. 910.

[20] Validity of enactments: In Coleman v. Miller, supra, this Court held that the questions of how long a proposed amendment to the Federal Constitution remained open to ratification, and what effect a prior rejection had on a subsequent ratification, were committed to congressional resolution and involved criteria of decision that necessarily escaped the judicial grasp. FN41 Similar considerations apply to the enacting process:**709 'The respect due to coequal and independent departments,' and the need for finality and certainty about the status of a statute contribute to judicial reluctance to inquire whether, as passed, it complied with all requisite formalities. Field v. Clark, 143 U.S. 649, 672, 676-677, 12 S.Ct. 495, 497, 499, 36 L.Ed. 294; see Leser v. Garnett, 258 U.S. 130, 137, 42 S.Ct. 217, 218, 66 L.Ed. 505. But it is not true that courts will never delve *215 into a legislature's records upon such a quest: If the enrolled statute lacks an effective date, a court will not hesitate to seek it in the legislative journals in order to preserve the enactment. Gardner v. Collector, 6 Wall. 499, 18 L.Ed. 890. The political question doctrine, a tool for maintenance of governmental order, will not be so applied as to promote only disorder.

FN41. Cf. Dillon v. Gloss, 256 U.S. 368, 41 S.Ct. 510, 65 L.Ed. 994. See also United States v. Sprague, 282 U.S. 716, 732, 51 S.Ct. 220, 222, 75 L.Ed. 640.

The status of Indian tribes: This Court's deference to the political departments in determining whether Indians are recognized as a tribe, while it reflects familiar attributes of political questions, FN42 United States v. Holliday, 3 Wall. 407, 419, 18 L.Ed. 182, also has a unique element in that 'the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else. * * * (The Indians are) domestic dependent nations * * * in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian.' Cherokee Nation v. Georgia, 5 Pet. 1, 16, 17, 8 L.Ed. 25. FN43 Yet, here too,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN42. See also Fellows v. Blacksmith, 19 How. 366, 372, 15 L.Ed. 684; United States v. OldSettlers, 148 U.S. 427, 466, 13 S.Ct. 650, 666, 37 L.Ed. 509; and compare Doe v. Braden, 16 How. 635, 657, 14 L.Ed. 1090.

FN43. This case, so frequently cited for the broad proposition that the status of an Indian tribe is a matter for the political departments, is in fact a noteworthy example of the limited and precise impact of a political question. The Cherokees brought an original suit in this Court to enjoin Georgia's assertion of jurisdiction over Cherokee territory and abolition of Cherokee government and laws. Unquestionably the case lay at the vortex of most fiery political embroilment. See 1 Warren, The Supreme Court in United States History (Rev. ed.), 729-779. But in spite of some broader language in separate opinions, all that the Court held was that it possessed no original jurisdiction over the suit: for the Cherokees could in no view be considered either a State of this Union or a 'foreign state.' Chief Justice Marshall treated the question as one of de novo interpretation of words in the Constitution. The Chief Justice did say that 'The acts of our government plainly recognize the Cherokee nation as a state, and the courts are bound by those acts,' but here he referred to their existence 'as a state, as a distinct political society, separated from others * * *.' From there he went to 'A question of much more difficulty * * *. Do the Cherokees constitute a foreign state in the sense of the constitution?'   Id., 5 Pet. at 16, 30 U.S. at 16. Thus, while the Court referred to 'the political' for the decision whether the tribe was an entity, a separate polity, it held that whether being an entity the tribe had such status as to be entitled to sue originally was a judicially soluble issue: criteria were discoverable in relevant phrases of the Constitution and in the common understanding of the times. As to this issue, the Court was not hampered by problems of the management of unusual evidence or of possible interference with a congressional program. Moreover, Chief Justice Marshall's dictum that 'It savours too much of the exercise of political power to be within the proper province of the judicial department,' id., 5 Pet. at 20, 30 U.S. at 20, was not addressed to the issue of the Cherokees' status to sue, but rather to the breadth of the claim asserted and the impropriety of the relief sought. Compare Georgia v. Stanton, 6 Wall. 50, 77, 18 L.Ed. 721. The Chief Justice made clear that if the issue of the Cherokees' rights arose in a customary legal context, 'a proper case with proper parties,' it would be justiciable Thus, when the same dispute produced a case properly brought, in which the right asserted was one of protection under federal treaties and laws from conflicting state law, and the relief sought was the voiding of a conviction under that state law, the Court did void the tion.   Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483. There, the fact that the tribe was a separate polity served as a datum contributing to the result, and despite the consequences in a heated federal-state controversy and the opposition of the other branches of the National Government, the judicial power acted to reverse the State Supreme Court. An example of similar isolation of a political question in the decision of a case is Luther v. Borden, 7 How. 1, 1 2 L.Ed. 581; see infra.

While *216 "It is for (Congress) * * *, and not for the courts, to determine when the true interests of the Indian require **710 his release from (the) condition of tutelage' * * *, it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe * * *.' United States v. Sandoval, 231 U.S. 28, 46, 34 S.Ct. 1, 6, 58 L.Ed. 107. Able to discern what is 'distinctly Indian,' ibid., the courts will strike down *217 any heedless extension of that label. They will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power.

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for

unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

[21] Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.

[22] But it is argued that this case shares the characteristics of decisions that constitute a category not yet considered, cases concerning the Constitution's guaranty, in *218Art. IV, s 4, of a republican form of government. A conclusion as to whether the case at bar does present a political question cannot be confidently reached until we have considered those cases with special care. We shall discover that Guaranty Clause claims involve those elements which define a 'political question,' and for that reason and no other, they are nonjusticiable. In particular, we shall discover that the nonjusticiability of such claims has nothing to do with their touching upon matters of state governmental organization.

Republican form of government: Luther v. Borden, 7 How. 1, 1 2 L.Ed. 581, though in form simply an action for damages for trespass was, as Daniel Webster said in opening the argument for the defense, 'an unusual case.'[FN44] The defendants, admitting an otherwise tortious breaking and entering, sought to **711 justify their action on the ground that they were agents of the established lawful government of Rhode Island, which State was then under martial law to defend itself from active insurrection; that the plaintiff was engaged in that insurrection; and that they entered under orders to arrest the plaintiff. The case arose 'out of the unfortunate political differences which agitated the people of Rhode Island in 1841 and 1842,' 7 How., at 34, and which had resulted in a situation wherein two groups laid competing claims to recognition as the lawful government.[FN45] The plaintiff's right to *219 recover depended upon which of the two groups was entitled to such recognition; but the lower court's refusal to receive evidence or hear argument on that issue, its charge to the jury that the earlier established or 'charter' government

was lawful, and the verdict for the defendants, were affirmed upon appeal to this Court.

> FN44. 7 How., at 29. And see 11 The Writings and Speeches of Daniel Webster 217 (1903).

> FN45. See Mowry, The Dorr War (1901), and its exhaustive bibliography. And for an account of circumstances surrounding the decision here, see 2 Warren, The Supreme Court in United States History (Rev. ed.), 185-195.

> 'Dorr himself, head of one of the two groups and held in a Rhode Island jail under a conviction for treason, had earlier sought a decision from the Supreme Court that his was the lawful government. His application for original habeas corpus in the Supreme Court was denied because the federal courts then lacked authority to issue habeas for a prisoner held under a state court sentence. Ex parte Dorr, 3 How. 103, 11 L.Ed. 514.

Chief Justice Taney's opinion for the Court reasoned as follows: (1) If a court were to hold the defendants' acts unjustified because the charter government had no legal existence during the period in question, it would follow that all of that government's actions-laws enacted, taxes collected, salaries paid, accounts settled, sentences passed-were of no effect; and that 'the officers who carried their decisions into operation (were) answerable as trespassers, if not in some cases as criminals.'[FN46] There was, of course, no room for application of any doctrine of de facto status to uphold prior acts of an officer not authorized de jure, for such would have defeated the plaintiff's very action. A decision for the plaintiff would inevitably have produced some significant measure of chaos, a consequence to be avoided if it could be done without abnegation of the judicial duty to uphold the Constitution.

> FN46. 7 How., at 39.

(2) No state court had recognized as a judicial responsibility settlement of the issue of the locus of state governmental authority. Indeed, the courts of Rhode Island had in several cases held that 'it rested with the political power to decide whether the charter government had been displaced or not,' and that that department had acknowledged no change.

*220 (3) Since '(t)he question relates, altogether, to the

82 S.Ct. 691                                                                                                                Page 21
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
 **(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

constitution and laws of (the) * * * State,' the courts of the United States had to follow the state courts' decisions unless there was a federal constitutional ground for overturning them.[FN47]

 FN47. Id., at 39, 40.

(4) No provision of the Constitution could be or had been invoked for this purpose except Art. IV, s 4, the Guaranty Clause. Having already noted the absence of standards whereby the choice between governments could be made by a court acting independently, Chief Justice Taney now found further textual and practical reasons for concluding that, if any department of the United States was empowered by the Guaranty Clause to resolve the issue, it was not the judiciary:

'Under this article of the Constitution it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress**712 must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal. It is true that the contest in this case did not last long enough to bring the matter to this issue; and * * * Congress was not called upon to decide the controversy. Yet the right to decide is placed there, and not in the courts.

***221 'So, too, as relates to the clause in the above-mentioned article of the Constitution, providing for cases of demestic violence. It rested with Congress, too, to determine upon the means proper to be adopted to fulfill this guarantee. * * * (B)y the act of February 28, 1795, (Congress) provided that, 'in case of an insurrection in any State against the government thereof, it shall be lawful for the President of the United States, on application of the legislature of such State or of the executive (when the legislature cannot be convened) to call forth such number of the militia of any other State or States, as may be applied for, as he may judge sufficient to suppress such insurrection.'

'By this act, the power of deciding whether the exigency had arisen upon which the government of the United States

is bound to interfere, is given to the President. * * *

'After the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right? * * * If the judicial power extends so far, the guarantee contained in the Constitution of the United States is a guarantee of anarchy, and not of order. * * *

'It is true that in this case the militia were not called out by the President. But upon the application of the governor under the charter government, the President recognized him as the executive power of the State, and took measures to call out the militia to support his authority if it should be found necessary for the general government to interfere * * *. (C)ertainly no court of the United States, with a knowledge of this decision, would have been justified in recognizing the opposing party as the lawful government*222 * * *. In the case of foreign nations, the government acknowledged by the President is always recognized in the courts of justice. * * *' 7 How., at 42-44.

Clearly, several factors were thought by the Court in Luther to make the question there 'political': the commitment to the other branches of the decision as to which is the lawful state government; the unambiguous action by the President, in recognizing the charter government as the lawful authority; the need for finality in the executive's decision; and the lack of criteria by which a court could determine which form of government was republican.[FN48]

 FN48. Even though the Court wrote of unrestrained legislative and executive authority under this Guaranty, thus making its enforcement a political question, the Court plainly implied that the political question barrier was no absolute: 'Unquestionably a military government, established as the permanent government of the State, would not be a republican government, and it would be the duty of Congress to overthrow it.' 7 How., at 45. Of course, it does not necessarily follow that if Congress did not act, the Court would. For while the judiciary might be able to decide the limits of the meaning of 'republican form,' and thus the factor of lack of criteria might fall away, there would remain other possible barriers to decision because of primary commitment to another branch, which would have to be considered in the particular fact setting presented.

 That was not the only occasion on which this

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

Court indicated that lack of criteria does not obliterate the Guaranty's extreme limits: 'The guaranty is of a republican form of government. No particular government is designated as republican, neither is the exact form to be guaranteed, in any manner especially designated. Here, as in other parts of the instrument, we are compelled to resort elsewhere to ascertain what was intended.

'The guaranty necessarily implies a duty on the part of the States themselves to provide such a government. All the States had governments when the Constitution was adopted. In all the people participated to some extent, through their representatives elected in the manner specially provided. These governments the Constitution did not change. They were accepted precisely as they were, and it is, therefore, to be presumed that they were such as it was the duty of the States to provide. Thus we have unmistakable evidence of what was republican in form, within the meaning of that term as employed in the Constitution.' Minor v. Happersett, 21 Wall. 162, 175-176, 22 L.Ed. 627. There, the question was whether a government republican in form could deny the vote to women.

 In re Duncan, 139 U.S. 449, 11 S.Ct. 573, 35 L.Ed. 219, upheld a murder conviction against a claim that the relevant codes had been invalidly enacted. The Court there said:

'By the Constitution, a republican form of government is guaranteed to every state in the Union, and the distinguishing feature of that form is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves; but, while the people are thus the source of political power, their governments, national and State, have been limited by written constitutions, and they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities.' 139 U.S. at 461, 11 S.Ct. at 577. But the Court did not find any of these fundamental principles violated.

**\*\*713 \*223** But the only significance that Luther could have for our immediate purposes is in its holding that the Guaranty Clause is not a repository of judicially manageable standards which a court could utilize independently in order to identify a State's lawful government. The Court has since refused to resort to the Guaranty Clause-which alone had been invoked for the purpose-as the source of a constitutional standard for invalidating state action. See Taylor & Marshall v. Beckham (No. 1), 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187 (claim that Kentucky's resolution of contested gubernatorial election deprived voters of republican government held nonjusticiable); Pacific States Tel. & T. Co. v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (claim that initiative and referendum negated republican government held nonjusticiable); Kiernan v. Portland, 223 U.S. 151, 32 S.Ct. 231, 56 L.Ed. 386 (claim that municipal charter amendment per municipal initiative and referendum negated republican government held nonjusticiable); **\*224** Marshall v. Dye, 231 U.S. 250, 34 S.Ct. 92, 58 L.Ed. 206 (claim that Indiana's constitutional amendment procedure negated republican government held nonjusticiable); O'Neill v. Leamer, 239 U.S. 244, 36 S.Ct. 54, 60 L.Ed. 249 (claim that delegation to court of power to form drainage districts negated republican government held 'futile'); Ohio ex rel. Davis v. Hildebrant, 241 U.S. 565, 36 S.Ct. 708, 60 L.Ed. 1172 (claim that invalidation of state reapportionment statute per referendum negates republican government held nonjusticiable);[FN49] **\*\*714**Mountain Timber Co. v. Washington, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685 (claim that workmen's compensation violates republican government held nonjusticiable); Ohio ex rel. Bryant v. Akron Metropolitan Park District, 281 U.S. 74, 50 S.Ct. 228, 74 L.Ed. 710 (claim that rule requiring invalidation of statute by all but one justice of state court negated republican government held nonjusticiable); Highland Farms Dairy v. Agnew, 300 U.S. 608, 57 S.Ct. 549, 81 L.Ed. 835 (claim that delegation to agency of power to control milk prices violated republican government, rejected).

FN49. But cf. Hawke v. Smith (No. 1), 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871; National Prohibition Cases, State of Rhode Island v. Palmer, 253 U.S. 350, 40 S.Ct. 486, 64 L.Ed. 946.

[23] Just as the Court has consistently held that a challenge to state action based on the Guaranty Clause presents no justiciable question so has it held, and for the same reasons, that challenges to congressional action on the ground of inconsistency with that clause present no justiciable question. In Georgia v. Stanton, 6 Wall. 50, 18 L.Ed. 721, the State sought by an original bill to enjoin execution of the Reconstruction Acts, claiming that it already possessed 'A

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

republican State, in every political, legal, constitutional, and juridical sense,' and that enforcement of the new Acts 'Instead of keeping the guaranty against a forcible overthrow of its government by foreign invaders or domestic insurgents, * * * is destroying that very government by force.'[FN50] Congress had clearly refused to *225 recognize the republican character of the government of the suing State.[FN51] It seemed to the Court that the only constitutional claim that could be presented was under the Guaranty Clause, and Congress having determined that the effects of the recent hostilities required extraordinary measures to restore governments of a republican form, this Court refused to interfere with Congress' action at the behest of a claimant relying on that very guaranty.[FN52]

FN50. 6 Wall., at 65, 66.

FN51. The First Reconstruction Act opened: 'Whereas no legal State governments * * * now exists (sic) in the rebel States of * * * Georgia (and) Mississippi * * *; and whereas it is necessary that peace and good order should be enforced in said States until loyal and republican State governments can be legally established: * * *.' 14 Stat. 428. And see 15 Stat. 2, 14.

FN52. In Mississippi v. Johnson, 4 Wall. 475, 18 L.Ed. 437, the State sought to enjoin the President from executing the Acts, alleging that his role was purely ministerial. The Court held that the duties were in no sense ministerial, and that although the State sought to compel inaction rather than action, the absolute lack of precedent for any such distinction left the case one in which 'general principles * * * forbid judicial interference with the excrcise of Executive discretion.' 4 Wall., at 499. See also Mississippi v. Stanton, 154 U.S. 554, 14 S.Ct. 1209, 18 L.Ed. 725; and see 2 Warren, The Supreme Court in United States History (Rev. ed.), 463.

For another instance of congressional action challenged as transgressing the Guaranty Clause, see Collector v. Day, 11 Wall. 113, 125-126, 20 L.Ed. 122, overruled, Graves v. O'Keefe, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927.

In only a few other cases has the Court considered Art. IV, s 4, in relation to congressional action. It has refused to pass on a claim relying on the Guaranty Clause to establish that Congress lacked power to allow the States to employ the referendum in passing on legislation redistricting for congressional seats. Ohio ex rel. Davis v. Hildebrant, supra. And it has been pointed out that Congress is not required to establish republican government in the territories before they become States, and before they have attained a sufficient population to warrant a *226 polularly elected legislature. Downes v. Bidwell, 182 U.S. 244, 278-279, 21 S.Ct. 770, 783-784, 45 L.Ed. 1088 (dictum).[FN53]

FN53. On the other hand, the implication of the Guaranty Clause in a case concerning congressional action does not always preclude judicial action. It has been held that the clause gives Congress no power to impose restrictions upon a State's admission which would undercut the constitutional mandate that the States be on an equal footing. Coyle v. Smith, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853. And in Texas v. White, 7 Wall. 700, 19 L.Ed. 227, although Congress had determined that the State's government was not republican in form, the State's standing to bring an original action in this Court was sustained.

We come, finally, to the ultimate inquiry whether our precedents as to what constitutes a nonjusticiable 'political **715 question' bring the case before us under the umbrella of that doctrine. A natural beginning is to note whether any of the common characteristics which we have been able to identify and label descriptively are present. We find none: The question here is the consistency of state action with the Federal Constitution. We have no question decided, or to be decided, by a political branch of government coequal with this Court. Nor do we risk embarrassment of our government abroad, or grave disturbance at home[FN54] if we take issue with Tennessee as to the constitutionality of her action here challenged. Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action.

FN54. See, infra, 369 U.S., p. 235, 82 S.Ct., p. 720, considering Kidd v. McCanless, 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157.

This case does, in one sense, involve the allocation of political power within a State, and the appellants *227

might conceivably have added a claim under the Guaranty Clause. Of course, as we have seen, any reliance on that clause would be futile. But because any reliance on the Guaranty Clause could not have succeeded it does not follow that appellants may not be heard on the equal protection claim which in fact they tender. True, it must be clear that the Fourteenth Amendment claim is not so enmeshed with those political question elements which render Guaranty Clause claims nonjusticiable as actually to present a political question itself. But we have found that not to be the case here.

In this connection special attention is due Pacific States Tel. & T. Co. v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377. In that case a corporation tax statute enacted by the initiative was attacked ostensibly on three grounds: (1) due process; (2) equal protection; and (3) the Guaranty Clause. But it was clear that the first two grounds were invoked solely in aid of the contention that the tax was invalid by reason of its passage:

'The defendant company does not contend here that it could not have been required to pay a license tax. It does not assert that it was denied an opportunity to be heard as to the amount for which it was taxed, or that there was anything inhering in the tax or involved intrinsically in the law which violated any of its constitutional rights. If such questions had been raised, they would have been justiciable, and therefore would have required the calling into operation of judicial power. Instead, however, of doing any of these things, the attack on the statute here made is of a wholly different character. Its essentially political nature is at once made manifest by understanding that the assault which the contention here advanced makes it (sic) not on the tax as a tax, but on the state as a state. It is addressed to the *228 framework and political character of the government by which the statute levying the tax was passed. It is the government, the political entity, which (reducing the case to its essence) is called to the bar of **716 this court, not for the purpose of testing judicially some exercise of power, assailed on the ground that its exertion has injuriously affected the rights of an individual because of repugnancy to some constitutional limitation, but to demand of the state that it establish its right to exist as a State, republican in form.' 223 U.S. at 150-151, 32 S.Ct. at 231.

The due process and equal protection claims were held nonjusticiable in Pacific States not because they happened to be joined with a Guaranty Clause claim, or because they sought to place before the Court a subject matter which might conceivably have been dealt with through the Gua-

ranty Clause, but because the Court believed that they were invoked merely in verbal aid of the resolution of issues which, in its view, entailed political questions. Pacific States may be compared with cases such as Mountain Timber Co. v. Washington, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685, wherein the Court refused to consider whether a workmen's compensation act violated the Guaranty Clause but considered at length, and rejected, due process and equal protection arguments advanced against it; and O'Neill v. Leamer, 239 U.S. 244, 36 S.Ct. 54, 60 L.Ed. 249, wherein the Court refused to consider whether Nebraska's delegation of power to form drainage districts violated the Guaranty Clause, but went on to consider and reject the contention that the action against which an injunction was sought was not a taking for a public purpose.

[24] We conclude then that the nonjusticiability of claims resting on the Guaranty Clause which arises from their embodiment of questions that were thought 'political,' can have no bearing upon the justiciability of the equal protection claim presented in this case. Finally, we *229 emphasize that it is the involvement in Guaranty Clause claims of the elements thought to define 'political questions,' and no other feature, which could render them nonjusticiable. Specifically, we have said that such claims are not held nonjusticiable because they touch matters of state governmental organization. Brief examination of a few cases demonstrates this.

[25] When challenges to state action respecting matters of 'the administration of the affairs of the State and the officers through whom they are conducted' [FN55] have rested on claims of constitutional deprivation which are amenable to judicial correction, this Court has acted upon its view of the merits of the claim. For example, in Boyd v. Nebraska ex rel. Thayer, 143 U.S. 135, 12 S.Ct. 375, we reversed the Nebraska Supreme Court's decision that Nebraska's Governor was not a citizen of the United States or of the State and therefore could not continue in office. In Kennard v. Louisiana ex rel. Morgan, 92 U.S. 480, 23 L.Ed. 478, and Foster v. Kansas ex rel. Johnston, 112 U.S. 201, 5 S.Ct. 8, 28 L.Ed. 629, we considered whether persons had been removed from public office by procedures consistent with the Fourteenth Amendment's due process guaranty, and held on the merits that they had. And only last Term, in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, we applied the Fifteenth Amendment to strike down a redrafting of municipal boundaries which effected a discriminatory impairment of voting rights, in the face of what a majority of the Court of Appeals thought to be a sweeping commitment to state legislatures of the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                                          Page 25
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

power to draw and redraw such boundaries.[FN56]

> FN55. Boyd v. Nebraska ex rel. Thayer, 143 U.S. 135, 183, 12 S.Ct. 375, 389, 36 L.Ed. 103 (Field, J., dissenting).

> FN56. Gomillion v. Lightfoot, 5 Cir., 270 F.2d 594, relying upon, inter alia, Hunter v. Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151.

Gomillion was brought by a Negro who had been a resident of the City of **717 Tuskegee, Alabama, until the municipal boundaries were so recast by the State Legislature*230 as to exclude practically all Negroes. The plaintiff claimed deprivation of the right to vote in municipal elections. The District Court's, 167 F.Supp. 405, dismissal for want of jurisdiction and failure to state a claim upon which relief could be granted was affirmed by the Court of Appeals, 5 Cir., 270 F.2d 594. This Court unanimously reversed. This Court's answer to the argument that States enjoyed unrestricted control over municipal boundaries was:

'Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution. * * * The opposite conclusion, urged upon us by respondents, would sanction the achievement by a State of any impairment of voting rights whatever so long as it was cloaked in the garb of the realignment of political subdivisions. 'It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence. '"'''' 364 U.S. at 344-345, 81 S.Ct. at 129.

To a second argument, that Colegrove v. Green, supra, was a barrier to hearing the merits of the case, the Court responded that Gomillion was lifted 'out of the so-called 'political' arena and into the conventional sphere of constitutional litigation' because here was discriminatory treatment of a racial minority violating the Fifteenth Amendment.

'A statute which is alleged to have worked unconstitutional deprivations of petitioners' rights is not immune to attack simply because the mechanism employed by the legislature is a redefinition of municipal boundaries. * * * While in form this is merely an act redefining metes and bounds, if the allegations are established, the inescapable human effect of this essay in geometry and geography is to despoil colored citizens, and only colored citizens, of *231 their theretofore enjoyed voting rights. That was not Colegrove

v. Green.

'When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.' 364 U.S. at 347, 81 S.Ct. at 130.[FN57]

> FN57. The Court's opinion was joined by Mr. Justice Douglas, noting his adherence to the dissents in Colegrove and South v. Peters, supra; and the judgment was concurred in by Mr. Justice Whittaker, who wrote that the decision should rest on the Equal Protection Clause rather than on the Fifteenth Amendment, since there had been not solely a denial of the vote (if there had been that at all) but also a 'fencing out' of a racial group.

We have not overlooked such cases as In re Sawyer, 124 U.S. 200, 8 S.Ct. 482, 31 L.Ed. 402, and Walton v. House of Representatives, 265 U.S. 487, 44 S.Ct. 628, 68 L.Ed. 1115, which held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer. But these decisions explicitly reflect only a traditional limit upon equity jurisdiction, and not upon federal courts' power to inquire into matters of state governmental organization. This is clear not only from the opinions in those cases, but also from White v. Berry, 171 U.S. 366, 18 S.Ct. 917, 43 L.Ed. 199, which, relying on Sawyer, withheld federal equity from staying removal of a federal officer. Wilson v. North Carolina, 169 U.S. 586, 18 S.Ct. 435, 42 L.Ed. 865, simply dismissed an appeal from an unsuccessful suit to upset a State's removal procedure, on the ground that the constitutional claim presented-that a jury trial was necessary if the removal procedure was to comport with due process requirements-was frivolous. Finally, in **718 Taylor and Marshall v. Beckham (No. 1), 178 U.S. 548, 20 S.Ct. 890, 1009, 44 L.Ed. 1187, where losing candidates attacked the constitutionality of Kentucky's resolution of a contested gubernatorial election, the Court refused to consider the merits of a claim posited upon *232 the Guaranty Clause, holding it presented a political question, but also held on the merits that the ousted candidates had suffered no deprivation of property without due process of law.[FN58]

> FN58. No holding to the contrary is to be found in Cave v. Newell, 246 U.S. 650, 38 S.Ct. 334, 62 L.Ed. 921, dismissing a writ of error to the Supreme Court of Missouri, 272 Mo. 653, 199 S.W.

1014; or in Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497.

Since, as has been established, the equal protection claim tendered in this case does not require decision of any political question, and since the presence of a matter affecting state government does not render the case nonjusticiable, it seems appropriate to examine again the reasoning by which the District Court reached its conclusion that the case was nonjusticiable.

We have already noted that the District Court's holding that the subject matter of this complaint was nonjusticiable relied upon Colegrove v. Green, supra, and later cases. Some of those concerned the choice of members of a state legislature, as in this case; others, like Colegrove itself and earlier precedents, Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795; Koenig v. Flynn, 285 U.S. 375, 52 S.Ct. 403, 76 L.Ed. 805, and Carroll v. Becker, 285 U.S. 380, 52 S.Ct. 402, 76 L.Ed. 807, concerned the choice of Representatives in the Federal Congress. Smiley, Koenig and Carroll settled the issue in favor of justiciability of questions of congressional redistricting. The Court followed these precedents in Colegrove although over the dissent of three of the seven Justices who participated in that decision. On the issue of justiciability, all four Justices comprising a majority relied upon Smiley v. Holm, but in two opinions, one for three Justices, 328 U.S. at 566, 568, 66 S.Ct. at 1209, and a separate one by Mr. Justice Rutledge, 328 U.S. at 564, 66 S.Ct. at 1208. The argument that congressional redistricting problems presented a 'political question' the resolution of which was confided to Congress might have been rested upon Art. I, s 4, Art. I, s 5, Art. I, s 2, and Amendment XIV, **\*233** s 2. Mr. Justice Rutledge said: 'But for the ruling in Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795, I should have supposed that the provisions of the Constitution, Art. I, s 4, that 'The Times, Places and Manner of holding Elections for * * * Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations * * *'; Art. I, s 2 (but see Amendment XIV, s 2), vesting in Congress the duty of apportionment of representatives among the several states 'according to their respective Numbers'; and Art. I, s 5, making each house the sole judge of the qualifications of its own members, would remove the issues in this case from justiciable cognizance. But, in my judgment, the Smiley case rules squarely to the contrary, save only in the matter of degree. * * * Assuming that that decision is to stand, I think * * * that its effect is to rule that this Court has power to afford relief in a case of this type as against

the objection that the issues are not justiciable.' 328 U.S. at 564-565, 66 S.Ct. at 1208. Accordingly, Mr. Justice Rutledge joined in the conclusion that the case was justiciable, although he held that the dismissal of the complaint should be affirmed. His view was that 'The shortness of the time remaining (before forthcoming elections) makes it doubtful whether action could, or would, be taken in time to secure for petitioners the effective relief they seek. * * * I think, therefore, **\*\*719** the case is one in which the Court may properly, and should, decline to exercise its jurisdiction. Accordingly, the judgment should be affirmed and I join in that disposition of the cause.' 328 U.S., at 565-566, 66 S.Ct. at 1208.[FN59]

> FN59. The ground of Mr. Justice Rutledge's vote to affirm is further explained in his footnote, 3, 328 U.S. at 566, 66 S.Ct. at 1209: "The power of a court of equity to act is a discretionary one. * * * Where a federal court of equity is asked to interfere with the enforcement of state laws, it should do so only 'to prevent irreparable injury which is clear and imminent.'" American Federation of Labor v. Watson, 327 U.S. 582, (593) 66 S.Ct. 761, 766, (90 L.Ed. 873) and cases cited.'

No constitutional questions, including the question whether voters have a judicially enforceable constitutional right to vote at elections of congressmen from districts of equal population, were decided in Colegrove. Six of the participating Justices reached the questions but divided three to three on their merits. Mr. Justice Rutledge believed that it was not necessary to decide them. He said: 'There is (an alternative to constitutional decision) in this case. And I think the gravity of the constitutional questions raised so great, together with the possibilities for collision (with the political departments of the Government), that the admonition (against avoidable constitutional decision) is appropriate to be followed here. Other reasons support this view, including the fact that, in my opinion, the basic ruling and less important ones in Smiley v. Holm, supra, would otherwise be brought into question.' 328 U.S. at 564-565, 66 S.Ct. at 1208. He also joined with his brethren who shared his view that the issues were justiciable in considering that Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131, decided no constitutional questions but 'the Court disposed of the cause on the ground that the 1929 Reapportionment Act, 46 Stat. 21, did not carry forward the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

requirements of the 1911 Act, 37 Stat. 13, and declined to decide whether there was equity in the bill.' 328 U.S. at 565, 66 S.Ct. at 1208 see also, id., at 573, 66 S.Ct. at 1212. We agree with this view of Wood v. Broom.

*234 Article I, ss 2, 4, and 5, and Amendment XIV, s 2, relate only to congressional elections and obviously do not govern apportionment of state legislatures. However, our decisions in favor of justiciability even in light of those provisions plainly afford no support for the District Court's conclusion that the subject matter of this controversy presents a political question. Indeed, the refusal to award relief in Colegrove resulted only from the controlling view of a want of equity. Nor is anything contrary to be found in those per curiams that came after Colegrove. This Court dismissed the appeals in Cook v. Fortson (Turman v. Duckworth), 329 U.S. 675, 67 S.Ct. 21, 91 L.Ed. 596, as moot. MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3, held only that in that case equity would not act to void the State's requirement that there be at least a minimum of support for nominees*235 for state-wide office, over at least a minimal area of the State. Problems of timing were critical in Remmey v. Smith, 342 U.S. 916, 72 S.Ct. 368, 96 L.Ed. 685, dismissing for want of a substantial federal question a three-judge court's dismissal of the suit as prematurely brought, D.C., 102 F.Supp. 708; and in Hartsfield v. Sloan, 357 U.S. 916, 78 S.Ct. 1363, 2 L.Ed.2d 1363, denying mandamus sought to compel the convening of a three-judge court-movants urged the Court to advance consideration of their case 'Inasmuch as the mere lapse of time before this case can be reached in the normal course of * * * business may defeat the cause, and inasmuch as the time problem is due to the inherent nature of the case * * *.' South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834, like Colegrove appears to be a refusal to exercise equity's powers; see the statement of the holding, quoted, supra, 369 U.S., p. 203, 82 S.Ct. p. 703. And Cox v. Peters, 342 U.S. 936, 72 S.Ct. 559, 96 L.Ed. 697, dismissed for want of a substantial federal question the appeal from the state court's holding that their primary elections implicated no 'state action.' See 208 Ga. 498, 67 S.E.2d 579. But compare Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152

**720 [26][27] Tedesco v. Board of Supervisors, 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357, indicates solely that no substantial federal question was raised by a state court's refusal to upset the districting of city council seats, especially as it was urged that there was a rational justification for the challenged districting. See La.App., 43 So.2d 514.

Similarly, in Anderson v. Jordan, 343 U.S. 912, 72 S.Ct. 648, 96 L.Ed. 1328, it was certain only that the state court had refused to issue a discretionary writ, original mandamus in the Supreme Court. That had been denied without opinion, and of course it was urged here that an adequate state ground barred this Court's review. And in Kidd v. McCanless, 200 Tenn. 273, 292 S.W.2d 40, the Supreme Court of Tennessee held that it could not invalidate the very statute at issue in the case at bar, but its holding rested on its state law of remedies, i.e., the state view of *236 de facto officers,[FN60] and not on any view that the norm for legislative apportionment in Tennessee is not numbers of qualified voters resident in the several counties. Of course this Court was there precluded by the adequate state ground, and in dismissing the appeal, 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157, we cited Anderson, supra, as well as Colegrove. Nor does the Tennessee court's decision in that case bear upon this, for just as in Smith v. Holm, 220 Minn. 486, 19 N.W.2d 914, and Magraw v. Donovan, D.C., 163 F.Supp. 184; D.C., 177 F.Supp. 803, a state court's inability to grant relief does not bar a federal court's assuming jurisdiction to inquire into alleged deprivation of federal constitutional rights. Problems of relief also controlled in Radford v. Gary, 352 U.S. 991, 77 S.Ct. 559, 1 L.Ed.2d 540, affirming the District Court's refusal to mandamus the Governor to call a session of the legislature, to mandamus the legislature then to apportion, and if they did not comply, to mandamus the State Supreme Court to do so. And Matthews v. Handley, 361 U.S. 127, 80 S.Ct. 256, 4 L.Ed.2d 180, affirmed a refusal to strike down the State's gross income tax statute-urged on the ground that the legislature was malapportioned-that had rested on the adequacy of available state legal remedies for suits involving that tax, including challenges to its constitutionality. Lastly, Colegrove v. Barrett, 330 U.S. 804, 67 S.Ct. 973, 91 L.Ed. 1262, in which Mr. Justice Rutledge concurred in this Court's refusal to note the appeal from a dismissal for want of equity, is sufficiently explained by his statement in Cook v. Fortson, supra: 'The discretionary exercise or nonexercise of equitable or declaratory judgment jurisdiction * * * in one case is not precedent in another case *237 where the facts differ.' 329 U.S. at 678, n. 8, 67 S.Ct. 21, at 22, 91 L.Ed. 596. (Citations omitted.)

FN60. See also Buford v. State Board of Elections, 206 Tenn. 480, 334 S.W.2d 726; State ex rel. Sanborn v. Davidson County Board of Election Comm'rs, No. 36,391 Tenn.Sup.Ct., Oct. 29, 1954 (unreported); 8 Vand.L.Rev. 501 (1955).

We conclude that the complaint's allegations of a denial of

equal protection present a justiciable constitutional cause of action upon which appellants are entitled to a trial and a decision. The right asserted is within the reach of judicial protection under the Fourteenth Amendment.

The judgment of the District Court is reversed and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

Mr. Justice WHITTAKER did not participate in the decision of this case.

### APPENDIX TO OPINION OF THE COURT

The Tennessee Code Annotated provides for representation in the General Assembly as follows:

'3-101. Composition-Counties electing one representative each.-The general**721** assembly of the state of Tennessee shall be composed of thirty-three (33) senators and ninety-nine (99) representatives, to be apportioned among the qualified voters of the state as follows: Until the next enumeration and apportionment of voters each of the following counties shall elect one (1) representative, to wit: Bedford, Blount, Cannon, Carroll, Chester, Cocke, Claiborne, Coffee, Crockett, DeKalb, Dickson, Dyer, Fayette, Franklin, Giles, Greene, Hardeman, Hardin, Henry, Hickman, Hawkins, Haywood, Jackson, Lake, Lauderdale, Lawrence, Lincoln, Marion, Marshall, Maury, Monroe, Montgomery, Moore, McMinn, McNairy, Obion, Overton, Putnam, Roane, Robertson, Rutherford, Sevier, Smith, Stewart, Sullivan, Sumner, Tipton, Warren, Washington, White, Weakley, Williamson**238** and Wilson. (Acts 1881 (E.S.), ch. 5, s 1; 1881 (E.S.), ch. 6, s 1; 1901, ch. 122, s 2; 1907, ch. 178, ss 1, 2; 1915, ch. 145; Shan., s 123; Acts 1919, ch. 147, ss 1, 2; 1925 Private, ch. 472, s 1; Code 1932, s 140; Acts 1935, ch. 150, s 1; 1941, ch. 58, s 1; 1945, ch. 68, s 1; C.Supp.1950, s 140.)'

'3-102. Counties electing two representatives each.-The following counties shall elect two (2) representatives each, to wit: Gibson and Madison. (Acts 1901, ch. 122, s 3; Shan., s 124; mod. Code 1932, s 141.)'

'3-103. Counties electing three representatives each.-The following counties shall elect three (3) representatives each, to wit: Knox and Hamilton. (Acts 1901, ch. 122, s 4; Shan., s 125; Code 1932, s 142.)'

'3-104. Davidson County.-Davidson county shall elect six (6) representatives. (Acts 1901, ch. 122, s 5; Shan., s 126; Code 1932, s 143.)

'3-105. Shelby County.-Shelby county shall elect eight (8) representatives. Said county shall consist of eight (8) representative districts, numbered one (1) through eight (8), each district coextensive with the county, with one (1) representative to be elected from each district. (Acts 1901, ch. 122, s 6; Shan., s 126a 1; Code 1932; s 144; Acts 1957, ch. 220, s 1; 1959, ch. 213, s 1.)

'3-106. Joint representatives.-The following counties jointly, shall elect one representative, as follows, to wit:

'First district-Johnson and Carter.

'Second district-Sullivan and Hawkins.

'Third district-Washington, Greene and Unicoi.

'Fourth district-Jefferson and Hamblen.

'Fifth district-Hancock and Grainger.

'Sixth district-Scott, Campbell, and Union.

'Seventh district-Anderson and Morgan.

'Eighth district-Knox and Loudon.

**239** 'Ninth district-Polk and Bradley.

'Tenth district-Meigs and Rhea.

'Eleventh district-Cumberland, Bledsoe, Sequatchie, Van Buren and Grundy.

'Twelfth district-Fentress, Pickett, Overton, Clay and Putnam.

'Fourteenth district-Sumner, Trousdale and Macon.

'Fifteenth district-Davidson and Wilson.

'Seventeenth district-Giles, Lewis, Maury and Wayne.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                    Page 29
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

'Eighteenth district-Williamson, Cheatham and Robertson.

'Nineteenth district-Montgomery and Houston.

'Twentieth district-Humphreys and Perry.

'Twenty-first district-Benton and Decatur.

'Twenty-second district-Henry, Weakley and Carroll.

**\*\*722** 'Twenty-third district-Madison and Henderson.

'Twenty-sixth district-Tipton and Lauderdale. (Acts 1901, ch. 122, s 7; 1907, ch. 178, ss 1, 2; 1915, ch. 145, ss 1, 2; Shan., s 127; Acts 1919, ch. 147, s 1; 1925 Private, ch. 472, s 2; Code 1932, s 145; Acts 1933, ch. 167, s 1; 1935, ch. 150, s 2; 1941, ch. 58, s 2; 1945, ch. 68, s 2; C.Supp.1950, s 145; Acts 1957, ch. 220, s 2.)

'3-107. State senatorial districts.-Until the next enumeration and apportionment of voters, the following counties shall comprise the senatorial districts, to wit:

'First district-Johnson, Carter, Unicoi, Greene, and Washington.

'Second district-Sullivan and Hawkins.

'Third district-Hancock, Morgan, Grainger, Claiborne, Union, Campbell, and Scott.

'Fourth district-Cocke, Hamblen, Jefferson, Sevier, and Blount.

'Fifth district-Knox.

'Sixth district-Knox, Loudon, Anderson, and Roane.

**\*240** 'Seventh district-McMinn, Bradley, Monroe, and Polk.

'Eighth district-Hamilton.

'Ninth district-Rhea, Meigs, Bledsoe, Sequatchie, Van Buren, White, and Cumberland.

'Tenth district-Fentress, Pickett, Clay, Overton, Putnam, and Jackson.

'Eleventh district-Marion, Franklin, Grundy and Warren.

'Twelfth district-Rutherford, Cannon, and DeKalb.

'Thirteenth district-Wilson and Smith.

'Fourteenth district-Sumner, Trousdale and Macon.

'Fifteenth district-Montgomery and Robertson.

'Sixteenth district-Davidson.

'Seventeenth district-Davidson.

'Eighteenth district-Bedford, Coffee and Moore.

'Nineteenth district-Lincoln and Marshall.

'Twentieth district-Maury, Perry and Lewis.

'Twenty-first district-Hickman, Williamson and Cheatham.

'Twenty-second district-Giles, Lawrence and Wayne.

'Twenty-third district-Dickson, Humphreys, Houston and Stewart.

'Twenty-fourth district-Henry and Carroll.

'Twenty-fifth district-Madison, Henderson and Chester.

'Twenty-sixth district-Hardeman, McNairy, Hardin, Decatur and Benton.

'Twenty-seventh district-Gibson.

'Twenty-eighth district-Lake, Obion and Weakley.

'Twenty-ninth district-Dyer, Lauderdale and Crockett.

'Thirtieth district-Tipton and Shelby.

'Thirty-first district-Haywood and Fayette.

'Thirty-second district-Shelby.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

**\*241** 'Thirty-third district-Shelby. (Acts 1901, ch. 122, s 1; 1907, ch. 3, s 1; Shan., s 128; Code 1932, s 146; Acts 1945, ch. 11, s 1; C.Supp.1950, s 146.)'

Today's apportionment statute is as enacted in 1901, with minor changes. For example:

| County | Population | Representation |
| --- | --- | --- |
| Carter | 23,303 | 1.10 |
| Maury | 24,556 | 2.25 |
| Washington | 36,967 | 1.93 |
| Madison | 37,245 | 3.50 |

(1) In 1957, Shelby County was raised from 7 1/2 to 8 representatives. Acts of 1957, c. 220. See also Acts of 1959, c. 213. The 1957 Act, s 2, abolished the Twenty-seventh Joint Representative District, which had included Shelby and Fayette Counties.

**\*\*723** (2) In 1907, Marion County was given a whole House seat instead of sharing a joint seat with Franklin County. Acts of 1907, c. 178. Acts of 1915, c. 145, repealed that change, restoring the status quo ante. And that reversal was itself reversed, Acts of 1919, c. 147.

(3) James County was in 1901 one of five counties in the Seventh State Senate District and one of the three in the Ninth House District. It appears that James County no longer exists but we are not advised when or how it was dissolved.

(4) In 1945, Anderson and Roane Counties were shifted to the Sixth State Senate District from the Seventh, and Monroe and Polk Counties were shifted to the Seventh from the Sixth. Acts of 1945, c. 11.

Mr. Justice DOUGLAS, concurring.

While I join the opinion of the Court and, like the Court, do not reach the merits, a word of explanation is necessary.[FN1] I put to one side the problems of 'political'**\*242** questions involving the distribution of power between this Court, the Congress, and the Chief Executive. We have here a phase of the recurring problem of the relation of the federal courts to state agencies. More particularly, the question is the extent to which a State may weight one person's vote more heavily than it does another's.

[FN1.] I feel strongly that many of the cases cited

by the Court and involving so-called 'political' questions were wrongly decided.

In joining the opinion, I do not approve those decisions but only construe the Court's opinion in this case as stating an accurate historical account of what the prior cases have held.

So far as voting rights are concerned, there are large gaps in the Constitution. Yet the right to vote is inherent in the republican form of government envisaged by Article IV, Section 4 of the Constitution. The House-and now the Senate-are chosen by the people. The time, manner, and place of elections of Senators and Representatives are left to the States (Article I, Section 4, Clause 1; Amendment XVII) subject to the regulatory power of Congress. A 'republican form' of government is guaranteed each State by Article IV, Section 4, and each is likewise promised protection against invasion.[FN2] Ibid. **\*243** That the States may specify the qualifications for voters **\*\*724** is implicit in Article I, Section 2, Clause 1, which provides that the House of Representatives shall be chosen by the **\*244** people and that 'the Electors (voters) in each state shall have the qualifications requisite for electors (voters) of the most numerous branch of the state legislature.' The same provision, contained in the Seventeenth Amendment, governs the election of Senators. Within limits those qualifications may be fixed by state law. See Lassiter v. Northampton Election Board, 360 U.S. 45, 50-51, 79 S.Ct. 985, 989, 3 L.Ed.2d 1072. Yet, as stated in Ex parte Yarbrough, 110 U.S. 651, 663-664, 4 S.Ct. 152, 158, 28 L.Ed. 274, those who vote for members of Congress do not 'owe their right to vote to the state law, in any sense which makes the exercise of the right to depend exclusively on the law of the state.' The power of Congress to prescribe the qualifications for voters and thus override state law is

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                                                    Page 31
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
 **(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

not in issue here. It is, however, clear that by reason of the commands of the Constitution there are several qualifications that a State may not require.

FN2. The statements in Luther v. Borden, 7 How. 1, 42, 12 L.Ed. 581, that this guaranty is enforceable only by Congress or the Chief Executive is not maintainable. Of course the Chief Executive, not the Court, determines how a State will be protected against invasion. Of course each House of Congress, not the Court, is 'the judge of the elections, returns, and qualifications of its own members.' Article I, Section 5, Clause 1. But the abdication of all judicial functions respecting voting rights ( 7 How. at 41), however justified by the peculiarities of the charter form of government in Rhode Island at the time of Dorr's Rebellion, states no general principle. It indeed is contrary to the cases discussed in the body of this opinion-the modern decisions of the Court that give the full panoply of judicial protection to voting rights. Today we would not say with Chief Justice Taney that it is no part of the judicial function to protect the right to vote of those 'to whom it is denied by the written and established constitution and laws of the State.' Ibid.

Moreover, the Court's refusal to examine the legality of the regime of martial law which had been laid upon Rhode Island ( id. at 45-46) is indefensible, as Mr. Justice Woodbury maintained in his dissent. Id. at 59 et seq. Today we would ask with him: '* * * who could hold for a moment, when the writ of habeas corpus cannot be suspended by the legislature itself, either in the general government or most of the States, without an express constitutional permission, that all other writs and laws could be suspended, and martial law substituted for them over the whole State or country, without any express constitutional license to that effect, in any emergency?' Id. at 67.

Justice Woodbury went on to say:

'It would be alarming enough to sanction here an unlimited power, exercised either by legislatures, or the executive, or courts, when all our governments are themselves governments of limitations and checks, and of fixed and known laws, and the people a race above all others jealous of encroachments by those in power. And it is far

better that those persons should be without the protection of the ordinary laws of the land who disregard them in an emergency, and should look to a grateful country for indemnity and pardon, than to allow, beforehand, the whole frame of jurisprudence to be overturned, and every thing placed at the mercy of the bayonet.

'No tribunal or department in our system of governments ever can be lawfully authorized to dispense with the laws, like some of the tyrannical Stuarts, or to repeal, or abolish, or suspend the whole body of them; or, in other words, appoint an unrestrained military dictator at the head of armed men.

'Whatever stretches of such power may be ventured on in great crises, they cannot be upheld by the laws, as they prostrate the laws and ride triumphant over and beyond them, however the Assembly of Rhode Island, under the exigency, may have hastily supposed that such a measure in this instance was constitutional. It is but a branch of the omnipotence claimed by Parliament to pass bills of attainder, belonging to the same dangerous and arbitrary family with martial law.' Id at 69-70.

What he wrote was later to become the tradition, as expressed by Chief Justice Hughes in Sterling v. Constantin, 287 U.S. 378, 401, 53 S.Ct. 190, 196, 77 L.Ed. 375: 'What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions.'

Race, color, or previous condition of servitude is an impermissible standard by reason of the Fifteenth Amendment, and that alone is sufficient to explain Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. See Taper, Gomillion versus Lightfoot (1962), pp. 12-17.

Sex is another impermissible standard by reason of the Nineteenth Amendment.

There is a third barrier to a State's freedom in prescribing qualifications of voters and that is the Equal Protection Clause of the Fourteenth Amendment, the provision invoked here. And so the question is, may a State weight the vote of one county or one district more heavily than it weights the vote in another?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The traditional test under the Equal Protection Clause has been whether a State has made 'an invidious discrimination,' as it does when it selects 'a particular race or nationality for oppressive treatment.' See Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655. Universal equality is not *245 the test; there is room for weighting. As we stated in Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 'The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.'

I agree with my Brother CLARK that if the allegations in the complaint can **725 be sustained a case for relief is established. We are told that a single vote in Moore County, Tennessee, is worth 19 votes in Hamilton County, that one vote in Stewart or in Chester County is worth nearly eight times a single vote in Shelby or Knox County. The opportunity to prove that an 'invidious discrimination' exists should therefore be given the appellants.

It is said that any decision in cases of this kind is beyond the competence of courts. Some make the same point as regards the problem of equal protection in cases involving racial segregation. Yet the legality of claims and conduct is a traditional subject for judicial determination. Adjudication is often perplexing and complicated. An example of the extreme complexity of the task can be seen in a decree apportioning water among the several States. Nebraska v. Wyoming, 325 U.S. 589, 665, 65 S.Ct. 1332, 1373, 89 L.Ed. 1815. The constitutional guide is often vague, as the decisions under the Due Process and Commerce Clauses show. The problem under the Equal Protection Clause is no more intricate. See Lewis, Legislative Apportionment and the Federal Courts, 71 Harv.L.Rev. 1057, 1083-1084.

There are, of course, some questions beyond judicial competence. Where the performance of a 'duty' is left to the discretion and good judgment of an executive officer, the judiciary will not compel the exercise of his discretion one way or the other ( Commonwealth of Kentucky v. Dennison, 24 How. 66, 10 9, 16 L.Ed. 717), for to do so would be to take over the office. Cf. Federal Communications Comm. v. Broadcasting Co., 309 U.S. 134, 145, 60 S.Ct. 437, 442, 84 L.Ed. 656.

*246 Where the Constitution assigns a particular function wholly and indivisibly FN3 **726 to another department, the federal judiciary does not intervene. Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 310, 62 L.Ed. 726. None of those cases is relevant here.

FN3. The category of the 'political' question is, in my view, narrower than the decided cases indicate. 'Even the English courts have held that a resolution of one House of Parliament does not change the law (Stockdale v. Hansard (1839) 9 A. & E. 1; and Bowles v. Bank of England (No. 2) (1913) 1 Ch. 57), and these decisions imply that the House of Commons acting alone does not constitute the 'Parliament' recognised by the English courts.' 103 Sol.Jour. 995, 996. The Court in Bowles v. Bank of England, (1913) 1 Ch. 57, 84-85, stated: 'By the statute 1 W. & M., usually known as the Bill of Rights, it was finally settled that there could be no taxation in this country except under authority of an Act of Parliament. The Bill of Rights still remains unrepealed, and no practice or custom, however prolonged, or however acquiesced in on the part of the subject, can be relied on by the Crown as justifying any infringement of its provisions. It follows that, with regard to the powers of the Crown to levy taxation, no resolution, either of the Committee for Ways and Means or of the House itself, has any legal effect whatever. Such resolutions are necessitated by a parliamentary procedure adopted with a view to the protection of the subject against the hasty imposition of taxes, and it would be strange to find them relied on as justifying the Crown in levying a tax before such tax is actually imposed by Act of Parliament.'

In The Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894, the Court undertook a review of the veto provisions of the Constitution and concluded that the measure in litigation had not become a law. Cf. Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385.

Georgia v. Stanton, 6 Wall. 50, 18 L.Ed. 721, involved the application of the Reconstruction Acts to Georgia-laws which destroyed by force the internal regime of that State. Yet the Court refused to take jurisdiction. That question was no more 'political' than a host of others we have entertained. See, e.g., Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117; Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153; Alabama v. Texas, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                 Page 33
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

Today would this Court hold nonjusticiable or 'political' a suit to enjoin a Governor who, like Fidel Castro, takes everything into his own hands and suspends all election laws?

Georgia v. Stanton, supra, expresses a philosophy at war with Ex parte Milligan, 4 Wall. 2, 18 L.Ed. 281, and Duncan v. Kahanamoku, 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688. The dominance of the civilian authority has been expressed from the beginning. See Wise v. Withers, 3 Cranch 331, 337, 2 L.Ed. 457; Sterling v. Constantin, supra, note 2.

*247 There is no doubt that the federal courts have jurisdiction of controversies concerning voting rights. The Civil Rights Act gives them authority to redress the deprivation 'under color of any State law' of any 'right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens * * *.' 28 U.S.C. s 1343(3), 28 U.S.C.A. s 1343(3). And 28 U.S.C. s 1343(4), 28 U.S.C.A. s 1343(4) gives the federal courts authority to award damages or issue an injunction to redress the violation of 'any Act of Congress providing for the protection of civil rights, including the right to vote.' (Italics added.) The element of state action covers a wide range. For as stated in United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368:

'Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.' And see Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492.

The right to vote in both federal and state elections was protected by the judiciary long before that right received the explicit protection it is now accorded by s 1343(4). Discrimination against a voter on account of race has been penalized (Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274) or struck down. Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Terry v. Admas, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152. Fraudulent acts that dilute the votes of some *248 have long been held to be within judicial cognizance. Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717. The 'right to have one's vote counted' whatever his race or nationality or creed was held in United States v. Mosley, 238 U.S. 383, 386, 35 S.Ct. 904, 905, 59

L.Ed. 1355, to be 'as open to protection by Congress as the right to put a ballot in a box.' See also United States v. Classic, supra, 313 U.S. at 324-325, 61 S.Ct. at 1042; United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341.

Chief Justice Holt stated in Ashby v. White, 2 Ld.Raym. 938, 956 (a suit in which damages were awarded against election officials for not accepting the plaintiff's vote, 3 Ld.Raym. 320) that:

'To allow this action will make publick officers more careful to observe the constitution of cities and boroughs, and not to be so partial as they commonly are in all elections, which is indeed a great and growing mischief, and tends to the prejudice of the peace of the nation.'

The same prophylactic effect will be produced here, as entrenched political regimes make other relief as illusory in this case as a petition to Parliament in Ashby v. White would have been.[FN4]

> FN4.  We are told by the National Institute of Municipal Law Officers in an amicus brief:
>
> 'Regardless of the fact that in the last two decades the United States has become a predominantly urban country where well over two-thirds of the population now lives in cities or suburbs, political representation in the majority of state legislatures is 50 or more years behind the times. Apportionments made when the greater part of the population was located in rural communities are still determining and undermining our elections.
>
> 'As a consequence, the municipality of 4960 is forced to function in a horse and buggy environment where there is little political recognition of the heavy demands of an urban population. These demands will become even greater by 1970 when some 150 million people will be living in urban areas.
>
> 'The National Institute of Municipal Law Officers has for many years recognized the wide-spread complaint that by far the greatest preponderance of state representatives and senators are from rural areas which, in the main, fail to become vitally interested in the increasing difficulties now facing urban administrators.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                 Page 34
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

'Since World War II, the explosion in city and suburban population has created intense local problems in education, transportation, and housing. Adequate handling of these problems has not been possible to a large extent, due chiefly to the political weakness of municipalities. This situation is directly attributable to considerable under-representation of cities in the legislatures of most states.' Amicus brief, pp. 2-3.

***249** Intrusion of the Federal Government into the election machinery of the States ****727** has taken numerous forms-investigations ( Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307); criminal proceedings (Ex parte Siebold, supra; Ex parte Yarbrough, supra; United States v. Mosley, supra; United States v. Classic, supra); collection of penalties (Smith v. Allwright, supra); suits for declaratory relief and for an injunction (Terry v. Adams, supra); suits by the United States under the Civil Rights Act to enjoin discriminatory practices.   United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524.

As stated by Judge McLaughlin in Dyer v. Kazuhisa Abe, D.C., 138 F.Supp. 220, 236 (an apportionment case in Hawaii which was reversed and dismissed as moot, 9 Cir., 256 F.2d 728):

'The whole thrust of today's legal climate is to end unconstitutional discrimination. It is ludicrous to preclude judicial relief when a mainspring of representative government is impaired. Legislators have no immunity from the Constitution. The legislatures of our land should be made as responsive to the Constitution of the United States as are the citizens who elect the legislators.'

With the exceptions of Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432; MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3; South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834, and the decisions they spawned, the Court has never thought that protection of voting rights ***250** was beyond judicial cognizance. Today's treatment of those cases removes the only impediment to judicial cognizance of the claims stated in the present complaint.

The justiciability of the present claims being established, any relief accorded can be fashioned in the light of wellknown principles of equity. [FN5]

FN5. The recent ruling by the Iowa Supreme Court that a legislature, though elected under an unfair apportionment scheme, is nonetheless a legislature empowered to act ( City of Cedar Rapids v. Cox, 252 Iowa 948, 964, 108 N.W.2d 253, 262-263; cf. Kidd v. McCanless, 200 Tenn. 273, 292 S.W.2d 40) is plainly correct.

There need be no fear of a more disastrous collision between federal and state agencies here than where a federal court enjoins gerrymandering based on racial lines. See Gomillion v. Lightfoot, supra.

The District Court need not undertake a complete reapportionment. It might possibly achieve the goal of substantial equality merely by directing respondent to eliminate the egregious injustices. Or its conclusion that reapportionment should be made may in itself stimulate legislative action. That was the result in Asbury Park Press v. Woolley, 33 N.J. 1, 161 A.2d 705, where the state court ruled it had jurisdiction:

'If by reason of passage of time and changing conditions the reapportionment statute no longer serves its original purpose of securing to the voter the full constitutional value of his franchise, and the legislative branch fails to take appropriate restorative action, the doors of the courts must be open to him. The lawmaking body cannot by inaction alter the constitutional system under which it has its own existence.' 33 N.J. at 14, 161 A.2d at 711. The court withheld its decision on the merits in order that the legislature might have an opportunity to consider adoption of a reapportionment act. For the sequel see Application of Lamb, 67 N.J.Super. 39, 46-47, 169 A.2d 822, 825-826.

Reapportionment was also the result in Magraw v. Donovan, D.C., 159 F.Supp. 901, where a federal three-judge District Court took jurisdiction, saying, D.C., 163 F.Supp. 184, 187:

'Here it is the unmistakable duty of the State Legislature to reapportion itself periodically in accordance with recent population changes. * * * Early in January 1959 the 61st Session of the Minnesota Legislature will convene, all of the members of which will be newly elected on No-

vember 4th of this year. The facts which have been presented to us will be available to them. It is not so to be presumed that the Legislature will refuse to take such action as is necessary to comply with its duty under the State Constitution. We defer decision on all the issues presented (including that of the power of this Court to grant relief), in order to afford the Legislature full opportunity to 'heed the constitutional mandate to redistrict.''

See, D.C., 177 F.Supp. 803, where the case was dismissed as moot, the State Legislature having acted.

**\*251** Mr. Justice CLARK, concurring.
One emerging from the rash of opinions with their accompanying clashing **\*\*728** of views may well find himself suffering a mental blindness. The Court holds that the appellants have alleged a cause of action. However, it refuses to award relief here-although the facts are undisputed-and fails to give the District Court any guidance whatever. One dissenting opinion, bursting with words that go through so much and conclude with so little, contemns the majority action as 'a massive repudiation of the experience of our whole past.' Another describes the complaint as merely asserting conclusory allegations that Tennessee's apportionment is 'incorrect,' 'arbitrary,' 'obsolete,' and 'unconstitutional.' I believe it can be shown that this case is distinguishable from earlier cases dealing with the distribution of political power by a State, that a patent violation of the Equal Protection Clause of the United States Constitution has been shown, and that an appropriate remedy may be formulated.

I.

I take the law of the case from MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3 (1948), which involved an attack under the Equal Protection Clause upon an Illinois election statute. The Court decided that case on its merits without hindrance from the 'political question' doctrine. Although the statute under attack was upheld, it is clear **\*252** that the Court based its decision upon the determination that the statute represented a rational state policy. It stated:

'It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former.' Id., at 284, 69 S.Ct. at 2. (Emphasis supplied.)

The other cases upon which my Brethren dwell are all distinguishable or inapposite. The widely heralded case of Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), was one not only in which the Court was bobtailed but in which there was no majority opinion. Indeed, even the 'political question' point in Mr. Justice FRANKFURTER'S opinion was no more than an alternative ground.[FN1] Moreover, the appellants did not present an equal protection **\*\*729** argument.[FN2] While it has served as a Mother Hubbard to most of the subsequent cases, I feel it was in that respect ill cast and for all of these reasons put it to one side.[FN3] Likewise, **\*253** I do not consider the Guaranty Clause cases based on Art. I, s 4, of the Constitution, because it is not invoked here and it involves different criteria, as the Court's opinion indicates. Cases resting on various other considerations not present here, such as Radford v. Gary, 352 U.S. 991, 77 S.Ct. 559, 1 L.Ed.2d 540 (1957) (lack of equity); Kidd v. McCanless, 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157 (1956) (adequate state grounds supporting the state judgment); Anderson v. Jordan, 343 U.S. 912, 72 S.Ct. 648, 96 L.Ed. 1328 (1952) (adequate state grounds); Remmey v. Smith, 342 U.S. 916, 72 S.Ct. 368, 96 L.Ed. 685 (1952) (failure to exhaust state procedures), are of course not controlling. Finally, the Georgia county-unit-system cases, such as South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834 (1950), reflect the viewpoint of MacDougall, i.e., to refrain from intervening where there is some rational policy behind the State's system.[FN4]

FN1. The opinion stated at 551, 66 S.Ct., at 1199 that the Court 'could also dispose of this case on the authority of Wood v. Broom (287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1932)).' Wood v. Broom involved only the interpretation of a congressional reapportionment Act.

FN2. Similarly, the Equal Protection Clause was not invoked in Tedesco v. Board of Supervisors, 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357 (1950).

FN3. I do not read the later case of Colegrove v. Barrett, 330 U.S. 804, 67 S.Ct. 976, 91 L.Ed. 1262 (1947) as having rejected the equal protection argument adopted here. That was merely a dismissal of an appeal where the equal protection

point was mentioned along with attacks under three other constitutional provisions, two congressional Acts, and three state constitutional provisions.

FN4. Georgia based its election system on a consistent combination of political units and population, giving six unit votes to the eight most populous counties, four unit votes to the 30 counties next in population, and two unit votes to each of the remaining counties.

II.

The controlling facts cannot be disputed. It appears from the record that 37% of the voters of Tennessee elect 20 of the 33 Senators while 40% of the voters elect 6o of the 99 members of the House. But this might not on its face be an 'invidious discrimination,' Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955), for a 'statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

It is true that the apportionment policy incorporated in Tennessee's Constitution, i.e., state-wide numerical equality of representation with certain minor qualifications,FN5 is a rational one. On a county-by-county comparison\*254 a districting plan based thereon naturally will have disparities in representation due to the qualifications. But this to my mind does not raise constitutional problems, for the overall policy is reasonable. However, the root of the trouble is not in Tennessee's Constitution, for admittedly its policy has not been followed. The discrimination lies in the action of Tennessee's Assembly in allocating legislative seats to counties or districts created by it. Try as one may, Tennessee's apportionment just cannot be made to fit the pattern cut by its Constitution. This was the finding of the District Court. The policy of the Constitution referred to by the dissenters, therefore, is of no relevance here. We must examine what the Assembly has done.FN6 The frequency and magnitude of the inequalities in the present districting admit of no policy whatever.\*\*730 An examination of Table I accompanying this opinion, 369 U.S., p. 262, 82 S.Ct., p. 734, conclusively reveals that the apportionment picture in Tennessee is a topsy-turvical of gigantic proportions. This is not to say that some of the disparity cannot be explained, but when the entire table is examined-comparing the voting strength of counties of like population as well as contrasting that of the smaller with

the larger counties-it leaves but one conclusion, namely that Tennessee's apportionment is a crazy quilt without rational basis. At the risk of being accused of picking out a few of the horribles I shall allude to a series of examples that are taken from Table I.

FN5. See Part I of the Appendix to Mr. Justice HARLAN'S dissent, 369 U.S., p. 341, 82 S.Ct., p. 776.

FN6. It is suggested that the districting is not unconstitutional since it was established by a statute that was constitutional when passed some 60 years ago. But many Assembly Sessions since that time have deliberately refused to change the original act, and in any event '(a) statute (constitutionally) valid when enacted may become invalid by change in the conditions to which it is applied.' Nashville, C. & St. L.R. Co. v. Walters, 294 U.S. 405, 415, 55 S.Ct. 486, 488, 79 L.Ed. 949 (1935).

As is admitted, there is a wide disparity of voting strength between the large and small counties. Some \*255 samples are: Moore County has a total representation of twoFN7 with a population (2,340) of only one-eleventh of Rutherford County (25,316) with the same representation; Decatur County (5,563) has the same representation as Carter (23,303) though the latter has four times the population; likewise, Loudon County (13,264), Houston (3,084), and Anderson County (33,990) have the same representation, i.e., 1.25 each. But it is said that in this illustration all of the underrepresented counties contain municipalities of over 10,000 population and they therefore should be included under the 'urban' classification, rationalizing this disparity as an attempt to effect a rural-urban political balance. But in so doing one is caught up in the backlash of his own bull whip, for many counties have municipalities with a population exceeding 10,000, yet the same invidious discrimination is present. For example:

FN7. 'Total representation' indicates the combined representation in the State Senate (33 members) and the State House of Representatives (99 members) in the Assembly of Tennessee. Assuming a county has one representative, it is credited in this calculation with 1/99. Likewise, if the same county has one-third of a senate seat, it is credited with another 1/99, and thus such a county, in our calculation, would have a 'total representation' of two; if a county has one rep-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

resentative and one-sixth of a senate seat, it is credited with 1.5/99, or 1.50. It is this last figure that I use here in an effort to make the comparisons clear. The 1950 rather than the 1960 census of voting population is used to avoid the charge

that use of 1960 tabulations might not have allowed sufficient time for the State to act. However, the 1960 picture is even more irrational than the 1950 one.

| County | Population | Representation |
|---|---|---|
| Carter | 23,303 | 1.10 |
| Maury | 24,556 | 2.25 |
| Washington | 36,967 | 1.93 |
| Madison | 37,245 | 3.50 |

**\*256** Likewise, counties with no municipality of over 10,000 suffer a similar discrimination:

| County | Population | Representation |
|---|---|---|
| Grundy | 6,540 | 0.95 |
| Chester | 6,391 | 2.00 |
| Cumberland | 9,593 | 0.63 |
| Crockett | 9,676 | 2.00 |
| Loudon | 13,264 | 1.25 |
| Fayette | 13,577 | 2.50 |

**\*\*731** This could not be an effort to attain political balance between rural and urban populations. Since discrimination is present among counties of like population, the plan is neither consistent nor rational. It discriminates horizontally creating gross disparities between rural areas themselves as well as between urban areas themselves,[FN8] still maintaining the wide vertical disparity already pointed out between rural and urban.

> FN8. Of course this was not the case in the Georgia county unit system, South v. Peters, supra, or the Illinois initiative plan, MacDougall v. Green, supra, where recognized political units having independent significance were given minimum political weight.

It is also insisted that the representation formula used

above (see note 7) is 'patently deficient' because 'it eliminates from consideration the relative voting power of the counties that are joined together in a single election district.' This is a strange claim coming from those who rely on the proposition that 'the voice of every voter' need not have 'approximate equality.' Indeed, representative government, as they say, is not necessarily one of 'bare numbers.' The use of floterial districts in our political system is not ordinarily based on the theory that the floterial representative is splintered among the counties of his district per relative population. His function is to represent the whole district. However, I shall meet the charge on its own ground and by use of its 'adjusted **\*257** 'total representation' formula show that the present apportionment is loco. For example, compare some 'urban' areas of like population, using the HARLAN formula:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

| County | Population | Representation |
|---|---|---|
| Washington | 36,967 | 2.65 |
| Madison | 37,245 | 4.87 |
| | | |
| Carter | 23,303 | 1.48 |
| Greene | 23,649 | 2.05 |
| Maury | 24,556 | 3.81 |
| | | |
| Coffee | 13,406 | 2.32 |
| Hamblen | 14,090 | 1.07 |

And now, using the same formula, compare some so-called 'rural' areas of like population:

| County | Population | Representation |
|---|---|---|
| Moore | 2,340 | 1.23 |
| Pickett | 2,565 | .22 |
| | | |
| Stewart | 5,238 | 1.60 |
| Cheatham | 5,263 | .74 |
| | | |
| Chester | 6,391 | 1.36 |
| Grundy | 6,540 | .69 |
| | | |
| Smith | 8,731 | 2.04 |
| Unicoi | 8,787 | 0.40 |

**732** And for counties with similar representation but with gross differences in population, take:

| County | Population | Representation |
|---|---|---|
| Sullivan | 55,712 | 4.07 |
| Maury | 24,556 | 3.81 |
| | | |
| Blount | 30,353 | 2.12 |
| Coffee | 13,406 | 2.32 |

These cannot be 'distorted effects,' for here the same formula proposed by the dissenters is used and the result is even 'a crazier' quilt.

**258** The truth is that-although this case has been here for two years and has had over six hours' argument (three

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

times the ordinary case) and has been most carefully considered over and over again by us in Conference and individually-no one, not even the State nor the dissenters, has come up with any rational basis for Tennessee's apportionment statute.

No one-except the dissenters advocating the HARLAN 'adjusted 'total representation" formula-contends that mathematical equality among voters is required by the Equal Protection Clause. But certainly there must be some rational design to a State's districting. The discrimination here does not fit any pattern-as I have said, it is but a crazy quilt. My Brother HARLAN contends that other proposed apportionment plans contain disparities. Instead of chasing those rabbits he should first pause long enough to meet appellants' proof of discrimination by showing that in fact the present plan follows a rational policy. Not being able to do this, he merely counters with such generalities as 'classic legislative judgment,' no 'significant discrepancy,' and 'de minimis departures.' I submit that even a casual glance at the present apportionment picture shows these conclusions to be entirely fanciful. If present representation has a policy at all, it is to maintain the status quo of invidious discrimination at any cost. Like the District Court, I conclude that appellants have met the burden of showing 'Tennessee is guilty of a clear violation of the state constitution and of the (federal) rights of the plaintiffs. * * *'

III.

Although I find the Tennessee apportionment statute offends the Equal Protection Clause, I would not consider intervention by this Court into so delicate a field if there were any other relief available to the people of Tennessee. But the majority of the people of Tennessee have no *259 'PRACTICAL OPPORTUNITIES FOR EXERTING THEir political weight at the polls' to correct the existing 'invidious discrimination.' Tennessee has no initiative and referendum. I have searched diligently for other 'practical opportunities' present under the law. I find none other than through the federal courts. The majority of the voters have been caught up in a legislative strait jacket. Tennessee has an 'informed, civically militant electorate' and 'an aroused popular conscience,' but it does not sear 'the conscience of the people's representatives.' This is because the legislative policy has riveted the present seats in the Assembly to their respective constituencies, and by the votes of their incumbents a reapportionment of any kind **733 is prevented. The people have been rebuffed at the hands of the Assembly; they have tried the constitutional convention

route, but since the call must originate in the Assembly it, too, has been fruitless. They have tried Tennessee courts with the same result,[FN9] and Governors have fought the tide only to flounder. It is said that there is recourse in Congress and perhaps that may be, but from a practical standpoint this is without substance. To date Congress has never undertaken such a task in any State. We therefore must conclude that the people of Tennessee are stymied and without judicial intervention will be saddled with the present discrimination in the affairs of their state government

   FN9. It is interesting to note that state judges often rest their decisions on the ground that this Court has precluded adjudication of the federal claim. See, e.g., Scholle v. Secretary of State, 360 Mich. 1, 104 N.W.2d 63 (1960).

IV.

Finally, we msut consider if there are any appropriate modes of effective judicial relief. The federal courts are of course not forums for political debate, nor should they *260 resolve themselves into state constitutional conventions or legislative assemblies. Nor should their jurisdiction be exercised in the hope that such a declaration as is made today may have the direct effect of bringing on legislative action and relieving the courts of the problem of fashioning relief. To my mind this would be nothing less than blackjacking the Assembly into reapportioning the State. If judicial competence were lacking to fashion an effective decree, I would dismiss this appeal. However, like the Solicitor General of the United States, I see no such difficulty in the position of this case. One plan might be to start with the existing assembly districts, consolidate some of them, and award the seats thus released to those counties suffering the most egregious discrimination. Other possibilities are present and might be more effective. But the plan here suggested would at least release the stranglehold now on the Assembly and permit it to redistrict itself.

In this regard the appellants have proposed a plan based on the rationale of state-wide equal representation. Not believing that numerical equality of representation throughout a State is constitutionally required, I would not apply such a standard albeit a permissive one. Nevertheless, the dissenters attack it by the application of the HARLAN 'adjusted 'total representation " formula. The result is that some isolated inequalities are shown, but this in itself does not make the proposed plan irrational or place it in the 'crazy quilt' category. Such inequalities, as the dissenters

point out in attempting to support the present apportionment as rational, are explainable. Moreover, there is no requirement that any plan have mathematical exactness in its application. Only where, as here, the total picture reveals incommensurables of both magnitude and frequency can it be said that there is present an invidious discrimination.

**\*261** In view of the detailed study that the Court has given this problem, it is unfortunate that a decision is not reached on the merits. The majority appears to hold, at least sub silentio, that an invidious discrimination is present, but it remands to the three-judge court for it to make what is certain to be that formal determination. It is true that Tennessee has not filed a formal answer. However, it has filed voluminous papers and made extended arguments supporting its position. At no time has it been able to contradict the appellants' factual claims; it has offered no rational explanation for the present apportionment; indeed, it has indicated that there are none known to it. As I have emphasized, the case proceeded to the point before the three-judge court that it was able to find an invidious discrimination factually **\*\*734** present, and the State has not contested that holding here. In view of all this background I doubt if anything more can be offered or will be gained by the State on remand, other than time. Nevertheless, not being able to muster a court to dispose of the case on the merits, I concur in the opinion of the majority and acquiesce in the decision to remand. However, in fairness I do think that Tennessee is entitled to have my idea of what

it faces on the record before us and the trial court some light as to how it might proceed.

As John Rutledge (later Chief Justice) said 175 years ago in the course of the Constitutional Convention, a chief function of the Court is to secure the national rights.[FN10] Its decision today supports the proposition for which our forebears fought and many died, namely, that to be fully conformable to the principle of right, the form of government must be representative.[FN11] That is the keystone upon which our government was founded **\*262** and lacking which no republic can survive. It is well for this Court to practice self-restraint and discipline in constitutional adjudication, but never in its history have those principles received sanction where the national rights of so many have been so clearly infringed for so long a time. National respect for the courts is more enhanced through the forthright enforcement of those rights rather than by rendering them nugatory through the interposition of subterfuges. In my view the ultimate decision today is in the greatest tradition of this Court.

FN10. Farrand, The Records of the Federal Convention of 1787, 124.

FN11. Kant, Perpetual Peace.

TABLE I

| County | 1950 voting 4population | Present total representation using J.Clark's formula | Present total representation using J. Harlan's formula | Proposed total representation (appellants' plan), using J. Harlan's formula |
|---|---|---|---|---|
| Van Buren | 2,039 | .63 | .23 | .11 |
| Moore | 2,340 | 2.00 | 1.23 | .18 |
| Pickett | 2,565 | .70 | .22 | .24 |
| Sequatchie | 2,904 | .63 | .33 | .19 |
| Meigs | 3,039 | .93 | .48 | .17 |
| Houston | 3,084 | 1.25 | .46 | .24 |
| Trousdale | 3,351 | 1.33 | .43 | .12 |
| Lewis | 3,413 | 1.25 | .39 | .25 |
| Perry | 3,711 | 1.50 | .71 | .40 |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

| | | | | |
|---|---|---|---|---|
| Bledsoe | 4,198 | .63 | .49 | .24 |
| Clay | 4,528 | .70 | .40 | .42 |
| Union | 4,600 | .76 | .37 | .45 |
| Hancock | 4,710 | .93 | .62 | .49 |
| Stewart | 5,238 | 1.75 | 1.60 | .41 |
| Cheatham | 5,263 | 1.33 | .72 | .20 |
| Cannon | 5,341 | 2.00 | 1.43 | .52 |
| Decatur | 5,563 | 1.10 | .79 | .52 |
| Lake | 6,252 | 2.00 | 1.44 | .41 |
| Chester | 6,391 | 2.00 | 1.36 | .19 |
| Grundy | 6,540 | .95 | .69 | .43 |
| Humphreys | 6,588 | 1.25 | 1.39 | .72 |
| Johnson | 6,649 | 1.10 | .42 | .43 |
| Jackson | 6,719 | 1.50 | 1.43 | .63 |
| De Kalb | 6,984 | 2.00 | 1.56 | .68 |
| Benton | 7,023 | 1.10 | 1.01 | .66 |
| Fentress | 7,057 | .70 | .62 | .64 |
| Grainger | 7,125 | .93 | .94 | .65 |
| Wayne | 7,176 | 1.25 | .69 | .76 |
| Polk | 7,330 | 1.25 | .68 | .73 |
| Hickman | 7,598 | 2.00 | 1.85 | .80 |
| Macon | 7,974 | 1.33 | 1.01 | .61 |
| Morgan | 8,308 | .93 | .59 | .75 |
| Scott | 8,417 | .76 | .68 | .62 |
| Smith | 8,731 | 2.50 | 2.04 | .67 |
| Unicoi | 8,787 | .93 | .40 | .63 |
| Rhea | 8,937 | .93 | 1.42 | .21 |
| White | 9,244 | 1.43 | 1.69 | .90 |
| Overton | 9,474 | 1.70 | 1.83 | .89 |
| Hardin | 9,577 | 1.60 | 1.61 | .93 |
| Cumberland | 9,593 | .63 | 1.10 | .87 |
| Crockett | 9,676 | 2.00 | 1.66 | .63 |
| Henderson | 10,199 | 1.50 | .78 | .96 |
| Marion | 10,998 | 1.75 | 1.73 | .72 |
| Marshall | 11,288 | 2.50 | 2.28 | .84 |
| Dickson | 11,294 | 1.75 | 2.29 | 1.23 |
| Jefferson | 11,359 | 1.10 | .87 | 1.03 |
| McNairy | 11,601 | 1.60 | 1.74 | 1.13 |
| Cocke | 12,572 | 1.60 | 1.46 | .89 |
| Sevier | 12,793 | 1.60 | 1.47 | .69 |
| Claiborne | 12,799 | 1.43 | 1.61 | 1.34 |
| Monroe | 12,884 | 1.75 | 1.68 | 1.30 |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

| | | | | |
|---|---|---|---|---|
| Loudon | 13,264 | 1.25 | .28 | .52 |
| Warren | 13,337 | 1.75 | 1.89 | 1.68 |
| Coffee | 13,406 | 2.00 | 2.32 | 1.68 |
| Hardeman | 13,565 | 1.60 | 1.86 | 1.11 |
| Fayette | 13,577 | 2.50 | 2.48 | 1.11 |
| Haywood | 13,934 | 2.50 | 2.52 | 1.69 |
| Williamson | 14,064 | 2.33 | 2.96 | 1.71 |
| Hamblen | 14,090 | 1.10 | 1.07 | 1.67 |
| Franklin | 14,297 | 1.75 | 1.95 | 1.73 |
| Lauderdale | 14,413 | 2.50 | 2.45 | 1.73 |
| Bedford | 14,732 | 2.00 | 1.45 | 1.74 |
| Lincoln | 15,092 | 2.50 | 2.72 | 1.77 |
| Henry | 15,465 | 2.83 | 2.76 | 1.73 |
| Lawrence | 15,847 | 2.00 | 2.22 | 1.81 |
| Giles | 15,935 | 2.25 | 2.54 | 1.81 |
| Tipton | 15,944 | 3.00 | 1.68 | 1.13 |
| Robertson | 16,456 | 2.83 | 2.62 | 1.85 |
| Wilson | 16,459 | 3.00 | 3.03 | 1.21 |
| Carroll | 16,472 | 2.83 | 2.88 | 1.82 |
| Hawkins | 16,900 | 3.00 | 1.93 | 1.82 |
| Putnam | 17,071 | 1.70 | 2.50 | 1.86 |
| Campbell | 17,477 | .76 | 1.40 | 1.94 |
| Roane | 17,639 | 1.75 | 1.26 | 1.30 |
| Weakley | 18,007 | 2.33 | 2.63 | 1.85 |
| Bradley | 18,273 | 1.25 | 1.67 | 1.92 |
| McMinn | 18,347 | 1.75 | 1.97 | 1.92 |
| Obion | 18,434 | 2.00 | 2.30 | 1.94 |
| Dyer | 20,062 | 2.00 | 2.36 | 2.32 |
| Sumner | 20,143 | 2.33 | 3.56 | 2.54 |
| Carter | 23,303 | 1.10 | 1.48 | 2.55 |
| Greene | 23,649 | 1.93 | 2.05 | 2.68 |
| Maury | 24,556 | 2.25 | 3.81 | 2.85 |
| Rutherford | 25,316 | 2.00 | 3.02 | 2.39 |
| Montgomery | 26,284 | 3.00 | 3.73 | 3.06 |
| Gibson | 29,832 | 5.00 | 5.00 | 2.86 |
| Blount | 30,353 | 1.60 | 2.12 | 2.19 |
| Anderson | 33,990 | 1.25 | 1.30 | 3.62 |
| Washington | 36,967 | 1.93 | 2.65 | 3.45 |
| Madison | 37,245 | 3.50 | 4.87 | 3.69 |
| Sullivan | 55,712 | 3.00 | 4.07 | 5.57 |
| Hamilton | 131,971 | 6.00 | 6.00 | 15.09 |
| Knox | 140,559 | 7.25 | 8.96 | 15.21 |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                      Page 43
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

| Davidson | 211,930 | 12.50 | 12.93 | 21.57 |
|----------|---------|-------|-------|-------|
| Shelby   | 312,345 | 15.50 | 16.85 | 31.59 |

**\*\*736 \*265** Mr. Justice STEWART, concurring.
The separate writings of my dissenting and concurring Brothers stray so far from the subject of today's decision as to convey, I think, a distressingly inaccurate impression of what the Court decides. For that reason, I think it appropriate, in joining the opinion of the Court, to emphasize in a few words what the opinion does and does not say.

The Court today decides three things and no more: '(a) that the court possessed jurisdiction of the subject matter; (b) that a justiciable cause of action is stated upon which appellants would be entitled to appropriate relief; and (c) * * * that the appellants have standing to challenge the Tennessee apportionment statutes.' 369 U.S., pp. 197-198, 82 S.Ct., p. 699.

The complaint in this case asserts that Tennessee's system of apportionment is utterly arbitrary-without any possible justification in rationality. The District Court did not reach the merits of that claim, and this Court quite properly expresses no view on the subject. Contrary to the suggestion of my Brother HARLAN, the Court does not say or imply that 'state legislatures must be so structured as to reflect with approximate equality the voice of every voter.' **\*\*737** 369 U.S., p. 332, 82 S.Ct., p. 772. The Court does not say or imply that there is anything in the Federal Constitution 'to prevent a State, acting not irrationally, from choosing any electoral legislative structure it thinks best suited to the interests, temper, and customs of its people.' 369 U.S., p. 334, 82 S.Ct., p. 773. And contrary to the suggestion of my Brother DOUGLAS, the Court most assuredly does not decide the question, 'may a State weight the vote of one county or one district more heavily than it weights the vote in another?' 369 U.S., p. 244, 82 S.Ct., p. 724.

In MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3, the Court held that the Equal Protection Clause does not 'deny a State the power to assure a proper diffusion of political initiative**\*266** as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former.' 335 U.S. at 284, 69 S.Ct. at 2. In case after case arising under the Equal Protection Clause the Court has said what it said again only last Term-that 'the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of

citizens differently than others.' McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393. In case after case arising under that Clause we have also said that 'the burden of establishing the unconstitutionality of a statute rests on him who assails it.' Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070.

Today's decision does not turn its back on these settled precedents. I repeat, the Court today decides only: (1) that the District Court possessed jurisdiction of the subject matter; (2) that the complaint presents a justiciable controversy; (3) that the appellants have standing. My Brother CLARK has made a convincing prima facie showing that Tennessee's system of apportionment is in fact utterly arbitrary-without any possible justification in rationality. My Brother HARLAN has, with imagination and ingenuity, hypothesized possibly rational bases for Tennessee's system. But the merits of this case are not before us now. The defendants have not yet had an opportunity to be heard in defense of the State's system of apportionment; indeed, they have not yet even filed an answer to the complaint. As in other cases, the proper place for the trial is in the trial court, not here.

Mr. Justice FRANKFURTER, whom Mr. Justice HARLAN joins, dissenting.
The Court today reverses a uniform course of decision established by a dozen cases, including one by which the very claim now sustained was unanimously rejected **\*267** only five years ago. The impressive body of rulings thus cast aside reflected the equally uniform course of our political history regarding the relationship between population and legislative representation-a wholly different matter from denial of the franchise to individuals because of race, color, religion or sex. Such a massive repudiation of the experience of our whole past in asserting destructively novel judicial power demands a detailed analysis of the role of this Court in our constitutional scheme. Disregard of inherent limits in the effective exercise of the Court's 'judicial Power' not only presages the futility of judicial intervention in the essentially political conflict of forces by which the relation between population and representation has time out of mind been and now is determined. It may well impair the Court's position as the ultimate organ of 'the supreme Law of the Land' in that vast range of legal problems, often strongly entangled in popular feeling, on which this Court must pronounce. The Court's authori-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

ty-possessed of neither the purse nor the sword-ultimately rests on sustained public confidence in its moral sanction. Such feeling must be **738 nourished by the Court's complete detachment, in fact and in appearance, from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements.

A hypothetical claim resting on abstract assumptions is now for the first time made the basis for affording illusory relief for a particular evil even though it foreshadows deeper and more pervasive difficulties in consequence. The claim is hypothetical and the assumptions are abstract because the Court does not vouchsafe the lower courts-state and federal-guidelines for formulating specific, definite, wholly unprecedented remedies for the inevitable litigations that today's umbrageous disposition is bound to stimulate in connection with politically motivated reapportionments in so many States. In *268 such a setting, to promulgate jurisdiction in the abstract is meaningless. It is as devoid of reality as 'a brooding omnipresence in the sky,' for it conveys no intimation what relief, if any, a District Court is capable of affording that would not invite legislatures to play ducks and drakes with the judiciary. For this Court to direct the District Court to enforce a claim to which the Court has over the years consistently found itself required to deny legal enforcement and at the same time to find it necessary to withhold any guidance to the lower court how to enforce this turnabout, new legal claim, manifests an odd-indeed an esoteric-conception of judicial propriety. One of the Court's supporting opinions, as elucidated by commentary, unwittingly affords a disheartening preview of the mathematical quagmire (apart from divers judicially inappropriate and elusive determinants) into which this Court today catapults the lower courts of the country without so much as adumbrating the basis for a legal calculus as a means of extrication. Even assuming the indispensable intellectual disinterestedness on the part of judges in such matters, they do not have accepted legal standards or criteria or even reliable analogies to draw upon for making judicial judgments. To charge courts with the task of accommodating the incommensurable factors of policy that underlie these mathematical puzzles is to attribute, however flatteringly, omnicompetence to judges. The Framers of the Constitution persistently rejected a proposal that embodied this assumption and Thomas Jefferson never entertained it.

Recent legislation, creating a district appropriately described as 'an atrocity of ingenuity,' is not unique. Considering the gross inequality among legislative electoral

units within almost every State, the Court naturally shrinks from asserting that in districting at least substantial equality is a constitutional requirement enforceable *269 by courts.FN* Room continues to be allowed for weighting. This of course implies that geography, economics, urbun-rural conflict, and all the other non-legal factors which have throughout our history entered into political districting are to some extent not to be ruled out in the **739 undefined vista now opened up by review in the federal courts of state reapportionments. To some extent-aye, there's the rub. In effect, today's decision empowers the courts of the country to devise what should constitute the proper composition of the legislatures of the fifty States. If state courts should for one reason or another find themselves unable to discharge this task, the duty of doing so is put on the federal courts or on this Court, if State views do not satisfy this Court's notion of what is proper districting.

> FN* It is worth reminding that the problem of legislative apportionment is not one dividing North and South. Indeed, in the present House of Representatives, for example, Michigan's congressional districts are far less representative of the numbers of inhabitants, according to the 1960 census, than are Louisiana's. Michigan's Sixteenth District, which is 93.1% urban, contains 802,994 persons and its twelfth, which is 47.6% urban, contains 177,431-one-fifth as many persons. Louisiana's most populous district, the Sixth, is 53.6% urban and contains 536,029 persons, and its least populous, the Eighth, 36.7% urban, contains 263,850-nearly half. Gross disregard of any assumption that our political system implies even approximation to the notion that individual votes in the various districts within a State should have equal weight is as true, e.g., of California, Illinois, and Ohio as it is of Georgia. See United States Department of Commerce, Census Release, February 24, 1962, CB62-23.

We were soothingly told at the bar of this Court that we need not worry about the kind of remedy a court could effectively fashion once the abstract constitutional right to have courts pass on a state-wide system of electoral districting is recognized as a matter of judicial rhetoric, because legislatures would heed the Court's admonition. This is not only a euphoric hope. It implies a sorry *270 confession of judicial impotence in place of a frank acknowledgment that there is not under our Constitution a judicial remedy for every political mischief, for every undesirable exercise of legislative power. The Framers

carefully and with deliberate forethought refused so to enthrone the judiciary. In this situation, as in others of like nature, appeal for relief does not belong here. Appeal must be to an informed, civically militant electorate. In a democratic society like ours, relief must come through an aroused popular conscience that sears the conscience of the people's representatives. In any event there is nothing judicially more unseemly nor more self-defeating than for this Court to make in terrorem pronouncements, to indulge in merely empty rhetoric, sounding a word of promise to the ear, sure to be disappointing to the hope. This is the latest in the series of cases in which the Equal Protection and Due Process Clauses of the Fourteenth Amendment have been invoked in federal courts as restrictions upon the power of the States to allocate electoral weight among the voting populations of their various geographical subdivisions.[FN1] The present action, which **271 comes here on appeal from an order of a statutory three-judge District Court dismissing amended complaints seeking declaratory and injunctive relief, challenges the provisions of Tenn.Code Ann.1955, ss 3-101 to 3-109, which apportion state representative and senatorial seats among Tennessee's ninety-five counties.

FN1. See Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131; Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, rehearing denied, 329 U.S. 825, 67 S.Ct. 118, 91 L.Ed. 701, motion for reargument before the full bench denied, 329 U.S. 828, 67 S.Ct. 199, 91 L.Ed. 703; Cook v. Fortson, 329 U.S. 675, 67 S.Ct. 21, 91 L.Ed. 596, rehearing denied, 329 U.S. 829, 67 S.Ct. 296, 91 L.Ed. 704; Turman v. Duckworth, 329 U.S. 675, 67 S.Ct. 21, 91 L.Ed. 596, rehearing denied, 329 U.S. 829, 67 S.Ct. 296, 91 L.Ed. 704; Colegrove v. Barrett, 330 U.S. 804, 67 S.Ct. 973, 91 L.Ed. 1262; MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3; South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834; Tedesco v. Board of Supervisors, 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357; Remmey v. Smith, 342 U.S. 916, 72 S.Ct. 368, 96 L.Ed. 685; Cox v. Peters, 342 U.S. 936, 72 S.Ct. 559, 96 L.Ed. 697, rehearing denied, 343 U.S. 921, 72 S.Ct. 675, 96 L.Ed. 1334; Anderson v. Jordan, 343 U.S. 912, 72 S.Ct. 648, 96 L.Ed. 1328; Kidd v. McCanless, 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157; Radford v. Gary, 352 U.S. 991, 77 S.Ct. 559, 1 L.Ed.2d 540; Hartsfield v. Sloan, 357 U.S. 916, 78 S.Ct. 1363, 2 L.Ed.2d 1363; Matthews v. Handley, 361 U.S. 127, 80 S.Ct. 256, 4 L.Ed.2d 180; Perry v. Folsom, 144 F.Supp. 874 (D.C.N.D.Ala.); Magraw v. Dono-

van, 163 F.Supp. 184 (D.C.D.Minn.); cf. Dyer v. Kazuhisa Abe, 138 F.Supp. 220 (D.C.D.Hawaii). And see Keogh v. Neely, 50 F.2d 685 (C.A.7th Cir.).

The original plaintiffs, citizens and qualified voters entitled to vote for members of the Tennessee Legislature in the several counties in which they respectively**740 reside, bring this action in their own behalf and 'on behalf of all other voters in the State of Tennessee,' or, as they alternatively assert, 'on behalf of all qualified voters of their respective counties, and further, on behalf of all voters of the State of Tennessee who are similarly situated.' The cities of Knoxville and Chattanooga, and the Mayor of Nashville-on his own behalf as a qualified voter and, pursuant to an authorizing resolution by the Nashville City Council, as a representative of all the city's residents-were permitted to intervene as parties plaintiff.[FN2] The defendants are executive officials charged with statutory duties in connection with state elections.[FN3]

FN2. Although the motion to intervene by the Mayor of Nashville asserted an interest in the litigation in only a representative capacity, the complaint which he subsequently filed set forth that he was a qualified voter who also sued in his own behalf. The municipalities of Knoxville and Chattanooga purport to represent their residents. Since the claims of the municipal intervenors do not differ materially from those of the parties who sue as individual voters, the Court need not now determine whether the municipalities are proper parties to this proceeding. See, e.g., Stewart v. Kansas City, 239 U.S. 14, 36 S.Ct. 15, 60 L.Ed. 120.

FN3. The original complaint named as defendants Tennessee's Secretary of State, Attorney General, Coordinator of Elections, and the three members of the State Board of Elections, seeking to make the Board members representatives of all the State's County Election Commissioners. The prayer in an intervening complaint by The City of Knoxville, that the Commissioners of Elections of Knox County be added as parties defendant seems not to have been acted on by the court below. Defendants moved to dismiss, inter alia, on the ground of failure to join indispensable parties, and they argue in this Court that only the County Election Commissioners of the ninety-five counties are the effective administrators of Tennes-

see's elections laws, and that none of the defendants have substantial duties in connection therewith. The District Court deferred ruling on this ground of the motion. Inasmuch as it involves questions of local law more appropriately decided by judges sitting in Tennessee than by this Court, and since in any event the failure to join County Election Commissioners in this action looking to prospective relief could be corrected, if necessary, by amendment of the complaints, the issue does not concern the Court on this appeal.

**\*272** The original plaintiff's amended complaint avers, in substance, the following. [FN4] The Constitution of the State of Tennessee declares that 'elections shall be free and equal,' provides that no qualifications other than age, citizenship and specified residence requirements shall be attached to the right of suffrage, and prohibits denying to any person the suffrage to which he is entitled except upon conviction of an infamous crime. Art. I, s 5; Art. IV, s 1. It requires an enumeration of qualified voters within every term of ten years after 1871 and an apportionment of representatives and senators among the several counties or districts according to the number of qualified voters in each[FN5] at the time of each decennial **\*273** enumeration. Art. II, ss 4, 5, 6. Notwithstanding these provisions, the State Legislature has not reapportioned itself since 1901. The Reapportionment Act of that year, Tenn.Acts 1901, c. 122, now Tenn. Code Ann.1955, ss 3-101 to 3-109,[FN6] was unconstitutional when enacted, because not preceded by the required enumeration of qualified voters and because it allocated legislative seats arbitrarily, unequally and discriminatorily, as measured by the 1900 federal census. Moreover, irrespective of the question of its validity in 1901, it is asserted that the Act became 'unconstitutional and obsolete' in 1911 by virtue of the decennial reapportionment requirement of the Tennessee Constitution. Continuing a 'purposeful and systematic plan to discriminate against a geographical class of persons,' recent Tennessee Legislatures have failed, as did their predecessors, to enact reapportionment legislation, although a number of bills providing for reapportionment have been introduced. Because of population shifts since 1901, the apportionment fixed by the Act of that year and still in effect is not proportionate to population, denies to the counties in which the plaintiffs **\*274** live an additional number of representatives to which they are entitled, and renders plaintiffs' votes 'not as effective as the votes of the voters residing in other senatorial and representative districts * * *.' Plaintiffs 'suffer a debasement of their votes by virtue of the incorrect, arbitrary, obsolete and unconstitutional apportionment of the General Assembly * * *,'

and the totality of the malapportionment's effect-which permits a minority of about thirty-seven percent of the voting population of the State to control twenty of the thirty-three members of Tennessee's Senate, and a minority of forty percent of the voting population to control sixty-three of the ninety-nine members of the House-results in 'a distortion of the constitutional system' established by the Federal and State Constitutions, prevents the General Assembly 'from being a body representative of the people of the State of Tennessee, * * *' and is 'contrary to the basic principle of representative government * * *,' and 'contrary to the philosophy of government in the United States and all anglo-Saxon jurisprudence * * *.'

> FN4. Jurisdiction is predicated upon R.S. s 1979, 42 U.S.C. s 1983, 42 U.S.C.A. s 1983, and 28 U.S.C. s 1343(3), 28 U.S.C.A. s 1343(3).

> FN5. However, counties having two-thirds of the ratio required for a Representative are entitled to seat one member in the House, and there are certain geographical restrictions upon the formation of Senate districts. The applicable provisions of Article II of the Tennessee Constitution are:

> 'Sec. 4. Census.-An enumeration of the qualified voters, and an apportionment of the Representatives in the General Assembly, shall be made in the year one thousand eight hundred and seventy-one, and within every subsequent term of ten years.'

> 'Sec. 5. Apportionment of representatives.-The number of Representatives shall, at the several periods of making the enumeration, be apportioned among the several counties or districts, according to the number of qualified voters in each; and shall not exceed seventy-five, until the population of the State shall be one million and a half, and shall never exceed ninety-nine; Provided that any county having two-thirds of the ratio shall be entitled to one member.'

> 'Sec. 6. Apportionment of senators.-The number of Senators shall, at the several periods of making the enumeration, be apportioned among the several counties or districts according to the number of qualified electors in each, and shall not exceed one-third the number of representatives. In apportioning the Senators among the different counties, the fraction that may be lost by any

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

county or counties, in the apportionment of members to the House of Representatives, shall be made up to such county or counties in the Senate, as near as may be practicable. When a district is composed of two or more counties, they shall be adjoining; and no county shall be divided in forming a district.'

FN6. It is alleged that certain amendments to the Act of 1901 made only minor modifications of that Act, adjusting the boundaries of individual districts in a manner not material to plaintiffs' claims.

Exhibits appended to the complaint purport to demonstrate the extent of the inequalities of which plaintiffs complain. Based upon 'approximate voting population,'[FN7] these set forth figures showing **742 that the State *275 Senator from Tennessee's most populous senatorial district represents five and two-tenths times the number of voters represented by the Senator from the least populous district, while the corresponding ratio for most and least populous House districts is more than eighteen to one. The General Assembly thus apportioned has discriminated against the underrepresented counties and in favor of the overrepresented counties in the collection and distribution of various taxes and tax revenues, notably in the distribution of school and highway-improvement founds,[FN8] this discrimination being 'made possible and effective' by the Legislature's failure to reapportion itself. Plaintiffs conclude that election of the State Legislature pursuant to the apportionment fixed by the 1901 Act violates the Tennessee Constitution and deprives them of due process of law and of the equal protection of the laws guaranteed by the Fourteenth Amendment. Their prayer below was for a declaratory judgment striking down the Act, an injunction restraining defendants from any acts necessary to the holding of elections in the districts prescribed by Tenn.Code Ann. 1955, ss 3-101 to 3-109, until such time as the legislature is reapportioned 'according to the *276 Constitution of the State of Tennessee,' and an order directing defendants to declare the next primary and general elections for members of the Tennessee Legislature on an atlarge basis-the thirty-three senatorial candidates and the ninety-nine representative candidates receiving the highest number of votes to be declared elected.[FN9]

FN7. The exhibits do not reveal the source of the population figures which they set forth, but it appears that the figures were taken from the United States Census of Population, 1950, Vo-

lume II, Part 42 (Tennessee), Table 41, at 76-91. These census figures represent the total population over twenty-one years of age in each Tennessee County; they do not purport to enumerate 'qualified voters' or 'qualified electors,' the measure of apportionment prescribed by the Tennessee Constitution. See note 5, supra. To qualify to vote in Tennessee, in addition to fulfilling the age requirement, an individual must be a citizen of the United States, a resident of the State for twelve months and of the county where he offers his vote for six months next preceding the election, and must not be under the disqualification attaching to conviction for certain offenses. Tenn.Code Ann.1955, ss 2-201, 2-205. The statistics found in the United States Census of Population, 1950, Volume II, Part 42 (Tennessee), Table 42, at 92-97, suggest that the residence requirement, in particular, may be an unknown variable of considerable significance. Appellants do not suggest a means by which a court, on the basis of the federal census figures, can determine the number of qualified voters in the various Tennessee counties.

FN8. The 'county aid funds' derived from a portion of a state gasoline privilege tax, for example, are distributed among the counties as follows: one-half equally among the ninety-five counties, one-quarter on the basis of area, one-quarter on the basis of population, to be used by county authorities in the building, repairing and improving of county roads and bridges. Tenn.Code Ann.1955, s 54-403. Appellants urge that this distribution is discriminatory.

FN9. Plaintiffs also suggested, as an alternative to at-large elections, that the District Court might itself redistrict the State. They did not, however, expressly pray such relief.

Motions to dismiss for want of jurisdiction of the subject matter and for failure to state a claim were made and granted, 179 F.Supp. 824, the District Court relying upon this Court's series of decisions beginning with Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, rehearing denied, 329 U.S. 825, 67 S.Ct. 118, 91 L.Ed. 701, motion for reargument before the full bench denied, 329 U.S. 828, 67 S.Ct. 199, 91 L.Ed. 703. The original and intervening plaintiffs bring the case here on appeal. 364 U.S. 898, 81 S.Ct. 230, 5 L.Ed.2d 193. In this Court they

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                                   Page 48
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

have altered their request for relief, suggesting a 'step-by-step approach.' The first step is a remand to the District Court with directions to vacate the order dismissing the complaint and to enter an order retaining jurisdiction, providing 'the necessary spur to legislative action * * *.' If this proves insufficient, appellants will ask the 'additional spur' of an injunction prohibiting elections under the 1901 Act, or a declaration of the Act's unconstitutionality, or both. Finally, all other means failing, the District Court is invited by the plaintiffs, greatly daring, to order an election at large or redistrict the State **743 itself or through a master. The Solicitor General of the United States, who has filed a brief amicus and argued in favor of reversal, asks the Court on this appeal to hold only that the District Court has 'jurisdiction' and may properly exercise it to entertain the plaintiffs' claims on the merits. This would leave to that court after remand the questions of the challenged statute's*277 constitutionality and of some undefined, unadumbrated relief in the event a constitutional violation is found. After an argument at the last Term, the case was set down for reargument, 366 U.S. 907, 81 S.Ct. 1082 and heard this Term.

I.

In sustaining appellants' claim, based on the Fourteenth Amendment, that the District Court may entertain this suit, this Court's uniform course of decision over the years is overruled or disregarded. Explicitly it begins with colegrove v. Green, supra, decided in 1946, but its roots run deep in the Court's historic adjudicatory process.

Colegrove held that a federal court should not entertain an action for declaratory and injunctive relief to adjudicate the constitutionality, under the Equal Protection Clause and other federal constitutional and statutory provisions, of a state statute establishing the respective districts for the State's election of Representatives to the Congress. Two opinions were written by the four Justices who composed the majority of the seven sitting members of the Court. Both opinions joining in the result in Colegrove v. Green agreed that considerations were controlling which dictated denial of jurisdiction though not in the strict sense of want of power. While the two opinions show a divergence of view regarding some of these considerations, there are important points of concurrence. Both opinions demonstrate a predominant concern, first, with avoiding federal judicial involvement in matters traditionally left to legislative policy making; second, with respect to the difficulty-in view of the nature of the problems of apportionment and its history in this country-of drawing on or devising

judicial standards for judgment, as opposed to legislative determinations, of the part which mere numerical equality among voters should play as a criterion for the allocation of *278 political power; and, third, with problems of finding appropriate modes of relief-particularly, the problem of resolving the essentially political issue of the relative merits of atlarge elections and elections held in districts of unequal population.

The broad applicability of these considerations-summarized in the loose shorthand phrase, 'political question'-in cases involving a State's apportionment of voting power among its numerous localities has led the Court, since 1946, to recognize their controlling effect in a variety of situations. (In all these cases decision was by a full Court.) The 'political question' principle as applied in Colegrove has found wide application commensurate with its function as 'one of the rules basic to the federal system and this Court's appropriate place within that structure.' Rescue Army v. Municipal Court, 331 U.S. 549, 570, 67 S.Ct. 1409, 1420, 91 L.Ed. 1666. In Colegrove v. Barrett, 330 U.S. 804, 67 S.Ct. 973, 91 L.Ed. 1262, litigants brought suit in a Federal District Court challenging as offensive to the Equal Protection Clause Illinois' state legislative-apportionment laws. They pointed to state constitutional provisions requiring decennial reapportionment and allocation of seats in proportion to population, alleged a failure to reapportion for more than forty-five years-during which time extensive population shifts had rendered the legislative districts grossly unequal-and sought declaratory and injunctive relief with respect to all elections to be held thereafter. After the complaint was dismissed by the District Court, this Court dismissed an appeal for want of a substantial federal question. A similar District**744 Court decision was affirmed here in Radford v. Gary, 352 U.S. 991, 77 S.Ct. 559, 1 L.Ed.2d 540. And cf. Remmey v. Smith, 342 U.S. 916, 72 S.Ct. 368, 96 L.Ed. 685. In Tedesco v. Board of Supervisors, 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357, the Court declined to hear, for want of a substantial federal question, the claim that the division of a municipality into voting districts of unequal population for the selection for councilmen fell *279 afoul of the Fourteenth Amendment, and in Cox v. Peters, 342 U.S. 936, 72 S.Ct. 559, 96 L.Ed. 697, rehearing denied, 343 U.S. 921, 72 S.Ct. 675, 96 L.Ed. 1334, it found no substantial federal question raised by a state court's dismissal of a claim for damages for 'devaluation' of plaintiff's vote by application of Georgia's county-unit system in a primary election for the Democratic gubernatorial candidate. The same Georgia system was subsequently attacked in a complaint for declaratory judgment and an injunction; the federal district judge declined to take the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

requisite steps for the convening of a statutory three-judge court; and this Court, in Hartsfield v. Sloan, 357 U.S. 916, 78 S.Ct. 1363, 2 L.Ed.2d 1363, denied a motion for leave to file a petition for a writ of mandamus to compel the district judge to act. In MacDougall v. Green, 335 U.S. 281, 283, 69 S.Ct. 1, 93 L.Ed. 3, the Court noted that 'To assume that political power is a function exclusively of numbers is to disregard the practicalities of government,' and, citing the Colegrove cases, declined to find in 'such broad constitutional concepts as due process and equal protection of the laws,' id., at 284, 69 S.Ct. at 2, a warrant for federal judicial invalidation of an Illinois statute requiring as a condition for the formation of a new political party the securing of at least two hundred signatures from each of fifty counties. And in South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834, another suit attacking Georgia's county-unit law, it affirmed a District Court dismissal, saying

'Federal courts consistently refuse to exercise their equity powers in cases posing political issues arising from a state's geographical distribution of electoral strength among its political subdivisions.' Id., at 277, 70 S.Ct. at 642.

Of course it is important to recognize particular, relevant diversities among comprehensively similar situations. Appellants seek to distinguish several of this Court's prior decisions on one or another ground-Colegrove v. **\*280** Green on the ground that federal, not state, legislative apportionment was involved; Remmey v. Smith on the ground that state judicial remedies had not been tried; Radford v. Gary on the ground that Oklahoma has the initiative, whereas Tennessee does not. It would only darken counsel to discuss the relevance and significance of each of these assertedly distinguishing factors here and in the context of this entire line of cases. Suffice it that they do not serve to distinguish Colegrove v. Barrett, supra, which is on all fours with the present case, or to distinguish Kidd v. McCanless, 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157, in which the full Court without dissent, only five years ago, dismissed on authority of Colegrove v. Green and Anderson v. Jordan, 343 U.S. 912, 72 S.Ct. 648, 96 L.Ed. 1328, an appeal from the Supreme Court of Tennessee in which a precisely similar attack was made upon the very statute now challenged. If the weight and momentum of an unvarying course of carefully considered decisions are to be respected, appellants' claims are foreclosed not only by precedents governing the exact facts of the present case but are themselves supported by authority the more persuasive in that it gives effect to the Colegrove principle in dis-

tinctly varying circumstances in which state arrangements allocating relative degrees of political influence among geographic groups of voters were challenged under the Fourteenth Amendment.

**\*\*745** II.

The colegrove doctrine, in the form in which repeated decisions have settled it, was not an innovation. It represents long judicial thought and experience. From its earliest opinions this Court has consistently recognized a class of controversies which do not lend themselves to judicial standards and judicial remedies. To classify the various instances as 'political questions' is rather a form **\*281** of stating this conclusion than revealing of analysis. [FN10] Some of the cases so labelled have no relevance here. But from others emerge unifying considerations that are compelling.

FN10. See Bickel, Foreword: The Passive Virtues, 75 Harv.L.Rev. 40, 45 et seq. (1961).

1. The cases concerning war or foreign affairs, for example, are usually explained by the necessity of the country's speaking with one voice in such matters. While this concern alone undoubtedly accounts for many of the decisions,[FN11] others do not fit the pattern. It would hardly embarrass the conduct of war were this Court to determine, in connection with private transactions between litigants, the date upon which war is to be deemed terminated. But the Court has refused to do so. See, e.g., The Protector, 12 Wall. 700, 20 L.Ed. 463; Brown v. Hiatts, 15 Wall. 177, 21 L.Ed. 128; Adger v. Alston, 15 Wall. 555, 21 L.Ed. 234; Williams v. Bruffy, 96 U.S. 176, 192-193, 24 L.Ed. 716. It does not suffice to explain such cases as Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881-deferring to political determination the question of the duration of war for purposes of the Presidential power to deport alien enemies-that judicial intrusion would seriously **\*282** impede the President's power effectively to protect the country's interests in time of war. Of course, this is true; but the precise issue presented is the duration of the time of war which demands the power. Cf. Martin v. Mott, 12 Wheat. 19, 6 L.Ed. 537; Lamar v. Browne, 92 U.S. 187, 193, 23 L.Ed. 650; Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194; Kahn v. Anderson, 255 U.S. 1, 41 S.Ct. 224, 65 L.Ed. 469. And even for the purpose of determining the extent of congressional regulatory power over the tribes and dependent communities of Indians, it is ordinarily for Congress, not the Court, to determine whether or not a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                                          Page 50
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
 (Cite as: 369 U.S. 186, 82 S.Ct. 691)

particular Indian group retains the characteristics consti-tutionally requisite to confer the power.[FN12] E.g., United States v. Holliday, 3 Wall. 407, 18 L.Ed. 182; **746 Tiger v. Western Investment Co., 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738; United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107. A controlling factor in such cases is that, decision respecting these kinds of complex matters of policy being traditionally committed not to courts but to the political agencies of government for determination by criteria of political expediency, there exists no standard ascertainable by settled judicial experience or process by reference to which a political decision affecting the ques-tion at issue between the parties can be judged. Where the question arises in the course of a litigation involving pri-marily the adjudication of other issues between the liti-gants, the Court accepts as a basis for adjudication the political departments' decision of it. But where its deter-mination is the sole function to be served by the exercise of the judicial power, the Court will not entertain the action. See Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568. *283 The dominant consideration is 'the lack of satisfactory criteria for a judicial determination * * *.' Mr. Chief Justice Hughes, for the Court, in Coleman v. Miller, 307 U.S. 433, 454-455, 59 S.Ct. 972, 982, 83 L.Ed. 1385. Compare United States v. Rogers, 4 How. 567, 572, 11 L.Ed. 1105, with Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483. [FN13]

FN11. See, e.g., United States v. Palmer, 3 Wheat. 610, 634, 635, 4 L.Ed. 471; The Divina Pastora, 4 Wheat. 52, 4 L.Ed. 512; Williams v. Suffolk Ins. Co., 13 Pet. 415, 10 L.Ed. 226; Kennett v. Chambers, 14 How. 38, 14 L.Ed. 316; Doe ex dem. Clark v. Braden, 16 How. 635, 14 L.Ed. 1090; Jones v. United States, 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691; Terlinden v. Ames, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534; Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274; Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; Ex parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014; Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633. Compare Foster and Elam v. Neilson, 2 Pet. 253, 7 L.Ed. 415, with United States v. Arredondo, 6 Pet. 691, 8 L.Ed. 547. Of course, judgment concerning the 'political' nature of even a controversy affecting the Nation's foreign affairs is not a simple mechanical matter, and certain of the Court's decisions have accorded scant weight to the consideration of unity of ac-tion in the conduct of external relations. Compare Vermilya-Brown Co. v. Connell, 335 U.S. 377,

69 S.Ct. 140, 93 L.Ed. 76, with United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796.

FN12. Obviously, this is the equivalent of saying that the characteristics are not 'constitutionally requisite' in a judicially enforceable sense. The recognition of their necessity as a condition of legislation is left, as is observance of certain other constitutional commands to the conscience of the non-judicial organs. Cf. Kentucky v. Dennison, 24 How. 66, 16 L.Ed. 717.

FN13. Also compare the Coleman case and United States v. Sprague, 282 U.S. 716, 51 S.Ct. 220, 75 L.Ed. 640, with Hawke v. Smith (No. 1), 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871. See the National Prohibition Cases, State of Rhode Island v. Palmer, 253 U.S. 350, 40 S.Ct. 486, 588, 64 L.Ed. 946; and consider the Court's treatment of the several contentions in Leser v. Garnett, 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505.

This may be, like so many questions of law, a matter of degree. Questions have arisen under the Constitution to which adjudication gives answer although the criteria for decision are less than unwavering bright lines. Often in these cases illumination was found in the federal structures established by, or the underlying presuppositions of, the Constitution. With respect to such questions, the Court has recognized that, concerning a particular power of Congress put in issue, '* * * effective restraints on its exercise must proceed from political rather than from judicial processes.' Wickard v. Filburn, 317 U.S. 111, 120, 63 S.Ct. 82, 87, 87 L.Ed. 122. It is also true that even re-garding the duration of war and the status of Indian tribes, referred to above as subjects ordinarily committed exclu-sively to the nonjudicial branches, the Court has suggested that some limitations exist upon the range within which the decisions of those branches will be permitted to go unre-viewed. See United States v. Sandoval, supra, 231 U.S. at 46, 34 S.Ct. at 5; cf. Chastleton Corp. v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841. But this is merely to ac-knowledge that particular circumstances may differ so greatly in degree as to differ thereby in kind, and that, although within a certain range of cases on a continuum, no standard of distinction can be found to tell between them, other cases will fall above or below the range. The doctrine of political questions, like any other, is not to *284 be applied beyond the limits of its own logic, with all the quiddities and abstract disharmonies it may manifest. See the disposition of contentions based on logically distorting

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
 **(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

views of Colegrove v. Green and Hunter v. Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151, in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110.

2. The Court has been particularly unwilling to interven in matters concerning the structure and organization of the political institutions of the States. The abstention from judicial entry into such areas has been greater even than that which marks the Court's ordinary approach to issues of state power challenged under broad federal guarantees. **747 'We should be very reluctant to decide that we had jurisdiction in such a case, and thus in an action of this nature to supervise and review the political administration of a state government by its own officials and through its own courts. The jurisdiction of this court would only exist in case there had been * * * such a plain and substantial departure from the fundamental principles upon which our government is based that it could with truth and propriety be said that, if the judgment were suffered to remain, the party aggrieved would be deprived of his life, liberty, or property in violation of the provisions of the federal constitution.' Wilson v. North Carolina, 169 U.S. 586, 596, 18 S.Ct. 435, 439, 42 L.Ed. 865. See Taylor and Marshall v. Beckham (No. 1), 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187; Walton v. House of Representatives, 265 U.S. 487, 44 S.Ct. 628, 68 L.Ed. 1115; Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497. Cf. In re Sawyer, 124 U.S. 200, 220-221, 8 S.Ct. 482, 492-493, 31 L.Ed. 402.

Where, however, state law has made particular federal questions determinative of relations within the structure of state government, not in challenge of it, the Court has resolved such narrow, legally defined questions in proper proceedings. See Boyd v. Nebraska ex rel. Thayer, 143 U.S. 135, 12 S.Ct. 375, 36 L.Ed. 103. In such instances there is no conflict between state policy and the exercise of federal judicial *285 power. This distinction explains the decisions in Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795; Koenig v. Flynn, 285 U.S. 375, 52 S.Ct. 403, 76 L.Ed. 805; and Carroll v. Becker, 285 U.S. 380, 52 S.Ct. 402, 76 L.Ed. 807, in which the Court released state constitutional provisions prescribing local lawmaking procedures from misconceived restriction of superior federal requirements. Adjudication of the federal claim involved in those cases was not one demanding the accommodation of conflicting interests for which no readily accessible judicial standards could be found. See McPherson v. Blacker, 146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869, in which, in a case coming here on writ of error from the judgment of a state court which had entertained it on the merits, the Court

treated as justiciable the claim that a State could not constitutionally select its presidential electors by districts, but held that Art. II, s 1, cl. 2, of the Constitution left the mode of choosing electors in the absolute discretion of the States. Cf. Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817; Breedlove v. Suttles, 302 U.S. 277, 58 S.Ct. 205, 82 L.Ed. 252. To read with literalness the abstracted jurisdictional discussion in the McPherson opinion reveals the danger of conceptions of 'justiciability' derived from talk and not from the effective decision in a case. In probing beneath the surface of cases in which the Court has declined to interfere with the actions of political organs of government, of decisive significance is whether in each situation the ultimate decision has been to intervene or not to intervene. Compare the reliance in South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834, on MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3, and the 'jurisdictional' form of the opinion in Wilson v. North Carolina, 169 U.S. 586, 596, 18 S.Ct. 435, 439, 43 L.Ed. 865, supra.

3. The cases involving Negro disfranchisement are no exception to the principle of avoiding federal judicial intervention into matters of state government in the absence of an explicit and clear constitutional imperative. For here the controlling command of Supreme Law is plain and unequivocal. An end of discrimination against *286 the Negro was the compelling motive of the Civil War Amendments. The Fifteenth expresses this in terms, and it is no less true of the Equal Protection Clause of the Fourteenth. Slaughter-House Cases, 16 Wall. 36, 67-72, 21 L.Ed. 394; Strauder v. West Virginia, 100 U.S. 303, 306-307, 25 L.Ed. 664; Nixon v. Herndon, 273 U.S. 536, 541, 47 S.Ct. 446, 447, 71 L.Ed. 759. **748 Thus the Court, in cases involving discrimination against the Negro's right to vote, has recognized not only the action at law for damages,[FN14] but, in appropriate circumstances, the extraordinary remedy of declaratory or injunctive relief.[FN15] Schnell v. Davis, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093; Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152.[FN16] Injunctions in these cases, it should be noted, would not have restrained statewide general elections. Compare Giles v. Harris, 189 U.S. 475, 23 S.Ct. 639, 47 L.Ed. 909.

FN14. E.g., Myers v. Anderson, 238 U.S. 368, 35 S.Ct. 932, 59 L.Ed. 1349; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984; Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987. The action for damages for

82 S.Ct. 691                                                                          Page 52
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

improperly rejecting an elector's vote had been given by the English law since the time of Ashby v. White, 1 Brown's Cases in Parliament 62; 2 Ld.Raym. 938; 3 Ld.Raym. 320, a case which in its own day precipitated an intraparliamentary war of major dimensions. See 6 Hansard, Parliamentary History of England (1810), 225-324, 376-436. Prior to the racial-discrimination cases, this Court had recognized the action, by implication, in dictum in Swafford v. Templeton, 185 U.S. 487, 22 S.Ct. 783, 46 L.Ed. 1005, and Wiley v. Sinkler, 179 U.S. 58, 21 S.Ct. 17, 45 L.Ed. 84, both respecting federal elections.

FN15. Cf. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110.

FN16. By statute an action for preventive relief is now given the United States in certain voting cases. 71 Stat. 637, 42 U.S.C. s 1971(c), 42 U.S.C.A. s 1971(c), amending R.S. s 2004. See United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524; United States v. Thomas, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535.

4. The Court has refused to exercise its jurisdiction to pass on 'abstract questions of political power, of sovereignty, of government.' Massachusetts v. Mellon, 262 U.S. 447, 485, 43 S.Ct. 597, 600, 67 L.Ed. 1078. See Texas v. Interstate Commerce Commission, 258 U.S. 158, 162, 42 S.Ct. 261, 262, 66 L.Ed. 531; New Jersey v. Sargent, 269 U.S. 328, 337, 46 S.Ct. 122, 124, 70 L.Ed. 289. The 'political question' doctrine, in this aspect, reflects the policies underlying the requirement of 'standing': that the litigant who would challenge official*287 action must claim infringement of an interest particular and personal to himself, as distinguished from a cause of dissatisfaction with the general frame and functioning of government-a complaint that the political institutions are awry. See Stearns v. Wood, 236 U.S. 75, 35 S.Ct. 229, 59 L.Ed. 475; Fairchild v. Hughes, 258 U.S. 126, 42 S.Ct. 274, 66 L.Ed. 499; United Public Workers of America (C.I.O.) v. Mitchell, 330 U.S. 75, 89-91, 67 S.Ct. 556, 564-565, 91 L.Ed. 754. What renders cases of this kind non-justiciable is not necessarily the nature of the parties to them, for the Court has resolved other issues between similar parties;FN17 nor is it the nature of the legal question involved, for the same type of question has been adjudicated when presented in other forms of controversy.FN18 The crux of the matter is that courts are not fit instruments of decision where what is essentially at stake is the composition of those large contests of policy traditionally fought out in non-judicial forums, by which governments and the actions of governments are made and unmade. See Texas v. White, 7 Wall. 700, 19 L.Ed. 227; White v. Hart, 13 Wall. 646, 20 L.Ed. 685; Phillips v. Payne, 92 U.S. 130, 23 L.Ed. 649; Marsh v. Burroughs, Fed.Cas.No. 9,112, 1 Woods 463, 471-472 (Bradley, Circuit Justice); cf. Wilson v. Shaw, 204 U.S. 24, 27 S.Ct. 233, 51 L.Ed. 351; but **749 see Coyle v. Smith, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853. Thus, where the Cherokee Nation sought by an original motion to restrain the State of Georgia from the enforcement of laws which assimilated Cherokee territory to the State's counties, abrogated Cherokee law, and abolished Cherokee government, the Court held that such a claim was not judicially cognizable. Cherokee Nation v. Georgia, 5 Pet. 1, 8 L.Ed. 25.FN19 And in Georgia v. Stanton, 6 Wall. 50, 18 L.Ed. 721, *288 the Court dismissed for want of jurisdiction a bill by the State of Georgia seeking to enjoin enforcement of the Reconstruction Acts on the ground that they command by military districts which they established extinguished existing state government and replaced it with a form of government unauthorized by the Constitution.FN20

FN17. Compare Rhode Island v. Massachusetts, 12 Pet. 657, 9 L.Ed. 1233, and cases following, with Georgia v. Stanton, 6 Wall. 50, 18 L.Ed. 721.

FN18. Compare Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483, with Cherokee Nation v. Georgia, 5 Pet. 1, 20, 28 (Mr. Justice Johnson, concurring), 51 and 75, 8 L.Ed. 25 (Mr. Justice Thompson, dissenting).

FN19. This was an alternative ground of Chief Justice Marshall's opinion for the Court. Id., at 20. The question which Marshall reserved as 'unnecessary to decide,' ibid., was not the justiciability of the bill in this aspect, but the 'more doubtful' question whether that 'part of the bill which respects the land occupied by the Indians, and prays the aid of the court to protect their possession,' might be entertained. Ibid. Mr. Justice Johnson, concurring, found the controversy non-justiciable and would have put the ruling solely on this ground, id., at 28, and Mr. Justice Thompson, in dissent, agreed that much of the matter in the bill was not fit for judicial determination. Id., at 51, 75.

FN20. Cf. Mississippi v. Johnson, 4 Wall. 475, 18 L.Ed. 437.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

'That these matters, both as stated in the body of the bill, and, in the prayers for relief, call for the judgment of the court upon political questions, and, upon rights, not of persons or property, but of a political character, will hardly be denied. For the rights for the protection of which our authority is invoked, are the rights of sovereignty, of political jurisdiction, of government, of corporate existence as a State, with all its constitutional powers and privileges. No case of private rights or private property infringed, or in danger of actual or threatened infringement, is presented by the bill, in a judicial form, for the judgment of the court.' Id., at 77.[FN21]

> FN21. Considerations similar to those which determined the Cherokee Nation case and Georgia v. Stanton no doubt explain the celebrated decision in Nabob of the Carnatic v. East India Co., 1 Ves.Jr. *371; 2 Ves.Jr. *56, rather than any attribution of a portion of British sovereignty, in respect of Indian affairs, to the company. The reluctance of the English Judges to involve themselves in contests of factional political power is of ancient standing. In The Duke of York's Claim to the Crown, 5 Rotuli Parl. 375, printed in Wambaugh, Cases on Constitutional Law (1915), 1, the role which the Judges were asked to play appears to have been rather that of advocates than of judges, but the answer which they returned to the Lords relied on reasons equally applicable to either role.

**\*289** 5. The influence of these converging considerations-the caution not to undertake decision where standards meet for judicial judgment are lacking, the reluctance to interfere with matters of state government in the absence of an unquestionable and effectively enforceable mandate, the unwillingness to make courts arbiters of the broad issues of political organization historically committed to other institutions and for whose adjustment the judicial process is illadapted-has been decisive of the settled line of cases, reaching back more than a century, which holds that Art. IV, s 4, of the Constitution, guaranteeing to the States 'a Republican Form of Government,'[FN22] is not enforceable through the courts. E.g., O'Neill v. Leamer, 239 U.S. 244, 36 S.Ct. 54, 60 L.Ed. 249; **\*\*750**Mountain Timber Co. v. Washington, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685; Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913; Highland Farms Dairy, Inc. v. Agnew, 300 U.S. 608, 57 S.Ct. 549, 81 L.Ed. 835.[FN23] Claims resting on this specific **\*290** guarantee of

the Constitution have been held non-justiciable which challenged state distribution of powers between the legislative and judicial branches, Ohio ex rel. Bryant v. Akron Metropolitan Park District, 281 U.S. 74, 50 S.Ct. 228, 74 L.Ed. 710, state delegation of power to municipalities, Kiernan v. Portland, Oregon, 223 U.S. 151, 32 S.Ct. 231, 56 L.Ed. 386, state adoption of the referendum as a legislative institution, Ohio ex rel. Davis v. Hildebrant, 241 U.S. 565, 569, 36 S.Ct. 708, 710, 60 L.Ed. 1172, and state restriction upon the power of state constitutional amendment, Marshall v. Dye, 231 U.S. 250, 256-257, 34 S.Ct. 92, 93-94, 58 L.Ed. 206. The subject was fully considered in Pacific States Telephone & Telegraph Co. v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377, in which the Court dismissed for want of jurisdiction a writ of error attacking a state licensetax statute enacted by the initiative, on the claim that this mode of legislation was inconsistent with a Republican Form of Government and violated the Equal Protection Clause and other federal guarantees. After noting '* * * the ruinous destruction of legislative authority in matters purely political which would necessarily be occasioned by giving sanction **\*291** to the doctrine which underlies and would be necessarily involved in sustaining the propositions contended for,'[FN24] the Court said:

> FN22. 'The United States shall guarantee to every state in this Union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened) against domestic violence.'

> FN23. Cf. the cases holding that the Fourteenth Amendment imposes no such restriction upon the form of a State's governmental organization as will permit persons affected by government action to complain that in its organization principles of separation of powers have been violated. E.g., Dryer v. Illinois, 187 U.S. 71, 23 S.Ct. 28, 47 L.Ed. 79; Soliah v. Heskin, 222 U.S. 522, 32 S.Ct. 103, 56 L.Ed. 294; Houck v. Little River Drainage District, 239 U.S. 254, 36 S.Ct. 58, 60 L.Ed. 266. The same consistent refusal of this Court to find that the Federal Constitution restricts state power to design the structure of state political institutions is reflected in the cases rejecting claims arising out of the States' creation, alteration, or destruction of local subdivisions or their powers, insofar as these claims are made by the subdivisions themselves, see Laramie County Com'rs v. Albany County, 92 U.S. 307, 23 L.Ed.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

552; Pawhuska v. Pawhuska Oil & Gas Co., 250 U.S. 394, 39 S.Ct. 526, 63 L.Ed. 1054; Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937; Risty v. Chicago, R.I. & P.R. Co., 270 U.S. 378, 389-390, 46 S.Ct. 236, 241, 70 L.Ed. 641; Williams v. Mayor and City Council of Baltimore, 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015, or by the whole body of their residents who share only a general, undifferentiated interest in their preservation. See Hunter v. Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151. The policy is also given effect by the denial of 'standing' to persons seeking to challenge state action as infringing the interest of some separate unit within the State's administrative structure-a denial which precludes the arbitrament by federal courts of what are only disputes over the local allocation of government functions and powers. See, e.g., Smith v. Indiana, 191 U.S. 138, 24 S.Ct. 51, 48 L.Ed. 125; Braxton County Court v. West Virginia, 208 U.S. 192, 28 S.Ct. 275, 52 L.Ed. 450; Marshall v. Dye, 231 U.S. 250, 34 S.Ct. 92, 58 L.Ed. 206; Stewart v. Kansas City, 239 U.S. 14, 36 S.Ct. 15, 60 L.Ed. 120.

FN24. 223 U.S., at 141, 32 S.Ct. at 227. '* * * (T)he contention, if held to be sound, would necessarily affect the validity, not only of the particular statute which is before us, but of every other statute passed in Oregon since the adoption of the initiative and referendum. And indeed, the propositions go further than this, since in their essence they assert that there is no governmental function, legislative or judicial, in Oregon, because it cannot be assumed, if the proposition be well founded, that there is, at one and the same time, one and the same government which is republican in form, and not of that character.' Compare Luther v. Borden, 7 How, 1, 38-39, 12 L.Ed. 581:

'* * * For, if this court is authorized to enter upon this inquiry as proposed by the plaintiff, and it should be decided that the charter government had no legal existence during the period of time above mentioned,-if it had been annulled by the adoption of the opposing government,-then the laws passed by its legislature during that time were nullities; its taxes wrongfully collected; its salaries and compensation to its officers illegally paid; its public accounts improperly settled; and

the judgments and sentences of its courts in civil and criminal cases null and void, and the officers who carried their decisions into operation answerable as trespassers, if not in some cases as criminals.

'When the decision of this court might lead to such results, it becomes it duty to examine very carefully its own powers before it undertakes to exercise jurisdiction.'

'* * * (The) essentially political nature (of this claim) is at **751 once made manifest by understanding that the assault which the contention here advanced makes it (sic) not on the tax as a tax, but on the State as a State. It is addressed to the framework and political character of the government by which the statute levying the tax was passed. It is the government, the political entity, which (reducing the case to its essence) is called to the bar of this court, not for the purpose of testing judicially some exercise of power assailed, on the ground that its exertion *292 has injuriously affected the rights of an individual because of repugnancy to some constitutional limitation, but to demand of the State that it establish its right to exist as a State, republican in form.' Id., at 150-151, 32 S.Ct. at 231.

The starting point of the doctrine applied in these cases is, of course, Luther v. Borden, 7 How. 1, 1 2 L.Ed. 581. The case arose out of the Dorr Rebellion in Rhode Island in 1841-1842. Rhode Island, at the time of the separation from England, had not adopted a new constitution but had continued, in its existence as an independent State, under its original royal Charter, with certain statutory alterations. This frame of government provided no means for amendment of the fundamental law; the right of suffrage was to be prescribed by legislation, which limited it to freeholders. In the 1830's, largely because of the growth of towns in which there developed a propertied class whose means were not represented by freehold estates, dissatisfaction arose with the suffrage qualifications of the charter government. In addition, population shifts had caused a dated apportionment of seats in the lower house to yield substantial numerical inequality of political influence, even among qualified voters. The towns felt themselves underrepresented, and agitation began for electoral reform. When the charter government failed to respond, popular meetings of those who favored the broader suffrage were held and delegates elected to a convention which met and drafted a state constitution. This constitution provided for universal manhood suffrage (with certain qualifications); and it was to be adopted by vote of the people at elections

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                                     Page 55
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
 (Cite as: 369 U.S. 186, 82 S.Ct. 691)

at which a similarly expansive franchise obtained. This new scheme of government was ratified at the polls and declared effective by the convention, but the government elected and organized under it, with Dorr at its head, never came to power. The *293 charter government denied the validity of the convention, the constitution and its government and, after an insignificant skirmish, routed Dorr and his followers. It meanwhile provided for the calling of its own convention, which drafted a constitution that went peacefully into effect in 1843.[FN25]

> FN25. See Bowen, The Recent Contest in Rhode Island (1844); Frieze, A Concise History of the Efforts to Obtain an Extension of Suffrage in Rhode Island; From the Year 1811 to 1842 (2d ed. 1842); Mowry, The Dorr War (1901); Wayland, The Affairs of Rhode Island (2d ed. 1842).

**752 Luther v. Borden was a trespass action brought by one of Dorr's supporters in a United States Circuit Court to recover damages for the breaking and entering of his house. The defendants justified under military orders pursuant to martial law declared by the charter government, and plaintiff, by his reply, joined issue on the legality of the charter government subsequent to the adoption of the Dorr constitution. Evidence offered by the plaintiff tending to establish that the Dorr government was the rightful government of Rhode Island was rejected by the Circuit Court; the court charged the jury that the charter government was lawful; and on a verdict for defendants, plaintiff brought a writ of error to this Court.

The Court, through Mr. Chief Justice Taney, affirmed. After noting that the issue of the charter government's legality had been resolved in that government's favor by the state courts of Rhode Island-that the state courts, deeming the matter a political one unfit for judicial determination, had declined to entertain attacks upon the existence and authority of the charter government-the Chief Justice held that the courts of the United States must follow those of the State in this regard. Id., at 39-40. It was recognized that the compulsion to follow *294 state law would not apply in a federal court in the face of a superior command found in the Federal Constitution, ibid., but no such command was found. The Constitution, the Court said-referring to the Guarantee Clause of the Fourth Article-'* * * as far as it has provided for an emergency of this kind, and authorized the general government to interfere in the domestic concerns of a State, has treated the subject as political in its nature, and placed the power in the hands of that department.' Id., at 42.

'Under this article of the Constitution it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal. It is true that the contest in this case did not last long enough to bring the matter to this issue; and as no senators or representatives were elected under the authority of the government of which Mr. Dorr was the head, Congress was not called upon to decide the controversy. Yet the right to decide is placed there, and not in the courts.' Ibid.[FN26]

> FN26. The Court reasoned, with respect to the guarantee against domestic violence also contained in Art. IV, s 4, that this, too, was an authority committed solely to Congress; that Congress had empowered the President, not the courts, to enforce it; and that it was inconceivable that the courts should assume a power to make determinations in the premises which might conflict with those of the Executive. It noted further that, in fact, the President had recognized the governor of the charter government as the lawful authority in Rhode Island, although it had been unnecessary to call out the militia in his support.

*295 In determining this issue non-justiciable, the Court was sensitive to the same considerations to which its later decisions have given the varied applications already discussed. It adverted to the delicacy of judicial intervention into the very structure of government.[FN27] It acknowledged**753 that tradition had long entrusted questions of this nature to non-judicial processes,[FN28] and that judicial processes were unsuited to their decision.[FN29] The absence of guiding standards for judgment was critical, for the question whether the Dorr constitution had been rightfully adopted depended, in part, upon the extent of the franchise to be recognized-the very point of contention over which rebellion had been fought.

> FN27. See note 24, supra.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN28. Id., at 39, 46-47.

FN29. Id., at 41-42.

'* * * (I)f the Circuit Court had entered upon this inquiry, by what rule could it have determined the qualification of voters upon the adoption or rejection of the proposed constitution, unless there was some previous law of the State to guide it? It is the province of a court to expound the law, not to make it. And certainly it is no part of the judicial functions of any court of the United States to prescribe the qualification of voters in a State, giving the right to those to whom it is denied by the written and established constitution and laws of the State, or taking it away from those to whom it is given; nor has it the right to determine what political privileges *296 the citizens of a State are entitled to, unless there is an established constitution or law to govern its decision.' Id., at 41

Mr. Justice Woodbury (who dissented with respect to the effect of martial law) agreed with the Court regarding the inappropriateness of judicial inquiry into the issues:

'But, fortunately for our freedom from political excitements in judicial duties, this court can never with propriety be called on officially to be the umpire in questions merely political. The adjustment of these questions belongs to the people and their political representatives, either in the State or general government. These questions relate to matters not to be settled on strict legal principles. They are adjusted rather by inclination,-or prejudice or compromise, often. Some of them succeed or are defeated even by public policy alone, or mere naked power, rather than intrinsic right. * * *

'Another evil, alarming and little foreseen, involved in regarding these as questions for the final arbitrament of judges would be, that in such an event all political privileges and rights would, in a dispute among the people, depend on our decision finally. * * * (D)isputed points in making constitutions, depending often, as before shown, on policy, inclination, popular resolves, and popular will, * * * if the people, in the distribution of powers under the constitution, should ever think of making judges supreme arbiters in political controversies, when not selected by nor, frequently, amenable to them, nor at liberty to follow such various considerations in their judgments as belong to mere political questions, they will dethrone themselves and lose one of their own invaluable birthrights; building up in this way-slowly, but surely-a new sovereign power in the **297** republic, in most respects irresponsible and un-

changeable for life, and one more dangerous, in theory at least, than the worst elective oligarchy in the worst of times * * *.' Id., at 51-53.[FN30]

FN30. In evaluating the Court's determination not to inquire into the authority of the charter government, it must be remembered that, throughout the country, Dorr 'had received the sympathy of the Democratic press. His cause, therefore, became distinctly a party issue.' 2 Warren, The Supreme Court in United States History (Rev. ed. 1937), 186.

## **754 III.

The present case involves all of the elements that have made the Guarantee Clause cases non-justiciable. It is, in effect, a Guarantee Clause claim masquerading under a different label. But it cannot make the case more fit for judicial action than appellants invoke the Fourteenth Amendment rather than Art. IV, s 4, where, in fact, the gist of their complaint is the same-unless it can be found that the Fourteenth Amendment speaks with greater particularity to their situation. We have been admonished to avoid 'the tyranny of labels.' Snyder v. Massachusetts, 291 U.S. 97, 114, 54 S.Ct. 330, 335, 78 L.Ed. 674. Art. IV, s 4, is not committed by express constitutional terms to Congress. It is the nature of the controversies arising under it, nothing else, which has made it judicially unenforceable. Of course, if a controversy falls within judicial power, it depends 'on how he (the plaintiff) casts his action,' Pan American Petroleum Corp. v. Superior Court, 366 U.S. 656, 662, 81 S.Ct. 1303, 1307, 6 L.Ed.2d 584, whether he brings himself within a jurisdictional statute. But where judicial competence is wanting, it cannot be created by invoking one clause of the Constitution rather than another. When what was essentially a Guarantee Clause claim was sought to be laid, as well, under the Equal Protection Clause in Pacific States Telephone & Telegraph Co. v. Oregon, supra, the Court had no difficulty in 'dispelling**298** any mere confusion resulting from forms of expression, and considering the substance of things * * *.' 223 U.S., at 140, 32 S.Ct. at 227, 56 L.Ed. 377.

Here appellants attack 'the State as a State,' precisely as it was perceived to be attacked in the Pacific States case, id., at 150, 32 S.Ct. at 231. Their complaint is that the basis of representation of the Tennessee Legislature hurts them. They assert that 'a minority now rules in Tennessee,' that the apportionment statute results in a 'distortion of the constitutional system,' that the General Assembly is no

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

longer 'a body representative of the people of the State of Tennessee,' all 'contrary to the basic principle of representative government * * *.' Accepting appellants' own formulation of the issue, one can know this handsaw from a hawk. Such a claim would be non-justiciable not merely under Art. IV, s 4, but under any clause of the Constitution, by virtue of the very fact that a federal court is not a forum for political debate. Massachusetts v. Mellon, supra.

But appellants, of course, do not rest on this claim simpliciter. In invoking the Equal Protection Clause, they assert that the distortion of representative government complained of is produced by systematic discrimination against them, by way of 'a debasement of their votes * * *.' Does this characterization, with due regard for the facts from which it is derived, add anything to appellants' case?[FN31]

> FN31. Appellants also allege discrimination in the legislature's allocation of certain tax burdens and benefits. Whether or not such discrimination would violate the Equal Protection Clause if the tax statutes were challenged in a proper proceeding, see Dane v. Jackson, 256 U.S. 589, 41 S.Ct. 566, 65 L.Ed. 1107; cf. Nashville, C. & St. L.R. Co. v. Wallace, 288 U.S. 249, 268, 53 S.Ct. 345, 350, 77 L.Ed. 730, these recitative allegations do not affect the nature of the controversy which appellants' complaints present.

At first blush, this charge of discrimination based on legislative underrepresentation is given the appearance of *299 a more private, less impersonal claim, than the assertion that the frame of government is askew. Appellants appear as representatives of a class that is prejudiced as a class, in contradistinction to the polity in its entirety. However, the discrimination relied on is the deprivation of what appellants conceive to be their proportionate share of political influence.**755 This, of course, is the practical effect of any allocation of power within the institutions of government. Hardly any distribution of political authority that could be assailed as rendering government nonrepublican would fail similarly to operate to the prejudice of some groups, and to the advantage of others, within the body politic. It would be ingenuous not to see, or consciously blind to deny, that the real battle over the initiative and referendum, or over a delegation of power to local rather than state-wide authority, is the battle between forces whose influence is disparate among the various organs of government to whom power may be given. No shift of power but works a corresponding shift in political influence among the groups composing a society.

What, then, is this question of legislative apportionment? Appellants invoke the right to vote and to have their votes counted.[FN32] But they are permitted to vote and their votes are counted. They go to the polls, they cast their ballots, they send their representatives to the state *300 councils. Their complaint is simply that the representatives are not sufficiently numerous or powerful-in short, that Tennessee has adopted a basis of representation with which they are dissatisfied. Talk of 'debasement' or 'dilution' is circular talk. One cannot speak of 'debasement' or 'dilution' of the value of a vote until there is first defined a standard of reference as to what a vote should be worth. What is actually asked of the Court in this case is to choose among competing bases of representation-ultimately, really, among competing theories of political philosophy-in order to establish an appropriate frame of government for the State of Tennessee and thereby for all the States of the Union.

> FN32. Appellants would find a 'right' to have one's ballot counted on authority of United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341. All that these cases hold is that conspiracies to commit certain sharp election practices which, in a federal election, cause ballots not to receive the weight which the law has in fact given them, may amount to deprivations of the constitutionally secured right to vote for federal officers. But see United States v. Bathgate, 246 U.S. 220, 38 S.Ct. 269, 62 L.Ed. 676. The cases do not so much as suggest that there exists a constitutional limitation upon the relative weight to which the law might properly entitle respective ballots, even in federal elections.

In such a matter, abstract analogies which ignore the facts of history deal in unrealities; they betray reason. This is not a case in which a State has, through a device however oblique and sophisticated, denied Negroes or Jews or redheaded persons a vote, or given them only a third or a sixth of a vote. That was Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. What Tennessee illustrates is an old and still widespread method of representation-representation by local geographical division, only in part respective of population-in preference to others, others, forsooth, more appealing. Appellants contest this choice and seek to make this Court the arbiter of the disa-

greement. They would make the Equal Protection Clause the charter of adjudication, asserting that the equality which it guarantees comports, if not the assurance of equal weight to every voter's vote, at least the basic conception that representation ought to be proportionate to population, a standard by reference to which the reasonableness of apportionment plans may be judged.

To find such a political conception legally enforceable in the broad and unspecific guarantee of equal protection is to rewrite the Constitution. See Luther v. Borden, supra. Certainly, 'equal protection' is no more secure **\*301** a foundation for judicial judgment of the permissibility of varying forms of representative **\*\*756** government than is 'Republican Form.' Indeed since 'equal protection of the laws' can only mean an equality of persons standing in the same relation to whatever governmental action is challenged, the determination whether treatment is equal presupposes a determination concerning the nature of the relationship. This, with respect to apportionment, means an inquiry into the theoretic base of representation in an acceptably republican state. For a court could not determine the equal-protection issue without in fact first determining the Republican-Form issue, simply because what is reasonable for equal-protection purposes will depend upon what frame of government, basically, is allowed. To divorce 'equal protection' from 'Republican Form' is to talk about half a question.

The notion that representation proportioned to the geographic spread of population is so universally accepted as a necessary element of equality between man and man that it must be taken to be the standard of a political equality preserved by the Fourteenth Amendment-that it is, in appellants' words 'the basic principle of representative government'-is, to put it bluntly, not true. However desirable and however desired by some among the great political thinkers and framers of our government, it has never been generally practiced, today or in the past. It was not the English system, it was not the colonial system, it was not the system chosen for the national government by the Constitution, it was not the system exclusively or even predominantly practiced by the States at the time of adoption of the Fourteenth Amendment, it is not predominantly practiced by the States today. Unless judges, the judges of this Court, are to make their private views of political wisdom the measure of the Constitution-views which in all honesty cannot but give the appearance, if not reflect the reality, of **\*302** involvement with the business of partisan politics so inescapably a part of apportionment controversies-the Fourteenth Amendment, 'itself a historical prod-

uct,' Jackman v. Rosenbaum Co., 260 U.S. 22, 31, 43 S.Ct. 9, 10, 67 L.Ed. 107, provides no guide for judicial oversight of the representation problem.

1. Great Britain. Writing in 1958, Professor W. J. M. Mackenzie aptly summarized the British history of the principle of representation proportioned to population: "Equal electoral districts' formed part of the programme of radical reform in England in the 1830s, the only part of that programme which has not been realised.'[FN33] Until the late nineteenth century, the sole base of representation (with certain exceptions not now relevant) was the local geographical unit: each county or borough returned its fixed number of members, usually two for the English units, regardless of population.[FN34] Prior to the Reform Act of 1832, this system was marked by the almost total disfranchisement of the populous northern industrial centers, which had grown to significant size at the advent of the Industrial Revolution and had not been granted borough representation, and by the existence of the rotten borough, playing its substantial part in the Crown's struggle for continued control of the Commons.[FN35] In 1831, ten southernmost English counties, numbering three and a quarter million people, had two hundred and thirty-five parliamentary representatives, while the six northernmost counties, with more than three and a half million people, had sixty-**\*\*757** eight.[FN36] It was said that one hundred and eighty persons appointed three hundred and **\*303** fifty members in the Commons[FN37] Less than a half century earlier, Madison in the Federalist had remarked that half the House was returned by less than six thousand of the eight million people of England and Scotland.[FN38]

FN33. Mackenzie, Free Elections (1958) (hereafter, Mackenzie), 108.

FN34. Ogg, English Government and Politics (2d ed. 1936) (hereafter Ogg), 248-250, 257; Seymour, Electoral Reform in England and Wales (1915) (hereafter, Seymour), 46-47.

FN35. Ogg 257-259; Seymour 45-52; Carpenter, The Development of American Political Thought (1930) (hereafter, Carpenter), 45-46.

FN36. Ogg 258.

FN37. Seymour 51.

FN38. The Federalist, No. 56 (Wright ed. 1961),

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

at 382. Compare Seymour 49. This takes account of the restricted franchise as well as the effect of the localunit apportionment principle.

The Act of 1832, the product of a fierce partisan political struggle and the occasion of charges of gerrymandering not without foundation,[FN39] effected eradication of only the most extreme numerical inequalities of the unreformed system. It did not adopt the principle of representation based on population, but merely disfranchised certain among the rotten borough and enfranchised most of the urban centers-still quite without regard to their relative numbers.[FN40] In the wake of the Act there remained substantial electoral inequality: the boroughs of Cornwall were represented sixteen times as weightily, judged by population, as the county's eastern division; the average ratio of seats to population in ten agricultural counties was four and a half times that in ten manufacturing divisions; Honiton, with about three thousand inhabitants, was equally represented with Liverpool, which had four hundred thousand.[FN41] In 1866 apportionment by population began to be advocated generally in the House, but was not made the basis of the redistribution of 1867, although the act of that year did apportion representation more evenly, gauged by the population standard.[FN42] Population shifts increased the surviving inequalities; by 1884 the representation ratio *304 in many small boroughs was more than twenty times that of Birmingham or Manchester, forty-to-one disparities could be found elsewhere, and, in sum, in the 1870's and 1880's, a fourth of the electorate returned two-thirds of the members of the House.[FN43]

FN39. Seymour 52-76.

FN40. Ogg 264-265; Seymour 318-319.

FN41. For these and other instances of gross inequality, see Seymour 320-325.

FN42. Seymour 333-346; Ogg 265.

FN43. Seymour 349, 490-491.

The first systematic English attempt to distribute seats by population was the Redistribution Act of 1885.[FN44] The statute still left ratios of inequality of as much as seven to one,[FN45] which had increased to fifteen to one by 1912.[FN46] In 1918 Parliament again responded to 'shockingly bad' conditions of inequality,[FN47] and to partisan political inspiration,[FN48] by redistribution.[FN49] In 1944, redistribution

was put on a periodic footing by the House of Commons (Redistribution of Seats) Act of that year,[FN50] which committed a continuing primary responsibility for reapportioning the Commons to administrative agencies (Boundary Commissions for England, Scotland, Wales and Northern Ireland, respectively).[FN51] The Commissions, having**758 regard to certain rules prescribed for their guidance, are to prepare at designated intervals reports for the Home Secretary's submission to Parliament, along with the draft of an Order in Council to give effect to the *305 Commissions' recommendations. The districting rules adopt the basic principle of representation by population, although the principle is significantly modified by directions to respect local geographic boundaries as far as practicable, and by discretion to take account of special geographical conditions, including the size, shape and accessibility of constituencies. Under the original 1944 Act, the rules provided that (subject to the exercise of the discretion respecting special geographical conditions and to regard for the total size of the House of Commons as prescribed by the Act) so far as practicable, the single-member districts should not deviate more than twenty-five percent from the electoral quota (population divided by number of constituencies). However, apparently at the recommendation of the Boundary Commission for England, the twenty-five percent standard was eliminated as too restrictive in 1947, and replaced by the flexible provision that constituencies are to be as near the electoral quota as practicable, a rule which is expressly subordinated both to the consideration of special geographic conditions and to that of preserving local boundaries.[FN52] Free of the twenty-five percent rule, the Commissions drew up plans of distribution in which inequalities among the districts run, in ordinary cases, as high as two to one and, in the case of a few extraordinary constituencies, three to one.[FN53] The action of the Boundary Commission for England was twice challenged in the courts in 1954-the claim being that the Commission had violated statutory rules *306 prescribing the standards for its judgment-and in both cases the Judges declined to intervene. In Hammersmith Borough Council v. Boundary Commission for England,[FN54] Harman, J., was of opinion that the nature of the controversy and the scheme of the Acts made the matter inappropriate for judicial interference, and in Harper v. Home Secretary,[FN55] the Court of Appeal, per Evershed, M.R., quoting Harman, J., with approval, adverting to the wide range of discretion entrusted to the Commission under the Acts, and remarking the delicate character of the parliamentary issues in which it was sought to engage the court, reached the same conclusion.[FN56]

FN44. Seymour 489-518.

FN45. Mackenzie 108; see also Seymour 513-517.

FN46. Ogg 270.

FN47. Ogg 253.

FN48. Ogg 270-271.

FN49. Ogg 273-274.

FN50. 7 & 8 Geo. VI, c. 41. The 1944 Act was amended by the House of Commons (Redistribution of Seats) Act, 1947, 10 & 11 Geo. VI, c. 10, and the two, with other provisions, were consolidated in the House of Commons (Redistribution of Seats) Act, 1949, 12 & 13 Geo. VI, c. 66, since amended by the House of Commons (Redistribution of Seats) Act, 1958, 6 & 7 Eliz. II, c. 26.

FN51. See generally Butler, The Redistribution of Seats, 33 Public Administration 125 (1955).

FN52. See note 50, supra. However, Commissions are given discretion to depart from the strict application of the local boundary rule to avoid excessive disparities between the electorate of a constituency and the electoral quota, or between the electorate of a constituency and that of neighboring constituencies. For detailed discussion, see Craig, Parliament and Boundary Commissions, (1959) Public Law 23. See also Butler, supra, note 51, at 127.

FN53. Mackenzie 108, 113.

FN54. The Times, Dec. 15, 1954, p. 4, cols. 3-4.

FN55. (1955) 1 Ch. 238.

FN56. The court reserved the question whether a judicial remedy might be found in a case in which it appeared that a Commission had manifestly acted in complete disregard of the Acts.

The House of Commons (Redistribution of Seats) Act, 1958,[FN57] made two further amendments to the law. Responsive to the recommendation of the Boundary Com-

mission for England,[FN58] the interval permitted between Commission reports was more than doubled, to a new maximum of fifteen years. [FN59] And at the **759 suggestion of the same Commission that 'It would ease the future labours of the Commission and remove much local irritation if Rule 5 (requiring that the electorate of each constituency be as near the electoral quota as practicable) were to be so amended as to allow us to make recommendations preserving the status quo in any area where such a course appeared to be desirable and not inconsistent *307 with the broad intention of the Rules,'[FN60] the Commissions were directed to consider the inconveniences attendant upon the alteration of constituencies, and the local ties which such alteration might break. The Home Secretary's view of this amendment was that it worked to erect 'a presumption against making changes unless there is a very strong case for them.'[FN61]

FN57. Note 50, supra.

FN58. First Periodical Report of the Boundary Commission for England (Cmd. 9311) (1954), 4, par. 19.

FN59. Under the 1949 Act, see note 50, supra, the intervals between reports were to be not less than three nor more than seven years with certain qualifications. The 1958 Act raised the minimum to ten and the maximum to fifteen years.

FN60. First Periodical Report, supra, note 58, at 4, par. 20.

FN61. 582 H.C.Deb. (5th ser. 1957-1958), 230.

2. The Colonies and the Union. For the guiding political theorists of the Revolutionary generation, the English system of representation, in its most salient aspects of numerical inequality, was a model to be avoided, not followed.[FN62] Nevertheless, the basic English principle of apportioning representatives among the local governmental entities, towns or counties, rather than among units of approximately equal population, had early taken root in the colonies.[FN63] In some, as in Massachusetts and Rhode Island, numbers of electors were taken into account, in a rough fashion, by allotting increasing fixed quotas of representatives to several towns or classes of towns graduated by population, but in most of the colonies delegates were allowed to the local units without respect to numbers.[FN64] This resulted in grossly unequal electoral units.[FN65] The representation ratio in one North Carolina county was

more than eight times that in another.[FN66] Moreover, American rotten boroughs had appeared,[FN67] and apportionment was made an instrument first in the political*308 struggles between the King or the royal governors and the colonial legislatures,[FN68] and, later, between the older tidewater regions in the colonies and the growing interior.[FN69] Madison in the Philadelphia Convention adverted to the 'inequality of the Representation in the Legislatures of particular States, * * *'[FN70] arguing that it was necessary to confer on Congress the power ultimately to regulate the times, places and manner of selecting Representatives,[FN71] in order to forestall the overrepresented counties' securing themselves a similar overrepresentation in the national councils. The example of South Carolina, where Charleston's overrepresentation was a continuing bone of contention between the tidewater and the back country, was cited by Madison in the Virginia Convention and by King in the Massachusetts Convention, in support of the same power, and King also spoke of the extreme numerical inequality arising from Connecticut's town-representation system.[FN72]

> FN62. See The Federalistic, No. 56, supra, note 38; Tudor, Life of James Otis (1823), 188-190.

> FN63. Griffith, The Rise and Development of the Gerrymander (1907) (hereafter, Griffith), 23-24.

> FN64. Luce, Legislative Principles (1930) (hereafter, Luce), 336-342.

> FN65. Griffith 25.

> FN66. Griffith 15-16, n. 1.

> FN67. Griffith 28.

> FN68. Carpenter 48-49, 54; Griffith 26, 28-29; Luce 339-340.

> FN69. Carpenter 87; Griffith 26-29, 31.

> FN70. II Farrand, Records of the Federal Convention (1911), 241.

> FN71. The power was provided. Art. I, s 4, cl. 1.

> FN72. III Elliot's Debates (2d ed. 1891), 367; II id., at 50-51.

Such inequalities survived the constitutional period. The United States Constitution itself did not largely adopt the principle of numbers. Apportionment of the national legislature among the States was one of the most difficult **760 problems for the Convention;[FN73] its solution-involving State representation in the Senate[FN74] and the three-fifths compromise in the House[FN75] left neither chamber apportioned proportionately to population. *309 Within the States, electoral power continued to be allotted to favor the tidewater.[FN76] Jefferson, in his Notes on Virginia, recorded the 'very unequal' representation there: individual counties differing in population by a ratio of more than seventeen to one elected the same number of representatives, and those nineteen thousand of Virginia's fifty thousand men who lived between the falls of the rivers and the seacoast returned half the State's senators and almost half its delegates.[FN77] In South Carolina in 1790, the three lower districts, with a white population of less than twenty-nine thousand elected twenty senators and seventy assembly members; while in the uplands more than one hundred and eleven thousand white persons elected seventeen senators and fifty-four assemblymen.[FN78]

> FN73. See Madison, in I Farrand, op. cit., supra, note 70, at 321: 'The great difficulty lies in the affair of Representation; and if this could be adjusted, all others would be surmountable.'

> FN74. See The Federalist, No. 62 (Wright ed. 1961), at 408-409.

> FN75. See The Federalist, No. 54, id., at 369-374.

> FN76. Carpenter 130.

> FN77. Jefferson, Notes on the State of Virginia (Peden ed. 1955), 118-119. See also II Writings of Thomas Jefferson (Memorial ed. 1903), 160-162.

> FN78. Carpenter 139-140.

In the early nineteenth century, the demands of the interior became more insistent. The apportionment quarrel in Virginia was a major factor in precipitating the calling of a constitutional convention in 1829. Bitter animosities racked the convention, threatening the State with disunion. At last a compromise which gave the three hundred and twenty thousand people of the west thirteen senators, as against the nineteen senators returned by the three hundred

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

sixty-three thousand people of the east, commanded agreement. It was adopted at the polls but left the western counties so dissatisfied that there were threats of revolt and realignment with the State of Maryland.[FN79]

FN79. Griffith 102-104.

Maryland, however, had her own numerical disproportions. In 1820, one representative vote in Calvert County *310 was worth five in Frederick County, and almost two hundred thousand people were represented by eighteen members, while fifty thousand others elected twenty.[FN80] This was the result of the county-representation system of allotment. And, except for Massachusetts which, after a long struggle, did adopt representation by population at the mid-century, a similar town-representation principle continued to prevail in various forms throughout New England, with all its attendant, often gross inequalities.[FN81]

FN80. Griffith 104-105.

FN81. Luce 343-350. Bowen, supra, note 25, at 17-18, records that in 1824 Providence County, having three-fifths of Rhode Island's population, elected only twenty-two of its seventy-two representatives, and that the town of Providence, more than double the size of Newport, had half Newport's number of representatives.

3. The States at the time of ratification of the Fourteenth Amendment, and those later admitted. The several state conventions throughout the first half of the nineteenth century were the scenes of fierce sectional and party strifes respecting the geographic allocation of representation.[FN82] Their product was a wide variety of apportionment methods which recognized the element of population in differing ways and degrees. Particularly**761 pertinent to appraisal of the contention that the Fourteenth Amendment embodied a standard limiting the freedom of the States with regard to the principles and bases of local legislative apportionment is an examination of the apportionment provisions of the thirty-three States which ratified the Amendment between 1866 and 1870, at their respective times of ratification. These may be considered in two groups: (A) the ratifying States other than the ten Southern States whose constitutions, at the time of ratification or shortly thereafter, were the work of the Reconstruction Act conventions;[FN83] and *311 (B) the ten Reconstruction-Act States. All thirty-three are significant, because they demonstrate how unfounded is the assumption that the ratifying States could have agreed on a standard apportionment

theory or practice, and how baseless the suggestion that by voting for the Equal Protection Clause they sought to establish a test mold for apportionment which-if appellants' argument is sound-struck down sub silentio not a few of their own state constitutional provisions. But the constitutions of the ten Reconstruction-Act States have an added importance, for it is scarcely to be thought that the Congress which was so solicitous for the adoption of the Fourteenth Amendment as to make the readmission of the late rebel States to Congress turn on their respective ratifications of it, would have approved constitutions which-again, under appellants' theory-contemporaneously offended the Amendment.

FN82. Carpenter 130-137; Luce 364-367; Griffith 116-117.

FN83. See 14 Stat. 428; 15 Stat. 2, 14, 41.

A. Of the twenty-three ratifying States of the first group, seven or eight had constitutions which demanded or allowed apportionment of both houses on the basis of population,[FN84] unqualifiedly or with only qualifications respecting the preservation of local boundaries.[FN85] Three *312 more apportioned on what was essentially a population base, but provided that in one house counties having a specified fraction of a ratio-a moiety or two-thirds-should have a representative.[FN86] Since each of these three States limited the size of their chambers, the **762 fractional rule could operate-and, at least in Michigan, has in fact operated[FN87]-to produce substantial numerical inequalities *313 in favor of the sparsely populated counties.[FN88] Iowa favored her small counties by the rule that no more than four counties might be combined in a representative district,[FN89] and New York and Kansas compromised population and county-representation principles by assuring every county, regardless of the number of its inhabitants, at least one seat in their respective Houses.[FN90]

FN84. Various indices of population were employed among the States which took account of the factor of numbers. Some counted all inhabitants, e.g., N.J.Const.1844, Art. IV, s 3; some, only white inhabitants, e.g., Ill.Const.1848, Art. III, s 8; some, male inhabitants over twenty-one, e.g., Ind.Const.1851, Art. IV, ss 4-5; some, qualified voters, e.g., Tenn.Const.1834, Art. II, ss 4 to 6; some excluded aliens, e.g., N.Y.Const.1846, Art. III, ss 4, 5 (and untaxed persons of color); some excluded untaxed Indians and military personnel, e.g., Neb.Const.1866-1867, Art. II, s 3.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

For present purposes these differences, although not unimportant as revealing fundamental divergences in representation theory, will be disregarded.

FN85. Ore.Const.1857, Art. IV, ss 5, 6, 7; Ill. Const.1848, Art. III, ss 8, 9; Ind.Const.1851, Art. IV, ss 4, 5, 6; Minn.Const.1857, Art. IV, s 2; Wis.Const.1848, Art. IV, ss 3 to 5; Mass.Const.1780, Amends. XXI, XXII; Neb.Const.1866-1867, Art. II, s 3. All of these but Minnesota made provision for periodic reapportionment. Nevada's Constitution of 1864, Art. XV, s 13, provided that the federal censuses and interim state decennial enumerations should serve as the bases of representation for both houses, but did not expressly require either numerical equality or reapportionment at fixed intervals.

Several of these constitutions contain provisions which forbid splitting counties or which otherwise require recognition of local boundaries. See, e.g., the severe restriction in Ill.Const.1848, Art. III, s 9. Such provisions will almost inevitably produce numerical inequalities. See, for example, University of Oklahoma, Bureau of Government Research, Legislative Apportionment in Oklahoma (1956), 21-23. However, because their effect in this regard will turn on idiosyncratic local factors, and because other constitutional provisions are a more significant source of inequality, these provisions are here disregarded.

FN86. Tenn.Const.1834, Art. II, ss 4 to 6 (two-thirds of a ratio entitles a county to one representative in the House); W.Va.Const.1861-1863, Art. IV, ss 4, 5, 7, 8, 9 (one-half of a ratio entitles a county to one representative in the House); Mich.Const.1850, Art. IV, ss 2 to 4 (one-half of a ratio entitles each county thereafter organized to one representative in the House). In Oregon and Iowa a major-fraction rule applied which gave a House seat not only to counties having a moiety of a single ratio, but to all counties having more than half a ratio in excess of the multiple of a tio. Ore.Const.1857, Art. IV, s 6, note 85, supra; Iowa Const.1857, Art. III, ss 33, 34, 35, 37, note 89, infra.

FN87. See Bone, States Attempting to Comply with Reapportionment Requirements, 17 Law & Contemp.Prob. 387, 391 (1952).

FN88. It also appears, although the section is not altogether clear, that the provisions of West Virginia's Constitution controlling apportionment of senators would operate in favor of the State's less populous regions by limiting any single county to a maximum of two senators. W.Va.Const.1861-1863, Art. IV, s 4.

FN89. Iowa Const.1857, Art. III, ss 33, 34, 35, 37.

FN90. N.Y.Const.1846, Art. III, ss 4, 5 (except Hamilton County); Kan.Const.1859, Art. 2, s 2; Art. 10. The Kansas provisions require periodic apportionment based on censuses, but do not in terms demand equal districts.

Ohio and Maine recognized the factor of numbers by a different device. The former gave a House representative to each county having half a ratio, two representatives for a ratio and three-quarters, three representatives for three ratios, and a single additional representative for each additional ratio. [FN91] The latter, after apportioning among counties on a population base, gave each town of fifteen hundred inhabitants one representative, each town of three thousand, seven hundred and fifty inhabitants two representatives, and so on in increasing intervals to twenty-six thousand, two hundred and fifty inhabitants-towns of that size or larger receiving the maximum permitted number of representatives: seven.[FN92] The departure from numerical equality under these systems is apparent: in Maine, assuming the incidence of towns in *314 all categories, representative values would differ by factors of two and a half to one, at a minimum. Similarly, Missouri gave each of its counties, however small, one representative, two representatives for three ratios, three representatives for six ratios, and one additional representative for each three ratios above six.[FN93] New Hampshire allotted a representative to each town of one hundred and fifty ratable male polls of voting age and one more representative for each increment of three hundred above that figure;[FN94] its Senate was not apportioned by population but among districts based on the proportion of direct taxes paid.[FN95] In Pennsylvania, the basis of apportionment in both houses was taxable inhabitants; and in the House every county of **763 at least thirty-five hundred taxables had a representative, nor could more than three counties be joined in forming a representative district; while in the Senate no city or county could have more than four of the State's

82 S.Ct. 691                                                          Page 64
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

twenty-five to thirty-three senators.[FN96]

FN91. Ohio Const.1851, Art. XI, ss 1 to 5. See Art. XI, ss 6 to 9 for Senate apportionment.

FN92. Me.Const.1819, Art. IV, Pt. First, ss 2, 3. See Art. IV, Pt. Second, s 2, for Senate apportionment based on numbers.

FN93. Mo.Const.1865, Art. IV, ss 2, 7, 8. See Art. IV, ss 4 to 8 for Senate apportionment based on numbers.

FN94. Towns smaller than one hundred and fifty, if so situated that it was 'very inconvenient' to join them to other towns for voting purposes, might be permitted by the legislature to send a representative.

FN95. N.H.Const.1792, Pt. Second, ss IV to XI; Pt. Second, s XXVI.

FN96. Pa.Const.1838, as amended, Art. I, ss 4, 6, 7.

Finally, four States apportioned at least one House with no regard whatever to population. In Connecticut[FN97] and Vermont[FN98] representation in the House was on a town basis; Rhode Island gave one senator to each of its towns or cities,[FN99] and New Jersey, one to each of its counties.[FN100] *315 Nor, in any of these States, was the other House apportioned on a strict principle of equal numbers: Connecticut gave each of its counties a minimum of two senators[FN101] and Vermont, one;[FN102] New Jersey assured each county a representative;[FN103] and in Rhode Island, which gave at least one representative to each town or city, no town or city could have more than one-sixth of the total number in the House.[FN104]

FN97. Conn.Const.1818, Art. Third, s 3.

FN98. Vt.Const.1793, c. II, s 7.

FN99. R.I.Const.1842, Art. VI, s 1.

FN100. N.J.Const.1844, Art. IV, s 2, cl. 1.

FN101. Conn.Const.1818, Amend. II.

FN102. Vt.Const.1793, Amend. 23.

FN103. N.J.Const.1844, Art. IV, s 3, cl. 1.

FN104. R.I.Const.1842, Art. V, s 1.

B. Among the ten late Confederate States affected by the Reconstruction Acts, in only four did it appear that apportionment of both state legislative houses would or might be based strictly on population.[FN105] In North Carolina,[FN106] South Carolina,[FN107] Louisiana,[FN108] and Alabama,[FN109] each county (in the case of Louisiana, each parish) was assured at least one seat in the lower House irrespective of numbers-a distribution which exhausted, respectively, *316 on the basis of the number of then-existing counties, three-quarters, one-quarter, two-fifths and three-fifths of the maximum possible number of representatives, before a single seat was available for assignment on a population basis; and in South Carolina, moreover, the Senate was composed of one member elected from each county, except that Charleston sent two.[FN110] In Florida's House, each county had one seat guaranteed and an additional seat for every thousand registered voters up to a maximum of four representatives;[FN111] while Georgia, whose Senate seats were distributed among forty-four single-member districts each composed of three contiguous counties,[FN112] assigned representation in its House as follows: three seats to each **764 of the six most populous counties, two to each of the thirty-one next most populous, one to each of the remaining ninety-five.[FN113] As might be expected, the one-representative-per-county minimum pattern has proved incompatible with numerical equality,[FN114] and Georgia's *317 county-clustering system has produced representative-ratio disparities, between the largest and smallest counties, of more than sixty to one.[FN115]

FN105. Ark.Const.1868, Art. V, ss 8, 9; Va.Const.1864, Art. IV, s 6 (this constitution was in effect when Virginia ratified the Fourteenth Amendment); Va.Const.1870, Art. V, s 4 (this was Virginia's Reconstruction-Act convention constitution); Miss.Const.1868, Art. IV, ss 33 to 35; Tex.Const.1868, Art. III, ss 11, 34. The Virginia Constitutions and Texas' provisions for apportioning its lower chamber do not in terms require equality of numbers, although they call for reapportionment following a census. In Arkansas, the legislature was authorized, but not commanded, to reapportion periodically; it is not clear that equality was required.

FN106. N.C.Const.1868, Art. II, ss 6, 7. See Art. II, s 5, for Senate apportionment based on numbers.

FN107. S.C.Const.1868, Art. I, s 34; Art. II, ss 4 to 6.

FN108. La.Const.1868, Tit. II, Arts. 20, 21. See Tit. II, Arts. 28 to 30, for Senate apportionment based on numbers.

FN109. Ala.Const.1867, Art. VIII, s 1. See Art. VIII, s 3, for Senate apportionment based on numbers.

FN110. S.C.Const.1868, Art. II, s 8.

FN111. Fla.Const.1868, Art. XIV, par. 1. See Art. XIV, par. 2, for Senate apportionment.

FN112. Ga.Const.1868, Art. III, s 2. The extent of legislative authority to alter these districts is unclear, but it appears that the structure of three contiguous counties for each of forty-four districts is meant to be permanent.

FN113. Ga.Const.1868, Art. III, s 3. The extent of legislative authority to alter the apportionment is unclear, but it appears that the three-tiered structure is meant to be permanent.

FN114. See, e.g., Durfee, Apportionment of Representation in the Legislature: A Study of State Constitutions, 43 Mich.L.Rev. 1091, 1097 (1945); Short, States That Have Not Met Their Constitutional Requirements, 17 Law & Contemp.Prob. 377 (1952); Harvey, Reapportionments of State Legislatures-Legal Requirements, 17 Law & Contemp.Prob. 364, 370 (1952). For an excellent case study of numerical inequalities deriving solely from a one-member-per-county minimum provision in Ohio, see Aumann, Rural Ohio Hangs On, 46 Nat.Mun.Rev. 189, 191-192 (1957).

FN115. Dauer and Kelsay, Unrepresentative States, 44 Nat.Mun.Rev. 571, 574 (1955). (This is the effect of a later Georgia constitutional provision, Ga.Const.1945, s 2-1501, art. 3, s 3, par. 1, substantially similar to that of 1868.) The same

three-tiered system has subsequently been adopted in Florida, Fla.Const.1885, Art. VII, ss 3, 4, where its effects have been inequalities of the order of eighty to one. Dauer and Kelsay, supra, at 575, 587.

C. The constitutions[FN116] of the thirteen States which Congress admitted to the Union after the ratification of the Fourteenth Amendment showed a similar pattern. Six of them required or permitted apportionment of both Houses by population, subject only to qualifications concerning local boundaries.[FN117] Wyoming, apportioning by population, guaranteed to each of its counties at least one seat in each House,[FN118] and Idaho, which prescribed (after the first legislative session) that apportionment should be 'as may be provided by law,' gave each county at least one representative.[FN119] In Oklahoma, House members were apportioned among counties so as to give one **318 seat for half a ratio, two for a ratio and three-quarters, and one for each additional ratio up to a maximum of seven representatives per county.[FN120] Montana required reapportionment of its House on the basis of periodic enumerations according to ratios to be fixed by law[FN121] but its counties were represented as counties in the Senate, each county having one senator.[FN122] Alaska[FN123] and **765 Hawaii[FN124] each apportioned a number of senators among constitutionally fixed districts; their respective Houses were to be periodically reapportioned by population, subject to a moiety rule in Alaska[FN125] and to Hawaii's guarantee of one representative to each of four constitutionally designated areas.[FN126] The Arizona Constitution assigned representation to each county in each house, giving one or two senators and from one to seven representatives to each, and making no provision for reapportionment.[FN127]

FN116. The constitutions discussed are those under which the new States entered the Union.

FN117. Colo.Const.1876, Art. V, ss 45, 47; N.D.Const.1889, Art. 2, ss 29, 35; S.D.Const.1889, Art. III s 5; Wash.Const.1889, Art. II, ss 3, 6; Utah Const.1895, Art. IX, ss 2, 4; N.M.Const.1911, Art. IV, following s 41. The Colorado and Utah Constitutions provide for reapportionment 'according to ratios to be fixed by law' after periodic census and enumeration. In New Mexico the legislature is authorized, but not commanded, to reapportion periodically. North Dakota does not in terms demand equality in House representation; members are to be assigned among the several senatorial districts, which are

of equal population.

FN118. Wyo.Const.1889, Art. III, Legislative Department, s 3; Art. III, Apportionment, ss 2, 3.

FN119. Idaho Const.1889, Art. III, s 4.

FN120. Okl.Const.1907, Art. V, s 10(b) to (j). See Art. V, ss 9(a), 9(b) for Senate apportionment based on numbers.

FN121. Mont.Const.1889, Art. VI, ss 2, 3.

FN122. Mont.Const.1889, Art. V, s 4; Art. VI, s 4. The effective provisions are, first, that there shall be no more than one senator from each county, and, second, that no senatorial district shall consist of more than one county.

FN123. Alaska Const.1956, Art. VI, s 7; Art. XIV, s 2. The exact boundaries of the districts may be modified to conform to changes in House districts, but their numbers of senators and their approximate perimeters are to be preserved.

FN124. Hawaii Const.1950, Art. III, s 2.

FN125. Alaska Const.1956, Art. VI, ss 3, 4, 6. The method of equal proportions is used.

FN126. Hawaii Const.1950, Art. III, s 4. The method of equal proportions is used, and, for sub-apportionment within the four 'basic' areas, a form of moiety rule obtains.

FN127. Ariz.Const.1910, Art. IV, Pt. 2, s 1, A.R.S. On the basis of 1910 census figures, this apportionment yielded, for example, a senatorial-ratio differential of more than four to one between Mohave and Cochise or between Mohave and Maricopa Counties. II Thirteenth Census of the United States (1910), 71-73.

*319 4. Contemporary apportionment. Detailed recent studies are available to describe the present-day constitutional and statutory status of apportionment in the fifty States.[FN128] They demonstrate a decided twentieth-century trend away from population as the exclusive base of representation. Today, only a dozen state constitutions provide for periodic legislative reapportionment of both

houses by a substantially unqualified application of the population standard,[FN129] and only about a dozen more prescribe such reapportionment for even a single chamber. 'Specific provision for county representation in at least one house of the state legislature has been increasingly adopted since the end of the 19th century. * * *'[FN130] More than twenty States now guarantee each county at least one seat in one of their houses regardless of population, and in nine others county or town units are given equal representation in one legislative branch, whatever the number of each unit's inhabitants. Of course, numerically considered, 'These provisions invariably result in over-representation of the least populated areas. * * *'[FN131] And in an effort to curb and political dominance of metropolitan regions, at least ten States now limit the maximum entitlement of any single county (or, in some cases, city) *320 in one legislative house-another source of substantial numerical disproportion.[FN132]

FN128. The pertinent state constitutional provisions are set forth in tabular form in XIII Book of the States (1960-1961), 54-58; and Greenfield, Ford and Emery, Legislative Reapportionment: California in National Perspective (University of California, Berkeley, 1959), 81-85. An earlier treatment now outdated in several respects but still useful is Durfee, supra, note 114. See discussions in Harvey, supra, note 114; Shull, Political and Partisan Implications of State Legislative Apportionment, 17 Law & Contemp.Prob. 417, 418-421 (1952).

FN129. Nebraska's unicameral legislature is included in this count.

FN130. Greenfield, Ford and Emery, supra, note 128, at 7.

FN131. Harvey, supra, note 114, at 367. See Tabor, The Gerrymandering of State and Federal Legislative Districts, 16 Md.L.Rev. 277, 282-283 (1956).

FN132. See, e.g., Mather and Ray, The Iowa Senatorial Districts Can Be Reapportioned-A Possible Plan, 39 Iowa L.Rev. 535, 536-537 (1954).

Moreover, it is common knowledge that the legislatures have not kept reapportionment up to date, even where state constitutions in terms require it.[FN133] In particular, the

82 S.Ct. 691                                                                    Page 67
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

pattern of according greater**766** per capita representation to rural, relatively sparsely populated areas-the same pattern which finds expression in various state constitutional provisions, [FN134] and which has been given effect in England and elsewhere [FN135]-has, in some of the States, been made the law by legislative inaction in the face of *321 population shifts.[FN136] Throughout the country, urban and suburban areas tend to be given higher representation ratios than do rural areas.[FN137]

[FN133.] See, e.g., Walter, Reapportionment and Urban Representation, 195 Annals of the American Academy of Political and Social Science 11, 12-13 (1938); Bone, supra, note 87. Legislative inaction and state constitutional provisions rejecting the principle of equal numbers have both contributed to the generally prevailing numerical inequality of representation in this country. Compare Walter, supra, with Baker One Vote, One Value, 47 Nat.Mun.Rev. 16, 18 (1958).

[FN134.] See, e.g., Griffith 116-117; Luce 364-367, 370; Merriam, American Political Ideas (1929), 244-245; Legislation, Apportionment of the New York State Senate, 31 St. John's L.Rev. 335, 341-342 (1957).

[FN135.] In 1947, the Boundary Commission for England, '* * * impressed by the advantages of accessibility (that large compact urban regions) * * * enjoy over widely scattered rural areas * * * came to the conclusion that they could conveniently support electorates in excess of the electoral quota, and would in the majority of cases prefer to do so rather than suffer severance of local unity for parliamentary purposes'-that 'in general urban constituencies could more conveniently support large electorates than rural constituencies * * *.' Initial Report of the Boundary Commission for England (Cmd. 7260) (1947), 5. See also Mackenzie 110-111; De Grazia, General Theory of Apportionment, 17 Law & Contemp.Prob. 256, 261-262 (1952).

[FN136.] See Walter, supra, note 133; Walter, Reapportionment of State Legislative Districts, 37 Ill.L.Rev. 20, 37-38 (1942). The urban-rural conflict is often the core of apportionment controversy. See Durfee, supra, note 114, at 1093-1094; Short, supra, note 114, at 381.

[FN137.] Baker, Rural Versus Urban Political Power (1955), 11-19; MacNeil, Urban Representation in State Legislatures, 18 State Government 59 (1945); United States Conference of Mayors, Government Of the People, By the People, For the People (ca. 1947).

The stark fact is that if among the numerous widely varying principles and practices that control state legislative apportionment today there is any generally prevailing feature, that feature is geographic inequality in relation to the population standard.[FN138] Examples could be endlessly multiplied. In New Jersey, counties of *322 thirty-five thousand and of more than nine hundred and five thousand inhabitants respectively each have a single senator.[FN139] Representative districts**767 in Minnesota range from 7,290 inhabitants to 107,246 inhabitants.[FN140] Rations of senatorial representation in California vary as much as two hundred and ninety-seven to one.[FN141] In Oklahoma, the range is ten to one for House constituencies and roughly sixteen to one for Senate constituencies.[FN142] Colebrook, Connecticut-population 592-elects two House representatives; Hartford-population 177,397-also elects two.[FN143] The first, third and fifth of these examples are the products of constitutional provisions which subordinate population to regional considerations in apportionment; the second is the result of legislative inaction; the fourth derives from both constitutional and legislative sources. A survey made in 1955, in sum, reveals that less than thirty percent of the population inhabit districts sufficient to elect a House majority in thirteen States and a Senate majority in nineteen States.[FN144] These figures show more than individual variations from a generally accepted standard of electoral equality. They show there is not-as there has never been-a standard by *323 which the place of equality as a factor in apportionment can be measured.

[FN138.] See, in addition to the authorities cited in notes 130, 131, 136 and 137, supra, and 140 to 144, infra, (all containing other examples than those remarked in text), Hurst, The Growth of American Law, The Law Makers (1950), 41-42; American Political Science Assn., Committee on American Legislatures, American State Legislatures (Zeller ed. 1954) 34-35; Gosnell, Democracy, The Threshold of Freedom (1948), 179-181; Lewis, Legislative Apportionment and the Federal Courts, 71 Harv.L.Rev. 1057, 1059-1064 (1958); Friedman, Reapportionment Myth, 49 Nat.Civ.Rev. 184, 185-186 (1960); 106 Cong.Rec. 14901-14916 (remarks of Senator

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                                 Page 68
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

Clark and supporting materials); H.R.Rep. No. 2533, 85th Cong., 2d Sess. 24; H.R.Dec. No. 198, 84th Cong., 1st Sess. 38-40; Hadwiger, Representation in the Missouri General Assembly, 24 Mo.L.Rev. 178, 180-181 (1959); Hamilton, Beardsley and Coats, Legislative Reapportionment in Indiana: Some observations and a Suggestion, 35 Notre Dame Law, 368-370 (1960); Corter, Pennsylvania Ponders Apportionment, 32 Temple L.Q. 279, 283-288 (1959). Concerning the classical gerrymander, see Griffith, passim; Luce 395-404; Brooks, Political Parties and Electoral Problems (3d ed. 1933), 472-481. For foreign examples of numerical disproportion, see Hogan, Election and Representation (1945), 95; Finer, Theory and Practice of Modern Government (Rev. ed. 1949), 551-552.

FN139. Baker, supra, note 137, at 11. Recent New Jersey legislation provides for reapportionment of the State's lower House by executive action following each United States census subsequent to that of 1960. N.J.Laws 1961, c. 1, N.J.S.A. 52:10-3 et seq. The apportionment is to be made on the basis of population, save that each county is assured at least one House seat. In the State's Senate, however, by constitutional command, each county elects a single senator, regardless of population. N.J.Const.1947, Art. IV, s II, par. 1, N.J.S.A.

FN140. Note, 42 Minn.L.Rev. 617, 618-619 (1958).

FN141. Greenfield, Ford and Emery, supra, note 128, at 3.

FN142. University of Oklahoma, Bureau of Government Research, The Apportionment Problem in Oklahoma (1959), 16-29.

FN143. 1 Labor's Economic Rev. 89, 96 (1956).

FN144. Dauer and Kelsay, Unrepresentative States, 44 Nat.Mun.Rev. 571, 572, 574 (1955).

Manifestly, the Equal Protection Clause supplies no clearer guide for judicial examination of apportionment methods than would the Guarantee Clause itself. Apportionment, by its character, is a subject of extraordinary complexity, involving-even after the fundamental theoretical issues concerning what is to be represented in a representative legislature have been fought out or compromised-considerations of geography, demography, electoral convenience, economic and social cohesions or divergencies among particular local groups, communications, the practical effects of political institutions like the lobby and the city machine, ancient traditions and ties of settled usage, respect for proven incumbents of long experience and senior status, mathematical mechanics, censuses compiling relevant data, and a host of others.[FN145] *324 Legislative responses**768 throughout the country to the reapportionment demands of the 1960 Census have glaringly confirmed that these are not factors that lend themselves to evaluations of a nature that are the staple of judicial determinations or for which judges are equipped to adjudicate by legal training or experience or native wit. And this is the more so true because in every strand of this complicated, intricate web of values meet the contending forces of partisan politics.[FN146] The practical significance of apportionment is that the next election results may differ because of it. Apportionment battles are overwhelmingly party or intra-party contests.[FN147] It will add a virulent source of friction and tension in federal-state relations to embroil the federal judiciary in them.[FN148]

FN145. See the Second Schedule to the House of Commons (Redistribution of Seats) Act, 1949, 12 & 13 Geo. VI, c. 66, as amended by the House of Commons (Redistribution of Seats) Act, 1958, 6 & 7 Eliz. II, c. 26, s 2, and the English experience described in text at notes 50 to 61, supra. See also the Report of the Assembly Interim Committee on Elections and Reapportionment, California Assembly (1951) (hereafter, California Committee Report), 37: 'The geographic-the socio-economic-the desires of the people-the desires of the elected officeholders-the desires of political parties-all these can and do legitimately operate not only within the framework of the 'relatively equal in population districts' factor, but also within the factors of contiguity and compactness. The county and Assembly line legal restrictions operate outside the framework of theoretically 'equal in population districts.' All the factors might conceivably have the same weight in one situation; in another, some factors might be considerably more important than others in making the final determination.' A Virginia legislative committee adverted to '* * * many difficulties such as natural topographical barriers, divergent business and social interests, lack of

communication by rail or highway, and disinclinations of communities to breaking up political ties of long standing, resulting in some cases of districts requesting to remain with populations more than their averages rather than have their equal representation with the changed conditions.' Report of the Joint Committee on the Re-apportionment of the State into Senatorial and House Districts, Virginia General Assembly, House of Delegates, H.Doc. No. 9 (1922), 1-2. And the Tennessee State Planning Commission, concerning the problem of congressional redistricting in 1950, spoke of a 'tradition (which) relates to the sense of belonging-loyalties to groups and items of common interest with friends and fellow citizens of like circumstance, environment or region.' Tennessee State Planning Commission, Pub. No. 222, Redistricting for Congress (1950), first page.

FN146. See, e.g., California Committee Report, at 52.

'* * * (T)he reapportionment process is, by its very nature, political * * *. There will be politics in reapportionment as long as a representative form of government exists * * *.

'It is impossible to draw a district boundary line without that line's having some political significance * * *.'

FN147. See, e.g., Celler, Congressional Apportionment-Past, Present, and Future, 17 Law & Contemp.Prob. 268 (1952), speaking of the history of congressional apportionment:

'* * * A mere reading of the debates (from the Constitutional Convention down to contemporary Congresses) on this question of apportionment reveals the conflicting interests of the large and small states and the extent to which partisan politics permeates the entire problem.'

FN148. See Standards for Congressional Districts (Apportionment), Hearings before Subcommittee No. 2 of the Committee on the Judiciary, House of Representatives, 86th Cong., 1st Sess. 23, concerning a proposed provision for judicial enforcement of certain standards in the laying out of districts:

'Mr. KASEM. You do not think that that (a provision embodying the language: 'in as compact form as practicable') might result in a decision depending upon the political inclinations of the judge?

'Mr. CELLER. Are you impugning the integrity of our Federal judiciary?

'Mr. KASEM. No; I just recognize their human frailties.'

For an instance of a court torn, in fact or fancy, over the political issues involved in reapportionment, see State ex rel. Lashly v. Becker, 290 Mo. 560, 235 S.W. 1017, and especially the dissenting opinion of Higbee, J., 290 Mo., at 613, 235 S.W., at 1037.

**\*325 IV.**

Appellants, however, contend that the federal courts may provide the standard which the Fourteenth Amendment lacks by reference to the provisions of the constitution of Tennessee. The argument is that although the same or greater disparities of electoral strength may be suffered to exist immune from federal judicial review in States where they result from apportionment legislation consistent with state constitutions, the Tennessee Legislature may not abridge the rights which, on its face, its own constitution appears to give, without by that act denying equal protection of the laws. It is said that the law of Tennessee, as expressed by the words of its written constitution, has made the basic choice among policies in favor of representation proportioned to population, and that it is no longer open to the State to allot its voting power on other principles.

This reasoning does not bear analysis. Like claims invoking state constitutional requirement have been rejected here and for good reason. It is settled that whatever federal consequences may derive from a discrimination worked by a state **\*\*769** statute must be the same as if the same discrimination were written into the **\*326** State's fundamental law. Nashville, C. & St. L.R. Co. v. Browning, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254. And see Castillo v. McConnico, 168 U.S. 674, 18 S.Ct. 229, 42 L.Ed. 622; Coulter v. Louisville & N.R. Co., 196 U.S. 599, 608-609, 25 S.Ct. 342, 344-345, 49 L.Ed. 615; Owensboro Water-

works Co. v. Owensboro, 200 U.S. 38, 26 S.Ct. 249, 50 L.Ed. 361; Hebert v. Louisiana, 272 U.S. 312, 316-317, 47 S.Ct. 103, 104, 71 L.Ed. 270; Snowden v. Hughes, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497.   Appellants complain of a practice which, by their own allegations, has been the law of Tennessee for sixty years.  They allege that the Apportionment Act of 1901 created unequal districts when passed and still maintains unequal districts. They allege that the Legislature has since 1901 purposefully retained unequal districts. And the Supreme Court of Tennessee has refused to invalidate the law establishing these unequal districts.   Kidd v. McCanless, 200 Tenn. 273, 292 S.W.2d 40; appeal dismissed here in 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157. In these circumstances, what was said in the Browning case, supra, at 369, 60 S.Ct. at 972, clearly governs this case:

'* * * Here, according to petitioner's own claim, all the organs of the state are conforming to a practice, systematic, unbroken for more than forty years, and now questioned for the first time. It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice cannot supplant constitutional guarantees, but it can establish what is state law. The equal protection clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text. * * * (T) he equal protection clause is not a command of candor.' * * *'

*327 Tennessee's law and its policy respecting apportionment are what 60 years of practice show them to be, not what appellants cull from the unenforced and, according to its own judiciary, unenforceable words of its Constitution. The statute comes here on the same footing, therefore, as would the apportionment laws of New Jersey, California or Connecticut,[FN149] and is unaffected by its supposed repugnance to the state constitutional language on which appellants rely.[FN150]

FN149. See text at notes 139-143, supra.

FN150. Decisions of state courts which have entertained apportionment cases under their respective state constitutions do not, of course, involve the very different considerations relevant to federal judicial intervention. State-court adjudication does not involve the delicate problems of feder-

al-state relations which would inhere in the exercise of federal judicial power to impose restrictions upon the States' shaping of their own governmental institutions. Moreover, state constitutions generally speak with a specificity totally lacking in attempted utilization of the generalities of the Fourteenth Amendment to apportionment matters. Some expressly commit apportionment to state judicial review, see, e.g., N.Y.Const.1938, Art. III, s 5, and even where they do not, they do precisely fix the criteria for judicial judgment respecting the allocation of representative strength within the electorate. See, e.g., Asbury Park Press, Inc. v. Woolley, 33 N.J. 1, 161 A.2d 705.

In another aspect, however, the Kidd v. McCanless case, supra, introduces a factor peculiar to this litigation, which only emphasizes the duty of declining the exercise of federal judicial jurisdiction. In all of the apportionment cases which have come before the Court, a consideration which has been weighty in determining their non-justiciability **770 has been the difficulty or impossibility of devising effective judicial remedies in this class of case. An injunction restraining a general election unless the legislature reapportions would paralyze the critical centers of a State's political system and threaten political dislocation whose consequences are not foreseeable. A declaration devoid *328 of implied compulsion of injunctive or other relief would be an idle threat.[FN151] Surely a Federal District Court could not itself remap the State: the same complexities which impede effective judicial review of apportionment a fortiori make impossible a court's consideration of these imponderables as an original matter. And the choice of elections at large as opposed to elections by district, however unequal the districts, is a matter of sweeping political judgment having enormous political implications, the nature and reach of which are certainly beyond the informed understanding of, and capacity for appraisal by, courts.

FN151. Appellants' suggestion that, although no relief may need be given, jurisdiction ought to be retained as a 'spur' to legislative action does not merit discussion.

In Tennessee, moreover, the McCanless case has closed off several among even these unsatisfactory and dangerous modes of relief. That case was a suit in the state courts attacking the 1901 Reapportionment Act and seeking a declaration and an injunction of the Act's enforcement or,

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

alternatively, a writ of mandamus compelling state election officials to hold the elections at large, or, again alternatively, a decree of the court reapportioning the State. The Chancellor denied all coercive relief, but entertained the suit for the purpose of rendering a declaratory judgment. It was his view that despite an invalidation of the statute under which the present legislature was elected, that body would continue to possess de facto authority to reapportion, and that therefore the maintaining of the suit did not threaten the disruption of the government. The Tennessee Supreme Court agreed that no coercive relief could be granted; in particular, it said, 'There is no provision of law for election of our General Assembly by an election at large over the State.' 200 Tenn., at 277, 292 S.W.2d, at 42. Thus, a legislature elected at *329 large would not be the legally constituted legislative authority of the State. The court reversed, however, the Chancellor's determination to give declaratory relief, holding that the ground of demurrer which asserted that a striking down of the statute would disrupt the orderly process of government should have been sustained:

'(4) It seems obvious and we therefore hold that if the Act of 1901 is to be declared unconstitutional, then the de facto doctrine cannot be applied to maintain the present members of the General Assembly in office. If the Chancellor is correct in holding that this statute has expired by the passage of the decade following its enactment then for the same reason all prior apportionment acts have expired by a like lapse of time and are nonexistent. Therefore we would not only not have any existing members of the General Assembly but we would have no apportionment act whatever under which a new election could be held for the election of members to the General Assembly.

'The ultimate result of holding this Act unconstitutional by reason of the lapse of time would be to deprive us of the present Legislature and the means of electing a new one and ultimately bring about the destruction of the State itself.' 200 Tenn., at 281-282, 292 S.W.2d, at 44.

A federal court enforcing the Federal Constitution is not, to be sure, bound by the remedial doctrines of the state courts. But it must consider as pertinent to the propriety or impropriety of exercising **771 its jurisdiction those state-law effects of its decree which it cannot itself control. A federal court cannot provide the authority requisite to make a legislature the proper governing body of the State of Tennessee. And it cannot be doubted that the striking*330 down of the statute here challenged on equal protection grounds, no less than on grounds of failure to

reapportion decennially, would deprive the State of all valid apportionment legislation and-under the ruling in McCanless-deprive the State of an effective law-based legislative branch. Just such considerations, among others here present, were determinative in Luther v. Borden and the Oregon initiative cases. [FN152]

    FN152. See note 24, supra.

Although the District Court had jurisdiction in the very restricted sense of power to determine whether it could adjudicate the claim, the case is of that class of political controversy which, by the nature of its subject, is unfit for federal judicial action. The judgment of the District Court, in dismissing the complaint for failure to state a claim on which relief can be granted, should therefore be affirmed.

Dissenting opinion of Mr. Justice HARLAN, whom Mr. Justice FRANKFURTER joins.

The dissenting opinion of Mr. Justice FRANKFURTER, in which I join, demonstrates the abrupt departure the majority makes from judicial history by putting the federal courts into this area of state concerns-an area which, in this instance, the Tennessee state courts themselves have refused to enter.

It does not detract from his opinion to say that the panorama of judicial history it unfolds, though evincing a steadfast underlying principle of keeping the federal courts out of these domains, has a tendency, because of variants in expression, to becloud analysis in a given case. With due respect to the majority, I think that has happened here.

Once one cuts through the thicket of discussion devoted to 'jurisdiction,' 'standing,' 'justiciability,' and 'political*331 question,' there emerges a straightforward issue which, in my view, is determinative of this case. Does the complaint disclose a violation of a federal constitutional right, in other words, a claim over which a United States District Court would have jurisdiction under 28 U.S.C. s 1343(3), 28 U.S.C.A. s 1343(3) and 42 U.S.C. s 1983, 42 U.S.C.A. s 1983? The majority opinion does not actually discuss this basic question, but, as one concurring Justice observes, seems to decide it 'sub silentio.' 369 U.S., p. 261, 82 S.Ct., p. 733. However, in my opinion, appellants' allegations, accepting all of them as true, do not, parsed down or as a whole, show an infringement by Tennessee of any rights assured by the Fourteenth Amendment. Accordingly, I believe the complaint should have been dismissed for 'failure to state a claim upon which relief can be

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

granted.' Fed.Rules Civ.Proc., Rule 12(b)(6), 28 U.S.C.A.

It is at once essential to recognize this case for what it is. The issue here relates not to a method of state electoral apportionment by which seats in the federal House of Representatives are allocated, but solely to the right of a State to fix the basis of representation in its own legislature. Until it is first decided to what extent that right is limited by the Federal Constitution, and whether what Tennessee has done or failed to do in this instance runs afoul of any such limitation, we need not reach the issues of 'justiciability' or 'political question' or any of the other considerations which in such cases as Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, led the Court to decline to adjudicate a challenge to a state apportionment affecting seats in the federal House of Representatives, in the absence of a controlling Act of Congress. See also Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131.

**772 The appellants' claim in this case ultimately rests entirely on the Equal Protection Clause of the Fourteenth Amendment. It is asserted that Tennessee has violated the Equal Protection Clause by maintaining in effect a *332 system of apportionment that grossly favors in legislative representation the rural sections of the State as against its urban communities. Stripped to its essentials the complaint purports to set forth three constitutional claims of varying breadth:

(1) The Equal Protection Clause requires that each vote cast in state legislative elections be given approximately equal weight.

(2) Short of this, the existing apportionment of state legislators is so unreasonable as to amount to an arbitrary and capricious act of classification on the part of the Tennessee Legislature, which is offensive to the Equal Protection Clause.

(3) In any event, the existing apportionment is rendered invalid under the Fourteenth Amendment because it flies in the face of the Tennessee Constitution. For reasons given in Mr. Justice FRANKFURTER'S opinion, 369 U.S., pp. 325-327, 82 S.Ct., pp. 768-769, the last of these propositions is manifestly untenable, and need not be dealt with further. I turn to the other two.

I.

I can find nothing in the Equal Protection Clause or else-

where in the Federal Constitution which expressly or impliedly supports the view that state legislatures must be so structured as to reflect with approximate equality the voice of every voter. Not only is that proposition refuted by history, as shown by my Brother FRANKFURTER, but it strikes deep into the heart of our federal system. Its acceptance would require us to turn our backs on the regard which this Court has always shown for the judgment of state legislatures and courts on matters of basically local concern.

*333 In the last analysis, what lies at the core of this controversy is a difference of opinion as to the function of representative government. It is surely beyond argument that those who have the responsibility for devising a system of representation may permissibly consider that factors other than bare numbers should be taken into account. The existence of the United States Senate is proof enough of that. To consider that we may ignore the Tennessee Legislature's judgment in this instance because that body was the product of an asymmetrical electoral apportionment would in effect be to assume the very conclusion here disputed. Hence we must accept the present form of the Tennessee Legislature as the embodiment of the State's choice, or, more realistically, its compromise, between competing political philosophies. The federal courts have not been empowered by the Equal Protection Clause to judge whether this resolution of the State's internal political conflict is desirable or undesirable, wise or unwise.

With respect to state tax statutes and regulatory measures, for example, it has been said that the 'day is gone when this Court uses the * * * Fourteenth Amendment to strike down state laws * * * because they may be unwise, improvident, or out of harmony with a particular school of thought.' Williamson v. Lee Optical Co., 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563. I would think it all the more compelling for us to follow this principle of self-restraint when what is involved is the freedom of a State to deal with so intimate a concern as the structure of its own legislative branch. The Federal Constitution imposes no limitation on the form which a state government may take other than generally committing to the United States the duty to guarantee to every State 'a Republican Form of Government.' And, as my Brother FRANKFURTER so conclusively proves (ante, 369 U.S., pp. 308-317, 82 S.Ct., pp. 759-764), no intention to fix immutably the *334 means of selecting representatives for state governments could have been in the minds of either the founders or the draftsmen of the Fourteenth Amendment.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
 **(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

**\*\*773** In short, there is nothing in the Federal Constitution to prevent a State, acting not irrationally, from choosing any electoral legislative structure it thinks best suited to the interests, temper, and customs of its people. I would have thought this proposition settled by MacDougall v. Green, 335 U.S. 281, at p. 283, 69 S.Ct. 1, at p. 2, 93 L.Ed. 3, in which the Court observed that to 'assume that political power is a function exclusively of numbers is to disregard the practicalities of government,' and reaffirmed by South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834. A State's choice to distribute electoral strength among geographical units, rather than according to a census of population, is certainly no less a rational decision of policy than would be its choice to levy a tax on property rather than a tax on income. Both are legislative judgments entitled to equal respect from this Court.

II.

The claim that Tennessee's system of apportionment is so unreasonable as to amount to a capricious classification of voting strength stands up no better under dispassionate analysis.

The Court has said time and again that the Equal Protection Clause does not demand of state enactments either mathematical identity or rigid equality. E.g., Allied Stores of Ohio, Inc., v. Bowers, 358 U.S. 522, 527-528, 79 S.Ct. 437, 440, 441, 3 L.Ed.2d 480, and authorities there cited; McGowan v. State of Maryland, 366 U.S. 420, 425-426, 81 S.Ct. 1101, 1104, 1105, 6 L.Ed.2d 393. All that is prohibited is 'invidious discrimination' bearing no rational relation to any permissible policy of the State. Williamson v. Lee Optical Co., supra, 348 U.S. at 489, 75 S.Ct. 461, 99 L.Ed. 563. And in deciding whether such discrimination has been practiced by a State, it must be borne in mind that a 'statutory discrimination will not be set aside if any state of facts reasonably may be conceived\*335 to justify it.' McGowan v. Maryland, supra. It is not inequality alone that calls for a holding of unconstitutionality; only if the inequality is based on an impermissible standard may this Court condemn it.

What then is the basis for the claim made in this case that the distribution of state senators and representatives is the product of capriciousness or of some constitutionally prohibited policy? It is not that Tennessee has arranged its electoral districts with a deliberate purpose to dilute the voting strength of one race, cf. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, or that some reli-

gious group is intentionally underrepresented. Nor is it a charge that the legislature has indulged in sheer caprice by allotting representatives to each county on the basis of a throw of the dice, or of some other determinant bearing no rational relation to the question of apportionment. Rather, the claim is that the State Legislature has unreasonably retained substantially the same allocation of senators and representatives as was established by statute in 1901, refusing to recognize the great shift in the population balance between urban and rural communities that has occurred in the meantime.

It is further alleged that even as of 1901 the apportionment was invalid, in that it did not allocate state legislators among the counties in accordance with the formula set out in Art. II, s 5, of the Tennessee Constitution. In support of this the appellants have furnished a Table which indicates that as of 1901 six counties were overrepresented and 11 were underrepresented. But that Table in fact shows nothing in the way of significant discrepancy; in the instance of each county it is only one representative who is either lacking or added. And it is further perfectly evident that the variations are attributable to nothing more than the circumstance that the then enumeration of voters resulted in fractional remainders with respect to which the precise formula of the Tennessee **\*\*774** Constitution was in some **\*336** instances slightly disregarded. Unless such de minimis departures are to be deemed of significance, these statistics certainly provide no substantiation for the charge that the 1901 apportionment was arbitrary and capricious. Indeed, they show the contrary.

Thus reduced to its essentials, the charge of arbitrariness and capriciousness rests entirely on the consistent refusal of the Tennessee Legislature over the past 60 years to alter a pattern of apportionment that was reasonable when conceived.

A Federal District Court is asked to say that the passage of time has rendered the 1901 apportionment obsolete to the point where its continuance becomes vulnerable under the Fourteenth Amendment. But is not this matter one that involves a classic legislative judgment? Surely it lies within the province of a state legislature to conclude that an existing allocation of senators and representatives constitutes a desirable balance of geographical and demographical representation, or that in the interest of stability of government it would be best to defer for some further time the redistribution of seats in the state legislature.

Indeed, I would hardly think it unconstitutional if a state

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

82 S.Ct. 691                                                    Page 74
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

legislature's expressed reason for establishing or maintaining an electoral imbalance between its rural and urban population were to protect the State's agricultural interests from the sheer weight of numbers of those residing in its cities. A State may, after all, take account of the interests of its rural population in the distribution of tax burdens, e.g., American Sugar Rfg. Co. v. State of Louisiana, 179 U.S. 89, 21 S.Ct. 43, 45 L.Ed. 102, and recognition of the special problems of agricultural interests has repeatedly been reflected in federal legislation, e.g., Capper-Volstead Act, 42 Stat. 388, 7 U.S.C.A. ss 291, 292; Agricultural Adjustment Act of 1938, 52 Stat. 31, 7 U.S.C.A. s 601 et seq. Even the exemption of agricultural activities from state criminal statutes of otherwise general application has not been deemed offensive to the Equal Protection Clause. **\*337** Tigner v. State of Texas, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124. Does the Fourteenth Amendment impose a stricter limitation upon a State's apportionment of political representatives to its central government? I think not. These are matters of local policy, on the wisdom of which the federal judiciary is neither permitted nor qualified to sit in judgment.

The suggestion of my Brother FRANKFURTER that courts lack standards by which to decide such cases as this, is relevant not only to the question of 'justiciability,' but also, and perhaps more fundamentally, to the determination whether any cognizable constitutional claim has been asserted in this case. Courts are unable to decide when it is that an apportionment originally valid becomes void because the factors entering into such a decision are basically matters appropriate only for legislative judgment. And so long as there exists a possible rational legislative policy for retaining an existing apportionment, such a legislative decision cannot be said to breach the bulwark against arbitrariness and caprice that the Fourteenth Amendment affords. Certainly, with all due respect, the facile arithmetical argument contained in Part II of my Brother CLARK's separate opinion (369 U.S., pp. 253-258, 82 S.Ct. pp. 729-732) provides no tenable basis for considering that there has been such a breach in this instance. (See the Appendix to this opinion.)

These conclusions can hardly be escaped by suggesting that capricious state action might be found were it to appear that a majority of the Tennessee legislators, in refusing to consider reapportionment, had been actuated by self-interest in perpetuating their own political offices or by other unworthy or improper motives. Since Fletcher v. Peck, 6 Cranch 87, 3 L.Ed. 162, was decided many years ago, it has repeatedly been pointed out that it is not the

business of the federal**\*\*775** courts to inquire into the personal motives of legislators. E.g., State of Arizona v. State of California, 283 U.S. 423, 455 & n. 7, 51 S.Ct. 522, 526, 75 L.Ed. 1154. The function of the federal judiciary ends in **\*338** matters of this kind once it appears, as I think it does here on the undisputed facts, that the state action complained of could have rested on some rational basis. (See the Appendix to this opinion.)

It is my view that the majority opinion has failed to point to any recognizable constitutional claim alleged in this complaint. Indeed, it is interesting to note that my Brother STEWART is at pains to disclaim for himself, and to point out that the majority opinion does not suggest, that the Federal Constitution requires of the States any particular kind of electoral apportionment, still less that they must accord to each voter approximately equal voting strength. Concurring opinion, 369 U.S., p. 265, 82 S.Ct., pp. 736, 737. But that being so, what, may it be asked, is left of this complaint? Surely the bare allegations that the existing Tennessee apportionment is 'incorrect,' 'arbitrary,' 'obsolete' and 'unconstitutional'-amounting to nothing more than legal conclusions-do not themselves save the complaint from dismissal. See Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253. Nor do those allegations shift to the appellees the burden of proving the constitutionality of this state statute; as is so correctly emphasized by my Brother STEWART (369 U.S., p. 266, 82 S.Ct., p. 737), this Court has consistently held in cases arising under the Equal Protection Clause that "the burden of establishing the unconstitutionality of a statute rests on him who assails it.' Metropolitan Casualty Ins. Co. of New York v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070.' (Emphasis added.) Moreover, the appellants do not suggest that they could show at a trial anything beyond the matters previously discussed in this opinion, which add up to nothing in the way of a supportable constitutional challenge against this statute. And finally, the majority's failure to come to grips with the question whether the complaint states a claim cognizable under the Federal Constitution-an issue necessarily presented by appellees' motion to dismiss-**\*339** does not of course furnish any ground for permitting this action to go to trial.

From a reading of the majority and concurring opinions one will not find it difficult to catch the premises that underlie this decision. The fact that the appellants have been unable to obtain political redress of their asserted grievances appears to be regarded as a matter which should lead the Court to stretch to find some basis for judicial inter-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

vention. While the Equal Protection Clause is invoked, the opinion for the Court notably eschews explaining how, consonant with past decisions, the undisputed facts in this case can be considered to show a violation of that constitutional provision. The majority seems to have accepted the argument, pressed at the bar, that if this Court merely asserts authority in this field, Tennessee and other 'malapportioning' States will quickly respond with appropriate political action, so that this Court need not be greatly concerned about the federal courts becoming further involved in these matters. At the same time the majority has wholly failed to reckon with what the future may hold in store if this optimistic prediction is not fulfilled. Thus, what the Court is doing reflects more an adventure in judicial experimentation than a solid piece of constitutional adjudication. Whether dismissal of this case should have been for want of jurisdiction or, as is suggested in Bell v. Hood, 327 U.S. 678, 682-683, 66 S.Ct. 773, 776, 777, 90 L.Ed. 939, for failure of the complaint to state a claim upon which relief could be granted, the judgment of the District Court was correct.

In conclusion, it is appropriate to say that one need not agree, as a citizen, with what Tennessee has done or failed to do, **776 in order to deprecate, as a judge, what the majority is doing today. Those observers of the Court who see it primarily as the last refuge for the correction of all inequality or injustice, no matter what its nature or source, will no doubt applaud this decision and its break *340 with the past. Those who consider that continuing national respect for the Court's authority depends in large measure upon its wise exercise of self-restraint and discipline in constitutional adjudication, will view the decision with deep concern.

I would affirm.

APPENDIX TO OPINION OF MR. JUSTICE HARLAN.

THE INADEQUACY OF ARITHMETICAL FORMU-
LAS AS MEASURES OF THE RATIONALITY OF-
TENNESSEE'S APPORTIONMENT.

Two of the three separate concurring opinions appear to concede that the Equal Protection Clause does not guarantee to each state voter a vote of approximately equal weight for the State Legislature. Whether the existing Tennessee apportionment is constitutional is recognized to depend only on whether it can find 'any possible justification in rationality' (369 U.S., p. 265, 82 S.Ct., p. 736); it is to be struck down only if 'the discrimination here does not

fit any pattern' (369 U.S., p. 258, 82 S.Ct., p. 732).

One of the concurring opinions, that of my Brother STEWART, suggests no reasons which would justify a finding that the present distribution of state legislators is unconstitutionally arbitrary. The same is true of the majority opinion. My Brother CLARK, on the other hand, concludes that 'the apportionment picture in Tennessee is a topsy-turvical of gigantic proportions' (369 U.S., p. 254, 82 S.Ct., p. 730), solely on the basis of certain statistics presented in the text of his separate opinion and included in a more extensive Table appended thereto. In my view, that analysis is defective not only because the 'total representation' formula set out in footnote 7 of the opinion (369 U.S., p. 255, 82 S.Ct., pp. 730, 731), rests on faulty mathematical foundations, but, more basically, because the approach taken wholly *341 ignores all other factors justifying a legislative determination of the sort involved in devising a proper apportionment for a State Legislature.

In failing to take any of such other matters into account and in focusing on a particular mathematical formula which, as will be shown, is patently unsound, my Brother CLARK'S opinion has, I submit, unwittingly served to bring into basrelief the very reasons that support the view that this complaint does not state a claim on which relief could be granted. For in order to warrant holding a state electoral apportionment invalid under the Equal Protection Clause, a court, in line with well-established constitutional doctrine, must find that none of the permissible policies and none of the possible formulas on which it might have been based could rationally justify particular inequalities.

I.

At the outset, it cannot be denied that the apportionment rules explicitly set out in the Tennessee Constitution are rational. These rules are based on the following obviously permissible policy determinations: (1) to utilize counties as electoral units; (2) to prohibit the division of any county in the composition of electoral districts; (3) to allot to each county that has a substantial voting population-at least two-thirds of the average voting population per county-a separate 'direct representative'; (4) to create 'floterial' districts (multicounty representative districts) made up of more than one county; and (5) to require that such districts be composed of adjoining counties.[FN1] Such a framework unavoidably **777 *342 leads to unreliable arithmetic inequalities under any mathematical formula whereby the counties' 'total representation' is sought to be measured. It particularly results in egregiously deceptive disparities if

the formula proposed in my Brother CLARKS'S opinion is applied.

> FN1. The relevant provisions of the Tennessee Constitution are Art. II, ss 5 and 6:

> 'Sec. 5. Apportionment of representatives.-The number of Representatives shall, at the several periods of making the enumeration, be apportioned among the several counties or districts, according to the number of qualified voters in each; and shall not exceed seventy-five, until the population of the State shall be one million and a half, and shall never exceed ninety-nine; Provided that any county having two-thirds of the ratio shall be entitled to one member.

> 'Sec. 6. Apportionment of senators.-The number of Senators shall, at the several periods of making the enumeration, be apportioned among the several counties or districts according to the number of qualified electors in each, and shall not exceed one-third the number of representatives. In apportioning the Senators among the different counties, the fraction that may be lost by any county or counties, in the apportionment of members to the House of Representatives, shall be made up to such county or counties in the Senate, as near as may be practicable. When a district is composed of two or more counties, they shall be adjoining; and no counties shall be divided in forming a district.'

That formula computes a county's 'total representation' by adding (1) the number of 'direct representatives' the county is entitled to elect; (2) a fraction of any other seats in the Tennessee House which are allocated to that county jointly with one or more others in a 'floterial district'; (3) triple the number of senators the county is entitled to elect alone; and (4) triple a fraction of any seats in the Tennessee Senate which are allocated to that county jointly with one or more others in a multicounty senatorial district. The fractions used for items (2) and (4) are computed by allotting to each county in a combined district an equal share of the House or Senate seat, regardless of the voting population of each of the counties that make up the election district.[FN2]

> FN2. This formula is not clearly spelled out in the opinion, but it is necessarily inferred from the figures that are presented. Knox County, for example, is said to have a 'total representation' of

7.25. It elects (1) three direct representatives (value 3.00); (2) one representative from a two-county district (value .50); (3) one direct senator (value 3.00); and (4) one senator in a four-county district (value .75). See Appendix to opinion of MR. JUSTICE CLARK, 369 U.S., pp. 262-264, 82 S.Ct., pp. 734-736.

**\*343** This formula is patently deficient in that it eliminates from consideration the relative voting power of the counties that are joined together in a single election district. As a result, the formula unrealistically assigns to Moore County one-third of a senator, in addition to its direct representative (369 U.S., p. 255, 82 S.Ct., p. 730), although it must be obvious that Moore's voting strength in the Eighteenth Senatorial District is almost negligible. Since Moore County could cast only 2,340 votes of a total eligible vote of 30,478 in the senatorial district, it should in truth be considered as represented by one-fifteenth of a senator. Assuming, arguendo, that any 'total representation' figure is of significance, Moore's 'total representation' should be 1.23, not 2.[FN3]

> FN3. If this 'adjusted' formula for measuring 'total representation' is applied to the other 'horribles' cited in the concurring opinion (369 U.S., p. 255, 82 S.Ct., pp. 730, 731), it reveals that these counties-which purportedly have equal 'total representation' but distinctly unequal voting population-do not have the same 'total representation' at all. Rather than having the same representation as Rutherford County, Moore County has only about 40% of what Rutherford has. Decatur County has only 55% of the representation of Carter County. While Loudon and Anderson Counties are substantially underrepresented, this is because of their proximity to Knox County, which outweighs their votes in the Sixth Senatorial District and in the Eighth Floterial District.

The formula suggested by my Brother CLARK must be adjusted regardless whether one thinks, as I assuredly do not, that the Federal Constitution requires that each vote be given equal weight. The correction is necessary simply to reflect the real facts of political life. It may, of course, be true that the floterial representative's 'function **\*344** is to represent the whole district' (369 U.S., p. 256, **\*\*778** 82 S.Ct., p. 731). But can it be gainsaid that so long as elections within the district are decided not by a county-unit system, in which each county casts one vote, but by adding the total number of individual votes cast for each candi-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

date, the concern of the elected representatives will primarily be with the most populous counties in the district?

## II.

I do not mean to suggest that any mathematical formula, albeit an 'adjusted' one, would be a proper touchstone to measure the rationality of the present or of appellants' proposed apportionment plan. For, as the Table appended to my Brother CLARK'S opinion so conclusively shows, whether one applies the formula he suggests or one that is adjusted to reflect proportional voting strength within an election district, no plan of apportionment consistent with the principal policies of the Tennessee Constitution could provide proportionately equal 'total representation' for each of Tennessee's 95 counties.

The pattern suggested by the appellants in Exhibits 'A' and 'B' attached to their complaint is said to be a 'fair distribution' which accords with the Tennessee Constitution, and under which each of the election districts represents approximately equal voting population. But even when tested by the 'adjusted' formula, the plan reveals gross 'total representation' disparities that would make it appear to be a 'crazy quilt.' For example, Loudon County, with twice the voting population of Humphreys County would have less representation than Humphreys, and about one-third the representation of Warren County, which has only 73 more voters. Among the more populous counties, similar discrepancies would appear. Although Anderson County has only somewhat over 10% more voters than Blount County, it would have **\*345** approximately 75% more representation. And Blount would have approximately two-thirds the representation of Montgomery County, which has about 13% less voters.[FN4]

FN4. These disparities are as serious, if not more so, when my Brother CLARK'S formula is applied to the appellants' proposal. For example, if the seven counties chosen by him as illustrative are examined as they would be represented under the appellants' distribution, Moore County, with a voting population of 2,340, is given more electoral strength than Decatur County, with a voting population of 5,563. Carter County (voting population 23,302) has 20% more 'total representation' that Anderson County (voting population 33,990), and 33% more than Rutherford County (voting population 25,316).

## III.

The fault with a purely statistical approach to the case at hand lies not with the particular mathematical formula used, but in the failure to take account of the fact that a multitude of legitimate legislative policies, along with circumstances of geography and demography, could account for the seeming electoral disparities among counties. The principles set out in the Tennessee Constitution are just some of those that were deemed significant. Others may have been considered and accepted by those entrusted with the responsibility for Tennessee's apportionment. And for the purposes of judging constitutionality under the Equal Protection Clause it must be remembered that what is controlling on the issue of 'rationality' is not what the State Legislature may actually have considered but what it may be deemed to have considered.

For example, in the list of 'horribles' cited by my Brother CLARK (369 U.S., p. 255, 82 S.Ct., p. 730), all the 'underrepresented' counties are semiurban: all contain municipalities of over 10,000 population.[FN5] This is not to say, however, that the **\*346** presence of any such municipality within a county necessarily demands that its proportional representation be reduced in order to render it consistent with an 'urban versus rural'**\*\*779** plan of apportionment. Other considerations may intervene and outweigh the Legislature's desire to distribute seats so as to achieve a proper balance between urban and rural interests. The size of a county, in terms of its total area, may be a factor.[FN6] Or the location within a county of some major industry may be thought to call for dilution of voting strength.[FN7] Again, the combination of certain smaller counties with their more heavily populated neighbors in senatorial or 'floterial' districts may result in apparent arithmetic inequalities.[FN8]

FN5. Murfreesboro, Rutherford County (pop. 16,017); Elizabethton, Carter County (pop. 10,754); Oak Ridge, Anderson County (pop. 27,387). Tennessee Blue Book, 1960, pp. 143-149.

FN6. For example, Carter and Washington Counties are each approximately 60% as large as Maury and Madison Counties in terms of square miles, and this may explain the disparity between their 'total representation' figures.

FN7. For example, in addition to being 'semi-urban,' Blount County is the location of the City of Alcoa, where the Aluminum Company of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

America has located a large aluminum smelting and rolling plant. This may explain the difference between its 'total representation' and that of Gibson County, which has no such large industry and contains no municipality as large as Maryville.

FN8. For example, Chester County (voting population 6,391) is one of those that is presently said to be overrepresented. But under the appellants' proposal, Chester would be combined with populous Madison County in a 'floterial district' and with four others, including Shelby County, in a senatorial district. Consequently, its total representation according to the Appendix to my Brother CLARK'S opinion would be .19. (369 U.S., p. 262, 82 S.Ct., p. 734.) This would have the effect of disenfranchising all the county's voters. Similarly, Rhea County's almost 9,000 voters would find their voting strength so diluted as to be practically nonexistent.

More broadly, the disparities in electoral strength among the various counties in Tennessee, both those relied upon by my Brother CLARK and others, may be *347 accounted for by various economic,[FN9] political,[FN10] and geographic[FN11] considerations. No allegation is made by the appellants that the existing apportionment is the result of any other forces that are always at work in any legislative process; and the record, briefs, and arguments in this Court themselves attest to the fact that the appellants could put forward nothing further at a trial.

FN9. For example, it is primarily the eastern portion of the State that is complaining of malapportionment (along with the Cities of Memphis and Nashville). But the eastern section is where industry is principally located and where population density, even outside the large urban areas, is highest. Consequently, if Tennessee is apportioning in favor of its agricultural interests, as constitutionally it was entitled to do, it would necessarily reduce representation from the east.

FN10. For example, sound political reasons surely justify limiting the legislative chambers to workable numbers; in Tennessee, the House is set at 99 and the Senate at 33. It might have been deemed desirable, therefore, to set a ceiling on representation from any single county so as not to deprive others of individual representation. The

proportional discrepancies among the four counties with large urban centers may be attributable to a conscious policy of limiting representation in this manner.

FN11. For example, Moore County is surrounded by four counties each of which has sufficient voting population to exceed two-thirds of the average voting population per county (which is the standard prescribed by the Tennessee Constitution for the assignment of a direct representative), thus qualifying for direct representatives. Consequently Moore County must be assigned a representative of its own despite its small voting population because it cannot be joined with any of its neighbors in a multicounty district, and the Tennessee Constitution prohibits combining it with nonadjacent counties. See note 1, supra.

By disregarding the wide variety of permissible legislative considerations that may enter into a state electoral apportionment by Brother CLARK has turned a highly complex process into an elementary arithmetical puzzle. *348 It is only by blinking reality that such an analysis can stand and that the essentially legislative determination can be made the subject of judicial inquiry.

**780 IV.

Apart from such policies as those suggested which would suffice to justify particular inequalities, there is a further consideration which could rationally have led the Tennessee Legislature, in the exercise of a deliberate choice, to maintain the status quo. Rigidity of an apportionment pattern may be as much a legislative policy decision as is a provision for periodic reapportionment. In the interest of stability, a State may write into its fundamental law a permanent distribution of legislators among its various election districts, thus forever ignoring shifts in population. Indeed, several States have achieved this result by providing for minimum and maximum representation from various political subdivisions such as counties, districts, cities, or towns. See Harvey, Reapportionments of State Legislatures-Legal Requirements, 17 Law & Contemp. Probs. (1952), 364, 368-372.

It is said that one cannot find any rational standard in what the Tennessee Legislature has failed to do over the past 60 years. But surely one need not search far to find rationality in the Legislature's continued refusal to recognize the growth of the ruban population that has accompanied the

369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663
**(Cite as: 369 U.S. 186, 82 S.Ct. 691)**

development of industry over the past half decade. The existence of slight disparities between rural areas does not overcome the fact that the foremost apparent legislative motivation has been to preserve the electoral strength of the rural interests notwithstanding shifts in population. And I understand it to be conceded by at least some of the majority that this policy is not **\*349** rendered unconstitutional merely because it favors rural voters.

Once the electoral apportionment process is recognized for what it is-the product of legislative give-and-take and of compromise among policies that often conflict-the relevant constitutional principles at once put these appellants out of the federal courts.

U.S.Tenn. 1962.
Baker v. Carr
369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 3

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Saturday, September 19, 2009 00:01 Central |
| Client Identifier: | BARNETT |
| Database: | SCTFIND |
| Citation Text: | 91 S.Ct. 1999 |
| Lines: | 1496 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

Supreme Court of the United States
Webster BIVENS, Petitioner,
v.
SIX UNKNOWN NAMED AGENTS OF FEDERAL
BUREAU OF NARCOTICS.
**No. 301.**

Argued Jan. 12, 1971.
Decided June 21, 1971.

Appeal from order of the United States District Court
for the Eastern District of New York, 276 F.Supp. 12,
dismissing damage action based on unconstitutional
search and seizure by defendant federal narcotics
agents. The Court of Appeals, 409 F.2d 718, affirmed
and certiorari was granted. The Supreme Court, Mr.
Justice Brennan, held that complaint alleging that
agents of Federal Bureau of Narcotics, acting under
color of federal authority, made warrantless entry of
petitioner's apartment, searched the apartment and
arrested him on narcotics charges, all without probable
cause, stated federal cause of action under the Fourth
Amendment for damages recoverable upon proof of
injuries resulting from agents' violation of that
Amendment.

Reversed and remanded.

Mr. Justice Harlan concurred in the judgment and filed
opinion, Mr. Chief Justice Burger, Mr. Justice Black
and Mr. Justice Blackmun filed dissenting opinions.

West Headnotes

**[1] Searches and Seizures 349 ⟊23**

349 Searches and Seizures
    349I In General
        349k23 k. Fourth Amendment and Reasona-
bleness in General. Most Cited Cases
    (Formerly 349k7(1))

**Searches and Seizures 349 ⟊85**

349 Searches and Seizures
    349I In General
        349k85 k. Liability for Wrongful Search and
Seizure; Actions. Most Cited Cases
    (Formerly 349k8)

**United States 393 ⟊50.1**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
            393k50.1 k. In General. Most Cited Cases
    (Formerly 393k50(1))
The Fourth Amendment operates as a limitation on
the exercise of federal power regardless of whether the
state in whose jurisdiction that power is exercised
would prohibit or penalize the identical act if engaged
in by a private citizen, and citizen who sustains
damages as result of federal agents' violation of Fourth
Amendment is not limited to action in tort, under state
law, in state courts, to obtain money damages to re-
dress invasion of Fourth Amendment rights.
U.S.C.A.Const. Amend. 4.

**[2] Searches and Seizures 349 ⟊147.1**

349 Searches and Seizures
    349III Execution and Return of Warrants
        349k147 Scope of Search
            349k147.1 k. In General. Most Cited Cases
    (Formerly 349k147, 349k7(9))
The Fourth Amendment confines an officer executing
a search warrant strictly within the bounds set by the
warrant. U.S.C.A.Const. Amend. 4.

**[3] Searches and Seizures 349 ⟊32**

349 Searches and Seizures
    349I In General
        349k31 Persons Subject to Limitations; Go-
vernmental Involvement
            349k32 k. Application of Federal Standards
to States and Territories. Most Cited Cases
    (Formerly 349k7(1))
State law may not authorize federal agents to violate
the Fourth Amendment. U.S.C.A.Const. Amend. 4.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[4] States 360** 🔑**18.5**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.5 k. Conflicting or Conforming Laws or Regulations. Most Cited Cases
    (Formerly 360k4.15)
State law may not undertake to limit the extent to which federal authority can be exercised.

**[5] Searches and Seizures 349** 🔑**85**

349 Searches and Seizures
    349I In General
        349k85 k. Liability for Wrongful Search and Seizure; Actions. Most Cited Cases
    (Formerly 349k8)
Damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials. U.S.C.A.Const. Amend. 4.

**[6] Controlled Substances 96H** 🔑**129**

96H Controlled Substances
    96HIV Searches and Seizures
        96HIV(B) Search Without Warrant
            96Hk127 Premises, Search of
                96Hk129 k. Probable or Reasonable Cause. Most Cited Cases
    (Formerly 138k185(2), 138k182 Drugs and Narcotics)

**Searches and Seizures 349** 🔑**85**

349 Searches and Seizures
    349I In General
        349k85 k. Liability for Wrongful Search and Seizure; Actions. Most Cited Cases
    (Formerly 349k8)

**United States 393** 🔑**50.20**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for Negligence or Misconduct
            393k50.20 k. Actions. Most Cited Cases

Complaint alleging that agents of Federal Bureau of Narcotics, acting under color of federal authority, made warrantless entry of petitioner's apartment, searched the apartment and arrested him on narcotics charges, all without probable cause, stated federal cause of action under the Fourth Amendment for damages recoverable upon proof of injuries resulting from agents' violation of that Amendment. U.S.C.A.Const. Amend. 4.

**[7] Federal Courts 170B** 🔑**461**

170B Federal Courts
    170BVII Supreme Court
        170BVII(B) Review of Decisions of Courts of Appeals
            170Bk460 Review on Certiorari
                170Bk461 k. Questions Not Presented Below or in Petition for Certiorari. Most Cited Cases
    (Formerly 106k383(1))
The Supreme Court on writ of certiorari to United States Court of Appeals would not consider question not passed upon by the Court of Appeals.

**\*\*2000 Syllabus**[FN*]

> [FN*] NOTE: The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*388** Petitioner's complaint alleged that respondent agents of the Federal Bureau of Narcotics, acting under color of federal authority, made a warrantless entry of his apartment, searched the apartment, and arrested him on narcotics charges. All of the acts were alleged to have been done without probable cause. Petitioner's suit to recover damages from the agents was dismissed by the District Court on the alternative grounds (1) that it failed to state a federal cause of action and (2) that respondents were immune from suit by virtue of their official position. The Court of Appeals affirmed on the first ground alone. held:

1. Petitioner's complaint states a federal cause of action under the Fourth Amendment for which damages are recoverable upon proof of injuries resulting from the federal agents' violation of that Amendment. P. 2005.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

91 S.Ct. 1999                                                                                                       Page 3
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

**\*\*2001** 2. The Court does not reach the immunity question, which was not passed on by the Court of Appeals. Pp. 2001-2005.

409 F.2d 718, reversed and remanded.

Stephen A. Grant, for petitioner.

Jerome Feit, Washington, D.C., for respondents.

**\*389** Mr. Justice BRENNAN delivered the opinion of the Court.

The Fourth Amendment provides that:

'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. * * *'

In Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), we reserved the question whether violation of that command by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct. Today we hold that it does.

This case has its origin in an arrest and search carried out on the morning of November 26, 1965. Petitioner's complaint alleged that on that day respondents, agents of the Federal Bureau of Narcotics acting under claim of federal authority, entered his apartment and arrested him for alleged narcotics violations. The agents manacled petitioner in front of his wife and children, and threatened to arrest the entire family. They searched the apartment from stem to stern. Thereafter, petitioner was taken to the federal courthouse in Brooklyn, where he was interrogated, booked, and subjected to a visual strip search.

On July 7, 1967, petitioner brought suit in Federal District Court. In addition to the allegations above, his complaint asserted that the arrest and search were effected without a warrant, and that unreasonable force was employed in making the arrest; fairly read, it alleges as well that the arrest was made without probable cause.[FN1] Petitioner claimed to have suffered great humiliation,**\*390** embarrassment, and mental suffering as a result of the agents' unlawful conduct, and sought $15,000 damages from each of them. The District Court, on respondents' motion, dismissed the complaint on the ground, inter alia, that it failed to state a cause of action.[FN2] 276 F.Supp. 12 (EDNY 1967). The Court of Appeals, one judge concurring specially,[FN3] affirmed on that basis. 409 F.2d 718 (CA2 1969). We granted certiorari. 399 U.S. 905, 90 S.Ct. 2203, 26 L.Ed.2d 559 (1970). We reverse.

FN1. Petitioner's complaint does not explicitly state that the agents had no probable cause for his arrest, but it does allege that the arrest was 'done unlawfully, unreasonably and contrary to law.' App. 2. Petitioner's affidavit in support of his motion for summary judgment swears that the search was 'without cause, consent or warrant,' and that the arrest was 'without cause, reason or warrant.' App. 28.

FN2. The agents were not named in petitioner's complaint, and the District Court ordered that the compaint be served upon 'those federal agents who it is indicated by the records of the United States Attorney participated in the November 25, 1965, arrest of the (petitioner).' App. 3. Five agents were ultimately served.

FN3. Judge Waterman, concurring, expressed the thought that 'the federal courts can * * * entertain this cause of action irrespective of whether a statute exists specifically authorizing a federal suit against federal officers for damages' for acts such as those alleged. In his view, however, the critical point was recognition that some cause of action existed, albeit a state-created one, and in consequence he was willing 'as of now' to concur in the holding of the Court of Appeals. 409 F.2d, at 726 (emphasis in original).

I

[1] Respondents do not argue that petitioner should be entirely without remedy for an unconstitutional invasion of his rights by federal agents. In respondents' view, however, the rights that petitioner asserts-primarily **\*\*2002** rights of privacy-are creations of state and not of federal law. Accordingly, they argue, petitioner may obtain money damages to redress invasion of these rights only by an action in tort,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

91 S.Ct. 1999                                                                                   Page 4
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

under state law, in the state courts. In this scheme the Fourth Amendment would serve merely to limit the extent to which the agents could defend**391** the state law tort suit by asserting that their actions were a valid exercise of federal power: if the agents were shown to have violated the Fourth Amendment, such a defense would be lost to them and they would stand before the state law merely as private individuals. Candidly admitting that it is the policy of the Department of Justice to remove all such suits from the state to the federal courts for decision,[FN4] respondents nevertheless urge that we uphold dismissal of petitioner's complaint in federal court, and remit him to filing an action in the state courts in order that the case may properly be removed to the federal court for decision on the basis of state law.

> FN4.  '(S)ince it is the present policy of the Department of Justice to remove to the federal courts all suits in state courts against federal officers for trespass or false imprisonment, a claim for relief, whether based on state common law or directly on the Fourth Amendment will ultimately be heard in a federal court.' Brief for Respondents 13 (citations omitted); see 28 U.S.C. s 1442(a); Willingham v. Morgan, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). In light of this, it is difficult to understand our Brother BLACKMUN's complaint that our holding today 'opens the door for another avalanche of new federal cases.' Post, at 2021. In estimating the magnitude of any such 'avalanche,' it is worth noting that a survey of comparable actions against state officers under 42 U.S.C. s 1983 found only 53 reported cases in 17 years (1951-1967) that survived a motion to dismiss. Ginger & Bell, Police Misconduct Litigation-Plaintiff's Remedies, 15 Am.Jur. Trials 555, 580-590 (1968). Increasing this figure by 900% to allow for increases in rate and unreported cases, every federal district judge could expect to try one such case every 13 years.

We think that respondents' thesis rests upon an unduly restrictive view of the Fourth Amendment's protection against unreasonable searches and seizures by federal agents, a view that has consistently been rejected by this Court. Respondents seek to treat the relationship between a citizen and a federal agent unconstitution-

ally exercising his authority as no different from the relationship**392** between two private citizens. In so doing, they ignore the fact that power, once granted, does not disappear like a magic gift when it is wrongfully used. An agent acting-albeit unconstitutionally-in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own. Cf. Amos v. United States, 255 U.S. 313, 317, 41 S.Ct. 266, 267-268, 65 L.Ed. 654 (1921); United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941). Accordingly, as our cases make clear, the Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen. It guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority. And 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.'  Bell v. Hood, 327 U.S., at 684, 66 S.Ct., at 777 (footnote omitted); see Bemis Bros. Bag Co. v. United States, 289 U.S. 28, 36, 53 S.Ct. 454, 457, 77 L.Ed. 1011 (1933) (Cardozo, J.); The Western Maid, 257 U.S. 419, 433, 42 S.Ct. 159, 161, 66 L.Ed. 299 (1922) (Holmes, J.).

First. Our cases have long since rejected the notion that the Fourth Amendment proscribes only such conduct as would, if engaged in by private persons, be condemned by state law. Thus in Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927), petitioners**2003** were convicted of conspiracy to violate the National Prohibition Act on the basis of evidence seized by state police officers incident to petitioners' arrest by those officers solely for the purpose of enforcing federal law. Id., at 314, 48 S.Ct., at 137-138. Notwithstanding the lack of probable cause for the arrest, id., at 313, 48 S.Ct., at 137, it would have been permissible under state law if effected **393** by private individuals.[FN5] It appears, moreover, that the officers were under direction from the Governor to aid in the enforcement of federal law. Id., at 315-317, 48 S.Ct., at 138. Accordingly, if the Fourth Amendment reached only to conduct impermissible under the law of the State, the Amendment would have had no application to the case. Yet this Court held the Fourth Amendment applicable and reversed petitioners' convictions as having been based

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

upon evidence obtained through an unconstitutional search and seizure. Similarly, in Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927), the petitioner was convicted on the basis of evidence seized under a warrant issued, without probable cause under the Fourth Amendment, by a state court judge for a state law offense. At the invitation of state law enforcement officers, a federal prohibition agent participated in the search. This Court explicitly refused to inquire whether the warrant was 'good under the state law * * * since in no event could it constitute the basis for a federal search and seizure.' Id., at 29, 47 S.Ct., at 248 (emphasis added).FN6 And our recent decisions regarding electronic surveillance have made it clear beyond peradventure that the Fourth Amendment is not tied to the **\*394** niceties of local trespass laws. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682-683, 5 L.Ed.2d 734 (1961). In light of these cases, respondents' argument that the Fourth Amendment serves only as a limitation on federal defenses to a state law claim, and not as an independent limitation upon the exercise of federal power, must be rejected.

FN5. New York at that time followed the common-law rule that a private person may arrest another if the latter has in fact committed a felony, and that if such is the case the presence or absence of probable cause is irrelevant to the legality of the arrest. See McLoughlin v. New York Edison Co., 252 N.Y. 202, 169 N.E. 277; 225 App.Div. 846, 232 N.Y.S. 622 (1929); cf. N.Y.Code Crim.Proc. s 183 (1958) for codification of the rule. Conspiracy to commit a federal crime was at the time a felony. Act of March 4, 1909, s 37, 35 Stat. 1096.

FN6. Conversely, we have in some instances rejected Fourth Amendment claims despite facts demonstrating that federal agents were acting in violation of local law. McGuire v. United States, 273 U.S. 95, 47 S.Ct. 259, 71 L.Ed. 556 (1927) (trespass ab initio); Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924) ('open fields' doctrine); cf. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921) (possession

of stolen property).

[2][3][4] Second. The interests protected by state laws regulating trespass and the invasion of privacy, and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile. Thus, we may bar the door against an unwelcome private intruder, or call the police if he persists in seeking entrance. The availability of such alternative means for the protection of privacy may lead the State to restrict imposition of liability for any consequent trespass. A private citizen, asserting no authority other than his own, will not normally be liable in trespass if he demands, and is granted, admission to another's house. See W. Prosser, The Law of Torts s 18, pp. 109-110 (3d ed., 1964); 1 F. Harper & F. James, The Law of Torts s 1.11 (1956). But one who demands admission under a claim of federal authority stands in a far different **\*\*2004** position. Cf. Amos v. United States, 255 U.S. 313, 317, 41 S.Ct. 266, 267-268, 65 L.Ed. 654 (1921). The mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry or arrest by resort to the local police; and a claim of authority to enter is likely to unlock the door as well. See Weeks v. United States, 232 U.S. 383, 386, 34 S.Ct. 341, 342, 58 L.Ed. 652 (1914); Amos v. United States, supra.FN7 'In such cases there is no safety for the citizen, **\*395** except in the protection of the judicial tribunals, for rights wich have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime.' United States v. Lee, 106 U.S. 196, 219, 1 S.Ct. 240, 259, 27 L.Ed. 171 (1882).FN8 Nor is it adequate to answer that state law may take into account the different status of one clothed with the authority of the Federal Government. For just as state law may not authorize federal agents to violate the Fourth Amendment, Byars v. United States, supra; Weeks v. United States, supra; In re Ayers, 123 U.S. 443, 507, 8 S.Ct. 164, 183-184, 31 L.Ed. 216 (1887), neither may state law undertake to limit the extent to which federal authority can be exercised. In re Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890). The inevitable consequence of this dual limitation on state power is that the federal question becomes not merely a possible defense to the state law action, but an independent claim both necessary and sufficient to make out the plaintiff's cause of action. Cf. International Brotherhood of Boilermakers, etc. v. Hardeman, 401 U.S. 233, 241, 91 S.Ct. 609, 28 L.Ed.2d 10

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

91 S.Ct. 1999                                                                                   Page 6
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

(1971).

FN7. Similarly, although the Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant, Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927); see Stanley v. Georgia, 394 U.S. 557, 570-572, 89 S.Ct. 1243, 1251-1252, 22 L.Ed.2d 542 (1969) (Stewart, J., concurring in result), a private individual lawfully in the home of another will not normally be liable for trespass beyond the bounds of his invitation absent clear notice to that effect. See 1 F. Harper & F. James, The Law of Torts s 1.11 (1956).

FN8. Although no State has undertaken to limit the common-law doctrine that one may use reasonable force to resist an unlawful arrest by a private person, at least two States have outlawed resistance to an unlawful arrest sought to be made by a person known to be an officer of the law. R.I.Gen.Laws s 12-7-10 (1969); State v. Koonce, 89 N.J.Super. 169,

[5][6] Third. That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. See Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *396 Nixon v. Herndon, 273 U.S. 536, 540, 47 S.Ct. 446, 71 L.Ed. 759 (1927); Swafford v. Templeton, 185 U.S. 487, 22 S.Ct. 783, 46 L.Ed. 1005 (1902); Wiley v. Sinkler, 179 U.S. 58, 21 S.Ct. 17, 45 L.Ed. 84 (1900); J. Landynski, Search and Seizure and the Supreme Court 28 et seq. (1966); N. Lasson, History and Development of the Fourth Amendment to the United States Constitution 43 et seq. (1937); Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in Bell v. Hood, 117 U.Pa.L.Rev. 1, 8-33 (1968); cf. West v. Cabell, 153 U.S. 78, 14 S.Ct. 752, 38 L.Ed. 643 (1894); Lammon v. Feusier, 111 U.S. 17, 4 S.Ct. 286, 28 L.Ed. 337 (1884). Of course, the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation. But 'it is * * * well settled that where legal rights have been

invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' Bell v. Hood, 327 U.S., at 684, 66 S.Ct., at 777 (footnote omitted.) The present **2005 case involves no special factors counseling hesitation in the absence of affirmative action by Congress. We are not dealing with a question of 'federal fiscal policy,' as in United States v. Standard Oil Co., 332 U.S. 301, 311, 67 S.Ct. 1604, 1609-1610, 91 L.Ed. 2067 (1947). In that case we refused to infer from the Government-soldier relationship that the United States could recover damages from one who negligently injured a soldier and thereby caused the Government to pay his medical expenses and lose his services during the course of his hospitalization. Noting that Congress was normally quite solicitous where the federal purse was involved, we pointed out that 'the United States (was) the party plaintiff to the suit. And the United States has power at any time to create the liability.' Id., at 316, 67 S.Ct., at 1612; see United States v. Gilman, 347 U.S. 507, 74 S.Ct. 695, 98 L.Ed. 898 (1954). Nor are we asked in this case to impose liability upon a congressional employee for actions contrary to no constitutional*397 prohibition, but merely said to be in excess of the authority delegated to him by the gress. Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963). Finally, we cannot accept respondents' formulation of the question as whether the availability of money damages is necessary to enforce the Fourth Amendment. For we have here no explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress. The question is merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts. Cf. J.I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); Jacobs v. United States, 290 U.S. 13, 16, 54 S.Ct. 26, 27-28, 78 L.Ed. 142 (1933). 'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.' Marbury v. Madison, 1 Cranch 137, 163, 2 L.Ed. 60 (1803). Having concluded that petitioner's complaint states a cause of action under the Fourth Amendment, supra, at 2001-2004, we hold that petitioner is entitled to recover money damages for any

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

injuries he has suffered as a result of the agents' violation of the Amendment.

II

[7] In addition to holding that petitioner's complaint had failed to state facts making out a cause of action, the District Court ruled that in any event respondents were immune from liability by virtue of their official position. 276 F.Supp., at 15. This question was not passed upon by the Court of Appeals, and accordingly we do not consider**398 it here. The judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.

So ordered.

Judgment reversed and case remanded.
Mr. Justice HARLAN, concurring in the judgment.
My initial view of this case was that the Court of Appeals was correct in dismissing the complaint, but for reasons stated in this opinion I am now persuaded to the contrary. Accordingly, I join in the judgment of reversal.

Petitioner alleged, in his suit in the District Court for the Eastern District of New York, that the defendants, federal agents acting under color of federal law, subjected him to a search and seizure contravening the requirements of the Fourth Amendment. He sought damages in the amount of $15,000 from each of the agents. Federal jurisdiction**2006 was claimed, inter alia,[FN1] under 28 U.S.C. s 1331(a) which provides:

> FN1. Petitioner also asserted federal jurisdiction under 42 U.S.C. s 1983 and 28 U.S.C. s 1343(3), and 28 U.S.C. s 1343(4). Neither will support federal jurisdiction over the claim. See Bivens v. Six Unknown Named Agents, 409 F.2d 718, 720 n. 1 (CA2 1969).

'The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.'
The District Court dismissed the complaint for lack of federal jurisdiction under 28 U.S.C. s 1331(a) and failure to state a claim for which relief may be granted. 276 F.Supp. 12 (EDNY 1967). On appeal, the Court of

Appeals concluded, on the basis of this Court's decision in Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), that petitioner's claim for damages did '(arise) under the Constitution' *399 within the meaning of 28 U.S.C. s 1331(a); but the District Court's judgment was affirmed on the ground that the complaint failed to state a claim for which relief can be granted. 409 F.2d 718 (CA2 1969).

In so concluding, Chief Judge Lumbard's opinion reasoned, in essence, that: (1) the framers of the Fourth Amendment did not appear to contemplate a 'wholly new federal cause of action founded directly on the Fourth Amendment,' id., at 721, and (2) while the federal courts had power under a general grant of jurisdiction to imply a federal remedy for the enforcement of a constitutional right, they should do so only when the absence of alternative remedies renders the constitutional command a 'mere 'form of words.'' Id., at 723. The Government takes essentially the same position here. Brief for Respondents 4-5. And two members of the Court add the contention that we lack the constitutional power to accord Bivens a remedy for damages in the absence of congressional action creating 'a federal cause of action for damages for an unreasonable search in violation of the Fourth Amendment.' Opinion of Mr. Justice BLACK, post, at 2020; see also opinion of THE CHIEF JUSTICE, post, at 2015, 2017.

For the reasons set forth below, I am of the opinion that federal courts do have the power to award damages for violation of 'constitutionally protected interests' and I agree with the Court that a traditional judicial remedy such as damages is appropriate to the vindication of the personal interests protected by the Fourth Amendment.

I

I turn first to the contention that the constitutional power of federal courts to accord Bivens damages for his claim depends on the passage of a statute creating a 'federal cause of action.' Although the point is not *400 entirely free of ambiguity,[FN2] I do not understand either the Government or my dissenting Brothers to maintain that Bivens' contention that he is entitled to be free from the type of official conduct prohibited by the Fourth Amendment depends on a decision by the State in which he resides to accord him a remedy. Such a position would be incompatible with the pre-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

sumed availability of federal equitable relief, if a proper showing can be made in terms of the ordinary principles governing equitable remedies. See Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 776-777, 90 L.Ed. 939 (1946). However broad a federal court's discretion concerning equitable remedies, it is absolutely clear-at least after Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)-that in a nondiversity suit a federal court's power to grant even equitable relief depends on the presence of a substantive right derived from federal law. Compare Guaranty Trust Co. v. York, 326 U.S. 99, 105-107, 65 S.Ct. 1464, 1467-1469, 89 L.Ed. 2079 (1945). **2007** with Holmberg v. Armbrecht, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946). See also H. Hart & H. Wechsler, The Federal Courts and the Federal System 818-819 (1953).

FN2. See n. 3, infra.

Thus the interest which Bivens claims-to be free from official conduct in contravention of the Fourth Amendment-is a federally protected interest. See generally Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in Bell v. Hood, 117 U.Pa.L.Rev. 1, 33-34 (1968).FN3 Therefore, the question **401** of judicial power to grant Bivens damages is not a problem of the 'source' of the 'right'; instead, the question is whether the power to authorize damages as a judicial **402** remedy for the vindication of a federal constitutional right is placed by the Constitution itself exclusively in Congress' hands.

FN3. The Government appears not quite ready to concede this point. Certain points in the Government's argument seem to suggest that the 'state-created right-federal defense' model reaches not only the question of the power to accord a federal damages remedy, but also the claim to any judicial remedy in any court. Thus, we are pointed to Lasson's observation concerning Madison's version of the Fourth Amendment as introduced into the House:

'The observation may be made that the language of the proposal did not purport to create the right to be secure from unreasonable search and seizures but merely stated it as a right which already existed.' N. Lasson, History and Development of the Fourth

Amendment to the United States Constitution 100 n. 77 (1937), quoted in Brief for Respondents 11 n. 7. And, on the problem of federal equitable vindication of constitutional rights without regard to the presence of a 'state-created right,' see Hart, The Relations Between State and Federal Law, 54 Col.L.Rev. 489, 523-524 (1954), quoted in Brief for Respondents 17.

On this point, the choice of phraseology in the Fourth Amendment itself is singularly unpersuasive. The leading argument against a 'Bill of Rights' was the fear that individual liberties not specified expressly would be taken as excluded. See generally, Lasson, supra, at 79-105. This circumstance alone might well explain why the authors of the Bill of Rights would opt for language which presumes the existence of a fundamental interest in liberty, albeit originally derived from the common law. See Entick v. Carrington, 19 How.St.Tr. 1029, 95 Eng.Rep. 807 (1765).

In truth, the legislative record as a whole behind the Bill of Rights is silent on the rather refined doctrinal question whether the framers considered the rights therein enumerated as dependent in the first instance on the decision of a State to accord legal status to the personal interests at stake. That is understandable since the Government itself points out that general federal-question jurisdiction was not extended to the federal district courts until 1875. Act of March 3, 1875, s 1, 18 Stat. 470. The most that can be drawn from this historical fact is that the authors of the Bill of Rights assumed the adequacy of common-law remedies to vindicate the federally protected interest. One must first combine this assumption with contemporary modes of jurisprudential thought which appeared to link 'rights' and 'remedies' in a 1:1 correlation, cf., Marbury v. Madison, 1 Cranch 137, 163, 2 L.Ed. 60 (1803), before reaching the conclusion that the framers are to be understood today as having created no federally protected interests. And, of course, that would simply require the conclusion that federal equitable

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

91 S.Ct. 1999                                                                 Page 9
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

relief would not lie to protect those interests guarded by the Fourth Amendment.

Professor Hart's observations concerning the 'imperceptible steps' between In re Ayers, 123 U.S. 443, 8 S.ct. 164, 31 L.Ed. 216 (1887), and Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), see Hart, supra, fail to persuade me that the source of the legal interest asserted here is other than the Federal Constitution itself. In re Ayers concerned the precise question whether the Eleventh Amendment barred auit in a federal court for an injunction compelling a state officer to perform a contract to which the State was a party. Having concluded that the suit was inescapably a suit against the State under the Eleventh Amendment, the Court spoke of the presence of state-created rights as a distinguishing factor supporting the exercise of federal jurisdiction in other contract clause cases. The absence of a statecreated right in In re Ayers served to distinguish that case from the perspective of the State's immunity to suit; Ayers simply does not speak to the analytically distinct question whether the Constitution is in the relevant sense a source of legal protection for the 'rights' enumerated therein.

**\*\*2008** II

The contention that the federal courts remedy in the absence of any express for a claimed invasion of his federal constitutional rights until Congress explicitly authorizes the remedy cannot rest on the notion that the decision to grant compensatory relief involves a resolution of policy considerations not susceptible to judicial discernment. Thus, in suits for damages based on violations of federal statutes lacking any express authorization of a damage remedy, this Court has authorized such relief where, in its view, damages are necessary to effectuate the congressional policy underpinning the substantive provisions of the statute. J.I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 213, 65 S.Ct. 235, 237, 89 L.Ed. 187 (1944). Cf. Wyandotte Transportation Co. v. United States, 389 U.S. 191, 201-204, 88 S.Ct. 379, 385-387, 19 L.Ed.2d 407 (1967).[FN4]

FN4. The Borak case is an especially clear example of the exercise of federal judicial power to accord damages as an appropriate remedy in the absence of a federal cause statutory authorization of a federal cause of action. There we 'implied'-from what can only be characterized as an 'exclusively procedural provision' affording access to a federal forum, cf. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 462-463, 77 S.Ct. 912, 923-924, 1 L.Ed.2d 972 (1957) (Frankfurter, J., dissenting)-a private cause of action for damages for violation of s 14(a) of the Securities Exchange Act of 1934, 48 Stat. 895, 15 U.S.C. s 78n(a). See s 27, 48 Stat. 902, 15 U.S.C. s 78aa. We did so in an area where federal regulation has been singularly comprehensive and elaborate administrative enforcement machinery had been provided. The exercise of judicial power involved in Borak simply cannot be justified in terms of statutory construction, see Hill, Constitutional Remedies, 69 Col.L.Rev. 1109, 1120-1121 (1969); nor did the Borak Court purport to do so. See Borak, supra, 377 U.S. at 432-434, 84 S.Ct., at 1559-1561. The notion of 'implying' a remedy, therefore, as applied to cases like Borak, can only refer to a process whereby the federal judiciary exercises a choice among traditionally available judicial remedies according to reasons related to the substantive social policy embodied in an act of positive law. See ibid., and Bell v. Hood, supra, 327 U.S., at 684, 66 S.Ct., at 776-777.

**\*403** If it is not the nature of the remedy which is thought to render a judgment as to the appropriateness of damages inherently 'legislative,' then it must be the nature of the legal interest offered as an occasion for invoking otherwise appropriate judicial relief. But I do not think that the fact that the interest is protected by the Constitution rather than statute or common law justifies the assertion that federal courts are powerless to grant damages in the absence of explicit congressional action authorizing the remedy. Initially, I note that it would be at least anomalous to conclude that the federal judiciary-while competent to choose among the range of traditional judicial remedies to implement statutory and common-law policies, and even to gen-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

91 S.Ct. 1999
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

erate substantive rules governing primary behavior in furtherance of broadly formulated policies articulated by statute or Constitution, see Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972 (1957); United States v. Standard Oil Co., 332 U.S. 301, 304-311, 67 S.Ct. 1604, 1606-1610, 91 L.Ed. 2067 (1947); Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943)-is powerless to accord a damages **\*404** remedy to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of the popular will.

More importantly, the presumed availability of federal equitable relief against threatened invasions of constitutional interests appears entirely to negate the contention that the status of an interest as constitutionally protected divests federal courts of the power to grant damages absent express congressional authorization. Congress provided specially for the exercise of equitable remedial powers by federal courts, Act of May **\*\*2009** 8, 1792, s 2, 1 Stat. 276; C. Wright, Law of Federal Courts 257 (2d ed., 1970), in part because of the limited availability of equitable remedies in state courts in the early days of the Republic. See Guaranty Trust Co. v. York, 326 U.S. 99, 104-105, 65 S.Ct. 1464, 1467-1468, 89 L.Ed. 2079 (1945). And this Court's decisions make clear that, at least absent congressional restrictions, the scope of equitable remedial discretion is to be determined according to the distinctive historical traditions of equity as an institution, Holmberg v. Armbrecht, 327 U.S. 392, 395-396, 66 S.Ct. 582, 584-585, 90 L.Ed. 743 (1946); Sprague v. Ticonic National Bank, 307 U.S. 161, 165-166, 59 S.Ct. 777, 779-780, 83 L.Ed. 1184 (1939). The reach of a federal district court's 'inherent equitable powers,' Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 460, 77 S.Ct. 912, 919-920, 1 L.Ed.2d 972 (Burton, J., concurring in result), is broad indeed, e.g., Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); nonetheless, the federal judiciary is not empowered to grant equitable relief in the absence of congressional action extending jurisdiction over the subject matter of the suit. See Textile Workers Union v. Lincoln Mills, supra, 353 U.S., at 460, 77 S.Ct., at 919-920 (Burton, J., concurring in result); Katz, 117 U.Pa.L.Rev., at 43.[FN5]

FN5. With regard to a court's authority to

grant an equitable remedy, the line between 'subject matter' jurisdiction and remedial powers has undoubtedly been obscured by the fact that historically the 'system of equity 'derived its doctrines, as well as its powers, from its mode of giving relief.'' See Guaranty Trust Co. v. York, supra, 326 U.S., at 105, 65 S.Ct., at 1468, quoting C. Langdell, Summary of Equity Pleading xxvii (1877). Perhaps this fact alone accounts for the suggestion sometimes made that a court's power to enjoin invasion of constitutionally protected interests derives directly from the Constitution. See Bell v. Hood, 71 F.Supp. 813, 819 (SD Cal.1947).

**\*405** If explicit congressional authorization is an absolute prerequisite to the power of a federal court to accord compensatory relief regardless of the necessity or appropriateness of damages as a remedy simply because of the status of a legal interest as constitutionally protected, then it seems to me that explicit congressional authorization is similarly prerequisite to the exercise of equitable remedial discretion in favor of constitutionally protected interests. Conversely, if a general grant of jurisdiction to the federal courts by Congress is thought adequate to empower a federal court to grant equitable relief for all areas of subject-matter jurisdiction enumerated therein, see 28 U.S.C. s 1331(a), then it seems to me that the same statute is sufficient to empower a federal court to grant a traditional remedy at law.[FN6] Of course, the special historical traditions governing the federal equity system, see **\*406** Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), might still bear on the comparative appropriateness of granting equitable relief as opposed to money damages. That possibility, however, relates, not to whether the federal courts have the power to afford one type of remedy as opposed to the other, but rather to the criteria which should govern the exercise of our power. To that question, I now pass.

FN6. Chief Judge Lumbard's opinion for the Court of Appeals in the instant case is, as I have noted, in accord with this conclusion:

'Thus, even if the Constitution itself does not give rise to an inherent injunctive power to prevent its violation by governmental officials there are strong reasons for inferring the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

existence of this power under any general grant of jurisdiction to the federal courts by Congress.' 409 F.2d, at 723.

The description of the remedy as 'inferred' cannot, of course, be intended to assimilate the judicial decision to accord such a remedy to any process of statutory construction. Rather, as with the cases concerning remedies, implied from statutory schemes, see n. 4, supra, the description of the remedy as 'inferred' can only bear on the reasons offered to explain a judicial decision to accord or not to accord a particular remedy.

## **2010 III

The major thrust of the Government's position is that, where Congress has not expressly authorized a particular remedy, a federal court should exercise its power to accord a traditional form of judicial relief at the behest of a litigant, who claims a constitutionally protected interest has been invaded, only where the remedy is 'essential,' or 'indispensable for vindicating constitutional rights.' Brief for Respondents 19, 24. While this 'essentially' test is most clearly articulated with respect to damage remedies, apparently the Government believes the same test explains the exercise of equitable remedial powers. Id., at 17-18. It is argued that historically the Court has rarely exercised the power to accord such relief in the absence of an express congressional authorization and that '(i)f Congress had thought that federal officers should be subject to a law different than state law, it would have had no difficulty in saying so, as it did with respect to state officers * * *.' Id., at 20-21; see 42 U.S.C. s 1983. Although conceding that the standard of determining whether a damage remedy should be utilized to effectuate statutory policies is one of 'necessity' or 'appropriateness,' see J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1559-1560, 12 L.Ed.2d 423 (1964); United States v. Standard Oil Co., 332 U.S. 301, 307, 67 S.Ct. 1604 (1947), the Government contends that questions concerning congressional discretion to modify judicial remedies relating to constitutionally protected interests warrant a more stringent constraint on *407 the exercise of judicial power with respect to this class of legally protected interests. Brief for Respondents at 21-22.

These arguments for a more stringent test to govern the grant of damages in constitutional cases[FN7] seem to be adequately answered by the point that the judiciary has a particular responsibility to assure the vindication of constitutional interests such as those embraced by the Fourth Amendment. To be sure, 'it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.' Missouri, Kansas & Texas R. Co. of Texas v. May, 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971 (1904). But it must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities; at the very least, it strikes me as no more appropriate to await express congressional authorization of traditional judicial relief with regard to these legal interests than with respect to interests protected by federal statutes.

> FN7. I express no view on the Government's suggestion that congressional authority to simply discard the remedy the Court today authorizes might be in doubt; nor do I understand the Court's opinion today to express any view on that particular question.

The question then, is, as I see it, whether compensatory relief is 'necessary' or 'appropriate' to the vindication of the interest asserted. Cf. J. I. Case Co. v. Borak, supra, 377 U.S., at 432, 84 S.Ct., at 1559-1560; United States v. Standard Oil Co., supra, 332 U.S., at 307, 67 S.Ct., at 1607-1608; Hill, Constitutional Remedies, 69 Col.L.Rev. 1109, 1155 (1969); Katz, 117 U.Pa.L.Rev., at 72. In resolving that question, it seems to me that the range of policy considerations we may take into account is at least as broad as the range of a legislature would consider with respect to an express statutory authorization of a traditional remedy. In this regard I agree with the Court that the appropriateness of according Bivens *408 compensatory relief does not turn simply on the deterrent effect liability will have on federal official conduct. [FN8] Damages as a traditional form **2011 of compensation for invasion of a legally protected interest may be entirely appropriate even if no substantial deterrent effects on future official lawlessness might be thought to result. Bivens, after all, has invoked judicial processes claiming entitlement to compensation for injuries resulting from allegedly lawless official behavior, if those injuries are properly compensable in money damages. I do not think a court of law-vested with the power to accord a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

91 S.Ct. 1999
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

remedy-should deny him his relief simply because he cannot show that future lawless conduct will thereby be deterred.

FN8. And I think it follows from this point that today's decision has little, if indeed any, bearing on the question whether a federal court may properly devise remedies-other than traditionally available forms of judicial relief-for the purpose of enforcing substantive social policies embodied in constitutional or statutory policies. Compare today's decision with Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The Court today simply recognizes what has long been implicit in our decisions concerning equitable relief and remedies implied from statutory schemes; i.e., that a court of law vested with jurisdiction over the subject matter of a suit has the power-and therefore the duty-to make principled choices among traditional judicial remedies. Whether special prophylactic measures-which at least arguably the exclusionary rule exemplifies, see Hill, The Bill of Rights and the Supervisory Power, 69 Col.L.Rev. 181, 182-185 (1969)-are supportable on grounds other than a court's competence to select among traditional judicial remedies to make good the wrong done, cf. Bell v. Hood, supra, 327 U.S. at 684, 66 S.Ct. at 776-777, is a separate question.

And I think it is clear that Bivens advances a claim of the sort that, if proved, would be properly compensable in damages. The personal interests protected by the Fourth Amendment are those we attempt to capture by the notion of 'privacy'; while the Court today properly points out that the type of harm which officials can inflict when they invade protected zones of an individual's life **\*409** are different from the types of harm private citizens inflict on one another, the experience of judges in dealing with private trespass and false imprisonment claims supports the conclusion that courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of Fourth Amendment rights.[FN9]

FN9. The same, of course, may not be true

with respect to other types of constitutionally protected interests, and therefore the appropriateness of money damages may well vary with the nature of the personal interest asserted. See Monroe v. Pape, 365 U.S. 167, 196, 81 S.Ct. 473, 488-489, 5 L.Ed.2d 492 n. 5 (Harlan, J., concuring).

On the other hand, the limitations on state remedies for violation of common-law rights by private citizens argue in favor of a federal damages remedy. The injuries inflicted by officials acting under color of law, while no less compensable in damages than those inflicted by private parties, are substantially different in kind, as the Court's opinion today discusses in detail. See Monroe v. Pape, 365 U.S. 167, 195, 81 S.Ct. 473, 488, 5 L.Ed.2d 492 (1961) (Harlan, J., concurring). It seems to me entirely proper that these injuries be compensable according to uniform rules of federal law, especially in light of the very large element of federal law which must in any event control the scope of official defenses to liability. See Wheeldin v. Wheeler, 373 U.S. 647, 652, 83 S.Ct. 1441, 1445-1446, 10 L.Ed.2d 605 (1963); Monroe v. Pape, supra, 365 U.S., at 194-195, 81 S.Ct., at 487-488 (Harlan, J., concurring); Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed. 1454 (1959). Certainly, there is very little to be gained from the standpoint of federalism by preserving different rules of liability for federal officers dependent on the State where the injury occurs. Cf. United States v. Standard Oil Co., 332 U.S. 301, 305-311, 67 S.Ct. 1604, 1606-1610, 91 L.Ed. 2067 (1947).

Putting aside the desirability of leaving the problem of federal official liability to the vagaries of common-law actions, it is apparent that some form of damages is the only possible remedy for someone in Bivens' alleged **\*410** position. It will be a rare case indeed in which an individual in Bivens' position will be able to obviate the harm by securing injunctive **\*\*2012** relief from any court. However desirable a direct remedy against the Government might be as a substitute for individual official liability, the sovereign still remains immune to suit. Finally, assuming Bivens' innocence of the crime charged, the 'exclusionary rule' is simply irrelevant. For people in Bivens' shoes, it is damages or nothing.

The only substantial policy consideration advanced against recognition of a federal cause of action for

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

violation of Fourth Amendment rights by federal officials is the incremental expenditure of judicial resources that will be necessitated by this class of litigation. There is, however, something ultimately self-defeating about this argument. For if, as the Government contends, damages will rarely be realized by plaintiffs in these cases because of jury hostility, the limited resources of the official concerned, etc., then I am not ready to assume that there will be a significant increase in the expenditure of judicial resources on these claims. Few responsible lawyers and plaintiffs are likely to choose the course of litigation if the statistical chances of success are truly de minimis. And I simply cannot agree with my Brother BLACK that the possibility of 'frivolous' claims-if defined simply as claims with no legal merit-warrants closing the courthouse doors to people in Bivens' situation. There are other ways, short of that, of coping with frivolous lawsuits.

On the other hand, if-as I believe is the case with respect, at least, to the most flagrant abuses of official power-damages to some degree will be available when the option of litigation is chosen, then the question appears to be how Fourth Amendment interests rank on a scale of social values compared with, for example, the interests of stockholders defrauded by misleading proxies. **\*411** See J. I. Case Co. v. Borak, supra. Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests. And current limitations upon the effective functioning of the courts arising from budgetary inadequacies should not be permitted to stand in the way of the recognition of otherwise sound constitutional principles.

Of course, for a variety of reasons, the remedy may not often be sought. See generally Foote, Tort Remedies for Police Violations of Individual Rights, 39 Minn.L.Rev. 493 (1955). And the countervailing interests in efficient law enforcement of course argue for a protective zone with respect to many types of Fourth Amendment violations. Cf. Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (opinion of Harlan, J.). But, while I express no view on the immunity defense offered in the instant case, I deem it proper to venture the thought that at the very least such a remedy would be available for the most flagrant and

patently unjustified sorts of police conduct. Although litigants may not often choose to seek relief, it is important, in a civilized society, that the judicial branch of the Nation's government stand ready to afford a remedy in these circumstances. It goes without saying that I intimate no view on the merits of petitioner's underlying claim.

For these reasons, I concur in the judgment of the Court.

Mr. Chief Justice BURGER, dissenting.
I dissent from today's holding which judicially creates a damage remedy not provided for by the Constitution and not enacted by Congress. We would more surely preserve the important values of the doctrine of separation **\*412** of powers and perhaps get a better result-by recommending a solution to the Congress as the branch of government in which the Constitution has vested the legislative power. Legislation is the business of the Congress, and it has the facilities and competence for that task-as we do **\*\*2013** not. Professor Thayer, speaking of the limits on judicial power, albeit in another context, had this to say.[FN1]

    FN1. J. Thayer, O. Holmes, & F. Frankfurter, John Marshall 88 (Phoenix ed., 1967).

'And if it be true that the holders of legislative power are careless or evil, yet the constitutional duty of the court remains untouched; it cannot rightly attempt to protect the people, by undertaking a function not its own. On the other hand, by adhering rigidly to its own duty, the court will help, as nothing else can, to fix the spot where responsibility lies, and to bring down on that precise locality the thunderbolt of popular condemnation. \* \* \* For that course-the true course of judicial duty always-will powerfully help to bring the people and their representatives to a sense of their own responsibility.'

This case has significance far beyond its facts and its holding. For more than 55 years this Court has enforced a rule under which evidence of undoubted reliability and probative value has been suppressed and excluded from criminal cases whenever it was obtained in violation of the Fourth Amendment. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Boyd v. United States, 116 U.S. 616, 633, 6 S.Ct. 524, 533, 29 L.Ed. 746 (1886) (dictum). This rule was extended to the States in Mapp

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).[FN2] **\*413** The rule has rested on a theory that suppression of evidence in these circumstances was imperative to deter law enforcement authorities from using improper methods to obtain evidence.

> [FN2.](#) The Court reached the issue of applying the Weeks doctrine to the States sua sponte.

The deterrence theory underlying the suppression doctrine, or exclusionary rule, has a certain appeal in spite of the high price society pays for such a drastic remedy. Notwithstanding its plausibility, many judges and lawyers and some of our most distinguished legal scholars have never quite been able to escape the force of Cardozo's statement of the doctrine's anomalous result:

'The criminal is to go free because the constable has blundered. * * * A room is searched against the law, and the body of a murdered man is found. * * * The privacy of the home has been infringed, and the murderer goes free.' People v. Defore, 242 N.Y. 13, 21, 23-24, 150 N.E. 585, 587, 588 (1926).[FN3]

> [FN3.](#) What Cardozo suggested as an example of the potentially far-reaching consequences of the suppression doctrine was almost realized in Killough v. United States, 114 U.S.App.D.C. 305, 315 F.2d 241 (1962).

The plurality opinion in Irvine v. California, 347 U.S. 128, 136, 74 S.Ct. 381, 385, 98 L.Ed. 561 (1954), catalogued the doctrine's defects:

Rejection of the evidence does nothing to punish the wrong-doing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its remedy against one lawbreaker because he has been pursued by another. It protects one against whom incriminating evidence is discovered, but does nothing to protect innocent persons who are the victims of illegal but fruitless searches.'

From time to time members of the Court, recognizing the validity of these protests, have articulated varying **\*414** alternative justifications for the suppression of important evidence in a criminal trial. Under one of these alternative theories the rule's foundation is shifted to the 'sporting contest' thesis that the gov-

ernment must 'play the game fairly' and cannot be allowed to profit from its own illegal acts. Olmstead v. United States, 277 U.S. 438, 469, 471, 48 S.Ct. 564, 569, 570, 72 L.Ed. 944 (1928) (dissenting opinions); see Terry v. Ohio, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968). But the exclusionary rule does not ineluctably flow from a desire to ensure that government plays the 'game' **\*\*2014** according to the rules. If an effective alternative remedy is available, concern for official observance of the law does not require adherence to the exclusionary rule. Nor is it easy to understand how a court can be thought to endorse a violation of the Fourth Amendment by allowing illegally seized evidence to be introduced against a defendant if an effective remedy is provided against the government.

The exclusionary rule has also been justified on the theory that the relationship between the Self-Incrimination Clause of the Fifth Amendment and the Fourth Amendment requires the suppression of evidence seized in violation of the latter. Boyd v. United States, supra, 116 U.S., at 633, 6 S.Ct., at 533 (dictum); Wolf v. Colorado, 338 U.S. 25, 47, 48, 69 S.Ct. 1359, 1368, 93 L.Ed. 1782 (1949) (Rutledge, J., dissenting); Mapp v. Ohio, supra, 367 U.S. at 661-666, 81 S.Ct. at 1694-1697 (Black, J., concurring).

Even ignoring, however, the decisions of this Court that have held that the Fifth Amendment applies only to 'testimonial' disclosures, United States v. Wade, 388 U.S. 218, 221-223, 87 S.Ct. 1926, 1929, 18 L.Ed.2d 1149 (1967); Schmerber v. California, 384 U.S. 757, 764 and n. 8, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966), it seems clear that the Self-Incrimination Clause does not protect a person from the seizure of evidence that is incriminating. It protects a person only from being the conduit by which the police acquire evidence. Mr. Justice Holmes once put it succinctly, 'A party is privileged from producing the **\*415** evidence, but not from its production.' ( Johnson v. United States, 228 U.S. 457, 458, 33 S.Ct. 572, 57 L.Ed. 919 (1913).

It is clear, however, that neither of these theories undergirds the decided cases in this Court. Rather the exclusionary rule has rested on the deterrent rationale-the hope that law enforcement officials would be deterred from unlawful searches and seizures if the illegally seized, albeit trustworthy, evidence was

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

91 S.Ct. 1999                                                                                         Page 15
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

suppressed often enough and the courts persistently enough deprived them of any benefits they might have gained from their illegal conduct.

This evidentiary rule is unique to American jurisprudence. Although the English and Canadian legal systems are highly regarded, neither has adopted our rule. See Martin, The Exclusionary Rule Under Foreign Law-Canada, 52 J.Crim.L.C. & P.S. 271, 272 (1961); Williams, The Exclusionary Rule Under Foreign Law-England, 52 J.Crim.L.C. & P.S. 272 (1961).

I do not question the need for some remedy to give meaning and teeth to the constitutional guarantees against unlawful conduct by government officials. Without some effective sanction, these protections would constitute little more than rhetoric. Beyond doubt the conduct of some officials requires sanctions as cases like Irvine indicate. But the hope that this objective could be accomplished by the exclusion of reliable evidence from criminal trials was hardly more than a wistful dream. Although I would hesitate to abandon it until some meaningful substitute is developed, the history of the suppression doctrine demonstrates that it is both conceptually sterile and practically ineffective in accomplishing its stated objective. This is illustrated by the paradox that an unlawful act against a totally innocent person-such as petitioner claims to be-has been left without an effective remedy, and hence the Court finds **\*416** it necessary now-55 years later-to construct a remedy of its own.

Some clear demonstration of the benefits and effectiveness of the exclusionary rule is required to justify it in view of the high price it extracts from society-the release of countless guilty criminals. See Allen, Federalism and the Fourth Amendment: A Requiem for Wolf, 1961 Sup.Ct.Rev. 1, 33 n. 172. But there is no empirical evidence to support the claim that the rule actually deters illegal conduct of law enforcement officials. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U.Chi.L.Rev. 665, 667 (1970).

**\*\*2015** There are several reasons for this failure. The rule does not apply any direct sanction to the individual official whose illegal conduct results in the exclusion of evidence in a criminal trial. With rare exceptions law enforcement agencies do not impose direct sanctions on the individual officer responsible for a particular judicial application of the suppression

doctrine. Id., at 710. Thus there is virtually nothing done to bring about a change in his practices. The immediate saction triggered by the application of the rule is visited upon the prosecutor whose case against a criminal is either weakened or destroyed. The doctrine deprives the police in no real sense; except that apprehending wrongdoers is their business, police have no more stake in successful prosecutions than prosecutors or the public.

The suppression doctrine vaguely assumes that law enforcement is a monolithic governmental enterprise. For example, the dissenters in Wolf v. Colorado, supra, 338 U.S., at 44, 69 S.Ct., at 1370, argued that:

'Only by exclusion can we impress upon the zealous prosecutor that violation of the Constitution will do him no good. And only when that point is driven home can the prosecutor be expected to emphasize **\*417** the importance of observing the constitutional demands in his instructions to the police.' (Emphasis added.)

But the prosecutor who loses his case because of police misconduct is not an official in the police department; he can rarely set in motion any corrective action or administrative penalties. Moreover, he does not have control or direction over police procedures or police actions that lead to the exclusion of evidence. It is the rare exception when a prosecutor takes part in arrests, searches, or seizures so that he can guide police action.

Whatever educational effect the rule conceivably might have in theory is greatly diminished in fact by the realities of law enforcement work. Policemen do not have the time, inclination, or training to read and grasp the nuances of the appellate opinions that ultimately define the standards of conduct they are to follow. The issues that these decisions resolve often admit of neither easy nor obvious answers, as sharply divided courts on what is or is not 'reasonable' amply demonstrate.[FN4] Nor can judges, in all candor, forget that opinions sometimes lack helpful clarity.

> [FN4.] For example, in a case arising under Mapp, supra, state judges at every level of the state judiciary may find the police conduct proper. On federal habeas corpus a district judge and a court of appeals might agree. Yet, in these circumstances, this Court, reviewing the case as much as 10 years later,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

might reverse by a narrow margin. In these circumstances it is difficult to conclude that the policeman has violated some rule that he should have known was a restriction on his authority.

The presumed educational effect of judicial opinions is also reduced by the long time lapse-often several years-between the original police action and its final judicial evaluation. Given a policeman's pressing responsibilities, it would be surprising if he ever becomes aware of the final result after such a delay. Finally, the exclusionary*418 rule's deterrent impact is diluted by the fact that there are large areas of police activity that do not result in criminal prosecutions-hence the rule has virtually no applicability and no effect in such situations. Oaks, supra, at 720-724.

Today's holding seeks to fill one of the gaps of the suppression doctrine-at the price of impinging on the legislative and policy functions that the Constitution vests in Congress. Nevertheless, the holding serves the useful purpose of exposing the fundamental weaknesses of the suppression doctrine. Suppressing unchallenged truth has set guilty criminals free but demonstrably has neither deterred deliberate violations of the Fourth Amendment nor decreased those errors in judgment that will inevitably occur **2016 given the pressures inherent in police work having to do with serious crimes.

Although unfortunately ineffective, the exclusionary rule has increasingly been characterized by a single, monolithic, and drastic judicial response to all official violations of legal norms. Inadvertent errors of judgment that do not work any grave injustice will inevitably occur under the pressure of police work. These honest mistakes have been treated in the same way as deliberate and flagrant Irvine-type violations of the Fourth Amendment. For example, in Miller v. United States, 357 U.S. 301, 309-310, 78 S.Ct. 1190, 1195-1196, 2 L.Ed.2d 1332 (1958), reliable evidence was suppressed because of a police officer's failure to say a 'few more words' during the arrest and search of a known narcotics peddler.

This Court's decision announced today in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 dramatically illustrates the extent to which the doctrine represents a mechanically inflexible response to widely varying degrees of police error

and the resulting high price that society pays. I dissented in Coolidge primarily because I do not believe the Fourth Amendment had been violated. Even on the Court's contrary premise, however, whatever violation *419 occurred was surely insufficient in nature and extent to justify the drastic result dictated by the suppression doctrine. A fair trial by jury has resolved doubts as to Coolidge's guilt. But now his conviction on retrial is placed in serious question by the remand for a new trial-years after the crime-in which evidence that the New Hampshire courts found relevant and reliable will be withheld from the jury's consideration. It is hardly surprising that such results are viewed with incomprehension by nonlawyers in this country and lawyers, judges, and legal scholars the world over.

Freeing either a tiger or a mouse in a schoolroom is an illegal act, but no rational person would suggest that these two acts should be punished in the same way. From time to time judges have occasion to pass on regulations governing police procedures. I wonder what would be the judicial response to a police order authorizing 'shoot to kill' with respect to every fugitive. It is easy to predict our collective wrath and outrage. We, in common with all rational minds, would say that the police response must relate to the gravity and need; that a 'shoot' order might conceivably be tolerable to prevent the escape of a convicted killer but surely not for a car thief, a pickpocket or a shoplifter.

I submit that society has at least as much right to expect rationally graded responses from judges in place of the universal 'capital punishment' we inflict on all evidence when police error is shown in its acquisition. See ALI, Model Code of Pre-Arraignment Procedure s SS 8.02(2), p. 23 (Tent. Draft No. 4, 1971), reprinted in the Appendix to this opinion. Yet for over 55 years, and with increasing scope and intensity as today's Coolidge holding shows, our legal system has treated vastly dissimilar cases as if they were the same. Our adherence to the exclusionary rule, our resistance to change, and our refusal even to acknowledge the need *420 for effective enforcement mechanisms bring to mind Holmes' wellknown statement:

'It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.'

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

91 S.Ct. 1999                                                                     Page 17
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 469 (1897).

In characterizing the suppression doctrine as an anomalous and ineffective mechanism with which to regulate law enforcement, I intend no reflection on the motivation of those members of this Court who hoped it would be a means of enforcing the Fourth Amendment. Judges cannot be faulted for being offended by arrests, searches, and seizures **2017 that violate the Bill of Rights or statutes intended to regulate public officials. But we can and should be faulted for clinging to an unworkable and irrational concept of law. My criticism is that we have taken so long to find better ways to accomplish these desired objectives. And there are better ways.

Instead of continuing to enforce the suppression doctrine inflexibly, rigidly, and mechanically, we should view it as one of the experimental steps in the great tradition of the common law and acknowledge its shortcomings. But in the same spirit we should be prepared to discontinue what the experience of over half a century has shown nither deters errant officers nor affords a remedy to the totally innocent victims of official misconduct.

I do not propose, however, that we abandon the suppression doctrine until some meaningful alternative can be developed. In a sense our legal system has become the captive of its own creation. To overrule Weeks and Mapp, even assuming the Court was now prepared to *421 take that step, could raise yet new problems. Obviously the public interest would be poorly served if law enforcement officials were suddenly to gain the impression, however erroneous, that all constitutional restraints on police had somehow been removed-that an open season on 'criminals' had been declared. I am concerned lest some such mistaken impression might be fostered by a flat overruling of the suppression doctrine cases. For years we have relied upon it as the exclusive remedy for unlawful official conduct; in a sense we are in a situation akin to the narcotics addict whose dependence on drugs precludes any drastic or immediate withdrawal of the supposed prop, regardless of how futile its continued use may be.

Reasonable and effective substitutes can be formulated if Congress would take the lead, as it did for example in 1946 in the Federal Tort Claims Act. I see

no insuperable obstacle to the elimination of the suppression doctrine if Congress would provide some meaningful and effective remedy against unlawful conduct by government officials.

The problems of both error and deliberate misconduct by law enforcement officials call for a workable remedy. Private damage actions against individual police officers concededly have not adequately met this requirement, and it would be fallacious to assume today's work of the Court in creating a remedy will really accomplish its stated objective. There is some validity to the claims that juries will not return verdicts against individual officers except in those unusual cases where the violation has been flagrant or where the error has been complete, as in the arrest of the wrong person or the search of the wrong house. there is surely serious doubt, for example, that a drug peddler caught packing his wares will be able to arouse much sympathy in a jury on the ground that the police officer did not announce his identity and *422 purpose fully or because he failed to utter a 'few more words.' See Miller v. United States, supra. Jurors may well refuse to penalize a police officer at the behest of a person they believe to be a 'criminal' and probably will not punish an officer for honest errors of judgment. In any event an actual recovery depends on finding non-exempt assets of the police officer from which a judgment can be satisfied.

I conclude, therefore, that an entirely different remedy is necessary but it is one that in my view is as much beyond judicial power as the step the Court takes today. Congress should develop an administrative or quasi-judicial remedy against the government itself to afford compensation and restitution for persons whose Fourth Amendment rights have been violated. The venerable doctrine of respondeat superior in our tort law provides an entirely appropriate conceptual basis for this remedy. If, for exemple, a security guard privately employed by a department store commits an assault or other tort on a customer such as an improper search, the victim **2018 has a simple and obvious remedy-an action for money damages against the guard's employer, the department store. W. Prosser, The Law of Torts s 68, pp. 470-480 (3d ed., 1964).FN5 Such a statutory scheme would have the added advantage of providing some remedy to the completely innocent persons who are sometimes the victims of illegal police conduct-something that the suppression doctrine, of course, can never accomplish.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN5. Damage verdicts for such acts are often sufficient in size to provide an effective deterrent and stimulate employers to corrective action.

A simple structure would suffice.FN6 For example, Congress could enact a statute along the following lines:

FN6. Electronic eavesdropping presents special problems. See 18 U.S.C. ss 2510-2520 (1964 ed., Supp. V).

(a) a waiver of sovereign immunity as to the illegal *423 acts of law enforcement officials committed in the performance of assigned duties;

(b) the creation of a cause of action for damages sustained by any person aggrieved by conduct of governmental agents in violation of the Fourth Amendment or statutes regulating official conduct;

(c) the creation of a tribunal, quasijudicial in nature or perhaps patterned after the United States Court of Claims to adjudicate all claims under the statute;

(d) a provision that this statutory remedy is in lieu of the exclusion of evidence secured for use in criminal cases in violation of the Fourth Amendment; and

(e) a provision directing that no evidence, otherwise admissible, shall be excluded from any criminal proceeding because of violation of the Fourth Amendment.

I doubt that lawyers serving on such a tribunal would be swayed either by undue sympathy for officers or by the prejudice against 'criminals' that has sometimes moved lay jurors to deny claims. In addition to awarding damages, the record of the police conduct that is condemned would undoubtedly become a relevant part of an officer's personnel file so that the need for additional training or disciplinary action could be identified or his future usefulness as a public official evaluated. Finally, appellate judicial review could be made available on much the same basis that it is now provided as to district courts and regulatory agencies. This would leave to the courts the ultimate responsibility for determining and articulating stan-

dards.

Once the constitutional validity of such a statute is established,FN7 it can reasonably be assumed that the States *424 would develop their own remedial systems on the federal model. Indeed there is nothing to prevent a State from enacting a comparable statutory scheme without waiting for the Congress. Steps along these lines would move our system toward more responsible law enforcement on the one hand and away from the irrational and drastic results of the suppression doctrine on the other. Independent of the alternative embraced in this dissenting opinion, I believe the time has come to re-examine the scope of the exclusionary rule and consider at least some narrowing of its thrust so as to eliminate the anomalies it has produced.

FN7. Any such legislation should emphasize the interdependence between the waiver of sovereign immunity and the elimination of the judicially created exclusionary rule so that if the legislative determination to repudiate the exclusionary rule falls, the entire statutory scheme would fall.

In a country that prides itself on innovation, inventive genius, and willingness to experiment, it is a paradox that we should cling for more than a half century to a legal mechanism that was poorly designed and never really worked. I can only hope now that the Congress will manifest a willingness to view realistically the hard evidence of the half-century history of the suppression doctrine revealing**2019 thousands of cases in which the criminal was set free because the constable blundered and virtually no evidence that innocent victims of police error-such as petitioner claims to be-have been afforded meaningful redress.

APPENDIX TO OPINION OF BURGER, C.J., DISSENTING

It is interesting to note that studies over a period of years led the American Law Institute to propose the following in its tentative draft of a model prearraignment code:

'(2) Determination. Unless otherwise required by the Constitution of the United States or of this State, a motion to suppress evidence based upon a *425 violation of any of the provisions of this code shall be

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

91 S.Ct. 1999                                                    Page 19
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

granted only if the court finds that such violation was substantial. In determining whether a violation is substantial the court shall consider all the circumstances, including:

'(a) the importance of the particular interest violated;

'(b) the extent of deviation from lawful conduct;

'(c) the extent to which the violation was willful;

'(d) the extent to which privacy was invaded;

'(e) the extent to which exclusion will tend to prevent violations of this Code;

'(f) whether, but for the violation, the things seized would have been discovered; and

'(g) the extent to which the violation prejudiced the moving party's ability to support his motion, or to defend himself in the proceeding in which the things seized are sought to be offered in evidence against him.

'(3) Fruits of Prior Unlawful Search. If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to a motion to suppress under subsection (1), and if as a result of such search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes that such evidence would probably have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of this Code.'

ALI, Model Code of Pre-Arraignment Procedure ss SS 8.02(2), (3), pp. 23-24 (Tent. Draft No. 4, 1971) (emphasis supplied).

**\*426** The Reporters' views on the exclusionary rule are also reflected in their comment on the proposed section:

'The Reporters wish to emphasize that they are not, as a matter of policy, wedded to the exclusionary rule as the sole or best means of enforcing the Fourth Amendment. See Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. of Chi.L.Rev. 665 (1970). Paragraph (2) embodies what the Reporters hope is a more flexible approach to the problem, subject of course to constitutional requirements.' Id., comment, at 26-27.

This is but one of many expressions of disenchantment with the exclusionary rule; see also:

1. Barrett, Exclusion of Evidence Obtained by Illegal Searches-A Comment on People vs. Cahan, 43 Calif.L.Rev. 565 (1955).

2. Burns, Mapp v. Ohio: An All-American Mistake, 19 DePaul L.Rev. 80 (1969).

3. Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif.L.Rev. 929, 951, 952-954 (1965).

4. F.Inbau, J. Thompson, & C. Sowle, Cases and Comments on Criminal Justice; Criminal Law Administration 1-84 (2d ed., 1968).

5. LaFave, Improving Police Performance Through the Exclusionary Rule **\*\*2020** (pts. 1 & 2), 30 Mo.L.Rev. 391, 566 (1965).

6. LaFave & Remington, Controlling the Police: The Judge's Role in Making and Reviewing Law Enforcement Decisions, 63 Mich.L.Rev. 987 (1965).

7. N. Morris & G. Hawkins, The Honest Politician's Guide to Crime Control 101 (1970).

8. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U.Chi.L.Rev. 665 (1970).

**\*427** 9. Plumb, Illegal Enforcement of the Law, 24 Cornell L.Q. 327 (1939).

10. Schaefer, The Fourteenth Amendment and Sanctity of the Person, 64 Nw.U.L.Rev. 1 (1969).

11. Waite, Judges and the Crime Burden, 54 Mich.L.Rev. 169 (1955).

12. Waite, Evidence-Police Regulation by Rules of Evidence, 42 Mich.L.Rev. 679 (1944).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

91 S.Ct. 1999
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

Page 20

13. Wigmore, Using Evidence Obtained by Ilegal Search and Seizure, 8 A.B.A.J. 479 (1922).

14. 8 J. Wigmore, Evidence s 2184a (McNaughton rev., 1961).
Mr. Justice BLACK, dissenting.
In my opinion for the Court in Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), we did as the Court states, reserve the question whether an unreasonable search made by a federal officer in violation of the Fourth Amendment gives the subject of the search a federal cause of action for damages against the officers making the search. There can be no doubt that Congress could create a federal cause of action for damages for an unreasonable search in violation of the Fourth Amendment. Although Congress has passed such a federal cause of action against state officials acting under color of state law,[FN*] it has never created such a cause of action against federal officials. If it wanted to do so, Congress could, of course, create a remedy against **\*428** federal officials who violate the Fourth Amendment in the performance of their duties. But the point of this case and the fatal weakness in the Court's judgment is that neither Congress nor the State of New York has enacted legislation creating such a right of action. For us to do so is, in my judgment, an exercise of power that the Constitution does not give us.

FN* 'Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.' Rev.Stat. s 1979, 42 U.S.C. s 1983.

Even if we had the legislative power to create a remedy, there are many reasons why we should decline to create a cause of action where none has existed since the formation of our Government. The courts of the United States as well as those of the States are choked with lawsuits. The number of cases on the docket of this Court have reached an unprecedented volume in recent years. A majority of these cases are brought by citizens with substantial complaints-persons who are physically or economically injured by torts or frauds or governmental infringement of their rights; persons who have been unjustly deprived of their liberty or their property; and persons who have not yet received the equal opportunity in education, employment, and pursuit of happiness that was the dream of our forefathers. Unfortunately, there have also been a growing number of frivolous lawsuits, particularly actions for damages against law enforcement officers whose conduct has been judicially sanctioned by state trial and appellate courts and in many instances even by this Court. My fellow Justices on this Court and our brethren throughout the federal judiciary know only too well the time-consuming task of conscientiously poring over hundreds of thousands of pages of factual allegations**\*2021** of misconduct by police, judicial, and corrections officials. Of course, there are instances of legitimate grievances, but legislators might well desire to devote judicial resources to other problems of a more serious nature.

**\*429** We sit at the top of a judicial system accused by some of nearing the point of collapse. Many criminal defendants do not receive speedy trials and neither society nor the accused are assured of justice when inordinate delays occur. Citizens must wait years to litigate their private civil suits. Substantial changes in correctional and parole systems demand the attention of the lawmakers and the judiciary. If I were a legislator I might well find these and other needs so pressing as to make me believe that the resources of lawyers and judges should be devoted to them rather than to civil damage actions against officers who generally strive to perform within constitutional bounds. There is also a real danger that such suits might deter officials from the proper and honest performance of their duties.

All of these considerations make imperative careful study and weighing of the arguments both for and against the creation of such a remedy under the Fourth Amendment. I would have great difficulty for myself in resolving the competing policies, goals, and priorities in the use of resources, if I thought it were my job to resolve those questions. But that is not my task. The task of evaluating the pros and cons of creating judicial remedies for particular wrongs is a matter for Congress and the legislatures of the States. Congress has not provided that any federal court can entertain a suit against a federal officer for violations of Fourth

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
**(Cite as: 403 U.S. 388, 91 S.Ct. 1999)**

Amendment rights occurring in the performance of his duties. A strong inference can be drawn from creation of such actions against state officials that Congress does not desire to permit such suits against federal officials. Should the time come when Congress desires such lawsuits, it has before it a model of valid legislation, 42 U.S.C. s 1983, to create a damage remedy against federal officers. Caess could be cited to support the legal proposition which **\*430** I assert, but it seems to me to be a matter of common understanding that the business of the judiciary is to interpret the laws and not to make them.

I dissent.

Mr. Justice BLACKMUN, dissenting.

I, too, dissent. I do so largely for the reasons expressed in Chief Judge Lumbard's thoughtful and scholarly opinion for the Court of Appeals. But I also feel that the judicial legislation, which the Court by its opinion today concededly is effectuating, opens the door for another avalanche of new federal cases. Whenever a suspect imagines, or chooses to assert, that a Fourth Amendment right has been violated, he will now immediately sue the federal officer in federal court. This will tend to stultify proper law enforcement and to make the day's labor for the honest and conscientious officer even more onerous and more critical. Why the Court moves in this direction at this time of our history, I do not know. The Fourth Amendment was adopted in 1791, and in all the intervening years neither the Congress nor the Court has seen fit to take this step. I had thought that for the truly aggrieved person other quite adequate remedies have always been available. If not, it is the Congress and not this Court that should act.

U.S.N.Y. 1971.

Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics

403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 4

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Saturday, September 19, 2009 00:02 Central |
| Client Identifier: | BARNETT |
| Database: | FEDFIND |
| Citation Text: | 847 F.2d 502 |
| Lines: | 903 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

847 F.2d 502, 56 USLW 2670
**(Cite as: 847 F.2d 502)**

United States Court of Appeals,
Ninth Circuit.
BULLFROG FILMS, INC., et al., Plain-
tiffs-Appellees,
v.
Charles Z. WICK, Director, United States Information
Agency, et al., Defendants-Appellants.
No. 86-6630.

Argued and Submitted July 10, 1987.
Decided May 17, 1988.

Independent film makers, film production and distri-
bution companies, and membership association
brought action challenging United States Information
Agency regulations implementing the Beirut agree-
ment, multilateral treaty aimed at facilitating interna-
tional circulation of educational, scientific, and cul-
tural audio-visual materials. The United States District
Court for the Central District of California, A. Wallace
Tashima, J., 646 F.Supp. 492, held that implementing
regulations establishing substantive criteria for de-
termining eligibility for certification were unconstitu-
tional on their face, and appeal was taken. The Court
of Appeals, Poole, Circuit Judge, held that: (1) inde-
pendent film makers, film production and distribution
companies, and membership association, all of which
had interest in films denied certification under
agreement, had standing to challenge agreement; (2)
challenged regulations violated First Amendment
insofar as they disadvantaged materials on basis of
content; and (3) regulations were unconstitutionally
vague.

Affirmed.

West Headnotes

**[1]** **Administrative Law and Procedure 15A**
☞**391**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative
Agencies, Officers and Agents

15AIV(C) Rules and Regulations
15Ak390 Validity
15Ak391 k. Determination of Validity;
Presumptions. Most Cited Cases

**Treaties 385** ☞**13**

385 Treaties
    385k13 k. Performance and Enforcement of Pro-
visions. Most Cited Cases
Independent film makers, film production and distri-
bution companies, and membership association,
which had interests in films which the United States
Information Agency refused to certify as educational,
scientific, or cultural under the Beirut agreement, had
standing to challenge the USIA's implementing regu-
lations; allegations that customs duties had to be paid
on four films to export them to Canada and that denial
of benefits under agreement put films at competitive
disadvantage established injury in fact, and there was
substantial likelihood that those injuries would be
redressed by requested relief. Act Oct. 8, 1966, § 1 et
seq., 80 Stat. 879; U.S.C.A. Const. Art. 3, § 1 et seq.;
U.S.C.A. Const.Amends. 1, 5.

**[2]** **Administrative Law and Procedure 15A**
☞**390.1**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative
Agencies, Officers and Agents
        15AIV(C) Rules and Regulations
            15Ak390 Validity
                15Ak390.1 k. In General. Most Cited
Cases
        (Formerly 15Ak390)

**Treaties 385** ☞**13**

385 Treaties
    385k13 k. Performance and Enforcement of Pro-
visions. Most Cited Cases
United States Information Agency regulations im-
plementing Beirut agreement, multilateral treaty
aimed at facilitating international circulation of edu-
cational, scientific, and cultural audio-visual mate-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
**(Cite as: 847 F.2d 502)**

rials, did not violate agreement; while regulations did not provide widest possible definition of what was educational, scientific, or cultural, they were not so restrictive that they could be found inconsistent with agreement's broad mandate. Act Oct. 8, 1966, § 1 et seq., 80 Stat. 879.

**[3] Constitutional Law 92 ☞1545**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
            92XVIII(A)3 Particular Issues and Applications in General
                92k1545 k. In General. Most Cited Cases
        (Formerly 92k90.1(1))

**United States 393 ☞40**

393 United States
    393I Government in General
        393k40 k. Authority and Powers of Officers and Agents and Exercise Thereof. Most Cited Cases
        (Formerly 92k90.1(1))
United States Information Agency regulations implementing Beirut agreement, multilateral treaty aimed at facilitating international circulation of educational, scientific, and cultural audio-visual materials, infringed the First Amendment insofar as they disadvantaged materials on basis of content and, therefore, were subject to strict scrutiny. Act Oct. 8, 1966, § 1 et seq., 80 Stat. 879; U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law 92 ☞1545**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
            92XVIII(A)3 Particular Issues and Applications in General
                92k1545 k. In General. Most Cited Cases
        (Formerly 92k90.1(1))

**United States 393 ☞40**

393 United States
    393I Government in General
        393k40 k. Authority and Powers of Officers and Agents and Exercise Thereof. Most Cited Cases
        (Formerly 92k90.1(1))
United States Information Agency regulations implementing Beirut agreement, multilateral treaty aimed at facilitating international circulation of educational, scientific, and cultural audio-visual materials, violated the First Amendment insofar as they disadvantaged materials on basis of content; regulations did not advance compelling stay interest, nor were they narrowly drawn. Act Oct. 8, 1966, § 1 et seq., 80 Stat. 879; U.S.C.A. Const.Amend. 1.

**[5]  Administrative  Law  and  Procedure  15A ☞390.1**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(C) Rules and Regulations
            15Ak390 Validity
                15Ak390.1 k. In General. Most Cited Cases
        (Formerly 15Ak390)

**Treaties 385 ☞13**

385 Treaties
    385k13 k. Performance and Enforcement of Provisions. Most Cited Cases
United States Information Agency regulations implementing Beirut agreement, multilateral treaty aimed at facilitating international circulation of educational, scientific, and cultural audio-visual materials, were unconstitutionally vague insofar as they attempted to establish substantive criteria for determining eligibility for certification of materials under agreement; regulations enabled USIA officials to act in arbitrary and discriminatory manner in granting or denying certificates and still be completely within scope of their regulations. Act Oct. 8, 1966, § 1 et seq., 80 Stat. 879; U.S.C.A. Const.Amend. 5.
***503** Wendy M. Keats, Appellate Staff Atty., U.S. Dept. of Justice (Civil Div.), Washington, D.C., for defendants-appellants.

David Cole, Center for Constitutional Rights, New

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
 **(Cite as: 847 F.2d 502)**

York City, Ben Margolis, Margolis, McTernan, Scope & Epstein, Los Angeles, Cal., for plaintiffs-appellees.

Robert B. Broadbelt, ACLU Foundation of Southern California, Los Angeles, Cal., for amici.

Appeal from the United States District Court for the Central District of California.

Before BROWNING, FLETCHER and POOLE, Circuit Judges.

POOLE, Circuit Judge:

This appeal is brought by the United States Information Agency (USIA), as the federal agency charged with the domestic administration of the Beirut Agreement, a multilateral treaty aimed at facilitating the international circulation of "educational, scientific and cultural" audio-visual materials. Under the treaty, qualifying materials receive various benefits, including exemption from import duties. A certificate of international educational character is a necessary prerequisite to the receipt of treaty **\*504** benefits. Owners of American materials must apply to the USIA for such certificates. Plaintiffs-appellees are film makers, production and distribution companies and a membership association, all of whom have an interest in one or more films that were denied certification. In their complaint, plaintiffs alleged that the regulations employed by the USIA to implement the treaty were unconstitutional. On a motion for summary judgment, the district court agreed, holding that three of the regulations are facially unconstitutional, in violation of the First and Fifth Amendments.

For reasons set forth below, we affirm.

I.

A.

The Beirut Agreement,[FN1] the outgrowth of a proposal by the United States delegation to the General Conference of the United Nations Educational, Scientific and Cultural Organization (UNESCO) at its third session in Beirut, Lebanon, in 1948, entered into force on August 12, 1954. S.Rep. No. 1626, 89th Cong., 2d Sess. 2, *reprinted in* 1966 U.S.Code Cong. & Ad-

min.News 3143, 3143-44 (S.Rep. No. 1626). The United States Senate ratified the Agreement on May 26, 1960, but deposit of ratification was withheld pending the enactment of implementing legislation. *Id.* On October 8, 1966, Congress passed the necessary implementation statute, Pub.L. No. 89-634; 80 Stat. 879 (1966), and formal operations by the United States under the Agreement commenced January 12, 1967. 22 C.F.R. § 502.1.

> FN1. Opened for signature July 15, 1949, 17 U.S.T. 1578, T.I.A.S. No. 6116, 197 U.N.T.S. 3.

According to its Preamble, the purpose of the Agreement is to facilitate the international circulation of audio-visual materials that are of an "educational, scientific and cultural character." This objective is portrayed as part of a larger effort to promote the "free flow of ideas by word and image" and encourage "the mutual understanding of peoples."

To achieve these ends, contracting States agree to accord certain benefits to qualifying materials. These benefits include exemption from customs duties, import licenses, special rates, quantitative restrictions and other restraints and costs. Art. III, ¶¶ 1, 3. The value of these benefits to those seeking to export audio-visual materials can be substantial.[FN2]

> FN2. According to one source, film makers may be confronted by duties of up to $50,000 per print. Robinson, *Silenced Screens: The Role of the United States Information Agency In Denying Export Certificates to American Films,* 17 N.Y.U.J.Int'l L. & Pol. 77, 77-78 (1978).

Securing favorable treatment under the Agreement is a two-step process. First, the exporter must obtain a certificate from the appropriate governmental agency in the country of the material's origin attesting to the item's educational, scientific or cultural character. Art. IV, ¶¶ 1-2. Second, the certificate must be filed with the appropriate governmental agency of the contracting State into which entry is sought. That agency must then decide for itself whether the material presented qualifies for benefits under the Agreement. Art. IV, ¶ 4. The decision of the importing state is final. Art. IV, ¶ 6.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
 **(Cite as: 847 F.2d 502)**

Article I of the Agreement offers the following broad standards for judging whether materials qualify as educational, scientific or cultural:

Visual and auditory materials shall be deemed to be of an educational, scientific and cultural character:

(a) when their primary purpose or effect is to instruct or inform through the development of a subject or aspect of a subject, or when their content is such as to maintain, increase or diffuse knowledge, and augment international understanding and goodwill; and

(b) when the materials are representative, authentic, and accurate; and

(c) when the technical quality is such that it does not interfere with the use made of the material.

**\*505** When Congress, in 1966, enacted implementing legislation, it authorized the President to designate a federal agency to "take appropriate measures for the carrying out of the provisions of the Agreement including the issuance of regulations." Pub.L. No. 89-634; 80 Stat. 879. Pursuant to this Congressional delegation, the USIA, the selected agency, issued regulations to facilitate the implementation of the Agreement. *World-Wide Free Flow (Export-Import) of Audio-Visual Materials*, 22 C.F.R. §§ 502.1-502.8. Under these regulations, applications for certificates of international educational character are reviewed by the Agency's Chief Attestation Officer or his subordinates. If certification is denied, the regulations provide for appeal to a Review Board, and, as a last resort, to the director of the USIA. 22 C.F.R. § 502.5(b)-(c).

In addition to setting application procedures, the USIA's implementing regulations establish "substantive criteria" for determining eligibility for certification. 22 C.F.R. § 502.6. Three of these regulations were held by the district court to be unconstitutional on their face and are at issue in this appeal. The first regulation repeats verbatim the definition of "educational, scientific or cultural" found in Article I of the Agreement. 22 C.F.R. § 502.6(a)(3). The other two regulations were promulgated by the USIA to assist in the "interpretation" of the Article I criteria. Section 502.6(b)(3) provides:

The Agency does not certify or authenticate materials which by special pleading attempt generally to influence opinion, conviction or policy (religious, economic, or political propaganda), to espouse a cause, or conversely, when they seem to attack a particular persuasion....

Section 502.6(b)(5) reads as follows:
The Agency does not regard as augmenting international understanding or good will and cannot certify or authenticate any material which may lend itself to misinterpretation, or misrepresentation of the United States or other countries, their peoples or institutions, or which appear to have as their purpose or effect to attack or discredit economic, religious, or political views or practices.

B.

Plaintiffs-appellees are independent film makers, film production and distribution companies and a membership association. They brought suit in the district court to challenge the constitutionality of two of the USIA regulations referred to in the previous section, 22 C.F.R. §§ 502.6(b)(3) and (b)(5), after the USIA refused to certify seven of their films as "educational, scientific, or cultural" under the Agreement.

The films denied certification cover a wide range of topics and are described briefly by appellees as follows: (1) *In Our Own Backyards: Uranium Mining in the United States* looks at "the effects of uranium mining on the environment and on the health of those who work in or live near the mines"; (2) *Save the Planet* presents "a film history of the atomic age"; (3) *Ecocide: A Strategy of War* "documents the environmental impact of United States military tactics in Vietnam"; (4) *From the Ashes ... Nicaragua Today* "traces the historical roots of the 1979 Nicaraguan Revolution"; (5) *Whatever Happened to Childhood?* "addresses the changing reality facing children growing up in modern-day urban America, principally through first-hand interviews and statistical evidence"; (6) *Peace: A Conscious Choice* "attempts to teach its viewers about the first step toward peace in a Cold War society, by suggesting that the United States and the Soviet Union are inextricably related, and that their relationship has implications for world peace"; (7) *The Secret Agent* "examines the use and effects of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
**(Cite as: 847 F.2d 502)**

dioxin, a toxic ingredient in Agent Orange, through archival footage and interviews." Aples.' Br. at 6-11. Many of these films are the recipients of prizes, awards and other forms of critical acclaim.

The district court granted plaintiffs' motion for summary judgment, finding both §§ 502.6(b)(3) and (b)(5) facially violative of the First and Fifth Amendments. *Bullfrog Films, Inc. v. Wick,* 646 F.Supp. 492, 510 (C.D.Cal.1986). The court, *sua sponte,* also granted summary judgment to plaintiffs **\*506** with respect to the facial invalidity of § 502.6(a)(3). *Id.* It went on to permanently enjoin the USIA from enforcing the three regulations and ordered the Agency to reconsider the eligibility of plaintiffs' films under constitutionally sound standards. *Id.* at 510-11.[FN3]

> [FN3.] Plaintiffs also alleged that (1) §§ 502.6(a)(3), (b)(3), and (b)(5) are invalid as applied, and (2) the USIA illegally delegated its authority to grant or deny certificates to "non-neutral" agencies. The district court did not have occasion to reach these claims, and we do not do so herein.

The USIA now appeals.

## II.

[1] Our initial concern is with the USIA's argument that plaintiffs-appellees lack standing to challenge the Agency's regulations. Rejecting the conclusions of the district court, the USIA contends that plaintiffs have failed to meet the requirements for Article III standing set forth in *Valley Forge Christian College v. Americans United For Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).[FN4] We disagree.

> [FN4.] At an "irreducible minimum" Article III standing requires that a plaintiff show (1) "that he personally has suffered some actual or threatened injury" as a result of defendant's conduct, (2) that the injury "fairly can be traced to the challenged action" and (3) that the injury "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). *See*

*also Fair v. United States E.P.A.,* 795 F.2d 851, 853 (9th Cir.1986); *Preston v. Heckler,* 734 F.2d 1359, 1364 (9th Cir.1984).

### A.

The requirement that a plaintiff present an injury in fact is satisfied by the showing of a pecuniary injury. *Data Processing v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). By alleging they have had to pay customs duties to export to Canada four of their films, plaintiffs discharge this burden.[FN5] Plaintiffs also satisfy this requirement by alleging that the denial of benefits under the Agreement puts their films at a competitive disadvantage in the international marketplace, resulting in the loss of sales. *See Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 64 n. 6, 83 S.Ct. 631, 636 n. 6, 9 L.Ed.2d 584 (1963). Although plaintiffs did not produce evidence that the payment of customs duties or other barriers caused decreased sales or profits, at the summary judgment stage, a plaintiff's allegations need not be proven but merely provable. *United States v. SCRAP,* 412 U.S. 669, 689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).

> [FN5.] Plaintiffs present a Canadian customs form which shows that on July 2, 1987 Churchill Films paid $67.00 in duties to export a copy of *Whatever Happened to Childhood?.* Similar documentation shows that on June 11, 1986 Green Mountain Post Films paid $3.41 to export a copy of *Save the Planet* and $2.56 for a copy of *Ecocide: A Strategy of War.* (While it is not clear whether the amounts reflect U.S. or Canadian dollars, the disparity in duties paid reflects the differentiation in film valuation.) Plaintiffs also present the affirmation of Melanie Maholick, Secretary-Treasurer of the International Women's Film Project, Inc. attesting to the payment "on several occasions" of duties for exporting *From the Ashes ... Nicaragua Today* into Canada.

We also find merit in plaintiffs' contention that the denial of USIA certification works a cognizable injury to their ability to compete for benefits under the Agreement. Such competitive injuries have often been recognized as grounds for standing. *Regents of University of California v. Bakke,* 438 U.S. 265, 280-81 n.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
**(Cite as: 847 F.2d 502)**

14, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978) (university decision not to permit plaintiff to compete for all 100 places in entering medical school class); Preston v. Heckler, 734 F.2d 1359, 1365 (9th Cir.1984) (failure of government agency to adopt standards that would enable plaintiff to be considered for employment); Glacier Park Foundation v. Watt, 663 F.2d 882, 885 (9th Cir.1981) (federal agency's statutory violations rendered plaintiff "unable to compete on an equal basis" for concession contract). Cf. Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 261-63, 97 S.Ct. 555, 561-63, 50 L.Ed.2d 450 (1977) (refusal of city to rezone precluded possibility of construction of low income-housing). Here, it is undisputed that a certificate of **507 international educational character is, as the district court found, an "indispensable prerequisite" to the realization of benefits under the Agreement. 646 F.Supp. at 501; see Treaty, Art. IV, ¶ 1. The USIA acknowledged as much when in its briefs below it stated that USIA certificates are the "*sine qua non* for receipt of customs exemptions." 646 F.Supp. at 502. We therefore find that plaintiffs have sustained a competitive injury because by denying certification the USIA has deprived them of the opportunity to obtain favorable treatment under the Agreement.[FN6]

> **FN6.** At oral argument, counsel for the USIA suggested that benefits approximating those attainable under the Agreement might be available through other channels. We find this contention meritless because (1) there is no evidence that there exists more than a theoretical possibility that comparable benefits might somehow be obtained, and (2) without a USIA certificate plaintiffs may not receive benefits *under* the Agreement. Even if similar benefits could be had through what can only be presumed to be the largesse of a foreign government, the need to hurdle special obstacles is itself a detriment which confers standing. Meese v. Keene, 481 U.S. 465, 107 S.Ct. 1862, 1868-69, 95 L.Ed.2d 415 (1987); Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

> Plaintiffs also allege standing on the ground that the regulations impair their First Amendment rights. The district court, without deciding, indicated that it ap-

proved this argument. See 646 F.Supp. at 500 n. 12. Because we find that plaintiffs adequately allege standing on other grounds, we decline the invitation to decide this issue.

### B.

The USIA takes the position that even if the injury in fact requirement is met, none of the alleged injuries is likely to be redressed by a favorable judgment because importing states will necessarily reject plaintiffs' films. We reject this contention. First, we are not persuaded that all Beirut Agreement signatories employ precisely the same implementing regulations, *i.e.* the regulations promulgated by the USIA. So far as we can discern, with the exception of Canada, none of the approximately sixty other Beirut Agreement participants, *see* 22 C.F.R. § 502.7(e), has promulgated any formal regulations to implement the Treaty whatsoever. Nevertheless, appellants ask us to conclude that the absence of any contrary regulations establishes the *de facto* adoption of the USIA's regulations by the other countries. We do not find support in fact for that conclusion.[FN7] Second, even if it could be established that all other signatory nations had adopted the USIA's regulations, appellants would still have the burden of showing that the regulations are uniformly applied. Otherwise, it could not be said that certification of plaintiffs' materials would certainly lead to their rejection by any and all importing nations. The inherent ambiguity and subjectivity of the regulations makes in our judgment such a double coincidence far less than a sure bet. Moreover, the fact that the USIA has in the past rejected films certified by Canada serves as proof that authorities in two countries with the same regulations do not always concur. *See* Aples.' Br. at 17 n. 11.

> **FN7.** Appellants cite a UNESCO document titled "A Guide to the Operation of the Agreement for Facilitating the International Circulation of Visual and Auditory Materials of an Educational, Scientific and Cultural Character," Aplts.' Br. Addendum at 20, in an effort to prove that all other Treaty participants have *de facto* adopted USIA-like regulations. The UNESCO document, however, which appellants refer to as the "UNESCO Guidelines," are not in fact guidelines at all

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
**(Cite as: 847 F.2d 502)**

with respect to determinations of eligibility for certification. The document merely reports that "certain participating countries" have adopted special regulations. It does not require, or even encourage, other countries to follow suit.

At present, there is no disagreement among the parties that USIA certificates are accepted by importing states as a matter of course. We see no reason why this practice would change dramatically if the USIA certified films such as plaintiffs. Accordingly, we conclude that there is a substantial likelihood that plaintiffs' pecuniary injuries are "likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

Redress seems even more certain for the injury plaintiffs allege to their ability to compete for Beirut Agreement benefits. If plaintiffs' films are certified by the USIA, they at least stand a chance of winning **\*508** foreign acceptance. Without a certificate, they have no possibility of even being considered by other countries for duty and licensing exemptions. Opening the door to the possibility of obtaining sought after benefits is sufficient to satisfy the redress requirement. *Bakke,* 438 U.S. at 280 n. 14, 98 S.Ct. at 2743 n. 14; *Preston,* 734 F.2d at 1366; *West Virginia Assn. of Community Health Centers v. Heckler,* 734 F.2d 1570, 1576 (D.C.Cir.1984).[FN8]

> FN8. This is not a case such as *Fernandez v. Brock,* 840 F.2d 622 (9th Cir.1988), where it is merely speculative as to whether the relief sought will increase the plaintiffs' opportunity to seek benefits. In *Fernandez,* migrant farm workers sought to compel the Secretary of Labor to issue regulations under ERISA governing pension plans for seasonal employees. We held that because the plaintiffs could only speculate what those regulations might be and whether their employers would continue to participate, they could not establish that the relief sought would increase their opportunity to receive pension benefits. 840 F.2d at 626-28 (citing *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d (1984), and *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). Here,

by contrast, it is clear that certification of plaintiffs' films would increase plaintiffs' opportunity to compete for benefits under the Beirut Agreement.

III.

[2] In the interests of judicial economy, the court should decide this case on non-constitutional grounds, if possible. Thus, we first consider appellees' contention that the two interpretive regulations, §§ 502.6(b)(3) and (5), offend the Agreement, and are therefore invalid.

In order for regulations to be valid, they must be consistent with the legislation under which they are promulgated. *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936). If they are not, they are void as contrary to law. 5 U.S.C. § 706(2)(A); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 131 (9th Cir.1980).

The USIA regulations were enacted pursuant to Pub.L. No. 89-634. This implementing legislation was obviously intended to give the USIA broad discretion by authorizing it "to take appropriate measures for carrying out the provisions of the Agreement including the issuance of regulations." The legislative history adds nothing to limit the scope of the USIA's discretion. *See* S.Rep. No. 1629. Thus, whether the USIA has acted in conformity with Pub.L. No. 89-634 turns on the language of the Treaty itself.

Appellees maintain that the Treaty's broad definition of "educational, scientific and cultural" excludes interpretations which narrow its scope. They contend that even if their films do attempt to influence opinion, espouse a cause or attack a political view or persuasion, in violation of 22 C.F.R. 502.6(b)(3) and (5), they remain within the Treaty's definition of educational because they nevertheless serve to instruct, inform and increase knowledge. Any materials which satisfy the Article I definition, appellees emphasize, "shall" be deemed educational in character. Appellees therefore insist that the regulations are invalid because they deny certification to materials that, under a broad reading of the Treaty definition, presumably qualify as educational. The district court rejected appellees'

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
**(Cite as: 847 F.2d 502)**

contention. It held that "the Treaty's language is so broad that it provides no standards against which the Court can judge the Agency's regulations." 646 F.Supp. at 500-01.

While we hesitate to say that the Treaty provides "no standards", we do agree that the language is extremely broad and susceptible to multiple interpretations. While the USIA regulations do not provide the widest possible definition of what is educational, scientific or cultural, they are not so restrictive that we may find them inconsistent with Pub.L. 89-634's broad mandate. The fact that the Canadian regulations are similar to those challenged here, and that UNESCO referred to them without criticism, underscores our conclusion. Unable to resolve this case on statutory grounds, we proceed to the constitutional issues.

***509** IV.

A.

[3] Before we can determine whether the regulations are constitutional, we must first ascertain the appropriate level of scrutiny. We are guided in our inquiry by the understanding that "[g]enerally, statutory classifications are valid if they bear a rational relation to a legitimate governmental purpose. Statutes are subjected to a higher level of scrutiny if they interfere with the exercise of a fundamental right, such as freedom of speech...." *Regan v. Taxation With Representation, 461 U.S. 540, 547, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983).* Our initial concern, therefore, is whether the regulations impinge on the exercise of plaintiffs' First Amendment rights.[FN9]

> FN9. A logically prior question, whether the First Amendment applies abroad, was raised by the district court. After receiving supplemental briefing, the court concluded: "[T]here can be no question that, in the absence of some overriding governmental interest such as national security, the First Amendment protects communications with foreign audiences to the same extent as communications within our borders." 646 F.Supp. at 502. Neither party challenges the district court's well-reasoned conclusion on appeal. We therefore find it unnecessary to revisit the issue.

Appellants argue that the regulations do not implicate the First Amendment because they do not punish or directly obstruct plaintiffs' ability to produce or disseminate their films. We disagree both with appellants' benign characterization of the effect of their regulations and with their limited reading of the requirements of the First Amendment.

As they did below, appellants seek to characterize this as a case of the government simply declining to pay a subsidy, as in *Regan v. Taxation With Representation, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983),* where the Court held that the government may withhold a tax subsidy from nonprofit public interest organizations if they engage in political lobbying. The challenged statute and regulations in *Regan* distinguished lobbying from informational and charitable activities, and reflected Congress' choice under the spending power to refuse to use Treasury funds to subsidize the lobbying activity. In upholding this distinction, the Court relied on the fact that the lobbying restriction was neutral as to content and not aimed at the suppression of particular ideas. *Id.* at 548, 103 S.Ct. at 2002.[FN10] Our case is fundamentally different. Here, the challenged regulations discriminate based on content within given media of expression. Moreover, here, no Treasury Department funds are involved. As the district court observed, if any "subsidy" is to be paid at all, it "would come from the treasuries of the foreign states that agree to waive their customs duties." 646 F.Supp. at 501. *See also* Christ, *The Beirut Agreement: A License to Censor?,* 7 Loy.L.A.Int'l & Comp.L.J. 255, 268-69 & n. 97 (1985).

> FN10. The Court further observed that the organization could express its views and still get the tax subsidy by returning to its "dual structure" in which a separate, affiliated organization did the lobbying. 461 U.S. at 544, 103 S.Ct. at 2000.

Nor do we find *Harris v. McRae, 448 U.S. 297, 316, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784 (1980),* holding that a state need not subsidize abortions although it subsidizes other medical procedures, including childbirth, to be controlling authority. The Court, in *Harris* reasoned that "although government may not place obstacles in the path of a woman's exercise of her

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
**(Cite as: 847 F.2d 502)**

freedom of choice, it need not remove those not of its own creation." 448 U.S. at 316, 100 S.Ct. 2688. *See also Maher v. Roe,* 432 U.S. 464, 474, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977). Here, by contrast, the government's denial of certification constitutes an absolute barrier to benefits under the treaty.

Appellants argue that the regulations do not "interfere" with plaintiffs' freedom of speech because they do not draw distinctions on the basis of the speaker's point of view. Whether the regulations are indeed "viewpoint neutral", as appellants assert, is doubtful.[FN11] However, the Supreme Court *510 has made it clear that legislation "does not evade the strictures of the First Amendment merely because it does not burden the expression of particular *views....*" *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 1728, 95 L.Ed.2d 209 (1987). Even if the regulations could be deemed neutral with respect to their burden on viewpoint, they may still be found to "interfere" with the exercise of plaintiffs' free speech interests if they improperly discriminate between exercises of protected speech on the basis of content. *See FCC v. League of Women Voters,* 468 U.S. 364, 383-84, 104 S.Ct. 3106, (1984); *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 518-19, 101 S.Ct. 2882, 2898, 69 L.Ed.2d 800 (1981) (plurality opinion); *Consolidated Edison Co. v. Public Service Comm'n of New York,* 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980); *Carey v. Brown,* 447 U.S. 455, 462 n. 6, 100 S.Ct. 2286, 2291 n. 6, 65 L.Ed.2d 263 (1980); *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972).

FN11. Discrimination against the expression of particular points of view is especially disfavored, because "[t]here is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard." *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

Appellants acknowledge that the regulations forbid certification of films that "present a point of view." Plaintiffs' Statement of Uncontroverted Facts, ¶ 5, ER at 45. *In our Own Backyards,* for example, was denied certification not because of its general subject-matter-nuclear

energy-but because it expressed "a point of view" on that subject. However, *Radiation ... Naturally,* a film on the same subject with the opposite point of view, was granted an educational certificate. Arguably, *In Our Own Backyards* was denied certification because its viewpoint was one with which USIA and Department of Energy officials did not agree.

Nevertheless, appellants argue that the regulations are not viewpoint-based because rather than forbidding particular viewpoints, they forbid all points of view. This argument is flawed for two reasons.

First, even if we were to accept the proposition that criteria such as "balance," "viewpoint neutrality" and "objectivity" lend themselves to clear and uniform application, we note that the regulations, taken as a whole, are not viewpoint neutral. By denying certification to materials which "espouse a cause," "attack a particular persuasion," or "lend [themselves] to misinterpretation, or misrepresentations of the United States or other countries, their peoples or institutions, or which appear to have as their purpose or effect to attack or discredit economic, religious, or political views or practices," the regulations seem to disapprove materials that criticize and approve those that accept the prevailing state of affairs on a given topic. This slant in the regulations has been amply demonstrated in the practices of the USIA.

Second, we agree with the district court that "[o]ur nation considers the free exchange of ideas to be central to the educational process.... Thus, any definition of 'educational' that is constitutionally acceptable must accommodate materials that purport to reach a conclusion or take a stand." 646 F.Supp. at 507 (citing *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967), quotation omitted).

The challenged regulations require that in order to be

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
**(Cite as: 847 F.2d 502)**

certified, a film must be balanced and truthful; must neither criticize nor advocate any political, religious, or economic views; and must not "by special pleading" seek to influence opinion or policy. Each of these requirements draws content-based lines forbidden by the First Amendment.

The danger inherent in government editorial oversight, even in the interest of "balance," is well established. In *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), a unanimous Court struck down a Florida statute which required newspapers in the state to present balanced campaign coverage by publishing candidates' replies to editorial criticism of the candidate. According to the Court, "[i]t has yet to be demonstrated how governmental regulation of [the editorial] process can be exercised consistent with the First Amendment." *Id. at 258, 94 S.Ct. at 2840.* The USIA has gone so far as to deny certificates not only because certain views were assertedly missing, but also because viewpoints mentioned were, in the government's editorial judgment, insufficiently highlighted. However, the First Amendment does not allow the government to require independent filmmakers to present all views on a subject, or indeed any view contrary to the filmmakers' own. *See Big Mama Rag, Inc. v. United States,* 631 F.2d 1030 n. 18 (D.C.Cir.1980).

**\*511** The USIA's proscriptions on films that "attempt generally to influence opinion" or to espouse or criticize a cause or policy are also unconstitutional, because they limit expressions of opinion on issues of public controversy. *See Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (striking down order forbidding public utilities from using bill inserts to discuss "controversial issues of public policy"); *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (striking down prohibition on editorializing by public broadcasting companies). Regulations based on the political or controversial subject matter of speech are particularly invidious, for they restrict public debate in that area most privileged by the First Amendment. *League of Women Voters,* 468 U.S. at 381, 104 S.Ct. at 3118; *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982) ("expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.' ") *Cf. Police Dep't of Chicago v. Moseley,* 408 U.S. 92,

96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) ("government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.").

In sum, we find that the regulations plainly interfere with the exercise of plaintiffs' First Amendment rights. First, they disadvantage materials on the basis of content. Non-certified materials are entirely ineligible to receive benefits under the Agreement, including the waiver of import duties. Such content-based distinctions are patently offensive to the First Amendment. *See Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 1726-28, 95 L.Ed.2d 209 (1987). Second, by conditioning a valuable governmental benefit on the basis of speech content, the USIA forces film makers to choose between exercising their right to free speech and foregoing benefits under the Agreement, or curtailing their speech and obtaining the benefits. The imposition of this sort of dilemma patently transgresses the well-established principle that government may not condition the conferral of a benefit on the relinquishment of a constitutional right:

For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit.... [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-especially his interest in freedom of speech.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). *See also Thomas v. Review Board,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). For these reasons we conclude that the regulations infringe the First Amendment and warrant the imposition of strict scrutiny.

B.

[4] As a result of our determination that appellants' content-based regulations infringe the First Amend-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
 **(Cite as: 847 F.2d 502)**

ment, appellants' burden in attempting to uphold its regulations is heavy. In order to justify its scheme for awarding Beirut Agreement certificates, appellants must demonstrate that their regulations are "necessary to serve a compelling state interest" and are "narrowly drawn to achieve that end." *Arkansas Writers' Project,* 107 S.Ct. at 1728; *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

Relying on its earlier argument that the "rational relation" standard of review applies, the USIA makes no effort to discharge this higher standard. Instead, the government argues that a deferential level of scrutiny is appropriate because USIA certification decisions implicate "the delicate area of foreign relations." Appellant's Br. at 32. We agree with the district court in rejecting the suggestion that the First Amendment's protection is lessened when the expression is directed abroad. 646 F.Supp. 503-04.

**\*512** The cases cited by the government do not support its contention that otherwise protected free speech interests may be routinely subordinated to foreign policy concerns. In these cases, the Supreme Court either found the speech to be unprotected, see *Haig v. Agee,* 453 U.S. 280, 284-85 & n. 7, 308-09, 101 S.Ct. 2766, 2770 & n. 7, 2782-83, 69 L.Ed.2d 640 (1981) (disclosures damaging to intelligence operations and threatening to lives of American personnel are not protected by First Amendment), or else found that no content-based restrictions on speech were involved in government-imposed travel restrictions. See *Regan v. Wald,* 468 U.S. 222, 241-42, 104 S.Ct. 3026, 3037, 82 L.Ed.2d 171 (1984) (upholding content- and viewpoint-neutral restrictions on travel to Cuba); *Zemel v. Rusk,* 381 U.S. 1, 13, 85 S.Ct. 1271, 1279, 14 L.Ed.2d 179 (1965) (same). Indeed, the Supreme Court has recently held that the government's interest in obeying its international law obligation to safeguard the "dignity" of foreign embassies and diplomats was not "automatically" to be regarded as " 'compelling' for purposes of First Amendment analysis." *Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 1165, 99 L.Ed.2d 333 (1988) (striking down content-based restriction on display of placards critical of foreign governments outside those governments' embassies). As the district court aptly stated:

it is clear that there is no "sliding scale" of First

Amendment protection under which the degree of scrutiny fluctuates in accordance with the degree to which the regulation touches on foreign affairs. Rather, the only permissible non-neutral inquiry into the content of the speech is whether the statements adversely affect foreign policy interests to such a degree that the speech is completely unprotected. As *Haig v. Agee* itself indicates, the clearest example of the kind of compelling government interest that would lead to such a result is where the speech poses a clear and direct threat to national security.

646 F.Supp. at 504.

We do not perceive the existence of a compelling state interest, and the government advances none. Certainly the existence of a Treaty does not by itself justify content-based discrimination in violation of the First Amendment. See *Boos v. Barry,* 108 S.Ct. at 1165; see also *Reid v. Covert,* 354 U.S. 1, 16-19, 77 S.Ct. 1222, 1230-31, 1 L.Ed.2d 1148 (1957). Moreover, we are not presented here with the sort of delicate foreign policy matter best entrusted to the political branches. Cf. *Regan v. Wald,* 468 U.S. at 242, 104 S.Ct. at 3037 (upholding restrictions on travel to Cuba). Nor do we find that the regulations are narrowly drawn. Accordingly, we agree with the district court that the challenged regulations violate the First Amendment.

V.

[5] Due process requires that insufficiently clear regulations be held void for vagueness. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). Laws that are vague are objectionable on a number of grounds. First, they may "trap the innocent by not providing fair warning." *Id.* Second, "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108-109, 92 S.Ct. at 2298-99. Third, a vague statute that implicates First Amendment freedoms discourages the exercise of those freedoms: ' "Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" ... than if the boundaries of the forbidden areas were clearly marked.' " *Id.* at 109, 92 S.Ct. at 2299.

Not surprisingly, where the guarantees of the First

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
**(Cite as: 847 F.2d 502)**

Amendment are at stake the Court applies its vagueness analysis strictly. In invalidating a New York State teacher loyalty law on grounds of unconstitutional vagueness, the Court stated:

We emphasize once again that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms," *513*N.A.A.C.P. v. Button, 371 U.S. 415, 438 [83 S.Ct. 328, 340, 9 L.Ed.2d 405]; "[f]or standards of permissible statutory vagueness are strict in the area of free expression.... Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." Id., at 432-433 [83 S.Ct. at 337-338].

Keyishian v. Board of Regents, 385 U.S. 589, 603-04, 87 S.Ct. 675, 684, 17 L.Ed.2d 629] (1967).

In this case, the district court decided that §§ 502.6(b)(3) and (5) were "unquestionably ... unconstitutionally vague," adding: "these regulations are not merely 'flexible'; they are boundless." 646 F.Supp. at 505. The district court drew the same conclusion with respect to § 502.6(a)(3). Id. at 507.

Appellants contend first that because the certificates are simply an expression of governmental opinion, and do not confer or deny any benefits or interfere with any activity, the certification process does not implicate constitutional considerations, including the right to due process. This contention clearly fails for reasons stated in the preceding section of this opinion.

Second, appellants argue that a greater degree of vagueness is tolerated with respect to civil enactments, as opposed to criminal, "because the consequences of imprecision are qualitatively less severe." Hoffman Estates v. Flipside, 455 U.S. 489, 498-99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). While this may be true generally, it is not the case where constitutional rights are at issue. See Keyishian, supra. In fact the Court in Hoffman Estates makes this very point:

perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

455 U.S. at 499, 102 S.Ct at 1193 (emphasis added).

Appellants further contend that the regulations survive the vagueness challenge because "they are set out in terms that the ordinary person exercising ordinary common-sense can sufficiently understand and comply with." Apts.' Br. at 36, quoting United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 578-79, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973). The validity of appellants, assertion is called into serious doubt by an examination of the language of the regulations themselves. Under 502.6(b)(3) the Agency does not certify materials which "by special pleading attempt generally to influence opinion conviction or policy ... espouse a cause, or ... seem to attack a particular persuasion." An ordinary person would be hard pressed to define "special pleading." He would also be unlikely to know precisely what it means to "attempt generally to influence opinion, conviction or policy," or "to espouse a cause." Some attempt to influence policy would seem to be permitted. How much? When does material "seem to attack a particular persuasion"? When does it not? What is a "persuasion"?

Section 502.6(b)(5) is equally mystifying. By what standard does the USIA decide whether material lends itself to "misinterpretation, or misrepresentation of the United States or other countries, their peoples or institutions"? When do materials "appear to have as their purpose or effect to attack or discredit economic, religious, or political views or practices"?

As for 502.6(a)(3), though it tracks the language of the Treaty, it too is highly ambiguous. Material may be certified if its "content is such as to ... augment international understanding and good will." It must also be "representative", "authentic" and "accurate". This terminology is unquestionably vague.

One might perhaps make some educated guesses as to the meaning of these regulations, but one could never be confident that the USIA would agree. We agree with appellees that "[t]o the extent that they are susceptible to interpretation at all, they appear to preclude virtually anything that *514* someone would consider either educational or a documentary." Aples.' Br. at 31.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

847 F.2d 502, 56 USLW 2670
**(Cite as: 847 F.2d 502)**

The constitutional infirmity of the regulations is well illustrated by comparing them with those at issue in *Big Mama Rag v. United States,* 631 F.2d 1030 (D.C.Cir.1980), in which a nonprofit feminist organization denied tax-exempt status by the IRS challenged for vagueness a regulation defining educational institutions. The regulation, in pertinent part, provided:

An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a *sufficiently full and fair exposition of the pertinent facts* as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion.

*Id.* at 1034 (emphasis supplied). The court, in a lengthy discussion, held the regulation unconstitutionally vague. *Id.* at 1035-39. *See also Beckerman v. City of Tupelo,* 664 F.2d 502, 507 (5th Cir.1981) (ordinance void for vagueness which authorized police chief to deny parade permit where "conduct of the parade will probably cause injury to persons or property or provoke disorderly conduct or create a disturbance"; court held: "This provision is unconstitutionally vague since it contains no instructions directing the Chief in the formulation of his opinion.").

The cases cited by USIA do not help its cause. *FEC v. Furgatch,* 807 F.2d 857 (9th Cir.1987), does not involve a vagueness challenge. As for *United States Civil Service Commission v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), and *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), we are satisfied that they are distinguishable for the reasons stated by the Supreme Court in *FCC v. League of Women Voters,* 468 U.S. at 401 n. 27, 104 S.Ct. at 3128 n. 27 (challenged Hatch Act provisions differed from content discrimination in that they 1) deal with government employees' active political participation; 2) are grounded in government's interest in employee job performance; and 3) are based on a century of experience with less restrictive alternatives).

We therefore find that the regulations are unconstitutionally vague. The regulations enable USIA officials to "act in an arbitrary and discriminatory manner in granting or denying permits and still be completely within the scope of their regulations." Amicus Br. at 43. This kind of unfettered discretion is patently offensive to the notion of due process.

VI.

In conclusion, we hold that plaintiffs-appellees clearly have standing to sue. They allege adequate injuries in fact in the form of pecuniary losses and deprivation of the opportunity to compete for valuable treaty-benefits. We are also satisfied that there is a substantial likelihood of redress.

In addition, we find that the USIA regulations violate, on their face, the First Amendment. By withholding a valuable benefit on the basis of speech-content, the regulations plainly implicate plaintiffs' First Amendment rights and are therefore subject to strict scrutiny analysis. Under this rigorous standard of review, the regulations do not pass constitutional muster: they are neither justified by a compelling government purpose nor narrowly tailored.

We also hold that the regulations are void for vagueness under the Due Process Clause of the Fifth Amendment. The regulations are so ambiguous that they provide USIA officials with a virtual license to engage in censorship. In this case, that license has been exercised.

We recognize that the implementation of the Beirut agreement requires some content-based judgments. We do not hold that "educational, scientific and cultural" materials cannot be identified by regulations that pass constitutional muster. Such regulations, however, must be more narrowly tailored and clearly drawn than those before us today.

AFFIRMED.

C.A.9 (Cal.),1988.
Bullfrog Films, Inc. v. Wick
847 F.2d 502, 56 USLW 2670

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 5

**Westlaw Delivery Summary Report for KREEP,GARY G**

Date/Time of Request:              Saturday, September 19, 2009 00:03 Central
Client Identifier:                     BARNETT
Database:                              SCTFIND
Citation Text:                         99 S.Ct. 1601
Lines:                                  1623
Documents:                           1
Images:                               0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



Supreme Court of the United States
GLADSTONE, REALTORS, et al., Petitioners,
v.
VILLAGE OF BELLWOOD et al.
**No. 77-1493.**

Argued Nov. 29, 1978.
Decided April 17, 1979.

Actions by area residents and a village charged real estate brokers and sales personnel with "steering" prospective home buyers to different residential areas according to race, in violation of the Fair Housing Act and Civil Rights Act of 1866. A summary judgment of dismissal was affirmed in part and reversed in part, and remanded, by the Court of Appeals, Seventh Circuit, 569 F.2d 1013. On writ of certiorari, the Supreme Court, Mr. Justice Powell, held that: (1) standing under the Fair Housing Act section providing for enforcement, by civil actions in United States district court, of rights granted by specified sections of the Act is as broad as is permitted by the judicial article of the Constitution; (2) upon allegations that such realty sales practices had actually begun to rob the village of its racial balance and stability, the village had standing to challenge legality of such conduct under the Act; (3) complaint alleging that violations of the Act caused harm to particular area and its residents showed no standing on part of individual plaintiffs who resided elsewhere, and (4) complaint alleging that violations by real estate brokerage firms and employees were depriving plaintiff residents of village of "social and professional benefits of living in an integrated society" was sufficient allegation of injury to plaintiff individual residents of the described area, to confer standing, subject to requirements of proof.

Affirmed, subject to exception.

Mr. Justice Rehnquist dissented and filed opinion in which Mr. Justice Stewart joined.

West Headnotes

**[1] Federal Civil Procedure 170A** ⚷**103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
        170Ak103.1 Standing
           170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
     (Formerly 170Ak103)
Constitutional limits on standing eliminate claims in which plaintiff has failed to make out case or controversy between himself and defendant, and, in order to satisfy judicial article of Constitution, plaintiff must show that he personally suffered some actual or threatened injury as result of putatively illegal conduct of defendant. U.S.C.A.Const. art. 3, § 1 et seq.

**[2] Federal Civil Procedure 170A** ⚷**103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
        170Ak103.1 Standing
           170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
     (Formerly 170Ak103.1, 170Ak103)
Even when case falls within constitutional boundaries, plaintiff may still lack standing under prudential principles by which judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated, and to limit access to federal courts to those litigants best suited to certain particular claim, and, e. g., litigant normally must assert injury peculiar to himself or to distinct group of which he is part, rather than one shared in substantially equal measure by all or large class of citizens, and plaintiff must also assert his own legal interests rather than those of third parties. U.S.C.A.Const. art. 3, § 1 et seq.

**[3] Federal Civil Procedure 170A** ⚷**103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
        170Ak103.1 Standing
           170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

(Formerly 170Ak103.1, 170Ak103)
Congress by legislation may expand standing to full extent permitted by judicial article of Constitution, thus permitting litigation by one who otherwise would be barred by prudential standing rules, but in no event may Congress abrogate judicial article minima, and plaintiff must always have suffered distinct and palpable injury to himself that is likely to be redressed if requested relief is granted. U.S.C.A.Const. art. 3, § 1 et seq.

[4] Civil Rights 78 🔑1332(3)

78 Civil Rights
    78III Federal Remedies in General
        78k1328 Persons Protected and Entitled to Sue
            78k1332 Third Party Rights; Decedents
                78k1332(3) k. Property and Housing. Most Cited Cases
        (Formerly 78k202, 78k13.6)
That plaintiffs themselves had not been granted substantive rights by Fair Housing Act section did not determine whether they could sue to enforce rights granted to others by such section. Civil Rights Act of 1968, §§ 804, 812 as amended 42 U.S.C.A. §§ 3604, 3612; 42 U.S.C.A. § 1982.

[5] Civil Rights 78 🔑1318

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion of State Remedies
            78k1318 k. Property and Housing. Most Cited Cases
        (Formerly 78k209, 78k13.9)
Fair Housing Act section providing for enforcement, by "person aggrieved," in federal district court, of rights granted is not structured to keep complaints brought under it from reaching federal courts, or even to assure that administrative process runs its full course, though such section does appear to restrict access to federal courts in one respect not paralleled by section providing for civil actions for enforcement of certain provisions, in that, to extent state or local remedies prove adequate, complainant under first-mentioned section is required to pursue them. Civil Rights Act of 1968, §§ 801 et seq., 810, 812 as amended 42 U.S.C.A. §§ 3601 et seq., 3610, 3612.

[6] Civil Rights 78 🔑1318

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion of State Remedies
            78k1318 k. Property and Housing. Most Cited Cases
        (Formerly 78k209, 78k13.9)
Fair Housing Act section providing for enforcement, by "person aggrieved," in federal district court, of rights granted, unlike section providing remedy for violation of equal employment opportunity provisions, does not provide effective administrative buffer between federal courts and individual complainants. Civil Rights Act of 1968, §§ 804, 810, 810(c, d), 812 as amended 42 U.S.C.A. §§ 3604, 3610, 3610(c, d), 3612; Civil Rights Act of 1964, §§ 706 et seq., 706(a), (e) as amended 42 U.S.C.A. §§ 2000e-5 et seq., 2000e-5(b)(f)(1).

[7] Statutes 361 🔑219(1)

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k213 Extrinsic Aids to Construction
                361k219 Executive Construction
                    361k219(1) k. In General. Most Cited Cases
Agency's interpretation of statute ordinarily commands considerable deference. Civil Rights Act of 1968, §§ 810, 812, 42 U.S.C.A. §§ 3610, 3612.

[8] Civil Rights 78 🔑1331(3)

78 Civil Rights
    78III Federal Remedies in General
        78k1328 Persons Protected and Entitled to Sue
            78k1331 Persons Aggrieved, and Standing in General
                78k1331(3) k. Property and Housing. Most Cited Cases
        (Formerly 78k201, 78k13.6)
Standing under Fair Housing Act section providing for enforcement, by civil actions in United States district court, of rights granted by specified sections of Act is, like standing under Fair Housing Act section providing for aggrieved person's enforcement of rights granted by Fair Housing Act provisions generally, as broad as is permitted by judicial article of the Constitution. Civil Rights Act of 1968, §§ 810, 812 as

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

99 S.Ct. 1601

441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66

**(Cite as: 441 U.S. 91, 99 S.Ct. 1601)**

Page 3

amended 42 U.S.C.A. §§ 3610, 3612; U.S.C.A.Const. art. 3, § 1 et seq.

**[9] Federal Courts 170B ☞460.1**

170B Federal Courts
 170BVII Supreme Court
  170BVII(B) Review of Decisions of Courts of Appeals
   170Bk460 Review on Certiorari
    170Bk460.1 k. In General. Most Cited Cases
 (Formerly 170Bk460)
In resolving issue of standing, Supreme Court would, as did courts below and parties themselves, accept as true all material allegations of complaint and facts contained in discovery materials, and would construe complaint in favor of complaining party.

**[10] Civil Rights 78 ☞1331(3)**

78 Civil Rights
 78III Federal Remedies in General
  78k1328 Persons Protected and Entitled to Sue
   78k1331 Persons Aggrieved, and Standing in General
    78k1331(3) k. Property and Housing. Most Cited Cases
 (Formerly 78k201, 78k13.6)
Upon allegations that sales practices of real estate brokerage firms and employees had actually begun to rob village of its racial balance and stability, village had standing to challenge legality of such conduct under Fair Housing Act. Civil Rights Act of 1968, §§ 801 et seq., 810, 812 as amended 42 U.S.C.A. §§ 3601 et seq., 3610, 3612; U.S.C.A.Const. art. 3, § 1 et seq.

**[11] Civil Rights 78 ☞1395(3)**

78 Civil Rights
 78III Federal Remedies in General
  78k1392 Pleading
   78k1395 Particular Causes of Action
    78k1395(3) k. Property and Housing. Most Cited Cases
 (Formerly 78k235(4), 78k13.12(3))
Complaint alleging only that violations of Fair Housing Act caused harm to particular area and its residents showed no standing on part of individual plaintiffs who resided elsewhere. Civil Rights Act of

1968, §§ 810, 812 as amended 42 U.S.C.A. §§ 3610, 3612; U.S.C.A.Const. art. 3, § 1 et seq.

**[12] Civil Rights 78 ☞1395(3)**

78 Civil Rights
 78III Federal Remedies in General
  78k1392 Pleading
   78k1395 Particular Causes of Action
    78k1395(3) k. Property and Housing. Most Cited Cases
 (Formerly 78k235(4), 78k13.12(3))
Complaint alleging that Fair Housing Act violations by real estate brokerage firms and employees were depriving plaintiff residents of village of "social and professional benefits of living in an integrated society" although complaint defined community in terms of city blocks in suburban neighborhood rather than apartment buildings, was sufficient allegation, of injury to plaintiff individual residents of the described area, to confer standing, subject to requirements of proof of "distinct and palpable injury", to which nature and extent of business of the real estate brokers would be relevant. Civil Rights Act of 1968, §§ 810, 812 as amended 42 U.S.C.A. §§ 3610, 3612; U.S.C.A.Const. art. 3, § 1 et seq.

**[13] Federal Civil Procedure 170A ☞103.5**

170A Federal Civil Procedure
 170AII Parties
  170AII(A) In General
   170Ak103.1 Standing
    170Ak103.5 k. Pleading. Most Cited Cases
 (Formerly 170Ak103)
Standing is generally matter dealt with at earliest stages of litigation, usually on pleadings, but it sometimes remains to be seen whether factual allegations of complaint necessary for standing will be supported adequately by evidence adduced at trial. U.S.C.A.Const. art. 3, § 1 et seq.

***1603 Syllabus** FN*

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co., 200 U.S. 321,*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*91** Section 812 of the Fair Housing Act of 1968 (Act) provides that the rights granted by § 804 against racial discrimination in the sales or rental of housing "may be enforced by civil actions in appropriate United States district courts." Respondents (the village of Bellwood, one Negro and four white residents of Bellwood, and one Negro resident of a neighboring municipality) brought separate actions in District Court under § 812 against petitioners (two real estate brokerage firms and certain of their employees), alleging that they had violated § 804 by "steering" prospective Negro homeowners toward a specified 12-by 13-block integrated area ("target" area) of Bellwood and by steering white customers away from the "target" area. It was further alleged that Bellwood had been injured by having its housing market wrongfully manipulated to the economic and social detriment of its citizens and that the individual respondents had been denied their right to select housing without regard to race and had been deprived of the social and professional benefits**\*\*1604** of living in an integrated society. Monetary, injunctive, and declaratory relief was sought. Prior to bringing suit, the individual respondents, purportedly but not in fact seeking to purchase homes, had acted as "testers" in an attempt to determine whether petitioners were engaged in racial steering. Four of the six individual respondents reside in the "target" area. The District Court granted summary judgment for the petitioners in both cases, holding that respondents, who had acted only as testers and thus were at most indirect victims of the alleged violations, lacked standing to sue under § 812, which was limited to actions by "direct victims" of violations. The Court of Appeals reversed and remanded, holding that although the individual respondents lacked standing in their capacity as testers, they were entitled to prove that the discriminatory practices documented by their testing deprived them, as residents of the adversely affected area, of the social and professional benefits of living in an integrated society; that the requirements of Art. III had been satisfied as to both the individual respondents and respondent village; that § 810 of the Act-which provides that a "person aggrieved" by a violation of the **\*92** Act may seek conciliation from the Secretary of Housing and Urban Development (HUD) and if conciliation fails bring suit in district court-and § 812 provide alternative remedies available to precisely the same class of plaintiffs; and that the conclusion in *Trafficante v. Metropolitan Life Ins. Co., 409 U.S.*

205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415, that standing under § 810 extends " 'as broadly as is permitted by Article III,' " is applicable to cases brought under § 812. *Held* :

1. The Court of Appeals correctly interpreted §§ 810 and 812 as providing alternative remedies to precisely the same class of plaintiffs, with the result that standing under § 812, like that under § 810, is as broad as is permitted by Art. III. *Trafficante, supra.* This construction of the Act is consistent with both its language and its legislative history and with the interpretation of HUD, the agency primarily assigned to implement and administer the Act. Pp. 1608-1613.

2. The facts alleged in the complaints and revealed by initial discovery are sufficient to provide standing to respondents under Art. III, except with respect to the two individual respondents who do not reside within the "target" area, and thus summary judgments for petitioners should not have been entered. Pp. 1613-1616.

(a) If, as alleged, petitioners' sales practices actually have begun to rob Bellwood of its racial balance and stability, the village has standing to challenge the legality of that conduct. Pp. 1613-1614.

(b) The allegation that the "target" area is losing its integrated character because of petitioners' conduct is sufficient to satisfy Art. III with respect to the individual respondents who reside in that area. The constitutional limits of these respondents' standing to protest the intentional segregation of their community do not vary simply because that community is defined in terms of city blocks rather than, as in *Trafficante, supra,* by reference to apartment buildings, but instead are determined by the presence or absence of a "distinct and palpable injury" to respondents. *Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343.* Moreover, to the extent that the complaints allege economic injury to these respondents resulting from a diminution in the value of their homes due to petitioners' conduct, convincing evidence of such a decrease in value would be sufficient under Art. III to allow standing to contest the legality of that conduct. Pp. 1614-1616.

569 F.2d 1013, affirmed in part.
**\*93** Jonathan T. Howe, Chicago, Ill., for petitioners.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

F. Willis Caruso, Chicago, Ill., for respondents.

Lawrence G. Wallace, Washington, D. C., for United States, as amicus curiae, by special leave of Court.

**\*\*1605** Mr. Justice POWELL delivered the opinion of the Court.

Title VIII of the Civil Rights Act of 1968, 82 Stat. 81, as amended, 42 U.S.C. § 3601 *et seq.*, commonly known as the Fair Housing Act of 1968 (Act), broadly prohibits discrimination in housing throughout the Nation. This case presents both statutory and constitutional questions concerning standing to sue under Title VIII.

I

Petitioners in this case are two real estate brokerage firms, Gladstone, Realtors (Gladstone), and Robert A. Hintze, Realtors (Hintze), and nine of their employees. Respondents are the village of Bellwood, a municipal corporation and suburb of Chicago, one Negro and four white residents of Bellwood, and one Negro resident of neighboring Maywood. During **\*94** the fall of 1975, the individual respondents and other persons consulted petitioners, stating that they were interested in purchasing homes in the general suburban area of which Bellwood is a part. The individual respondents were not in fact seeking to purchase homes, but were acting as "testers" in an attempt to determine whether petitioners were engaging in racial "steering," *i. e.,* directing prospective home buyers interested in equivalent properties to different areas according to their race.

In October 1975, respondents commenced an action under § 812 of the Act, 42 U.S.C. § 3612.[FN1] against Gladstone and its employees in the District Court for the Northern District of Illinois, alleging that they had violated § 804 of Title VIII, 42 U.S.C. § 3604.[FN2] Simultaneously, respondents filed a **\*95** virtually identical complaint against Hintze and its salespeople in the same court. The complaints, as illuminated by subsequent discovery, charged that petitioners had steered prospective Negro home buyers toward an integrated area of Bellwood approximately 12 by 13 blocks in dimension and away from other, predominately white areas. White customers, by contrast, allegedly were steered away from the integrated area of Bellwood. Four of the six individual respondents

reside in this "target" area of Bellwood described in the complaint.[FN3] The complaints further alleged that the "Village of Bellwood ... has been injured by having [its] housing market ... wrongfully and illegally manipulated to the economic and social detriment of the citizens **\*\*1606** of [the] village," and that the individual respondents "have been denied their right to select housing without regard to race and have been deprived of the social and professional benefits of living in an integrated society." App. 6, 99. Respondents requested monetary, injunctive, and declaratory relief.

FN1. Section 812 provides in part:

"(a) The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction."

FN2. Section 804 provides:

"As made applicable by section 803 and except as exempted by sections 803(b) and 807, it shall be unlawful-

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

"(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

"(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

"(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

"(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin." 82 Stat. 83, as amended, 88 Stat. 729.

Respondents also claimed that petitioners had violated 42 U.S.C. § 1982.

FN3. Respondent Perry is a resident of Bellwood, but lives outside the area allegedly affected by petitioners' steering practices. Respondent Sharp lives in Maywood. These respondents are Negroes.

Petitioners moved for summary judgment in both cases, arguing that respondents had "no actionable claim or standing to sue" under the statutes relied upon in the complaint, that there existed "no case or controversy between the parties within the meaning of Article III of the Constitution," and that respondents failed to satisfy the prudential requirements for standing applicable in the federal courts. *Id.*, at 78, 143. The District Judge presiding over the case against Gladstone and its employees decided that respondents were not within the **\*96** class of persons to whom Congress had extended the right to sue under § 812. The court expressly adopted the reasoning of *TOPIC v. Circle Realty, 532 F.2d 1273 (CA9 1976)*, a case involving facts similar to those here. In *TOPIC* the Ninth Circuit decided that Congress intended to limit actions under § 812 of the Act to "direct victims" of Title VIII violations, even though under *Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)*, standing under § 810 FN4 of the Act, **\*97** 42 U.S.C. § 3610, extends to the broadest class of plaintiffs permitted by Art. III. Since the individual respondents had been acting only as testers and thus admittedly had not been steered away from any homes they might have wished to purchase, the court concluded that they were, at most, only indirect victims of Gladstone's alleged violations of the Act.

As respondents' action was brought under § 812, the court ruled that they lacked standing under the terms of the Act. The court did not discuss Gladstone's contention that respondents lacked standing under Art. III and the prudential limitations on federal jurisdiction. The District Judge presiding over the case against Hintze adopted the opinion of the Gladstone court as his own and also granted summary judgment.

FN4. Section 810 provides in part:

"(a) Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter 'person aggrieved') may file a complaint with the Secretary [of HUD]. . . . Within thirty days after receiving a complaint, or within thirty days after the expiration of any period of reference under subsection (c), the Secretary shall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint, he shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. . . .

"(c) Wherever a State or local fair housing law provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title, the Secretary shall notify the appropriate State or local agency of any complaint filed under this title which appears to constitute a violation of such State or local fair housing law, and the Secretary shall take no further action with respect to such complaint if the appropriate State or local law enforcement official has, within thirty days from the date the alleged offense has been brought to his attention, commenced proceedings in the matter, or, having done so, carries forward such proceedings with reasonable promptness. In no event shall the Secretary take further action unless he certifies that in his judgment, under the circumstances of the particular case, the protection of the rights of the parties or the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

interests of justice require such action.

  "(d) If within thirty days after a complaint is filed with the Secretary or within thirty days after expiration of any period of reference under subsection (c), the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this title, insofar as such rights relate to the subject of the complaint: *Provided*, That no such civil action may be brought in any United States district court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title. . . ." 82 Stat. 85.

  **1607** The Court of Appeals for the Seventh Circuit consolidated the cases for appellate review. It first considered the significance of the fact that the individual respondents were merely testers not genuinely interested in purchasing homes. The court noted that while this precluded respondents from arguing that they had been denied their right to select housing without regard to race, "the testers did . . . generate evidence suggesting the perfectly permissible inference that [petitioners] have been engaging, as the complaints allege, in the *practice* of racial steering with all of the buyer prospects who come through their doors." 569 F.2d 1013, 1016 (1978) (emphasis in original). Thus, although the individual respondents lacked standing in their capacity as testers, they were entitled to prove that the discriminatory practices documented by *98 their testing deprived them, as residents of the adversely affected area, "of the social and professional benefits of living in an integrated society."

  The Court of Appeals then turned to the question whether the Art. III minima for standing had been satisfied. Observing the similarity between the allegations of injury here and those accepted as constitutionally sufficient in *Trafficante*, it concluded that the individual respondents had presented a case or con-

troversy within the meaning of Art. III. The court also read the complaints as alleging economic injury to the village itself as a consequence of the claimed racial segregation of a portion of Bellwood. Although this aspect of the case was not directly controlled by *Trafficante*, the court found that the requirements of Art. III had been satisfied. [FN5]

>  FN5. The Court of Appeals agreed with the District Court that the Leadership Council for Metropolitan Open Communities, also a plaintiff in the two actions in the District Court, lacked standing. 569 F.2d, at 1017. That ruling has not been challenged in this Court.

  Having concluded that a case or controversy within the meaning of Art. III was before it, the Court of Appeals addressed the District Court's ruling that § 812 of the Act, unlike § 810, affords standing only to those directly injured by the discriminatory acts challenged. After considering the legislative history and recent federal-court decisions construing these provisions, the court concluded, contrary to the decision in *TOPIC v. Circle Realty, supra*, that §§ 810 and 812 provide alternative remedies available to precisely the same class of plaintiffs. The conclusion of this Court in *Trafficante* that standing under § 810 extends " 'as broadly as is permitted by Article III of the Constitution,' " 409 U.S., at 209, 93 S.Ct., at 367, quoting *Hackett v. McGuire Bros., Inc.*, 445 F.2d 442, 446 (CA3 1971), was seen as applicable to these cases brought under § 812. The Court of Appeals reversed the judgments of the District Court and remanded for further proceedings.

  Petitioners sought review in this Court. We granted certiorari**99 to resolve the conflict between the decision of the Court of Appeals in this case and that of the Ninth Circuit in *TOPIC*, and to consider the important questions of standing raised under Title VIII of the Civil Rights Act of 1968. 436 U.S. 956, 98 S.Ct. 3068, 57 L.Ed.2d 1120 (1978). With the limitation noted in n. 25, *infra*, we now affirm.

                    II

  In recent decisions, we have considered in some detail the doctrine of standing in the federal courts. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the

99 S.Ct. 1601                                                                                                    Page 8
441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66
**(Cite as: 441 U.S. 91, 99 S.Ct. 1601)**

dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. . . . In both dimensions it is founded in concern about the proper-and properly limited-role of the courts in a democratic society." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

[1] The constitutional limits on standing eliminate claims in which the plaintiff has failed to make out a case or controversy between himself and the defendant. In order to satisfy Art. III, the plaintiff must **\*\*1608** show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 260-261, 97 S.Ct. 555, 560-561, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *Warth v. Seldin, supra* 422 U.S., at 499, 95 S.Ct., at 2205; *Linda R. S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Otherwise, the exercise of federal jurisdiction "would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. Eastern Kentucky Welfare Rights Org., supra,* 426 U.S., at 38, 96 S.Ct., at 1924.

[2] Even when a case falls within these constitutional boundaries, a plaintiff may still lack standing under the prudential principles by which the judiciary seeks to avoid deciding **\*100** questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim. For example, a litigant normally must assert an injury that is peculiar to himself or to a distinct group of which he is a part, rather than one "shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin,* 422 U.S., at 499, 95 S.Ct., at 2205. He also must assert his own legal interests rather than those of third parties.[FN6] *Ibid.* Accord, *Arlington Heights v. Metropolitan Housing Dev. Corp., supra,* 429 U.S., at 263, 97 S.Ct., at 561.

FN6. There are other nonconstitutional limitations on standing to be applied in appropriate circumstances. See, *e. g., Simon v. Eastern Kentucky Welfare Rights Org.,* 426

U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1925 n. 19, 48 L.Ed.2d 450 (1976) ("the interest of the plaintiff, regardless of its nature in the absolute, [must] at least be 'arguably within the zone of interests to be protected or regulated' by the statutory framework within which his claim arises," quoting *Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1969)).

[3] Congress may, by legislation, grant standing to the full extent permitted by Art. III, thus permitting litigation by one "who otherwise would be barred by prudential standing rules." *Warth v. Seldin,* 422 U.S., at 501, 95 S.Ct., at 2206. In no event, however, may Congress abrogate the Art. III minima: A plaintiff must always have suffered "a distinct and palpable injury to himself," *ibid.,* that is likely to be redressed if the requested relief is granted. *Simon v. Eastern Kentucky Welfare Rights Org., supra,* 426 U.S., at 38, 96 S.Ct., at 1924.

III

Petitioners have insisted throughout this litigation that respondents lack standing under the terms of the Act. Their argument, which was accepted by the District Court, is that while § 810 provides standing to the fullest extent permitted by Art. III, see *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S., at 209, 93 S.Ct., at 366, § 812, under which respondents proceed, affords standing only to "direct victims" of the conduct proscribed by Title VIII. Respondents, on the other hand, argue **\*101** that the Court of Appeals correctly concluded that §§ 810 and 812 are alternative remedies available to precisely the same class of plaintiffs. The issue is a critical one, for if the District Court correctly understood and applied § 812, we do not reach the question whether the minimum requirements of Art. III have been satisfied. If the Court of Appeals is correct, however, then the constitutional question is squarely presented.[FN7]

FN7. It is not clear whether our opinion in *Trafficante* was intended to construe § 812 as well as § 810. Although certain intervening plaintiffs in that case asserted standing under § 812, but not § 810, see *Trafficante v. Metropolitan Life Ins. Co.,* 322 F.Supp. 352, 353 (N.D.Cal.), aff'd, 446 F.2d 1158, 1161 n. 5 (CA9 1971), and the Court failed to disclaim

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

99 S.Ct. 1601                                                                                         Page 9
441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66
**(Cite as: 441 U.S. 91, 99 S.Ct. 1601)**

a decision on the former provision, the opinion focuses exclusively on § 810. Rather than attempt to reconstruct whatever understanding of the relationship between §§ 810 and 812 might have been implicit in *Trafficante*, we consider the merits of this important statutory question directly.

**\*\*1609** Petitioners' argument centers on two points. First, § 810 uses the term "person aggrieved," defined as "[a]ny person who claims to have been injured by a discriminatory housing practice," to describe those who may seek relief under that section. By contrast, § 812 lacks this broad definition of potential plaintiffs, referring explicitly only to civil suits brought to enforce the rights granted elsewhere in the Act. Second, under § 810 a plaintiff must first seek informal conciliation of housing discrimination disputes from the Department of Housing and Urban Development (HUD) and appropriate state agencies before pursuing a judicial remedy. See n. 4, *supra.* But under § 812 a complainant may proceed directly to federal court.

From these facts, petitioners infer a congressional plan to create two distinct, though overlapping, remedial avenues under Title VIII. Under § 810, they argue, Congress intended to reach *all* victims-both direct and indirect-of housing discrimination by referring generally to those "aggrieved." But in order to protect the courts from the volume of litigation**\*102** such plaintiffs might generate, to make available the administrative expertise of state and federal agencies, and to involve state and local governments in national fair housing goals, Congress interposed administrative remedies as a prerequisite to the invocation of the federal judicial power by "indirect victims" of Title VIII violations.

Since § 812 does not specifically refer to "persons aggrieved" and allows direct access to the courts by those invoking it, petitioners argue that Congress must have intended this provision to be available only to those most in need of a quick, authoritative solution: those directly victimized by a wrongful refusal to rent or sell a dwelling place or by some other violation of the Act. The construction of § 812 accepted by the Court of Appeals, they contend, is illogical because it would permit a plaintiff simply to ignore, at his option, the scheme of administrative remedies set up in § 810. Thus, according to petitioners, "direct victims" may proceed under either § 810 or § 812, while those in-

jured only indirectly by housing discrimination may proceed, if at all, under the former provision alone.

[4] Finally, petitioners claim that the legislative history of the Act supports their view. That history reflects that Congress was concerned that Title VIII not be used as an instrument of harassment.^[FN8] Petitioners contend that permitting individuals such as respondents, who have not been harmed directly by petitioners' alleged conduct, to invoke § 812 provides substantial opportunity for abuse of that kind.

> FN8. This concern was expressed clearly in connection with an amendment to § 804 proposed by Senator Allott. See 114 Cong.Rec. 5515 (1968).

We find this construction of Title VIII to be inconsistent with the statute's terms and its legislative history. Nothing in the language of § 812 suggests that it contemplates a more restricted class of plaintiffs than does § 810. The operative language of § 812 is phrased in the passive voice-"[t]he rights granted by sectio[n] 804 ... may be enforced by civil **\*103** actions in appropriate United States district courts"-simply avoiding the need for a direct reference to the potential plaintiff. The absence of "person aggrieved" in § 812, therefore, does not indicate that standing is more limited under that provision than under § 810. To the contrary, § 812 on its face contains no particular statutory restrictions on potential plaintiffs.^[FN9]

> FN9. Both petitioners and the dissenting opinion, *post,* at 1620, emphasize the language of § 812 that "[t]he rights granted by sectio[n] 804 . . . may be enforced by civil actions . . .." See n. 1, *supra.* They argue that since § 804 on its face grants no right to have one's community protected from the harms of racial segregation, respondents have no substantive rights to enforce under § 812.

> That respondents themselves are not granted substantive rights by § 804, however, hardly determines whether they may sue to enforce the § 804 rights of others. See *supra,* at 1608. If, as is demonstrated in the text, Congress intended standing under § 812 to extend to the full limits of Art. III, the normal prudential rules do not apply; as long as the plaintiff suffers actual injury as a result of the defen-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

dant's conduct, he is permitted to prove that the rights of another were infringed. The central issue at this stage of the proceedings is not who possesses the legal rights protected by § 804, but whether respondents were genuinely injured by conduct that violates *someone's* § 804 rights, and thus are entitled to seek redress of that harm under § 812.

[5][6] Contrary to petitioners' contention, § 810 is not structured to keep complaints**1610** brought under it from reaching the federal courts, or even to assure that the administrative process runs its full course. Section 810(d) appears to give a complainant the right to commence an action in federal court whether or not the Secretary of HUD completes or chooses to pursue conciliation efforts.[FN10] Thus, a complainant under § 810 may *104 resort to federal court merely because he is dissatisfied with the results or delays of the conciliatory efforts of HUD.[FN11] The most plausible inference to be drawn from Title VIII is that Congress intended to provide all victims of Title VIII violations two alternative mechanisms by which to seek redress: immediate suit in federal district court, or a simple, inexpensive, informal conciliation procedure, to be followed by litigation should conciliation efforts fail.[FN12]

FN10. The lower federal courts are divided over the question whether a Title VIII complainant who has enlisted the aid of HUD under § 810 must commence the civil action referred to in § 810(d) no later than 60 days after the filing of his administrative complaint, even if HUD has not completed its conciliatory efforts by that time. Several courts believe the plain language of § 810(d), see n. 4, *supra,* requires this result. *Green v. Ten Eyck,* 572 F.2d 1233, 1240-1243 (CA8 1978); *Tatum v. Myrick,* 425 F.Supp. 809, 810-812 (M.D.Fla.1977); *Sumlin v. Brown,* 420 F.Supp. 78, 80-82 (N.D.Fla.1976); *Brown v. Blake & Bane, Inc.,* 402 F.Supp. 621, 622 (E.D.Va.1975); *Young v. AAA Realty Co.,* 350 F.Supp. 1382, 1385-1387 (M.D.N.C.1972). Others, following HUD's interpretation of § 810(d), see 24 CFR §§ 105.16(a), 105.34 (1978), believe that the only time limitation on one who has properly complained to HUD is that a civil action be

commenced within 30 days of notice of HUD's failure to negotiate a settlement. *Logan v. Richard E. Carmack & Assoc.,* 368 F.Supp. 121, 122-123 (E.D.Tenn.1973); *Brown v. Ballas,* 331 F.Supp. 1033, 1036 (N.D.Tex.1971). This case does not require us to resolve this conflict, and we express no views on it. But regardless of which position is correct, it is clear that § 810 does not serve as a screening mechanism to deflect certain classes of Title VIII grievances from the federal courts.

FN11. Section 810 does appear to restrict access to the federal courts in one respect not paralleled by § 812. To the extent state or local remedies prove adequate, a complainant under § 810 is required to pursue them. Thus, under § 810(c), the Secretary of HUD must suspend his conciliation efforts if local remedies providing protection equivalent to that of Title VIII are being carried forward by the appropriate public officials. Such deferral by the Secretary apparently delays the availability of judicial review under § 810(d). Section 810(d) also conditions the availability of its civil action on the absence of an equivalent state or local judicial remedy. Section 812 contains no such limitation.

We are convinced that neither these differences nor the variations between § 810 and § 812 relied upon by the dissent, see *post,* at 1620-1621, imply that § 810 is directed to a larger class of plaintiffs than is § 812. The legislative history, discussed in the text, contradicts any such suggestion. See *infra,* at 1611-1612, and n. 20.

FN12. It is instructive to compare the administrative remedy of § 810 with that provided by § 706 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. Under § 810(d), a complainant may simply bypass the conciliatory efforts of HUD by commencing a civil action, apparently without notice to the agency, 30 days after filing his complaint. Under § 706(f)(1), by contrast, a complainant must allow the Equal Employment Opportunity Commission a full 180 days to negotiate a settlement, and he

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

must obtain a "right-to-sue" letter before proceeding in federal court. Moreover, under § 706(b), the EEOC is instructed to make a judgment on the merits of the administrative complaints it receives by dismissing those it does not have reasonable cause to believe are true. No such administrative statement on the merits of a § 810 complaint is required; the Secretary of HUD is asked only to indicate whether he "intends to resolve" a complaint. Finally, under § 706(f)(1), the EEOC may elect to bring suit itself, thereby preempting the individual complainant's right to commence the litigation and exercising important supervision over the conduct of the case. The Secretary of HUD enjoys no similar authority under § 810. From these and other differences between the two statutes, it is apparent that § 810, unlike § 706, does not provide an effective administrative buffer between the federal courts and individual complainants.

**\*105** Although the legislative history gave little help in determining the proper scope of **\*\*1611** standing under § 810, see *Trafficante, 409 U.S., at 210, 93 S.Ct., at 367,* it provides substantial and rather specific support for the view that §§ 810 and 812 are available to precisely the same class of plaintiffs.[FN13] Early legislative proposals for fair housing legislation contained no administrative remedies.[FN14] The nonjudicial avenue of relief was later added on the theory that it would provide a more expeditious and less burdensome method of resolving housing complaints. [FN15] **\*106** There is no evidence that Congress intended to condition access to the courts on a prior resort to the federal agency. To the contrary, the history suggests that all Title VIII complainants were to have available immediate judicial review. The alternative, administrative remedy was then offered as an option to those who desired to use it.

FN13. For a general review of the legislative history of Title VIII, see Dubofsky, Fair Housing: A Legislative History and a Perspective, 8 Washburn L.J. 149 (1969).

FN14. Three bills containing fair housing provisions were introduced in Congress in 1966: S. 3296, 89th Cong., 2d Sess.; H.R. 14770, 89th Cong., 2d Sess.; H.R. 14765, 89th Cong., 2d Sess. As introduced, they

provided for judicial enforcement only.

FN15. Explaining the addition of administrative remedies to H.R. 14765, one of the bills introduced in 1966, Representative Conyers stated:

"Experience with comparable State and local agencies repeatedly has shown that the administrative process is quicker and fairer. It more quickly implements the rights of the person discriminated against and also quickly resolves frivolous and otherwise invalid complaints. Conciliation is easier in an informal administrative procedure than in the formal judicial process. Also individual court suits would place a greater burden of expense, time and effort on not only the plaintiff but on all other parties involved, including the seller, broker and mortgage financier, and on the judicial system itself." 112 Cong.Rec. 18402 (1966).

Fair housing legislation introduced in 1967 similarly provided for administrative relief, which again was justified in terms of its perceived advantages to litigants over judicial review. Hearings on S. 1358 et al. before the Subcommittee on Housing and Urban Affairs of the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., 108 (testimony of Roy Wilkins, Executive Director, NAACP, and Chairman, Leadership Conference on Civil Rights).

The administrative remedies in the 1966 and 1967 proposals would have granted substantive enforcement powers to HUD. Although Title VIII, enacted in 1968, provided for only informal, conciliatory efforts by that agency, petitioners have identified nothing in the legislative history suggesting that the purpose for including an administrative avenue of relief had changed from that stated with respect to the 1966 and 1967 bills.

[7] This apparently was the understanding of Representative Celler who, as chairman of the House Judiciary Committee, summarized the Act on the floor of the House.[FN16] Similar perceptions were reflected in reports on the proposed legislation by the Department

of Justice [FN17] and the House Judiciary **\*107** Committee.[FN18] HUD, the federal agency primarily assigned to implement and administer Title VIII, consistently has treated §§ 810 and 812 as alternative **\*\*1612** remedial provisions.[FN19] Under familiar principles, see *Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), and as we stated in *Trafficante, supra,* 409 U.S., at 210, 93 S.Ct., at 367, the agency's interpretation of the statute ordinarily commands considerable deference.

> FN16. In describing the enforcement provisions of Title VIII, Representative Celler stated: "In addition to administrative remedies, the bill authorizes immediate civil suits by private persons within 180 days after the alleged discriminatory housing practice occurred . . . ." 114 Cong.Rec. 9560 (1968).

> FN17. The Justice Department report explained an amendment to the proposed Fair Housing Act offered by Senator Dirksen, which contained the enforcement provisions ultimately enacted as §§ 810 and 812. It states:

> "In addition to the administrative remedy provided through the Department of Housing and Urban Development, the bill provides for an immediate right to proceed by civil action in an appropriate Federal or State court." 114 Cong.Rec. 4908 (1968).

> FN18. The House Judiciary Committee Report states:

> "Section 812 states what is apparently an alternative to the conciliation-then-litigation approach [of § 810]: an *aggrieved person* within 180 days after the alleged discriminatory practice occurred, may, without complaining to HUD, file an action in the appropriate U. S. district court." *Id.,* at 9612 (emphasis added).

> The use of the term "aggrieved person" to refer to potential plaintiffs under § 812, as well as the reference to the § 812 remedy as an alternative to that of § 810, indicates that

the authors of this Report believed the two sections were intended to reach a single class of plaintiffs.

> FN19. In its regulations describing the process of administrative conciliation under § 810, HUD provides that every "person aggrieved [who files a complaint with HUD] shall be notified of . . . his right to bring court action under sections 810 and 812." 24 CFR § 105.16(a) (1978). The regulations suggest no distinction between complainants under § 810 and plaintiffs under § 812.

> In a handbook designed for internal agency use, § 812 is described as an "additional remed[y] for discriminatory housing practices [that] may be pursued concurrently with the complaint procedure [of § 810]." Department of Housing and Urban Development, Title VIII Field Operations Handbook 59 (1971).

[8] Petitioners have identified nothing in the legislative history contrary to this view. Their reliance on the expressed intent that Title VIII not be used for harassment is unconvincing. Nowhere does the history of the Act suggest that Congress attempted to deter possible harassment by limiting standing under § 812. Indeed, such an attempt would have been **\*108** pointless, given the relatively easy access to the courts provided by § 810.[FN20]

> FN20. Although the legislative history is not free from some ambiguity, we do not agree with the view of it taken by the dissenting opinion. See *post,* at 1621-1622. The fact that, under Senator Miller's amendment, Title VIII complainants choosing to avail themselves of the informal, administrative procedures under § 810 are required to exhaust state remedies equivalent to Title VIII does not compel any particular conclusion about the size of the class to which § 812 extends. It was not irrational for Congress to conclude that, even with its limited exhaustion requirement, the incentive of § 810's simple, inexpensive conciliation procedure, as opposed to the immediate commencement of a formal lawsuit in federal district court under § 812, would be an attractive alternative to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

many of those aggrieved under Title VIII. Thus, under our construction of § 812, the exhaustion requirement of § 810 is not rendered meaningless. Apart from the argument based on the Miller amendment, the dissent relies on nothing more than an isolated, rhetorical remark by one Senator. Nothing in the legislative history or the administrative practices of HUD affirmatively supports the view that standing under § 810 is not identical to that under § 812.

Most federal courts that have considered the issue agree that §§ 810 and 812 provide parallel remedies to precisely the same prospective plaintiffs. *E. g., Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.,* 429 F.Supp. 486, 489-492 (E.D.N.Y.1977); *Village of Park Forest v. Fairfax Realty,* P-H 1 EOHC ¶ 13,699, pp. 14,467-14,468 (N.D.Ill.1975); *Fair Housing Council v. Eastern Bergen County Multiple Listing Serv., Inc.,* 422 F.Supp. 1071, 1081-1083 (N.J.1976). See also *Howard v. W. P. Bill Atkinson Enterprises,* 412 F.Supp. 610, 611 (W.D.Okl.1975); *Miller v. Poretsky,* 409 F.Supp. 837, 838 (D.C.1976); *Young v. AAA Realty Co.,* 350 F.Supp. 1382, 1384-1385 (M.D.N.C.1972); *Crim v. Glover,* 338 F.Supp. 823, 825 (S.D.Ohio 1972); *Johnson v. Decker,* 333 F.Supp. 88, 90-92 (N.D.Cal.1971); *Brown v. Lo Duca,* 307 F.Supp. 102, 103-104 (E.D.Wis.1969). The notable exception is the Ninth Circuit in *TOPIC v. Circle Realty,* 532 F.2d 1273 (1976), upon which petitioners rely. For the reasons**109** stated, we believe that the Court of Appeals in this case correctly declined to follow *TOPIC.* Standing under § 812, like that under § 810, is " 'as broa[d] as is permitted by Article III of the Constitution.' " *Trafficante,* 409 U.S., at 209, 93 S.Ct., at 367.[FN21]

FN21. Petitioners argue that regardless of the scope of standing under § 812, the village of Bellwood cannot sue under that provision since it is not a "private person" as referred to in the caption to § 812.

The Court of Appeals noted that "[i]n a single sentence at oral argument, counsel for [petitioners] advanced the argument, not mentioned in their brief, that the Village lacks standing because it is not a 'person' as defined in [§ 802(d)]." 569 F.2d, at 1020 n. 8.

The court rejected this contention, reasoning that the inclusion of "corporation" in the Act's definition of person encompassed municipal corporations such as Bellwood. *Ibid.* In this Court, petitioners have not argued that the village is not a "person," contending instead that it is not a "private person." Petitioners thus have presented a variant of the question raised belatedly in the Court of Appeals and given, perhaps deservedly, only cursory treatment there. Under these circumstances, the question whether Bellwood is a "private person" entitled to sue under § 812 is not properly before us, and we express no views on it.

**1613 IV

[9] We now consider the standing of the village of Bellwood and the individual respondents in light of Art. III. We "accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party," *Warth v. Seldin,* 422 U.S., at 501, 95 S.Ct., at 2206, as standing was challenged largely on the basis of the pleadings.[FN22]

FN22. In addition to the complaints, the records in these cases contain several admissions by respondents, answers to petitioners' interrogatories, and exhibits appended to those answers, including maps of Bellwood. As did the courts below and the parties themselves, we accept as true the facts contained in these discovery materials for the purposes of the standing issue.

A

[10] The gist of Bellwood's complaint is that petitioners' racial steering effectively manipulates the housing market in the *110 described area of the village: Some whites who otherwise would purchase homes there do not do so simply because petitioners refrain from showing them what is available; conversely, some Negroes purchase homes in the affected area solely because petitioners falsely lead them to believe that no suitable homes within the desired price range are available elsewhere in the general area. Although the complaints are more conclusory and abbreviated than good pleading would suggest, construed favorably to Bellwood they allege that this

conduct is affecting the village's racial composition, replacing what is presently an integrated neighborhood with a segregated one.

The adverse consequences attendant upon a "changing" neighborhood can be profound. If petitioners' steering practices significantly reduce the total number of buyers in the Bellwood housing market, prices may be deflected downward. This phenomenon would be exacerbated if perceptible increases in the minority population directly attributable to racial steering precipitate an exodus of white residents. Cf. *Zuch v. Hussey,* 394 F.Supp. 1028, 1030, 1054 (E.D.Mich.1975), order aff'g and remanding, 547 F.2d 1168 (CA6 1977); *Barrick Realty, Inc. v. City of Gary,* 354 F.Supp. 126, 135 (N.D.Ind.1973), aff'd, 491 F.2d 161 (CA7 1974); *United States v. Mitchell,* 335 F.Supp. 1004, 1005 (N.D.Ga.1971), aff'd *sub nom. United States v. Bob Lawrence Realty, Inc.,* 474 F.2d 115 (CA5), cert. denied, 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973).[FN23] A significant reduction in property values directly injures a *111 municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services. Other harms flowing from the realities of a racially segregated community are not unlikely.[FN24] As we have said before, "[t]here can be no question about the importance" to a community of "promoting stable, racially integrated housing." *Linmark Associates, Inc. v. Willingboro Tp.,* 431 U.S. 85, 94, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977). If, as alleged, petitioners' sales practices actually have begun to rob Bellwood of its racial balance and stability, the village has standing to challenge the legality of that conduct.

> FN23. *Zuch* and *Mitchell* were cases in which real estate brokers were accused of "blockbusting," *i. e.,* exploiting fears of racial change by directly perpetuating rumors and soliciting sales in target neighborhoods. Respondents have not alleged that petitioners engaged in such unprincipled conduct, but the description in those cases of the reaction of some whites to a perceived influx of minority residents underscores the import of Bellwood's allegation that petitioners' sales practices threaten serious economic dislocation to the village.

> FN24. It has been widely recognized, for

example, that school segregation is linked closely to housing segregation. See, *e. g., Lee v. Nyquist,* 318 F.Supp. 710, 717 (W.D.N.Y.1970) (three-judge court), summarily aff'd, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971); National Advisory Commission on Civil Disorders, Report 237 (1968); 114 Cong.Rec. 2276 (1968) (remarks of Sen. Mondale).

**1614 B

The individual respondents appeared before the District Court in two capacities. First, they and other individuals had acted as testers of petitioners' sales practices. In this Court, however, respondents have not pressed the claim that they have standing to sue as testers, see Brief for Respondents 14-15, and we therefore do not reach this question. Second, the individual respondents claimed to be injured as homeowners in the community against which petitioners' alleged steering has been directed. It is in this capacity that they claim standing to pursue this litigation.

Four of the individual respondents actually reside within the target area of Bellwood. They claim that the transformation of their neighborhood from an integrated to a predominantly Negro community is depriving them of "the social and professional benefits of living in an integrated society." This allegation is similar to that presented in *Trafficante.* In that case, a Negro and a white resident of a large apartment complex*112 in San Francisco complained that the landlord's exclusion of nonwhites from the complex stigmatized them as residents of a "white ghetto" and deprived them of the social and professional advantages of living in an integrated community. Noting the importance of the "benefits from interracial associations," 409 U.S., at 210, 93 S.Ct., at 367, and in keeping with the Court's recent statement that noneconomic injuries may suffice to provide standing, *Sierra Club v. Morton,* 405 U.S. 727, 734-735, 92 S.Ct. 1361, 1365-1366, 31 L.Ed.2d 636 (1972), we concluded that this injury was sufficient to satisfy the constitutional standing requirement of actual or threatened harm.

[11] Petitioners argue that *Trafficante* is distinguishable because the complainants in that case alleged harm to the racial character of their "community," whereas respondents refer only to their "society."

Reading the complaints as a whole, and remembering that we encounter these allegations at the pleading stage, we attach no particular significance to this difference in word choice. Although an injury to one's "society" arguably would be an exceptionally generalized harm or, more important for Art. III purposes, one that could not conceivably be the result of these petitioners' conduct, we are obliged to construe the complaint favorably to respondents, against whom the motions for summary judgment were made in the District Court. So construed, and read in context, the allegations of injury to the individual respondents' "society" refer to the harm done to the residents of the carefully described neighborhood in Bellwood in which four of the individual respondents reside.[FN25] The question before us, *113 therefore, is whether an allegation that this particular area is losing its integrated character because of petitioners' conduct is sufficient to satisfy Art. III.[FN26]

> FN25. As previously indicated, n. 3, *supra*, neither respondent Perry nor respondent Sharp resides within the target neighborhood of Bellwood. We read the complaints as claiming injury only to that area and its residents, and we are unable to find any allegations of harm to individuals residing elsewhere. On the record before us, we therefore conclude that summary judgment at to these two respondents was appropriate. We note, however, that the standing issue as framed by the District Court was simply whether respondents were direct, as opposed to indirect, victims of the steering practices of petitioners. Viewed in that context, it made no difference whether Perry and Sharp were residents of the target area or not, for they would be found to be without standing in either event. As stated in Part III, *supra*, the District Court's perception of the standing question was incorrect. Only upon reaching this Court has the failure of the complaints to make sufficient allegations as to these two individuals been put in issue clearly. Although we intimate no view as to whether persons residing outside of the target neighborhood have standing to sue under § 812 of Title VIII, we do not foreclose consideration of this question if, on remand, the District Court permits respondents Perry and Sharp to amend their complaints to include allegations of actual harm.

> FN26. Apart from the use of "community" rather than "society," the complaint in *Trafficante* differed from those here in that it alleged that a segregated community was prevented from becoming integrated because of the defendant's conduct. Here, by contrast, respondents claim that an integrated neighborhood is becoming a segregated community because of petitioners' conduct. We find this difference unimportant to our analysis of standing. In both situations, the deprivation of the benefits of interracial associations constitutes the alleged injury.

[12][13] Petitioners suggest that there is a critical distinction between an apartment **1615 complex, even one as large as that in *Trafficante*,[FN27] and a 12-by 13-block residential neighborhood. Although there are factual differences, we do not view them as controlling in this case. We note first that these differences arguably may run in favor of standing for the individual respondents, according to how one views his living environment. Apartment dwellers often are more mobile, with less attachment to a community as such, and thus are able to react more quickly to perceived social or economic changes. *114 The homeowner in a suburban neighborhood such as Bellwood may well have deeper community attachments and be less mobile. Various inferences may be drawn from these and other differences, but for the purpose of standing analysis, we perceive no categorical distinction between injury from racial steering suffered by occupants of a large apartment complex and that imposed upon residents of a relatively compact neighborhood such as Bellwood.[FN28]

> FN27. The apartment complex in *Trafficante* housed 8,200 tenants. 409 U.S., at 206, 93 S.Ct., at 365. The population of Bellwood, of which the target neighborhood is only a part, was estimated at 20,969 in 1975. Department of Commerce, Bureau of the Census, Population Estimates and Projections, Series P-25, No. 661, p. 15 (1977).

> FN28. See *Shannon v. HUD*, 305 F.Supp. 205, 208, 211 (E.D.Pa.1969), aff'd in part, 436 F.2d 809, 817-818 (CA3 1970) (residents in a neighborhood affected by urban renewal project have standing to challenge

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the project's impact on the neighborhood's racial balance). Accord, *Fox v. HUD,* 416 F.Supp. 954, 955-956 (E.D.Pa.1976); *Marin City Council v. Marin County Redevelopment Agency,* 416 F.Supp. 700, 702, 704 (N.D.Cal.1975). See also Comment, The Fair Housing Act: Standing for the Private Attorney General, 12 Santa Clara Law. 562, 568-571 (1972).

The constitutional limits of respondents' standing to protest the intentional segregation of their community do not vary simply because that community is defined in terms of city blocks rather than apartment buildings. Rather, they are determined by the presence or absence of a "distinct and palpable injury," *Warth v. Seldin,* 422 U.S., at 501, 95 S.Ct., at 2206, to respondents resulting from petitioners' conduct. A "neighborhood" whose racial composition allegedly is being manipulated may be so extensive in area, so heavily or even so sparsely populated, or so lacking in shared social and commercial intercourse that there would be no actual injury to a particular resident. The presence of a genuine injury should be ascertainable on the basis of discrete facts presented at trial.[FN29]

> [FN29.] In addition to evidence about the community, it will be relevant at trial to consider the nature and extent of the business of the petitioner real estate brokers. This should include an inquiry into the extent of their participation in the purchase, sale, and rental of residences in the target area, the number and race of their customers, and the type of housing desired by customers. Evidence of this kind may be relevant to the establishment of the necessary causal connection between the alleged conduct and the asserted injury. Respondents apparently attempted to discover such information, but summary judgment was entered against them before this was accomplished.

**\*115** In addition to claiming the loss of social and professional benefits to the individual respondents, the complaints fairly can be read as alleging economic injury to them as well.[FN30] The most obvious source of such harm would be an absolute or relative diminution in value of the individual respondents' homes. This is a fact subject to proof before the District Court, but convincing evidence that the economic value of one's

own home has declined as a result of the conduct of another certainly is sufficient under Art. III to allow standing to contest the legality of that conduct.

> [FN30.] The complaints state that petitioners have manipulated the housing market of Bellwood "to the economic and social detriment of the citizens of [the] village." App. 6, 99.

V

We conclude that the facts alleged in the complaints and revealed by initial discovery are sufficient to provide standing under **\*\*1616** Art. III. It remains open to petitioners, of course, to contest these facts at trial.[FN31] The adequacy of proof of respondents' standing is not before us, and we express no views on it.[FN32] We hold only that the summary judgments should not have been entered on the records before the District Court, except with respect to respondents Perry and Sharp. **\*116** See n. 25, *supra.* Subject to this exception, the judgment of the Court of Appeals is affirmed.[FN33]

> [FN31.] Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial.

> [FN32.] The federal courts that have considered the question have concluded that racial steering is prohibited by Title VIII. *E. g., Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.,* 429 F.Supp. 486, 488 (E.D.N.Y.1977); *United States v. Real Estate One, Inc.,* 433 F.Supp. 1140, 1144 (E.D.Mich.1977); *Fair Housing Council v. Eastern Bergen County Multiple Listing Serv., Inc.,* 422 F.Supp. 1071, 1075 (N.J.1976). We do not reach this issue, as it is not presented by this case.

> [FN33.] The Court of Appeals found it unnecessary to consider respondents' standing under § 1982. For this reason, and because of our decision with respect to respondents' standing under Title VIII, we do not reach the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

§ 1982 issue.

*So ordered.*

Mr. Justice REHNQUIST, with whom Mr. Justice STEWART joins, dissenting.

Title VIII of the Civil Rights Act of 1968, 82 Stat. 81, as amended, 42 U.S.C. § 3601 *et seq.,* which outlaws discrimination in virtually all aspects of the sale or rental of housing, provides two distinct and widely different routes into federal court. Under § 810, 42 U.S.C. § 3610,[FN1] a "person aggrieved," **117** that is, "[a]ny person who claims to have been injured by a discriminatory housing**1617** practice," may seek administrative relief from the Secretary of the Department of Housing and **118** Urban Development and, if the Secretary cannot within 30 days resolve the dispute "by informal methods of conference, conciliation, and persuasion," may bring a civil action in federal district court. In *Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972),* we held that the broad definition given to the term "person aggrieved" in § 810 evinced " 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution.' " 409 U.S., at 209, 93 S.Ct., at 367.

FN1. Section 810 provides:

"(a) Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter 'person aggrieved') may file a complaint with the Secretary. Complaints shall be in writing and shall contain such information and be in such form as the Secretary requires. Upon receipt of such a complaint the Secretary shall furnish a copy of the same to the person or persons who allegedly committed or are about to commit the alleged discriminatory housing practice. Within thirty days after receiving a complaint, or within thirty days after the expiration of any period of reference under subsection (c), the Secretary shall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint, he shall proceed to try to eliminate or correct the alleged dis-

criminatory housing practice by informal methods of conference, conciliation, and persuasion. Nothing said or done in the course of such informal endeavors may be made public or used as evidence in a subsequent proceeding under this title without the written consent of the persons concerned. Any employee of the Secretary who shall make public any information in violation of this provision shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $1,000 or imprisoned not more than one year.

"(b) A complaint under subsection (a) of this section shall be filed within one hundred and eighty days after the alleged discriminatory housing practice occurred. Complaints shall be in writing and shall state the facts upon which the allegations of a discriminatory housing practice are based. Complaints may be reasonably and fairly amended at any time. A respondent may file an answer to the complaint against him and with the leave of the Secretary, which shall be granted whenever it would be reasonable and fair to do so, may amend his answer at any time. Both complaints and answers shall be verified.

"(c) Wherever a State or local fair housing law provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title, the Secretary shall notify the appropriate State or local agency of any complaint filed under this title which appears to constitute a violation of such State or local fair housing law, and the Secretary shall take no further action with respect to such complaint if the appropriate State or local law enforcement official has, within thirty days from the date the alleged offense has been brought to his attention, commenced proceedings in the matter, or, having done so, carries forward such proceedings with reasonable promptness. In no event shall the Secretary take further action unless he certifies that in his judgment, under the circumstances of the particular case, the protection of the rights of the parties or the interests of justice require such action.

99 S.Ct. 1601                                                                                Page 18
441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66
**(Cite as: 441 U.S. 91, 99 S.Ct. 1601)**

"(d) If within thirty days after a complaint is filed with the Secretary or within thirty days after expiration of any period of reference under subsection (c), the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this title, insofar as such rights relate to the subject of the complaint: *Provided,* That no such civil action may be brought in any United States district court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title. Such actions may be brought without regard to the amount in controversy in any United States district court for the district in which the discriminatory housing practice is alleged to have occurred or be about to occur or in which the respondent resides or transacts business. If the court finds that a discriminatory housing practice has occurred or is about to occur, the court may, subject to the provisions of section 812 of this title, enjoin the respondent from engaging in such practice or order such affirmative action as may be appropriate.

"(e) In any proceeding brought pursuant to this section, the burden of proof shall be on the complainant.

"(f) Whenever an action filed by an individual, in either Federal or State court, pursuant to this section or section 812 of this title, shall come to trial the Secretary shall immediately terminate all efforts to obtain voluntary compliance." 82 Stat. 85, 42 U.S.C. § 3610.

 The second route into federal court under Title VIII-§ 812 [FN2]-provides simply that "[t]he rights granted by sections **119 803, 804, 805, and 806 of this title may be enforced by civil actions in appropriate United States district courts . . . ." 42 U.S.C. § 3612. Despite

the absence from § 812 of the "person aggrieved" language so crucial to our holding in *Trafficante* regarding standing under § 810, the Court today holds that "[s]tanding under § 812, like that under § 810, is 'as broa[d] as is permitted by Article III of the Constitution.' " *Ante,* at 1613, quoting *Trafficante v. Metropolitan Life Ins. Co., supra,* at 209, 93 S.Ct. at 366. **1618 I think that the Court's decision ignores the plain language of § 812 and makes nonsense out of Title VIII's formerly sensible statutory enforcement scheme.

   FN2. Section 812 provides:

 "(a) The rights granted by sections 803, 804, 805, and 806 of this title may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction. A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred: *Provided, however,* That the court shall continue such civil case brought pursuant to this section or section 810(d) of this title from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in satisfactory settlement of the discriminatory housing practice complained of in the complaint made to the Secretary or to the local or State agency and which practice forms the basis for the action in court: *And provided, however,* That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under the provisions of this Act shall not be affected."

 "(b) Upon application by the plaintiff and in such circumstances as the court may deem just, a court of the United States in which a civil action under this section has been brought may appoint an attorney for the plaintiff and may authorize the commencement of a civil action upon proper showing without the payment of fees, costs, or secu-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

rity. A court of a State or subdivision thereof may do likewise to the extent not inconsistent with the law or procedures of the State or subdivision.

"(c) The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided,* That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees." 82 Stat. 88, 42 U.S.C. § 3612.

I

The doctrine of standing is comprised of both constitutional limitations on the jurisdiction of federal courts and prudential rules of self-restraint designed to bar from federal court those parties who are ill-suited to litigate the claims they assert. In its constitutional dimension, the standing inquiry asks whether the party before the court has " 'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify **\*120** exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498-499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (emphasis in original), quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The crucial elements of standing are injury in fact and causation. To demonstrate the "personal stake" in the litigation necessary to satisfy the Constitution, the party must suffer "a distinct and palpable injury," *Warth v. Seldin, supra,* 422 U.S., at 501, 95 S.Ct., at 2206, that bears a " 'fairly traceable' causal connection" to the challenged action. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978), quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). Accordingly, when an objection to a party's standing to litigate in federal court is constitutionally based, "the relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

A plaintiff who alleges sufficient injury to satisfy these minimum constitutional limitations on federal jurisdiction may nonetheless be barred from federal court under our prudential standing rules because he asserts a generalized grievance shared in substantially equal measure by all or a large class of citizens, *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), or because he seeks to "rest his claim to relief on the legal rights or interests of third parties" rather than his own. *Warth v. Seldin,* 422 U.S., at 499, 95 S.Ct., at 2205. These prudential rules, however, are subject to modification by Congress, which may grant to any person satisfying Art. III's minimum standing requirements a right "to seek relief on the basis of the legal rights and interests of others, and, indeed, [to] invoke the general public interest in support of [his] claim." *Id., at 501, 95 S.Ct., at 2206.* Congress did just that in enacting § 810 of Title VIII, which grants to "[a]ny person who claims to have been injured by a discriminatory housing practice" a right to seek federal administrative and judicial relief. In *Trafficante,* **\*121** *supra,* we held that the broad definition given "person aggrieved" in § 810 indicated a congressional intent to accord apartment dwellers, who had not themselves suffered discrimination, an actionable right to be free from the adverse consequences flowing to them from racially discriminatory rental practices directed at third parties.[FN3] Plaintiffs' alleged "loss of important benefits from interracial associations," 409 U.S., at 210, 93 S.Ct., at 367, was sufficient to satisfy the injury-in-fact requirement of Art. III.

FN3. Despite suggestions to the contrary by the Court, *ante,* at 1609 n. 7, our decision in *Trafficante* was clearly not intended to construe § 812 as well as § 810. The opinion focuses exclusively on § 810, closing with the following statement:

"We can give vitality to § 810(a) only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities within the coverage of the statute." 409 U.S., at 212, 93 S.Ct., at 368.

The Court's passing reference in *Trafficante* to § 812 can hardly be construed as an inter-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

pretation of that provision.

**\*\*1619** In the case now before us, respondents-the village of Bellwood, five of its residents, and one resident of a neighboring community-brought suit against petitioner real estate firms, alleging that the firms had violated both 42 U.S.C. § 1982 and § 804 of Title VIII by "steering" prospective homebuyers to different areas in and around Bellwood according to their race. Like plaintiffs in *Trafficante,* the individual respondents allege that petitioners' practice of racial steering has deprived them of "the social and professional benefits of living in an integrated society." FN4 App. 6, 99. Respondent village of Bellwood alleges that it has been injured "by having [its] housing market . . . wrongfully and illegally **\*122** manipulated to the economic and social detriment of [its] citizens." *Ibid.* Unlike plaintiffs in *Trafficante,* however, respondents have not proceeded under § 810 of Title VIII, choosing instead to travel the direct route into federal court provided by § 812.

> FN4. Alleging injury to "their right to select housing without regard to race," App. 6, 99, the individual respondents initially sought to establish standing in their capacity as "testers." Respondents have abandoned, in this Court, their claim of standing as testers, electing to stand or fall on their allegations of injury in their capacity as residents in and around Bellwood.

In pertinent part, § 812 provides:

 "The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction." 82 Stat. 88, 42 U.S.C. § 3612(a).

The language of § 812 contains no indication that Congress intended to authorize the commencement of suits under Title VIII by persons who would otherwise be barred from federal court by prudential standing rules. Indeed, were § 812 the only method for enforcing Title VIII respondents-who were not themselves discriminated against by petitioners-could hardly argue that they were statutorily authorized to seek relief on the basis of legal rights and interests of third parties who had been racially "steered" into and

away from certain areas in the community. The Court, however, in effect reads the broadly defined "person aggrieved" language of § 810 into § 812, holding that the alternative routes into federal court provided under the sections are available to precisely the same class of plaintiffs. The language and structure of Title VIII lead me to a contrary conclusion.

II

 The term "person aggrieved" is used throughout § 810-no less than four times-to denominate the proper § 810 claimant; FN5 by contrast, in § 812 Congress wholly avoided use of this broadly defined term, preferring instead the familiar "plaintiff." Noting that § 812 is phrased in the passive voice, **\*123** the Court concludes that the absence of the "person aggrieved" language from the provision "does not indicate that standing is more *limited* under that provision than under § 810." *Ante,* at 1609 (emphasis added). The point of our decision in *Trafficante,* however, was that the presence of the "person aggrieved" language in § 810 demonstrated Congress' affirmative intent to abrogate prudential standing rules and to *expand* standing under the section to the full extent permitted by Art. III of the Constitution. It thus follows that the absence of "person aggrieved" from § 812 indicates that Congress did not intend to abrogate the normal prudential rules of standing with regard to § 812.

> FN5. Indeed, the term is found nowhere else in Title VIII.

 Consistent with § 810's broad grant of standing is the language chosen by Congress to define the scope of the civil action that may be brought under the section: "[T]he person aggrieved may . . . commence a civil action in any appropriate United States district court . . . to enforce the rights granted *or protected* by this title . . . ." 82 Stat. 86, 42 U.S.C. § 3610(d) (emphasis added). Section 812, in contrast, authorizes the commencement of a **\*\*1620** civil action to enforce only "[t]he rights granted by," as opposed to "rights granted or protected by," §§ 803, 804, 805, and 806. Clearly, Congress contemplated that § 812 suits could be instituted only by persons alleging injury to rights expressly secured under the enumerated sections.

 Section 804, the provision allegedly offended by petitioners, provides in pertinent part:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

99 S.Ct. 1601
441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66
**(Cite as: 441 U.S. 91, 99 S.Ct. 1601)**

Page 21

"[I]t shall be unlawful-

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

"(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or **\*124** in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

"(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 82 Stat. 83, as amended, 88 Stat. 729, 42 U.S.C. § 3604.

In essence, § 804 grants to all persons [FN6] seeking housing the right not to be discriminated against on the basis of race, color, religion, sex, or national origin. Nowhere in the section are the individual respondents granted a right to reap the "social and professional benefits of living in an integrated society." Nor does § 804 grant the village of Bellwood an actionable right not to have its housing market "wrongfully and illegally manipulated." Accordingly, respondents have suffered no injury to "rights granted by [§ 804]."

FN6. "Person" is defined in Title VIII as "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy, receivers, and fiduciaries." 42 U.S.C. § 3602(d).

The structure of both § 810 and § 812 and the significant differences between the two enforcement provisions further support the conclusion that Congress intended to restrict access to federal courts under § 812 to a more limited class of plaintiffs than that contemplated under § 810. A "person aggrieved," proceeding under § 810, must first file a complaint with the Secretary of Housing and Urban Development, who is authorized "to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persua-

sion." 42 U.S.C. § 3610(a). The Secretary, however, must defer to the appropriate state **\*125** or local agency whenever state or local fair-housing laws provide rights and remedies substantially equivalent to those secured under Title VIII. The Secretary may recommence action on the complaint only upon certification that such action is necessary to protect the rights of the parties or the interests of justice. 42 U.S.C. § 3610(c). If the Secretary's informal efforts prove futile, the "person aggrieved" may commence a civil action under Title VIII in federal district court, but only if he has no comparable judicial remedy under "substantially equivalent" state or local fair-housing legislation. 42 U.S.C. § 3610(d).

The § 812 "plaintiff" is not similarly encumbered. He may proceed directly into federal court, deferring neither to the Secretary of Housing and Urban Development nor to state administrative and judicial processes. See 42 U.S.C. § 3612(a). The District Court is authorized to appoint an attorney for the § 812 plaintiff and to waive payment of fees, costs, and security. 42 U.S.C. § 3612(b). Additionally, broader relief is available under § 812. The "prevailing plaintiff" may be awarded a "permanent or temporary injunction, temporary restraining order, or other order, and . . . actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees . . . ." **\*\*1621** 42 U.S.C. § 3612(c). Section 810, by contrast, makes no allowance for damages, costs, or counsel fees, limiting the victorious claimant to injunctive relief and such other affirmative action as may be appropriate. 42 U.S.C. § 3610(d). Nor does § 812 contain a provision similar to § 810(e), which provides that "[i]n any proceeding brought pursuant to [§ 810], the burden of proof shall be on the complainant." Given the advantages to the claimant of proceeding under § 812, it is hard to imagine why anyone would *voluntarily* proceed under § 810 if both routes were equally available.

When the carefully chosen language and the widely variant provisions of § 810 and § 812 are thus compared, the logic of **\*126** Title VIII's private enforcement mechanism becomes clear. Immediate access to federal judicial power under § 812 was reserved to those directly victimized by a discriminatory housing practice; that is, those actually discriminated against on the basis of race, color, religion, sex, or national origin. Only direct victims of housing discrimination were deemed to suffer injuries of sufficient magnitude

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to authorize appointment of counsel and recovery of compensatory and punitive damages, costs, and attorney fees. But because discrimination in housing can injure persons other than the direct objects of the discrimination, *Trafficante*, 409 U.S., at 210, 93 S.Ct., at 367, Congress believed that the statute's fair-housing goals would be served by extending standing under § 810 as broadly as constitutionally permissible. Anyone claiming to have been injured by a discriminatory housing practice, even if not himself directly discriminated against, is authorized to seek redress under § 810. By barring indirect victims of housing discrimination from immediate access to federal court under § 812, and thus requiring them to exhaust federal conciliation procedures as well as viable state and local remedies pursuant to § 810, Congress sought to facilitate informal resolution of Title VIII disputes, to avoid federal judicial intervention when possible, and to encourage state and local involvement in the effort to eliminate housing discrimination.

The legislative history of Title VIII, while "not too helpful," *Trafficante, supra,* at 210, 93 S.Ct., at 367, supports the view that standing to commence a civil action under § 812 is limited to direct victims of housing discrimination. Introduced on the Senate floor and approved unchanged by the House, Title VIII's legislative history must be culled primarily from the Congressional Record. The brief debate preceding adoption of Amendment No. 586, which amended § 810 to require exhaustion of "substantially equivalent" remedies under state or local fair-housing laws as a prerequisite to the filing of a Title **\*127** VIII action in federal court, is particularly enlightening. Senator Miller, who introduced the amendment, explained:

"I provide in the second part of my amendment that no civil action may be brought in any U. S. District Court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides substantially equivalent rights and remedies in this act.

"I believe it is a matter of letting the State and local courts have jurisdiction. We in the Senate know that our Federal district court calendars are crowded enough, without adding to that load if there is a good remedy under State law." 114 Cong.Rec. 4987 (1968).

Senator Hart added that the amendment "recognizes the desire all of us share that the State remedies, where adequate, be availed of and that unnecessary burden-

ing litigation not further clog the court calendars." *Ibid.* It seems unlikely that Congress would wholly frustrate the concerns moving it to adopt § 810's exhaustion requirement by opening § 812's direct route into federal court to all "persons aggrieved."

The debate concerning the allowance of attorney's fees to prevailing plaintiffs under § 812 also indicates a congressional understanding that standing to proceed immediately into federal court under § 812 was limited to discriminatees. Senator **\*\*1622** Hart commented that §§ 812(b) and (c)-which authorize the district court to waive payment of fees, costs, and security in appropriate cases and to award damages, court costs, and reasonable attorney fees to prevailing plaintiffs-"reveal a clear congressional intent to permit, and even encourage, litigation by those who cannot afford to redress *specific wrongs aimed at them because of the color of their skin.*" 114 Cong.Rec. 5514-5515 (1968) (emphasis added).

The meager legislative history marshaled by the Court provides at best thin support for its expansive interpretation of standing under § 812. References in the legislative history describing § 812 as an "addition[al]" and "alternative" remedial**\*128** provision to § 810, *ante,* at 1611, and nn. 16, 17, and 18, are hardly dispositive: one need only read the two sections to conclude that they provide "alternative" enforcement mechanisms. That § 810 and § 812 are "alternative" remedial provisions does not, however, compel the conclusion that they are equally available to all potential Title VIII claimants. The only piece of legislative history arguably supporting the Court's interpretation of § 812 is the House Judiciary Committee staff's use of the term "aggrieved person" to refer to potential § 812 plaintiffs. *Ante,* at n. 18. This single, fleeting reference in the legislative history hardly seems sufficient to overwhelm the contrary indications of congressional intent found elsewhere in Title VIII's legislative history and in the carefully worded and structured provisions of § 810 and § 812.

I think that *Trafficante* pushed standing to the limit in construing the "person aggrieved" language of § 810. I cannot join the Court in pressing the more narrowly confined language of § 812 to the same limit.

III

Respondents also claim standing under 42 U.S.C. §

1982, which provides: "All citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property." Unlike Title VIII, "§ 1982 is not a comprehensive open housing law." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968). Enacted as part of the Civil Rights Act of 1866, the section bars all racial discrimination, both private and public, in the sale or rental of property. *Ibid.*

It is clear that respondents have suffered no injury to the only right secured under § 1982-the right to be free from racially motivated interference with property rights. Their claim of standing under § 1982 is thus conceptually indistinguishable from a similar claim rejected by this Court in **\*129** *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Plaintiffs in *Warth* brought a § 1982 action against the town of Penfield, N.Y., and members of its Zoning, Planning, and Town Boards, claiming that the town's zoning ordinance effectively excluded persons of minority racial and ethnic groups. One of the plaintiffs, a nonprofit corporation organized to alleviate the housing shortage for low- and moderate-income persons in and around Penfield, based its standing to challenge the zoning ordinance on the loss to its members residing in Penfield of the "benefits of living in a racially and ethnically integrated community." 422 U.S., at 512, 95 S.Ct., at 2212. This Court rejected plaintiffs' claim of standing, distinguishing *Trafficante* on the ground that § 1982, unlike § 810 of Title VIII, does not give residents of certain communities an actionable right to be free from the adverse consequences of racially discriminatory practices directed at and immediately harmful to others. Thus, we held plaintiffs' "attempt to raise putative rights of third parties," 422 U.S., at 514, 95 S.Ct., at 2213, barred by the prudential rules of standing.

Like plaintiffs in *Warth*, respondents claim that they have been injured by racially discriminatory acts practiced on others. Thus, their claim of standing under § 1982 must also fail.

**\*\*1623** Because I think that respondents have no standing to litigate claims under 42 U.S.C. § 1982 and § 812 of the Civil Rights Act of 1968, I would reverse the judgment of the Court of Appeals.

U.S.Ill.,1979.

Gladstone Realtors v. Village of Bellwood
441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 6

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Monday, September 14, 2009 23:28 Central |
| Client Identifier: | BARNETT |
| Database: | FSFIND |
| Citation Text: | 566 F.Supp.2d 63 |
| Lines: | 496 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Westlaw.

566 F.Supp.2d 63, 2008 DNH 129
 **(Cite as: 566 F.Supp.2d 63)**

C

United States District Court,
D. New Hampshire.
Fred HOLLANDER
v.
Senator John McCAIN and the Republican National
Committee.
**Civil No. 08-cv-99-JL.**

July 24, 2008.

**Background:** Voter brought action against the Republican National Committee (RNC) and its presumed presidential nominee, alleging that candidate was not eligible for the presidency due to fact that he was born in the Panama Canal Zone. The RNC moved to dismiss.

**Holding:** The District Court, Joseph N. Laplante, J., held that voter did not have standing to bring suit.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A ⚷1829**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1829 k. Construction of
Pleadings. Most Cited Cases

**Federal Civil Procedure 170A ⚷1835**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1835 k. Matters Deemed Admitted; Acceptance as True of Allegations in Com-

plaint. Most Cited Cases
A court faced with a challenge to standing at the pleading stage must accept as true all material allegations of the complaint, and construe the complaint in favor of the complaining party.

**[2] Federal Civil Procedure 170A ⚷657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In General. Most
Cited Cases
A pro se complaint must be construed liberally, held to less stringent standards than formal pleadings drafted by lawyers.

**[3] Federal Civil Procedure 170A ⚷103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

**Federal Civil Procedure 170A ⚷103.3**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.3 k. Causation; Redressability. Most Cited Cases
Article III standing has three requirements: (1) the plaintiff has suffered an injury in fact; (2) that injury bears a causal connection to the defendant's challenged conduct; and (3) a favorable judicial decision will provide the plaintiff with redress from that injury. U.S.C.A. Const. Art. 3, § 1 et seq.

**[4] United States 393 ⚷26**

393 United States

566 F.Supp.2d 63, 2008 DNH 129
**(Cite as: 566 F.Supp.2d 63)**

393I Government in General
  393k26 k. President. Most Cited Cases
New Hampshire voter did not have standing to challenge Republican party's presumed presidential nominee, based on allegation that by virtue of candidate's birth in the Panama Canal Zone, he was not a "natural born citizen" eligible to hold office of President under the Constitution; voter did not suffer a cognizable injury, as inclusion of an alleged constitutionally ineligible candidate on the ballot did not prevent voter from voting for someone else. U.S.C.A. Const. Art. 2, § 1, cl. 1 et seq.; U.S.C.A. Const. Art. 3, § 1 et seq.

**[5] Elections 144 ☞273**

144 Elections
  144X Contests
    144k273 k. Persons Entitled to Bring Proceedings. Most Cited Cases
Voters have no standing to complain about the participation of an ineligible candidate in an election, even if it results in the siphoning of votes away from an eligible candidate they prefer.
*64 Fred Hollander, Nashua, NH, pro se.

Amir C. Tayrani, Matthew D. McGill, Gibson Dunn & Crutcher LLP, Washington, DC, Charles G. Douglas, III, Douglas Leonard & Garvey, Concord, NH, for Defendants.

### ORDER

JOSEPH N. LAPLANTE, District Judge.

Fred Hollander, proceeding pro se, brings this action challenging Senator John McCain's eligibility to serve as President of the United States. Hollander claims that McCain, by virtue of his birth in the Panama Canal Zone-albeit to American parents-is not a "natural born Citizen" eligible to hold the office of President under Article II, § 1 of the Constitution.

Though McCain and his co-defendant, the Republican National Committee ("RNC"), vigorously dispute this claim, they argue that this court cannot decide it in any event due to a number of jurisdictional defects: lack of standing and ripeness, mootness, and nonjusticiability. The defendants also argue that Hollander has failed to state a claim for relief because (1) they are not state actors, so Hollander cannot maintain any constitu-

tional claim against them and (2) in any event, any remedy for it would necessarily violate their own First Amendment rights.

**\*65** This court held a hearing on the defendants' motion to dismiss this action on those grounds on July 24, 2008. Based on the arguments presented there, as well as in the parties' briefing, the court rules that Hollander lacks standing to bring this action. The court does not reach the rest of the parties' arguments, including, most notably, the question of McCain's constitutional eligibility to be President.

### I. *Applicable Legal Standard*

[1][2] A court faced with a challenge to standing at the pleading stage, as here, must "accept as true all material allegations of the complaint, and ... construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Hollander's pro se complaint, furthermore, must be construed liberally, "held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (internal quotation marks omitted). Yet even these standards do not require the court to credit "[e]mpirically unverifiable conclusions, not logically compelled, or at least supported, by the stated facts" in the complaint. *Sea Shore Corp. v. Sullivan,* 158 F.3d 51, 54 (1st Cir.1998) (internal quotation marks omitted); *Ahmed v. Rosenblatt,* 118 F.3d 886, 890 (1st Cir.1997).

### II. *Background*

McCain was born, in 1936, at the Coco Solo Naval Air Station, a United States military installation in the Panama Canal Zone.[FN1] At the time, McCain's father-who, like McCain's mother, was an American citizen-was stationed there on active duty with the United States Navy. McCain, by virtue of his American parentage, is unquestionably an American citizen. *See* Act of May 24, 1934, Pub.L. No. 73-250, § 1, 48 Stat. 797 (amended 1952) ("Any child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States, is declared to be a citizen of the United States")[FN2]; *see also* Act of Aug. 4, 1937, Pub.L. No. 75-243, 50 Stat. 558 (codified as amended at 8 U.S.C. § 1403(b))

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

566 F.Supp.2d 63, 2008 DNH 129
 (Cite as: 566 F.Supp.2d 63)

(conferring citizenship on children born in the Canal Zone to one American parent on or after February 26, 1904, and born to one American parent anywhere in Panama after that date so long as the parent was employed there by the United States at the child's birth).

FN1. Though Hollander makes this allegation in his complaint, in his objection he states, "[s]ince the hospital at the Coco Solo Naval Air Station did not even exist until 1941 ..., it is reasonable to assume that [McCain] was born in the city of Colón in the Republic of Panama." Hollander has also provided a copy of McCain's birth certificate, which lists his place of birth as Colón. The defendants dispute this theory, but it is irrelevant to the present motion in any event.

FN2. The law is the same today. See 8 U.S.C. § 1401(c) (2005).

Yet the Constitution provides that "No person except a *natural born* Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President." U.S. Const. art. II, § 1, cl. 4 (emphasis added). The phrase "natural born Citizen" is not defined in the Constitution, *see Minor v. Happersett,* 88 U.S. 162, 167, 21 Wall. 162, 22 L.Ed. 627 (1875), nor does it appear anywhere else in the document, *see* Charles Gordon, *Who Can Be President of the United States: An Unresolved Enigma,* 28 Md. L. Rev. 1, 5 (1968). The phrase has thus spawned a largely academic controversy over whether it excludes those citizens who acquired that **66 status via birth to American parents abroad. *Compare, e.g.,* Jill A. Pryor, The *Natural-Born Citizen Clause and Presidential Eligibility: An Approach for Resolving Two Hundred Years of Uncertainty,* 97 Yale L.J. 881, 899 (1988) (concluding that those citizens are eligible) *with, e.g.,* Gabriel J. Chin, *Why Senator John McCain Cannot Be President* 17-18 (July 2008) (unpublished manuscript), *available at* http:// www. law. arizona. edu/ Faculty Pubs/ Documents/ Chin/ ALS 08- 14. pdf (concluding they are not).[FN3]

FN3. Though the weight of the commentary falls heavily on the side of eligibility, *see, e.g.,* Sarah Helene Duggin & Mary Beth Collins, *"Natural Born" in the USA: The Striking Unfairness and Dangerous Ambiguity of the Constitution's Presidential Qualifications Clause and Why We Need to Fix It,* 85 B.U. L. Rev. 53, 82-83 (2005) (surveying authority), many of these commentators acknowledge that the question is not completely free from doubt, *see, e.g.,* Lawrence Friedman, *An Idea Whose Time Has Come-The Curious History, Uncertain Effect, and Need for Amendment of the "Natural Born Citizen" Requirement for the Presidency,* 52 St. Louis U. L.J. 137, 143 (2007).

The question has taken on a real-world dimension, however, during the occasional presidential candidacies of politicians born abroad: Franklin D. Roosevelt, Jr., who was born to American parents in Canada, *see* Warren Freedman, *Presidential Timber: Foreign Born Children of American Parents,* 35 Cornell L.Q. 357 n. 2 (1950); George Romney (father to McCain's one-time opponent in the recent Republican presidential primary, Mitt Romney), who was born to American parents in Mexico, *see* Gordon, *supra,* at 1; and, now, McCain, *see, e.g.,* Chin, *supra,* at 3-4. In McCain's case, the question also takes on an additional layer of complication due to his birth in the Panama Canal Zone.

Those born "in the United States, and subject to the jurisdiction thereof," U.S. Const. amend. XIV, have been considered American citizens under American law in effect since the time of the founding, *United States v. Wong Kim Ark,* 169 U.S. 649, 674-75, 18 S.Ct. 456, 42 L.Ed. 890 (1898), and thus eligible for the presidency, *see, e.g.,* *Schneider v. Rusk,* 377 U.S. 163, 165, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964) (dicta). So the defendants say that, apart from McCain's citizenship by parentage, he can be President because "he was born within the sovereign territory of the United States," namely, the Canal Zone, over which they argue the United States was exercising the powers of a sovereign at the time of McCain's birth, under the Hay-Bunau-Varilla Convention. *See* Convention between the United States and the Republic of Panama for the Construction of a Ship Canal to Connect the Waters of the Atlantic and Pacific Oceans, U.S.-Pan., art. III, Nov. 18, 1903, 33 Stat. 2234, 2235. The Supreme Court, however, has made contradictory comments in dicta on the status of the Canal Zone. *Compare O'Connor v. United States,* 479 U.S. 27, 28, 107 S.Ct. 347, 93 L.Ed.2d 206 (1986) (observing that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

566 F.Supp.2d 63, 2008 DNH 129
 **(Cite as: 566 F.Supp.2d 63)**

the United States exercised sovereignty over the Canal Zone under the Convention) with *Vermilya-Brown Co. v. Connell,* 335 U.S. 377, 381, 69 S.Ct. 140, 93 L.Ed. 76 (1948) (observing that the United States has no sovereignty there).

Hollander claims, due to what he calls McCain's "unequivocal ineligibil [ity]" for the Presidency, that the RNC "should not be permitted to nominate him.... This would lead to the disenfranchisement of [Hollander] and 100 million additional voters" in the general presidential election. Hollander, in fact, claims that he has already suffered disenfranchisement in the 2008 New Hampshire Republican primary, because it resulted in the allocation of delegates to the Republican National Convention**67** on McCain's behalf, despite his alleged ineligibility.[FN4]

> FN4. McCain received about 37 percent of the vote in the primary, resulting in the allocation of seven delegates to him and five to other candidates.

As a result, Hollander says, his vote in the New Hampshire primary, and those of others participating in primary elections in which McCain appeared on the ballot, "will count less than [the votes of] those who voted in other parties' primary elections," which led to the allocation of votes to a constitutionally eligible Presidential candidate. Hollander adds that the defendants are responsible for this disenfranchisement because McCain ran in the New Hampshire primary "under false pretenses" to his eligibility for the Presidency, while the RNC "authorized" him to do so. To remedy his claimed disenfranchisement in the New Hampshire Republican primary, and to prevent his further claimed disenfranchisement in the general election, Hollander requests: (1) a declaratory judgment that McCain is ineligible for the Presidency, (2) an injunction requiring McCain to withdraw his candidacy, and (3) an injunction requiring the RNC to reallocate the delegates awarded to McCain as the result of the New Hampshire primary and others, and to nominate another candidate.

**III.** *Analysis*

[3] As previously mentioned, the defendants argue that Hollander lacks standing to maintain this lawsuit. "Article III of the Constitution limits the 'judicial

power' of the United States to the resolution of 'cases' and 'controversies'.... As an incident to the elaboration of this bedrock requirement, [the Supreme] Court has always required that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). So-called "Article III standing" has three requirements: (1) the plaintiff must have suffered "an injury in fact," (2) that injury bears a causal connection to the defendant's challenged conduct, and (3) a favorable judicial decision will likely provide the plaintiff with redress from that injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The party bringing the claim-Hollander here-bears the burden to show his or her standing to bring it. *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004).

Based on these principles, the Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large-does not state an Article III case or controversy." *Lujan,* 504 U.S. at 573-74, 112 S.Ct. 2130. These holdings include *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), where the Court ruled that a group of citizens lacked standing to litigate the eligibility, under the Incompatibility Clause,[FN5] of members of Congress to serve simultaneously in the military reserves.

> FN5. Together with the Ineligibility Clause, this provision states, "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." U.S. Const., art. I, § 6, cl. 2.

***68** Alleging injury "because Members of Congress

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

566 F.Supp.2d 63, 2008 DNH 129
 **(Cite as: 566 F.Supp.2d 63)**

holding a Reserve position in the Executive Branch were said to be subject to the possibility of undue influence by the Executive Branch, in violation of the concept of the independence of Congress" embodied in the Clause, the plaintiffs sought an injunction against the service of congressmen in the reserves as well as "a declaration that membership in the Reserves is an office under the United States prohibited to Members of Congress by Art. I, § 6, cl. 2." *Schlesinger,* 418 U.S. at 211-12, 94 S.Ct. 2925 (footnote omitted). But the Court called it

nothing more than a matter of speculation whether the claimed nonobservance of that Clause deprives citizens of the faithful discharge of the legislative duties of reservist members of Congress. And that claimed nonobservance, standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury.

 *Id.* at 217, 94 S.Ct. 2925 (footnote omitted). The Court went on to hold "that standing to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share." *Id.* at 229, 94 S.Ct. 2925.

 *Schlesinger* makes clear, then, that Hollander does not have standing based on the harm he would suffer should McCain be elected President despite his alleged lack of eligibility under Art. II, § 1, cl. 4. That harm, "standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance." 418 U.S. at 217, 94 S.Ct. 2925; *see also Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937) (ruling that citizen lacked standing to challenge appointment of Hugo Black to the Court under the Ineligibility Clause based on his membership in Congress when it enacted a new judicial pension plan).

[4] Hollander, however, argues that the harm to him from McCain's candidacy transcends simply the right to be governed by a constitutionally qualified President; Hollander claims it also impacts his right to vote, both in the New Hampshire Republican Primary and the general election. This is a difficult theory to understand, but it appears to rest on the premise that McCain's mere status as a presidential candidate or

party nominee somehow interferes with the electoral franchise of voters like Hollander who consider McCain ineligible for the office. Presumably, those voters are empowered to address that concern on their own by voting for a different presidential candidate, whose eligibility is unimpeachable. The presence of some allegedly ineligible candidate on the ballot would not seem to impair that right in the least, no matter how that candidate performs in the election.

To be sure, courts have held that a candidate or his political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election. *See, e.g., Tex. Dem. Party v. Benkiser,* 459 F.3d 582, 586-87 & n. 4 (5th Cir.2006); *Schulz v. Williams,* 44 F.3d 48, 53 (2d Cir.1994); *Fulani v. Hogsett,* 917 F.2d 1028, 1030 (7th Cir.1990). But that notion of "competitive standing" has never been extended to *voters* challenging the eligibility of a particular candidate. *See Gottlieb v. Fed. Elec. Comm'n,* 143 F.3d 618, 622 (D.C.Cir.1998).

[5] In *Gottlieb,* the court drew a distinction between voters' claims over the allegedly illegal *exclusion* of their preferred candidate and the allegedly illegal *inclusion* of a rival candidate. *Id.* While *69 the exclusion "directly imping[es] on the voters' ability to support" their chosen candidate-after all, they cannot vote for somebody who is not on the ballot-the mere inclusion of a rival does "not impede the voters from supporting the candidate of their choice" and thus does not cause the legally cognizable harm necessary for standing. *Id.* (citing *Buckley v. Valeo,* 424 U.S. 1, 94, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). So voters have no standing to complain about the participation of an ineligible candidate in an election, even if it results in the siphoning of votes away from an eligible candidate they prefer. *See id.* As *Gottlieb* reasons, only the eligible candidate, or his or her political party, can claim standing based on that injury.

In addition to *Gottlieb,* "[s]everal other Circuit Courts have also concluded that a voter fails to present an injury-in-fact when the alleged harm ... is only derivative of a harm experienced by a candidate." *Crist v. Comm'n on Pres. Debates,* 262 F.3d 193, 195 (2d Cir.2001) (per curiam). One of those courts was the First Circuit in *Becker v. Federal Election Commis-*

566 F.Supp.2d 63, 2008 DNH 129
 **(Cite as: 566 F.Supp.2d 63)**

*sion,* 230 F.3d 381 (1st Cir.2000). There, both presidential candidate Ralph Nader and a group of voters challenged the corporate sponsorship of presidential debates. *Id.* at 383-84. Nader alleged that, in light of "his principled stand against accepting corporate contributions," he could not participate in these debates, placing him at a competitive disadvantage to his campaign rivals, who harbored no such qualms. *Id.* at 386. The court of appeals ruled that this conferred standing on Nader, but not on the voters. *Id.* at 389-90.

In rejecting the voters' standing, the court reasoned:

Regardless of Nader's injury, his supporters remain fully able to advocate for his candidacy and to cast their votes in his favor. The only derivative harm Nader's supporters can possibly assert is that their preferred candidate now has less chance of being elected. Such 'harm,' however, is hardly a restriction on voters' rights and by itself is not a legally cognizable injury sufficient for standing.

*Id.* at 390 (citations omitted). That reasoning applies with equal force here. McCain's candidacy for the presidency, whatever his eligibility, is "hardly a restriction on voters' rights" because it in no way prevents them from voting for somebody else. In fact, Hollander alleges that he did just that in the New Hampshire Republican primary.

That Hollander's chosen candidate lost despite McCain's alleged ineligibility does not, as Hollander asserts, mean that his vote "count[ed] less" than, say, those cast in the New Hampshire Democratic primary, which presumably gave voters a choice among constitutionally qualified candidates only.[FN6] So far as the complaint discloses, the New Hampshire Secretary of State duly counted the votes in each party's primary and apportioned the delegates to the candidates accordingly under New Hampshire law. *See* N.H.Rev.Stat. Ann. § 659:94. The apportionment of a majority**70 of the Republican delegates to McCain, who won his party's primary here, did not injure Hollander any more than the constructive exclusion of Nader from the presidential debates injured his supporters; in each case, the practice simply made it less likely that the plaintiff's preferred candidate would ultimately be elected, which, as the First Circuit held in *Becker,* does not amount to a judicially cognizable injury.

FN6. It is hard to say for sure, since there were some twenty-one presidential candidates in the New Hampshire Democratic primary, many of whom are hardly household names. N.H. Sec'y of State, *Candidates for Upcoming Presidential Primary Election,* http:// www. sos. nh. gov/ presprim 2008/ candidates filed. htm (last visited July 24, 2008). There were the same number of presidential candidates on the Republican side. *Id.* This underscores the difficulty with Hollander's theory that the simple presence of an ineligible candidate on a ballot necessarily disenfranchises all voters who support eligible candidates in that election.

Hollander also argues that he "would again be disenfranchised should he vote for McCain in the general election and then McCain should be subsequently removed due to his lack of eligibility." Unlike Hollander's other "disenfranchisement" theory, this one does not depend on the failure of his chosen candidate *because of* McCain's alleged ineligibility, but on the success of Hollander's chosen candidate-who is McCain in this scenario-*despite* his alleged ineligibility. On this theory, however, Hollander's alleged "disenfranchisement" flows not from the actions he has challenged here, *i.e.,* McCain's presidential campaign or the RNC's likely selection of him as its nominee, but from his subsequent removal from office at the hands of someone else (presumably one of the co-equal branches of government), resulting (presumably, yet again) in a President different from the one Hollander helped to elect.

This theory presents a number of serious problems, not the least of which are whether the removal of an elected official by non-electoral means amounts to "disenfranchisement" of the voters who put him there, *cf. Powell v. McCormack,* 395 U.S. 486, 547, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), and whether the claim is "contingent on events that may not occur as anticipated or may not occur at all," *Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 847 (1st Cir.1990), namely, McCain's election to, then removal from, the office of President.[FN7] Putting those considerations aside, however, the theory does not establish Hollander's standing because it does not "allege personal injury fairly traceable to the defendant's allegedly unlawful

566 F.Supp.2d 63, 2008 DNH 129
 **(Cite as: 566 F.Supp.2d 63)**

conduct," *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), but to the conduct of those-whoever they might turn out to be-responsible for ultimately ousting McCain from office. Indeed, McCain and the RNC are trying to achieve the opposite.

> FN7. There is also the question of whether "disenfranchisement" resulting from a vote for an ineligible candidate is the sort of "self-inflicted" harm caused by the voter, rather than any state actor, which therefore does not amount to an infringement of the franchise right. *See* 1 Lawrence H. Tribe, *American Constitutional Law* § 13-24, at 1122-23 (2d ed. 1988) (reasoning that, where voters disqualify themselves from voting in one party's primary under state law by voting in another's, it is the voters' own behavior, "rather than the operation of state law, that should be blamed for their inability to cast a ballot," discussing *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973)).

Hollander's real complaint seems to be that, in the general election, he will face the Hobson's choice of having to vote for his party's nominee, who is allegedly ineligible, or against his party's nominee, though he is a registered Republican. But a political party retains considerable, if not unlimited, discretion over the selection of its nominees, *see* 1 Tribe, *supra,* §§ 13-23-13-25, at 1118-1129, and these limitations have never been understood to incorporate the "right" of registered party members to a constitutionally eligible nominee.[FN8] Moreover, Hollander remains free **\*71** to cast his vote for any candidate he considers eligible, including by writing in whichever Republican candidate he believes should be nominated instead of McCain, and to have that vote counted just as much as those cast for the party's official nominee, so his right to the franchise remains intact. *See Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (defining right as "to vote freely for the candidate of one's choice" without "debasement or dilution of the weight of a citizen's vote"). Difficult choices on Election Day do not translate into judicially cognizable injuries.

> FN8. The Supreme Court has upheld state

laws prohibiting certain candidates from appearing on the ballot-including those "ineligible for office, unwilling to serve, or [running as] another party's candidate"-against challenges founded on the associational rights of the party who wishes to nominate such a candidate. *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 359, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (footnote omitted); *see also Socialist Workers Party of Ill. v. Ogilvie,* 357 F.Supp. 109, 113 (N.D.Ill.1972) (rejecting party's First Amendment challenge to exclusion from ballot of presidential candidate who did not meet constitutional age requirement). But again, Hollander's claim is not a political party's challenge to the exclusion of its candidate from, or the inclusion of a rival candidate on, the ballot; it is a voter's challenge to the inclusion of an allegedly ineligible candidate on the ballot. So this case raises no question as to the constitutionality of a state-law prohibition on ineligible candidates; Hollander's claim is not that McCain was or will be kept from the ballot, but that he should have been or should be.

This is not to demean the sincerity of Hollander's challenge to McCain's eligibility for the presidency; as discussed *supra* Part II, that challenge has yet to be definitively settled, and, as a number of commentators have concluded, arguably cannot be without a constitutional amendment. What is settled, however, is that an individual voter like Hollander lacks standing to raise that challenge in the federal courts. *See* Dugan & Collins, *supra,* at 115 (recognizing debates over meaning of Art. II, § 1, cl. 4, but concluding that voters lack standing to raise that issue judicially). Indeed, "[t]he purest reason to deny standing is that the plaintiff is not able to show an injury to the voter interest, however much the plaintiff may feel offended by the challenged practice." 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3531.4 (2d ed. 1984 & 2007 supp.) (footnote omitted). Because Hollander can show no such injury, this court lacks jurisdiction over his attempt to resolve the question of McCain's eligibility under Art. II, § 1, cl. 4. Whatever the contours of that constitutional provision, Article III has been definitively read by the courts to confer no jurisdiction over this kind of action.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

566 F.Supp.2d 63, 2008 DNH 129
 **(Cite as: 566 F.Supp.2d 63)**

### IV. *Conclusion*

For the foregoing reasons, the defendants' motion to dismiss is granted on the ground that Hollander lacks standing. All other pending motions are denied as moot. The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

D.N.H.,2008.
Hollander v. McCain
566 F.Supp.2d 63, 2008 DNH 129

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 7

**Westlaw Delivery Summary Report for KREEP,GARY G**

Date/Time of Request:                 Monday, September 14, 2009 23:24 Central
Client Identifier:                    BARNETT
Database:                             AR-CS
Citation Text:                        163 S.W.2d 512
Lines:                                383
Documents:                            1
Images:                               0


 The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West
and their affiliates.



163 S.W.2d 512                                                                                                      Page 1
204 Ark. 682, 163 S.W.2d 512
**(Cite as: 204 Ark. 682, 163 S.W.2d 512)**

**C**

Supreme Court of Arkansas.
IRBY
v.
BARRETT.
**No. 4-6886.**

July 6, 1942.

Appeal from Pulaski Chancery Court; Frank H. Dodge, Chancellor.

Mandamus proceedings by W. O. Irby against Joe C. Barrett and another, to compel defendants to certify petitioner as a candidate for the office of state senator. From a decree of dismissal, petitioner appeals.

Reversed and remanded with directions.

GRIFFIN SMITH, C. J., dissenting.

West Headnotes

**States 360 🗝30**

360 States
    360II Government and Officers
        360k24 Legislature
            360k30 k. Determination as to Election and Qualification of Members. Most Cited Cases
In passing upon qualifications of a member of the State Senate, that body may accept either the majority or minority view of Supreme Court with respect to whether member is eligible to hold office, and the Senate's action on such question cannot be reviewed by Supreme Court, since the Senate is sole judge of qualifications of its members. Const. art. 5, § 11.

**Elections 144 🗝121(1)**

144 Elections
    144VI Nominations and Primary Elections
        144k121 Party Organizations and Regulations
            144k121(1) k. In General. Most Cited Cases
The duties of the chairman and secretary of the

Democratic State Committee are purely "ministerial duties" and they have no judicial power.

**Elections 144 🗝152**

144 Elections
    144VI Nominations and Primary Elections
        144k148 Objections and Contests
            144k152 k. Determination by Party Tribunals. Most Cited Cases
Where petitioner had sufficiently complied with Democratic Party rules and state laws to become a Democratic candidate for office of state senator, the chairman and secretary of the Democratic State Committee could not exclude petitioner's name as a candidate because, in their opinion, petitioner was ineligible for office of senator, whether that ineligibility arose out of a conviction for a felony or any other cause which would render petitioner ineligible. Const. art. 5, §§ 9, 11.
*512 Arthur Sneed, of Piggott, for appellant.

Buzbee, Harrison & Wright, of Little Rock, for appellee.

FRANK G. SMITH, Justice.

Appellant filed in the court below a petition for a writ of mandamus requiring Joe C. Barrett and Harvey G. Combs, chairman and secretary of the Democratic State Committee, respectively, to certify him as a candidate for the office of state senator from the 28th Senatorial District, of which district Clay county is a part. He alleged that he had been a resident of Clay county for many years; that he is 64 years of age and a qualified elector of that county, and had been all his life a Democrat, and that he is a member of the Democratic Party in Clay county, and that he had complied with all the laws of the state and all the rules of the Democratic Party to become a candidate for the nomination of his party as its candidate for the Senate in the district of which Clay county is a part; but notwithstanding these facts the defendants had refused to certify his name as required by the rules of the Democratic Party.

An answer was filed, which did not deny any of these

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

allegations, and averred that defendants had refused to certify petitioner's name because petitioner is legally ineligible to hold the office of State Senator by virtue of Art. 5, § 9, of the Constitution of 1874, which prohibits any person convicted of the embezzlement of public money or other infamous crime from serving as a member of the General Assembly or from holding any office of trust or profit in this State.

A demurrer was filed to this answer, which was overruled, and petitioner's cause of action was dismissed when he stood on his demurrer, and from that decree is this appeal.

Appellees justify their action by citing the cases of State ex rel. Attorney General v. Irby, 190 Ark. 786, 81 S.W.2d 419; Winton v. Irby, 189 Ark. 906, 75 S.W.2d 656, and Irby v. Day, 182 Ark. 595, 32 S.W.2d 157.

The case first above cited was a quo warranto proceeding to oust petitioner from the office of county judge of Clay county to which he had been elected, and it was there held that petitioner was ineligible to hold that office because of his conviction in the Federal District Court of the crime of embezzling post office funds, notwithstanding his unconditional and full pardon for that offense by the President of the United States.

It is urged that it would be a vain and useless proceeding to permit petitioner to be a candidate for an office which he could not fill, if he were elected to it.

**\*513** We cannot anticipate what action the Senate might take in the event petitioner were nominated and then elected Senator from the District in which he resides. Section 11 of Art. 5 of the Constitution provides that "Each house [of the General Assembly] shall appoint its own officers, and shall be sole judge of the qualifications returns and elections of its own members".

The last of these Irby cases, 190 Ark. 786, 81 S.W.2d 419, 425, was decided by a divided vote of 4 to 3. It is possible, and within the power of the Senate, to adopt the view of the dissenting judges, rather than the opinion of the majority, in that case, in which event petitioner would be eligible to serve as a member of the Senate.

It was the opinion of the majority in that case that one convicted, in a Federal Court, of embezzlement of money belonging to the United States, is ineligible to hold any office of trust or profit within this State notwithstanding the Presidential pardon, since the pardon restored merely his civil rights, as distinguished from his political privileges.

It was the opinion of the majority in that case that the disqualification of petitioner to hold office was no part of the punishment for the crime for which petitioner had been convicted and that, therefore, the pardon could not remove his disqualification for holding office.

It was also the opinion of the majority that it was immaterial that petitioner had not been convicted for a violation of a law of this State, and that a conviction in any jurisdiction barred petitioner from holding office as effectively as a conviction for a violation of the laws of this State would have done.

It was the opinion of the minority that all these holdings were contrary to the great weight of authority. It was said in the minority opinion that "It has held, upon great consideration, that a conviction and sentence for felony in one of the states and the disabilities arising from the same would not come within the inhibition of statutory and constitutional provisions of another state and the disqualifications therein denounced. Greenleaf on Evidence, [15th] Ed. [§ 376]".

It was the opinion also of the minority that the pardon removed, not only the guilt of the one pardoned, but likewise the legal infamy and all other consequences arising out of the conviction, and that it was futile to say that ineligibility to hold office was not a part of the punishment for crimes denounced by § 9 of Art. 5 of the Constitution. The concession appears to have been made in the majority opinion that if ineligibility to hold office was a part of the punishment, that this ineligibility was removed by the pardon.

 The Senate has the power to accept either the majority or the minority view, and its action is beyond the power of review by this court, as the Senate is the sole judge of the qualification of its members.

 But aside from these considerations, we are of the

opinion that the Chairman and Secretary of the State Committee acted without authority in refusing to certify petitioner as a candidate. Certainly no law of this State confers that power, and we are cited to no rule of the Party conferring it. Certain it is that the Chairman and Secretary of the State Committee are clothed with no judicial power. Their duties are purely ministerial, and in the matter under consideration are defined by § 58 of the Rules of the Party, which reads as follows: "Sec. 58. All candidates for United States Senator, Representative in Congress and all state and district offices shall file the prescribed pledge with the Secretary of the State Committee and all candidates for county and township offices shall file the prescribed pledge with the Secretary of the County Committee, not later than 12 o'clock noon on the 90th day before the preferential primary election, and all candidates for municipal offices (including candidates for county and city committeemen) shall file their pledges with the Secretary of the County Committee and the City Committee not later than 12 o'clock noon on the 30th day before the preferential primary election.

"The name of any candidate, who shall fail to sign and file said pledge within the time fixed shall not appear on the official ballot in said primary election.

"The Chairman and Secretary of the State Committee shall certify to the various county committees not later than 30 days before the day of the election the names of all candidates who have complied with the rules herein prescribed, and the name of no other candidate for such office shall be printed on the ballots by the county committee."

**\*514** It was held in the case of Williamson v. Montgomery, 185 Ark. 1129, 51 S.W.2d 987, that no one could become a candidate for a party nomination for an office without complying with the rules of the party; but it was also held in that case that where the committee or officer conducting a primary election acted fraudulently or in such an arbitrary manner as to prevent a person who, in good faith, sought to comply with the rules, the courts would require the party officers to comply with the party rules. There is no intimation here that the Chairman and Secretary of the Committee have acted fraudulently, but we think they have acted without authority conferred either by the laws of this State or the rules of the Party.

Rule 58, above quoted, requires the Chairman and Secretary to certify the names of all candidates "who have complied with the rules herein prescribed". The fact stands undisputed that the petitioner has complied with these rules and, having done so, no duty rests upon, nor is there any power vested in, the Chairman and Secretary of the Committee except to perform the ministerial duty of certifying the names of petitioner and all others who have complied with the party rules.

If it be said-and it is said-that the Supreme Court has decided that petitioner is ineligible to hold a public office, it may be answered that this proceeding is not a contest for an office nor a proceeding to oust one from office. The only question here is whether petitioner has complied with the laws of the State and the party rules sufficiently to become a candidate for office; and the fact is undisputed that he has done so.

If the Chairman and Secretary of the Committee have the right to say that because of the decision of this court petitioner is ineligible to be a candidate for office, they may also say, in any case, that for some other reason a candidate is ineligible. For instance, it has been held by this court in many election contests that one must pay his poll tax; that he must do so after proper assessment in the time and manner required by law, and that otherwise he is not eligible even to vote, and unless he were a voter he could not hold office. So with other qualifications, such as residence. May this question be considered or decided by the Chairman and Secretary of the Committee? It may be that such power can be conferred upon them by laws of this State or the rules of the party; but it is certain that this has not yet been done. If this can be done, and should be done, the door would be opened wide for corrupt and partisan action. It might be certified that a prospective candidate has sufficiently complied with the laws of the State and the rules of a political party to become a candidate, and, upon further consideration, that holding might be recalled; and this might be done before that action could be reviewed in a court of competent jurisdiction and reversed in time for the candidate to have his name placed on the ticket. It would afford small satisfaction if, after the ticket had been printed with the name of the candidate omitted, to have a holding by the court that the name should not have been omitted.

We are cited to only two cases in point, and in view of the fact that this opinion must be rendered within a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

163 S.W.2d 512                                                                                                   Page 4
204 Ark. 682, 163 S.W.2d 512
**(Cite as: 204 Ark. 682, 163 S.W.2d 512)**

week after the submission of the cause, if the peti-
tioner is to have redress which will require that he be
certified as a candidate, the time has not been afforded
for the investigation which otherwise would have been
made.

But these two cases are exactly in point and are
consonant with our view that the Chairman and Sec-
retary of the State Committee have only a ministerial
duty to perform, and have no right to exclude the name
of a candidate because, in their opinion, he is ineligi-
ble and could not hold the office, whether that ineli-
gibility arose out of a conviction for a felony or any
other cause which would render him ineligible.

The two cases to which we have referred are Young v.
Beckham, 115 Ky. 246, 72 S.W. 1092, decided by the
Court of Appeals of Kentucky, and the case of Roussel
v. Dornier, 130 La. 367, 57 So. 1007, 39 L.R.A.,N.S.,
826.

In the first of these cases the facts are so similar and
the reasoning so convincing that we quote somewhat
extensively from it. The first sentence in the opinion in
that case reads as follows: "Paynter, J. The purpose of
this proceeding is to compel the Democratic commit-
tee to place the name of the appellee, J. C. W. Beck-
ham, on the ballot as a candidate for the office of
governor before the Democratic primary election
called for May 9, 1903. The question of his eligibility
has been raised, and the committee refuses to place his
name upon the ballot. The question to be **\*515** de-
termined from the pleading is whether the governing
authority of the party has called a primary election,
and, if so, (a) whether the statute authorizes the
holding of primary elections to nominate candidates
for state offices; (b) whether the committee can refuse
to place his name upon the ballot because they think
he is ineligible to re-election; (c) whether, by pro-
ceeding in mandamus, the committee may be com-
pelled to place his name upon the ballot used at the
primary as a candidate for governor."

The opinion does not state upon what ground the
committee found Beckham to be ineligible. The facts
upon which the committee found Beckham to be in-
eligible were not in dispute, as the opinion does not
state them. Probably the Democratic State Committee
had concluded that a man had aspired to the nomi-
nation of their party for the highest office in the State
who could not serve if he were nominated and elected.

The ground of a candidate's ineligibility would be
immaterial. It would be unimportant whether he had
been convicted of a felony or was ineligible for some
other reason. If he were ineligible, he was ineligible
regardless of the cause of the ineligibility.

The Kentucky court did not consider the correctness of
the committee's finding that Beckham was ineligible
to be a candidate. That question was predetermined
and not even referred to, the opinion being based
solely upon the question of the power of the commit-
tee to exclude the name of a candidate. In holding that
the committee did not have this power it was there
said: "We are of the opinion that the committee had no
right to raise the question of the appellee's eligibility to
re-election to the office of governor. The governing
authority of the party has no right to determine who is
eligible under the laws of the land to hold offices. It
can call primary elections and make proper rules for
their government, but has no right to say who is eli-
gible to be a candidate before the primary. The per-
sons who are entitled to vote at the primary are the
ones to determine who shall be selected as their can-
didates for a particular office. If the committee can say
who is and who is not eligible to be nominated as
party's candidate for office, they can, on the very last
day before the ballots are printed, refuse to allow a
person's name to go on the ballot upon the pretext that
he is ineligible, and thus prevent his name from ap-
pearing upon the official ballot. They could thus de-
stroy one's prospect to be nominated, for the rules of
procedure in courts are necessarily such that no ade-
quate relief could be afforded the party complaining, if
at all, until after the primary election had been held. If
the committee or governing authority has the authority
to decide the question as to who is eligible to hold an
office or be a candidate before a primary election, then
they would have a discretion and judgment to exercise
that could not be exercised by a mandamus. The most
that could be done by such a writ would be to compel
them to act upon the question."

In the second case above cited the Supreme Court of
Louisiana, with equal emphasis, denied the right of a
party committee to pass upon the eligibility of a can-
didate for the nomination of that party as its candidate
for office. A headnote in that case reads as follows: "1.
A Democratic parish committee has no power to pass
upon the eligibility of candidates for public office as
they are not charged with judicial functions nor
clothed with juridical power." Parish committees in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

163 S.W.2d 512                                                                 Page 5
204 Ark. 682, 163 S.W.2d 512
 (Cite as: 204 Ark. 682, 163 S.W.2d 512)

Louisiana correspond with county committees in this State.

We conclude, therefore, that the Chairman and Secretary of the State Committee exceeded their power in refusing to perform the ministerial duty of certifying petitioner as one who had complied with the laws of the State and the rules of the party, as he admittedly has done.

The decree of the court below will, therefore, be reversed and the cause will be remanded with directions to award the writ of mandamus.

GRIFFIN SMITH, C. J., dissents.
GRIFFIN SMITH, Chief Justice (dissenting).
One of two things is certain: This court either inexcusably wronged W. O. Irby in two of the three cases cited in the majority opinion, or, figuratively speaking, it is playing checkers with decisions.

"In Irby v. Day, 182 Ark. 595, 32 S.W.2d 157, we expressly held that Irby was disqualified to receive the democratic nomination to public office in this state because of his previous conviction for embezzlement of public funds, therefore, any question as to his conviction resting in a foreign jurisdiction is laid at rest and we **516** shall not again consider it. The sole question here presented for consideration is, Does a pardon by the Chief Executive restore to Irby all civil rights and political privileges enjoyed by him prior to his conviction?"[FN1]

> FN1. Irby was sentenced February 17, 1922 on a charge of embezzling post office funds. He entered a plea of guilty. February 19, 1931, President Hoover issued a pardon, "the purpose being to restore Irby's civil rights".

The author of the opinion in Irby v. Day, (the preceding quotation having been taken from State ex rel. Attorney General v. Irby, 190 Ark. 786, 81 S.W.2d 419, 420) said: "Appellant's second and last contention for a reversal of the judgment is that the plea did not constitute a defense to the cause of action. The plea was sufficient to show that the appellant was ineligible to hold the office of representative from Clay county, and for that reason had no right to contest appellee's certificate of nomination. Section 9 of article 5 of the Constitution of 1874 provides that no person convicted of embezzlement of public money

shall be eligible to hold an office of representative in the General Assembly". [ 32 S.W.2d 158]

From what I have been able to ascertain by reading the majority opinion of today, and from discussions in conference, it is not intended that State ex rel. Attorney General v. Irby be overruled. On the contrary, my understanding is that if the result brings about an impairment of the opinion written by Chief Justice Johnson, a majority of the justices did not so intend. In other words, there were not four votes to overrule the former holding. We have, then, reaffirmation of the rule that one convicted of embezzling public money may not hold office, and this status is not altered by pardon.

By circuitous construction the opinion in State ex rel. Attorney General v. Irby is bypassed. It is now held that the state committee could not exercise a judicial function by deciding that Irby was not eligible; that the committee's functions were ministerial; that its members must close their vision and their minds to what this court has said on previous occasions-all this because, as it is argued, Irby might be nominated and elected, and under Art. 5, § 11, of the constitution, he could be seated.

But where, may it be asked, was the constitution when on November 3, 1930, it was held that appellant was ineligible to hold the office of representative?   Art. 5, § 11, gives the house of representatives the same power that it accords the senate in respect of member qualifications. It would seem that the only thing to consider is whether appellant is the same Irby whose status was determined by this court in 1930, and again on April 8, 1935. Since this is admitted, the issue has heretofore been disposed of.

Unless it should be held that the presidential pardon restored appellant's political rights, as well as his civil rights, I do not agree that if elected he can be seated by the senate. Section 11 of Art. 5 of the constitution authorizes each house of the general assembly to appoint its own officers; and it shall be the sole judge of the qualifications, returns and election of its own members when there has been an election. But this right must be read in connection with Art. 5, § 9, and with § 8 of Art. 5 when it is applicable. Section 8 provides: "No person who now is or shall be hereafter a collector or holder of public money, nor any assistant or deputy of such holder or collector of public

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

163 S.W.2d 512                                                                          Page 6
204 Ark. 682, 163 S.W.2d 512
 **(Cite as: 204 Ark. 682, 163 S.W.2d 512)**

money, shall be eligible to a seat in either house of the General Assembly, nor to any office of trust or profit, until he shall have accounted for and paid over all sums for which he may have been liable".

Section 9 is: "No person hereafter convicted of embezzlement of public money *** shall be eligible to the General Assembly or capable of holding any office of trust or profit in this State".

Effect of the majority opinion is to hold that the chairman and secretary of the state committee are guilty of tyrannical conduct, or at least grave indiscretion, in following the law as laid down in the decisions of 1930 and 1935.

It is my view that they were justified in believing the court meant what it said. They would have been insensible to a public trust had they ignored State ex rel. Attorney General v. Irby, and Irby v. Day. No discretion was exercised; no judicial function was usurped. This court had already made the law. There was more understanding in what they did than would have been the case had they simulated estrangement to the law as it had been written.

Ark. 1942.
Irby v. Barrett
204 Ark. 682, 163 S.W.2d 512

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 8

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Saturday, September 19, 2009 00:05 Central |
| Client Identifier: | BARNETT |
| Database: | SCTFIND |
| Citation Text: | 106 S.Ct. 2860 |
| Lines: | 1147 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



Supreme Court of the United States
JAPAN WHALING ASSOCIATION and Japan Fisheries Association, Petitioners
v.
AMERICAN CETACEAN SOCIETY et al.
Malcolm BALDRIGE, Secretary of Commerce, et al., Petitioners
v.
AMERICAN CETACEAN SOCIETY et al.
**Nos. 85-954, 85-955.**

Argued April 30, 1986.
Decided June 30, 1986.

Wildlife conservation groups brought action for declaratory relief and injunction, alleging that cabinet members breached statutory duty with respect to enforcement of international whaling quotas. The United States District Court for the District of Columbia, Charles R. Richey, J., 604 F.Supp. 1398, granted mandamus relief, and denied stay pending appeal, 604 F.Supp. 1411. The Court of Appeals, J. Skelly Wright, Circuit Judge, 768 F.2d 426, affirmed. Certiorari was granted. The Supreme Court, Justice White, held that: (1) political question doctrine did not bar judicial resolution of controversy; (2) under Pelly and Packwood Amendments, Secretary of Commerce was not required to certify that Japan's whaling practices diminished effectiveness of International Convention for Regulation of Whaling; and (3) Secretary's decision to secure certainty of Japan's future compliance with a program per executive agreement, rather than rely on possibility that certification and imposition of economic sanctions would produce same or better results, was reasonable construction of the Amendments.

Reversed.

Justice Marshall filed a dissenting opinion in which Justices Brennan, Blackmun, and Rehnquist joined.

West Headnotes

**[1] Constitutional Law 92 ⚷2580**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)5 Political Questions
                92k2580 k. In General. Most Cited Cases
    (Formerly 92k68(1))
Political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to halls of Congress or confines of executive branch.

**[2] Constitutional Law 92 ⚷2588**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)5 Political Questions
                92k2588 k. Foreign Policy and National Defense. Most Cited Cases
    (Formerly 92k68(1))
Political question doctrine did not bar judicial resolution of controversy as to whether, under Pelly and Packwood Amendments, Secretary of Commerce was required to certify that Japan's whaling practices diminished effectiveness of International Convention for Regulation of Whaling because Japan's harvest exceeded quotas established under Convention since challenge to decision not to certify Japan for harvesting whales in excess of quotas presented purely legal question of statutory interpretation. Fishermen's Protective Act of 1967, § 8, as amended, 22 U.S.C.A. § 1978; Magnuson Fishery Conservation and Management Act, § 201, as amended, 16 U.S.C.A. § 1821.

**[3] Fish 176 ⚷12**

176 Fish
    176k12 k. Preservation and Propagation. Most Cited Cases
Under Pelly and Packwood Amendments, Secretary of Commerce was not required to certify that Japan's whaling practices diminished effectiveness of International Convention for Regulation of Whaling because Japan's annual harvest exceeded quotas estab-

lished under Convention. Fishermen's Protective Act of 1967, § 8, as amended, 22 U.S.C.A. § 1978; Magnuson Fishery Conservation and Management Act, § 201, as amended, 16 U.S.C.A. § 1821.

[4] Fish 176 🖘12

176 Fish
    176k12 k. Preservation and Propagation. Most Cited Cases
Enactment of Packwood Amendment did not negate view of Secretary of Congress that he is not required to certify every failure to abide by whaling limits of International Convention for Regulation of Whaling. Fishermen's Protective Act of 1967, § 8, as amended, 22 U.S.C.A. § 1978; Magnuson Fishery Conservation and Management Act, § 201, as amended, 16 U.S.C.A. § 1821.

[5] Fish 176 🖘12

176 Fish
    176k12 k. Preservation and Propagation. Most Cited Cases
Decision of Secretary of Commerce to secure certainty of Japan's future compliance with International Convention for Regulation of Whaling program per executive agreement, rather than rely on possibility that certification of whaling practices as diminishing effectiveness of Convention and imposition of economic sanctions would produce same or better results, was reasonable construction of Pelly and Packwood Amendments. Fishermen's Protective Act of 1967, as amended, 22 U.S.C.A. § 1978; Magnuson Fishery Conservation and Management Act, § 201, as amended, 16 U.S.C.A. § 1821.

**2861 *221 Syllabus [FN*]

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

The International Convention for the Regulation of Whaling (ICRW) included a Schedule regulating whale harvesting practices of member nations (including the United States and Japan) and setting harvest limits for various whale species. It also established the International Whaling Commission (IWC) and authorized it to set future quotas. However, the IWC has no power to impose sanctions for quota violations, and any member country may file a timely objection to an IWC amendment of the Schedule and thereby exempt itself from any obligation to comply with the limit. Because of the IWC's inability to enforce its own quota and in an effort to promote enforcement of quotas set by other international fishery conservation programs, Congress enacted the Pelly Amendment to the Fishermen's Protective Act of 1967, directing the Secretary of Commerce (Secretary) to certify to the President if nationals of a foreign country are conducting fishing operations in such a manner as to "diminish the effectiveness" of an international fishery conservation program. The President, in his discretion, may then direct the imposition of sanctions on the certified nation. Later, Congress passed the Packwood Amendment to the Magnuson Fishery Conservation and Management Act, requiring expedition of the certification process and mandating that, if the Secretary certifies that nationals of a foreign country are conducting fishing operations in such a manner as to "diminish the effectiveness" of the ICRW, economic sanctions must be imposed by the Executive Branch against the offending nation. After the IWC established a zero quota for certain sperm whales and ordered a 5-year moratorium on commercial whaling to begin in 1985, Japan filed objections to both limitations and thus was not bound thereby. However, in 1984 Japan and the United States concluded an executive agreement whereby Japan pledged to adhere to certain harvest limits and to cease commercial whaling by 1988, and the Secretary agreed that the United States would not certify Japan under either the Pelly Amendment or the Packwood Amendment if Japan complied with its pledges. Shortly before consummation**222 of the executive agreement, several wildlife conservation groups filed suit in Federal District Court, seeking a writ of mandamus to compel the Secretary to certify Japan, and the court granted summary judgment for the groups, concluding that any taking of whales in excess of the IWC's quotas diminished the effectiveness of the ICRW. The court ordered the Secretary immediately to certify to the President that Japan was in violation of the sperm whale quota. The Court of Appeals affirmed.

Held:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.Ct. 2860                                                                          Page 3
478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742
**(Cite as: 478 U.S. 221, 106 S.Ct. 2860)**

1. The political question doctrine does not bar judicial resolution of the instant controversy. The courts have the authority to construe international treaties and executive agreements and to interpret congressional legislation. The challenge to the Secretary's decision not to certify Japan presents a purely legal question of **2862 statutory interpretation. The Judiciary's constitutional responsibility to interpret statutes cannot be shirked simply because a decision may have significant political overtones. Pp. 2865-2866.

2. Neither the Pelly Amendment nor the Packwood Amendment required the Secretary to certify Japan for refusing to abide by the IWC whaling quotas. The Secretary's decision to secure the certainty of Japan's future compliance with the IWC's program through the 1984 executive agreement, rather than to rely on the possibility that certification and imposition of economic sanctions would produce the same or a better result, is a reasonable construction of the Amendments. Pp. 2867-2872.

(a) Under the terms of the Amendments, certification is neither permitted nor required until the Secretary determines that nationals of a foreign country are conducting fishing operations in a manner that "diminishes the effectiveness" of the ICRW. Although the Secretary must promptly make a certification decision, there is no statutory definition of the words "diminish the effectiveness" or specification of the factors that the Secretary should consider in making the decision entrusted to him alone. The statutory language does not direct the Secretary automatically and regardless of the circumstances to certify a nation that fails to conform to the IWC whaling Schedule. Pp. 2867-2868.

(b) Nothing in the legislative history of either Amendment addresses the nature of the Secretary's duty and requires him to certify every departure from the IWC's scheduled limits on whaling. The history of the Pelly Amendment and its subsequent amendment shows that Congress had no intention to require the Secretary to certify every departure from the limits set by an international conservation program, and that Congress used the phrase "diminish the effectiveness" to give the Secretary a range of certification discretion. Although the Packwood Amendment was designed to remove executive discretion in imposing**223 sanctions once certification had been made,

Congress specifically retained the identical certification standard of the Pelly Amendment, and the legislative history does not indicate that the certification standard requires the Secretary, regardless of the circumstances, to certify each and every departure from the IWC's whaling Schedules. Pp. 2868-2871.

247 U.S.App.D.C. 309, 768 F.2d 426, reversed.

WHITE, J., delivered the opinion of the Court, in which BURGER, C.J., and POWELL, STEVENS, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and REHNQUIST, JJ., joined, *post*, p. ---. *Associate Attorney General Burns* argued the cause for petitioners in No. 85-955. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Wallace, Peter R. Steenland, Jr., Donald A. Carr, Dianne H. Kelly,* and *Abraham D. Sofaer. Scott C. Whitney* argued the cause for petitioners in No. 85-954. With him on the briefs were *Steven R. Perles* and *William H. Allen.*

*William D. Rogers* argued the cause for respondents in both cases. With him on the brief were *James A. Beat* and *Donald T. Hornstein.*†

† *Steven R. Ross, Charles Tiefer,* and *Michael L. Murray* filed a brief for the Speaker of the House of Representatives et al. as *amici curiae* urging affirmance.

Justice WHITE delivered the opinion of the Court.

In these cases, we address the question whether, under what are referred to in these cases as the Pelly and Packwood Amendments, 85 Stat. 786, as amended, 22 U.S.C. § 1978; 90 Stat. 337, as amended, 16 U.S.C. § 1821 (1982 ed. and Supp. III), the Secretary of Commerce is required to certify that Japan's whaling practices "diminish the effectiveness" of the International Convention for the Regulation of Whaling because that country's annual harvest exceeds quotas established under the Convention.

*224 I

For centuries, men have hunted whales in order to obtain both food and oil, which, in turn, can be

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.Ct. 2860                                                                                    Page 4
478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742
**(Cite as: 478 U.S. 221, 106 S.Ct. 2860)**

processed into a myriad of other products. Although at one time a harrowing and perilous profession, modern technological innovations have transformed **\*\*2863** whaling into a routine form of commercial fishing, and have allowed for a multifold increase in whale harvests worldwide.

Based on concern over the effects of excessive whaling, 15 nations formed the International Convention for the Regulation of Whaling (ICRW), Dec. 2, 1946, 62 Stat. 1716, T.I.A.S. No. 1849 (entered into force Nov. 10, 1948). The ICRW was designed to "provide for the proper conservation of whale stocks and thus make possible the orderly development of the whaling industry," *id.,* at 1717, and today serves as the principal international mechanism for promoting the conservation and development of whale populations. See generally Smith, The International Whaling Commission: An Analysis of the Past and Reflections on the Future, 16 Nat. Resources Law. 543 (1984). The United States was a founding member of the ICRW; Japan joined in 1951.

To achieve its purposes, the ICRW included a Schedule which, *inter alia,* regulates harvesting practices and sets harvest limits for various whale species. Art. I, 62 Stat. 1717, 1723-1727. In addition, the ICRW established the International Whaling Commission (IWC), which implements portions of the Convention and is authorized to amend the Schedule and set new harvest quotas. See Art. III, 62 Stat. 1717-1718; Art. V, 62 Stat. 1718-1719. See generally Smith, *supra,* at 547-550. The quotas are binding on IWC members if accepted by a three-fourths' majority vote. Art. III, 62 Stat. 1717. Under the terms of the Convention, however, the IWC has no power to impose sanctions for quota violations. See Art. IX, 62 Stat. 1720. Moreover, any member country may file a timely objection to an IWC amendment of the Schedule and thereby exempt itself from any obligation **\*225** to comply with the limit unless and until the objection is withdrawn. Art. V, 62 Stat. 1718-1719. All nonobjecting countries remain bound by the amendment.

Because of the IWC's inability to enforce its own quota and in an effort to promote enforcement of quotas set by other international fishery conservation programs, Congress passed the Pelly Amendment to the Fishermen's Protective Act of 1967. 22 U.S.C. § 1978. Principally intended to preserve and protect North American Atlantic salmon from depletion by

Danish fishermen in violation of the ban imposed by the International Convention for the Northwest Atlantic Fisheries, the Amendment protected whales as well. See 117 Cong.Rec. 34752 (1971) (remarks of Rep. Pelly); H.R.Rep. No. 92-468, p. 6 (1971), U.S.Code Cong. & Admin.News 1971, p. 2409. The Amendment directs the Secretary of Commerce to certify to the President if "nationals of a foreign country, directly or indirectly, are conducting fishing operations in a manner or under circumstances which diminish the effectiveness of an international fishery conservation program...." 22 U.S.C. § 1978(a)(1). Upon certification, the President, in his discretion, may then direct the Secretary of the Treasury to prohibit the importation of fish products from the certified nation. § 1978(a)(4). The President may also decline to impose any sanctions or import prohibitions.

After enactment of the Pelly Amendment, the Secretary of Commerce five times certified different nations to the President as engaging in fishing operations which "diminish[ed] the effectiveness" of IWC quotas. H.R.Rep. No. 95-1029, p. 9 (1978), U.S.Code Cong. & Admin.News 1978, p. 1768; 125 Cong.Rec. 22084 (1979) (remarks of Rep. Oberstar). None of the certifications resulted in the imposition of sanctions by the President. After each certification, however, the President was able to use the threat of discretionary sanctions to obtain commitments of future compliance from the offending nations.

Although "the Pelly Amendment ... served the useful function of quietly persuading nations to adhere to the decisions**\*226** of international fishery conservation bodies," H.R.Rep. No. 95-1029, *supra,* at 9, U.S.Code Cong. & Admin.News 1978, pp. 1768, 1773, Congress grew impatient with the Executive's delay in making **\*\*2864** certification decisions and refusal to impose sanctions. See 125 Cong.Rec. 22083 (1979) (remarks of Rep. Murphy); *id.,* at 22084 (remarks of Rep. Oberstar). As a result, Congress passed the Packwood Amendment to the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.* (1982 ed. and Supp. III). This Amendment requires the Secretary of Commerce to "periodically monitor the activities of foreign nationals that may affect [international fishery conservation programs]," 22 U.S.C. § 1978(a)(3)(A); "promptly investigate any activity by foreign nationals that, in the opinion of the Secretary, may be cause for certification ...," § 1978(a)(3)(B); and "promptly conclude; and reach a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742
**(Cite as: 478 U.S. 221, 106 S.Ct. 2860)**

decision with respect to; [that] investigation." § 1978(a)(3)(C).

To rectify the past failure of the President to impose the sanctions authorized-but not required-under the Pelly Amendment, the Packwood Amendment removes this element of discretion and mandates the imposition of economic sanctions against offending nations. Under the Amendment, if the Secretary of Commerce certifies that "nationals of a foreign country, directly or indirectly, are conducting fishing operations or engaging in trade or taking which diminishes the effectiveness of the International Convention for the Regulation of Whaling," 16 U.S.C. § 1821(e)(2)(A)(i), the Secretary of State must reduce, by at least 50%, the offending nation's fishery allocation within the United States' fishery conservation zone. § 1821(e)(2)(B). Although the Amendment requires the imposition of sanctions when the Secretary of Commerce certifies a nation, it did not alter the initial certification process, except for requiring expedition. It was also provided that a certificate under the Packwood Amendment also serves as a certification for the purposes of the Pelly Amendment. § 1821(e)(2)(A)(i).

*227 In 1981, the IWC established a zero quota for the Western Division stock of Northern Pacific sperm whales. The next year, the IWC ordered a 5-year moratorium on commercial whaling to begin with the 1985-1986 whaling season and last until 1990. In 1982, the IWC acted to grant Japan's request for a 2-year respite-for the 1982-1983 and 1983-1984 seasons-from the IWC's earlier decision banning sperm whaling.

Because Japan filed timely objections to both the IWC's 1981 zero quota for Northern Pacific sperm whales and 1982 commercial whaling moratorium, under the terms of the ICRW, it was not bound to comply with either limitation. Nonetheless, as the 1984-1985 whaling season grew near, it was apparently recognized that under either the Pelly or Packwood Amendment, the United States could impose economic sanctions if Japan continued to exceed these whaling quotas.

Following extensive negotiations, on November 13, 1984, Japan and the United States concluded an executive agreement through an exchange of letters between the Chargé d'Affaires of Japan and the Sec-

retary of Commerce. See App. to Pet. for Cert. in No. 85-955, pp. 102A-109A. Subject to implementation requirements,[FN1] **2865 Japan pledged to adhere*228 to certain harvest limits and to cease commercial whaling by 1988. Id., at 104A-106A. In return and after consulting with the United States Commissioner to the IWC, the Secretary determined that the short-term continuance of a specified level of limited whaling by Japan, coupled with its promise to discontinue all commercial whaling by 1988, "would not diminish the effectiveness of the International Convention for the Regulation of Whaling, 1946, or its conservation program." Id., at 107A. Accordingly, the Secretary informed Japan that, so long as Japan complied with its pledges, the United States would not certify Japan under either Amendment. See id., at 104A.

FN1. The details of the Japanese commitments were explained in a summary accompanying the letter from the Chargé d'Affaires to the Secretary. First, the countries agreed that if Japan would withdraw its objection to the IWC zero sperm whale quota, Japanese whalers could harvest up to 400 sperm whales in each of the 1984 and 1985 coastal seasons without triggering certification. Japan's irrevocable withdrawal of that objection was to take place on or before December 13, 1984, effective April 1, 1988. App. to Pet. for Cert. in No. 85-955, pp. 104A-105A. Japan fulfilled this portion of the agreement on December 11, 1984. Id., at 110A, 112A-114A.

Second, the two nations agreed that if Japan would end all commercial whaling by April 1, 1988, Japanese whalers could take additional whales in the interim without triggering certification. Japan agreed to harvest no more than 200 sperm whales in each of the 1986 and 1987 coastal seasons. In addition, it would restrict its harvest of other whale species-under limits acceptable to the United States after consultation with Japan-through the end of the 1986-1987 pelagic season and the end of the 1987 coastal season. The agreement called for Japan to announce its commitment to terminate commercial whaling operations by withdrawing its objection to

the 1982 IWC moratorium on or before April 1, 1985, effective April 1, 1988. *Id.,* at 105A-106A.

Several days before consummation of the executive agreement, several wildlife conservation groups [FN2] filed suit in District Court seeking a writ of mandamus compelling the Secretary of Commerce to certify Japan.[FN3] Because in its view any taking of whales in excess of the IWC quotas diminishes the *229 effectiveness of the ICRW, the District Court granted summary judgment for respondents and ordered the Secretary of Commerce immediately to certify to the President that Japan was in violation of the IWC sperm whale quota. 604 F.Supp. 1398, 1411 (DC 1985). Thereafter, Japan's Minister for Foreign Affairs informed the Secretary of Commerce that Japan would perform the second condition of the agreement-withdrawal of its objection to the IWC moratorium-provided that the United States obtained reversal of the District Court's order. App. to Pet. for Cert. in No. 85-955, pp. 116A-118A.

> FN2. The original plaintiffs to this action are: American Cetacean Society, Animal Protection Institute of America, Animal Welfare Institute, Center for Environmental Education, The Fund for Animals, Greenpeace U.S.A., The Humane Society of the United States, International Fund for Animal Welfare, The Whale Center, Connecticut Cetacean Society, Defenders of Wildlife, Friends of the Earth, and Thomas Garrett, former United States Representative to the IWC.

> FN3. In addition, plaintiffs also requested (1) a declaratory judgment that the Secretary's failure to certify violated both the Pelly and Packwood Amendments, because any whaling activities in excess of IWC quotas necessarily "diminishes the effectiveness" of the ICRW; and (2) a permanent injunction prohibiting any executive agreement which would violate the certification and sanction requirements of the Amendments. 604 F.Supp. 1398, 1401 (DC 1985). The Japan Whaling Association and Japan Fishing Association (Japanese petitioners), trade groups representing private Japanese interests, were allowed to intervene.

A divided Court of Appeals affirmed. 247 U.S.App.D.C. 309, 768 F.2d 426 (1985). Recognizing that the Pelly and Packwood-Magnuson Amendments did not define the specific activities which would "diminish the effectiveness" of the ICRW, the court looked to the Amendments' legislative history and concluded, as had the District Court, that the taking by Japanese nationals of whales in excess of quota automatically called for certification by the Secretary. We granted certiorari, 474 U.S. 1053, 106 S.Ct. 787, 88 L.Ed.2d 766 (1986), and now reverse.

II

We address first the Japanese petitioners' contention that the present actions are unsuitable for judicial review because they involve foreign relations and that a federal court, therefore, lacks the judicial power to command the Secretary of Commerce, an Executive Branch official, to dishonor and repudiate an international agreement. Relying on the political question doctrine, and quoting *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1969), the Japanese petitioners argue that the danger of "embarrassment from multifarious pronouncements by various departments on one question" bars any judicial resolution of the instant controversy.

[1] We disagree. *Baker* carefully pointed out that not every matter touching on politics is a political question, *id., at 209, 82 S.Ct., at 706,* and more specifically, that it is "error to suppose that every *230 case or **2866 controversy which touches foreign relations lies beyond judicial cognizance." *Id., at 211, 82 S.Ct., at 707.* The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions, as "courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *United States ex rel. Joseph v. Cannon,* 206 U.S.App.D.C. 405, 411, 642 F.2d 1373, 1379 (1981) (footnote omitted), cert. denied, 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 865 (1982).

[2] As *Baker* plainly held, however, the courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and ac-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

cepted task for the federal courts. It is also evident that the challenge to the Secretary's decision not to certify Japan for harvesting whales in excess of IWC quotas presents a purely legal question of statutory interpretation. The Court must first determine the nature and scope of the duty imposed upon the Secretary by the Amendments, a decision which calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below. We are cognizant of the interplay between these Amendments and the conduct of this Nation's foreign relations, and we recognize the premier role which both Congress and the Executive play in this field. But under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones. We conclude, therefore, that the present cases present a justiciable controversy, and turn to the merits of petitioners' arguments. [FN4]

FN4. We also reject the Secretary's suggestion that no private cause of action is available to respondents. Respondents brought suit against the Secretary of Commerce, the head of a federal agency, and the suit, in essence, is one to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), or alternatively, to "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A). The "right of action" in such cases is expressly created by the Administrative Procedure Act (APA), which states that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review," § 704, at the behest of "[a] person ... adversely affected or aggrieved by agency action." § 702 (1982 ed., Supp. III). A separate indication of congressional intent to make agency action reviewable under the APA is not necessary; instead, the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to preclude review. See, e.g., Block v. Community Nutrition Institute, 467 U.S. 340, 345, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); Abbott Laboratories v. Gardner, 387

U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).

It is clear that respondents may avail themselves of the right of action created by the APA. First, the Secretary's actions constitute the actions of an agency. See 5 U.S.C. § 551(1); Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S., at 410, 91 S.Ct., at 820. In addition, there has been "final agency action," in that the Secretary formally has agreed with the Japanese that there will be no certification, and this appears to be an action "for which there is no other adequate remedy in a court," as the issue whether the Secretary's failure to certify was lawful will not otherwise arise in litigation. Next, it appears that respondents are sufficiently "aggrieved" by the agency's action: under our decisions in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), they undoubtedly have alleged a sufficient "injury in fact" in that the whale watching and studying of their members will be adversely affected by continued whale harvesting, and this type of injury is within the "zone of interests" protected by the Pelly and Packwood Amendments. See Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Finally, the Secretary has failed to point to any expressed intention on the part of Congress to foreclose APA review of actions under either Amendment. We find, therefore, that respondents are entitled to pursue their claims under the right of action created by the APA.

*231 **2867 III

[3] The issue before us is whether, in the circumstances of these cases, either the Pelly or Packwood Amendment required the Secretary to certify Japan for refusing to abide by the IWC whaling quotas. We have concluded that certification*232 was not necessary and hence reject the Court of Appeals' holding and respondents' submission that certification is manda-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742
**(Cite as: 478 U.S. 221, 106 S.Ct. 2860)**

tory whenever a country exceeds its allowable take under the ICRW Schedule.

Under the Packwood Amendment, certification is neither permitted nor required until the Secretary makes a determination that nationals of a foreign country "are conducting fishing operations or engaging in trade or taking which diminishes the effectiveness" of the ICRW. It is clear that the Secretary must promptly make the certification decision, but the statute does not define the words "diminish the effectiveness of" or specify the factors that the Secretary should consider in making the decision entrusted to him alone. Specifically, it does not state that certification must be forthcoming whenever a country does not abide by IWC Schedules, and the Secretary did not understand or interpret the language of the Amendment to require him to do so. Had Congress intended otherwise, it would have been a simple matter to say that the Secretary must certify deliberate taking of whales in excess of IWC limits.

Here, as the Convention permitted it to do, Japan had filed its objection to the IWC harvest limits and to the moratorium to begin with the 1985-1986 season. It was accordingly not in breach of its obligations under the Convention in continuing to take whales, for it was part of the scheme of the Convention to permit nations to opt out of Schedules that were adopted over its objections. In these circumstances, the Secretary, after consultation with the United States Commissioner to the IWC and review of the IWC Scientific Committee opinions, determined that it would better serve the conservation ends of the Convention to accept Japan's pledge to limit its harvest of sperm whales for four years and to cease all commercial whaling in 1988, rather than to impose sanctions and risk continued whaling by the Japanese. In any event, the Secretary made the determination assigned to him by the Packwood Amendment and concluded that the **\*233** limited taking of whales in the 1984 and 1985 coastal seasons would not diminish the effectiveness of the ICRW or its conservation program, and that he would not make the certification that he would otherwise be empowered to make.

The Secretary, of course, may not act contrary to the will of Congress when exercised within the bounds of the Constitution. If Congress has directly spoken to the precise issue in question, if the intent of Congress is clear, that is the end of the matter. *Chevron U.S.A.*

*Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781-2782, 81 L.Ed.2d 694 (1984). But as the courts below and respondents concede, the statutory language itself contains no direction to the Secretary automatically and regardless of the circumstances to certify a nation that fails to conform to the IWC whaling Schedule. The language of the Pelly and Packwood Amendments might reasonably be construed in this manner, but the Secretary's construction that there are circumstances in which certification may be withheld, despite departures from the Schedules and without violating his duty, is also a reasonable construction of the language used in both Amendments. We do not understand the Secretary to be urging that he has *carte blanche* discretion to ignore and do nothing about whaling in excess of IWC Schedules. He does not argue, for example, that he could refuse to certify for any reason not connected with the aims and conservation goals of the Convention, or refuse to certify deliberate flouting of schedules by members who have failed to object to a particular schedule. But insofar as the plain language of the Amendments is concerned, the Secretary is not forbidden to refuse to certify for the reasons**\*2868** given in these cases. Furthermore, if a statute is silent or ambiguous with respect to the question at issue, our longstanding practice is to defer to the "executive department's construction of a statutory scheme it is entrusted to administer," *Chevron, supra,* 467 U.S., at 844, 104 S.Ct., at 2782, unless the legislative history of the enactment shows with sufficient clarity that the agency construction is contrary to the will of Congress. *United* **\*234** *States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985). See *Chemical Mfrs. Assn. v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985).

IV

Contrary to the Court of Appeals and respondents' views, we find nothing in the legislative history of either Amendment that addresses the nature of the Secretary's duty and requires him to certify every departure from the IWC's scheduled limits on whaling. The Pelly Amendment was introduced in 1971 to protect Atlantic salmon from possible extinction caused by overfishing in disregard of established salmon quotas. Under the International Convention for the Northwest Atlantic Fisheries (ICNAF), zero harvest quotas had been established in 1969 to regu-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.Ct. 2860                                                                                          Page 9

478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742
**(Cite as: 478 U.S. 221, 106 S.Ct. 2860)**

late and control high seas salmon fishing. 117
Cong.Rec. 34751 (1971) (remarks of Rep. Dingell).
Denmark, Germany, and Norway, members of the
ICNAF, exercised their right to file timely objections
to the quotas, however, and thus were exempt from
their limitations. Although respondents are correct
that Congress enacted the Pelly Amendment primarily
as a means to enforce those international fishing re-
strictions against these three countries, particularly
Denmark, they fail to establish that the Amendment
requires automatic certification of every nation whose
fishing operations exceed international conservation
quotas.

Both the Senate and House Committee Reports detail
the "conservation nightmare" resulting from Den-
mark's failure to recognize the ICNAF quota; a posi-
tion which "effectively nullified" the ban on high seas
harvesting of Atlantic salmon. S.Rep. No. 92-582, pp.
4-5 (1971); H.R.Rep. No. 92-468, pp. 5-6 (1971),
U.S.Code Cong. & Admin.News 1971, p. 2409. In
addition, Danish operations were seen as leading to
the "eventual destruction of this valuable sports fish,"
a matter of "critical concern" to both the Senate and
House Committees. S.Rep. No. 92-582, at 4; H.R.Rep.
No. 92-468, at 5, U.S.Code Cong. & Admin.News
1971, p. 2412. There is no question but that both
Committees**235** viewed Denmark's excessive fishing
operations as "diminish [ing] the effectiveness" of the
ICNAF quotas, and envisioned that the Secretary
would certify that nation under the Pelly Amendment.
The Committee Reports, however, do not support the
view that the Secretary must certify every nation that
exceeds every international conservation quota. [FN5]

> FN5. The Court of Appeals relied upon the
> statement in S.Rep. No. 92-582 that the
> purpose of the Amendment was " 'to prohibit
> the importation of fishery products from na-
> tions that do not conduct their fishing opera-
> tions in a manner that is consistent with in-
> ternational conservation programs. It would
> accomplish this by providing that whenever
> the Secretary of Commerce determines that a
> country's nationals are fishing in such a
> manner, he must certify such fact to the
> President.' " 247 U.S.App.D.C. 309, 319,
> 768 F.2d 426, 436 (1985) (emphasis omit-
> ted), quoting S.Rep. No. 92-582, at 2. This is
> indeed an explicit statement of purpose, but
> this is not the operative language in the sta-

tute chosen to effect that purpose. The sec-
tion-by-section analysis contained in the
same Report recites that the operative section
directs the Secretary of Commerce to certify
to the President the fact that nationals of a
foreign country, directly or indirectly, are
conducting fishing operations in a manner or
under circumstances which diminish the ef-
fectiveness of an international conservation
program whenever he determines the exis-
tence of such operations. Id., at 5. These are
not the words of a ministerial duty, but the
imposition of duty to make an informed
judgment. Even respondents do not contend
that every merely negligent or unintentional
violation must be certified. It should be noted
that the statement of purpose contained in the
House Report tracks the language of the
operative provisions of the Amendment.
H.R.Rep. No. 92-468, p. 2 (1971).

**2869** The discussion on the floor of the House by
Congressman Pelly and other supporters of the
Amendment further demonstrates that Congress' pri-
mary concern in enacting the Pelly Amendment was to
stave off the possible extermination of both the At-
lantic salmon as well as the extinction of other heavily
fished species, such as whales, regulated by interna-
tional fishery conservation programs. 117 Cong.Rec.
34752-34754 (1971) (remarks of Reps. Pelly, Wylie,
Clausen, and Hogan). The comments of Senator Ste-
vens, acting Chairman of the reporting Senate Com-
mittee and the only **236** speaker on the bill during
the Senate debate, were to the same effect. See id., at
47054 (if countries continue indiscriminately to fish
on the high seas, salmon may become extinct). Tes-
timony given during congressional hearings on the
Pelly Amendment also supports the conclusion that
Congress had no intention to require the Secretary to
certify every departure from the limits set by an in-
ternational conservation program. [FN6]

> FN6. Representative Pelly testified at the
> Senate hearings that the sanctions authorized
> by the Amendment were to be applied "in the
> case of flagrant violation of any international
> fishery conservation program to which the
> United States has committed itself." Hear-
> ings on S. 1242 et al. before the Subcom-
> mittee on Oceans and Atmosphere of the
> Senate Committee on Commerce, 92d Cong.,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

1st Sess., 47 (1971). Similarly, Donald McKernan, Special Assistant for Fisheries and Wildlife, and Coordinator of Ocean Affairs, United States Department of State, stated:

> "We do not anticipate that there would be any need to invoke the proposed legislation where conservation needs are effectively met by the agreement of all nations involved to an international conservation regime.

> "However, there are some situations where one or more nations have failed to agree to a program otherwise agreed among the involved nations, or having once agreed failed to abide by the agreement.

> "Under the proposed legislation, if the action of such countries diminished the effectiveness of the international fishery conservation program, consideration would need to be given to taking trade measures as necessary to support the conservation program." *Id.,* at 97.

Subsequent amendment of the Pelly Amendment in 1978 further demonstrates that Congress used the phrase, "diminish the effectiveness," to give the Secretary a range of certification discretion. The 1978 legislation expanded coverage of the Pelly Amendment "to authorize the President to embargo wildlife products from countries where nationals have acted in a manner which, directly or indirectly, diminishes the effectiveness of any international program for the conservation of endangered or threatened species." H.R.Rep. No. 95-1029, p. 8 (1978), U.S.Code Cong. & Admin.News 1978, p. 1772. This extension was premised on the success realized by the United States in using the **\*237** Amendment to convince other nations to adhere to IWC quotas, thus preserving the world's whale stocks. *Id.,* at 9.

In the House Report for the 1978 amendment, the Merchant Marine and Fisheries Committee specifically addressed the "diminish the effectiveness" standard and recognized the Secretary's discretion in making the initial certification decision:

"The nature of any trade or taking which qualifies as

diminishing the effectiveness of any international program for endangered or threatened species will depend on the circumstances of each case. In general, however, the trade or taking must be serious enough to warrant the finding that the effectiveness of the international program in question has been diminished. An isolated, individual violation of a convention provision will not ordinarily warrant certification under this section." *Id.,* at 15, U.S.Code Cong. & Admin.News 1978, p. 1779.

This statement makes clear that, under the Pelly Amendment as construed by Congress, the Secretary is to exercise his judgment in determining whether a particular fishing operation "diminishes the effectiveness" of an international fishery conservation program like the IWC.[FN7]

> FN7. The Committee also detailed two actions which "dramatically demonstrate[d] the value of the Pelly amendment to the United States in the conduct of international fishery negotiations." H.R.Rep. No. 95-1029, p. 9 (1978), U.S.Code Cong. & Admin.News 1978, p. 1773.

> > "In November, 1977, the Secretary of Commerce reported to the President that two nonmembers of the IWC-Peru and Korea-were taking whales in excess of IWC quotas. In March, 1978, the Secretary of Commerce reported to the subcommittee that although these nations are violating IWC quotas, certification under the Pelly amendment is pending a thorough documentation and substantiation of each action that may diminish the effectiveness of the IWC conservation program." *Ibid.* The fact that the Committee approved of the Secretary's actions in not automatically certifying these nations, even though they were found to be taking whales in excess of IWC quotas, is additional evidence that the Pelly Amendment does not require the *per se* rule respondents now urge.

**\*238 \*\*2870** The Court of Appeals held that this definition applies only to the 1978 addition to the Pelly Amendment, designed to enforce the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), Mar. 3, 1973, 27

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.Ct. 2860                                                                        Page 11

478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742

**(Cite as: 478 U.S. 221, 106 S.Ct. 2860)**

U.S.T. 1087, T.I.A.S. No. 8249, and not to the ICRW. We are unpersuaded. Congress perceived the two Conventions as seeking the same objectives. Both programs are designed to conserve endangered or threatened species, whether it be the sperm whale or the stumptail macaque. See H.R.Rep. No. 95-1029, pp. 9-10 (1978). This explains why the House Report noted that the purpose behind the 1978 extension of the Pelly Amendment was "to expand the success the United States has achieved in the conservation of whales to the conservation of endangered and threatened species." *Id.,* at 9, U.S.Code Cong. & Admin.News 1978, p. 1773.

Both Conventions also operate in a similar, and often parallel, manner, FN8 and nothing in the legislative history of the 1978 amendment shows that Congress intended the phrase "diminish the effectiveness" to be applied inflexibly with respect to departures from fishing quotas, but to be applied flexibly vis-a-vis departures from endangered species quotas. Without strong evidence to the contrary, we doubt that Congress intended the same phrase to have significantly different **239** meanings in two adjoining paragraphs of the same subsection. See *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 488-489, 105 S.Ct. 3275, 3280-3281, 87 L.Ed.2d 346 (1985); Morrison-Knudsen Constr. Co. v. Director, OWCP, 461 U.S. 624, 633, 103 S.Ct. 2045, 2050, 76 L.Ed.2d 194 (1983).* Congress' explanation of the scope of the Secretary's certification duty applies to both the original Pelly Amendment and the 1978 amendment: the Secretary is empowered to exercise his judgment in determining whether "the trade or taking [is] serious enough to warrant the finding that the effectiveness of the international program in question has been diminished." H.R.Rep. No. 95-1029, *supra,* at 15, U.S.Code Cong. & Admin.News 1978, p. 1779.

FN8. The CITES regulates trade in endangered and threatened species through inclusion of those species in one of three Appendices. CITES, Arts. II-IV, 27 U.S.T. 1092-1097. The ICRW regulates whaling through the use of a Schedule which sets harvest limits for whale species. ICRW, Art. V, 62 Stat. 1718-1719. The CITES requires a two-thirds' majority vote to amend an Appendix to include an additional species. CITES, Art. XV, 27 U.S.T. 1110-1112. The ICRW requires a three-fourths' majority vote

to amend the Schedule or to adopt regulations. ICRW, Art. III, 62 Stat. 1717. Both Conventions also contain analogous procedures for member nations to file timely objections to limitations imposed by the Convention. Compare CITES, Art. XV, 27 U.S.T. 1110-1112, with ICRW, Art. V, 62 Stat. 1719. See generally Recent Development, International Conservation-United States Enforcement of World Whaling Programs, 26 Va.J.Int'l L. 511, 531-532 (1986).

[4] Enactment of the Packwood Amendment did not negate the Secretary's view that he is not required to certify every failure to abide by ICW's whaling limits. There were hearings on the proposal but no Committee Reports. It was enacted as a floor amendment. It is clear enough, however, that it was designed to remove executive discretion in imposing sanctions once certification had been made-as Senator Packwood put it, "to put real economic teeth into our whale conservation efforts," by requiring the Secretary of State to impose severe economic sanctions until the **2871** transgression is rectified. 125 Cong.Rec. 21742 (1979). But Congress specifically retained the identical certification standard of the Pelly Amendment, which requires a determination by the Secretary that the whaling operations at issue diminish the effectiveness of the ICRW. 16 U.S.C. § 1821(e)(2)(A)(i). See 125 Cong.Rec. 21743 (1979) (remarks of Sen. Magnuson); *id.,* at 22083 (remarks of Rep. Breaux); *id.,* at 22084 (remarks of Rep. Oberstar). We find no specific indication in this history that henceforth the certification standard would require the Secretary to certify each and every departure from ICW's whaling Schedules.FN9

FN9. Indeed, to the extent that the hearings on the Packwood Amendment are indicative of congressional intent, they support the Secretary's view of his duty and authority to certify whaling in excess of IWC limits. Hearings before the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, 96 Cong., 1st Sess., 311-312, 317 (1979).

We note also that in 1984, Senator Packwood introduced a further amendment to the Packwood Amendment. This proposal

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 8:09-cv-00082-DOC-AN   Document 67-2   Filed 09/18/09   Page 184 of 254

106 S.Ct. 2860                                                                                    Page 12
478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742
(Cite as: 478 U.S. 221, 106 S.Ct. 2860)

required that " '[a]ny nation whose na-
tionals conduct commercial whaling oper-
ations [after 1986] unless such whaling has
been authorized by the International
Whaling Commission shall be deemed to
be certified for the purposes of this [act].' "
Quoted in Comment, The U.S.-Japanese
Whaling Accord: A Result of the Discre-
tionary Loophole in the Pack-
wood-Magnuson Amendment, 19
Geo.Wash.J.Int'l L. & Econ. 577, 609, n.
220 (1986). Congress thus had the express
opportunity to mandate that the Secretary
certify any foreign nation which exceeds
an IWC quota, but chose not to do so.

*240 It may be that in the legislative history of these
Amendments there are scattered statements hinting at
the *per se* rule advocated by respondents, but read as a
whole, we are quite unconvinced that this history
clearly indicates, contrary to what we and the Secre-
tary have concluded is a permissible reading of the
statute, that all departures from IWC Schedules, re-
gardless of the circumstances, call for immediate
certification.[FN10]

FN10. The "diminish the effectiveness of"
standard has been used in legislation other
than the Pelly and Packwood Amendments.
It first appeared in the 1962 amendment to
the Tuna Convention Act of 1950, 64 Stat.
777, 16 U.S.C. § 951 *et seq.* It was also used
in 1984 in the Eastern Pacific Tuna Licensing
Act, 16 U.S.C. § 972 *et seq.* (1982 ed., Supp.
III), which was enacted to implement the
Eastern Pacific Ocean Tuna Fishing Agree-
ment. Nothing has been called to our atten-
tion in the history of these Acts to indicate
that this standard calls for automatic certifi-
cation once the Secretary has discovered that
foreign nationals are violating an interna-
tional fishing convention or agreement. In-
deed, to the extent they are relevant, they
lend affirmative support to the position that
Congress has employed the standard to vest a
range of judgment in the Secretary as to
whether a departure from an agreed limit
diminishes the effectiveness of the interna-
tional conservation effort and hence calls for
certification.

V

We conclude that the Secretary's construction of the
statutes neither contradicted the language of either
Amendment, nor frustrated congressional intent. See
*241 Chevron U.S.A., Inc. v. Natural Resources De-
fense Council, Inc., 467 U.S., at 842-843, 104 S.Ct., at
2781-2782. In enacting these Amendments, Congress'
primary goal was to protect and conserve whales and
other endangered species. The Secretary furthered this
objective by entering into the agreement with Japan,
calling for that nation's acceptance of the worldwide
moratorium on commercial whaling and the with-
drawal of its objection to the IWC zero sperm whale
quota, in exchange for a transition period of limited
additional whaling. Given the lack of any express
direction to the Secretary that he must certify a nation
whose whale harvest exceeds an IWC quota, the
Secretary reasonably could conclude, as he has, that
"a cessation of all Japanese commercial whaling ac-
tivities would contribute more to the effectiveness of
the IWC and its conservation program than any other
single development." Affidavit of Malcolm Baldrige,
Brief for Petitioners in No. 85-955, Addendum III, pp.
6A-7A.

[5] We conclude, therefore, that the Secretary's deci-
sion to secure the certainty **2872 of Japan's future
compliance with the IWC's program through the 1984
executive agreement, rather than rely on the possibil-
ity that certification and imposition of economic
sanctions would produce the same or better result, is a
reasonable construction of the Pelly and Packwood
Amendments. Congress granted the Secretary the
authority to determine whether a foreign nation's
whaling in excess of quotas diminishes the effective-
ness of the IWC, and we find no reason to impose a
mandatory obligation upon the Secretary to certify
that every quota violation necessarily fails that stan-
dard. Accordingly, the judgment of the Court of Ap-
peals is

*Reversed.*

Justice MARSHALL, with whom Justice BRENNAN,
Justice BLACKMUN, and Justice REHNQUIST join,
dissenting.
Since 1971, Congress has sought to lead the world,
through the repeated exercise of its power over foreign
commerce, in preventing the extermination of whales
and other threatened species of marine animals. I

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.Ct. 2860                                                                    Page 13
478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742
**(Cite as: 478 U.S. 221, 106 S.Ct. 2860)**

deeply regret that it will now ***242** have to act again before the Executive Branch will finally be compelled to obey the law. I believe that the Court has misunderstood the question posed by the case before us, and has reached an erroneous conclusion on a matter of intense worldwide concern. I therefore dissent.

Congress began its efforts with the Pelly Amendment, which directs that "[w]hen the Secretary of Commerce determines that nationals of a foreign country, directly or indirectly, are conducting fishing operations in a manner or under circumstances which diminish the effectiveness of an international fishery conservation program, the Secretary of Commerce shall certify such fact to the President." 22 U.S.C. § 1978(a)(1). That Amendment, although apparently mandatory in its certification scheme, did not provide for a mandatory response from the President once the certification was made. Rather, the President was empowered, in his discretion, to impose sanctions on the certified nations or not to act at all. § 1978(a)(4).

This executive latitude in enforcement proved unsatisfactory. Between 1971 and 1978, every time that a nation exceeded international whaling quotas-on five occasions the Secretary of Commerce duly certified to the President that the trespassing nation had exceeded whaling quotas set by the International Whaling Commission and had thus diminished the effectiveness of the conservation program. See App. 168, 177.[FN*] Although the offending nations had promised immediate compliance, the Secretary apparently believed that he was obliged to certify the past violations. Yet on the basis of those assurances, the President each time exercised his option under the Pelly Amendment to impose no sanctions on the violators. *Id.,* at 193, 195.

> FN* Citations to "App." refer to the joint appendix filed by the parties in the Court of Appeals; the Solicitor General sought and was granted leave not to file a joint appendix in this Court. 475 U.S. 1007, 106 S.Ct. 1178, 89 L.Ed.2d 296 (1986).

Unhappy with the President's failure to sanction clear violations of international whaling agreements, Congress responded*243 in 1979 with the Packwood Amendment. That Amendment provides that if the Secretary of Commerce certifies that a country is diminishing the effectiveness of the International

Convention for the Regulation of Whaling, the Secretary of State must reduce the fishing allocation of the offending nation by at least 50 percent. 16 U.S.C. § 1821(e)(2). It also provides certain time limits within which the Executive Branch must act in imposing the mandatory sanctions. The automatic imposition of sanctions, it seemed, would improve the effectiveness of the Pelly Amendment by providing a definite consequence for any nation disregarding whaling limits. See 125 Cong.Rec. 22084 (1979) (statement of Rep. Oberstar).

In 1984, the Secretary of Commerce for the first time declined to certify a case of intentional whaling in excess of established quotas. Rather than calling into play the ****2873** Packwood Amendment's mandatory sanctions by certifying to the President Japan's persistence in conducting whaling operations, Secretary Baldrige set about to negotiate with Japan, using his power of certification under domestic law to obtain certain promises of reduced violations in future years. In the resulting compromise, the Secretary agreed not to certify Japan, provided that Japan would promise to reduce its whaling until 1988 and then withdraw its objection to the international whaling quotas. Arguing that the Secretary had no discretion to withhold certification, respondents sought review of the Secretary's action in federal court. Both the District Court, 604 F.Supp. 1398 (DC 1985), and the Court of Appeals, 247 U.S.App.D.C. 309, 768 F.2d 426 (1985), found that Congress had not empowered the Secretary to decline to certify a clear violation of International Whaling Commission (IWC) quotas, and ordered the Secretary to make the statutory certification. This Court now renders illusory the mandatory language of the statutory scheme, and finds permissible exactly the result that Congress sought to *244 prevent in the Packwood Amendment: executive compromise of a national policy of whale conservation.

I

The Court devotes its opinion to the question whether the language of the Pelly or the Packwood Amendment leaves room for discretion in the Secretary to determine that a violation of the whaling quota need not be certified. Although framed in the same way by the Court of Appeals and by the parties before this Court, that issue is not the most direct approach to resolving the dispute before us. Indeed, by focusing entirely on this question, the Court fails to take into

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.Ct. 2860

478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742
  **(Cite as: 478 U.S. 221, 106 S.Ct. 2860)**

Page 14

account the most significant aspect of these cases: that even the Secretary himself has not taken the position that Japan's past conduct is not the type of activity that diminishes the effectiveness of the whale conservation program, requiring his certification under the Pelly Amendment. In the face of an IWC determination that only a zero quota will protect the species, never has the Secretary concluded, nor could he conclude, that the intentional taking of large numbers of sperm whales does *not* diminish the effectiveness of the IWC program. Indeed, the Secretary has concluded just the opposite. Just four months before the execution of the bilateral agreement that spawned this litigation, Senator Packwood wrote to the Secretary as follows:

"It has been assumed by everyone involved in this issue, including the whaling nations, that a nation which continues commercial whaling after the IWC moratorium takes effect would definitely be certified. I share this assumption since I see no way around the logical conclusion that a nation which ignores the moratorium is diminishing the effectiveness of the IWC.

"What I am asking, Mac, is that you provide me with an assurance that it is the position of the Commerce Department that any nation which continues whaling after the moratorium takes effect will be certified under **\*245** Packwood-Magnuson." App. 197 (letter from Sen. Packwood to Secretary Baldrige, June 28, 1984).

The Secretary expressed his agreement:
"You noted in your letter the widespread view that any continued commercial whaling after the International Whaling Commission (IWC) moratorium decision takes effect would be subject to certification. I agree, since any such whaling attributable to the policies of a foreign government would clearly diminish the effectiveness of the IWC." *Id.,* at 198 (letter from Secretary Baldrige to Sen. Packwood, July 24, 1984).

It has not been disputed that Japan's whaling activities have been just as described in that correspondence. The Secretary's expressed view is borne out by his apparent belief, four months later, that he held sufficient power under domestic law to threaten certification in an effort to extract promises from Japan regarding its **\*\*2874** future violations. Presumably he would not threaten such certification without believing that the factual predicate for that action existed.

I cannot but conclude that the Secretary has determined in these cases, *not* that Japan's past violations are so negligible that they should not be understood to trigger the certification obligation, but that he would prefer to impose a *penalty* different from that which Congress prescribed in the Packwood Amendment. Significantly, the Secretary argues here that the agreement he negotiated with Japan will-in the future-protect the whaling ban more effectively than imposing sanctions now. Brief for Federal Petitioners 43. But the regulation of future conduct is irrelevant to the certification scheme, which affects future violations only by punishing past ones. The Secretary's manipulation of the certification process to affect punishment is thus an attempt to evade the statutory sanctions rather than a genuine judgment that the effectiveness of the quota has not been diminished.

**\*246** The Secretary would rewrite the law. Congress removed from the Executive Branch any power over penalties when it passed the Packwood Amendment. Indeed, the Secretary's compromise in these cases is precisely the type of action, previously taken by the President, that led Congress to enact the mandatory sanctions of the Packwood Amendment: in 1978, five nations had been found to have exceeded quotas, but the President had withheld sanctions upon the promise of future compliance with international norms. Here, the future "compliance" is even less satisfactory than that exacted in the past instances: instead of immediate compliance, the Secretary has settled for continued violations until 1988. And in 1988 all that Japan has promised is to withdraw its formal objection to the IWC moratorium; I see no indication that Japan has pledged to "cease commercial whaling by 1988," *ante,* at 2865, or to "dismantle its commercial whaling industry." Brief for Federal Petitioners 43. The important question here, however, is not whether the Secretary's choice of sanctions was wise or effective, but whether it was authorized. The Court does not deny that Congress intended the consequences of actions diminishing the effectiveness of a whaling ban to be governed exclusively by the sanctions enumerated in the Packwood Amendment, with the optional addition of those provided in the Pelly Amendment. Thus, when the Secretary's action here, well intentioned or no, is seen for what it really is-a substitute of his judgment for Congress' on the issue of how best to respond to a foreign nation's intentional past violation of quotas-there can be no question but that the Secre-

478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742
**(Cite as: 478 U.S. 221, 106 S.Ct. 2860)**

tary has flouted the express will of Congress and exceeded his own authority. On that basis alone, I would affirm the judgment of the Court of Appeals.

## II

A quite separate concern is raised by the majority's treatment of the issue that it does address. The Court peremptorily rejects the Court of Appeals' conclusion that Congress intended**\*247** the Pelly Amendment to impose a nondiscretionary duty on the Secretary of Commerce to certify whenever a nation has exceeded whaling quotas. Asserting that "we find nothing in the legislative history of either Amendment that addresses the nature of the Secretary's duty and requires him to certify every departure from the IWC's scheduled limits on whaling," *ante,* at 12, the Court has simply ignored the many specific citations put forth by respondents and the Court of Appeals to just such authority, and has offered nothing to contradict them.

The Court of Appeals devoted voluminous portions of its opinion to excerpts from legislative history establishing that Congress expected that substantial violations of whaling quotas would always result in certification. Illustrative of these are the following exchanges between Members of Congress and Richard A. Frank, Administrator of the National Oceanic and Atmospheric Administration, discussing **\*\*2875** meaning of the Pelly Amendment in preparation for the 1979 legislation:

"Mr. McCLOSKEY.... Now, it seems to me the discretion then is left with the President and the Secretary of the Treasury, not with the Secretary of Commerce. If you have determined, as you in your testimony indicate, that Japan is importing non-IWC whale products, *I do not see where you have any discretion to politely say to the Japanese you are violating our rules, but we will withhold certifying if you will change....* [T]he certification is a mandatory act under the law. It is not a discretionary act.

"Mr. FRANK. That is correct.

 "Mr. BREAUX. I understand, Mr. Frank, that actually what we are talking about under the Pelly amendment is a two-stage process. First, if a country is violating the terms of an international treaty, the Secretary of Commerce has to certify that he is doing that, and that is not a discretionary thing. But after he

certifies**\*248** that there is a violation, and there is discretion on the part of the President to impose any import quotas, or the elimination of any imported fish products from that country and, the second part is the optional authority that the President has.

"Mr. FRANK. That is correct. The first one is mandatory on the Secretary of Commerce. The second is discretionary on the part of the President." Hearings on Whaling Policy and International Whaling Commission Oversight before the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, 96th Cong., 1st Sess., 301, 322-323 (1979) (emphasis added).

Representative Breaux summarized the administration's representations to Congress:

"Apparently Dick Frank is saying that the taking of whales in violation of IWC quotas is something that automatically would require the Department of Commerce to certify that nation as being in violation of the taking provision. Then you get into two other categories, not supplying enough data and the importation of whale meat [which involve discretion on the part of the Secretary]." *Id.,* at 359 (remarks of Rep. Breaux).

This and other legislative history relied on by the Court of Appeals demonstrate that Congress believed that, under the Pelly Amendment, when a nation clearly violated IWC quotas, the only discretion in the Executive Branch lay in the choice of sanction. The Packwood Amendment removed that discretion. The majority speculates that "it would have been a simple matter to say that the Secretary must certify deliberate taking of whales in excess of IWC limits," *ante,* at 2867. However, because everyone in the Congress and the Executive Branch appeared to share an understanding that quota violations would always be considered to diminish the **\*249** effectiveness of a conservation program, in accord with the consistent interpretations of past Secretaries of Commerce, there was no need to amend the statute. It was only when Secretary Baldrige became dissatisfied with the Packwood Amendment sanctions that the certification obligation was ever questioned.

The sole support that the Court offers for its position is the unobjectionable proposition, in a House Report,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

106 S.Ct. 2860                                                                    Page 16
478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742
**(Cite as: 478 U.S. 221, 106 S.Ct. 2860)**

that " '[a]n isolated, individual violation of a convention provision will not ordinarily warrant certification under this section.' " *Ante,* at ---- (quoting H.R.Rep. No. 95-1029, p. 15 (1978)). Petitioners indeed have a respectable argument that the Secretary was left with some inherent discretion to ignore violations of a *de minimis* nature. Such an argument, however, has no relevance to these cases. It is uncontested here that Japan's taking of whales has been flagrant, consistent, and substantial. Such gross disregard for international norms set for the benefit of the entire world represents the core of what Congress set about to punish and to deter with the weapon of reduced fishing rights in United States waters. The Court's decision today leaves **2876 Congress no closer to achieving that goal than it was in 1971, before either Amendment was passed.

### III

I would affirm the judgment below on the ground that the Secretary has exceeded his authority by using his power of certification, not as a means for identifying serious whaling violations, but as a means for evading the constraints of the Packwood Amendment. Even focusing, as the Court does, upon the distinct question whether the statute prevents the Secretary from determining that the effectiveness of a conservation program is not diminished by a substantial transgression of whaling quotas, I find the Court's conclusion utterly unsupported. I am troubled that this Court is empowering an officer of the Executive Branch, sworn to uphold and defend the laws of the United States, to ignore Congress' *250 pointed response to a question long pondered: "whether Leviathan can long endure so wide a chase, and so remorseless a havoc; whether he must not at last be exterminated from the waters, and the last whale, like the last man, smoke his last pipe, and then himself evaporate in the final puff." H. Melville, Moby Dick 436 (Signet ed. 1961).

U.S.,1986.
Japan Whaling Ass'n v. American Cetacean Soc.
478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166, 54 USLW 4929, 16 Envtl. L. Rep. 20,742

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 9

**Westlaw Delivery Summary Report for KREEP,GARY G**

Date/Time of Request:              Saturday, September 19, 2009 00:05 Central
Client Identifier:                 BARNETT
Database:                          SCTFIND
Citation Text:                     112 S.Ct. 2130
Lines:                             2200
Documents:                         1
Images:                            0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.


504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
 **(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

Supreme Court of the United States
Manuel LUJAN, Jr., Secretary of the Interior, Petitioner
v.
DEFENDERS OF WILDLIFE, et al.
No. 90-1424.

Argued Dec. 3, 1991.
Decided June 12, 1992.

Environmental groups brought action challenging regulation of the Secretary of the Interior which required other agencies to confer with him under the Endangered Species Act only with respect to federally funded projects in the United States and on the high seas. The United States District Court for the district of Minnesota, Donald D. Alsop, Chief Judge, dismissed for lack of standing, 658 F.Supp. 43. The Court of Appeals for the Eighth Circuit reversed, 851 F.2d 1035. The District Court entered judgment in favor of environmental groups, 707 F.Supp. 1082, and the Court of Appeals affirmed, 911 F.2d 117. On certiorari, the Supreme Court, Justice Scalia, held that: (1) plaintiffs did not assert sufficiently imminent injury to have standing, and (2) plaintiffs' claimed injury was not redressable.

Reversed and remanded.

Justice Kennedy filed an opinion concurring in part and concurring in the judgment in which Justice Souter joined.

Justice Stevens filed an opinion concurring in the judgment.

Justice Blackmun dissented and filed an opinion in which Justice O'Connor joined.

West Headnotes

**[1] Constitutional Law 92 ⬅2330**

92 Constitutional Law

92XX Separation of Powers
  92XX(A) In General
    92k2330 k. In General. Most Cited Cases
  (Formerly 92k50)
Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts. U.S.C.A. Const. Art. 1, § 1; Art. 2, § 1, cl. 1; Art. 3, § 1 et seq.

**[2] Federal Civil Procedure 170A ⬅103.2**

170A Federal Civil Procedure
  170AII Parties
    170AII(A) In General
      170Ak103.1 Standing
        170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
  (Formerly 170Ak103.1)
Though some of its elements express merely prudential considerations that are part of judicial self-government, core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III. U.S.C.A. Const. Art. 3, § 1 et seq.

**[3] Federal Civil Procedure 170A ⬅103.2**

170A Federal Civil Procedure
  170AII Parties
    170AII(A) In General
      170Ak103.1 Standing
        170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

**Federal Civil Procedure 170A ⬅103.3**

170A Federal Civil Procedure
  170AII Parties
    170AII(A) In General
      170Ak103.1 Standing
        170Ak103.3 k. Causation; Redressability. Most Cited Cases

**Federal Civil Procedure 170A ⬅103.4**

170A Federal Civil Procedure

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
 **(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

170AII Parties
   170AII(A) In General
     170Ak103.1 Standing
       170Ak103.4 k. Rights of Third Parties or Public. Most Cited Cases
Irreducible constitutional minimum of standing requires that plaintiff have suffered an injury in fact, which is an invasion of a legally protected interest which is concrete and particularized and actual or imminent rather than conjectural or hypothetical; that there be a causal connection between the injury and conduct complained of so that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party who is not before the court; and that it be likely, as opposed to merely speculative, that injury will be redressed by a favorable decision.

**[4] Federal Civil Procedure 170A ⛐103.2**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
       170Ak103.1 Standing
         170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
In order for injury to be "particularized," it must affect the plaintiff in a personal and individual way.

**[5] Federal Civil Procedure 170A ⛐103.2**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
       170Ak103.1 Standing
         170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
     (Formerly 170Bk247)
Party invoking federal jurisdiction bears the burden of establishing elements of standing.

**[6] Federal Civil Procedure 170A ⛐103.2**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
       170Ak103.1 Standing
         170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

**Federal Civil Procedure 170A ⛐103.5**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
       170Ak103.1 Standing
         170Ak103.5 k. Pleading. Most Cited Cases
Elements of standing are not merely pleading requirements but, rather, are an indispensable part of the plaintiff's case, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the manner and degree of evidence required at successive stages of litigation.

**[7] Federal Civil Procedure 170A ⛐103.2**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
       170Ak103.1 Standing
         170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

**Federal Civil Procedure 170A ⛐2544**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
       170AXVII(C)3 Proceedings
         170Ak2542 Evidence
           170Ak2544 k. Burden of Proof. Most Cited Cases
At the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice to establish standing; in response to summary judgment motion, plaintiff can no longer rest on mere allegations but must set forth by affidavit or other evidence the specific facts which will be taken as true for purposes of summary judgment; at the final stage, those facts, if controverted, must be supported adequately by the evidence adduced at trial. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⛐103.3**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

170Ak103.1 Standing
170Ak103.3 k. Causation; Redressability. Most Cited Cases
When plaintiff's asserted injury arises from the government's allegedly unlawful regulation or lack of regulation of someone else, causation and redressability required for standing hinge on response of the regulated or regulable third party to the government action or inaction and on the response of others as well.

**[9]** Environmental Law 149E ⚖651

149E Environmental Law
149EXIII Judicial Review or Intervention
149Ek649 Persons Entitled to Sue or Seek Review; Standing
149Ek651 k. Cognizable Interests and Injuries, in General. Most Cited Cases
(Formerly 187k3.5, 187k31/2)
Desire to use or observe animal species, even for purely aesthetic purposes, is a cognizable interest for standing purposes.

**[10]** Federal Civil Procedure 170A ⚖2544

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2542 Evidence
170Ak2544 k. Burden of Proof. Most Cited Cases

To survive summary judgment motion for dismissal of suit under Endangered Species Act for lack of standing, environmental groups had to submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by funded activities abroad but, also that one or more of the groups' members would thereby be directly affected, apart from their special interest in the subject. Endangered Species Act of 1973, § 11(g), as amended, 16 U.S.C.A. § 1540(g).

**[11]** Environmental Law 149E ⚖652

149E Environmental Law
149EXIII Judicial Review or Intervention
149Ek649 Persons Entitled to Sue or Seek Review; Standing

149Ek652 k. Organizations, Associations, and Other Groups. Most Cited Cases
(Formerly 187k3.5, 187k31/2)
Affidavits in which members of organizations stated that they had previously traveled to places in the world where projects being funded by the Agency for International Development (AID) were taking place and that they hoped to be able to return and observe endangered species in those locations did not show that damage to species from the projects would produce imminent injury to them, and organizations thus did not have standing to challenge regulation of the Secretary of the Interior requiring that other agencies consult under the Endangered Species Act only with respect to actions in the United States or on the high seas. Endangered Species Act of 1973, § 7(a)(2), as amended, 16 U.S.C.A. § 1536(a)(2).

**[12]** Federal Civil Procedure 170A ⚖103.2

170A Federal Civil Procedure
170AII Parties
170AII(A) In General
170Ak103.1 Standing
170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
Imminence of injury is demanded for standing even when the alleged harm does not depend upon affirmative actions of third parties which are beyond the plaintiff's control.

**[13]** Environmental Law 149E ⚖651

149E Environmental Law
149EXIII Judicial Review or Intervention
149Ek649 Persons Entitled to Sue or Seek Review; Standing
149Ek651 k. Cognizable Interests and Injuries, in General. Most Cited Cases
(Formerly 199k25.15(4.1), 199k25.15(4) Health and Environment)
"Ecosystem nexus," under which a person who uses any part of a continuous ecosystem may be considered adversely affected by activity, does not provide basis for standing to challenge the activity.

**[14]** Environmental Law 149E ⚖656

149E Environmental Law
149EXIII Judicial Review or Intervention

112 S.Ct. 2130                                                                                          Page 4
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

149Ek649 Persons Entitled to Sue or Seek Review; Standing
149Ek656 k. Other Particular Parties. Most Cited Cases
(Formerly 187k3.5, 187k31/2)

Persons seeking to challenge regulation of the Secretary of the Interior which required other agencies to consult under the Endangered Species Act only with respect to federally funded projects in the United States and on the high seas, and not in other countries, could not obtain standing under a "animal nexus" approach, whereby anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing, or under a "vocational nexus" approach, under which anyone with a professional interest in the animals can sue. Endangered Species Act of 1973, § 7(a)(2), as amended, 16 U.S.C.A. § 1536(a)(2).

**[15] Environmental Law 149E ☞652**

149E Environmental Law
149EXIII Judicial Review or Intervention
149Ek649 Persons Entitled to Sue or Seek Review; Standing
149Ek652 k. Organizations, Associations, and Other Groups. Most Cited Cases
(Formerly 187k3.5, 187k31/2)

Harm allegedly suffered by members of environmental groups as result of federal funding of projects in other countries which might threaten endangered species could not be redressed in action against Secretary of the Interior challenging his regulation which required consultation under the Endangered Species Act by other governmental agencies only with respect to funding of projects in the United States and on the high seas, and groups thus lacked standing, as other agencies denied the authority of the Secretary to order consultation and would not be bound by an order and action to which they were not a party. (Per Justice Scalia with the Chief Justice and two Justices concurring and two Justices concurring in part and in the judgment.) Endangered Species Act of 1973, § 7(a)(2), as amended, 16 U.S.C.A. § 1536(a)(2).

**[16] Federal Civil Procedure 170A ☞103.3**

170A Federal Civil Procedure
170AII Parties
170AII(A) In General
170Ak103.1 Standing

170Ak103.3 k. Causation; Redressability. Most Cited Cases

Existence of federal jurisdiction ordinarily depends upon facts as they exist when the complaint is filed, and later participation in a suit by those parties necessary for plaintiffs' injury to be redressed will not give plaintiffs standing when their injury was not redressable by any of the parties to the suit at the time that it was filed. (Per Justice Scalia with the Chief Justice and two Justices concurring and two Justices concurring in part and in the judgment.)

**[17] Environmental Law 149E ☞656**

149E Environmental Law
149EXIII Judicial Review or Intervention
149Ek649 Persons Entitled to Sue or Seek Review; Standing
149Ek656 k. Other Particular Parties. Most Cited Cases
(Formerly 187k3.5, 187k31/2)

Members of environmental groups who asserted injury due to lack of opportunity to observe endangered species as a result of projects in other countries partially funded by the Agency for International Development (AID) did not show an injury which would be redressable as a result of challenge to regulation of the Secretary of the Interior which required AID to consult under the Endangered Species Act only with respect to projects in the United States and on the high seas where AID provided less than 10% of the funding for project about which plaintiffs complained and there was nothing to indicate that the project would be suspended or do less harm to endangered species if that funding were eliminated. (Per Justice Scalia with Chief Justice and two Justices concurring and two Justices concurring in part and in judgment.) Endangered Species Act of 1973, § 7(a)(2), as amended, 16 U.S.C.A. § 1536(a)(2).

**[18] Environmental Law 149E ☞656**

149E Environmental Law
149EXIII Judicial Review or Intervention
149Ek649 Persons Entitled to Sue or Seek Review; Standing
149Ek656 k. Other Particular Parties. Most Cited Cases
(Formerly 187k3.5, 187k31/2)

Persons challenging regulation of the Secretary of the Interior requiring other agencies to consult with him

112 S.Ct. 2130                                                                                Page 5
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
 **(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

under the Endangered Species Act only with respect to funding of projects in the United States and on the high seas did not have standing on basis of the "citizen-suit" provision of the Endangered Species Act. Endangered Species Act of 1973, §§ 7(a)(2), 11(g), as amended, 16 U.S.C.A. §§ 1536(a)(2), 1540(g).

**[19]** Federal Civil Procedure 170A 🔗103.4

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.4 k. Rights of Third Parties or Public. Most Cited Cases
Plaintiff raising only a generally available grievance about government, and claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large does not state an Article III case or controversy. U.S.C.A. Const. Art. 3, § 1 et seq.

**\*\*2133** Syllabus [FN\*]

> [FN\*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Section 7(a)(2) of the Endangered Species Act of 1973 divides responsibilities regarding the protection of endangered species between petitioner Secretary of the Interior and the Secretary of Commerce, and requires each federal agency to consult with the relevant Secretary to ensure that any action funded by the agency is not likely to jeopardize the continued existence or habitat of any endangered or threatened species. Both Secretaries initially promulgated a joint regulation extending § 7(a)(2)'s coverage to actions taken in foreign nations, but a subsequent joint rule limited the section's geographic scope to the United States and the high seas. Respondents, wildlife conservation and other environmental organizations, filed an action in the District Court, seeking a declaratory judgment that the new regulation erred as to § 7(a)(2)'s geographic scope and an injunction requiring the Secretary of the Interior to promulgate a new rule restoring his initial interpretation. The Court of Ap-

peals reversed the District Court's dismissal of the suit for lack of standing. Upon remand, on cross-motions for summary judgment, the District Court denied the Secretary's motion, which renewed his objection to standing, and granted respondents' motion, ordering the Secretary to publish a new rule. The Court of Appeals affirmed.

**\*\*2134** *Held:* The judgment is reversed, and the case is remanded.

 911 F.2d 117, (CA 8 1990), reversed and remanded.

Justice SCALIA delivered the opinion of the Court, except as to Part III-B, concluding that respondents lack standing to seek judicial review of the rule. Pp. 2135-2140, 2142-2146.

(a) As the parties invoking federal jurisdiction, respondents bear the burden of showing standing by establishing, *inter alia,* that they have suffered an injury in fact, *i.e.,* a concrete and particularized, actual or imminent invasion of a legally protected interest. To survive a summary judgment motion, they must set forth by affidavit or other evidence specific facts to support their claim. Standing is particularly difficult to show here, since third parties, rather than respondents, are the object of the Government action or inaction to which respondents object. Pp. 2135-2137.

 **\*556** b) Respondents did not demonstrate that they suffered an injury in fact. Assuming that they established that funded activities abroad threaten certain species, they failed to show that one or more of their members would thereby be directly affected apart from the members' special interest in the subject. See *Sierra Club v. Morton,* 405 U.S. 727, 735, 739, 92 S.Ct. 1361, 1366, 1368, 31 L.Ed.2d 636. Affidavits of members claiming an intent to revisit project sites at some indefinite future time, at which time they will presumably be denied the opportunity to observe endangered animals, do not suffice, for they do not demonstrate an "imminent" injury. Respondents also mistakenly rely on a number of other novel standing theories. Their theory that any person using any part of a contiguous ecosystem adversely affected by a funded activity has standing even if the activity is located far away from the area of their use is inconsistent with this Court's opinion in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695. And they state purely speculative,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 8:09-cv-00082-DOC-AN   Document 67-2   Filed 09/18/09   Page 196 of 254

112 S.Ct. 2130                                                                    Page 6
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
 **(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

nonconcrete injuries when they argue that suit can be brought by anyone with an interest in studying or seeing endangered animals anywhere on the globe and anyone with a professional interest in such animals. Pp. 2137-2140.

(c) The Court of Appeals erred in holding that respondents had standing on the ground that the statute's citizen-suit provision confers on all persons the right to file suit to challenge the Secretary's failure to follow the proper consultative procedure, notwithstanding their inability to allege any separate concrete injury flowing from that failure. This Court has consistently held that a plaintiff claiming only a generally available grievance about government, unconnected with a threatened concrete interest of his own, does not state an Article III case or controversy. See, e.g., *Fairchild v. Hughes,* 258 U.S. 126, 129-130, 42 S.Ct. 274, 275, 66 L.Ed. 499. Vindicating the public interest is the function of the Congress and the Chief Executive. To allow that interest to be converted into an individual right by a statute denominating it as such and permitting all citizens to sue, regardless of whether they suffered any concrete injury, would authorize Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed," Art. II, § 3. Pp. 2142-2146.

SCALIA, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III-A, and IV, in which REHNQUIST, C.J., WHITE, KENNEDY, SOUTER, and THOMAS, JJ., joined, and an opinion with respect to Part III-B, in which REHNQUIST, C.J., and WHITE and THOMAS, JJ., joined. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which SOUTER, J., joined, *post,* p. 2146. STEVENS, J., filed an opinion concurring in the judgment, *post,* **2135 *557 p. 2147. BLACKMUN, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post,* p. 2151.

*Edwin S. Kneedler* argued the cause for petitioner. With him on the briefs were *Solicitor General Starr, Acting Assistant Attorney General Hartman, Deputy Solicitor General Wallace, Robert L. Klarquist, David C. Shilton, Thomas L. Sansonetti,* and *Michael Young.*

*Brian B. O'Neill* argued the cause for respondents. With him on the brief were *Steven C. Schroer* and *Richard A. Duncan.*\*

\* *Terence P. Ross, Daniel J. Popeo,* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the City of Austin et al. by *William A. Butler, Angus E. Crane, Michael J. Bean, Kenneth Oden, James M. McCormack,* and *Wm. Robert Irvin;* for the American Association of Zoological Parks & Aquariums et al. by *Ronald J. Greene* and *W. Hardy Callcott;* for the American Institute of Biological Sciences by *Richard J. Wertheimer* and *Charles M. Chambers;* and for the Ecotropica Foundation of Brazil et al. by *Durwood J. Zaelke.*

A brief of *amici curiae* was filed for the State of Texas et al. by *Patrick J. Mahoney, Dan Morales,* Attorney General of Texas, *Will Pryor,* First Assistant Attorney General, *Mary F. Keller,* Deputy Attorney General, and *Nancy N. Lynch, Mary Ruth Holder,* and *Shannon J. Kilgore,* Assistant Attorneys General, *Grant Woods,* Attorney General of Arizona, *Winston Bryant,* Attorney General of Arkansas, *Daniel E. Lungren,* Attorney General of California, *Robert A. Butterworth,* Attorney General of Florida, *Michael E. Carpenter,* Attorney General of Maine, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Robert J. Del Tufo,* Attorney General of New Jersey, *Robert Abrams,* Attorney General of New York, *Lee Fisher,* Attorney General of Ohio, and *Jeffrey L. Amestoy,* Attorney General of Vermont, *Victor A. Kovner, Leonard J. Koerner, Neal M. Janey,* and *Louise H. Renne.*

Justice SCALIA delivered the opinion of the Court with respect to Parts I, II, III-A, and IV, and an opinion with respect to Part III-B, in which THE CHIEF JUSTICE, Justice WHITE, and Justice THOMAS join.

This case involves a challenge to a rule promulgated by the Secretary of the Interior interpreting § 7 of the Endangered *558 Species Act of 1973 (ESA), 87 Stat. 884, 892, as amended, 16 U.S.C. § 1536, in such fashion as to render it applicable only to actions within the United States or on the high seas. The preliminary issue, and the only one we reach, is whether respondents here, plaintiffs below, have standing to seek judicial review of the rule.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

I

The ESA, 87 Stat. 884, as amended, 16 U.S.C. § 1531 et seq., seeks to protect species of animals against threats to their continuing existence caused by man. See generally TVA v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The ESA instructs the Secretary of the Interior to promulgate by regulation a list of those species which are either endangered or threatened under enumerated criteria, and to define the critical habitat of these species. 16 U.S.C. §§ 1533, 1536. Section 7(a)(2) of the Act then provides, in pertinent part:

"Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical." 16 U.S.C. § 1536(a)(2).

In 1978, the Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS), on behalf of the Secretary of the Interior and the Secretary of Commerce respectively, promulgated a joint regulation stating that the obligations imposed by § 7(a)(2) extend to actions taken in foreign nations. 43 Fed.Reg. 874 (1978). The next year, however, the Interior Department began to reexamine its position. Letter from Leo Kuliz, Solicitor, Department of the Interior, to Assistant Secretary, Fish and Wildlife and Parks, Aug. 8, 1979. A revised joint regulation, reinterpreting*559 § 7(a)(2) to require consultation only for actions taken in the United States or on the high seas, was proposed in 1983, 48 Fed.Reg. 29990, and promulgated in 1986, 51 Fed.Reg. 19926; 50 CFR 402.01 (1991).

Shortly thereafter, respondents, organizations dedicated to wildlife conservation and other environmental causes, filed this action against the Secretary of the Interior, seeking a declaratory judgment that the new regulation is in error as to the geographic scope of § 7(a)(2) and an injunction requiring the Secretary to promulgate a new regulation restoring the initial interpretation. The District Court granted the Secretary's motion to dismiss for lack of standing. Defenders of Wildlife v. Hodel, 658 F.Supp. 43, 47-48 (Minn.1987).

The Court of Appeals for the Eighth Circuit reversed by a divided vote. Defenders of Wildlife v. Hodel, 851 F.2d 1035 (1988). On remand, the Secretary moved for summary judgment on the standing issue, and respondents moved for summary judgment on the merits. The District Court denied the Secretary's motion, on the ground that the Eighth Circuit had already determined the standing question in this case; it granted respondents' merits motion, and ordered the Secretary to publish a revised regulation. Defenders of Wildlife v. Hodel, 707 F.Supp. 1082 (Minn.1989). The Eighth Circuit affirmed. 911 F.2d 117 (1990). We granted certiorari, 500 U.S. 915, 111 S.Ct. 2008, 114 L.Ed.2d 97 (1991).

II

[1][2] While the Constitution of the United States divides all power conferred upon **2136 the Federal Government into "legislative Powers," Art. I, § 1, "[t]he executive Power," Art. II, § 1, and "[t]he judicial Power," Art. III, § 1, it does not attempt to define those terms. To be sure, it limits the jurisdiction of federal courts to "Cases" and "Controversies," but an executive inquiry can bear the name "case" (the Hoffa case) and a legislative dispute can bear the name "controversy" (the Smoot-Hawley controversy). Obviously, then, the Constitution's central mechanism of separation of powers depends*560 largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts. In The Federalist No. 48, Madison expressed the view that "[i]t is not infrequently a question of real nicety in legislative bodies whether the operation of a particular measure will, or will not, extend beyond the legislative sphere," whereas "the executive power [is] restrained within a narrower compass and ... more simple in its nature," and "the judiciary [is] described by landmarks still less uncertain." The Federalist No. 48, p. 256 (Carey and McClellan eds. 1990). One of those landmarks, setting apart the "Cases" and "Controversies" that are of the justiciable sort referred to in Article III-"serv[ing] to identify those disputes which are appropriately resolved through the judicial process," Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135 (1990)-is the doctrine of standing. Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III. See,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

*e.g., Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).*

[3][4] Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, see *id., at 756, 104 S.Ct., at 3327; Warth v. Seldin, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975); Sierra Club v. Morton, 405 U.S. 727, 740-741, n. 16, 92 S.Ct. 1361, 1368-1369, n. 16, 31 L.Ed.2d 636 (1972);* [FN1] and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " *Whitmore, supra, 495 U.S., at 155, 110 S.Ct., at 1723* (quoting *Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)*). Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." **\*561***Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976).* Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id., at 38, 43, 96 S.Ct., at 1924, 1926.*

> FN1. By particularized, we mean that the injury must affect the plaintiff in a personal and individual way.

[5][6][7] The party invoking federal jurisdiction bears the burden of establishing these elements. See *FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990); Warth, supra, 422 U.S., at 508, 95 S.Ct., at 2210.* Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation. See *Lujan v. National Wildlife Federation, 497 U.S. 871, 883-889, 110 S.Ct. 3177, 3185-3189, 111 L.Ed.2d 695 (1990); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 114-115, and n. 31, 99 S.Ct. 1601, 1614-1615, and n. 31, 60 L.Ed.2d 66 (1979);* **\*\*2137***Simon, supra, 426 U.S., at 45, n. 25, 96 S.Ct., at 1927, and n. 25; Warth, supra, 422 U.S., at 527, and n. 6, 95 S.Ct., at 2219, and n. 6*

(Brennan, J., dissenting). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *National Wildlife Federation, supra, 497 U.S., at 889, 110 S.Ct., at 3189.* In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," *Fed.Rule Civ.Proc. 56(e),* which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." *Gladstone, supra, 441 U.S., at 115, n. 31, 99 S.Ct., at 1616, n. 31.*

[8] When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has **\*562** caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction-and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," *ASARCO Inc. v. Kadish, 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989)* (opinion of KENNEDY, J.); see also *Simon, supra, 426 U.S., at 41-43, 96 S.Ct., at 1925, 1926;* and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. *E.g., Warth, supra, 422 U.S., at 505, 95 S.Ct., at 2208.* Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish. *Allen, supra, 468 U.S., at 758, 104 S.Ct., at 3328; Simon, supra, 426 U.S., at 44-45, 96 S.Ct., at 1927;*

Case 8:09-cv-00082-DOC-AN   Document 67-2   Filed 09/18/09   Page 199 of 254

112 S.Ct. 2130                                                                                                Page 9
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
 **(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

*Warth, supra,* 422 U.S., at 505, 95 S.Ct., at 2208.

### III

We think the Court of Appeals failed to apply the foregoing principles in denying the Secretary's motion for summary judgment. Respondents had not made the requisite demonstration of (at least) injury and redressability.

### A

[9][10] Respondents' claim to injury is that the lack of consultation with respect to certain funded activities abroad "increas[es] the rate of extinction of endangered and threatened species." Complaint ¶ 5, App. 13. Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of **\*563** standing. See, *e.g., Sierra Club v. Morton,* 405 U.S., at 734, 92 S.Ct., at 1366. "But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.,* at 734-735, 92 S.Ct., at 1366. To survive the Secretary's summary judgment motion, respondents had to submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by **\*\*2138** funded activities abroad, but also that one or more of respondents' members would thereby be "directly" affected apart from their " 'special interest' in th[e] subject." *Id.,* at 735, 739, 92 S.Ct., at 1366, 1368. See generally *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

[11][12] With respect to this aspect of the case, the Court of Appeals focused on the affidavits of two Defenders' members-Joyce Kelly and Amy Skilbred. Ms. Kelly stated that she traveled to Egypt in 1986 and "observed the traditional habitat of the endangered nile crocodile there and intend[s] to do so again, and hope[s] to observe the crocodile directly," and that she "will suffer harm in fact as the result of [the] American ... role ... in overseeing the rehabilitation of the Aswan High Dam on the Nile ... and [in] develop [ing] ... Egypt's ... Master Water Plan." App. 101. Ms. Skilbred averred that she traveled to Sri Lanka in 1981 and "observed th[e] habitat" of "endangered species such as the Asian elephant and the leopard" at what is now the site of the Mahaweli project funded by the Agency for International Development (AID), although she "was unable to see any of the endangered species"; "this development project," she continued, "will seriously reduce endangered, threatened, and endemic species habitat including areas that I visited ... [, which] may severely shorten the future of these species"; that threat, she concluded, harmed her because she "intend[s] to return to Sri Lanka in the future and hope[s] to be more fortunate in spotting at least the endangered elephant and leopard." *Id.,* at 145-146. When Ms. Skilbred was asked **\*564** at a subsequent deposition if and when she had any plans to return to Sri Lanka, she reiterated that "I intend to go back to Sri Lanka," but confessed that she had no current plans: "I don't know [when]. There is a civil war going on right now. I don't know. Not next year, I will say. In the future." *Id.,* at 318.

We shall assume for the sake of argument that these affidavits contain facts showing that certain agency-funded projects threaten listed species-though that is questionable. They plainly contain no facts, however, showing how damage to the species will produce "imminent" injury to Mses. Kelly and Skilbred. That the women "had visited" the areas of the projects before the projects commenced proves nothing. As we have said in a related context, " 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " *Lyons,* 461 U.S., at 102, 103 S.Ct., at 1665 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495-496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). And the affiants' profession of an "inten[t]" to return to the places they had visited before-where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species-is simply not enough. Such "some day" intentions-without any description of concrete plans, or indeed even any specification of *when* the some day will be-do not support a finding of the "actual or imminent" injury that our cases require. See *supra,* at 2136.[FN2]

> FN2. The dissent acknowledges the settled requirement that the injury complained of be, if not actual, then at least *imminent,* but it contends that respondents could get past summary judgment because "a reasonable finder of fact could conclude ... that ... Kelly or Skilbred will soon return to the project sites." *Post,* at 2152. This analysis suffers

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 8:09-cv-00082-DOC-AN   Document 67-2   Filed 09/18/09   Page 200 of 254

112 S.Ct. 2130                                                                Page 10
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
 (Cite as: 504 U.S. 555, 112 S.Ct. 2130)

either from a factual or from a legal defect, depending on what the "soon" is supposed to mean. If "soon" refers to the standard mandated by our precedents-that the injury be "imminent," *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990)-we are at a loss to see how, as a factual matter, the standard can be met by respondents' mere profession of an intent, some day, to return. But if, as we suspect, "soon" means nothing more than "in this lifetime," then the dissent has undertaken quite a departure from our precedents. Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes-that the injury is " ' "certainly impending," ' " *id.,* at 158, 110 S.Ct., at 1725 (emphasis added). It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control. In such circumstances we have insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all. See, *e.g., id.,* at 156-160, 110 S.Ct., at 1723-1726; *Los Angeles v. Lyons,* 461 U.S. 95, 102-106, 103 S.Ct. 1660, 1665-1667, 75 L.Ed.2d 675 (1983).

There is no substance to the dissent's suggestion that imminence is demanded only when the alleged harm depends upon "the affirmative actions of third parties beyond a plaintiff's control," *post,* at 2153. Our cases *mention* third-party-caused contingency, naturally enough; but they also mention the plaintiff's failure to show that he will soon expose *himself* to the injury, see, *e.g., Lyons, supra,* at 105-106, 103 S.Ct., at 1666-1667; *O'Shea v. Littleton,* 414 U.S. 488, 497, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974); *Ashcroft v. Mattis,* 431 U.S. 171, 172-173, n. 2, 97 S.Ct. 1739, 1740 n. 2, 52 L.Ed.2d 219 (1977) (*per curiam* ). And there is certainly no reason in principle to demand evidence that third persons will take the action exposing the

plaintiff to harm, while *presuming* that the plaintiff himself will do so.

Our insistence upon these established requirements of standing does not mean that we would, as the dissent contends, "demand ... detailed descriptions" of damages, such as a "nightly schedule of attempted activities" from plaintiffs alleging loss of consortium. *Post,* at 2153. That case and the others posited by the dissent all involve *actual* harm; the existence of standing is clear, though the precise extent of harm remains to be determined at trial. Where there is no actual harm, however, its imminence (though not its precise extent) must be established.

**2139 [13] *565 Besides relying upon the Kelly and Skilbred affidavits, respondents propose a series of novel standing theories. The first, inelegantly styled "ecosystem nexus," proposes that any person who uses *any part* of a "contiguous ecosystem" adversely affected by a funded activity has standing even if the activity is located a great distance away. This approach, as the Court of Appeals correctly observed, is inconsistent with our opinion in *National Wildlife Federation,* which held that a plaintiff claiming injury from environmental damage*566 must use the area affected by the challenged activity and not an area roughly "in the vicinity" of it. 497 U.S., at 887-889, 110 S.Ct., at 3188-3189; see also *Sierra Club,* 405 U.S., at 735, 92 S.Ct., at 1366. It makes no difference that the general-purpose section of the ESA states that the Act was intended in part "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," 16 U.S.C. § 1531(b). To say that the Act protects ecosystems is not to say that the Act creates (if it were possible) rights of action in persons who have not been injured in fact, that is, persons who use portions of an ecosystem not perceptibly affected by the unlawful action in question.

[14] Respondents' other theories are called, alas, the "animal nexus" approach, whereby anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing; and the "vocational nexus" approach, under which anyone with a professional interest in such animals can sue. Under these theories, anyone who goes to see Asian ele-

112 S.Ct. 2130                                                                                   Page 11
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

phants in the Bronx Zoo, and anyone who is a keeper of Asian elephants in the Bronx Zoo, has standing to sue because the Director of the Agency for International Development (AID) did not consult with the Secretary regarding the AID-funded project in Sri Lanka. This is beyond all reason. Standing is not "an ingenious academic exercise in the conceivable," *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973), but as we have said requires, at the summary judgment stage, a factual showing of perceptible harm. It is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist. It is even plausible-though it goes to the outermost limit of plausibility-to think that a person who observes or works with animals **2140 of a particular species in the very area of the world where that species is threatened by a federal decision is facing such harm, since some animals that *567 might have been the subject of his interest will no longer exist, see *Japan Whaling Assn. v. American Cetacean Society,* 478 U.S. 221, 231, n. 4, 106 S.Ct. 2860, 2866, n. 4, 92 L.Ed.2d 166 (1986). It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection.[FN3]

> FN3. The dissent embraces each of respondents' "nexus" theories, rejecting this portion of our analysis because it is "unable to see how the distant location of the destruction *necessarily* (for purposes of ruling at summary judgment) mitigates the harm" to the plaintiff. *Post,* at 2154. But summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Respondents had to adduce facts, therefore, on the basis of which it could reasonably be found that concrete injury to their members was, as our cases require, "certainly impending." The dissent may be correct that the geographic remoteness of those members (here in the

United States) from Sri Lanka and Aswan does not "*necessarily* " prevent such a finding-but it assuredly does so when no further facts have been brought forward (and respondents have produced none) showing that the impact upon animals in those distant places will in some fashion be reflected here. The dissent's position to the contrary reduces to the notion that distance *never* prevents harm, a proposition we categorically reject. It cannot be that a person with an interest in an animal automatically has standing to enjoin federal threats to that species of animal, anywhere in the world. Were that the case, the plaintiff in *Sierra Club,* for example, could have avoided the necessity of establishing anyone's use of Mineral King by merely identifying one of its members interested in an endangered species of flora or fauna at that location. Justice BLACKMAN's accusation that a special rule is being crafted for "environmental claims," *post,* at 2154, is correct, but *he* is the craftsman.

> Justice STEVENS, by contrast, would allow standing on an apparent "animal nexus" theory to all plaintiffs whose interest in the animals is "genuine." Such plaintiffs, we are told, do not have to visit the animals because the animals are analogous to family members. *Post,* at 2148-2149, and n. 2. We decline to join Justice STEVENS in this Linnaean leap. It is unclear to us what constitutes a "genuine" interest; how it differs from a "nongenuine" interest (which nonetheless prompted a plaintiff to file suit); and why such an interest in animals should be different from such an interest in anything else that is the subject of a lawsuit.

*568 B

Besides failing to show injury, respondents failed to demonstrate redressability. Instead of attacking the separate decisions to fund particular projects allegedly causing them harm, respondents chose to challenge a more generalized level of Government action (rules regarding consultation), the invalidation of which would affect all overseas projects. This programmatic approach has obvious practical advantages, but also

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                                Page 12
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

obvious difficulties insofar as proof of causation or redressability is concerned. As we have said in another context, "suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations ... [are], even when premised on allegations of several instances of violations of law, ... rarely if ever appropriate for federal-court adjudication." *Allen,* 468 U.S., at 759-760, 104 S.Ct., at 3329.

[15] The most obvious problem in the present case is redressability. Since the agencies funding the projects were not parties to the case, the District Court could accord relief only against the Secretary: He could be ordered to revise his regulation to require consultation for foreign projects. But this would not remedy respondents' alleged injury unless the funding agencies were bound by the Secretary's regulation, which is very much an open question. Whereas in other contexts the ESA is quite explicit as to the Secretary's controlling authority, see, *e.g.,* 16 U.S.C. § 1533(a)(1) ( "The Secretary shall" promulgate regulations determining endangered species); § 1535(d)(1) **2141 ("The Secretary is authorized to provide financial assistance to any State"), with respect to consultation the initiative, and hence arguably the initial responsibility for determining statutory necessity, lies with *569 the agencies, see § 1536(a)(2) ("*Each Federal agency shall,* in consultation with and with the assistance of the Secretary, insure that any" funded action is not likely to jeopardize endangered or threatened species) (emphasis added). When the Secretary promulgated the regulation at issue here, he thought it was binding on the agencies, see 51 Fed.Reg. 19928 (1986). The Solicitor General, however, has repudiated that position here, and the agencies themselves apparently deny the Secretary's authority. (During the period when the Secretary took the view that § 7(a)(2) did apply abroad, AID and FWS engaged in a running controversy over whether consultation was required with respect to the Mahaweli project, AID insisting that consultation applied only to domestic actions.)

[16] Respondents assert that this legal uncertainty did not affect redressability (and hence standing) because the District Court itself could resolve the issue of the Secretary's authority as a necessary part of its standing inquiry. Assuming that it is appropriate to resolve an issue of law such as this in connection with a threshold standing inquiry, resolution by the District Court would not have remedied respondents' alleged injury

anyway, because it would not have been binding upon the agencies. They were not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced.[FN4] The *570 Court of Appeals tried to finesse this problem by simply proclaiming that "[w]e are satisfied that an injunction requiring the Secretary to publish [respondents' desired] regulatio[n] ... would result in consultation." *Defenders of Wildlife,* 851 F.2d, at 1042, 1043-1044. We do not know what would justify that confidence, particularly when the Justice Department (presumably after consultation with the agencies) has taken the **2142 position that the regulation is not binding.[FN5] The *571 short of the matter is that redress of the only injury in fact respondents complain of requires action (termination of funding until consultation) by the individual funding agencies; and any relief the District Court could have provided in this suit against the Secretary was not likely to produce that action.

> FN4. We need not linger over the dissent's facially impracticable suggestion, *post,* at 2154-2155, that one agency of the Government can acquire the power to direct other agencies by simply claiming that power in its own regulations and in litigation to which the other agencies are not parties. As for the contention that the other agencies will be "collaterally estopped" to challenge our judgment that they are bound by the Secretary of the Interior's views, because of their participation in this suit, *post,* at 2155-2156: Whether or not that is true now, it was assuredly not true when this suit was filed, naming the Secretary alone. "The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 830, 109 S.Ct. 2218, 2222, 104 L.Ed.2d 893 (1989) (emphasis added). It cannot be that, by later participating in the suit, the State Department and AID retroactively created a redressability (and hence a jurisdiction) that did not exist at the outset.
>
> The dissent's rejoinder that redressability *was* clear at the outset because the *Secretary* thought the regulation binding on the agencies, *post,* at 2156, n. 4, continues to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

miss the point: The *agencies* did not *agree* with the Secretary, nor would they be bound by a district court holding (as to this issue) in the Secretary's favor. There is no support for the dissent's novel contention, *ibid.,* that Rule 19 of the Federal Rules of Civil Procedure, governing joinder of indispensable parties, somehow alters our longstanding rule that jurisdiction is to be assessed under the facts existing when the complaint is filed. The redressability element of the Article III standing requirement and the "*complete* relief" referred to by Rule 19 are not identical. Finally, we reach the dissent's contention, *post,* at 2156, n. 4, that by refusing to waive our settled rule for purposes of this case we have made "federal subject-matter jurisdiction ... a one-way street running the Executive Branch's way." That is so, we are told, because the Executive can dispel jurisdiction where it previously existed (by either conceding the merits or by pointing out that nonparty agencies would not be bound by a ruling), whereas a plaintiff cannot retroactively create jurisdiction based on postcomplaint litigation conduct. But *any* defendant, not just the Government, can dispel jurisdiction by conceding the merits (and presumably thereby suffering a judgment) or by demonstrating standing defects. And permitting a defendant to point out a pre-existing standing defect late in the day is not remotely comparable to permitting a plaintiff to *establish* standing on the basis of the defendant's litigation conduct occurring after standing is erroneously determined.

FN5. Seizing on the fortuity that the case has made its way to *this* Court, Justice STEVENS protests that no agency would ignore "an authoritative construction of the [ESA] by this Court." *Post,* at 2149. In that he is probably correct; in concluding from it that plaintiffs have demonstrated redressability, he is not. Since, as we have pointed out above, standing is to be determined as of the commencement of suit; since at that point it could certainly not be known that the suit would reach this Court; and since it is not likely that an agency would feel compelled to

accede to the legal view of a district court expressed in a case to which it was not a party; redressability clearly did not exist.

[17] A further impediment to redressability is the fact that the agencies generally supply only a fraction of the funding for a foreign project. AID, for example, has provided less than 10% of the funding for the Mahaweli project. Respondents have produced nothing to indicate that the projects they have named will either be suspended, or do less harm to listed species, if that fraction is eliminated. As in Simon, 426 U.S., at 43-44, 96 S.Ct., at 1926-1927, it is entirely conjectural whether the nonagency activity that affects respondents will be altered or affected by the agency activity they seek to achieve.FN6 There is no standing.

> FN6. The dissent criticizes us for "overlook[ing]" memoranda indicating that the Sri Lankan Government solicited and required AID's assistance to mitigate the effects of the Mahaweli project on endangered species, and that the Bureau of Reclamation was advising the Aswan project. *Post,* at 2157-2158. The memoranda, however, contain no indication whatever that the projects will cease or be less harmful to listed species in the absence of AID funding. In fact, the Sri Lanka memorandum suggests just the opposite: It states that AID's role will be to *mitigate* the " 'negative impacts to the wildlife,' " *post,* at 2157, which means that the termination of AID funding would *exacerbate* respondents' claimed injury.

## IV

[18] The Court of Appeals found that respondents had standing for an additional reason: because they had suffered a "procedural injury." The so-called "citizen-suit" provision of the ESA provides, in pertinent part, that "any person may commence**572 a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter." 16 U.S.C. § 1540(g). The court held that, because § 7(a)(2) requires interagency consultation, the citizen-suit provision creates a "procedural righ[t]" to consultation in all "persons"-so that *anyone* can file suit in federal court to challenge the Secretary's (or presumably any

112 S.Ct. 2130                                                                                                    Page 14

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

other official's) failure to follow the assertedly correct consultative procedure, notwithstanding his or her inability to allege any discrete injury flowing from that failure. 911 F.2d, at 121-122. To understand the remarkable nature of this holding one must be clear about what it does *not* rest upon: This is not a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs (*e.g.,* the procedural requirement for a hearing prior to denial of their license application, or the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them).[FN7] Nor is it simply a case where concrete injury has been **2143 suffered by many persons, as in mass fraud or mass tort situations. Nor, finally, is it the *573 unusual case in which Congress has created a concrete private interest in the outcome of a suit against a private party for the government's benefit, by providing a cash bounty for the victorious plaintiff. Rather, the court held that the injury-in-fact requirement had been satisfied by congressional conferral upon *all* persons of an abstract, self-contained, noninstrumental "right" to have the Executive observe the procedures required by law. We reject this view.[FN8]

> [FN7.] There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years. (That is why we do not rely, in the present case, upon the Government's argument that, *even if* the other agencies were obliged to consult with the Secretary, they might not have followed his advice.) What respondents' "procedural rights" argument seeks, however, is quite different from this: standing for persons who have no concrete interests affected-persons who live (and propose to live) at the other end of the country from the dam.

> [FN8.] The dissent's discussion of this aspect of the case, *post,* at 2157-2160, distorts our opinion. We do *not* hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing. The dissent, however, asserts that there exist "classes of procedural duties ... so enmeshed with the prevention of a substantive, concrete harm that an individual plaintiff may be able to demonstrate a sufficient likelihood of injury just through the breach of that procedural duty." *Post,* at 2159. If we understand this correctly, it means that the Government's violation of a certain (undescribed) class of procedural duty satisfies the concrete-injury requirement by itself, without any showing that the procedural violation endangers a concrete interest of the plaintiff (apart from his interest in having the procedure observed). We cannot agree. The dissent is unable to cite a single case in which we actually found standing solely on the basis of a "procedural right" unconnected to the plaintiff's own concrete harm. Its suggestion that we did so in *Japan Whaling Assn. v. American Cetacean Soc.,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), and *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), *post,* at 2158-2159, is not supported by the facts. In the former case, we found that the environmental organizations had standing because the "whale watching and studying of their members w [ould] be adversely affected by continued whale harvesting," see 478 U.S., at 230-231, n. 4, 106 S.Ct., at 2866, n. 4; and in the latter we did not so much as mention standing, for the very good reason that the plaintiff was a citizens' council for the area in which the challenged construction was to occur, so that its members would obviously be concretely affected, see *Methow Valley Citizens Council v. Regional Forester,* 833 F.2d 810, 812-813 (CA9 1987).

[19] We have consistently held that a plaintiff raising only a generally available grievance about govern-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                      Page 15
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

ment-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that **\*574** no more directly and tangibly benefits him than it does the public at large-does not state an Article III case or controversy. For example, in *Fairchild v. Hughes*, 258 U.S. 126, 129-130, 42 S.Ct. 274, 275, 66 L.Ed. 499 (1922), we dismissed a suit challenging the propriety of the process by which the Nineteenth Amendment was ratified. Justice Brandeis wrote for the Court:

"[This is] not a case within the meaning of ... Article III.... Plaintiff has [asserted] only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted. Obviously this general right does not entitle a private citizen to institute in the federal courts a suit...." *Ibid.*

In *Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), we dismissed for lack of Article III standing a taxpayer suit challenging the propriety of certain federal expenditures. We said:

"The party who invokes the power [of judicial review] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.... Here the parties plaintiff have no such case.... [T]heir complaint ... is merely that officials of the executive department of the government are executing and will execute **\*\*2144** an Act of Congress asserted to be unconstitutional; and this we are asked to prevent. To do so would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess." *Id., at 488-489, 43 S.Ct., at 601.*

In *Ex parte Lévitt*, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937), we dismissed a suit contending that Justice Black's appointment to this Court violated the Ineligibility Clause, Art. I, § 6, cl. 2. **\*575** "It is an established principle," we said, "that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a

general interest common to all members of the public." 302 U.S., at 634, 58 S.Ct., at 1. See also *Doremus v. Board of Ed. of Hawthorne*, 342 U.S. 429, 433-434, 72 S.Ct. 394, 396-397, 96 L.Ed. 475 (1952) (dismissing taxpayer action on the basis of *Mellon*).

More recent cases are to the same effect. In *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), we dismissed for lack of standing a taxpayer suit challenging the Government's failure to disclose the expenditures of the Central Intelligence Agency, in alleged violation of the constitutional requirement, Art. I, § 9, cl. 7, that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." We held that such a suit rested upon an impermissible "generalized grievance," and was inconsistent with "the framework of Article III" because "the impact on [plaintiff] is plainly undifferentiated and 'common to all members of the public.' " *Richardson, supra,* at 171, 176-177, 94 S.Ct., at 2944, 2946. And in *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), we dismissed for the same reasons a citizen-taxpayer suit contending that it was a violation of the Incompatibility Clause, Art. I, § 6, cl. 2, for Members of Congress to hold commissions in the military Reserves. We said that the challenged action, "standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance.... We reaffirm *Levitt* in holding that standing to sue may not be predicated upon an interest of th[is] kind...." *Schlesinger, supra,* at 217, 220, 94 S.Ct., at 2930, 2932. Since *Schlesinger* we have on two occasions held that an injury amounting only to the alleged violation of a right to have the Government act in accordance with law was not judicially cognizable because **\*576** " 'assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning.' " *Allen*, 468 U.S., at 754, 104 S.Ct., at 3326; *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 483, 102 S.Ct. 752, 764, 70 L.Ed.2d 700 (1982). And only two Terms ago, we rejected the notion that Article III permits a citizen suit to prevent a condemned criminal's execution on the basis of " 'the public interest protections of the Eighth Amendment' "; once again, "[t]his allegation raise[d] only the 'generalized interest of all citizens in constitutional governance' ... and [was] an inadequate basis on

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                              Page 16
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

which to grant ... standing." *Whitmore, 495 U.S., at 160, 110 S.Ct., at 1725.*

To be sure, our generalized-grievance cases have typically involved Government violation of procedures assertedly ordained by the Constitution rather than the Congress. But there is absolutely no basis for making the Article III inquiry turn on the source of the asserted right. Whether the courts were to act on their own, or at the invitation of Congress, in ignoring the concrete injury requirement described in our cases, they would be discarding a principle fundamental **2145 to the separate and distinct constitutional role of the Third Branch-one of the essential elements that identifies those "Cases" and "Controversies" that are the business of the courts rather than of the political branches. "The province of the court," as Chief Justice Marshall said in *Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803),* "is, solely, to decide on the rights of individuals." Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive. The question presented here is whether the public interest in proper administration of the laws (specifically, in agencies' observance of a particular, statutorily prescribed procedure) can be converted into an individual right by a statute that denominates it as such, and *577 that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue. If the concrete injury requirement has the separation-of-powers significance we have always said, the answer must be obvious: To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an "individual right" vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed," Art. II, § 3. It would enable the courts, with the permission of Congress, "to assume a position of authority over the governmental acts of another and co-equal department," *Massachusetts v. Mellon, 262 U.S., at 489, 43 S.Ct., at 601,* and to become " 'virtually continuing monitors of the wisdom and soundness of Executive action.' " *Allen, supra, 468 U.S., at 760, 104 S.Ct., at 3329* (quoting *Laird v. Tatum, 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972)).* We have always rejected that vision of our role:

"When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. This permits the courts to participate in law enforcement entrusted to administrative bodies only to the extent necessary to protect justiciable individual rights against administrative action fairly beyond the granted powers.... This is very far from assuming that the courts are charged more than administrators or legislators with the protection of the rights of the people. Congress and the Executive supervise the acts of administrative agents.... But under Article III, Congress established courts to adjudicate cases and controversies as to claims of infringement of individual rights whether by unlawful action of private persons or by the exertion of unauthorized administrative power." *Stark v. Wickard, 321 U.S. 288, 309-310, 64 S.Ct. 559, 571, 88 L.Ed. 733 (1944)* (footnote omitted).

*578 "Individual rights," within the meaning of this passage, do not mean public rights that have been legislatively pronounced to belong to each individual who forms part of the public. See also *Sierra Club, 405 U.S., at 740-741, n. 16, 92 S.Ct., at 1369, n. 16.*

Nothing in this contradicts the principle that "[t]he ... injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' " *Warth, 422 U.S., at 500, 95 S.Ct., at 2206* (quoting *Linda R. S. v. Richard D., 410 U.S. 614, 617, n. 3, 93 S.Ct. 1146, 1148, n. 3, 35 L.Ed.2d 536 (1973)).* Both of the cases used by *Linda R. S.* as an illustration of that principle involved Congress' elevating to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law (namely, injury to an individual's personal interest in living in a racially integrated community, see *Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 208-212, 93 S.Ct. 364, 366-368, 34 L.Ed.2d 415 (1972),* and injury to a company's interest in marketing its product free from competition, see *Hardin v. Kentucky Utilities Co., 390 U.S. 1, 6, 88 S.Ct. 651, 654, 19 L.Ed.2d 787 (1968)).* As we said in *Sierra Club,* "[Statutory] broadening [of] the categories of injury that may be alleged in support **2146 of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." *405 U.S., at 738, 92 S.Ct., at 1368.* Whether or not the principle set forth in *Warth* can be extended beyond that distinction, it is

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                          Page 17
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

clear that in suits against the Government, at least, the concrete injury requirement must remain.

\* \* \*

We hold that respondents lack standing to bring this action and that the Court of Appeals erred in denying the summary judgment motion filed by the United States. The opinion of the Court of Appeals is hereby reversed, and the cause is remanded for proceedings consistent with this opinion.

*It is so ordered.*
 **\*579** Justice KENNEDY, with whom Justice SOUTER joins, concurring in part and concurring in the judgment.
Although I agree with the essential parts of the Court's analysis, I write separately to make several observations.

I agree with the Court's conclusion in Part III-A that, on the record before us, respondents have failed to demonstrate that they themselves are "among the injured." *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). This component of the standing inquiry is not satisfied unless

"[p]laintiffs ... demonstrate a 'personal stake in the outcome.' ... Abstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' " *Los Angeles v. Lyons,* 461 U.S. 95, 101-102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citations omitted).

While it may seem trivial to require that Mses. Kelly and Skilbred acquire airline tickets to the project sites or announce a date certain upon which they will return, see *ante,* at 2138, this is not a case where it is reasonable to assume that the affiants will be using the sites on a regular basis, see *Sierra Club v. Morton, supra,* 405 U.S., at 735, n. 8, 92 S.Ct., at 1366, n. 8, nor do the affiants claim to have visited the sites since the projects commenced. With respect to the Court's discussion of respondents' "ecosystem nexus," "animal nexus," and "vocational nexus" theories, *ante,* at 2139-2140, I agree that on this record respondents' showing is insufficient to establish standing on any of

these bases. I am not willing to foreclose the possibility, however, that in different circumstances a nexus theory similar to those proffered here might support a claim to standing. See *Japan Whaling Assn. v. American Cetacean Society,* 478 U.S. 221, 231, n. 4, 106 S.Ct. 2860, 2866, n. 4, 92 L.Ed.2d 166 (1986) ("[R]espondents ... undoubtedly have alleged a sufficient 'injury in fact' in that **\*580** the whale watching and studying of their members will be adversely affected by continued whale harvesting").

In light of the conclusion that respondents have not demonstrated a concrete injury here sufficient to support standing under our precedents, I would not reach the issue of redressability that is discussed by the plurality in Part III-B.

I also join Part IV of the Court's opinion with the following observations. As Government programs and policies become more complex and farreaching, we must be sensitive to the articulation of new rights of action that do not have clear analogs in our common-law tradition. Modern litigation has progressed far from the paradigm of Marbury suing Madison to get his commission, *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), or Ogden seeking an injunction to halt Gibbons' steamboat operations, *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). In my view, Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before,**\*\*2147** and I do not read the Court's opinion to suggest a contrary view. See *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *ante,* at 2145-2146. In exercising this power, however, Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit. The citizen-suit provision of the Endangered Species Act does not meet these minimal requirements, because while the statute purports to confer a right on "any person ... to enjoin ... the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter," it does not of its own force establish that there is an injury in "any person" by virtue of any "violation." 16 U.S.C. § 1540(g)(1)(A).

The Court's holding that there is an outer limit to the power of Congress to confer rights of action is a direct and necessary consequence of the case and contro-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

versy limitations found in Article III. I agree that it would exceed those limitations if, at the behest of Congress and in the absence **\*581** of any showing of concrete injury, we were to entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws. While it does not matter how many persons have been injured by the challenged action, the party bringing suit must show that the action injures him in a concrete and personal way. This requirement is not just an empty formality. It preserves the vitality of the adversarial process by assuring both that the parties before the court have an actual, as opposed to professed, stake in the outcome, and that "the legal questions presented ... will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).* In addition, the requirement of concrete injury confines the Judicial Branch to its proper, limited role in the constitutional framework of Government.

An independent judiciary is held to account through its open proceedings and its reasoned judgments. In this process it is essential for the public to know what persons or groups are invoking the judicial power, the reasons that they have brought suit, and whether their claims are vindicated or denied. The concrete injury requirement helps assure that there can be an answer to these questions; and, as the Court's opinion is careful to show, that is part of the constitutional design.

With these observations, I concur in Parts I, II, III-A, and IV of the Court's opinion and in the judgment of the Court.

Justice STEVENS, concurring in the judgment.

Because I am not persuaded that Congress intended the consultation requirement in § 7(a)(2) of the Endangered Species Act of 1973 (ESA), 16 U.S.C. § 1536(a)(2), to apply to activities in foreign countries, I concur in the judgment of reversal. I do not, however, agree with the Court's conclusion**\*582** that respondents lack standing because the threatened injury to their interest in protecting the environment and studying endangered species is not "imminent." Nor do I agree with the plurality's additional conclusion that respondents' injury is not "redressable" in this litigation.

I

In my opinion a person who has visited the critical habitat of an endangered species has a professional interest in preserving the species and its habitat, and intends to revisit them in the future has standing to challenge agency action that threatens their destruction. Congress has found that a wide variety of endangered species of fish, wildlife, and plants are of "aesthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." **\*\*2148**16 U.S.C. § 1531(a)(3). Given that finding, we have no license to demean the importance of the interest that particular individuals may have in observing any species or its habitat, whether those individuals are motivated by esthetic enjoyment, an interest in professional research, or an economic interest in preservation of the species. Indeed, this Court has often held that injuries to such interests are sufficient to confer standing,[FN1] and the Court reiterates that holding today. See *ante,* at 2137.

> FN1. See, *e.g., Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 686-687, 93 S.Ct. 2405, 2415-2416, 37 L.Ed.2d 254 (1973); Japan Whaling Assn. v. American Cetacean Society, 478 U.S. 221, 230-231, n. 4, 106 S.Ct. 2860, 2866, n. 4, 92 L.Ed.2d 166 (1986).*

The Court nevertheless concludes that respondents have not suffered "injury in fact" because they have not shown that the harm to the endangered species will produce "imminent" injury to them. See *ante,* at 2138. I disagree. An injury to an individual's interest in studying or enjoying a species and its natural habitat occurs when someone (whether it be the Government or a private party) takes action that harms that species and habitat. In my judgment, **\*583** therefore, the "imminence" of such an injury should be measured by the timing and likelihood of the threatened environmental harm, rather than—as the Court seems to suggest, *ante,* at 2138-2139, and n. 2-by the time that might elapse between the present and the time when the individuals would visit the area if no such injury should occur.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 S.Ct. 2130                                                                                                Page 19
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

To understand why this approach is correct and consistent with our precedent, it is necessary to consider the purpose of the standing doctrine. Concerned about "the proper-and properly limited-role of the courts in a democratic society," we have long held that "Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party." *Warth v. Seldin,* 422 U.S. 490, 498-499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The plaintiff must have a "personal stake in the outcome" sufficient to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). For that reason, "[a]bstract injury is not enough. It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct.... The injury or threat of injury must be both 'real and immediate,' not 'conjectural,' or 'hypothetical.' " *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) (quoting *Golden v. Zwickler,* 394 U.S. 103, 109-110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969)).

Consequently, we have denied standing to plaintiffs whose likelihood of suffering any concrete adverse effect from the challenged action was speculative. See, *e.g., Whitmore v. Arkansas,* 495 U.S. 149, 158-159, 110 S.Ct. 1717, 1724-1725, 109 L.Ed.2d 135 (1990); *Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *O'Shea,* 414 U.S., at 497, 94 S.Ct., at 676. In this case, however, the likelihood that respondents will be injured by the destruction of the endangered species is not speculative. If respondents are genuinely interested in the preservation of the endangered species and intend to study or observe these animals in the future, their injury will occur as soon as the animals are destroyed. Thus the only potential**\*584** source of "speculation" in this case is whether respondents' intent to study or observe the animals is genuine.[FN2] In my view, Joyce Kelly and Amy Skilbred have **\*\*2149** introduced sufficient evidence to negate petitioner's contention that their claims of injury are "speculative" or "conjectural." As Justice BLACKMUN explains, *post,* at 2152-2153, a reasonable finder of fact could conclude, from their past visits, their professional backgrounds, and their affidavits and deposition testimony, that Ms. Kelly and Ms. Skilbred will return to the project sites and, consequently, will be injured by the destruction of the endangered species and critical habitat.

[FN2.] As we recognized in *Sierra Club v. Morton,* 405 U.S., at 735, 92 S.Ct. at 1366, the impact of changes in the esthetics or ecology of a particular area does "not fall indiscriminately upon every citizen. The alleged injury will be felt directly only by those who use [the area,] and for whom the aesthetic and recreational values of the area will be lessened...." Thus, respondents would not be injured by the challenged projects if they had not visited the sites or studied the threatened species and habitat. But, as discussed above, respondents did visit the sites; moreover, they have expressed an intent to do so again. This intent to revisit the area is significant evidence tending to confirm the genuine character of respondents' interest, but I am not at all sure that an intent to revisit would be indispensable in every case. The interest that confers standing in a case of this kind is comparable, though by no means equivalent, to the interest in a relationship among family members that can be immediately harmed by the death of an absent member, regardless of when, if ever, a family reunion is planned to occur. Thus, if the facts of this case had shown repeated and regular visits by the respondents, cf. *ante,* at 2146 (opinion of KENNEDY, J.), proof of an intent to revisit might well be superfluous.

The plurality also concludes that respondents' injuries are not redressable in this litigation for two reasons. First, respondents have sought only a declaratory judgment that the Secretary of the Interior's regulation interpreting § 7(a)(2) to require consultation only for agency actions in the United States or on the high seas is invalid and an injunction requiring him to promulgate a new regulation requiring consultation for agency actions abroad as well. But, the plurality opines, even if respondents succeed and a new regulation is **\*585** promulgated, there is no guarantee that federal agencies that are not parties to this case will actually consult with the Secretary. See *ante,* at 2140-2142. Furthermore, the plurality continues, respondents have not demonstrated that federal agencies can influence the behavior of the foreign governments where the affected projects are located. Thus, even if the agencies consult with the Secretary and terminate funding for foreign projects, the foreign

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

governments might nonetheless pursue the projects and jeopardize the endangered species. See *ante,* at 2142. Neither of these reasons is persuasive.

We must presume that if this Court holds that § 7(a)(2) requires consultation, all affected agencies will abide by that interpretation and engage in the requisite consultations. Certainly the Executive Branch cannot be heard to argue that an authoritative construction of the governing statute by this Court may simply be ignored by any agency head. Moreover, if Congress has required consultation between agencies, we must presume that such consultation will have a serious purpose that is likely to produce tangible results. As Justice BLACKMUN explains, *post,* at 2156-2157, it is not mere speculation to think that foreign governments, when faced with the threatened withdrawal of United States assistance, will modify their projects to mitigate the harm to endangered species.

II

Although I believe that respondents have standing, I nevertheless concur in the judgment of reversal because I am persuaded that the Government is correct in its submission that § 7(a)(2) does not apply to activities in foreign countries. As with all questions of statutory construction, the question whether a statute applies extraterritorially is one of congressional intent. *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 284-285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949). We normally assume that "Congress is primarily concerned with domestic conditions," *id.,* at 285, 69 S.Ct., at 577, and therefore presume that " 'legislation of Congress, unless a **586 contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States,' " **2150*EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227,1230, 113 L.Ed.2d 274 (1991) (quoting *Foley Bros.,* 336 U.S., at 285, 69 S.Ct., at 577).

Section 7(a)(2) provides, in relevant part:

"Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior or Commerce, as appropriate[FN3]], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or

adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section...." 16 U.S.C. § 1536(a)(2).

> FN3. The ESA defines "Secretary" to mean "the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970." 16 U.S.C. § 1532(15). As a general matter, "marine species are under the jurisdiction of the Secretary of Commerce and all other species are under the jurisdiction of the Secretary of the Interior." 51 Fed.Reg. 19926 (1986) (preamble to final regulations governing interagency consultation promulgated by the Fish and Wildlife Service and the National Marine Fisheries Service on behalf of the Secretary of the Interior and the Secretary of Commerce).

Nothing in this text indicates that the section applies in foreign countries.[FN4] Indeed, the only geographic reference in *587 the section is in the "critical habitat" clause,[FN5] which mentions "affected States." The Secretary of the Interior and the Secretary of Commerce have consistently taken the position that they need not designate critical habitat in foreign countries. See 42 Fed.Reg. 4869 (1977) (initial regulations of the Fish and Wildlife Service and the National Marine Fisheries Service on behalf of the Secretary of the Interior and the Secretary of Commerce). Consequently, neither Secretary interprets § 7(a)(2) to require federal agencies to engage in consultations to ensure that their actions in foreign countries will not adversely affect the critical habitat of endangered or threatened species.

> FN4. Respondents point out that the duties in § 7(a)(2) are phrased in broad, inclusive language: "Each Federal agency" shall consult with the Secretary and ensure that "any action" does not jeopardize "any endangered or threatened species" or destroy or adversely modify the "habitat of such species." See Brief for Respondents 36; 16 U.S.C. § 1536(a)(2). The Court of Appeals correctly

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

recognized, however, that such inclusive language, by itself, is not sufficient to overcome the presumption against the extraterritorial application of statutes. 911 F.2d 117, 122 (CA8 1990); see also *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 282, 287-288, 69 S.Ct. 575, 578-579, 93 L.Ed. 680 (1949) (statute requiring an 8-hour day provision in " '[e]very contract made to which the United States ... is a party' " is inapplicable to contracts for work performed in foreign countries).

FN5. Section 7(a)(2) has two clauses which require federal agencies to consult with the Secretary to ensure that their actions (1) do not jeopardize threatened or endangered species (the "endangered species clause"), and (2) are not likely to destroy or adversely affect the habitat of such species (the "critical habitat clause").

That interpretation is sound, and, in fact, the Court of Appeals did not question it.[FN6] There is, moreover, no indication that Congress intended to give a different geographic scope to the two clauses in § 7(a)(2). To the contrary, Congress recognized that one of the "major causes" of extinction of **2151 endangered species is the "destruction of natural habitat." S.Rep. No. 93-307, p. 2 (1973); see also H.Rep. No. 93-412, p. 2 (1973), U.S.Code Cong. & Admin.News 1973, pp. 2989, 2990; *TVA v. Hill,* 437 U.S. 153, 179, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978). It would thus be illogical to conclude that Congress required federal agencies to avoid jeopardy to endangered species abroad, but not destruction of critical habitat abroad.

FN6. Instead, the Court of Appeals concluded that the endangered species clause and the critical habitat clause are "severable," at least with respect to their "geographical scope," so that the former clause applies extraterritorially even if the latter does not. 911 F.2d, at 125. Under this interpretation, federal agencies must consult with the Secretary to ensure that their actions in foreign countries are not likely to threaten any endangered species, but they need not consult to ensure that their actions are not likely to destroy the critical habitats of these species. I

cannot subscribe to the Court of Appeals' strained interpretation, for there is no indication that Congress intended to give such vastly different scope to the two clauses in § 7(a)(2).

The lack of an express indication that the consultation requirement applies extraterritorially is particularly significant because other sections of the ESA expressly deal with the problem of protecting endangered species abroad. Section 8, for example, authorizes the President to provide assistance to "any foreign country (with its consent) ... in the development and management of programs in that country which [are] ... necessary or useful for the conservation of any endangered species or threatened species listed by the Secretary pursuant to section 1533 of this title." 16 U.S.C. § 1537(a). It also directs the Secretary of the Interior, "through the Secretary of State," to "encourage" foreign countries to conserve fish and wildlife and to enter into bilateral or multilateral agreements. § 1537(b). Section 9 makes it unlawful to import endangered species into (or export them from) the United States or to otherwise traffic in endangered species "in interstate or foreign commerce." §§ 1538(a)(1)(A), (E), (F). Congress thus obviously thought about endangered species abroad and devised specific sections of the ESA to protect them. In this context, the absence of any explicit statement that the consultation requirement is applicable to agency actions in foreign countries suggests that Congress did not intend that § 7(a)(2) apply extraterritorially.

Finally, the general purpose of the ESA does not evince a congressional intent that the consultation requirement be applicable to federal agency actions abroad. The congressional findings explaining the need for the ESA emphasize that "various species of fish, wildlife, and plants *in the United States* have been rendered extinct as a consequence *589 of economic growth and development untempered by adequate concern and conservation," and that these species "are of aesthetic, ecological, educational, historical, recreational, and scientific value to the *Nation and its people.*" §§ 1531(1), (3) (emphasis added). The lack of similar findings about the harm caused by development in other countries suggests that Congress was primarily concerned with balancing development and conservation goals in this country.[FN7]

FN7. Of course, Congress also found that

112 S.Ct. 2130                                                                                              Page 22
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

"the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to [several international agreements]," and that "encouraging the States ... to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments...." 16 U.S.C. §§ 1531(4), (5). The Court of Appeals read these findings as indicative of a congressional intent to make § 7(a)(2)'s consultation requirement applicable to agency action abroad. See 911 F.2d, at 122-123. I am not persuaded, however, that such a broad congressional intent can be gleaned from these findings. Instead, I think the findings indicate a more narrow congressional intent that the United States abide by its international commitments.

In short, a reading of the entire statute persuades me that Congress did not intend the consultation requirement in § 7(a)(2) to apply to activities in foreign countries. Accordingly, notwithstanding my disagreement with the Court's disposition of the standing question, I concur in its judgment.

Justice BLACKMUN, with whom Justice O'CONNOR joins, dissenting.
I part company with the Court in this case in two respects. First, I believe that respondents have raised genuine issues of fact-sufficient to survive summary judgment-both as to injury and as to redressability. Second, I question the Court's breadth of language in rejecting standing for "procedural" injuries. I fear the Court seeks to impose fresh limitations on the constitutional **2152 authority of Congress to allow *590 citizen suits in the federal courts for injuries deemed "procedural" in nature. I dissent.

I

Article III of the Constitution confines the federal courts to adjudication of actual "Cases" and "Controversies." To ensure the presence of a "case" or "controversy," this Court has held that Article III requires, as an irreducible minimum, that a plaintiff allege (1) an injury that is (2) "fairly traceable to the defendant's allegedly unlawful conduct" and that is (3)

"likely to be redressed by the requested relief." *Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).*

A

To survive petitioner's motion for summary judgment on standing, respondents need not prove that they are actually or imminently harmed. They need show only a "genuine issue" of material fact as to standing. Fed.Rule Civ.Proc. 56(c). This is not a heavy burden. A "genuine issue" exists so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party [respondents]." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).* This Court's "function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id., at 249, 106 S.Ct., at 2511.*

The Court never mentions the "genuine issue" standard. Rather, the Court refers to the type of evidence it feels respondents failed to produce, namely, "affidavits or other evidence showing, through specific facts" the existence of injury. *Ante,* at 2137. The Court thereby confuses respondents' evidentiary burden (*i.e.,* affidavits asserting "specific facts") in withstanding a summary judgment motion under Rule 56(e) with the standard of proof (*i.e.,* the existence of a "genuine issue" of "material fact") under Rule 56(c).

**\*591** 1

Were the Court to apply the proper standard for summary judgment, I believe it would conclude that the sworn affidavits and deposition testimony of Joyce Kelly and Amy Skilbred advance sufficient facts to create a genuine issue for trial concerning whether one or both would be imminently harmed by the Aswan and Mahaweli projects. In the first instance, as the Court itself concedes, the affidavits contained facts making it at least "questionable" (and therefore within the province of the factfinder) that certain agency-funded projects threaten listed species.[FN1] *Ante,* at 2138. The only remaining issue, then, is whether Kelly and Skilbred have shown that they personally would suffer imminent harm.

FN1. The record is replete with genuine issues of fact about the harm to endangered

112 S.Ct. 2130                                                                      Page 23

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

species from the Aswan and Mahaweli projects. For example, according to an internal memorandum of the Fish and Wildlife Service, no fewer than eight listed species are found in the Mahaweli project area (Indian elephant, leopard, purple-faced langur, toque macaque, red face malkoha, Bengal monitor, mugger crocodile, and python). App. 78. The memorandum recounts that the Sri Lankan Government has specifically requested assistance from the Agency for International Development (AID) in "mitigating the negative impacts to the wildlife involved." *Ibid.* In addition, a letter from the Director of the Fish and Wildlife Service to AID warns: "The magnitude of the Accelerated Mahaweli Development Program could have massive environmental impacts on such an insular ecosystem as the Mahaweli River system." *Id.,* at 215. It adds: "The Sri Lankan government lacks the necessary finances to undertake any long-term management programs to avoid the negative impacts to the wildlife." *Id.,* at 216. Finally, in an affidavit submitted by petitioner for purposes of this litigation, an AID official states that an AID environmental assessment "showed that the [Mahaweli] project could affect several endangered species." *Id.,* at 159.

I think a reasonable finder of fact could conclude from the information in the affidavits and deposition testimony that either Kelly or Skilbred will soon return to the project sites, thereby satisfying the "actual or imminent" injury standard. The Court dismisses **\*\*2153** Kelly's and Skilbred's general statements**\*592** that they intended to revisit the project sites as "simply not enough." *Ibid.* But those statements did not stand alone. A reasonable finder of fact could conclude, based not only upon their statements of intent to return, but upon their past visits to the project sites, as well as their professional backgrounds, that it was likely that Kelly and Skilbred would make a return trip to the project areas. Contrary to the Court's contention that Kelly's and Skilbred's past visits "prov[e] nothing," *ibid.,* the fact of their past visits could demonstrate to a reasonable factfinder that Kelly and Skilbred have the requisite resources and personal interest in the preservation of the species endangered by the Aswan and Mahaweli projects to make good on their intention to return again. Cf. *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d

675 (1983) ("Past wrongs were evidence bearing on whether there is a real and immediate threat of repeated injury") (internal quotation marks omitted). Similarly, Kelly's and Skilbred's professional backgrounds in wildlife preservation, see App. 100, 144, 309-310, also make it likely-at least far more likely than for the average citizen-that they would choose to visit these areas of the world where species are vanishing.

By requiring a "description of concrete plans" or "specification of *when* the some day [for a return visit] will be," *ante,* at 8, the Court, in my view, demands what is likely an empty formality. No substantial barriers prevent Kelly or Skilbred from simply purchasing plane tickets to return to the Aswan and Mahaweli projects. This case differs from other cases in which the imminence of harm turned largely on the affirmative actions of third parties beyond a plaintiff's control. See *Whitmore v. Arkansas,* 495 U.S. 149, 155-156, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (harm to plaintiff death-row inmate from fellow inmate's execution depended on the court's one day reversing plaintiff's conviction or sentence and considering comparable sentences at resentencing); *Los Angeles v. Lyons,* 461 U.S., at 105, 103 S.Ct., at 1667 (harm dependent on police's arresting plaintiff again **\*593** and subjecting him to chokehold); *Rizzo v. Goode,* 423 U.S. 362, 372, 96 S.Ct. 598, 605, 46 L.Ed.2d 561 (1976) (harm rested upon "what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception of departmental disciplinary procedures"); *O'Shea v. Littleton,* 414 U.S. 488, 495-498, 94 S.Ct. 669, 675-677, 38 L.Ed.2d 674 (1974) (harm from discriminatory conduct of county magistrate and judge dependent on plaintiffs' being arrested, tried, convicted, and sentenced); *Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969) (harm to plaintiff dependent on a former Congressman's (then serving a 14-year term as a judge) running again for Congress). To be sure, a plaintiff's unilateral control over his or her exposure to harm does not *necessarily* render the harm nonspeculative. Nevertheless, it suggests that a finder of fact would be far more likely to conclude the harm is actual or imminent, especially if given an opportunity to hear testimony and determine credibility.

I fear the Court's demand for detailed descriptions of future conduct will do little to weed out those who are

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

genuinely harmed from those who are not. More likely, it will resurrect a code-pleading formalism in federal court summary judgment practice, as federal courts, newly doubting their jurisdiction, will demand more and more particularized showings of future harm. Just to survive summary judgment, for example, a property owner claiming a decline in the value of his property from governmental action might have to specify the exact date he intends to sell his property and show that there is a market for the property, lest it be surmised he might not sell again. A nurse turned down for a job on grounds of her race had better be prepared to show on what date she was prepared to start work, that she had arranged daycare for her child, and that she **2154 would not have accepted work at another hospital instead. And a Federal Tort Claims Act plaintiff alleging loss of consortium should make sure to furnish this Court with a "description of concrete plans" for her nightly schedule of attempted activities.

## *594 2

The Court also concludes that injury is lacking, because respondents' allegations of "ecosystem nexus" failed to demonstrate sufficient proximity to the site of the environmental harm. *Ante,* at 2139. To support that conclusion, the Court mischaracterizes our decision in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), as establishing a general rule that "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity." *Ante,* at 2139. In *National Wildlife Federation,* the Court required specific geographical proximity because of the particular type of harm alleged in that case: harm to the plaintiff's visual enjoyment of nature from mining activities. 497 U.S., at 888, 110 S.Ct., at 3188. One cannot suffer from the sight of a ruined landscape without being close enough to see the sites actually being mined. Many environmental injuries, however, cause harm distant from the area immediately affected by the challenged action. Environmental destruction may affect animals traveling over vast geographical ranges, see, *e.g., Japan Whaling Assn. v. American Cetacean Society,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (harm to American whale watchers from Japanese whaling activities), or rivers running long geographical courses, see, *e.g., Arkansas v. Oklahoma,* 503 U.S. 91, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) (harm to Oklahoma residents from wastewater treat-

ment plant 39 miles from border). It cannot seriously be contended that a litigant's failure to use the precise or exact site where animals are slaughtered or where toxic waste is dumped into a river means he or she cannot show injury.

The Court also rejects respondents' claim of vocational or professional injury. The Court says that it is "beyond all reason" that a zoo "keeper" of Asian elephants would have standing to contest his Government's participation in the eradication of all the Asian elephants in another part of the world. *Ante,* at 2139. I am unable to see how the distant location of the destruction *necessarily* (for purposes of ruling *595 at summary judgment) mitigates the harm to the elephant keeper. If there is no more access to a future supply of the animal that sustains a keeper's livelihood, surely there is harm.

I have difficulty imagining this Court applying its rigid principles of geographic formalism anywhere outside the context of environmental claims. As I understand it, environmental plaintiffs are under no special constitutional standing disabilities. Like other plaintiffs, they need show only that the action they challenge has injured them, without necessarily showing they happened to be physically near the location of the alleged wrong. The Court's decision today should not be interpreted "to foreclose the possibility ... that in different circumstances a nexus theory similar to those proffered here might support a claim to standing." *Ante,* at 2146 (KENNEDY, J., concurring in part and concurring in judgment).

### B

A plurality of the Court suggests that respondents have not demonstrated redressability: a likelihood that a court ruling in their favor would remedy their injury. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 74-75, and n. 20, 98 S.Ct. 2620, 2630-2631, and n. 20, 57 L.Ed.2d 595 (1978) (plaintiff must show "substantial likelihood" that relief requested will redress the injury). The plurality identifies two obstacles. The first is that the "action agencies" (*e.g.,* AID) cannot be required to undertake consultation with petitioner Secretary, because they are not directly bound as parties to the suit and are otherwise not indirectly**2155 bound by being subject to petitioner Secretary's regulation. Petitioner, however, officially and publicly has taken the position

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
 **(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

that his regulations regarding consultation under § 7 of the Act are binding on action agencies. 50 CFR § 402.14(a) (1991).[FN2] And he has previously **\*596** taken the same position in this very litigation, having stated in his answer to the complaint that petitioner "admits the Fish and Wildlife Service (FWS) was designated the lead agency for the formulation of regulations concerning section 7 of the [Endangered Species Act]." App. 246. I cannot agree with the plurality that the Secretary (or the Solicitor General) is now free, for the convenience of this appeal, to disavow his prior public and litigation positions. More generally, I cannot agree that the Government is free to play "Three-Card Monte" with its description of agencies' authority to defeat standing against the agency given the lead in administering a statutory scheme.

> FN2. This section provides in part:
>
> "(a) *Requirement for formal consultation.* Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required...."
>
> The Secretary's intent to make the regulations binding upon other agencies is even clearer from the discussion accompanying promulgation of the consultation rules. See 51 Fed.Reg. 19928 (1986) ("Several commenters stated that Congress did not intend that the Service interpret or implement section 7, and believed that the Service should recast the regulations as 'nonbinding guidelines' that would govern only the Service's role in consultation.... The Service is satisfied that it has ample authority and legislative mandate to issue this rule, and believes that uniform consultation standards and procedures are necessary to meet its obligations under section 7").

Emphasizing that none of the action agencies are parties to this suit (and having rejected the possibility of their being indirectly bound by petitioner's regulation), the plurality concludes that "there is no reason they should be obliged to honor an incidental legal

determination the suit produced." *Ante,* at 2141. I am not as willing as the plurality is to assume that agencies at least will not try to follow the law. Moreover, I wonder if the plurality has not overlooked the extensive involvement from the inception of this litigation by the Department of State and AID.[FN3] Under **\*597** principles of collateral estoppel, these agencies are precluded from subsequently relitigating the issues decided in this suit.

> FN3. For example, petitioner's motion before the District Court to dismiss the complaint identified four attorneys from the Department of State and AID (an agency of the Department of State) as "counsel" to the attorneys from the Justice Department in this action. One AID lawyer actually entered a formal appearance before the District Court on behalf of AID. On at least one occasion petitioner requested an extension of time to file a brief, representing that " '[a]n extension is necessary for the Department of Justice to consult with ... the Department of State [on] the brief.' " See Brief for Respondents 31, n. 8. In addition, AID officials have offered testimony in this action.

"[O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own, and who does this openly to the knowledge of the opposing party, is as much bound by the judgment and as fully entitled to avail himself of it as an estoppel against an adverse party, as he would be if he had been a party to the record." *Souffront v. Compagnie des Sucreries de Puerto Rico,* 217 U.S. 475, 487, 30 S.Ct. 608, 612, 54 L.Ed. 846 (1910).
This principle applies even to the Federal Government. In *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), this Court held that the Government was estopped from relitigating in federal court the constitutionality of Montana's gross receipts tax, because that issue previously had been litigated in state court by an individual contractor whose litigation had been financed and controlled by the Federal Government. "Thus, although not a party, the United States plainly had a sufficient 'laboring**\*2156** oar' in the conduct of the state-court litigation to actuate principles of estoppel." *Id.,* at 155, 99 S.Ct., at 974. See also *United*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
 **(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

States v. Mendoza, 464 U.S. 154, 164, n. 9, 104 S.Ct. 568, 574, n. 9, 78 L.Ed.2d 379 (1984) (Federal Government estopped where it "constituted a 'party' in all but a technical sense"). In my view, the action agencies have had sufficient "laboring oars" in this litigation since its inception to be bound from subsequent **\*598** relitigation of the extraterritorial scope of the § 7 consultation requirement.[FN4] As a result, I believe respondents' injury would likely be redressed by a favorable decision.

> FN4. The plurality now suggests that collateral-estoppel principles can have no application here, because the participation of other agencies in this litigation arose *after* its inception. Borrowing a principle from this Court's statutory jurisdiction cases and transferring it to the constitutional standing context, the Court observes: " 'The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed* '". *Ante,* at 2141, n. 4 (quoting Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830, 109 S.Ct. 2218, 2222, 104 L.Ed.2d 893 (1989) ). See also Mollan v. Torrance, 9 Wheat. 537, 539, 6 L.Ed. 154 (1824) (Marshall, C.J.). The plurality proclaims that "[i]t cannot be" that later participation of other agencies in this suit retroactively created a jurisdictional issue that did not exist at the outset. *Ante,* at 2141, n. 4.

> The plurality, however, overlooks at least three difficulties with this explanation. In the first place, assuming that the plurality were correct that events as of the initiation of the lawsuit are the only proper jurisdictional reference point, were the Court to follow this rule in this case there would be no question as to the compliance of other agencies, because, as stated at an earlier point in the opinion: "When the Secretary promulgated the regulation at issue here, he thought it was binding on the agencies." *Ante,* at 2141. This suit was commenced in October 1986, just three months after the regulation took effect. App. 21; 51 Fed.Reg. 19926 (1986). As the plurality further admits, questions about compliance of other agencies with the Secretary's reg-

ulation arose only by later participation of the Solicitor General and other agencies in the suit. *Ante,* at 2141. Thus, it was, to borrow the plurality's own words, "assuredly not true when this suit was filed," naming the Secretary alone," *ante,* at 2141, n. 4, that there was any question before the District Court about other agencies being bound.

Second, were the plurality correct that, for purposes of determining redressability, a court may look only to facts as they exist when the complaint is filed, then the Court by implication would render a nullity part of Rule 19 of the Federal Rules of Civil Procedure. Rule 19 provides in part for the joinder of persons if "in the person's absence complete relief cannot be accorded among those already parties." This presupposes nonredressability at the outset of the litigation. Under the plurality's rationale, a district court would have no authority to join indispensable parties, because it would, as an initial matter, have no jurisdiction for lack of the power to provide redress at the outset of the litigation.

Third, the rule articulated in Newman-Green is that the existence of federal jurisdiction "*ordinarily*" depends on the facts at the initiation of the lawsuit. This is no ironclad *per se* rule without exceptions. Had the Solicitor General, for example, taken a position during this appeal that the § 7 consultation requirement does in fact apply extraterritorially, the controversy would be moot, and this Court would be without jurisdiction.

In the plurality's view, federal subject-matter jurisdiction appears to be a one-way street running the Executive Branch's way. When the Executive Branch wants to dispel jurisdiction over an action against an agency, it is free to raise at any point in the litigation that other nonparty agencies might not be bound by any determinations of the one agency defendant. When a plaintiff, however, seeks to preserve jurisdiction in the face of a claim of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

nonredressability, the plaintiff is not free to point to the involvement of nonparty agencies in subsequent parts of the litigation. The plurality does not explain why the street runs only one way-why some actions of the Executive Branch subsequent to initiation of a lawsuit are cognizable for jurisdictional purposes but others simply are not.

More troubling still is the distance this one-way street carries the plurality from the underlying purpose of the standing doctrine. The purpose of the standing doctrine is to ensure that courts do not render advisory opinions rather than resolve genuine controversies between adverse parties. Under the plurality's analysis, the federal courts are to ignore their *present* ability to resolve a concrete controversy if at some distant point in the past it could be said that redress could not have been provided. The plurality perverts the standing inquiry.

**\*599** The second redressability obstacle relied on by the plurality is that "the [action] agencies generally supply only a fraction of the funding for a foreign project." *Ante,* at 2142. What this Court might "generally" take to be true does not eliminate the existence of a genuine issue of fact to withstand **\*\*2157** summary judgment. Even if the action agencies supply only a fraction of the funding for a particular foreign project, it remains at least a question for the finder of fact whether threatened withdrawal of that fraction would affect foreign government conduct sufficiently to avoid harm to listed species.

The plurality states that "AID, for example, has provided less than 10% of the funding for the Mahaweli project." *Ibid.* The plurality neglects to mention that this "fraction" amounts to $170 million, see App. 159, not so paltry a sum for a country of only 16 million people with a gross national product of less than $6 billion in 1986 when respondents filed **\*600** the complaint in this action. Federal Research Division, Library of Congress, Sri Lanka: A Country Study (Area Handbook Series) xvi-xvii (1990).

The plurality flatly states: "Respondents have produced nothing to indicate that the projects they have

named will ... do less harm to listed species, if that fraction is eliminated." *Ante,* at 2142. As an initial matter, the relevant inquiry is not, as the plurality suggests, what will happen if AID or other agencies stop funding projects, but what will happen if AID or other agencies comply with the consultation requirement for projects abroad. Respondents filed suit to require consultation, not a termination of funding. Respondents have raised at least a genuine issue of fact that the projects harm endangered species and that the actions of AID and other United States agencies can mitigate that harm.

The plurality overlooks an Interior Department memorandum listing eight endangered or threatened species in the Mahaweli project area and recounting that "[t]he Sri Lankan government has requested the assistance of AID in mitigating the negative impacts to the wildlife involved." App. 78. Further, a letter from the Director of the Fish and Wildlife Service to AID states:

"The Sri Lankan government lacks the necessary finances to undertake any long-term management programs to avoid the negative impacts to the wildlife. The donor nations and agencies that are financing the [Mahaweli project] will be the key as to how successfully the wildlife is preserved. If wildlife problems receive the same level of attention as the engineering project, then the negative impacts to the environment can be alleviated. This means that there has to be long-term funding in sufficient amounts to stem the negative impacts of this project." *Id.,* at 216.

**\*601** I do not share the plurality's astonishing confidence that, on the record here, a factfinder could only conclude that AID was powerless to ensure the protection of listed species at the Mahaweli project.

As for the Aswan project, the record again rebuts the plurality's assumption that donor agencies are without any authority to protect listed species. Kelly asserted in her affidavit-and it has not been disputed-that the Bureau of Reclamation was "overseeing" the rehabilitation of the Aswan project. *Id.,* at 101. See also *id.,* at 65 (Bureau of Reclamation publication stating: "In 1982, the Egyptian government ... requested that Reclamation serve as its engineering advisor for the nine-year [Aswan] rehabilitation project").

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

I find myself unable to agree with the plurality's analysis of redressability, based as it is on its invitation of executive lawlessness, ignorance of principles of collateral estoppel, unfounded assumptions about causation, and erroneous conclusions about what the record does not say. In my view, respondents have satisfactorily shown a genuine issue of fact as to whether their injury would likely be redressed by a decision in their favor.

II

The Court concludes that any "procedural injury" suffered by respondents is insufficient to confer standing. It rejects the view that the "injury-in-fact requirement [is] satisfied by congressional conferral upon *all* persons of an abstract, self-contained, non-instrumental**2158 'right' to have the Executive observe the procedures required by law." *Ante,* at 2143. Whatever the Court might mean with that very broad language, it cannot be saying that "procedural injuries" *as a class* are necessarily insufficient for purposes of Article III standing.

Most governmental conduct can be classified as "procedural." Many injuries caused by governmental conduct, therefore, are categorizable at some level of generality as *602 "procedural" injuries. Yet, these injuries are not categorically beyond the pale of redress by the federal courts. When the Government, for example, "procedurally" issues a pollution permit, those affected by the permittee's pollutants are not without standing to sue. Only later cases will tell just what the Court means by its intimation that "procedural" injuries are not constitutionally cognizable injuries. In the meantime, I have the greatest of sympathy for the courts across the country that will struggle to understand the Court's standardless exposition of this concept today.

The Court expresses concern that allowing judicial enforcement of "agencies' observance of a particular, statutorily prescribed procedure" would "transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art. II, § 3." *Ante,* at 2145. In fact, the principal effect of foreclosing judicial enforcement of such procedures is to transfer power into the hands of the Executive at the expense-not of the courts-but of Congress, from which that power originates and emanates.

Under the Court's anachronistically formal view of the separation of powers, Congress legislates pure, substantive mandates and has no business structuring the procedural manner in which the Executive implements these mandates. To be sure, in the ordinary course, Congress does legislate in black-and-white terms of affirmative commands or negative prohibitions on the conduct of officers of the Executive Branch. In complex regulatory areas, however, Congress often legislates, as it were, in procedural shades of gray. That is, it sets forth substantive policy goals and provides for their attainment by requiring Executive Branch officials to follow certain procedures, for example, in the form of reporting, consultation, and certification requirements.

The Court recently has considered two such procedurally oriented statutes. In *Japan Whaling Assn. v. American Cetacean Society,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), the Court examined a *603 statute requiring the Secretary of Commerce to certify to the President that foreign nations were not conducting fishing operations or trading which "dimins[h] the effectiveness" of an international whaling convention. *Id.,* at 226, 106 S.Ct., at 2864. The Court expressly found standing to sue. *Id.,* at 230-231, n. 4, 106 S.Ct., at 2865-2866, n. 4. In *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348, 109 S.Ct. 1835, 1844, 104 L.Ed.2d 351 (1989), this Court considered injury from violation of the "action-forcing" procedures of the National Environmental Policy Act (NEPA), in particular the requirements for issuance of environmental impact statements.

The consultation requirement of § 7 of the Endangered Species Act is a similar, action-forcing statute. Consultation is designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species. Once consultation is initiated, the Secretary is under a duty to provide to the action agency "a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). The Secretary is also obligated to suggest "reasonable and prudent alternatives" to prevent jeopardy to listed species. *Ibid.* The action agency must undertake as well its own "biological**2159 assessment for the purpose of identifying any endan-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
**(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

gered species or threatened species" likely to be affected by agency action. § 1536(c)(1). After the initiation of consultation, the action agency "shall not make any irreversible or irretrievable commitment of resources" which would foreclose the "formulation or implementation of any reasonable and prudent alternative measures" to avoid jeopardizing listed species. § 1536(d). These action-forcing procedures are "designed to protect some threatened concrete interest," *ante,* at 2143, n. 8, of persons who observe and work with endangered or threatened species. That is why I am mystified by the Court's unsupported conclusion that "[t]his is not a case where plaintiffs **\*604** are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs." *Ante,* at 2142.

Congress legislates in procedural shades of gray not to aggrandize its own power but to allow maximum Executive discretion in the attainment of Congress' legislative goals. Congress could simply impose a substantive prohibition on Executive conduct; it could say that no agency action shall result in the loss of more than 5% of any listed species. Instead, Congress sets forth substantive guidelines and allows the Executive, within certain procedural constraints, to decide how best to effectuate the ultimate goal. See *American Power & Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). The Court never has questioned Congress' authority to impose such procedural constraints on Executive power. Just as Congress does not violate separation of powers by structuring the procedural manner in which the Executive shall carry out the laws, surely the federal courts do not violate separation of powers when, at the very instruction and command of Congress, they enforce these procedures.

To prevent Congress from conferring standing for "procedural injuries" is another way of saying that Congress may not delegate to the courts authority deemed "executive" in nature. *Ante,* at 2145 (Congress may not "transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art. II, § 3"). Here Congress seeks not to delegate "executive" power but only to strengthen the procedures it has legislatively mandated. "We have long recognized that the nondelegation doctrine does not prevent Congress from seeking assistance, within proper limits, from its coordinate Branches." *Touby v.*

*United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 1756, 114 L.Ed.2d 219 (1991). "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive *or judicial actors.*" *Ibid.* (emphasis added).

**\*605** Ironically, this Court has previously justified a relaxed review of congressional delegation to the Executive on grounds that Congress, in turn, has subjected the exercise of that power to judicial review. *INS v. Chadha,* 462 U.S. 919, 953-954, n. 16, 103 S.Ct. 2764, 2785-2786, n. 16, 77 L.Ed.2d 317 (1983); *American Power & Light Co. v. SEC,* 329 U.S., at 105-106, 67 S.Ct. at 142-143. The Court's intimation today that procedural injuries are not constitutionally cognizable threatens this understanding upon which Congress has undoubtedly relied. In no sense is the Court's suggestion compelled by our "common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Ante,* at 2136. In my view, it reflects an unseemly solicitude for an expansion of power of the Executive Branch.

It is to be hoped that over time the Court will acknowledge that some classes of procedural duties are so enmeshed with the prevention of a substantive, concrete harm that an individual plaintiff may be able to demonstrate a sufficient likelihood of injury just through the breach of that procedural duty. For example, in the context of the NEPA requirement of environmental-impact statements,**\*\*2160** this Court has acknowledged "it is now well settled that NEPA itself does not mandate particular results [and] simply prescribes the necessary process," but "*these procedures are almost certain to affect the agency's substantive decision.*" *Robertson v. Methow Valley Citizens Council,* 490 U.S., at 350, 109 S.Ct., at 1846 (emphasis added). See also *Andrus v. Sierra Club,* 442 U.S. 347, 350-351, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979) ("If environmental concerns are not interwoven into the fabric of agency planning, the 'action-forcing' characteristics of [the environmental-impact statement requirement] would be lost"). This acknowledgment of an inextricable link between procedural and substantive harm does not reflect improper appellate factfinding. It reflects nothing more than the proper deference owed to the judgment of a coordinate branch-Congress-that certain procedures are directly tied to protection against a substantive harm.

504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913
 **(Cite as: 504 U.S. 555, 112 S.Ct. 2130)**

 **\*606** In short, determining "injury" for Article III standing purposes is a fact-specific inquiry. "Typically ... the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright,* 468 U.S., at 752, 104 S.Ct., at 3325. There may be factual circumstances in which a congressionally imposed procedural requirement is so insubstantially connected to the prevention of a substantive harm that it cannot be said to work any conceivable injury to an individual litigant. But, as a general matter, the courts owe substantial deference to Congress' substantive purpose in imposing a certain procedural requirement. In all events, "[o]ur separation-of-powers analysis does not turn on the labeling of an activity as 'substantive' as opposed to 'procedural.' " *Mistretta v. United States,* 488 U.S. 361, 393, 109 S.Ct. 647, 665, 102 L.Ed.2d 714 (1989). There is no room for a *per se* rule or presumption excluding injuries labeled "procedural" in nature.

III

In conclusion, I cannot join the Court on what amounts to a slash-and-burn expedition through the law of environmental standing. In my view, "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison,* 1 Cranch 137, 163, 2 L.Ed. 60 (1803).

I dissent.

U.S.Minn.,1992.
Lujan v. Defenders of Wildlife
504 U.S. 555, 112 S.Ct. 2130, 34 ERC 1785, 119 L.Ed.2d 351, 60 USLW 4495, 22 Envtl. L. Rep. 20,913

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 10

**Westlaw Delivery Summary Report for KREEP,GARY G**

| | |
|---|---|
| Date/Time of Request: | Monday, September 14, 2009 23:21 Central |
| Client Identifier: | BARNETT |
| Database: | AR-CS |
| Citation Text: | 779 S.W.2d 169 |
| Lines: | 290 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



Supreme Court of Arkansas.
STATE of Arkansas ex rel. Blanche ROBINSON,
Appellant,
v.
CRAIGHEAD COUNTY BOARD OF ELECTION
COMMISSIONERS et al., Appellees.
No. 89-68.

Nov. 13, 1989.

Citizen petitioned for writ of mandamus ordering Board of Election Commissioners to remove names of three candidates from general election ballot. The Circuit Court, Craighead County, Gerald Pearson, J., declared that mandamus would not lie to compel Board of Election Commissioners to remove names from ballot once certified and imposed sanctions against the plaintiff and her attorney. Plaintiff appealed. The Supreme Court, Hickman, J., held that: (1) Board of Election Commissioners did not have authority to declare candidate ineligible and remove his name from ballot where there was dispute concerning the facts or the law; and (2) mandamus coupled with declaratory judgment action was proper legal proceeding to challenge eligibility of candidate and seek removal of candidate's name from general election ballot.

Affirmed in part, reversed in part.

West Headnotes

**[1] Mandamus 250 ⬤⟶74(1)**

250 Mandamus
    250II Subjects and Purposes of Relief
        250II(B) Acts and Proceedings of Public Officers and Boards and Municipalities
            250k74 Elections and Proceedings Relating Thereto
                250k74(1) k. In General. Most Cited Cases
Controversy regarding eligibility of candidate could be determined by Supreme Court even though controversy as to particular candidate's eligibility was

moot, due to public interest involved and possibility that similar controversies could become moot before they could be fully litigated.

**[2] Elections 144 ⬤⟶153**

144 Elections
    144VI Nominations and Primary Elections
        144k148 Objections and Contests
            144k153 k. Determination by Public Officers. Most Cited Cases
The Board of Election Commissioners does not have the authority to declare a candidate ineligible and remove his name from the ballot when there is a dispute concerning the facts or the law.

**[3] Declaratory Judgment 118A ⬤⟶212**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
        118AII(K) Public Officers and Agencies
            118Ak212 k. Elections. Most Cited Cases

**Mandamus 250 ⬤⟶74(1)**

250 Mandamus
    250II Subjects and Purposes of Relief
        250II(B) Acts and Proceedings of Public Officers and Boards and Municipalities
            250k74 Elections and Proceedings Relating Thereto
                250k74(1) k. In General. Most Cited Cases
Mandamus, together with a request for declaratory relief, was the proper legal proceeding to challenge the eligibility of the candidate and seek removal of the candidate's name from a general election ballot. A.C.A. §§ 7-5-207(b), 16-115-103, 16-115-104(b); Rules Civ.Proc., Rules 11, 19.

**[4] Costs 102 ⬤⟶2**

102 Costs
    102I Nature, Grounds, and Extent of Right in General
        102k1 Nature and Grounds of Right
            102k2 k. In General. Most Cited Cases

Sanctions for filing frivolous pleadings were improperly imposed on litigant who petitioned for writ of mandamus ordering Board of Election Commissioners to remove names of three candidates from general election ballot; although litigant's action was not entirely correct, it was warranted by existing law and there was no evidence of bad faith or harassment. Rules Civ.Proc., Rule 11.

**170 *407 Paul E. Hopper, Jonesboro, for appellant.

Mike Walden, Jonesboro, for appellees.

HICKMAN, Justice.

The question we must answer in this case is, what is the proper legal proceeding to challenge the eligibility of a candidate and seek removal of the candidate's name from a general election ballot? The answer is mandamus, coupled with a declaratory judgment action.

[1] While the election has been held in this case, with the candidates' names remaining on the ballot, we choose to decide the central legal issue presented, even though the controversy regarding the candidates' eligibility is moot. This is not uncommon in matters pertaining to elections where there is a public interest involved and where the issue is such that it tends to become moot before it can be fully litigated. *See Cummings v. Washington County Election Comm'n., 291 Ark. 354, 724 S.W.2d 486 (1987); Carroll v. Schneider, 211 Ark. 538, 201 S.W.2d 221 (1947).*

The appellant, a citizen of Craighead County, petitioned the circuit court for a writ of mandamus ordering the Board of Election Commissioners to remove the names of three candidates from the November 8, 1988, general election ballot. The candidates had won in the Democratic primary the preceding March, and their names had been certified to the Board by the Craighead County Democratic Party Committee. The appellant alleged that two justices of the peace candidates, Hugh Atwood and Tom Cureton, did not reside in the districts for which they were seeking election, as required by Ark.Code Ann. § 14-14-1306(a) (1987). She claimed that candidate Bill Webster was not eligible to run for municipal judge because he was not "of good moral character" as required by Ark.Code Ann. § 16-17-209(a) (1987). The *408 candidates were not named as defendants in the action.[FN1]

FN1. The appellant also contended that the act creating the Craighead County Municipal Court is special and local legislation in violation of Ark. Const. amend. 14. For a number of reasons, we will not address that issue.

The judge held a hearing ten days before the election and heard the testimony of Bill Penix and Charles Frierson, two of the three members of the Board of Election Commissioners. The two were also the secretary and chairman, respectively, of the county Democratic Party Committee. In his capacity as party secretary, Penix had investigated Cureton's and Atwood's eligibility. He disputed the appellant's claim that the candidates were not residents of the districts for which they sought election. He testified that, although Cureton had been living in an apartment complex in another district, it was because he had been divorced from his wife and had deeded the house to her. Penix was assured by Cureton that he intended to return to the proper district.

Hugh Atwood originally lived within the district which he sought to serve, but shortly after the primary, he moved to another district. When questioned by Penix, he explained that he was living in the other district only temporarily and had bought a lot in his original district, planning to return there.

The claims regarding municipal judge candidate Bill Webster (an incumbent) concerned allegations of use of public property and services to conduct private business, solicitation of charitable donations on court stationery, violations of campaign laws and lack of proper decorum and demeanor on the bench.

None of the candidates testified at the hearing. Before the appellant could present her case, the judge declared that mandamus would not lie to compel the Board of Election Commissioners to remove names from the general election ballot once those names were certified to the board by the county political party committee. The judge also found that the petition had been filed without legal basis and for the purpose of harassment. He imposed **171 ARCP Rule 11 sanctions of $1,000 in attorney fees against the appellant and her attorney.

[2] The judge's refusal to issue the writ was based on

779 S.W.2d 169                                                                   Page 3
300 Ark. 405, 779 S.W.2d 169
 **(Cite as: 300 Ark. 405, 779 S.W.2d 169)**

his reluctance to violate a well known legal maxim: mandamus may **409** not be used for the purpose of controlling discretion, reviewing findings of fact or correcting erroneous action. *See Municipal Court of Huntsville v. Casoli,* 294 Ark. 37, 740 S.W.2d 614 (1987); *McKenzie v. Burris,* 255 Ark. 330, 500 S.W.2d 357 (1973). The judge concluded that the Board of Election Commissioners had the power to make factual determinations concerning a candidate's eligibility and that, once that determination was made, mandamus could not compel an opposite result. In fact, the board does not have the authority to declare a candidate ineligible and remove his name from the ballot when there is a dispute concerning the facts or the law.

We have been reluctant over the years to allow either a party committee or a board of election commissioners to remove a candidate's name from a ballot. *See Ridgeway v. Catlett,* 238 Ark. 323, 379 S.W.2d 277 (1964); *Carroll v. Schneider, supra, Irby v. Barrett,* 204 Ark. 682, 163 S.W.2d 512 (1942). In *Irby,* the state Democratic party refused to certify Irby's name as a candidate for state senator because of this court's ruling that Irby's felony conviction in federal court rendered him ineligible for political office. We stated that the chairman and secretary of the state committee acted outside their authority in refusing to certify Irby as a candidate. Our reasons were compelling:

If the chairman and secretary of the committee have the right to say that because of the decision of this court petitioner is ineligible to be a candidate for office, they may also say, in any case, that for some other reason a candidate is ineligible. For instance, it has been held by this court in many election contests that one must pay his poll tax; that he must do so after proper assessment in the time and manner required by law, and that otherwise he is not eligible even to vote, and unless he were a voter he could not hold office. So with other qualifications, such as residence. May this question be considered or decided by the chairman and secretary of the committee? It may be that such power can be conferred upon them by laws of this state or the rules of the party; but it is certain that this has not yet been done. If this can be done, and should be done, the door would be opened wide for corrupt and partisan action.

We also quoted from the Kentucky case of **410***Young*

*v. Beckham,* 115 Ky. 246, 72 S.W. 1092 (1903):

If the committee or governing authority has the authority to decide the question as to who is eligible to hold an office or be a candidate before a primary election, then they would have a discretion and judgment to exercise that could not be exercised by a mandamus. The most that could be done by such a writ would be to compel them to act upon the question.

Since *Irby, Carroll v. Schneider, supra,* and *Ridgeway v. Catlett, supra,* were decided, the general assembly has passed a number of new election laws. One of those laws gives county political party committees the duty to investigate and make an affirmative determination of a candidate's eligibility before placing the candidate's name on the party's primary election ballot. Ark.Code Ann. § 7-7-301(b) (1987).[FN2] No such power has been conferred on boards of election commissioners.

    FN2. We do not decide whether this statute
    would allow a *party committee* to declare a
    candidate ineligible. Our focus is the power
    of the Board of Election Commissioners.

The reasoning of those early cases still applies where boards of election commissioners are concerned. This case well illustrates that the determination of eligibility may often require more than mere ministerial action. Here, the determination of residence requires an exploration of the candidates' intentions and conduct. Ark.Code Ann. § 14-14-1306(c) (1987). The question of whether a candidate is of good moral character likewise cannot be answered **172** without delving into the facts. To allow the board to consider disputed facts, make findings, and act thereon, is to put it in the same posture as a judicial tribunal. The board, being a ministerial entity, simply does not have that power.

So, the legal maxim that mandamus cannot control discretion or review findings of fact is no impediment. The board may not exercise discretion or make findings of fact concerning the eligibility of a candidate. That determination may only be made by a court, and the court may then direct the board to either place the candidate's name on the ballot or remove it, as the case may be. The next question to be answered is, by what means may the court direct the board to so act?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*411 Mandamus is traditionally regarded as a remedy to be used on all occasions where the law has established no specific remedy, and justice and good government require it. *Ex parte Trapnall,* 6 Ark. 9 (1845). It is a writ which is used to enforce an established right. *Gregg v. Hartwick,* 292 Ark. 528, 731 S.W.2d 766 (1987). The right the appellant seeks to enforce is contained in Ark.Code Ann. § 7-5-207(b) (1987). That statute created a right in the people to the proper administration of election laws by prohibiting the inclusion of ineligible candidates on the ballot:

No person's name shall be printed upon the ballot as a candidate for any public office in this state at any election unless the person is qualified and eligible at the time of filing as a candidate for the office, to hold the public office for which he is a candidate....

[3] The only practical method of enforcing this right is the remedy of mandamus. An action in chancery cannot lie because the chancery court has no jurisdiction in matters pertaining to elections. *Curry v. Dawson,* 238 Ark. 310, 379 S.W.2d 287 (1964). A writ of prohibition may only be directed to a court or adjudicative committee that is proceeding wholly without jurisdiction; it cannot be directed, as a writ of mandamus can, to a ministerial officer. Ark.Code Ann. § 16-115-101 (1987); *see also Sexton v. Supreme Court Comm. on Professional Conduct,* 297 Ark. 154-A, 761 S.W.2d 602 (1988). *Quo warranto* is not appropriate because it is the state that initiates that proceeding, not an individual. Ark.Code Ann. § 25-16-704 (1987); *Cummings v. Washington County Election Comm'n., supra;* McKenzie v. Burris, supra.

We have implicitly sanctioned the use of mandamus when seeking removal of a candidate's name from the ballot or when requiring a board to place a candidate's name on the ballot. *Cummings v. Washington County Election Comm'n., supra; Garner v. Holland,* 264 Ark. 536, 572 S.W.2d 589 (1978). *See also Ridgeway v. Ray,* 297 Ark. 195, 760 S.W.2d 848 (1988) (Glaze, J., concurring). In *Cummings,* the board placed the name of a Mrs. Linda Oxford on the ballot as a candidate for the county school board, even though she was admittedly not a resident of the school district. Citizens of the district filed a petition for a writ of mandamus commanding the board to remove the candidate's *412 name from the ballot. Mrs. Oxford intervened in the action. We held that mandamus was appropriate.

While it has its favorable features, mandamus is not a perfect remedy for this type of action. But more than any other remedy, it provides for prompt consideration of the matter, which is often important in election cases. Petitions for writs of mandamus and prohibition have precedence over other actions and, upon written application, must be heard within seven days. *See* Ark.Code §§ 16-115-103 and 16-115-104(b) (1987). Yet mandamus does not, as this case demonstrates, provide for the joinder of all affected parties. The trial judge was concerned, as are we, that the candidates in this case were not parties to the action. When a mandamus action is brought in a case such as this, courts will have to see that all necessary parties are joined under ARCP Rule 19. Of course, joinder will not be necessary if the candidates themselves bring the action, or if the candidates intervene, as in *Cummings.*

Additionally, mandamus does not provide the means for the court to make a declaration concerning the candidates' eligibility. So a request must be made for declaratory **173 relief in addition to mandamus. Even though the mandamus remedy is combined with a request for declaratory relief, that action will still be considered essentially one of mandamus and must be heard within seven days.

We declare that an action for mandamus and declaratory relief is the proper method of enforcing the right set out in Ark.Code Ann. § 7-5-207(b) which prohibits the inclusion of an ineligible candidate on an election ballot.

[4] Finally, we address the trial court's imposition of ARCP Rule 11 sanctions. Sanctions should not have been imposed in this case. By signing a pleading, motion or other paper, a party or attorney warrants that to the best of his knowledge, information and belief, formed after a reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as harassment or unnecessary delay. The party asking for Rule 11 sanctions has the burden of proving a violation of the rule. *413*Miles v. Southern,* 297 Ark. 274, 760 S.W.2d 868 (1988).

The appellant essentially brought the proper action and did not abuse the mandamus remedy as contended by the appellee. Her action, while not entirely correct,

779 S.W.2d 169                                                                                                Page 5
300 Ark. 405, 779 S.W.2d 169
 **(Cite as: 300 Ark. 405, 779 S.W.2d 169)**

was warranted by existing law. We find no evidence
of bad faith or harassment. Therefore, the order im-
posing sanctions is reversed.

Because the controversy is moot in this case, we make
no ruling on the candidates' eligibility. We do find the
trial court erred in deciding that mandamus was an
improper remedy. However, since the candidates were
not made parties to the appellant's action, and since
she failed to ask for declaratory relief, her action was
not entirely proper. For that reason, we affirm in part
and reverse in part.

Affirmed in part, reversed in part.

Ark.,1989.
State ex rel. Robinson v. Craighead County Bd. of
Election Com'rs
300 Ark. 405, 779 S.W.2d 169

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 11

**Westlaw Delivery Summary Report for KREEP,GARY G**

Date/Time of Request:                Saturday, September 19, 2009 00:06 Central
Client Identifier:                   BARNETT
Database:                            SCTFIND
Citation Text:                       89 S.Ct. 5
Lines:                               1721
Documents:                           1
Images:                              0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.



Supreme Court of the United States
Glen A. WILLIAMS et al., Appellants,
v.
James A. RHODES et al.
SOCIALIST LABOR PARTY et al., Appellants,
v.
James A. RHODES et al.
**Nos. 543, 544.**

Argued Oct. 7, 1968.
Decided Oct. 15, 1968.

Suits challenging validity of Ohio election laws as applied to Ohio American Independent Party and Socialist Labor Party. The three-judge United States District Court for the Southern District of Ohio, 290 F.Supp. 983, rendered judgments, and appeals were taken. The Supreme Court, Mr. Justice Black, held that the Ohio election laws making it virtually impossible for new political party, even though it has hundreds of thousands of members, or an old party, which has very small number of members, to be placed on state ballots to choose electors pledged to particular candidates for Presidency and Vice-Presidency of United States resulted in denial of equal protection of the laws.

Judgment affirmed in No. 544 and modified in No. 543.

See also 89 S.Ct. 3.

Mr. Chief Justice Warren dissented, and Mr. Justice White and Mr. Justice Stewart dissented in No. 543.

West Headnotes

**[1] Constitutional Law 92 🗝2585**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)5 Political Questions
                92k2584 Elections

92k2585 k. In General. Most Cited Cases
    (Formerly 92k68(1))
The political question doctrine did not preclude judicial consideration of cases challenging validity of Ohio election laws making it virtually impossible for a new political party, even though it has hundreds of thousands of members, or an old party, which has very small number of members, to be placed on state ballots to choose electors pledged to particular candidates for Presidency and Vice-Presidency of United States; the cases raised justiciable controversy under Constitution and would not be relegated to political arena. R.C.Ohio § 3517.01; Const. art. 2, § 1; U.S.C.A.Const. Amend. 14.

**[2] United States 393 🗝25**

393 United States
    393I Government in General
        393k25 k. Presidential Electors. Most Cited Cases
The constitutional provision that each state shall appoint, in such manner as legislature thereof may direct, a number of electors to choose President and Vice-President grants extensive power to states to pass laws regulating selection of electors; however, the provision does not give states power to impose burdens on right to vote, where such burdens are expressly prohibited in other constitutional provisions. Const. art. 2, § 1; U.S.C.A.Const. Amends. 14, 15, 19, 24.

**[3] Constitutional Law 92 🗝2340**

92 Constitutional Law
    92XX Separation of Powers
        92XX(B) Legislative Powers and Functions
            92XX(B)1 In General
                92k2340 k. Nature and Scope in General. Most Cited Cases
    (Formerly 92k27)
Specific powers granted by Constitution to Congress or states to legislate in certain areas are subject to limitation that powers may not be exercised in a way that violates other specific provisions of the Constitution.

**[4] United States 393 ⬭25**

393 United States
   393I Government in General
      393k25 k. Presidential Electors. Most Cited Cases
The power of states to select electors to choose President and Vice-President cannot be exercised in such a way as to violate express constitutional commands that specifically bar states from passing certain kinds of laws. Const. art. 2, § 1.

**[5] Elections 144 ⬭12(1)**

144 Elections
   144I Right of Suffrage and Regulation Thereof in General
      144k12 Denial or Abridgment on Account of Race
         144k12(1) k. In General. Most Cited Cases
     (Formerly 144k12)

**Elections 144 ⬭13**

144 Elections
   144I Right of Suffrage and Regulation Thereof in General
      144k13 k. Discrimination on Account of Sex. Most Cited Cases
The Fifteenth and Nineteenth Amendments were intended to bar federal government and states from denying right to vote on grounds of race and sex in presidential elections. U.S.C.A.Const. Amends. 15, 19.

**[6] Constitutional Law 92 ⬭3635**

92 Constitutional Law
   92XXVI Equal Protection
     92XXVI(E) Particular Issues and Applications
      92XXVI(E)9 Elections, Voting, and Political Rights
         92k3635 k. In General. Most Cited Cases
     (Formerly 92k225.2(1), 92k213)
No state can pass a law regulating elections that violates Fourteenth Amendment's command that no state shall deny to any person the equal protection of the laws. U.S.C.A.Const. Amend. 14.

**[7] Constitutional Law 92 ⬭3653**

92 Constitutional Law
   92XXVI Equal Protection
     92XXVI(E) Particular Issues and Applications
      92XXVI(E)9 Elections, Voting, and Political Rights
        92k3651 Conduct of Elections
         92k3653 k. Ballot Access. Most Cited Cases
     (Formerly 92k225.2(6), 92k213)
The Ohio election laws making it virtually impossible for new political party, even though it has hundreds of thousands of members, or an old party, which has very small number of members, to be placed on state ballots to choose electors pledged to particular candidates for Presidency and Vice-Presidency of United States resulted in denial of equal protection of the laws. R.C.Ohio § 3517.01; U.S.C.A.Const. Amend. 14.

**[8] Constitutional Law 92 ⬭3045**

92 Constitutional Law
   92XXVI Equal Protection
     92XXVI(A) In General
      92XXVI(A)5 Scope of Doctrine in General
        92k3045 k. Enforcement, Application, or Administration in General. Most Cited Cases
     (Formerly 92k211(2), 92k211)
The equal protection clause does not make every minor difference in application of laws to different groups a violation of Constitution. U.S.C.A.Const. Amend. 14.

**[9] Constitutional Law 92 ⬭3039**

92 Constitutional Law
   92XXVI Equal Protection
     92XXVI(A) In General
      92XXVI(A)5 Scope of Doctrine in General
        92k3038 Discrimination and Classification
         92k3039 k. In General. Most Cited Cases
     (Formerly 92k211(1), 92k211)
"Invidious" distinctions cannot be enacted without a violation of equal protection clause. U.S.C.A.Const. Amend. 14.

**[10]** Constitutional Law 92 ⟸3043

92 Constitutional Law
  92XXVI Equal Protection
    92XXVI(A) In General
      92XXVI(A)5 Scope of Doctrine in General
        92k3038 Discrimination and Classification
          92k3043 k. Statutes and Other Written Regulations and Rules. Most Cited Cases
    (Formerly 92k3053, 92k213.1(2), 92k213)
In determining whether or not state law violates equal protection clause, Supreme Court must consider facts and circumstances behind the law, the interests which state claims to be protecting, and the interests of those who are disadvantaged by the classification. U.S.C.A.Const. Amend. 14.

**[11]** Constitutional Law 92 ⟸1440

92 Constitutional Law
  92XVI Freedom of Association
    92k1440 k. In General. Most Cited Cases
  (Formerly 92k91)

**Constitutional Law 92 ⟸4035**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(G) Particular Issues and Applications
      92XXVII(G)1 In General
        92k4035 k. Association. Most Cited Cases
  (Formerly 92k274(2), 92k274.1(1), 92k274)
Freedom of association is protected by First Amendment; this freedom is entitled under Fourteenth Amendment to same protection from infringement by states. U.S.C.A.Const. Amends. 1, 14.

**[12]** Constitutional Law 92 ⟸1156

92 Constitutional Law
  92X First Amendment in General
    92X(A) In General
      92k1156 k. Strict or Heightened Scrutiny; Compelling State Interest. Most Cited Cases
    (Formerly 92k274(1), 92k274)
Only a compelling state interest in regulation of subject within state's constitutional power to regulate can justify limiting First Amendment freedoms. U.S.C.A.Const. Amend. 1.

**[13]** Elections 144 ⟸22

144 Elections
  144I Right of Suffrage and Regulation Thereof in General
    144k20 Power to Regulate Nominations and Ballots
      144k22 k. Official Ballots. Most Cited Cases
State's interest in promoting two-party system in order to encourage compromise and political stability, in attempting to see that election winner be choice of majority of voters, in giving choice of leadership and issues to disaffected groups in major parties, and in controlling multitudinous fragmentary groups is not such "compelling interest" as justifies Ohio's election laws making it virtually impossible for any party to qualify on ballot except Republican and Democratic Parties. R.C.Ohio § 3517.01; U.S.C.A.Const. Amend. 14.

**[14]** Constitutional Law 92 ⟸3636

92 Constitutional Law
  92XXVI Equal Protection
    92XXVI(E) Particular Issues and Applications
      92XXVI(E)9 Elections, Voting, and Political Rights
        92k3636 k. Political Parties in General. Most Cited Cases
  (Formerly 92k225.2(1), 92k213)
The number of voters in favor of party, along with other circumstances, is relevant in considering whether state election laws violate equal protection clause. U.S.C.A.Const. Amend. 14.

**[15]** Elections 144 ⟸18

144 Elections
  144I Right of Suffrage and Regulation Thereof in General
    144k18 k. Power to Prescribe Qualifications. Most Cited Cases
The state is left with broad powers to regulate voting, which may include laws relating to qualification and functions of electors.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 S.Ct. 5                                                                                          Page 4
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

**[16] Injunction 212 ☞80**

212 Injunction
   212II Subjects of Protection and Relief
      212II(E) Public Officers and Entities
         212k80 k. Elections and Election Officers.
Most Cited Cases
    (Formerly 106k262.4(11))
Where both Ohio American Independent Party and Socialist Labor Party successfully challenged Ohio's restrictive election laws and Independent Party acted in sufficient time that its name could be placed on ballot without disrupting state elections but Socialist Labor Party did not act in sufficient time, Ohio would be required to permit Independent Party to remain on ballot but would not be required to place Socialist Labor Party on ballot for 1968 presidential election. R.C.Ohio § 3517.01.
**\*\*7 \*24** David J. Young, Columbus, Ohio, and Jerry Gordon, Cleveland Heights, Ohio, for appellants, pro hac vice, by special leave of Court.

Charles S. Lopeman, Columbus, Ohio, for appellees.

Mr. Justice BLACK delivered the opinion of the Court.

The State of Ohio in a series of election laws has made it virtually impossible for a new political party, even though it has hundreds of thousands of members, or an old party, which has a very small number of members, to be placed on the state ballot to choose electors pledged to particular candidates for the Presidency and Vice Presidency of the United States.

Ohio Revised Code, s 3517.01, requires a new party to obtain petitions signed by qualified electors totaling 15% **\*25** of the number of ballots cast in the last preceding gubernatorial election. The detailed provisions of other Ohio election laws result in the imposition of substantial additional burdens, which were accurately summarized in Judge Kinneary's dissenting opinion in the court below and were substantially agreed on by the other members of that court. [FN1] Together these **\*\*8** various restrictive provisions make it virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties. These two Parties face substantially smaller burdens because they are allowed to retain their **\*26** positions on the ballot simply by obtaining 10% of the votes in the last gubernatorial election and need not obtain any signa-

ture petitions. Moreover, Ohio laws make no provision for ballot position for independent candidates as distinguished from political parties. The State of Ohio claims the power to keep minority parties and independent candidates off the ballot under Art. II, s 1, of the Constitution, which provides that:

    FN1. Judge Kinneary describes, in his dissenting opinion below, the legal obstacles placed before a would-be third party even after the 15% signature requirement has been fulfilled:

    'First, at the primary election, the new party, or any political party, is required to elect a state central committee consisting of two members from each congressional district and county central committees for each county in Ohio. (Ohio Rev.Code ss 3517.02-3517.04.) Second, at the primary election the new party must elect delegates and alternates to a national convention. (Ohio Rev.Code s 3505.10.) Since Section 3513.19.1, Ohio Rev.Code, prohibits a candidate from seeking the office of delegate to the national convention or committeeman if he voted as a member of a different party at a primary election in the preceding four year period, the new party would be required to have over twelve hundred members who had not previously voted in another party's primary, and who would be willing to serve as committeemen and delegates. Third, the candidates for nomination in the primary would have to file petitions signed by qualified electors. (Ohio Rev.Code s 3513.05.) The term 'qualified electors' is not adequately defined in the Ohio Revised Code (s 3501.01(H)), but a related section (s 3513.19), provides that a qualified elector at a primary election of a political party is one who, (1) voted for a majority of that party's candidates at the last election, or, (2) has never voted in any election before. Since neither of the political party plaintiffs had any candidates at the last preceding regular state election, they would, of necessity, have to seek out members who had never voted before to sign the nominating petitions, and it would be only these persons who could vote in the primary election of the new party.'

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 S.Ct. 5
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
(Cite as: 393 U.S. 23, 89 S.Ct. 5)

'Each State shall appoint, in such Manner as the Leg-islature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Repre-sentatives to which the State may be entitled in the Congress * * *.'

The Ohio American Independent Party, an appellant in No. 543, and the Socialist Labor Party, an appellant in No. 544, both brought suit to challenge the validity of these Ohio laws as applied to them, on the ground that they deny these Parties and the voters who might wish to vote for them the equal protection of the laws, guaranteed against state abridgment by the Equal Protection Clause of the Fourteenth Amendment. The three-judge District Court designated to try the case ruled these restrictive Ohio election laws unconstitu-tional but refused to grant the Parties the full relief they had sought, 290 F.Supp. 983 (D.C.S.D.Ohio 1968), and both Parties have appealed to this Court. The cases arose in this way:

The Ohio American Independent Party was formed in January 1968 by Ohio partisans of former Governor George C. Wallace of Alabama. During the following six months a campaign was conducted for obtaining signatures on petitions to give the Party a place on the ballot and over 450,000 signatures were eventually obtained, more than the 433,100 required. The State contends and the Independent Party agrees that due to the interaction of several provisions of the Ohio laws, such petitions were required to be filed by February 7, 1968, *27 and so the Secretary of the State of Ohio informed the Party that it would not be given a place on the ballot. Neither in the pleadings, the affidavits before the District Court, the arguments there, nor in our Court has the State denied that the petitions were signed by enough qualified electors of Ohio to meet the 15% requirement under Ohio law. Having dem-onstrated its numerical strength, the Independent Party argued that this and the other burdens, including the early deadline for filing petitions and the requirement of a primary election conforming to detailed and ri-gorous standards, denied the Party and certain Ohio voters equal protection of the laws. The three-judge District Court unanimously agreed with this conten-tion and ruled that the State must be required to pro-vide a space for write-in votes. A majority of the District Court refused to hold, however, that the Par-ty's name must be printed on the ballot, on the ground that Wallace and his adherents had been guilty of

'laches' by filing their suit too late to allow the Ohio Legislature an opportunity to remedy, in time for the presidential balloting, the defects which the court held the law possessed. The appellants in No. 543 then moved before Mr. Justice Stewart, Circuit Justice for the Sixth Circuit, for an injunction which would order the Party's candidates to be put on the ballot pending appeal. After consulting with the other members of the Court who were available, and after the State represented that the grant of interlocutory**9 relief would be in the interests of the efficient operation of the electoral machinery if this Court considered the chances of successful challenge to the Ohio statutes good, Mr. Justice Stewart granted the injunction, 89 S.Ct. 1, 21 L.Ed.2d 69.

The Socialist Labor Party, an appellant in No. 544, has all the formal attributes of a regular party. It has conventions and a State Executive Committee as re-quired by the Ohio law, and it was permitted to have a place on *28 the ballot until 1948. Since then, how-ever, it has not filed petitions with the total signatures required under new Ohio laws for ballot position, and indeed it conceded it could not do so this year. The same three-judge panel heard the Party's suit and reached a similar result-write-in space was ordered but ballot position was denied the Socialist Labor Party. In this case the District Court assigned both the Party's small membership of 108 and its delay in bringing suit as reasons for refusing to order more complete relief for the 1968 election. A motion to stay the District Court's judgment was presented to Mr. Justice Stewart several days after he had ordered similar relief in the Independent Party case. The motion was denied prin-cipally because of the Socialist Party's failure to move quickly to obtain relief, with the consequent confusion that would be caused by requiring Ohio once again to begin completely reprinting its election ballots, but the case was set by this Court for oral argument, along with the Independent Party case.

### I.

[1] Ohio's claim that the political-question doctrine precludes judicial consideration of these cases re-quires very little discussion. That claim has been re-jected in cases of this kind numerous times. It was rejected by the Court unanimously in 1892 in the case of McPherson v. Blacker, 146 U.S. 1, 23-24, 13 S.Ct. 3, 6, 36 L.Ed. 869 and more recently it has been squarely rejected in Baker v. Carr, 369 U.S. 186,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 S.Ct. 5                                                                                                              Page 6
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

208-237, 82 S.Ct. 691, 705-721, 7 L.Ed.2d 663 (1962), and in Wesberry v. Sanders, 376 U.S. 1, 5-7, 84 S.Ct. 526, 528-530, 11 L.Ed.2d 481 (1964). Other cases to the same effect need not now be cited. These cases do raise a justiciable controversy under the Constitution and cannot be relegated to the political arena.

II.

[2][3][4][5][6] The State also contends that it has absolute power to put any burdens it pleases on the selection of electors *29 because of the First Section of the Second Article of the Constitution, providing that 'Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors * * *' to choose a President and Vice President. There, of course, can be no question but that this section does grant extensive power to the States to pass laws regulating the selection of electors. But the Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution. For example, Congress is granted broad power to 'lay and collect Taxes,' FN2 but the taxing power, broad as it is, may not be invoked in such a way as to violate the privilege against self-incrimination.FN3 Nor can it be thought that the power to select electors could be exercised in such a way as to violate express constitutional commands that specifically bar States from passing certain kinds of laws. Clearly, **10 the Fifteenth and Nineteenth Amendments were intended to bar the Federal Government and the States from denying the right to vote on grounds of race and sex in presidential elections. And the Twenty-fourth Amendment clearly and literally bars any State from imposing a poll tax on the right to vote 'for electors for President or Vice President.' Obviously we must reject the notion that Art. II, s 1, gives the States power to impose burdens on the right to vote, where such burdens are expressly prohibited in other constitutional provisions. We therefore hold that no State can pass a law regulating elections that violates the Fourteenth Amendment's command that 'No State shall * * * deny to any person * * * the equal protection of the laws.'

FN2. Art. I, s 8, cl. 1.

FN3. Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 716, 19 L.Ed.2d 906 (1968).

*30 III.

[7][8][9][10][11] We turn then to the question whether the court below properly held that the Ohio laws before us result in a denial of equal protection of the laws. It is true that this Court has firmly established the principle that the Equal Protection Clause does not make every minor difference in the application of laws to different groups a violation of our Constitution. But we have also held many times that 'invidious' distinctions cannot be enacted without a violation of the Equal Protection Clause.FN4 In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.FN5 In the present situation the state laws place burdens on two different, although overlapping, kinds of rights-the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment.FN6 And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same *31 protection from infringement by the States.FN7 Similarly we have said with reference to the right to vote: 'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.'FN8

FN4. Skinner v. State of Oklahoma ex rel. Williamson, 316 U.S. 535, 539-541, 62 S.Ct. 1110, 1112-1113, 86 L.Ed. 1655 (1942); Cox v. State of Louisiana, 379 U.S. 536, 557, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Loving v. Com. of Vir-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

FN5. See, e.g., Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Skinner v. State of Oklahoma ex rel. Williamson, supra.

FN6. United Mine Workers of America, Dist. 12 v. Illinois State Bar Assn., 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); NAACP v. State of Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

FN7. See New York Times Co. v. Sullivan, 376 U.S. 254, 276-277, 84 S.Ct. 710, 723-724, 11 L.Ed.2d 686 (1964), and cases there cited.

FN8. Wesberry v. Sanders, supra, 376 U.S. at 17, 84 S.Ct., at 535. See also Carrington v. Rash, supra.

[12] No extended discussion is required to establish that the Ohio laws before us give the two old, established parties a decided advantage over any new parties struggling for existence and thus place substantially unequal burdens on both the right to vote and the right to associate. The right to form a party for the advancement of political goals means **11 little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot. In determining whether the State has power to place such unequal burdens on minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that 'only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.' NAACP v. Button, 371 U.S. 415, at 438, 83 S.Ct. 328, at 341 (1963).

[13] The State has here failed to show any 'compelling interest' which justifies imposing such heavy burdens on the right to vote and to associate.

The State asserts that the following interests are served by the restrictions it imposes. It claims that the State may validly promote a two-party system in order to encourage*32 compromise and political stability. The fact is, however, that the Ohio system does not merely favor a 'two-party system'; it favors two particular parties-the Republicans and the Democrats-and in effect tends to give them a complete monopoly. There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past.

Ohio makes a variety of other arguments to support its very restrictive election laws. It points out, for example, that if three or more parties are on the ballot, it is possible that no one party would obtain 50% of the vote, and the runner-up might have been preferred to the plurality winner by a majority of the voters. Concededly, the State does have an interest in attempting to see that the election winner be the choice of a majority of its voters. But to grant the State power to keep all political parties off the ballot until they have enough members to win would stifle the growth of all new parties working to increase their strength from year to year. Considering these Ohio laws in their totality, this interest cannot justify the very severe restrictions on voting and associational rights which Ohio has imposed.

The State also argues that its requirement of a party structure and an organized primary insures that those who disagree with the major parties and their policies 'will be given a choice of leadership as well as issues' since any leader who attempts to capitalize on the disaffection of such a group is forced to submit *33 to a primary in which other, possibly more attractive, leaders can raise the same issues and compete for the allegiance of the disaffected group. But while this goal may be desirable, Ohio's system cannot achieve it. Since the principal policies of the major parties change to some extent from year to year, and since the identity of the likely major party nominees may not be known until shortly before the election, this disaffected 'group' will rarely if ever be a cohesive or identifiable group until a few months before the election. Thus,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 S.Ct. 5                                                                                  Page 8
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
(Cite as: 393 U.S. 23, 89 S.Ct. 5)

Ohio's burdensome procedures, requiring extensive organization and other election activities by a very early date, operate to prevent such a group from ever getting on the ballot and the Ohio system thus denies the 'disaffected' not only a choice of leadership but a choice on the issues as well.

Finally Ohio claims that its highly restrictive provisions are justified because without them a large number of parties might qualify for the ballot, and the voters would then be confronted with a **12 choice so confusing that the popular will could be frustrated. But the experience of many States, including that of Ohio prior to 1948, demonstrates that no more than a handful of parties attempts to qualify for ballot positions even when a very low number of signatures, such as 1% of the electorate, is required.[FN9] It is true that the existence of multitudinous fragmentary groups might justify some regulatory control but in Ohio at the present time this danger seems to us no more than 'theoretically imaginable.'[FN10] No such remote danger can justify the immediate and crippling impact on the basic constitutional rights involved in this case.

FN9. Forty-two States require third parties to obtain the signatures of only 1% or less of the electorate in order to appear on the ballot. It appears that no significant problem has arisen in these States which have relatively lenient requirements for obtaining ballot position.

FN10. Cf. United Mine Workers of America, Dist. 12 v. Illinois State Bar Assn., supra, 389 U.S., at 224, 88 S.Ct., at 357.

*34 [14][15] Of course, the number of voters in favor of a party, along with other circumstances, is relevant in considering whether state laws violate the Equal Protection Clause. And, as we have said, the State is left with broad powers to regulate voting, which may include laws relating to the qualification and functions of electors. But here the totality of the Ohio restrictive laws taken as a whole imposes a burden on voting and associational rights which we hold is an invidious discrimination, in violation of the Equal Protection Clause.

IV.

[16] This leaves only the propriety of the judgments of the District Court. That court held that the Socialist Labor Party could get relief to the extent of having the right, despite Ohio laws, to get the advantage of write-in ballots. It restricted the Independent Party to the same relief. The Independent Party went before the District Court, made its challenge, and prayed for broader relief, including a judgment declaring the Ohio laws invalid. It also asked that its name be put on the ballot along with the Democratic and Republican Parties. The Socialist Labor Party also went to the District Court and asked for the same relief. On this record, however, the parties stand in different positions before us. Immediately after the District Court entered its judgment, the new Independent Party brought its case to this Court where Mr. Justice Stewart conducted a hearing. At that hearing Ohio represented to Mr. Justice Stewart that the Independent Party's name could be placed on the ballot without disrupting the state election, but if there was a long delay, the situation would be different. It was not until several days after that hearing was concluded and after Mr. Justice Stewart had issued his order staying the judgment against the Independent Party that the Socialist Labor Party asked for similar relief. The State *35 objected on the ground that at that time it was impossible to grant the relief to the Socialist Labor Party without disrupting the process of its elections; accordingly, Mr. Justice Stewart denied it relief, and the State now repeats its statement that relief cannot be granted without serious disruption of election process. Certainly at this late date it would be extremely difficult, if not impossible, for Ohio to provide still another set of ballots. Moreover, the confusion that would attend such a last-minute change poses a risk of interference with the rights of other Ohio citizens, for example, absentee voters. Under the circumstances we require Ohio to permit the Independent Party to remain on the ballot, along with its candidates for President and Vice President, subject, of course, to compliance with valid regulatory laws of Ohio, including the law relating to the qualification and functions of electors. We do not require Ohio to place the Socialist Party on the ballot for **13 this election. The District Court's judgment is affirmed with reference to No. 544, the Socialist Labor Party case, but is modified in No. 543, the Independent Party case, with reference to granting that Party the right to have its name printed on the ballot. It is so ordered.

Judgment affirmed in No. 544 and modified in No. 543.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 S.Ct. 5
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

Page 9

Mr. Justice STEWART concurs in the judgment in No. 544 insofar as it denies equitable relief to the appellants.Mr. Justice DOUGLAS.

I.

Ohio, through an entangling web of election laws, has effectively foreclosed its presidential ballot to all but Republicans and Democrats. It has done so initially by abolishing write-in votes so as to restrict candidacy *36 to names on the ballot;[FN1] it has eliminated all independent candidates through a requirement that nominees enjoy the endorsement of a political party;[FN2] it has defined 'political party' in such a way as to exclude virtually all but the two major parties.[FN3]

FN1. Ohio Rev.Code s 3505.03 (1930 Repl.Vol.).

FN2. Independent candidacy in Ohio is limited to municipal offices, Ohio Rev.Code ss 3513.251-3513.252; county offices, Ohio Rev.Code s 3513.256; state office and federal office, excluding President, Ohio Rev.Code ss 3513.257-3513.258.

FN3. Ohio Rev.Code ss 3505.10, 3513.05-3513.191, 3517.01-3517.04.

A candidate who seeks a place on the Ohio presidential ballot must first compile signatures of qualified voters who total at least 15% of those voting in the last gubernatorial election. In this election year, 1968, a candidate would need 433,100 such signatures. Moreover, he must succeed in gathering them long before the general election, since a nominating petition must be filed with the Secretary of State in February.[FN4] That is not all: having compiled those signatures, the candidate must further show that he has received the nomination of a group which qualifies as a 'political party' within the meaning of Ohio law.[FN5] It is not enough to be an independent candidate for President with wide popular support; one must trace his support to a political party.[FN6]

FN4. A candidate for President must first formulate a party by gathering signatures, Ohio Rev.Code s 3517.01, which must, in turn, be presented in time for the party to

participate in the state primary. Ohio Rev.Code ss 3513.256-3513.262.

FN5. Ohio Rev.Code s 3513.258.

FN6. Ohio Rev.Code s 3505.10.

To qualify as a party, a group of electors must participate in the state primary, electing one of its members from each county ward or precinct to a county central committee; two of its members from each congressional district to a state central committee;[FN7] and some of its members as delegates and alternates to a national*37 convention.[FN8] Moreover, those of its members who seek a place on the primary ballot as candidates for positions as central committeemen and national convention delegates must demonstrate that they did not vote in any other party primary during the preceding four years;[FN9] and must present petitions of endorsement on their behalf by anywhere from five to 1,000 voters who likewise failed to vote for any other party in the last preceding primary.[FN10] Thus, to qualify as a third party, a group must first erect elaborate political machinery, and then rest it upon the ranks of those who have proved both unwilling and unable to vote.

FN7. Ohio Rev.Code ss 3517.02-3517.04.

FN8. Ohio Rev.Code s 3505.10.

FN9. Ohio Rev.Code s 3513.191.

FN10. Ohio Rev.Code s 3513.05.

Having elected a central committee, the group has it convene a state convention attended by 500 delegates duly apportioned throughout the State according to **14 party strength.[FN11] Delegates to the state convention then go on to choose presidential electors for certification on the November ballot, while elected delegates to the national convention go on to nominate their candidate for President.[FN12] Ohioans, to be sure, as a result of the decision below, enjoy the opportunity of writing in the man of their choice on the ballot. But in a presidential election, a vote for a candidate is only operative as a vote for the electors representing him; and where the State has prevented that candidate from presenting a slate of electors for certification, the write-in vote has no effect. Furthermore, even where

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 S.Ct. 5                                                                                                          Page 10
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

operative, the write-ins are no substitute for a place on the ballot.

> FN11. Ohio Rev.Code s 3513.11.

> FN12. Ohion Rev.Code s 3513.12.

To force a candidate to rely on writeins is to burden him with disability. It makes it more difficult for him to get elected, and for the voters to elect him.

**\*38** These barriers of party, timing, and structure are great obstacles. Taken together they render it difficult, if not impossible, for a man who disagrees with the two major parties to run for President in Ohio, to organize an opposition, and to vote a third ticket.

## II.

The selection of presidential electors is provided in Art. II, s 1, of the Constitution. It is unnecessary in this case to decide whether electors are state rather than federal officials, whether States may select them through appointment rather than by popular vote, or whether there is a constitutional right to vote for them. For in this case Ohio has already provided for them to be chosen by right to popular suffrage. Having done so, the question is whether Ohio may encumber that right with conditions of the character imposed here.

## III.

The First Amendment, made applicable to the States by reason of the Fourteenth Amendment, lies at the root of these cases. The right of association is one form of 'orderly group activity' ( NAACP v. Button, 371 U.S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405), protected by the First Amendment. The right 'to engage in association for the advancement of beliefs and ideas' ( NAACP v. State of Alabama ex rel. Patterson, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488), is one activity of that nature that has First Amendment protection. As we said in Bates v. City of Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 'freedom of association for the purpose of advancing ideas and airing grievances is protected by the Due Process Clause of the Fourteenth Amendment from invasion by the States.' And see Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 296, 81 S.Ct. 1333, 1335, 6 L.Ed.2d 301. At the

root of the present controversy is the right to vote-a 'fundamental political right' that is 'preservative of all rights.' Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220. The rights of expression **\*39** and assembly may be 'illusory if the right to vote is undermined.' Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481.

In our political life, third parties are often important channels through which political dissent is aired: 'All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups, which innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. * * * The absence of such voices would be a symptom of grave illness in our society.' Sweezy v. State of New Hampshire, 354 U.S. 234, 250-251, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (opinion of Warren, C.J.).

**\*\*15** The Equal Protection Clause of the Fourteenth Amendment permits the States to make classifications and does not require them to treat different groups uniformly. Nevertheless, it bans any 'invidious discrimination.' Harper v. Virginia State Board of Elections, 383 U.S. 663, 667, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169.

That command protects voting rights and political groups ( Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675), as well as economic units, racial communities, and other entities. When 'fundamental rights and liberties' are at issue ( Harper v. Virginia State Board of Elections, supra, 383 U.S. at 670, 86 S.Ct. at 1083), a State has less leeway in making classifications than when it deals with economic matters. I would think that a State has precious little leeway in making it difficult or impossible for citizens to vote for whomsoever they please and to organize campaigns for any school of thought they may choose, whatever part of the spectrum it reflects.

Cumbersome election machinery can effectively suffocate the right of association, the promotion of political ideas and programs of political action, and the right to vote. The totality of Ohio's requirements has those effects. It is unnecessary to decide whether Ohio has an interest, 'compelling' or not, in abridging those **\*40** rights, because 'the men who drafted our Bill of Rights did all the 'balancing' that was to be done in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

this field.' Konigsberg v. State Bar, 366 U.S. 36, 61, 81 S.Ct. 997, 1012, 6 L.Ed.2d 105 (Black, J., dissenting). Appellees would imply that 'no kind of speech is to be protected if the Government can assert an interest of sufficient weight to induce this Court to uphold its abridgment.' ( Id., at 67, 81 S.Ct., at 1015.) I reject that suggestion.[FN13]

>    FN13. Bates v. City of Little Rock, 361 U.S. 516, 528, 80 S.Ct. 412, 419, 4 L.Ed.2d 480 (Black and Douglas, JJ., concurring); Smith v. People of State of California, 361 U.S. 147, 157, 80 S.Ct. 215, 220, 4 L.Ed.2d 205 (Black, J., concurring).

A three-judge district court held that appellants were entitled to the use of write-in ballots. Yet it refrained from ordering the Ohio American Independent Party to be placed on the ballot, relying partly on laches and partly on the presence of what it deemed to be so-called 'political' questions. 290 F.Supp. 983. First Amendment rights, the right to vote, and other 'fundamental rights and liberties' ( Harper v. Virginia State Board of Elections, supra, 383 U.S. at 670, 86 S.Ct., at 1083) have a well-established claim to inclusion in justiciable, as distinguished from 'political,' questions; and the relief the Court grants meets the practical needs of appellees in preparing and distributing the ballots.

The Socialist Labor Party, with a lineage that goes back to the presidential contest in 1892, by 1964 was on the ballot in 16 States. Today, although it has only 108 members in Ohio, it earnestly presses its claim for recognition. Yet it started the present action so late that concededly it would now be impossible to get its name on all the ballots. The relief asked is of such a character that we properly decline to allow the federal courts to play a disruptive role in this 1968 state election. On the merits, however, the Socialist Labor Party has as strong a case as the American Independent Party, as my Brother HARLAN states and as the Court apparently **41 agrees. It is therefore proper for us to grant it declaratory relief.

Hence I concur in today's decision; and, while my emphasis is different from the Court's, I join its opinion.

Mr. Justice HARLAN, concurring in the result.

I agree that the American Independent Party is entitled to have the names of its Presidential and Vice Presi-

dential candidates placed on the Ohio ballot in the forthcoming election, but that, for the **16 practical reasons stated by the Court, the Socialist Labor Party is not. However, I would rest this decision entirely on the proposition that Ohio's statutory scheme violates the basic right of political association assured by the First Amendment which is protected against state infringement under the Due Process Clause of the Fourteenth Amendment. See NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1964); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. State of Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). It is true that Ohio has not directly limited appellants' right to assemble or discuss public issues or solicit new members. Compare Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); De Jonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937); Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Instead, by denying the appellants any opportunity to participate in the procedure by which the President is selected, the State has eliminated the basic incentive that all political parties have for conducting such activities, thereby depriving appellants of much of the substance, if not the form, of their protected rights. The right to have one's voice heard and one's views considered by the appropriate governmental authority is at the core of the right of political association.

It follows that the particular method by which Presidential Electors are chosen is not of decisive importance *42 to a solution of the constitutional problem before us. Just as a political group has a right to organize effectively so that its position may be heard in court, NAACP v. Button, supra, or in the legislature, cf. Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137-138, 81 S.Ct. 523, 529-530, 5 L.Ed.2d 464 (1961); United States v. Rumely, 345 U.S. 41, 46-47, 73 S.Ct. 543, 546-547, 97 L.Ed. 770 (1953); United States v. Harriss, 347 U.S. 612, 625-626, 74 S.Ct. 808, 811, 816-817, 98 L.Ed. 989 (1954); so it has the right to place its candidate for the Presidency before whatever body has the power to make the State's selection of Electors. Consequently, it makes no difference that the State of Ohio may, under the Second Article of the Constitution, place the power of Electoral selection beyond the control of the general electorate. The requirement imposed by the Due Process Clause remains the same-no matter what the institution to which the de-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 S.Ct. 5                                                                                                  Page 12
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

cision is entrusted, political groups have a right to be heard before it. A statute that would require that all Electors be members of the two major parties is subject to the same constitutional challenge regardless of whether it is the legislature, the people, or some other body that is empowered to make the ultimate decision under the laws of the State.

Of course, the State may limit the right of political association by invoking an impelling policy justification for doing so. But as my Brother BLACK'S opinion demonstrates, Ohio has been able to advance no such justification for denying almost half a million of its citizens their fundamental right to organize effectively for political purposes. Consequently, it may not exclude them from the process by which Presidential Electors are selected.

In deciding this case of first impression, I think it unnecessary to draw upon the Equal Protection Clause.[FN1] *43 I am by no means clear that equal protection doctrine, especially as it has been propounded in the recent state reapportionment cases, e.g., **17Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), may properly be applied to adjudicate disputes involving the mere procedure by which the President is selected, as that process is governed by profoundly different principles.[FN2] Despite my doubts on this score, I think it perfectly consistent and appropriate to hold the Due Process Clause applicable. For I believe that our task is more difficult than one which involves merely the mechanical application of the commands to be found in the Fourteenth Amendment or in the first section of the Second Article to the Constitution. Rather, we must attempt to accommodate as best we may the narrow provision drafted by the Philadelphia Convention with the broad principles announced in the Fourteenth Amendment, generations later.

> FN1. The fact that appellants have chosen to pitch their argument throughout on the Equal Protection Clause does not, of course, limit us in reaching our decision here.

> FN2. At no stage in the complex process by which a President is chosen is the 'one man, one vote' principle of Reynolds v. Sims followed. The constitutional decision to grant each State at least three Electors, regardless of population, was a necessary part of the

effort to gain the consent of the small States, as was the provision that when the choice of the President fell to the House, each state delegation would cast but one vote. See N. Peirce, The People's President 43-50 (1968); L. Wilmerding, The Electoral College 17-22 (1958).

A decision resting solely upon the Due Process Clause would permit such an accommodation-for such a holding fully respects the original purposes and early development of the Electoral College. When one looks beyond the language of Article II, and considers the Convention's understanding of the College, Ohio's restrictive approach is seen to undermine what the draftsmen understood to be its very essence. The College was created to permit the most knowledgeable members of the community to choose the executive of a nation whose continental dimensions were thought to preclude an informed choice *44 by the citizenry at large.[FN3] If a State declares that an entire class of citizens is ineligible for the position of Elector, and that class is defined in a way in which individual merit plays no part, it strikes at the very basis of the College as it was originally conceived.

> FN3. Federalist Papers, No. 68 (Alexander Hamilton) (H. Lodge ed. 1908); American Bar Association, Electing The President 15 (1967); Wilmerding, supra, n. 2, at 10; R. MacBride, The American Electoral College 16-17 (1953).

The constitutional grant of power to the States was intended for a different purpose. While Madison reports that the popular election of Electors on a district-by-district basis was the method 'mostly, if not exclusively, in view when the Constitution was framed and adopted,' 3 M. Farrand, The Records of the Federal Convention of 1787, p. 459 (1911), it is quite clear that a significant, if not dominant, group[FN4] at the Convention contemplated that Electors would be chosen by other methods. It was to accommodate these members that the state legislatures were given their present leeway.[FN5] While during the first four decades of the Republic, the States did in fact adopt a variety of methods for selecting their Electors,[FN6] the **18 parties in this case *45 have pointed to, and I have found, no case in which the legislature attempted by statute to restrict the class of the enfranchised citizenry that could be considered for the office by

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

whatever body was to make the choice.[FN7]

FN4. The large number of leaders, of varying ideological convictions, who favored popular election included Hamilton, Madison, James Wilson, John Dickinson, Rufus King, Daniel Carroll, and Abraham Baldwin. The opponents of popular selection included Gerry, Ellsworth, Luther Martin, and Roger Sherman. See Chief Justice Fuller's illuminating opinion in McPherson v. Blacker, 146 U.S. 1, 28, 13 S.Ct. 3, 8, 36 L.Ed. 869 (1892). See also Wilmerding, supra, n. 2, at 13-14.

FN5. The story of the compromise is to be found in Wilmerding, supra, n. 2, at 17-22. The Convention did not, however, direct its attention to the precise meaning of the clause that is the subject of consideration here. See Peirce, supra, n. 2, at 45.

FN6. Electors were chosen by the legislature itself, by the general electorate on an at-large and district-by-district basis, partly by the legislature and partly by the people, by the legislature from a list of candidates selected by the people, and in other ways. See McPherson v. Blacker, supra, 146 U.S. 28-33, 13 S.Ct. 8-10; Wilmerding, supra, n. 2, c. 3; Peirce, supra, n. 2, at 309.

FN7. Nor does the leading case in this area, McPherson v. Blacker, supra, support such a claim. There the plaintiffs-in-error had challenged Michigan's attempt to permit its voters to select Electors on a district-by-district, rather than an atlarge, basis. The Court held that, given the early history, see n. 6, supra, the States have the plenary power to alter the method by which Electors are selected so long as the method cannot be attacked on Fourteenth Amendment grounds. Pursuing this analysis, the unanimous Court found the district-by-district approach free of any Fourteenth Amendment defect, 146 U.S., at 37-40, 13 S.Ct., at 11-13. I can perceive no reason to doubt the continuing validity of this holding.

Nothing in the history of the Electoral College from the moment of its inception, then, indicates that the

original understanding of that institution would at all be compromised if we refuse to read the language of Art. II, s 1, as granting a power of arbitrary action which is so radically inconsistent with the general principles of the Due Process Clause. Consequently, there is no obstacle to a holding which denies the States, absent an overriding state interest, the right to prevent third parties from having an opportunity to put their candidates before the attention of the voters or whatever other body the State has designated as the one which is to choose Electors.

A word should be added about the constitutional status of Ohio's requirement that a third party, to qualify for ballot position, must collect the signatures of eligible voters in a number equal to 15% of those voting at the last gubernatorial election. As I do not understand the State to contest the fact that Mr. Wallace and his partisans have successfully gathered more than the 433,100 signatures required by law, we can only properly reach this issue in the Socialist Labor Party case-for this Party did not even attempt to comply with the *46 statutory command. While the Court's opinion, striking down Ohio's statutory scheme in its entirety, does, as I read it, afford the Socialist Labor Party declaratory relief from the 15% provision, I think it well to deal with it more explicitly than the Court has done.

In my view, this requirement, even when regarded in isolation, must fall. As my Brother BLACK'S opinion suggests, the only legitimate interest the State may invoke in defense of this barrier to third-party candidacies is the fear that, without such a barrier, candidacies will proliferate in such numbers as to create a substantial risk of voter confusion.[FN8] Ohio's requirement cannot be said **19 to be reasonably related to this interest. Even in the unprecedented event of a complete and utter popular disaffection with the two established parties, Ohio law would permit as many as six additional party candidates to compete with the Democrats and Republicans only if popular support should be divided relatively evenly among the *47 new groups. And with fundamental freedoms at stake, such an unlikely hypothesis cannot support an incursion upon protected rights, especially since the presence of eight candidacies cannot be said, in light of experience, to carry a significant danger of voter confusion. As both Ohio's electoral history[FN9] and the actions taken by the overwhelming majority of other States[FN10] suggest, opening the ballot to this extent is

perfectly consistent with the effective functioning of the electoral process. In sum, I think that Ohio has fallen far short of showing the compelling state interest necessary to overcome this otherwise protected right of political association.

FN8. My Brother STEWART is, of course, quite right in pointing out that the presence of third parties may on occasion result in the election of the major candidate who is in reality less preferred by the majority of the voters. It seems clear to me, however, that many constitutional electoral structures could be designed which would accommodate this valid state interest, without depriving other political organizations of the right to participate effectively in the political process. A runoff election may be mandated if no party gains a majority, or the decision could be left to the State Legislature in such a case, compare Fortson v. Morris, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966). Alternatively, the voter could be given the right, at the general election, to indicate both his first and his second choice for the Presidency-if no candidate received a majority of first-choice votes, the second-choice votes could then be considered. Finally, Electors could be chosen on a district-by-district rather than an at-large basis, thereby apportioning the electoral vote in a way more nearly approximating the popular vote. See McPherson v. Blacker, supra, and text, at n. 4, supra. I would conclude that, with the substantial variety of less restrictive alternatives that are available, compare NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 307-308, 84 S.Ct. 1302, 1313-1314, 12 L.Ed.2d 325 (1964); Saia v. People of State of New York, 334 U.S. 558, 562, 68 S.Ct. 1148, 1150, 92 L.Ed. 1574 (1948); Martin v. City of Struthers, 319 U.S. 141, 146-149, 63 S.Ct. 862, 864-866, 87 L.Ed. 1313 (1943); Thornhill v. State of Alabama, 310 U.S. 88, 96, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940); Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), this interest cannot support Ohio's 15% requirement.

FN9. Ohio's present statutory scheme is a product of legislative action taken between 1948 and 1952. Before that time, independent candidates had been granted a place on the ballot if they could gather the signatures of registered voters in the number of 1% of those voting at the preceding gubernatorial election and present their petitions 60 days before the general election. The State's experience under this unexacting regime is instructive. Voting statistics compiled by Ohio's Secretary of State reveal that since 1900 no more than seven parties have appeared on the ballot to compete for a major statewide or national office. And even this number was not attained after 1908. During the last 10 years of the old regime, there are only two third-party candidates of record. The State took effective action only after Electors pledged to Henry A. Wallace gained some 30,000 votes out of the 3,000,000 cast in 1948. Since Harry S. Truman carried the State by some 7,000 votes, the Wallace vote might well have been decisive if it had increased marginally.

FN10. The other 49 States may be grouped in the following categories with regard to the size of the barriers they raise against third-party candidacies:

**\*48** Since Ohio's requirement is so clearly disproportionate to the magnitude of the risk that it may properly act to prevent, I need not reach the question of the size of the signature barrier a State may legitimately raise against third parties on this ground. This should be left to the Ohio Legislature in the first instance.

Mr. Justice STEWART, dissenting in No. 543.

If it were the function of this Court to impose upon the States our own ideas of wise policy, I might be inclined to join my Brethren in compelling the Ohio election authorities to disregard the laws enacted by the legislature of that State. We deal, however, not with a question of policy, but with a problem of constitutional power. And to me it is clear that, under the Constitution as it is written, the Ohio Legislature has the power to do what it has done.

I.

The Constitution does not provide for popular election of a President or Vice President of the United States,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

either nationally or on a state-by-state basis. On the contrary, the Constitution explicitly specifies:

'Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State **20 may be entitled in the Congress * * *.'FN1

> FN1. U.S.Const., Art. II, s 1. This provision represented a compromise among several conflicting views expressed at the Constitutional Convention regarding the most salutary method for choosing a President, most of which favored some method other than popular election. See McPherson v. Blacker, 146 U.S. 1, 28, 13 S.Ct. 3, 8, 36 L.Ed. 869.

(Emphasis supplied.)

*49 'The Electors shall meet in their respective states and vote by ballot for President and Vice-President * * *.'FN2

> FN2. U.S.Const. Amend. 12. The Twelfth Amendment also specifies the procedures for selecting a President and Vice President in the event that no candidate receives a majority of votes in the electoral college.

Chief Justice Fuller, therefore, was stating no more than the obvious when he wrote for a unanimous Court in McPherson v. Blacker, 146 U.S. 1, 13 S.Ct. 3, more than 75 years ago:

'The constitution does not provide that the appointment of electors shall be by popular vote, nor that the electors shall be voted for upon a general ticket, nor that the majority of those who exercise the elective franchise can alone choose the electors. It recognizes that the people act through their representatives in the legislature, and leaves it to the legislature exclusively to define the method of effecting the object.

'In short, the appointment and mode of appointment of electors belong exclusively to the states under the constitution of the United States. * * *' Id., at 27, 35, 13 S.Ct., at 7, 10.

A State is perfectly free under the Constitution to provide for the selection of its presidential electors by the legislature itself. Such a process of appointment was in fact utilized by several States throughout our early history, and by one State, Colorado, as late as 1876.FN3 Or a state legislature might nominate two slates of electors, and allow all eligible voters of the State to choose between them. Indeed, many of the States formerly provided for the appointment of presidential electors by *50 various kinds of just such cooperative action of their legislatures and their electorates.FN4

> FN3. See McPherson v. Blacker, supra, at 35, 13 S.Ct. at 10.

> FN4. '(V)arious modes of choosing the electors were pursued, as, by the legislature itself on joint ballot; by the legislature through a concurrent vote of the two houses; by vote of the people for a general ticket; by vote of the people in districts; by choice partly by the people voting in districts and partly by the legislature; by choice by the legislature from candidates voted for by the people in districts; and in other ways * * *.' McPherson v. Blacker, supra, at 29, 13 S.Ct., at 8.

> For a fuller description of the diverse methods pursued by the States in appointing their electors under Art. II, s 1, during this Courtry's first century of constitutional experience, see id., at 26-35, 13 S.Ct., at 7-10.

Here, the Ohio Legislature has gone further, and has provided for a choice by the State's eligible voters among slates of electors put forward by all political parties that meet the evenhanded requirements of long-standing state laws. We are told today, however, that, despite the power explicitly granted to the state legislatures under Art. II, s 1, the Legislature of Ohio nonetheless violated the Constitution in providing for the selection of electors in this way. I can perceive no such constitutional violation.

I agree with my Brethren that, in spite of the broad language of Art. II, s 1, a state legislature is not completely unfettered in choosing whatever process it may wish for the appointment of electors. Three separate constitutional amendments explicitly limit a legislature's power. The Fifteenth Amendment makes clear

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

that if voters are to be included in the process, no voter may be excluded 'on account of race, color, or **21 previous condition of servitude.' The Nineteenth Amendment makes equally clear that no voter may be excluded 'on account of sex.' And the Twenty-fourth Amendment prohibits exclusion of any voter 'by reason of failure to pay any poll tax or other tax.' But no claim has been or could be made in this case that any one of these Amendments has been violated by Ohio.

**\*51** Rather, it is said that Ohio has violated the provisions of the Fourteenth Amendment. The Court holds that the State has violated that Clause of the Amendment which prohibits it from denying 'to any person within its jurisdiction the equal protection of the laws.' And two concurring opinions emphasize First Amendment principles, made applicable to the States through the Fourteenth Amendment's guarantees, in summarily concluding that Ohio's statutory scheme is invalid. I concede that the Fourteenth Amendment imposes some limitations upon a state legislature's freedom to choose a method for the appointment of electors. A State may not, for example, adopt a system that discriminates on grounds of religious or political belief. But I cannot agree that Ohio's system violates the Fourteenth Amendment in any way.

## II.

In view of the broad leeway specifically given the States by Art. II, s 1, of the Constitution, it seems clear to me that the basic standard of constitutional adjudication under the Equal Protection Clause-a standard under which only 'invidious discrimination' is forbidden-is the most stringent test that properly can be held applicable here. A single quotation should suffice to summarize that standard of equal protection:

'The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' McGowan v. State of Maryland, 366 U.S. 420, 425-426, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393.

**\*52** The provisions enacted by the Ohio Legislature fully meet that standard.[FN5]

> FN5. It is clear that this Court's decisions in such cases as Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, all involving the direct popular election of candidates to state or federal office, do not control the issues in this case. Indeed, no opinion today suggests that those cases are apposite. They sustained the right of a voter to cast a ballot whose numerical weight is the equal of that of any other vote cast within the jurisdiction in question. No claim is made in this case that Ohio has in any way violated that right.

The laws of Ohio classify political parties, for purposes of access to that State's ballot, according to size and strength.[FN6] Those that timely demonstrate widespread support in the State may submit a slate of presidential electors to Ohio's voters, while those that neither have participated in past elections nor can show the support of 15% of the voting public 90 days before a primary election may not.[FN7] The appellants**22 claim that these provisions discriminate against them. They assert that although Ohio may establish 'reasonable' qualifying standards so that ballots do not become unwieldy, the **\*53** strength of the American Independent Party is so substantial that no such requirement could possibly suffice to keep the Party's candidates off the presidential ballot. Ohio's requirements are so high, they contend, that the legislative purpose behind those requirements can be only to keep new parties-even those that, like the American Independent Party, have gained considerably more than 'splinter' support-off the ballot. And such requirements, they conclude, thus deny persons in their position equal protection of the laws.

> FN6. The appellants plainly do not object to working through or voting for candidates of partisan political organizations, and I do not understand them to claim discrimination on the basis of Ohio's failure to allow access to its presidential ballot via an 'independent nominating petition.'

> FN7. Appellants have cited us to a complex

group of Ohio statutes which they say are relevant to the participation of political parties in that State's presidential elections. See Ohio Rev.Code ss 3505.10, 3513.05, 3513.11, 3513.19, 3513.191, 3517.01-3517.04. It is not entirely clear that all of those provisions are applicable to parties participating in the electoral process for the first time. But we need not examine that question since in any event the appellants clearly failed to file with the Secretary of State of Ohio on February 7 of this year, 90 days before the State's primary election, a petition signed by a number of voters equal to 15% of the number participating in Ohio's last gubernatorial election. Ohio Rev.Code ss 3505.10, 3517.01.

Ohio for its part concedes that the legislative objective underlying the statutes in question is to prevent the appearance on its ballot of slates of presidential electors whose substantial party support has not been timely demonstrated. That the basic classification drawn by the provisions is not 'irrelevant to the achievement of the State's objective'-the traditional standard for judging the validity of a legislative classification under the Equal Protection Clause-is clear. The Court seems to concede as much, but nonetheless holds that the Ohio provisions are invalid-a result which may rest in part, I believe, upon possible doubts regarding the permissibility or the legislative objective itself. The propriety of that objective is, then, a critical issue for determination.

III.

I can discern no basis for the position that Ohio's objective is in any way an illegitimate one. Surely a State may justifiably assert an interest in seeing that its presidential electors vote for the candidate best able to draw the support of a majority of voters within the State. By preventing parties that have not demonstrated timely and widespread support from gaining places on its ballot, Ohio's provisions tend to guard against the possibility that small-party candidates will draw enough support to prevent either of the major contenders from obtaining **\*54** an absolute majority of votes-and against the consequent possibility that election may be secured by candidates who gain a plurality but who are, vis-a -vis their principal opponents, preferred by less than half of those voting.[FN8]

Surely the attainment of these objectives is well within the scope of a State's authority under our Constitution. One may perhaps disagree with the political theory on which the objectives are based, but it is inconceivable to me that the Constitution imposes on the States a political philosophy under which they must be satisfied to award election on the basis **\*\*23** of a plurality rather than a majority vote.

FN8. This interest, which several States have chosen to protect in the context of state and local primary contests by providing for run-off elections, may be illustrated by a hypothetical example. Assume a State in which a dissident faction of one of the two major parties-party A-becomes dissatisfied with that party's nominees and sets itself up as a 'third party'-party C-putting forward candidates more to its liking. Still, the members of party C much prefer the candidates of party A to those of party B. A situation is possible in which party B's candidates poll, for example, 46% of the vote, party A's candidates 44%, and party C's candidates 10%. Party B's candidates would in such a situation be elected by plurality vote. In an election involving only the candidates of parties A and B, however, those persons preferring party C's candidates might well have voted overwhelmingly for party A's, thus giving party A's candidates a substantial majority victory.

In pursuing this interest Ohio has, at the same time, not completely prevented new parties from gaining access to that State's ballot. It has authorized ballot position for parties that can demonstrate by petition the support of 15% of the voting public 90 days before a primary election is to be held. My Brethren seem to suggest that the percentage figure is set too high, and the date too early. But I cannot join in this kind of second-guessing. While necessarily arbitrary, Ohio's standards can only be taken to represent reasonable **\*55** attempts at accommodating the conflicting interests involved.[FN9]

FN9. The date specified, for instance, is related to Ohio's requirement that all political parties hold primary elections-another provision that is, it seems to me, well within the State's power to enact.

89 S.Ct. 5                                                                                          Page 18
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

Although Ohio's provisions do not freeze the Republican and Democratic Parties into the State's election structure by specific reference to those parties, it is true that established parties, once they become participants in the electoral process, continue to enjoy ballot position so long as they have polled 10% of the vote in the most recent Ohio gubernatorial election. It is suggested that the disparity between this figure and the 15% requirement applicable to new parties is invidiously discriminatory. But I cannot accept the theory that Ohio is constitutionally compelled to apply precisely the same numerical test in determining whether established parties enjoy widespread support as it applies in determining that question with regard to new parties.

It is by no means clear to me that as an abstract matter there are no differences between parties that have long been on the ballot in a State and those that have not, such as might justify disparate standards for determining in those two classes of cases when widespread support, required for ballot position, has been demonstrated. In any event, I cannot conclude that the disparity involved here denies equal protection of the laws. The difference in figures is a difference between the requirements for getting on and staying on the ballot. It seems to me to be well within the State's powers to set somewhat different standards for those two requirements, so long as it applies them uniformly to all political parties. The only remaining argument would seem to be that the Republican and Democratic Parties never had to meet the 15% requirement: they were on the ballot in Ohio at the time the statutory scheme was **\*56** enacted, and so have had only to make certain they remain on by meeting the 10% standard. But the Ohio Legislature could well have taken notice at the time the provisions were enacted that the parties which had polled over 10% of the vote in the most recent gubernatorial election-the Republican and Democratic Parties-had both demonstrated strength far beyond the 15% figure specified for ballot entry by new parties. It seems to me totally unrealistic, therefore, to conclude that this minor disparity in standards cannot be justified by 'any state of facts (that) reasonably may be conceived.'   McGowan v. State of Maryland, supra, 366 U.S., at 426, 81 S.Ct., at 1105.

### IV.

The Court's opinion appears to concede that the State's

interest in attempting to ensure that a minority of voters do not thwart the will of the majority is a legitimate one, but summarily asserts that this legitimate interest cannot constitutionally be vindicated. That assertion seems to echo the claim of my concurring Brethren-a claim not made by the appellants-that Ohio's statutory requirements in some way infringe upon First Amendment rights. I cannot agree.

As the language of Art. II, s 1, and a great deal of history under that section make clear, there is no constitutional **\*\*24** right to vote for presidential electors.FN10 I take it, therefore, that the First Amendment theory of my Brethren rests on the view that, despite the legitimacy of the objective underlying Ohio's laws, those laws nonetheless have the effect of stifling the activity of persons who disagree with the major political parties now in existence. The concurring opinions cite a series of decisions protecting what has been termed the First **\*57** Amendment right of association.   NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405; Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480; NAACP v. State of Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488; Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430; De Jonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278. In my view, however, the principles on which those decisions were based do not call for today's result.

> FN10. Cf. Minor v. Happersett, 21 Wall. 162, 178, 22 L.Ed. 627:
>
> '(T)he Constitution of the United States does not confer the right of suffrage upon any one. * * *'

In Thomas v. Collins and De Jonge v. State of Oregon, supra, the very design of the statutes in question was to prevent persons from freely meeting together to advance political or social views. Ohio's laws certainly are not of that nature. In the other three cases cited, all involving the activities of the National Association for the Advancement of Colored People, the statutes challenged were not on their face calculated to affect associational rights. We were able to determine with a good deal of certainty in those cases, however, (1) that application of the statutes to the NAACP would clearly result in a considerable impairment of those rights, and (2) that the interest said to underlie the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 S.Ct. 5                                                                                      Page 19
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

statutes was insubstantial in the contexts presented. I believe that those conclusions should as a general matter be regarded as prerequisites to any holding that laws such as those involved here, which serve a legitimate state interest but are said to have some impact on First Amendment activity, are invalid. Cf. United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672.

In NAACP v. State of Alabama ex rel. Patterson, supra, for instance, where the NAACP was ordered in accord with state law to disclose its membership lists, we outlined the issues as follows:

'We think that the production order, in the respects here drawn in question, must be regarded as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association. Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and **\*58** other manifestations of public, hostility. Under these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

'We turn to the final question whether Alabama has demonstrated an interest in obtaining the disclosures it seeks from petitioner which is sufficient to justify the deterrent effect which we have concluded these disclosures may well have on the free exercise**\*\*25** by petitioner's members of their constitutionally protected right of association. * * *

'* * * The exclusive purpose (of the state authorities) was to determine whether petitioner was conducting intrastate business in violation of the Alabama foreign corporation registration statute, and the membership lists were expected to help resolve this question. The issues in the litigation commenced by Alabama by its bill in equity were whether the character of petitioner and its activities in Alabama had been such as to make petitioner subject to the registration statute, and

whether the extent of petitioner's activities without qualifying suggested its permanent ouster from the State. Without intimating the slightest view upon the merits of these issues, we are unable to perceive that the disclosure of the names of petitioner's rank-and-file members has a substantial bearing on either of them. * * *' 357 U.S., at 462-464, 78 S.Ct., at 1172-1173.

**\*59** And in Bates v. City of Little Rock, supra, where an almost identical requirement was involved, we stated:

'On this record it sufficiently appears that compulsory disclosure of the membership lists of the local branches of the National Association for the Advancement of Colored People would work a significant interference with the freedom of association of their members. There was substantial uncontroverted evidence that public identification of persons in the community as members of the organizations had been followed by harassment and threats of bodily harm. There was also evidence that fear of community hostitlity and economic reprisals that would follow public disclosure of the membership lists had discouraged new members from joining the organizations and induced former members to withdraw. This repressive effect, while in part the result of private attitudes and pressures, was brought to bear only after the exercise of governmental power had threatened to force disclosure of the members' names. * * * Thus, the threat of substantial government encroachment upon important and traditional aspects of individual freedom is neither speculative nor remote.

'Decision in this case must finally turn, therefore, on whether the cities as instrumentalities of the State have demonstrated so cogent an interest in obtaining and making public the membership lists of these organizations as to justify the substantial abridgment of associational freedom which such disclosures will effect. * * * ln*

'In this record we can find no relevant correlation between the power of the municipalities to impose occupational license taxes and the compulsory disclosure and publication of the membership lists of the local branches of the National Association for the **\*60** Advancement of Colored People. * * *' 361 U.S., at 523-525, 80 S.Ct., at 417-418.[FN11]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

FN11. The NAACP cases, furthermore, held invalid only the application of the state laws in question to the parties involved. Here, however, Ohio is told, as I read the opinion of the Court and the concurring opinions, that it cannot in any circumstances validly enforce its ballot requirements.

Here, there certainly is no comparable showing that Ohio's ballot requirements have any substantial impact on the attempts of political dissidents to organize effectively. Such persons are entirely free to assemble, speak, write, and proselytize as they see fit. They are free either to attempt to modify the character of the established major parties or to go their own way and set up separate political organizations. And if they can timely demonstrate that they have substantial support within the State-according**26 to Ohio's reasonable standards for deciding that question-they may secure ballot position for the candidates they support. Ohio has restricted only their ability to secure ballot position without demonstrating that support. To me the conclusion that single disability in any way significantly impairs their First Amendment rights is sheer speculation. As my Brethern's surveys of ballot requirements in the various States suggest, the present two-party system in this country is the product of social and political forces rather than of legal restrictions on minority parties. This Court has been shown neither that in States with minimal ballot restrictions third parties have flourished, nor that in States with more difficult requirements they are moribund. Mere speculation ought not to suffice to strike down a State's duly enacted laws.

Nor, I think, can we with any confidence conclude that Ohio's interest in attempting to ensure that the will of the majority shall prevail is an insubstantial one. It requires more insensitivity to constitutional principles of federalism than I possess to tell Ohio that that interest is, according**61 to this Court's scale of values, somehow unworthy of implementation.FN12 I cannot conclude, therefore, that First Amendment principles call for the result reached today.

FN12. My Brother HARLAN suggests that Ohio's interest may be protected in 'less restrictive' ways. In light of the views I have stated above, I do not see why Ohio should be compelled to utilize one method for achieving its ends rather than another. In any event,

each of the methods mentioned by Mr. Justice HARLAN appears to me to entail consequences which arguably would frustrate other legitimate state interests. Nor do all of them serve as effectively to promote the interest in question here as does the statutory scheme the Ohio Legislature has in fact enacted. I do not think problems such as those raised in this case can be solved by means of facile and unelaborated suggestions of 'less restrictive alternatives'; issues of legislative policy are too complex for such easy answers to be satisfactory.

V.

It is thought by a great many people that the entire electoral college system of presidential selection set up by the Constitution is an anachronism in need of major overhaul.FN13 As a citizen, I happen to share that view. But this Court must follow the Constitution as it is written, and Art. II, s 1, vests in the States the broad discretion to select their presidential electors as they see fit. The method Ohio has chosen may be unwise as a matter of policy, but I cannot agree that it violates the Constitution.FN14

FN13. Similar suggestions were being made as early as 1804, at the time of the adoption of the Twelfth Amendment. See McPherson v. Blacker, 146 U.S. 1, at 33, 13 S.Ct. 3, at 10.

FN14. For the reasons stated in this opinion, and the further reasons stated in Part IV of the opinion of the Court, I agree with the Court's denial of equitable relief to the appellants in No. 544, the Socialist Labor Party case.

Mr. Justice WHITE, dissenting in No. 543 and concurring in No. 544.

I agree with much of what by Brother STEWART says in his dissenting opinion in No. 543. In my view, neither **62 the Due Process Clause nor the Equal Protection Clause of the Fourteenth Amendment prohibits Ohio from requiring that the appointment of presidential electors be carried out through the political party process. The Court does not hold that Ohio must accord ballot position to those who are unwilling to work through the framework of an established or nascent political party, nor do I understand appellants

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

to make this contention. In this connection, there is no suggestion in the majority opinion that Ohio merely by requiring potential candidates to participate in a primary, has acted unreasonably. Indeed, this requirement provides the opportunity for the presentation and winnowing out of candidates which is surely a legitimate objective of state policy. Nor is it held that Ohio's requirement,**27 pursuant to this objective, that parties must show their base of popular support by obtaining the signatures of 15% of Ohio's gubernatorial voters is itself unreasonable.

In the face of such requirements, which neither alone nor in combination are unconstitutional, I do not understand how the American Independent Party may be ordered on the ballot over the objections of the State. The Independent Party has not complied with the provision that it show a sufficient base of popular support in time for participation in a primary. Indeed, the Party made no effort whatsoever to comply with these provisions. It claims it secured the necessary number of signatures but admits it wholly ignored the requirement that the petitions be filed prior to the primary election date. Had it filed them, and been denied participation in the primary or the election for failure to meet some other requirement, the case would be very different. But it did not even commence judicial challenge of the signature requirement, not to mention gathering signatures, in time to participate in the primary. The Independent Party is in no position to complain that it would have been impossible*63 for its members to gather the necessary signatures-which they were in fact able to assemble subsequently-or that it might in its progress toward ballot position have encountered some later obstacle.

That other Ohio provisions related to later phases of the election process might have imposed unconstitutional barriers to ballot position is no reason to excuse the Independent Party from complying with those preconditions which the State may validly impose. Why a majority of the Court insists on holding the primary petition requirement impermissible, not on its own demerits, but because it appears in the statute books with more questionable provisions is the major mystery of the majority position. Neither the Independent nor the Socialist Labor Party is entitled to relief in this Court.

Mr. Chief Justice WARREN, dissenting.
We have had but seven days to consider the important constitutional questions presented by these cases. The

rationale of the opinion of the Court, based both on the Equal Protection Clause and the First Amendment guarantee of freedom of association, will apply to all elections, national, state, and local. Already, litigants from Alabama, California, Illinois, and Virginia have requested similar relief virtually on the eve of the 1968 presidential election. I think it fair to say that the ramifications of our decision today may be comparable to those of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), a case we deliberated for nearly a year.FN1 Appellants' belated requests for extraordinary relief have compelled all members of this Court to decide cases of this magnitude without the unhurried deliberation which is essential to the formulation of sound constitutional principles.

FN1. Baker was originally argued on April 19-20, 1961. On May 1, 1961, it was set for reargument and was reargued on October 9, 1961. Our decision was not announced until March 26, 1962, over 11 months after the original argument.

*64 I.

I cannot agree that the State of Ohio should be compelled to place the candidates of the American Independent Party on the ballot for the impending presidential election. Nor can I draw a distinction between this Party and the Socialist Labor Party. Both suits were filed in July of this year, and both were decided on August 29, 1968. The following week the American Independent Party petitioned the Circuit Justice for its Circuit for provisional relief, which was granted on September 10. The Socialist Labor Party sought similar relief only three days after the September 10 order was issued. Mr. Justice Stewart granted **28 provisional relief to one, but denied it to the other. No Ohio statutory deadline compelled that result, and presumably Ohio could have complied with an order granting the same relief to both Parties.FN2 Both parties should be treated alike; otherwise, we are bowing to a show of strength rather than applying constitutional principles.

FN2. Mr. Justice Stewart based his denial of the Socialist Labor Party's request for provisional relief upon the following considerations: 'the late date on which this motion was presented, the action already taken by the Ohio authorities, the relief already granted

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

the appellants by the district court, and the fact that the basic issues they present will be fully canvassed in the argument of the appeal in Williams v. Rhodes * * *.' He did not suggest that the State of Ohio made any re-presentations that it could not comply with an order granting the Socialist Labor Party the same relief already granted the American Independent Party.

I do not think any significance should be given to the fact that the interim relief granted by Mr. Justice Stewart made it physically possible to place the American Independent Party on the ballot. This relief, as explicitly recognized by Mr. Justice Stewart, was granted solely to allow Ohio to comply with all possible orders of this Court.

Appellants have invoked the equity jurisdiction of the federal courts. Placed in this context, the litigation before**65** us presents an issue not treated by the opinion of the Court: did the District Court abuse its discretion in denying the extraordinary equitable relief requested by appellants?[FN3] A review of the facts before the District Court convinces me that it did not, and therefore the emergency relief sought by appellants should be denied.

> FN3. This is the traditional standard for review of the denial of equitable relief. See, e.g., Brotherhood of Locomotive Engineers v. M.-K.-T. R. Co., 363 U.S. 528, 535, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960); United Fuel Gas Co. v. Public Serv. Comm'n, 278 U.S. 322, 326, 49 S.Ct. 157, 158, 73 L.Ed. 402 (1929).

The Socialist Labor Party has been an organized political party in Ohio since the end of the 19th century, and although it has not achieved ballot position since the enactment in 1948 of the laws it challenges,[FN4] not until July 2, 1968, did it press its claims for equitable relief. Similarly, the supporters of George C. Wallace did not institute their action until July 29, 1968, although early in 1967 Governor Wallace had expressed interest in the Presidency,[FN5] and, in the spring of that year, he voiced concern for the restrictive nature of Ohio's qualifying laws.[FN6]

> FN4. Appellants' Complaint in No. 544, pp.

1-2.

> FN5. New York Times, Jan. 26, 1967, p. 20, col. 3.

> FN6. Commencing in late April 1967, Governor Wallace began a four-day tour of selected northern States. At a press conference in Pittsburgh on April 27 he stated that he expected to run for President in all 50 States and that it might be necessary to institute suit in States where third parties had difficulty obtaining ballot position. Aides to the Governor mentioned California and Ohio as States in which difficulty might be encountered. New York Times, April 28, 1967, p. 28, col. 5.

Nevertheless, neither the American Independent Party nor the Socialist Labor Party made an effort to comply with Ohio's election laws. Nor has either timely invoked the jurisdiction of the courts. That both had the opportunity to do so cannot be denied. Because the **66** State of Ohio does not challenge the validity of the signatures gathered by the American Independent Party, a majority of this Court assumes they reflect the strength of that Party in Ohio. However, since the signatures were not submitted to Ohio in timely compliance with the State's election laws, they have never been verified; in fact, appellants in No. 543 did not seek to file their signatures **29** until over five months after the statutory filing date.[FN7]

> FN7. The Ohio election laws require that petitions for a position on the Ohio ballot be filed 90 days before the state primary. Ohio Rev.Code ss 3513.256-3513.262, 3517.01 (1960 Repl. Vol.). Appellants in No. 543 concede in their brief that their deadline was February 7, 1968, yet they apparently did not attempt to file their petitions until late in July. Appellants' Brief 86.

Despite these delays in instituting suit and the failure of either party to make an effort to comply with any of Ohio's election laws, the District Court ordered Ohio to provide for write-in voting. This relief guaranteed that each Ohio voter would have the right to vote for the candidate of his choice, including the candidates of these two Parties. At worst, therefore, denying appellants a position on the ballot for the 1968 election

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 S.Ct. 5                                                                                   Page 23

393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

prevented their candidates from competing on a completely equal basis with the candidates of the two major parties.

The imminence of the election, the Parties' failure to comply with Ohio law and the District Court's grant of partial relief must be considered in conjunction with the need to promote orderly federalstate relationships. Our reports are replete with decisions concerning the nature of the relief to be afforded in these sensitive areas, yet the opinion of the Court does not address itself to the principles of these cases. In the analogous area of legislative apportionment, we have often tolerated a temporary dilution of voting rights to protect the legitimate interests of the States in fashioning their own election**67** laws, see, e.g., Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 739, 84 S.Ct. 1459, 1475, 12 L.Ed.2d 632 (1964); cf. Davis v. Mann, 377 U.S. 678, 692-693, 84 S.Ct. 1441, 1448-1449, 12 L.Ed.2d 609 (1964); and in the area of school desegregation we have demonstrated even greater deference to the States. On occasion, we have even counseled abstention where First Amendment rights have been allegedly infringed by state legislation. See Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959).

For example, in WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964), holding unconstitutional the apportionment of New York's Legislature, we stated that on remand the District Court 'acting under equitable principles, must now determine whether, because of the imminence of that election and in order to give the New York Legislature an opportunity to fashion a constitutionally valid legislative apportionment plan, it would be desirable to permit the 1964 election of legislators to be conducted pursuant to the existing (unconstitutional) provisions, or whether under the circumstances the effectuation of appellants' right to a properly weighted voice in the election of state legislators should not be delayed beyond the 1964 election.'[FN8] Id., at 655, 84 S.Ct., at 1429. (Emphasis added.)

FN8. The prior history of Preisler v. Secretary of State, 279 F.Supp. 952 (D.C.W.D.Mo.1967), probable jurisdiction noted sub nom. Kirkpatrick v. Preisler, 390 U.S. 939, 88 S.Ct. 1053, 19 L.Ed.2d 1129 (1968), aptly demonstrates the deference we have paid legislative action in this area. On

January 4, 1965, the United States District Court for the Western District of Missouri held that the 1961 Missouri Congressional Redistricting Act was unconstitutional, but it refused to grant any additional relief 'until the Legislature of the State of Missouri has once more had an opportunity to deal with the problem * * *.' Preisler v. Secretary of State, 238 F.Supp. 187, 191 (D.C.W.D.Mo.1965). The Missouri General Assembly then enacted the 1965 Congressional Redistricting Act. On August 5, 1966, the District Court held this new plan unconstitutional, but it nevertheless permitted the 1966 Missouri congressional elections to be conducted under the void act. Preisler v. Secretary of State, 257 F.Supp. 953 (D.C.W.D.Mo.1966). We affirmed on January 9, 1967. sub nom. Kirkpatrick v. Preisler, 385 U.S. 450, 87 S.Ct. 613, 17 L.Ed.2d 511. In 1967, the Missouri General Assembly made still another attempt to enact a constitutional plan, but on December 29, 1967, this plan was also invalidated. 279 F.Supp. 952.

**30 *68** Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), decided only last Term, provides an even more striking example of our concern for the need to refrain from usurping the authority of the States in areas traditionally entrusted to them. Green reached this Court 13 years after Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1965), required that schools be established free of racial discrimination with 'all deliberate speed.' Although we held in Green that the particular 'freedom-of-choice' plan adopted by the school board did not pass constitutional muster, the case was remanded to the District Court so that the school board could once again attempt to formulate a constitutional plan.

The result achieved here is not compatible with recognized equitable principles, nor is it compatible with our traditional concern, manifested in both the reapportionment and school desegregation cases, for preserving the properly exercised powers of the States in our federal system. Moreover, in none of these analogous areas did we deal with an express constitutional delegation of power to the States. That delegation is unequivocal here. U.S.Const., Art. II, s 1.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
**(Cite as: 393 U.S. 23, 89 S.Ct. 5)**

The net result of the Court's action is that this Court is writing a new presidential election law for the State of Ohio without giving the Legislature or the courts of that State an opportunity to appraise their statutes in litigation[FN9] or to eliminate any constitutional defects **\*69** prior to a decision by this Court. Given both the lateness of the hour and the legitimate demands of federalism, the District Court did not abuse its discretion in denying the extraordinary relief appellants demanded.

> FN9. Cf. Scott v. Germano, 381 U.S. 407, 409, 85 S.Ct. 1525, 1527, 14 L.Ed.2d 477 (1965), in which we stated that the 'power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged.'

## II.

Although I believe that the court below properly exercised its discretionary equitable powers, this litigation involves far more than a resolution of whether either Party is entitled to ballot position for the 1968 election. Appellants' request for declaratory relief, challenging the constitutionality of Ohio's system of conducting presidential elections, has raised a question which may be fairly classified as one of first impression:[FN10] to what extent may a State, consistent with equal protection and the First Amendment guarantee of freedom of association, impose restrictions upon a candidate's desire to be placed upon the ballot? As I have already stated, the principles which would of necessity evolve from an answer to this question could not be confined either to the State of Ohio or to presidential elections.

> FN10. MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3 (1948), did contest the constitutionality of Illinois' system of nominating candidates representative of new political parties. However, MacDougall was decided during the reign of Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and its progeny have substantially modified the

constitutional matrix in this area. Fortson v. Morris, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966), although concerning the constitutionality of state election laws, involved consideration of a State's post-election procedure, not state requirements for initial ballot qualification.

Both the opinion of this Court and that of the District Court leave unresolved what restrictions, if any, a State can impose. Although both opinions treat **\*\*31** the Ohio statutes as a 'package,' giving neither Ohio nor the courts any guidance, each contains intimations that a State can by reasonable regulation condition ballot position**\*70** upon at least three considerations-a substantial showing of voter interest in the candidate seeking a place on the ballot, a requirement that this interest be evidenced sometime prior to the election, and a party structure demonstrating some degree of political organization. With each of these propositions I can agree. I do not believe, however, as does Mr. Justice STEWART, that the Equal Protection Clause has only attenuated applicability to the system by which a State seeks to control the selection of presidential electors.

Whatever may be the applicable constitutional principles, appellants and the State of Ohio are entitled to know whether any of the various provisions attacked in this litigation do comport with constitutional standards. As demonstrated by Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967),[FN11] this matter should be first resolved by the court below. Given the magnitude of the questions presented and the need for unhurried deliberation, I would dispose of appellants' request for declaratory relief in a manner consistent with Zwickler by a remand to the District Court for a clearer determination of the serious constitutional questions raised in these cases.

> FN11. 'We hold that a federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction.' 389 U.S., at 254, 88 S.Ct., at 399.

I must therefore dissent from the failure of the Court's opinion to explore or dispose adequately of the declaratory judgment actions, as well as from the grant of extraordinary relief in No. 543.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

89 S.Ct. 5                                                                    Page 25
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236
 **(Cite as: 393 U.S. 23, 89 S.Ct. 5)**




U.S.Ohio 1968.
Williams v. Rhodes
393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.